# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

NATIONAL ELECTRONIC ATTACHMENT, INC., D/B/A VYNE DENTAL,

                    *Plaintiff*,

          v.

HENRY SCHEIN ONE, LLC,

                    *Defendant*.

Case No. 1:25-cv-03246-MJM

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER
## AND PRELIMINARY INJUNCTION

GOODELL, DEVRIES, LEECH & DANN, LLP
One South Street, 20th Floor
Baltimore, MD 21202
(410) 783-4026

HOLWELL SHUSTER & GOLDBERG LLP
425 Lexington Avenue
New York, NY 10017
(646) 837-5151

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

STATEMENT OF FACTS .................................................................................................... 2

    A.    Vyne, Dentrix, and Historical Use of the Printer Driver ................................. 2

    B.    HS One Disseminates False Information About Vyne and Targets Its Printer-Driver
        Functionality ..................................................................................................... 4

    C.    Vyne Seeks to Find a Negotiated Solution through API ................................. 6

    D.    HS One Disables Vyne's Software .................................................................. 10

ARGUMENT ....................................................................................................................... 11

I.    Vyne Is Likely to Succeed on Its Claims Against HS One............................... 12

    A.    HS One's Conduct Violates Maryland Unfair Competition Law ............................. 13

    i.    HS One's Conduct Is Patently Unfair ............................................................. 14

    ii.    HS One's Conduct Also Violates Federal Law ............................................... 16

    B.    HS One Is Tortiously Interfering with Vyne's Business Relations ........................... 18

II.    Vyne Will Suffer Irreparable Harm Absent a Temporary Restraining Order and
    Injunction .......................................................................................................... 21

III.    The Equities Favor Vyne, and an Injunction Is in the Public Interest .............................. 23

CONCLUSION.................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Air Evac EMS, Inc. v. McVey*,
37 F.4th 89 (4th Cir. 2022) ................................................................. 21

*Am. Hospital Supply Corp. v. Hospital Prods. Ltd.*,
780 F.2d 589 (7th Cir. 1986) ............................................................... 23

*Amoco Prod. Co. v. Gambell*,
480 U.S. 531 (1987) ............................................................................ 23

*Balt. Bedding Corp. v. Moses*,
182 Md. 229 (1943) ............................................................................ 14

*Baron Fin. Corp. v. Natanzon*,
509 F. Supp. 2d 501 (D. Md. 2007) .................................................... 19

*Blackwelder Furniture Co. v. Seilig Mfg. Co.*,
550 F.2d 189 (4th Cir. 1977) ........................................................ 12, 25

*Brightview Grp., LP v. Teeters*,
441 F. Supp. 3d 115 (D. Md. 2020) ......................................... 12, 21, 24

*Clear One Advantage, LLC v. Kersen*,
756 F. Supp. 3d 30 (D. Md. 2024) ................................................ 15, 21

*Delmarva Sash & Door Co. of Md. v. Andersen Windows, Inc.*,
218 F. Supp. 2d 729 (D. Md. 2002) .................................................... 14

*Di Biase v. SPX Corp.*,
872 F.3d 224 (4th Cir. 2017) .............................................................. 12

*Foltz v. U.S. News & World Rep.*,
760 F.2d 1300 (D.C. Cir. 1985) .......................................................... 24

*Fowler v. Printers II, Inc.*,
89 Md. App. 448 (1991) ...................................................................... 18

*GAI Audio of N.Y., Inc. v. Columbia Broad. Sys., Inc.*,
27 Md. App. 172 (1975) ................................................................ 12, 16

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*,
174 F.3d 411 (4th Cir. 1999) .............................................................. 11

*K&K Mgmt., Inc. v. Lee*,
   316 Md. 137 (1989) ........................................................................................ 19

*League of Women Voters of N.C. v. North Carolina*,
   769 F.3d 224 (4th Cir. 2014) ......................................................................... 25

*Ledo Pizza Sys., Inc. v. Singh*,
   983 F. Supp. 2d 632 (D. Md. 2013) ............................................................... 23

*Maages Auditorium v. Prince George's Cnty.*,
   4 F. Supp. 3d 752 (D. Md. 2014) ................................................................... 11

*Macklin v. Robert Logan Assocs.*,
   334 Md. 287 (1994) ........................................................................................ 19

*Morris v. Shellpoint Mortg. Servicing*,
   2019 WL 7565456, at *1 (D. Md. May 3, 2019) ........................................... 21

*Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*,
   22 F.3d 546 (4th Cir. 1994) ........................................................................... 21

*Paccar Inc. v. Elliot Wilson Cap. Trucks LLC*,
   905 F. Supp. 2d 675 (D. Md. 2012) ............................................................... 14

*Pashby v. Delia*,
   709 F.3d 307 (4th Cir. 2013) ......................................................................... 25

*Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*,
   131 F.4th 205 (4th Cir. 2025) .................................................................. passim

*Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*,
   2024 WL 3569493 (D. Md. July 29, 2024) .......................................... 16, 20, 24

*Scotts Co. v. United Indus. Corp.*,
   315 F.3d 264 (4th Cir. 2002) ......................................................................... 23

*Sun Dun, Inc. of Wash. v. Coca-Cola Co.*,
   740 F. Supp. 381 (D. Md. 1990) .................................................................... 15

*Trimed, Inc. v. Sherwood Med. Co.*,
   977 F.2d 885 (4th Cir. 1992) ..................................................................... 14, 19

*United States v. Westvaco Corp.*,
   2015 WL 10323214 (D. Md. Feb. 26, 2015) ................................................. 24

*Variable Annuity Life Ins. v. Coreth*,
   535 F. Supp. 3d 488 (E.D. Va. 2021) ........................................................................ 22

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008) ................................................ 23

**Statutes**

42 U.S.C. § 300jj-52 ........................................................................................................ 16

**Regulations & Regulatory Materials**

21st Century Cures Act: Interoperability, Information Blocking, and the ONC Health IT
   Certification Program, 85 Fed. Reg. 25642, 25643 (May 1, 2020) .......................... 16

45 C.F.R. § 171.102 ........................................................................................................ 17

**Other Authorities**

Restatement (Third) of Unfair Competition (A.L.I. 1995) ........................................... 14

## INTRODUCTION

Plaintiff National Electronic Attachment, Inc., doing business as Vyne Dental ("Vyne") moves for a temporary restraining order and preliminary injunction to stop efforts by defendant Henry Schein One, Inc. ("HS One") to throttle Vyne's business by unlawful means.

Plaintiff Vyne offers a suite of software solutions to help dental practices run their businesses, including a program known as Vyne Trellis, which provides what the dental industry calls "revenue cycle management" ("RCM") services. Vyne Trellis facilitates the submission of claims to insurers, provides clearinghouse services, and supports data exchange transactions. Defendant HS One offers a software program known as Dentrix, which dental practices use to store patient health information. For many years, Vyne and HS One coexisted, and dental practices were able to use both software platforms by transferring customer information from Dentrix's platform to Vyne Trellis.

Earlier this year, however, HS One began a campaign targeting Vyne's customers with scare tactics and falsehoods to shift those customers to a competing product aligned with HS One. Last week, HS One escalated this campaign by distributing software directly to mutual customers of Vyne and HS One that, without authorization or notice, trawls the computer systems of HS One's customers like a computer virus, actively targeting and disabling Vyne's software and leaving Vyne unable to provide services to its customers. Even since Vyne initiated this lawsuit two days ago, HS One has continued to interfere with Vyne's customers' use of its services.

Vyne now seeks temporary and preliminary injunctive relief to bar HS One from interfering with Vyne's relations with its customers, including specifically to bar it from deploying its disruptive new software to its customers or otherwise interfering with the transfer of patient data from HS One's software to Vyne's software. Federal law prohibits efforts to impair the transfer of patient data. And, as this Court held in a case affirmed by the Fourth Circuit involving conduct

1

that is far less offensive, misconduct like HS One's violates state and federal law and should be preliminarily enjoined. The Court should enter a TRO and then a preliminary injunction pending disposition of the merits.

<strong>STATEMENT OF FACTS</strong>

The broader context of this action is set forth in Vyne's Complaint, *see* Dkt. 1 ("Compl."), ¶¶ 18–78.

### A.  Vyne, Dentrix, and Historical Use of the Printer Driver

Vyne has offered clearinghouse and RCM services for over 20 years. *Id.* ¶ 6; Exhibit 1, Declaration of Stephen Roberts, ¶ 3. Today, it offers those services through a software program known as Vyne Trellis, which helps dentists submit dental claims to insurers for payment and provides related clearinghouse services and data exchange transactions standardized under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). Ex. 1 ¶¶ 3–4. Healthcare providers rely on clearinghouse and RCM services like Vyne Trellis to verify patient eligibility for benefits in a health plan, submit medical claims to insurers, and receive electronic remittance advice from insurers. *Id.* ¶ 4. The use of such services is standard in the healthcare industry and simplifies the administrative burdens associated with claims management, allowing providers to focus on delivering healthcare to patients. *Id.*

Defendant HS One, a subsidiary of Henry Schein Inc., offers a dental practice management software program known as Dentrix. *Id.* ¶ 7. Dental practices use Dentrix (or competing products) to store their patients' health information. *Id.* Under federal and state law, patients' electronic health information does not belong to HS One simply because it is stored on Dentrix—the information and patient records belong to the dental practices that generate them, subject to the authority that HIPAA grants to patients to control the privacy and transfer of their own health information.

2

To use Vyne Trellis, dental practices must transmit electronic health information—including their patients' care and insurance information—to Vyne. Exhibit 2, Declaration of James Nix, ¶ 3–4. Many dental offices store that information on third-party dental practice management software like Dentrix. *Id*. ¶ 3. To facilitate the transfer of data from platforms such as Dentrix into Vyne Trellis, Vyne provides its customers with a printer driver that enables dental offices to effectively "print" electronic health information to an electronic document, which is then transmitted to Vyne, akin to a "print to PDF" function in Microsoft Word. *Id.* ¶¶ 5–6. The printer driver is a technologically simple, efficient, and secure means for dental practices to move data from one program to another, and Vyne and its customers have used this function for over 20 years without incident, including with at least 90 other practice management systems. *Id.* ¶¶ 5–10. Indeed, HS One uses this function itself for claims integration within "EDS," HS One's own clearinghouse and RCM solution, when integrating with third-party practice management systems. *Id.* ¶ 6.

This information transfer occurs pursuant to contracts between Vyne and its customers. Ex. 1 ¶¶ 8–10. Under those agreements, customers expressly authorize Vyne and grant Vyne full agency on their behalf to request, access, use, and export patient information, billing records, scheduling data, and other data maintained in third-party systems (including dental practice management systems) to facilitate Vyne's provision of services. *Id.* Vyne's customers represent that they have all the necessary rights, consents, and authorities to grant Vyne the right to access and use their data, and they acknowledge that Vyne's access to their data does not violate any agreements they have with third-party vendors or any applicable law or regulation. *Id.* Vyne, in turn, agrees not to use or disclose protected health information other than as permitted or required by law, and to use appropriate safeguards to prevent the unlawful use or disclosure of protected

3

health information.  *Id.*  Vyne has protected its customers' health information, consistent with its contractual and legal obligations under federal and state law, without incident.  *Id.* ¶ 10.

**B.    HS One Disseminates False Information About Vyne and Targets Its Printer-Driver Functionality**

Beginning in early March 2025, HS One started informing dental practices and other healthcare providers that, because of purported "security issues," HS One would be releasing updates to Dentrix that were intentionally designed to render Dentrix incompatible with Vyne.  Ex. 1 ¶¶ 14–15.  Vyne promptly responded with a letter to its customers, informing them of HS One's threat, refuting its baseless allegations of "security issues," and reaffirming that Vyne is a "SOC II, HiTrust-certified HIPAA Clearinghouse with a strong focus on quality, security, and performance."  *Id.* ¶ 16 and ex. A.

One month later, on or about April 17, 2025, HS One took its first step toward severing its own customers' ability to share patient data with Vyne by targeting the printer driver function that had long enabled Vyne customers to import data into Vyne Trellis.  Ex. 2 ¶ 12.  HS One released a beta version of Dentrix on a public server that was programmed to identify Vyne's printer driver and brand it on a list of supposedly "hostile printers," and it deployed that hostile printer list to a small number of its customers.  *Id.*  When those customers attempted to print data to Vyne using the new version of Dentrix, the printed document appeared blank.  *Id.*  Customers also reported receiving a pop-up warning them that Vyne's printer driver was flagged as "[a]ctivity detected from an unauthorized third-party."  *Id.*

After reviewing the release notes for the new Dentrix version, Vyne discovered that HS One had installed a new data-gathering tool called "EventBridge" on customers' Dentrix platforms.  *Id.* ¶¶ 13–14.  Vyne learned that EventBridge worked by surreptitiously monitoring Vyne's customers' Dentrix platforms and exporting information relating to the customer's

installed printer drivers and registry settings, allowing Dentrix to specifically identify which of its customers were also Vyne customers, and to disable those customers' access to Vyne's printer driver. *Id.* EventBridge also harvested data from Dentrix users, including a list of all programs that Dentrix users had installed on their systems, apparently far in excess of what Dentrix's users agreed in the End User License Agreement. *Id.*

The list of "hostile printers" included Vyne and other RCM and clearinghouse providers, but tellingly, did *not* include printer drivers for services favored by HS One even though, from a security point of view, they are indistinguishable.

On or around April 25, 2025, HS One sent a mass advertising email to Vyne's customers with an image titled, "Vyne Disconnects Imaging & Claims." Ex. 1 ¶ 18 and ex. B. In its email, HS One warned: "If you're using Vyne, you're manually attaching images, typing in CDT codes, and crossing your fingers. Sound familiar? That extra effort often leads to costly mistakes, claim rejections, and payment delays." *Id.* HS One stated that: "Disconnected Tools Mean Denied Claims. Vyne Doesn't Fix That – Dentrix Does." *Id.* HS One proceeded to list several purported reasons why "Dentrix beats Vyne," claiming that its service results in "fewer errors," "no missed documentation," "clean claims on first submission," and allows dental providers to "know what's accepted and what's not, instantly." *Id.* Finally, HS One offered a "limited time" opportunity for dental providers to "upgrade from Vyne to the Dentrix Eligibility & Claims Suite for just $99/month," claiming that providers would "stop losing time and money on disconnected processes." *Id.* The statements in HS One's email are falsehoods that misrepresent the functionality and integrity of Vyne's services. Ex. 1 ¶¶ 18–25.

Shortly after disseminating its April 25, 2025, email, HS One escalated its campaign against Vyne by falsely informing Vyne's customers that Vyne Trellis had supposedly been

flagged for "security issues" and that HS One would therefore be unable to integrate its Dentrix platform with Vyne. *Id.* ¶ 26. Customers reported receiving mass communications and aggressive outreach from HS One, with HS One claiming that Vyne is not authorized to access HS One's system. *Id.* One reported that HS One was actively calling offices and using blatant scare tactics, including telling practices they will be blocked from all eClaim services and that their practice will "suffer" if they continue to use Vyne. *Id.* ¶¶ 26–28. The same customer stated that several colleagues had received similar pressure from Dentrix sales representatives and have felt harassed and misled by their approach. *Id.*

In an email to Vyne, another customer stated: "This situation feels extremely sketchy. It seems like Dentrix is trying to trap us – and other practices – into working exclusively with them and purchasing additional features. We already tried Dentrix Hub and Engage for a year, and it was absolutely horrible." *Id.* ¶ 30. The customer wrote that her dental practice is now "being forced to pay even more and possibly work with multiple vendors just to replace what Vyne currently handles—and handles very well." *Id.*

Likewise, numerous other customers expressed outrage at HS One's outreach. *Id.* ¶ 31. Among other things, customers described HS One's communications as "grimy sales tactic[s]," lamented that they "[h]ate Dentrix," stated that HS One is "making it more difficult for us to use [V]yne for claims," and warned that HS One was using aggressive scare tactics. *Id.* During this time, Vyne received an influx of customer inquiries expressing concern regarding HS One's communications and requesting assistance as to how to continue using Vyne's Trellis platform. *Id.* ¶¶ 26–31.

### C.    Vyne Seeks to Find a Negotiated Solution through API

Although Vyne's printer-driver functionality provides seamless integration with dental practices using Dentrix, alternatives exist. These include Application Programming Interfaces

("API"), a form of software integration that operates as a boundary layer between two systems, allowing them to communicate and process requests. *Id.* ¶ 32. HS One offers access to electronic health information through API connections to Dentrix—and, importantly, charges royalties to use them.

In March 2025, in an effort to find peace, Vyne CEO Stephen Roberts, reached out to HS One to explore possible API integration between Dentrix and Vyne. *Id.* ¶¶ 32–33. Vyne believed that HS One's statements to Vyne users were based on HS One's desire to extract royalties through APIs.

Progress in these negotiations was curiously slow. Between March and May, HS One was puzzlingly unable to confirm that its existing APIs supported the transmission of the data required for claims submission. *Id.* ¶¶ 34–35. In late May, Vyne and HS One met to discuss an API solution, and HS One eventually proposed its "Dentrix Developer Program" ("DDP") as the path forward—but then informed Vyne that the wrong representatives were in the meeting and that a later meeting would have to take place to discuss DDP. *Id.* When HS One finally sent a draft "Henry Schein Developer Program Agreement" to Vyne, HS One proposed draconian conditions that it knew Vyne could never accept. *Id.* ¶ 36. These included terms that would immediately prohibit Vyne from using the printer driver while offering no API or comparable functionality that could replace it, and proscriptions on Vyne disclosing data received from Dentrix to any third party—restrictions that would, in effect, prevent Vyne from filing insurance claims using Dentrix data, which is the core function of Vyne's product. *See id.* ¶ 36.

Vyne pushed back on HS One's proposed terms, seeking to find a workable arrangement. *Id.* ¶¶ 36–37. And it observed that HS One's proposed agreement "appear[ed] to be a violation of the [21st Century] Cures Act [of 2016, 42 U.S.C. § 300jj-52,] Final Rule, issued by the Office of

the National Coordinator for Health Information Technology (ONC) in 2020." *Id.* ¶ 37.  HS One and Vyne's representatives met in early June, and Vyne proposed an interim solution that Vyne would join HS One's DDP and pay the required fees but would be permitted to use the printer driver integration as a workaround until the necessary APIs could be developed.  *Id.* ¶ 39.  HS One's CEO, Brian Weatherly, appeared to support Vyne's proposal, writing after the meeting that "[i]t will be great to get this done."  *Id.*  This all gave the impression that HS One and Vyne were nearing agreement—but HS One later backtracked and rejected these terms.  *See id.* ¶¶ 39–40.

Over the next two weeks, Vyne continued to outline its concerns that HS One's proposed terms would violate the Cures Act and prevent Vyne's customers from transferring necessary data from Dentrix to Vyne Trellis or transmitting that data on to insurance providers.  HS One continued to insist on its terms and stall.  On July 25, 2025, Vyne's President James Grover wrote to Weatherly stating that, since several weeks had passed without a material response from HS One, Vyne would consider negotiations concluded absent a response by July 28, 2025.  *Id.* ¶¶ 41–42.

That day, HS One's general counsel sent Vyne an updated draft of the DDP agreement proposing the same unworkable terms, accompanied by a demand for an immediate $2,000,000 payment for "Prior Use Fees."  *Id.* ¶¶ 43–44; *see also* Ex. 1 at ex. G, Section 3.4.  In the same email, HS One suddenly informed Vyne that it perceived Vyne's use of this printer driver as "hacking" that has "caused HS One damages, compromises the security and integrity of [HS One's] platform, and violates laws."  *Id.* ¶ 43 and ex. G, p. 2.

At this point, Vyne learned that HS One was informing Dentrix customers that, beginning August 26, 2025, HS One would take steps to completely block Vyne's printer driver functionality and prevent the sharing of electronic health information with Vyne Trellis.  Ex. 1 ¶ 45.  As it turned out, while Vyne was negotiating with HS One in good faith to reach an agreement, HS One was

slow-rolling negotiations while executing its plan to block Vyne from receiving necessary health information while promoting a competing claims submission product.

On August 22, 2025, HS One's CEO reached out directly to Vyne's, proposing "an opportunity to create a new integration with Vyne on claims, attachments, and related clearinghouse services" through a new API that would be developed, subject to a "commercially reasonable" fee arrangement. *Id.* ¶ 46. Vyne continued to engage with this proposal. But just days later, on August 26, 2025, and in the midst of negotiations, Vyne received a letter from outside litigation counsel retained by HS One, suggesting that HS One intended to sue Vyne for "multiple related common law and statutory claims," all based on Vyne's efforts to allow its customers the same service that it had been providing, with HS One's full knowledge, for decades—which HS One's litigator again called "hacking." *Id.* ¶ 47 and ex. I.

HS One did not, and has not since, provided any evidence that Vyne's printer driver compromises the security or integrity of Dentrix or that HS One has a protectable intellectual property interest in its customer's electronic health information. HS One has been aware of Vyne's use of the printer-driver functionality as a means to transmit electronic health information from Dentrix to Vyne *for over 20 years*—at least since 2003. Ex. 1 ¶ 13. HS One has never before raised security or technical concerns. *Id.*

And HS One's claims misrepresent how Vyne's printer driver operates. Ex. 2 ¶¶ 8–9. When a customer transfers their data to Vyne using the printer driver, none of HS One's confidential or proprietary information is submitted to Vyne; the printer driver simply allows customers to capture their patients' electronic health information from Dentrix and deliver it to Vyne. *Id.* Vyne's printer driver has no "Read" or "Write" access to HS One's databases, meaning that the printer driver does not allow Vyne to modify or view any aspects of the Dentrix platform.

9

*Id.* There is nothing insecure about it. Again, HS One itself uses a similar printer-driver process for its own programs—including its competing clearinghouse and RCM solution EDS. *Id.* ¶ 6.

### D.    HS One Disables Vyne's Software

On September 23, 2025, HS One escalated its efforts to throttle Vyne's business even further, resorting to deploying what can only be described as a virus on the computers of its own customers to remotely disable Vyne software functionality completely, including non-claims and software update functions that HS One has never objected to—and indeed any software (no matter what it does) that bears Vyne's digital certificate. Ex. 2 ¶ 16.

That day, HS One distributed a Dentrix update to customers containing an automated security scanner that specifically targets and disables Vyne software services (and no other). *Id.* The scanner runs continuously every 10 minutes, automatically stopping any Windows services signed with Vyne's digital certificate and preventing them from restarting, even on a reboot of the system. *Id.* It functionally disables any Vyne Dental software installed on the computer systems of the affected practices. *Id.* As far as Vyne is aware, the update has already been deployed to hundreds of mutual customers of Vyne and HS One, including at least seven dental practices in Maryland that were completely blocked from using Vyne's software. *Id.* To Vyne's knowledge, HS One provided no notice to the affected practices that it would use Dentrix to deploy a virus that would disable a competitor's software, nor does Dentrix's security scanner inform users or offer an opt-out when it disables Vyne's programs. *Id.* ¶ 18. Instead, HS One's update carries out intentional competitive blocking of Vyne's software. *Id.*

Vyne has been forced to take action to restore Vyne functionality for affected users, including, for some customers, manual intervention to enable them to continue to submit insurance claims. *Id.* ¶ 19. Still, many Vyne customers have been unable to submit insurance claims using the print driver or carry out other RCM services with Vyne software, and dozens of Vyne

customers have cancelled their service agreements with Vyne, specifically citing HS One's conduct as the reason for their cancellations. *Id.*; Ex. 1 ¶¶ 54–56.

In the meantime, HS One has continued to spread false and misleading information regarding Vyne Trellis. On September 23, 2025, for example, an HS One employee wrote to a Vyne customer that HS One was offering a "new unlimited eClaims bundle for Dentrix customers" who were "adversely affected" by a nonexistent Vyne "security breach." Ex. 1 ¶ 50. As HS One is fully aware, there have been no such "security breaches." And even since the filing of this action on September 30, 2025, HS One has continued to interfere with Vyne's products.

Vyne now seeks injunctive relief to stop HS One's unlawful tactics, including its outrageous efforts to misuse Dentrix to disable Vyne's software on its own customers' computers.

## ARGUMENT

A temporary restraining order is intended to "preserve the status quo" until "a preliminary injunction hearing can be held." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 422 (4th Cir. 1999). The same standards govern the grant of a TRO on notice and a preliminary injunction. *See Maages Auditorium v. Prince George's Cnty.,* 4 F. Supp. 3d 752, 760 n.1 (D. Md. 2014), *aff'd*, 681 F. App'x 256 (4th Cir. 2017).

To obtain a TRO or a preliminary injunction, the movant must demonstrate: "(1) that the movant is likely to succeed on the merits, (2) that the movant will face irreparable harm in the absence of preliminary relief, (3) that the balance of equities favors preliminary relief, and (4) that injunctive relief is in the public interest." *Brightview Grp., LP v. Teeters*, 441 F. Supp. 3d 115, 128 (D. Md. 2020); *accord Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189, 193 (4th Cir. 1977).

These factors are met, and the Court should enter a TRO and then a preliminary injunction.

I.    **Vyne Is Likely to Succeed on Its Claims Against HS One**

To begin, Vyne is "likely to succeed at trial" on at least its unfair competition and tortious interference claims. *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017).[1]  Federal courts in Maryland may issue temporary restraints and preliminary injunctions to prohibit a defendant's tortious conduct, including unfair competition. *See Brightview Grp.*, 441 F. Supp. 3d at 129 (citing *GAI Audio of N.Y., Inc. v. Columbia Broad. Sys., Inc.*, 27 Md. App. 172, 192–93 (1975)).  And this Court should do so here.

The Fourth Circuit's recent decision in *Real Time* is instructive, and all but controlling. *Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*, 131 F.4th 205 (4th Cir. 2025).  Like this case, *Real Time* concerned a dispute between two healthcare software providers. *Id.* at 214.  The plaintiff there, Real Time, provided analytics services to skilled nursing facilities by analyzing their patients' health records. *Id.*  To do this, Real Time needed to access electronic health information that the facilities stored on a medical records system offered by the defendant, PointClickCare. *Id.* at 213–14.  For years, as it did with many other customers, Real Time used bots to download patient information from PointClickCare's program and upload the information to Real Time's. *Id.* at 214–15.  But when PointClickCare decided to develop an analytics program that would compete with Real Time, it began making unsubstantiated claims that Real Time's use of bots caused "incidents and issues" for PointClickCare's software systems. *Id.* at 215–16.

Then, without warning, PointClickCare developed a CAPTCHA system designed to lock out Real Time's bots. *Id.* at 216–18.  When Real Time adapted, PointClickCare rolled out "indecipherable CAPTCHA images," *i.e.*, bot detection tests that even a human could not solve

---

[1] Vyne has advanced other claims, including for violation of the Computer Fraud and Abuse Act, the Lanham Act, and defamation law, *see* Compl. ¶¶ 79–89, 111–17, and will develop those claims in future briefing.

and that, when failed, would block a user from accessing PointClickCare's program indefinitely. *Id.* at 217–18. PointClickCare used this tactic to block Real Time from accessing data from over 700 facilities. *Id.* At the same time, PointClickCare, like HS One, led Real Time to believe that the parties were in fruitful negotiations regarding a potential API-based workaround to the bots PointClickCare claimed were causing so much trouble—only to break off negotiations with Real Time without warning. *Id.* at 218–20.

Real Time sued, alleging that PointClickCare's conduct constituted, among other things, unfair competition and tortious interference with business relations under Maryland law. *Id.* at 224. When, mid-litigation, PointClickCare restarted its efforts to lock Real Time out of its systems with indecipherable CAPTCHA images, Real Time moved for a preliminary injunction. *Id.* The District Court (Xinis, J.) issued that preliminary injunction, finding that "PointClickCare sought to leverage its control over its EHR system to harm Real Time's business, and that its cited reasons for its actions (security and system performance) were a cover for its true motivations (hurting a competitor)." *Id.* at 224, 238. The Fourth Circuit affirmed. *Id.* at 239–241.

*Real Time* would be on all fours if HS One had stopped its misconduct at blocking Vyne's printer driver. But HS One's actions are much worse. It has not only impeded information sharing, like PointClickShare did, but has reached into its own customers' computers to push software that disables Vyne's own programs. As *Real Time* shows, that is tortious, and the Court should issue a temporary restraint and preliminary injunction to stop it and preserve the status quo pending a determination of the merits.

### A.  HS One's Conduct Violates Maryland Unfair Competition Law

Vyne will prevail on its claim that HS One's conduct constitutes unfair competition under Maryland law. Unfair competition "is defined, generally, as 'damaging or jeopardizing another's business by fraud, deceit, trickery or unfair methods of any sort,' and must be evaluated case-by-

case." *Real Time*, 131 F.4th at 225 (quoting *Balt. Bedding Corp. v. Moses*, 182 Md. 229, 236–37 (1943)).  The Supreme Court of Maryland has "preserved a high degree of flexibility in the law of unfair competition." *Id.* (quoting *Delmarva Sash & Door Co. of Md. v. Andersen Windows, Inc.*, 218 F. Supp. 2d 729, 733 (D. Md. 2002)).  Although unfair competition law prohibits only conduct that rises to a certain level of dishonesty or fraud, "Maryland 'has never required *an unlawful act* as an essential element of an unfair competition claim.'"  *Id.* at 226 (quoting *Trimed, Inc. v. Sherwood Med. Co.*, 977 F.2d 885, 891 (4th Cir. 1992)).  Unfair competition law is animated by "the general principle that all dealings must be done on the basis of common honesty and fairness, without taint of fraud or deception." *Balt. Bedding Corp.*, 182 Md. at 237.

### i.  HS One's Conduct Is Patently Unfair

HS One's campaign of falsehoods, its efforts to block Vyne's means of access to its customers' data on Dentrix—the same means it has used for over 20 years without incident—and now HS One's hijacking of Vyne customers' computers qualify as "unfair" competition.

As the Restatement of Unfair Competition explains, an act is likely to be "judged unfair" if it "substantially interferes with the ability of others to compete on the merits of their products." Restatement (Third) of Unfair Competition, § 1, cmt. (g) (A.L.I. 1995); *see also Paccar Inc. v. Elliot Wilson Cap. Trucks LLC*, 905 F. Supp. 2d 675, 691 (D. Md. 2012).  At every turn, HS One has tried to prohibit Vyne's current and prospective customers from selecting Vyne based on the merits of its product, Vyne Trellis—misrepresenting Trellis as a security risk, interfering with how Vyne customers use it, and ultimately directly sabotaging it at the point of access.  Any of these

actions would suffice to constitute unfair competition. Taken together, they plainly form a pattern of unlawful and unfair conduct in violation of Maryland law.[2]

HS One's efforts to block the printer driver function—the only means Vyne's customers can use to transfer their data from Dentrix to Vyne Trellis—is similarly unfair. If successful, HS One will essentially block any transfer of data into Vyne Trellis, forcing Vyne's customers to turn to alternate software to process the insurance claims and other data exchange transactions they need to keep their practices afloat. This too is unfair competition. *See Sun Dun, Inc. of Wash. v. Coca-Cola Co.*, 740 F. Supp. 381, 385, 397–98 (D. Md. 1990) (defendants' adherence to territorial and marketing restrictions that "essentially cut[] off supply" to plaintiff "of two of its major product lines" constituted unfair competition).

And HS One's latest tactic—directly targeting and shutting down Vyne's software on its customers' computers—is nothing less than sabotage. The affected customers have had key practice management functions disabled, including submission of insurance claims. Vyne has been forced to dedicate time and resources to restoring its software for these clients. At the same time, HS One has aggressively marketed alternative software to Vyne's customers, including through special pricing offers and false claims of "security breaches."

If allowed to stand, HS One would force Dentrix customers to use HS One's preferred RCM software—regardless of those customers' preferences or the performance advantages of

---

[2] HS One's material falsehoods regarding Vyne Trellis are themselves unlawful under Maryland unfair competition law and other federal and state causes of action. *See, e.g.*, *Clear One Advantage, LLC v. Kersen*, 756 F. Supp. 3d 30, 44 (D. Md. 2024) (conduct that "misled" a prospective client into doubting the availability of plaintiff's product and led the client to enroll in a competing product constituted unfair competition); *see also* Compl. ¶¶ 9, 32–33, 68. Vyne will develop those claims at the appropriate time, but given the gravity of HS One's recent misconduct, it focuses its request for injunctive relief on HS One's attempt to block the exchange of patient information by disabling Vyne's printer driver and other software.

Vyne Trellis—simply because they have no other option.  As in *Real Time*, that conduct is unlawful and amounts to actionable unfair competition.  *Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*, 2024 WL 3569493, at *11 (D. Md. July 29, 2024) ("[PointClickCare] presented to Real Time a classic Hobson's choice: either continue with its current operations and face the business interruptions associated with unsolvable CAPTCHAs, or agree to alternative terms that would put it out of business.  Either way, [PointClickCare] aimed to handicap Real Time in a manner that cuts against 'the principles of old-fashioned honesty[.]'" (quoting *GAI Audio*, 27 Md. App. 172, 193 (1975))).

### ii.  HS One's Conduct Also Violates Federal Law

HS One's conduct is not just unfair but also illegal, just like in *Real Time*, because it violates the information-blocking provision of the Cures Act.  *See* 42 U.S.C. § 300jj-52.

The Cures Act defines "information blocking" as any practice that, except as required by law, "is likely to interfere with, prevent, or materially discourage access, exchange or use of electronic health information," and which "a health information technology developer, exchange, or network . . . knows, or should know . . . is likely to" have such an effect.  42 U.S.C. § 300jj-52(a)(1)(A)–(v)(i).   As the Fourth Circuit explained, the federal prohibition on information blocking under the Cures Act is "'designed to advance interoperability' and 'support the access, exchange, and use of electronic health information.'"  *Real Time*, 131 F.4th at 231 (quoting 21st Century Cures Act: Interoperability, Information Blocking, and the ONC Health IT Certification Program, 85 Fed. Reg. 25642, 25643 (May 1, 2020)).

For much the same reason as in *Real Time*, HS One's efforts to block use of the printer driver and to disable Vyne Trellis facially violate the information-blocking provision of the Cures Act because, at minimum, they "interfere with" the "exchange or use of electronic health information."  42 U.S.C. § 300jj-52(a)(1)(A).  Blocking the transfer of information by dental

practices from Dentrix to Vyne Trellis is the whole point of HS One's conduct. HS One knows

that its actions violate the information-blocking provision, which is why it voluntarily removed

Dentrix from the National Coordinator for Health Information's Health IT Certification Program—

which would have applied the Cures Act provisions to HS One as a "health IT developer"—*on the*

*exact day* that Vyne raised concerns with HS One regarding its compliance with the Cures Act.

Compl. ¶ 71.

　　Although HS One apparently attempted to take itself out of the law's purview with its

decertification, *id.*, HS One remains subject to the Cures Act information-blocking provision

because it is a "health information network or health information exchange" ("HIN/HIE") within

the meaning of the information blocking regulations, 45 C.F.R. Part 171. *See* Compl. ¶ 70. These

regulations define an HIN/HIE as:

> an individual or entity that determines, controls, or has discretion to administer any
> requirement, policy, or agreement that permits, enables, or requires the use of any
> technology or services for access, exchange, or use of electronic health information:
>> (1) Among more than two unaffiliated individuals or entities (other than the
>> individual or entity to which this definition might apply) that are enabled to
>> exchange with each other; and
>> (2) That is for treatment, payment, or health care operations purpose . . . .

45 C.F.R. § 171.102. HS One qualifies as an HIN/HIE for multiple reasons. *First*, HS One stores

electronic health information on Dentrix and develops APIs through the Dentrix Developer

Program that enable the exchange of this information—the same API program it sought to strong-

arm Vyne into joining. The DDP enables the exchange of electronic health information among

numerous unaffiliated dental practices and service providers. *Second*, HS One also qualifies as an

HIN/HIE because it markets eligibility-for-benefits and claims and attachments offerings

(marketed as "eClaims" and "Eligibility Essential and Pro") that allow dental practices and health

plans to conduct HIPAA-standardized transactions with numerous unaffiliated health plans. *Third*,

HS One qualifies because it imposes information security controls and technical policies that

17

regulate customers' access to electronic health information available on Dentrix; it "controls" and "administers" agreements governing access to and exchange of electronic health information.

In short, the information-blocking provision of the Cures Act plainly apply to HS One—and that provision plainly prohibits HS One's efforts to impede dental practices across the country from transmitting information from Dentrix to Vyne Trellis. Vyne's customers seek Vyne's assistance to submit claims to help them effectively coordinate payment with insurance providers. Ex. 1, Roberts Decl. ¶¶ 51–52. HS One's refusal to allow that access via the printer driver significantly delays and impedes Vyne's access to the necessary electronic health information and increases the costs, complexity, and burdens associated with Vyne's use of this data on behalf of its customers. *Id.* HS One's attempt to compete against Vyne by blocking the sharing of patients' healthcare information is illegal under the Cures Act—and thus constitutes unfair competition under *Real Time*. 131 F.4th at 238.

### B.    HS One Is Tortiously Interfering with Vyne's Business Relations

Vyne will also prevail on its claim that HS One is seeking to tortiously interfere with Vyne's contractual relations with its clients and prospective relations by, among other things, seeking to induce Vyne customers to transfer to HS One based on falsehoods; disabling core functions that Vyne's customers rely on to access and use Vyne Trellis, including the printer-driver function; and directly disabling Vyne software on customers' computers.

Under Maryland law, the elements of a tortious interference claim are: (1) a contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional interference with that contract; (4) hindrance to the performance of the contract; and (5) resulting damages to the plaintiff. *See Fowler v. Printers II, Inc.*, 89 Md. App. 448, 466 (1991). Tortious interference likewise applies to "prospective contractual relations" when the defendant has committed "improper or wrongful conduct" to interfere with the plaintiffs'

economic relations and done so with "a tortious intent." *Macklin v. Robert Logan Assocs.*, 334 Md. 287, 301 (1994).

As to the first and second elements, Vyne contracts with each of the dental practices that use Vyne Trellis to facilitate the exchange of patient healthcare information. And HS One well knows of Vyne's contracts with its customers—not only because such contracts are necessary in a heavily regulated field such as health data processing, but also because Vyne openly publishes its standard terms and conditions on its website, to say nothing of Vyne and HS One's history of mutual cooperation in this field. Compl. ¶ 92; Ex. 1 ¶ 25 (describing the parties' "past relationship" in which HS One was "an exclusive clearinghouse partner of Vyne").

As to the third element, an assessment of intentional interference with a contract looks to defendants' "legal duty . . . to refrain from intimidation, force, coercion, threats, or any other illegal means with a view of preventing" a plaintiff's fulfillment of its contractual obligations with another party. *K&K Mgmt., Inc. v. Lee*, 316 Md. 137, 161 (1989) (quotations omitted). Where a defendant fails to uphold that duty, "the defendant's liability for . . . damage and loss cannot be seriously doubted." *Id.* (quotation omitted). "[C]onduct that is quite subtle, nevertheless, can be improper or wrongful" for purposes of a tortious interference claim. *Macklin*, 334 Md. at 301. Proof of breach of the relevant contract is not needed. *See Baron Fin. Corp. v. Natanzon*, 509 F. Supp. 2d 501, 524 (D. Md. 2007). Whether a defendant uses tortious or "unlawful conduct" to interfere with relationships is a key factor when assessing whether a defendant's interference is itself tortious. *Trimed*, 977 F.2d at 889.

This element is readily met due to the defamatory falsehoods HS One has propagated and software it has deployed onto customer computers to interfere with Vyne Trellis's functionality, in violation of federal law. Again, HS One has mounted a systematic campaign seeking to induce

19

Vyne's customers to terminate their contracts with Vyne.  It has misrepresented the efficacy and security of Vyne's system, alarming its customers with baseless claims of security breaches.  And it has repeatedly impeded Vyne's customers' processing of routine data exchange transactions, all in an effort to draw more of Vyne's customers into contracts with HS One instead.  HS One has offered "no legitimate reason for deploying" its information-blocking measures.  *Real Time*, 2024 WL 3569493, at *11.  And the deployment violates federal law, namely the Cures Act's information-blocking provision.  For these reasons, the third element is met as well.

On the fourth element, HS One's actions severely hindered Vyne's ability to perform on its contracts with affected customers.  Vyne's customers targeted with HS One's "hostile printer" update were left with no ability to upload patient health information into Vyne Trellis, leaving Vyne unable to submit that information and related claims on to insurance providers—the exact service Vyne's customers contract for.  Ex. 2 ¶ 19.  As to the customers affected by HS One's surreptitious disabling of Vyne Trellis, Vyne was left unable to provide any services at all until it could repair the harm caused by HS One's Dentrix update.  *Id.*

As to the final element, a plaintiff may demonstrate damages by showing "(a) the pecuniary loss of the benefits of the contract; (b) consequential losses for which the interference is the legal cause; or (c) emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference."  *Real Time*, 2024 WL 3569493, at *11 (quotations omitted).  As in *Real Time*, Vyne at least "expended resources to restore access" to Vyne software, "which alone provides a measure of damages."  *Id.*; *see* Ex. 1 ¶ 56 (describing a fraction of Vyne's expenditure to respond to HS One's conduct to date).  Vyne also suffered severe and unquantifiable reputational harm among its current and prospective customers as a result of HS One's tortious conduct.  Ex. 1 ¶¶ 54–55.

*    *    *

In sum, Vyne is likely to succeed in showing that HS One's efforts to undermine and hinder Vyne's relationships with its customers to capture a greater share of the RCM services market is tortious conduct under Maryland law.

## II. Vyne Will Suffer Irreparable Harm Absent a Temporary Restraining Order and Injunction

Irreparable harm is suffered whenever "monetary damages are difficult to ascertain or are inadequate." *Morris v. Shellpoint Mortg. Servicing*, 2019 WL 7565456, (D. Md. May 3, 2019) (quotation omitted). This Court has "recognized that . . . reputational damage" is among the kinds of harms that "may be difficult to quantify in a dollar amount." *Clear One Advantage*, 756 F. Supp. 3d at 44. Therefore, "when the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable harm injury prong is satisfied." *Brightview Grp.*, 441 F. Supp. 3d at 137 (quoting *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994)); *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 103 (4th Cir. 2022) (impending "loss of customers and employees" was irreparable harm).

In *Real Time*, the Fourth Circuit found irreparable harm in granting a preliminary injunction because PointClickCare's information blocking threatened "actual and imminent loss of good will or erosion of [a company's] customer base." *Real Time*, 131 F.4th at 239 (quotations omitted; alteration in original). As the Court explained, every time PointClickCare's technical blocks forced Real Time to "reach out to a customer to ask them to reset an account, it wastes the customer's time and looks incompetent to the customer." *Id.* The reputational harm to Real Time in such circumstances was inevitable. And by "disrupt[ing] Real Time's ability to do its work with

21

hundreds of [customers] at a time," PointClickCare put Realtime in "immediate risk of breach of its contracts with its customers." *Id.*

Much the same is true here. Over 8,000 of Vyne's customers rely on Vyne's printer driver functionality to transmit electronic health information from Dentrix to Vyne. Compl. ¶ 6. HS One's measures to impede this core function can only result in substantial harm to Vyne's reputation—particularly when HS One has been simultaneously targeting these same customers with misleading and false accounts of Vyne's products. Ex. 1 ¶¶ 52–54. Each time Vyne must troubleshoot a customer's software that has been frustrated or disabled by HS One's misconduct, "it wastes the customer's time" and strains Vyne's relationship with that customer. *Real Time*, 131 F.4th at 239. Vyne was able to rapidly repair most of the damage caused by HS One's limited update targeting its software, but if HS One elected to distribute the update to additional customers—which it apparently can do at the push of a button—it could severely jeopardize Vyne's operations and risk the permanent loss of some of its customers to competitors. Ex. 1 ¶¶ 52–54. Already Vyne's customers have reached out to Vyne in alarm, concerned about the possible impact HS One's threats and actions would have on their businesses. *See Variable Annuity Life Ins. v. Coreth*, 535 F. Supp. 3d 488, 517 (E.D. Va. 2021) (evidence that "some clients have expressed concern to [plaintiff] about the [defendants'] repeated solicitations and clients' data privacy" evinced "lost good will, lost customer trust, and damage to reputation" sufficient for injunctive relief); Ex. 1 ¶ 53.

Since March 2025, at least 500 Dentrix users have cancelled their accounts with Vyne—including at least 45 Vyne customers since mid-August 2025 that have specifically cited HS One's false communications, a desire not to be "in the middle" of a dispute between HS One and Vyne, or software incompatibilities caused by HS One's misconduct as the reason for their cancellation.

Ex. 1 ¶ 55. And because most customers do not take the trouble to explain their reasons for cancelling, Vyne believes that this substantially understates the number of customers it has already lost as a result of HS One's tortious conduct—and the true number may be impossible to know. *Id.*

Not only does HS One's conduct risk interfering with Vyne's relationships with existing customers and causing lasting and difficult-to-quantify reputational harms, but the misconduct is also bound to interfere with Vyne's ability to enter into new contracts with dental practices that use Dentrix—which is precisely as HS One intends. *See Ledo Pizza Sys., Inc. v. Singh*, 983 F. Supp. 2d 632, 643 (D. Md. 2013) (irreparable harm from threat to relationship with "current and prospective franchisees"). Vyne has already witnessed a sharp decline in claims volumes since HS One escalated its efforts to target Vyne's business, and has faced an increased number of cancelled accounts from customers that have elected to transfer to competitors rather than endure HS One's disruptive actions. Ex. 1 ¶ 55. But there is no way to know how many sales have been lost from customers who decline to contract with Vyne because they wish to avoid the issues caused by Dentrix's unfair and illegal misconduct. All of this counts as irreparable harm.

## III.    The Equities Favor Vyne, and an Injunction Is in the Public Interest

In granting an injunction, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (quoting *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987)). "The entire preliminary injunction inquiry, and particularly the requirement that the district court carefully balance the harms to the parties, is intended to ensure that the district court 'chooses the course of action that will minimize the costs of being mistaken.'" *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 284 (4th Cir. 2002) (quoting *Am. Hosp. Supply Corp. v. Hosp. Prods. Ltd.*, 780 F.2d 589, 593 (7th Cir. 1986)).

The equities overwhelmingly favor Vyne and maintaining the status quo before HS One's misconduct. If HS One is allowed to block Vyne's customers' use of Vyne's products, they will be deprived of the ability to timely process insurance claims, a crucial link in dental practices' provision of medical care. And Vyne would face imminent reputational damage and loss of customers and goodwill. On the other hand, HS One has failed to articulate any legitimate security concerns justifying its refusal to allow Vyne to use a printer-driver service its customers have relied on for over 20 years without incident—and which HS One itself uses for analogous purposes. Regardless, the balance between the two weighs heavily in Vyne's favor; as in *Real Time*, HS One's unsubstantiated security concerns are "certainly not such a grave risk so as to outweigh" the risks HS One's "blocking poses to [Vyne's] ability to provide its valuable services." 131 F.4th at 241.

The public interest also favors injunctive relief. HS One's actions constitute an obstacle to medical care for patients in dozens of dental practices in Maryland alone, and thousands more around the country, and violates federal public policy as articulated by Congress in the Cures Act. The public interest lies behind "ensuring that the policies of federal law are enforced and upheld," *United States v. Westvaco Corp.*, 2015 WL 10323214, at *9 (D. Md. 2015), and the "public likewise benefits from fostering access to medical records consistent with, and not in contravention of, the Cures Act." *Real Time*, 2024 WL 3569493, at *12. The public interest also favors "the prevention of unfair business practices." *Brightview Grp.*, 441 F. Supp. 3d at 142.

Finally, the equities and public interest favor an injunction that would simply preserve the status quo. *See*, *e.g.*, *Foltz v. U.S. News & World Rep.*, 760 F.2d 1300, 1309 (D.C. Cir. 1985) ("[A]n equitable remedy designed to freeze the *status quo* . . . would be entirely in keeping with the principles that undergird equity jurisprudence."); *Blackwelder Furniture Co. v. Seilig Mfg. Co.*,

550 F.2d at 197 (emphasizing the "public interest in preserving the *status quo ante litem* until the merits of a *serious* controversy can be fully considered by a trial court" (emphasis in original)). Vyne seeks an injunction that preserves "the last uncontested status between the parties which preceded the controversy." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (quoting *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013)). Here, the "last uncontested status" was before HS One began distributing updates to Dentrix that targeted and disabled key Vyne Trellis functionality, disrupting dental practices nationwide. *See Real Time*, 131 F.4th at 223.

## CONCLUSION

For the foregoing reasons, this Court should issue a temporary restraining order and a preliminary injunction that would halt HS One from (i) using Dentrix or any other software program to disable Vyne software and/or software functions, or otherwise to interfere with Vyne's customers' use of Vyne's software; from (ii) denying printer driver access to Vyne's customers electronic health information stored in Dentrix; and from (iii) denying or otherwise interfering with Vyne's access to Vyne's customers' electronic health information stored on Dentrix.

DATED:    October 2, 2025

Respectfully submitted,

/s/ K. Nichole Nesbitt
K. Nichole Nesbitt (Bar No. 26137)
Derek M. Stikeleather (Bar No. 27815)
GOODELL, DEVRIES, LEECH & DANN, LLP
One South Street, 20th Floor
Baltimore, MD 21202
(410) 783-4026
knn@gdldlaw.com
dstikeleather@gdldlaw.com

Michael Shuster (admission motion forthcoming)
Vincent Levy (admission motion forthcoming)
Daniel Fahrenthold (admission motion forthcoming)
Torrell Mills (admission motion forthcoming)
HOLWELL SHUSTER & GOLDBERG LLP
425 Lexington Avenue, 14th Floor
New York, NY 10017
(646) 837-5151
vlevy@hsgllp.com

*Attorneys for Plaintiff*
*National Electronic Attachment, Inc. d/b/a Vyne Dental*