IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| NATIONAL ELECTRONIC ATTACHMENT, INC., d/b/a VYNE DENTAL, <br>                      *Plaintiff*, <br><br>        -against- <br> HENRY SCHEIN ONE, LLC, <br>                     *Defendant*. | Case No. 1:25-cv-03246 |

**DECLARATION OF STEPHEN ROBERTS**

I, Stephen Roberts, declare under penalty of perjury as follows:

1.      I am an adult citizen of the United States and am competent to testify as to the matters set forth in this declaration.  I submit this declaration in support of the application of National Electronic Attachment, Inc., d/b/a Vyne Dental ("Vyne Dental" or "Vyne") for a temporary restraining order and preliminary injunction in the above-captioned suit.

2.      I am the Chief Executive Officer of Vyne.  I have served as CEO since August 2022, leading the organization's strategy and growth in healthcare information technology with a focus on dental revenue cycle management.  Prior to joining Vyne, I held leadership positions across the healthcare IT sector, with more than 25 years of experience in building and scaling technology solutions for dental practices, payers, and providers.  The information set forth herein is true, to the best of my knowledge and belief, in my capacity as CEO of Vyne Dental.

**I.      Background**

**A.      Vyne, Vyne Trellis, and RCM Services**

3.      Founded in 1999, Vyne Dental is part of the larger Vyne family of industry-leading information exchange, revenue acceleration and communication solutions for healthcare.  For over

20 years, Vyne Dental has offered a software platform to dental practices across the country which provides those practices with what is referred to in the industry as "revenue cycle management" ("RCM") and clearinghouse services. Today, that platform is known as Vyne Trellis. Vyne Dental also offers related software solutions that enable dental practices to complete administrative and billing tasks, including Remote Lite, an e-claims processing program.

4.      Vyne Trellis facilitates dentists' submissions of dental claims to insurers for payment and provides related clearinghouse services and data exchange transactions standardized under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). Healthcare providers rely on clearinghouse and RCM services like Vyne Trellis to verify patient eligibility for benefits in a health plan, submit dental claims to insurers, and receive electronic remittance advice from insurers. The use of such services is standard in the healthcare industry and simplifies the administrative burdens associated with claims management, allowing providers to focus on delivering healthcare to patients.

5.      Vyne serves more than 54,000 dental offices in the United States, and maintains connections with more than 1000 dental plans and payers to help providers administer their claims and improve revenue cycles. In the state of Maryland alone, Vyne has over 1,000 direct customers that rely on Vyne Trellis and other Vyne Dental solutions to complete daily administrative and billing tasks.

**B.      HS One's Dentrix and the Printer-Driver Functionality**

6.      Vyne does not offer a dental practice management system, so customers who use Vyne Trellis typically rely on a different software system to handle front-office matters like patient intake and scheduling.

2

7.     Defendant Henry Schein One, LLC ("HS One"), a subsidiary of Henry Schein, Inc., offers one such dental practice management program, called "Dentrix."  Dental practices that use Dentrix store their patients' health information on the platform.  At least 165 Vyne customers in Maryland are joint customers with HS One.

8.     The security and integrity of patient data is Vyne's top priority.  In addition to the technical security measures Vyne takes to protect its customers' and their patients' electronic health information, described in more detail in the Declaration of Vyne Dental CTO James Nix (the "Nix Declaration"), submitted alongside this Declaration, Vyne works to ensure that it handles all patient health data consistent with the law.  To that end, ensures that its customers have the necessary consents from their patients to transmit patient health information to Vyne Trellis.  Pursuant to their contracts with Vyne, Vyne customers expressly authorize Vyne and grant Vyne full agency on their behalf to request, access, use, and export patient information, billing records, scheduling data, and other data maintained in third-party systems (including without limitation dental practice management systems) to facilitate Vyne's provision of services.  Vyne customers also represent that they have all necessary rights, consents, and authority to grant Vyne the right to access and use their data.  In addition, Vyne customers acknowledge that Vyne's access to their data does not violate any agreements they have with third-party vendors or any applicable law or regulation.

9.     Further, each contract contains a Business Associate Agreement that sets forth the respective obligations of Vyne and its customers with respect to electronic health information and other data that is protected health information under HIPAA.  Under these contracts, Vyne agrees, among other things, (i) not to use or disclose protected health information other than as permitted

or required by law and (ii) to use appropriate safeguards to prevent the unlawful use or disclosure of protected health information.

10.    Vyne has protected its customers' electronic health information without incident. Vyne has never suffered a breach of patient health information as defined, for example, in HIPAA, nor has any provider customer alleged that Vyne has breached a Business Associate Agreement or other contract, or violated applicable law by mishandling electronic health information.

11.    Due to that track record, and the quality of Vyne's products, Vyne has developed strong business relationships with dental practices across the country that rely on Vyne's programs to manage their practices.

12.    Customers have consistently praised Vyne's functionality and reliability, stating that they "absolutely love Vyne, [which] says a lot considering how many platforms we've tried over the past few years," "have used [Vyne] for YEARS with no issues," and are "happy with the way [V]yne has been integrated into the practice thus far."

13.    As explained in more detail in the Nix Declaration, for many years Vyne has used a printer-driver function to facilitate the transfer of data from HS One's Dentrix to Vyne Trellis. Vyne has historically maintained amicable relations with HS One and, until this year, HS One has raised no technical or security concerns regarding Vyne's use of the printer driver.  As far as Vyne is aware, HS One has known of Vyne's printer-driver functionality as a means to transmit patient data from Dentrix to Vyne for more than 20 years—since at least 2003.

II.    **HS One Disseminates False Information about Vyne**

14.    But in early 2025, HS One began spreading misinformation about Vyne and set out to block Vyne's access to their mutual customers' electronic health information, all while aggressively promoting HS One's competing product, its Eligibility & Claims Processing Suite.[1]

15.    In or around early March 2025, HS One began informing dental practices, dental service organizations, and other healthcare providers that HS One would be releasing updates to Dentrix that would intentionally cause Dentrix to no longer be compatible with Vyne.  HS One falsely asserted, among other things, that "security issues" affected Vyne's offering.

16.    On March 28, 2025, Vyne sent a letter to its customers addressing HS One's threats and false statements.  A true and correct copy of Vyne's March 28, 2025 letter is attached as Exhibit A.  Vyne refuted HS One's statement that Vyne was flagged for "security issues," emphasizing that Vyne is a "SOC II, HiTrust-certified HIPAA Clearinghouse with a strong focus on quality, security, and performance."

17.    Shortly thereafter, as detailed in the Nix Declaration, HS One took its first steps toward disabling the printer-driver functionality that allowed Vyne's customers to transmit information from Dentrix to Vyne Trellis.

18.    HS One's campaign to disparage and injure Vyne did not stop there.  On or around April 25, 2025, HS One sent a mass advertising email to Vyne's customers with an image titled, "Vyne Disconnects Imaging & Claims."  A true and correct copy of HS One's April 25, 2025 email is attached as Exhibit B.

---

[1] *See* Henry Schein One, "Eligibility & Claims Processing Suite," available at https://www.henryscheinone.com/products/eligibility-and-claims-processing-suite/.

19.     In its email, HS One warned: "If you're using Vyne, you're manually attaching images, typing in CDT codes, and crossing your fingers. Sound familiar? That extra effort often leads to costly mistakes, claim rejections, and payment delays."  HS One stated that: "Disconnected Tools Mean Denied Claims. Vyne Doesn't Fix That – Dentrix Does."

20.     Making clear that these claims were intended to favor HS One's competing offering, HS One offered a "limited time" opportunity for dental providers to "upgrade from Vyne to the Dentrix Eligibility & Claims Suite for just $99/month," claiming that providers would "stop losing time and money on disconnected processes."

21.     The statements in HS One's email are falsehoods that misrepresent the functionality and integrity of Vyne's services and that have caused—and continue to cause—damage to Vyne's reputation.

22.     For example, HS One's claim that Vyne "Disconnects Imaging & Claims" suggests that the Vyne Trellis platform lacks integration between imaging and claim submission.  But Vyne Trellis fully supports integration with imaging systems.  With Vyne Trellis Image Sync, customers do not have to export images from their imaging solution or create screen captures. Rather, Image Sync allows Trellis customers to select images from their imaging system and easily attach them to a claim for submission. HS One's claim that Vyne lacks imaging functionality is simply a false statement of fact that misrepresents Vyne's functionality.

23.     As another example, HS One's claim that "[i]f you're using Vyne, you're manually attaching images, typing in CDT codes, and crossing your fingers" suggests that Vyne Trellis lacks automated functionality that in turn, according to HS One, "leads to costly mistakes, claim rejections, and payment delays."  But Vyne Trellis fully supports automated integration and functionality; providers are *not* required to *manually* type CDT codes or attach images.  Rather,

Vyne Trellis facilitates claims validation processes by *automatically* filtering documentation that providers are required to include with each claim submission, thereby ensuring that providers submit the appropriate documentation for each claim.

24.     Likewise, HS One's statement that Vyne Trellis "leads to costly mistakes, claim rejections, and payment delays" suggests that Vyne's product causes adverse financial and administrative outcomes.  But Vyne Trellis integrates rules directly from insurers regarding the necessary documentation for each claim submission and prompts dental practices to supply the best available documentation, ensuring that claims are submitted in a timely and accurate manner. This verification process *reduces* claim rejections and unnecessary delays caused by missing or incorrect documentation.  Again, HS One's statements to the contrary are simply false.

25.     HS One's false statements are especially absurd given the parties' past relationship. HS One was an exclusive clearinghouse partner of Vyne for insurance claim attachment processing until 2022, and a non-exclusive partner until HS One unilaterally severed the parties' attachments clearinghouse agreement in September 2024, effective January 2025.  Upon termination of the original exclusivity agreement in 2022, Vyne granted a one-time license to Vyne's NEA Attachments Payer ruleset solely because HS One had installed that ruleset locally on every Dentrix system database and could not remove the rules—in other words, solely so that Dentrix customers would not be harmed by HS One's choice to end its exclusivity arrangement with Vyne.

26.     After disseminating its April 25, 2025 email, Vyne learned from customer feedback that HS One had escalated its campaign against Vyne by falsely informing Vyne's customers that Vyne Trellis had supposedly been flagged for "security issues" and that HS One would therefore be unable to integrate its Dentrix platform with Vyne in the future.  In fact, the "security issues" to which HS One referred were baseless pretexts for cutting off customers' access to Vyne Trellis,

with the improper purpose of injuring Vyne's business and impairing its ability to compete with HS One. To that end, customers reported receiving communications and aggressive outreach from HS One asserting that Vyne is not authorized to access customer data stored on Dentrix—which was another way of saying that customers would be unable to use Vyne's printer driver to populate their own data stored on Dentrix to Vyne Trellis.

27.    Vyne's alarmed customers began discussing online and in communications with Vyne how HS One's plan to disable interactivity between Vyne Trellis and Dentrix would disrupt their businesses and force them to change software vendors—HS One's exact goal.

28.    Vyne's customers sought reassurance about "impending security upgrades that will make it impossible to use Vyne for claims submissions??," and supposed "non compliance with cyber security requirements" by Vyne Trellis. Vyne's customers understood HS One's tactics very clearly. Customers observed that HS One was "blocking the Vyne Connection," and, in the words of another, "trying to block [V]yne from connecting to [D]entrix" in order to "mak[e] it more difficult for us to use [V]yne for claims." And they got the message: Vyne's main competitor in clearinghouse and RCM services, DentalXChange, "is now with Dentrix and that's who they want us to use."

29.    One customer reported that HS One representatives were actively calling customers' offices and using blatant scare tactics, including telling practices they will be blocked from all eClaim services and that their practice will "suffer" if they continue to use Vyne. The same customer stated that several colleagues had received similar communications from Dentrix sales reps.

30.    In an email to Vyne, another customer, correctly apprehending HS One's anti-competitive strategy, stated: "This situation feels extremely sketchy. It seems like Dentrix is trying

8

to trap us – and other practices – into working exclusively with them and purchasing additional features." As to any HS One assertion that its product was superior, the customer stated: "We already tried Dentrix Hub and Engage for a year, and it was absolutely horrible." The customer wrote that her dental practice is now "being forced to pay even more and possibly work with multiple vendors just to replace what Vyne currently handles – and handles very well."

31.    Numerous other customers, on message boards and in other fora, expressed outrage at HS One's tactics. Among other things, customers described HS One's communications as "grimy sales tactic[s]," lamented that they "[h]ate Dentrix," and warned that HS One was using aggressive scare tactics.

### III.    Vyne Attempts to Negotiate an API-Based Solution

32.    In light of HS One's conduct blocking customers' use of Vyne's printer driver functionality to seamlessly provide their data stored on Dentrix to Vyne, Vyne attempted to find workarounds using Application Programming Interfaces ("API") and other forms of electronic software integration. API connections are one method for accessing electronically stored data and transmitting that data from one program to another.

33.    On or around March 25, 2025, in an effort to resolve the problems created by HS One's actions, I initiated contact with HS One to explore possible API integration between Dentrix and Vyne for claims submission. Vyne was prepared to pay HS One to allow customers to transmit their Dentrix-stored data to Vyne Trellis via APIs, even though doing so would be rewarding HS One's strategy. Vyne's focus was on reassuring its customers and keeping their practices from being caught in the middle of what Vyne perceived to be a dispute fundamentally about royalties HS One sought to collect from Vyne through its API program.

34.    HS One stated that it would be willing to discuss the use of APIs to accomplish what Vyne's printer driver had earlier facilitated, but in early discussions, HS One claimed to be

9

unable to confirm that its existing APIs supported transmission of the data required for claims submission.

35.    After a few months of halting non-progress, on or around May 27, 2025, Vyne and HS One met to discuss an API-based integration between Vyne Trellis and Dentrix.  At the meeting, HS One proposed its "Dentrix Developer Program" ("DDP") as the path forward.  HS One then indicated that the wrong HS One representatives were in the meeting and that a subsequent meeting would be needed with the right people.

36.    HS One then presented Vyne with a proposed "Henry Schein Developer Program Agreement," outlining its supposed proposal for the API integration.  But rather than proposing workable arrangements for *allowing* dental providers to export their electronic health information to Vyne, HS One instead sought in a draft DDP agreement to impose draconian contractual *restrictions* on Vyne's ability to work with their mutual customers.  And certain of the terms HS One proposed made clear that HS One also wished to frustrate Vyne's ability to market itself to potential purchasers should the opportunity arise.

37.    On June 2, 2025, Vyne, attempting to keep the discussions alive despite HS One's apparent bad faith, sent back a red-lined version of the draft DDP agreement HS One provided, together with explanatory comments.  A true and correct copy of that email, with attachments, is attached as Exhibit C.  Among other things, Vyne raised concerns with the proposed limitations on data access, noting that HS One's proposed restrictive language "appear[] to be a violation of the Cures Act Final Rule, issued by the Office of the National Coordinator for Health Information Technology (ONC) in 2020."  Exhibit C at 24.

38.    Vyne also raised concerns that HS One's draft language "implies that data (e.g. Patient insurance information for eligibility verifications) cannot be transferred to Payers which is

Vyne's primary business." *Id.* Vyne also informed HS One that it could not agree to having the contract terminated upon a Change of Control, which again would have been obvious to HS One. *Id.* at 25.

39.    Vyne continued to seek an agreement that would enable it to serve its customers who used the Dentrix platform.  On June 3, 2025, Vyne and HS One executives met.  Vyne's President, James Grover, reiterated concerns that the DDP did not guarantee the required access to support claim submissions and proposed an interim solution, according to which Vyne would join HS One's DDP and pay the required fees for each location, but would be allowed to use its existing printer driver integration until the necessary APIs were developed by HS One.  Brian Weatherly, HS One's CEO, welcomed Vyne to the DDP, writing afterward "[i]t will be great to get this done."  A true and correct copy of Mr. Weatherly's email is attached as Exhibit D.

40.    HS One later rejected these same terms.

41.    In the following weeks, HS One doubled down on the restrictive terms it originally proposed, and essentially demanded that Vyne submit to those terms.  Nonetheless, Vyne continued to attempt to find common ground.  In response, on July 11, 2025, HS One's General Counsel stated that HS One was supposedly "working through the items" raised in various Vyne communications.  A true and correct copy of these emails is attached as Exhibit E.

42.    After receiving no further communications from HS One, Vyne sent HS One an email advising it that, absent a response to its proposals by July 28, 2025, Vyne would assume negotiations had concluded.  A true and correct copy of this email is attached as Exhibit F.

43.    On July 28, 2025, HS One's General Counsel sent an email to Vyne asserting that Vyne had been "hacking" into HS One's software, claiming that Vyne's services compromise HS

One's security, and alleging Vyne's violation of unspecified laws.  A true and correct copy of this email, together with attachment, is attached as Exhibit G.

44.    Having made these accusations and threats, HS One demanded that Vyne agree to its final version of the DDP agreement—which it knew Vyne could not do—or risk losing any and all access to electronic health information stored on the Dentrix platform.  Exhibit G at 2.  HS One's final proposal did not even attempt to resolve any of Vyne's concerns regarding HS One's initial proposal and instead added additional draconian and unacceptable terms. The final proposal called for the following terms and restrictions:

   a.  After a 90-day transition period, a restriction prohibiting Vyne from "access[ing] any HS One practice management software except through means explicitly authorized in an agreement with HS One," but the proposed agreement would not authorize any HS One API or other access method that would provide the electronic health information necessary for Vyne to provide its services to its customers, and HS One would not agree to provide any such access method before the end of the transition period.  *Id.* at Section 2.1(e).  The proposed agreement would also prohibit the use of any third-party products to access electronic health information stored in Dentrix.  *Id.*

   b.  A requirement that Vyne pay royalties for each dental provider using Vyne Trellis and Dentrix, *even if* Vyne opted not to use HS One's API for that particular provider.  *Id.* at Sections 1 & 3.1.

   c.  A requirement that Vyne pay "Prior Use Fees" of $2,000,000 as compensation for Vyne's prior access to customers' electronic health information through its printer driver functionality.  *Id.* at Section 3.4.

d.  Restrictions imposing limitations on Vyne's use of electronic health information that are more restrictive than limitations imposed by Vyne's customers themselves, including a prohibition on the provision, use, modification, reproduction, distribution, sale, display, or disclosure of data gathered from HS One software to any third party. *Id.* at Section 2.3(e).

e.  A restriction prohibiting assignment or change of control of the DDP Agreement to a HS One competitor. *Id.* at Section 12.2.

45.  Meanwhile, Vyne learned that HS One was informing Dentrix customers that their Vyne integration would be cut off in the near future. HS One disseminated communications to Vyne's customers informing them that, beginning on August 26, 2025, HS One would take steps to completely block Vyne's printer driver functionality and prevent the sharing of electronic health information with Vyne Trellis.

46.  On August 22, 2025, HS One's CEO initiated another round of negotiations directly with Vyne's CEO, proposing "an opportunity to create a new integration with Vyne on claims, attachments, and related clearinghouse services" through a to-be-developed API, subject to a "commercially reasonable fee structure." A true and correct copy of this email exchange is attached as Exhibit H.

47.  But just days later, on August 26, 2025, and in the midst of CEO-to-CEO negotiations, Vyne received a letter from outside litigation counsel retained by HS One, suggesting that HS One intended to sue Vyne for "multiple related common law and statutory claims," all based on Vyne's efforts to allow its customers the same service that it had been providing, with HS One's full knowledge, for decades—which HS One's litigator again baselessly called "hacking." A true and correct copy of this letter is attached as Exhibit I.

48.    HS One has continued to slow-roll negotiations with Vyne concerning a potential agreement on API access while, at the same time, pursuing aggressive and unlawful tactics to interfere with Vyne's relationships with its customers and lure Vyne's customers to its own claims-processing system based on false pretenses.

49.    As the Nix Declaration explains, while Vyne and HS One were ostensibly continuing to engage in negotiations, HS One distributed an update to Dentrix that sought to directly target and disable Vyne Trellis and any other Vyne software on its customers' computers.

50.    All the while, HS One has continued to spread false and misleading information regarding Vyne Trellis.  On September 23, 2025, for example, an HS One employee wrote to a Vyne customer that HS One was offering a new "eClaims bundle for Dentrix customers" who were "adversely affected" by a supposed Vyne "security breach."

## IV.    HS One's Actions Are Causing Irreparable Harm to Vyne

51.    Vyne's customers seek Vyne's assistance to submit claims to help them effectively coordinate payment with insurance providers.  HS One's refusal to allow Vyne access to the data via the printer driver, API, or other integration significantly delays and impedes Vyne's access to the necessary electronic health information and increases the costs, complexity, and burden associated with Vyne's use of this data on behalf of Vyne customers.

52.    Without access to its customers' electronic health information or the ability to operate Vyne's software on its customers' systems, Vyne's ability to provide these services will be substantially limited. HS One's campaign of smears and hacking has been pursued for the purpose and with the effect of encouraging or pressuring Vyne customers to terminate their contracts with Vyne and utilize its private-label claims submission offering instead.

53.    HS One's conduct harms Vyne's business reputation, risking the permanent loss of customers and the inability to attract new ones to Vyne's services.  As noted above, Vyne's

customers have expressed alarm regarding HS One's conduct and the possible impediments to Vyne's ability to deliver on its contractual obligations.

54.    Further, HS One's campaign of falsehoods and disparaging statements threatens to irreparably harm Vyne's reputation as a healthcare clearinghouse and RCM services provider and to irreparably impair its ability to provide patient information to payers.  If HS One is successful in its efforts to sever Vyne's access to their mutual customers' electronic health information, this number is certain to rise.  This reputational injury is also certain to have downstream effects, including threatening to drive future customers away from Vyne and interfere with Vyne's prospective business relationships, whether with future vendors, business partners, or investors.

55.    At my direction, Vyne staff have collected information concerning the impact of HS One's actions on Vyne's revenue, activity, and client retention.  In the last several weeks alone, Vyne has observed an over 50% decrease in claims submissions from nearly 1,000 dental provider customers, including 164 customers who have completely stopped submitting claims through Vyne Trellis since August or September 2025.  At least 500 Dentrix customers have cancelled their accounts with Vyne since early March 2025—and since mid-August 2025, at least 45 of these customers have specifically informed Vyne that they were cancelling their Vyne accounts because of concerns arising from HS One's false communications, a desire not to "be in the middle" of a dispute between HS One and Vyne, or because of incompatibilities with Dentrix caused by HS One's efforts to block Vyne's software.  I believe this substantially understates the number of cancellations that can be attributed directly to HS One's campaign against Vyne since early this year.

56.    In addition, my team has estimated that Vyne has spent at least $58,000 in the form of management time dedicated to addressing HS One's actions against Vyne this year—a substantial underestimate because it accounts only for time spent by management in meetings, and omits the countless hours devoted to planning and executing responses to HS One's actions, including developer time needed to generate software fixes.  That is in addition to at least $7,500 worth of time that Vyne customer support staff have had to expend fielding inquiries from customers regarding HS One's latest software blocking and assisting them with restoring access to Vyne software.  Ultimately, the full scope of the cost Vyne has incurred to protect its business from HS One's campaign cannot be determined.

I declare under penalty of perjury of the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed this 2nd day of October, in South Jordan, Utah.

_Stephen Roberts_
STEPHEN ROBERTS
Chief Executive Officer
National Electronic Attachment, Inc., d/b/a Vyne Dental

16

# EXHIBIT A



## Vyne Dental
## RE: Henry Schein One, Dentrix Supportability

It was brought to our attention that Henry Schein One is allegedly informing dental practices, dental service organizations and other providers of healthcare that Henry Schein One will be releasing updates to Dentrix that will intentionally cause their practice management system to no longer be compatible with Vyne's revenue management solutions.

We would like to provide clarity to what these statements mean from our point of view:

- The Change Healthcare breach in February 2024 highlighted the importance of having more than one way to get your insurance claims paid. At Vyne, our position is that no provider should have to deal with the risks and costs associated with a lack of choice in routing claims. To that regard, Vyne has always provided tools to give providers choice.

- Henry Schein One has allegedly stated they are taking actions to actively block **your ability** to use Vyne products, couching it in a general statement of "security, performance and reliability" concerns. However, Vyne is a SOC II, HiTrust-certified HIPAA Clearinghouse with a strong focus on quality, security, and performance.

- According to our records, approximately 20% of Henry Schein One's Dentrix customers use Vyne Trellis for revenue cycle management. You are not alone and we remain committed to innovating RCM solutions that provide the best value with a best-in-class experience.

- **You have a collective voice & we encourage you to engage with your local Henry Schein representative or call their customer support line at 1-800-472-4346 to express your concerns regarding tactics that could materially disrupt your practice.**

Vyne Dental fully supports interoperability across healthcare systems to improve data portability which ultimately drives provider choice and increased transparency into data exchange.  We value you, our clients, and your need to protect the privacy and security of the data you share with us.  Your trust in our operations is paramount to our mission.

For more information regarding our security measures, please visit our webpage at https://trust.vynecorp.com.

We are grateful to serve your dental practice and excited to continue bringing innovative solutions to your revenue cycle journey.

James Grover
President
Vyne Dental

# EXHIBIT B

4/25/25, 12:45 PM info.henryscheinone.com/webmail/791263/660778933/4aa7bbfa13aca696b1ce1d8ca1800096391dfad47268bb1eb7cf9290867c007a

Case 1:25-cv-03246-MJM    Document 6-2    Filed 10/02/25    Page 20 of 89



# Vyne Disconnects Imaging & Claims

Get cleaner claims, fewer errors, and faster payments with smarter imaging.



**Disconnected Tools Mean Denied Claims. Vyne Doesn't Fix That—Dentrix Does.**

If you're using Vyne, you're manually attaching images, typing in CDT codes, and crossing your fingers. Sound familiar? That extra effort often leads to costly mistakes, claim rejections, and payment delays.

Dentrix changes the game—by syncing your imaging directly with claims. No more extra steps. No more missing attachments.

**Here's how Dentrix beats Vyne:**

- **Auto-applies CDT codes to images**—no manual entry, fewer errors
- **Automatically attaches images**—no uploads, no missed documentation
- **Fewer rejections, faster payments**—clean claims on first submission
- **Real-time claim updates**—know what's accepted and what's not, instantly

**Bonus:** It's all in one place. No more jumping between tools.

P.S. For a limited time, upgrade from Vyne to the Dentrix Eligibility & Claims Suite for just **$99/month** and stop losing time and money on disconnected processes.

Get Paid for the Care You Deliver!

Limited-time promotional offer valid for the first 12 months. Available only to new Eligibility & Claims Suite customers. Requires the latest version of Dentrix.

4/25/25, 12:45 PM
info.henryscheinone.com/webmail/791263/660778933/4aa7bbfa13aca696b1ce1d8ca1800096391dfad47268bb1eb7cf9290867c007a

Case 1:25-cv-03246-MJM    Document 6-2    Filed 10/02/25    Page 21 of 89





View in Browser | Privacy Statement
Update Email Preferences | Unsubscribe from All Emails

Copyright © 2025, Henry Schein One, 1220 South 630 East, American Fork, UT 84003

# EXHIBIT C



James Grover <james.grover@vynedental.com>

---

## Re: EXTERNAL: Redlined Developer Program Agreement and Supporting Explanation

**James Grover** <james.grover@vynedental.com>                    Mon, Jun 2, 2025 at 8:44 PM
To: Riley Banks <Riley.Banks@henryscheinone.com>
Cc: "Weatherly, Brian" <Brian.Weatherly@henryschein.co.uk>, "Katherine Wich Sugden (LEGAL)"
<kwichsugden@henryscheinone.com>, Ali Hyatt <Ali.Hyatt@henryscheinone.com>, Steve Roberts
<steve.roberts@vynedental.com>, Kelly Owen <kelly.owen@vynedental.com>, Eric Markus <eric.markus@vynedental.com>

Many thanks, Riley!

-James



**James Grover**

President

PH: 801.380.2824

james.grover@vynedental.com

www.vynedental.com

On Mon, Jun 2, 2025 at 6:40 PM Riley Banks <Riley.Banks@henryscheinone.com> wrote:

> CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking
> links, especially from unknown senders.
>
> Thank you, James!
>
> Our team will need some time to review your redlines in more detail, but we certainly look forward to the
> discussion tomorrow and we are happy to listen to any further color your team may want to provide around the
> provided explanation.
>
> Warm regards,
>
> **Riley Banks**
> **DIRECTOR, PARTNERING**
> **P** (801) 319 - 8309  **E** riley.banks@HenryScheinOne.com  **W** HenryScheinOne.com
> Henry Schein One | 1220 South 630 East, American Fork, Utah 84003
>
> 
>
> ---
>
> **From:** James Grover <james.grover@vynedental.com>
> **Sent:** Monday, June 2, 2025 4:47 PM
> **To:** Riley Banks <Riley.Banks@henryscheinone.com>
> **Cc:** Weatherly, Brian <Brian.Weatherly@henryschein.co.uk>; Katherine Wich Sugden (LEGAL)
> <kwichsugden@henryscheinone.com>; Ali Hyatt <Ali.Hyatt@henryscheinone.com>; Steve Roberts
> <steve.roberts@vynedental.com>; Kelly Owen <kelly.owen@vynedental.com>; Eric Markus

<eric.markus@vynedental.com>

**Subject:** EXTERNAL: Redlined Developer Program Agreement and Supporting Explanation

**CAUTION:** This email originated from outside the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. When in doubt, contact the IT and Information Security Departments.

You don't often get email from james.grover@vynedental.com. Learn why this is important

Hi Riley,

I was able to locate a copy of the Henry Schein One Developer Program Agreement that you previously sent to Paul Bernard.

Attached, you will find a redlined version of the Agreement reflecting our requested edits. I've also included a document titled "2025-06-02 Explanation of Vyne DDP Agreement Redlines.docx", which outlines the rationale behind each proposed change. We hope this will provide clarity and help streamline the revision process by giving you a clear understanding of our objectives.

I look forward to seeing you in tomorrow's meeting!

All the best,
–James



**James Grover**

President

PH: 801.380.2824

james.grover@vynedental.com

www.vynedental.com

*Confidentiality Notice: The information contained in this electronic message and any attachments to this message are intended only for the individual(s) addressed in the message and may contain proprietary and confidential information. If you are not the intended recipient, you should not disseminate, distribute, or copy this e-mail. Please notify the sender and destroy this message. WARNING: Computer viruses can be transmitted via email. The recipient should scan this email before opening it. The company accepts no liability for any damage caused by any virus transmitted by this email.*

*Confidentiality Notice: The information contained in this electronic message and any attachments to this message are intended only for the individual(s) addressed in the message and may contain proprietary and confidential information. If you are not the intended recipient, you should not disseminate, distribute, or copy this e-mail. Please notify the sender and destroy this message. WARNING: Computer viruses can be transmitted via email. The recipient should scan this email before opening it. The company accepts no liability for any damage caused by any virus transmitted by this email.*

# HENRY SCHEIN ONE
# DEVELOPER PROGRAM AGREEMENT

This Henry Schein One Developer Program Agreement, including all exhibits hereto (collectively referred to as, the "**Agreement**"), is effective as of the Effective Date (as defined below) and entered into by and between National Electronic Attachment, Inc., a Delaware corporation dba Vyne Dental ("**Developer**"), and Henry Schein One, LLC, a Delaware limited liability company ("**HS One**").

**NOW THEREFORE**, in consideration of the mutual covenants and promises contained herein, the parties agree as follows:

1.    **Definitions.** Unless defined elsewhere in this Agreement, the following capitalized terms shall have the meanings set forth below:

"**Access Key**" means the security keys and files provided by HS One to Developer for Developer's use of the HS One API or other portions of the Software Developer Kit, including the username(s) and password(s) that permit Developer to access the HS One Software Content.

"**Developer Application(s)**" means the software application(s), developed, owned, or operated by Developer to interact with the HS One API and HS One Software named on Exhibit A attached hereto.

"**Developer Trademark(s)**" means all names, trade names, trademarks, service marks, domain names and logos owned by Developer and used by Developer in connection with Developer's products and services, including the Developer Application.

"**Developer Value Added Services**" means services offered by Developer related to and part of the Developer Application (examples include, but are not limited to, support, installation and conversion, configuration, database tuning, marketing change management and training, etc.).

"**Digital Code Signing Certificate**" means a digital certificate issued by a certificate authority approved by HS One that binds the Developer to a public key that is mathematically related to a private key pair pursuant to a Public Key Infrastructure (PKI).

"**Effective Date**" means the date signed by Developer.

"**HS One API(s)**" means the interfaces, documentation, protocols, and tools utilized to integrate with HS One Software.

"**HS One End User License Agreement**" means the terms and conditions on which HS One offers HS One Software or other products, applicable to Locations.

"**HS One Software**" means HS One's Dentrix practice management software, which includes the machine-readable software programs and associated files, whether in packaged form, or received electronically and any modified version, upgrades and other copies of such programs and files owned or licensed by HS One.

"**HS One Software Content**" means all of HS One's information and procedures stored in and retrieved from HS One Software databases (excluding Location Data and information that Developer obtains independent of the Software Developer Kit and the HS One API).

1

"**HS One Trademark(s)**" means all names, trade names, trademarks, service marks, domain names and logos owned by HS One and its affiliates and used in connection with this Agreement.

"**Intellectual Property Rights**" means any and all intellectual property rights existing from time to time under any laws or regulations anywhere in the world.

"**Interface**" means a shared boundary across which the Developer Application and the HS One Software interact and exchange information using the HS One API.

"**Knowledge Base**" means certain articles and other materials provided by HS One from time to time with information on access and use of the HS One API.

"**Location**" means a clinic or site that uses the HS One Software and that licenses the Developer Application. For the avoidance of doubt, with respect to organizations that have multiple clinics or sites, each such clinic or site shall be a separate Location.

"**Location Data**" means the information (including but not limited to patient, clinical, scheduling, and insurance information) that is loaded into the HS One Software by a Location. As between Developer and HS One, Location Data shall exclusively be owned by the Location.

"**Reporting Entities**" means any entity that files a cost report with any federal or state health care program (e.g., Medicare enrolled hospitals; other Medicare Part A enrolled facilities subject to cost reporting, such as dental or medical schools; Federally Qualified Health Centers; Community Health Centers; Rural Health Clinics or other cost reporting entities).

"**Software Developer Kit**" means the Access Key (as defined above), sample code, documentation and all other tools and information made available to Developer to assist in using the HS One API.

"**Term**" has the meaning given in Section 4.1.

"**Territory**" means the United States and Canada.

"**Trademark(s)**" means the Developer Trademarks and the HS One Trademarks.

**2.      Developer Rights and Obligations.**
**2.1.    Developer's Access and Use of HS One API and Software Developer Kit.**

    (a)      During the Term, HS One shall make available to Developer the HS One API and Software Developer Kit.  Subject to the terms and conditions of this Agreement, HS One grants to Developer in the Territory a limited, nonexclusive, nontransferable right to:

        (i)      access and use the HS One API with the Developer Application;

        (ii)     use internally and copy the HS One Software, Software Developer Kit and related documentation solely for the purpose of exercising the foregoing right to access and use the HS One API;

        (iii)    access and use the Knowledge Base; and

        (iv)     use HS One Trademarks in support of and in accordance with this Agreement.

(b)      Developer acknowledges and agrees that Location's use of the HS One Software and HS One Software Content is subject to the terms of the HS One End User License Agreement.

(c)      Developer's right to use and access the HS One API and Software Developer Kit shall be restricted solely to the Developer Application(s) named on Exhibit A attached hereto, and on any subsequent addenda or additional Exhibit as mutually agreed to in writing by the parties hereafter. FOR THE AVOIDANCE OF DOUBT, THE RIGHT TO USE AND ACCESS THE HS ONE API, SOFTWARE DEVELOPER KIT, AND LOCATION DATA ACCESSED THROUGH THE HS ONE API SHALL NOT BE EXTENDED TO ANY OTHER APPLICATIONS OR PRODUCTS OF DEVELOPER OR ANY OF ITS CURRENT OR FUTURE AFFILIATES WITHOUT THE EXPRESS WRITTEN CONSENT OF HS ONE.

(d)      The Developer must use only those API keys generated and issued by HS One in order to ensure accuracy and security of Location Data and cannot use API keys from any other entity or source. Use of any unauthorized API keys is cause for immediate termination of the Agreement.

(e)      If an API has been made available in the HS One API(s) for accessing the specific data element of Location Data that Developer Application(s) require access to, then Developer Application(s) may only access that data element through the HS One API(s). Developer has timeline obligations for replacing access methods to Location Data in Developer Application(s) with calls to the HS One API(s). Those timelines are as follows:

　　　　(i)      Eighteen (18) months from the Effective Date for all data elements that were accessible via the HS One API(s) prior to the Effective Date.

　　　　(ii)     Eighteen (18) months from the date that the specific data element becomes available via the HS One API(s) if those APIs were made available after Effective Date.

(f)      Developer may request, in writing, an extension of the applicable timeline for migrating integration methods to the HS One API(s) for specific data elements where Developer demonstrates that (i) using the HS One API(s) would not be technically feasible due to performance, reliability, or other operational concerns, or (ii) integration efforts are actively underway but require additional time for safe implementation. HS One agrees not to unreasonably withhold or delay approval of any such extension requests made in good faith. Failure to comply with migration timeline requirements without an approved extension shall constitute a material breach of this Agreement.

**2.2.     Developer's Obligations.**

(a)      Developer shall, at its own cost and expense, develop the Interface relating to the Developer Applications. The "About" screen of each Developer Application shall contain the following statement for Commercial Applications as applicable: "COMPANY NAME / APP NAME" is not affiliated with or sponsored by Henry Schein, Inc. or its affiliates.  This software application utilizes the Henry Schein One API Software Development Kit; all rights reserved".  HS One may extend, enhance, upgrade, improve, alter, or modify the Software Developer Kit, HS One API, HS One Software or HS One Software Content, or any portions thereof (an "Upgrade") from time to time in HS One's sole discretion.  HS One will provide written notice of the Upgrade and a pre-release copy of the Upgrade to Developer ninety (90) days or more prior to HS One's general release of an Upgrade. If the Upgrade is a "hotfix" and ninety (90) days notice is infeasible, then HS One will provide such notice and pre-release copy to Developer as soon as is reasonably feasible. Developer acknowledges and agrees that any such modifications may affect the compatibility and functionality of the Developer Application and may require Developer to make changes to such Developer Application and the Interface, as applicable, at Developer's own cost.  To the extent an Upgrade

requires Developer to make any modifications, Developer shall within one hundred eighty (180) days after HS One delivers an Upgrade (i) include such Upgrade on all newly licensed Developer Applications, and (ii) distribute the Upgrade to the already-installed base of existing Locations.

(b)    Developer further acknowledges and agrees that it shall not provide any access via any means to the HS One Software, HS One Software Content, Access Key, HS One API(s) or Software Developer Kit to any third party. All third-party access must be authorized directly by HS One via a fully executed Program Agreement between HS One and such third party. Developer is solely responsible for maintaining the strict confidentiality of Access Keys provided by HS One and any damages, or losses that may be incurred or suffered as a result of Developer's failure to maintain such confidentiality are Developer's sole responsibility. HS One is not liable for any harm related to the unauthorized use of Developer's Access Keys not in accordance with the terms hereof. The Access Keys are the property of HS One and may be revoked at any time in the sole discretion of HS One for Developer's failure to comply with any of the terms contained herein, including but not limited to the following: (i) Developer shares the Access Keys with any third party, including Locations, (ii) the security of such Access Keys is compromised in any way, (iii) Developer breaches any term of this Agreement; or (iv) this Agreement is terminated.

(c)    Within thirty (30) days of execution of this Agreement and prior to each Renewal Term, Developer shall provide to HS One a copy of its Digital Code Signing Certificate. The Developer agrees to sign all code with its private key and direct each Location to use the Developer's public key to verify the Developer's identity. For the avoidance of doubt, Developer must procure its own Digital Code Signing Certificate from a Certificate Authority, cannot sign the certificate as the same individual whose identity the certificate certifies (self-sign), cannot share it with any third party, and must use it to register each Location. Upon request, Developer will provide HS One with additional information on the use of the HS One API, HS One Software, HS One Software Content and Location Data by the Developer, including the business rationale for access and use of certain data types and documentation of how data will be used. Depending upon the level of integration with the HS One APIs and HS One Software, whether read-only access through or write-back access, Developer will be required to meet certain security protocols to ensure data protection and system integrity as requested by HS One.

(d)    Upon request from HS One, Developer will complete an additional or updated security assessment as provided by HS One to ensure that Developer maintains proper security protocols and procedures that are compliant with applicable laws and adhere to industry best practices. In the event Developer fails to meet the security assessment, HS One shall provide Developer with a written description of the deficiencies. Developer shall have thirty (30) days to remediate the deficiencies or present a mutually agreeable remediation plan. If Developer fails to remediate the deficiencies within the agreed remediation timeline, HS One may immediately terminate this Agreement.

(e)    Developer shall maintain during the Term (and, if any policy is on a claims-made and reported form, for three years thereafter): (i) comprehensive "occurrence" general liability insurance, including "occurrence" product liability, contractual liability insurance and advertising injury coverage, with minimum limits of liability of $3,000,000; and (ii) technology errors and omissions insurance, with minimum limits of $3,000,000 per claim and annual aggregate, covering all acts, errors, omissions, negligence, infringement of intellectual property (except patent and trade secret) and network security and privacy risks (including coverage for unauthorized access, unauthorized use, failure of security including tampering with or introduction of malicious code into firmware, data, software systems or networks, breach of privacy perils, wrongful disclosure or theft of confidential information and affirmative breach remediation expense and regulatory action

4

coverages). Within thirty (30) days of the Effective Date and thereafter upon request from HS One, Developer shall deliver to HS One a certificate thereof with "Henry Schein One, LLC and its subsidiaries and affiliates" named as an additional insured thereon. Such insurance must insure against the Developer Application. Insurance coverage must be procured from an insurance company bearing an AM Best Rating of no less than B+ or an S&P Rating of no less than BBB. Developer shall give HS One at least 30 days' notice of cancellation or expiration of such insurance.

(f)    Developer shall not advertise or list the Developer Application in conjunction with HS One's name, HS One Software or HS One Trademarks.

**2.3.    Prohibitions on Use and Access.** Developer shall not use or access (nor facilitate or enable any unauthorized third party to use or access) the Software Developer Kit, HS One API, HS One Software or HS One Software Content in any way not expressly permitted under this Agreement. For the avoidance of doubt, Developer shall not, and shall not allow any third party to:

(a)    Modify, adapt, translate, decompile, reverse engineer, disassemble or otherwise attempt to derive code from the Software Developer Kit, HS One Software or HS One Software Content or use, copy, distribute or modify the HS One API, Software Developer Kit, HS One Software, or the HS One Software Content, or any portion thereof, through any timesharing service, service bureau, network or other similar means, duplicate any of the specific functionality or workflow of the  HS One API, Software Developer Kit.

(b)    Remove, deface, obscure, or alter HS One's copyright notice, HS One Trademarks or other notices, branding, text, or images, affixed to or provided as a part of or in connection with the Software Developer Kit, HS One API, HS One Software or HS One Software Content.

(c)    Transfer, sell, distribute, disclose, lease, syndicate, sub-syndicate, lend, or sublicense the Software Developer Kit, HS One API, HS One Software Content, HS One Software or any content or materials provided as a part of or in connection with the foregoing.

(d)    Use the HS One API, Software Developer Kit, HS One Software, HS One Software Content, Interface or any derivative works thereof for any purpose other than in connection with Developer Application as set forth herein, including, without limitation, (i) for the purpose of developing or making available any product that will be owned by a third party or distributed under the trademarks or brand of a third party without HS One's prior written approval, (ii) use in a manner that is false, inaccurate or misleading or infringes on any third party's Intellectual Property Rights, violates any law, statute, ordinance, contract, regulation or generally accepted practice in all relevant jurisdictions, is defamatory, libelous, threatening or harassing, (iii) use in a manner that may damage, interfere (or attempt to interfere) with, surreptitiously intercept or expropriate any system or data, including, without limitation, the HS One API, Software Developer Kit, HS One Software or HS One Software Content; (iv) use that may create liability for HS One to lose (in whole or in part) the services of HS One's Internet service providers or other suppliers; or (v) use that may impact or damage the HS One API, Software Developer Kit, HS One Software, HS One Software Content or Interface. If HS One determines in its sole discretion that Developer's use constitutes a prohibited use, then HS One may take action in its discretion to prevent such use including terminating this Agreement or restricting the transactions that are impacting or damaging the HS One API, Software Developer Kit, HS One Software, HS One Software Content or Interface, including limiting the transactions to non-business hours.

(e)     Provide, use, modify, reproduce, distribute, sell, display or disclose data gathered from the HS One Software, including but not limited to HS One Software Content and Location Data to any third party without Location's express written permission and in a manner that is in compliance with all applicable laws. Notwithstanding the foregoing, Developer may use de-identified and aggregated Location Data internally for the purposes of analytics, performance benchmarking, or service improvement, provided that such use complies with all applicable data privacy and security laws and does not result in disclosure to third parties

**3.      Royalty Fees, Monthly Reporting, and Payments**.

**3.1.     Royalty Fees**. As consideration for the use and access rights granted herein, Developer shall pay to HS One the applicable fees set forth in Exhibit A attached hereto.   Notwithstanding the forgoing, Developer shall in no event pay any fees to HS One with respect to any Reporting Entities as defined herein.  The fees as set forth in Exhibit A will be calculated on a per Location basis starting with the first full month after the Effective Date (e.g. if the Effective Date is other than the first day of a month, fees will begin the following month).  Developer is responsible for updating the Location counts on a monthly basis to ensure that the HS One API is not used on behalf of unauthorized Locations.

**3.2.     Monthly Reporting.** Developer shall provide a Location report to HS One through ddp.dentrix.com, in the API Royalty Reporting tab, or such other method as HS One may direct from time to time, no later than the 10th day of each calendar month for the prior calendar month's peak Location count ("**Royalty Report**").  For the avoidance of doubt, a Location is counted for a given month if Developer used an API Access Plan with respect to such Location during any portion of the month.  All Royalty Reports must include each Location's unique customer ID assigned by Developer.  Developer shall have a ten (10) calendar day grace period beyond each monthly reporting due date to submit the applicable Royalty Report. During this grace period, no penalties, suspension of Access Keys, or termination rights may be exercised by HS One solely for delay in reporting. Developer shall not be deemed in breach of its reporting obligations so long as it provides the report within the grace period. If Royalty Reports are not submitted within the grace period to HS One as per the above instructions, HS One may immediately do any or all of the following: (1) terminate this Agreement, (2) suspend or revoke the Access Key, and (3) suspend customer support to Developer.  For the avoidance of doubt, a Royalty Report must be submitted even if Location count is zero (0) for any given reporting period.  Developer shall submit its first Royalty Report no later than the 10th day of the calendar month following the first full month after the Agreement Effective Date, and without proration (e.g., if the Effective Date is the first day of a month, the first report will be due the tenth day of the following month and if the Effective Date is other than the first day of a month, fees will be payable for the following full month and the first report will be due the tenth day of the month following such full month).

**3.3.     Developer Payments.** HS One will invoice Developer on a monthly basis for the fees due for the previous month. Developer agrees to pay those fees within thirty (30) days of receiving the invoice. If Developer fails to make any payments owed to HS One, HS One may, at its sole discretion, (1) terminate this Agreement, (2) suspend or revoke the Access Key, and/or (3) suspend customer support to Developer. Interest charges of one and one-half percent (1.5%) (or the highest rate permitted by law if the maximum allowed by law is less than one and one-half percent (1.5%)) calculated daily and compounded monthly will apply to any unpaid balance which is more than thirty (30) days past due. Developer shall reimburse HS One for all reasonable costs incurred by HS One in collecting any late payments or interest, including attorney's fees, court costs, and collection agency fees. All payments are non-refundable, whether or not Developer or Locations use the services purchased.

**4.      Term and Termination.**

6

**4.1.    Term**.  This Agreement will begin as of the Effective Date and will remain effective for an initial term of three (3) years (the "**Initial Term**").  After the Initial Term, this Agreement will automatically renew for successive additional one-year periods (each a "**Renewal Term**") unless and until either party elects not to renew by giving written notice to the other party not less than sixty (60) days prior to the end of the then-current period.  As used herein, the "**Term**" means the Initial Term and each Renewal Term.

**4.2.    Termination for Cause**.  Notwithstanding the foregoing, this Agreement may be terminated by either party immediately upon written notice to the other party if the other party: (a) has a receiver or similar party appointed for its property, becomes insolvent, acknowledges its insolvency in any manner, ceases to do business, makes an assignment for the benefit of its creditors, or files a petition in bankruptcy; (b) engages in any unlawful business practice related to that party's performance under the Agreement; (c) commits a material breach of any of its obligations under this Agreement, which breach is not cured within thirty (30) days after receiving written notice from the non-breaching party specifying the nature of the breach in reasonable detail. Termination under this Section 4.2 shall not apply to breaches for failure to make timely payment, in which case HS One may proceed under Section 3.3.

**4.3.    Effect of Termination.**

(a)    Except as otherwise provided in Section 4.4(b), upon termination of this Agreement: (i) all rights and access granted hereunder shall immediately cease; (ii) Developer shall cease all use of the Software Developer Kit, HS One API, HS One Software or HS One Software Content and HS One Trademarks and shall remove the HS One API from the Developer Applications and (iii) each party shall, upon written request of the other party, return or destroy all copies of any Confidential Information (as defined herein) in its possession of which it is aware and to which it has access and is reasonably able to destroy or delete.  Upon request of HS One, a duly authorized officer of Developer shall certify that these steps have been taken.  Upon termination, HS One shall invoice Developer for fees accrued up to the effective date of termination. Developer shall pay such amount within thirty (30) days of the invoice date, provided, however, that if the termination is due to Developer's uncured failure to pay fees as set forth in Section 3.3, then such fees shall be payable immediately upon receipt of invoice.

(b)    Except in the event of termination by HS One pursuant to Section 4.2, Developer may, for a period of no more than twelve (12) months following termination ("**Wind Down Period**"), continue to access and use the HS One API and advertise or list the Developer Application in conjunction with HS One's name or HS One Trademarks in order to effectuate the termination of its use for purposes of the Developer Application; provided, however, Developer may not add new Locations to the Developer Applications that will have access to the HS One API.  Developer shall continue to submit Royalty Reports and pay fees during the Wind Down Period.

(c)    Developer shall keep and maintain for three (3) years after the termination a complete and accurate set of books and records relating to such fee payments in sufficient detail so that such fee payments can be properly verified or audited in accordance with this Agreement.

(d)    For clarity, no provision of this Agreement shall require Developer to maintain or enforce technical restrictions on retained data that was lawfully obtained via the HS One API(s) during the Term.

**4.4.    Survival.**  The provisions of Section 1 (Definitions), Section 4.4 (Effect of Termination), Section 4.5 (Survival), Section 5 (Confidentiality), Section 6.1 (Ownership), Section 7 (Proprietary Rights), Section 8.2 (Disclaimer), Section 9 (Limitation of Liability), Section 10 (Indemnification), Section 11.1 (Audit Rights) and Section 12 (Miscellaneous) shall survive expiration or termination of this Agreement,

but only to the extent necessary to enforce rights or obligations accrued prior to termination, or to comply with applicable laws or regulatory requirements.

**5.     Confidentiality.**

**5.1.     Confidential Information**. All information, which may include but will not be limited to business, technical, financial or any other information, disclosed or made accessible by a party (the "**Disclosing Party**") to the other party ("**Receiving Party**"), (i) that is marked as the confidential or proprietary information of the Disclosing Party; or (ii) that should be reasonably recognized as the confidential or proprietary information of the Disclosing Party under the circumstances, is the confidential information of the Disclosing Party ("**Confidential Information**"). Confidential Information does not include information that: (a) is or has become readily publicly available without restriction through no fault of the Receiving Party or the Receiving Party's personnel; (b) is received, without restriction, from a third party lawfully in possession of such information and lawfully empowered to disclose such information; (c) was rightfully in the Receiving Party's possession without restriction prior to its disclosure by the Disclosing Party; or (d) is independently developed by the Receiving Party without access to the Disclosing Party's Confidential Information. The terms of this Agreement, but not the existence of this Agreement, will be the Confidential Information of both parties and Developer may not disclose the fees paid under this Agreement to any third party, including Locations. For clarity, 'Confidential Information' shall not include any Location Data accessed or received by Developer under this Agreement.

**5.2.     Confidentiality**.  The Receiving Party shall safeguard and hold in strict confidence and not disclose (other than to its employees and contractors who have a reasonable need to know in order for a party to perform under this Agreement), and not use for any purpose other than in connection with this Agreement, any Confidential Information of the Disclosing Party received in connection with this Agreement, which efforts shall be at least as protective as those used to protect similar confidential information belonging to the Receiving Party.  The Receiving Party may disclose the Disclosing Party's Confidential Information to the extent required by law or court order, so long as the receiving party gives reasonable advance notice to the Disclosing Party in advance of such disclosure, if not prohibited by applicable law; seeks confidential treatment of such information from the entity to which the disclosure is made; and discloses only that information which is legally required to be disclosed.  The Disclosing Party shall be entitled to seek injunctive relief for any violation of this Section.

**6.     Trademarks.**

**6.1.     Ownership.**  Each party shall own all right, title, and interest, including without limitation all Intellectual Property Rights, relating to its Trademarks.  Except to the limited extent expressly provided in this Agreement, neither party grants, and the other party shall not acquire, any right, title, or interest (including, without limitation, any implied license) in or to any Trademarks of the first party; and all rights not expressly granted herein are deemed withheld.  All use by HS One of Developer Trademarks (including any goodwill associated therewith) shall inure to the benefit of Developer, and all use by Developer of HS One Trademarks (including any goodwill associated therewith) shall inure to the benefit of HS One.   No party shall challenge or assist others to challenge the Trademarks of the other party (except to protect such party's rights with respect to its own Trademarks) or the registration thereof by the other party, nor shall either party attempt to register any Trademarks or domain names that are confusingly similar to those of the other party.

**6.2.     License to HS One Trademarks.** Subject to the terms and conditions of this Agreement, HS One grants to Developer a limited, nonexclusive license in the Territory during the Term to display those HS One Trademarks provided by HS One to Developer for use solely in connection with the Developer Application and on associated marketing and promotional materials, in each case to the extent approved in advance in writing by HS One.

**6.3.    License to Developer Trademarks.** Subject to the terms and conditions of this Agreement, Developer grants to HS One a limited, nonexclusive license to display Developer Trademarks during the Term for the sole purpose of advertising or publicizing Developer's use of the HS One API, provided, any such use shall not modify, adapt, or combine Developer's Trademarks with other marks in a manner likely to cause confusion..

**7.    Proprietary Rights.**

**7.1.    HS One.** As between Developer and HS One, HS One retains all right, title and interest, including without limitation all Intellectual Property Rights, in and to the Software Developer Kit, HS One API, Upgrades, HS One Software or HS One Software Content, and HS One Trademarks (and any derivative works or enhancements thereof), including but not limited to, all related software, technology, information, content, materials, guidelines, documentation, and data protocol(s). Developer shall not acquire any right, title, or interest therein, except for the limited use rights expressly set forth in this Agreement.  Any rights not expressly granted herein are withheld. HS One shall have no liability for unauthorized use of the HS One Software, the HS One Software Content, Location Data or other data stored on HS One's databases.

**7.2.    Developer.** As between Developer and HS One, Developer retains all right, title and interest, including without limitation all Intellectual Property Rights, in and to the Developer Applications and Developer Trademarks (and any derivative works or enhancements thereof), excluding the Software Developer Kit, HS One API, HS One Software, HS One Software Content, HS One Trademarks and including, but not limited to, all related software, technology, information, content, materials, guidelines, documentation, and data protocol(s). HS One shall not acquire any right, title, or interest therein, except for the limited rights expressly set forth in this Agreement. Any rights not expressly granted herein are withheld.

**7.3.    Competitive or Similar Materials.** In no event will HS One be precluded from discussing, reviewing, developing for itself, having developed, acquiring, licensing, or developing for third parties, or marketing and distributing, materials which are competitive with the Developer Application or other products or services provided by Developer, irrespective of their similarity to Developer's current products or products that Developer may develop.

**8.    Representations, Warranties, Covenants and Disclaimer.**

**8.1.    Representations, Warranties and Covenants**.

(a)    Each party represents and warrants to the other that it has full authority to enter into this Agreement and that the performance of its obligations hereunder will not constitute a breach or default of any other agreement to which it is a party.

(b)    Developer represents and warrants that: (i) it and its directors, officers, employees and agents will comply with all applicable laws, rules, regulations, ordinances, decisions and guidelines, including, without limitation, federal and state anti-kickback laws, applicable export laws and regulations, privacy and data security laws and best practices (including maintaining industry standard data protection practices with respect to the treatment and protection of personal information), Health Insurance Portability and Accountability Act of 1996 Pub. Law 104-191 (Aug. 21, 1996), its implementing regulations, the Health Information Technology for Economic and Clinical Health Act ("**HITECH**") and its implementing regulations (collectively "**HIPAA**") including meeting all obligations of a Business Associate as defined under HIPAA, and any similar obligations under any applicable laws, all as amended from time to time; (ii) the Developer Application, the Interface and all other interfaces with the HS One API and HS One's databases, will not infringe on any Intellectual Property Rights of any third party; (iii) Developer will take

9

all reasonable actions and precautions to prevent the introduction of any software routine, code, instruction, time-limiting routine, back door, time bomb, Trojan horse, worm, drop dead device, logic bomb, virus or combination of the above that is designed to, or permits unauthorized access to HS One Software and HS One Software Content; and (iv) that the Developer Applications are not used to provide patient care, diagnosis, treatment, or prevention of a health care disease or condition, nor regulated by the Food and Drug Administration, and shall immediately notify HS One if at any time such status changes.

(c)    HS One represents and warrants to Developer that: (i) it and its directors, officers, employees and agents will comply with all applicable laws, rules, regulations, ordinances, decisions and guidelines, including, without limitation, federal and state anti-kickback laws, applicable export laws and regulations, privacy and data security laws and best practices (including maintaining industry standard data protection practices with respect to the treatment and protection of personal information), Health Insurance Portability and Accountability Act of 1996 Pub. Law 104-191 (Aug. 21, 1996), its implementing regulations, the Health Information Technology for Economic and Clinical Health Act ("HITECH") and its implementing regulations (collectively "HIPAA") including meeting all obligations of a Business Associate as defined under HIPAA, the 21st Century Cures Act and implementing regulations, including regulations issued by the Office of the National Coordinator for Health Information Technology and CMS regarding interoperability, information blocking and patient access, and any similar obligations under any applicable laws, all as amended from time to time; (ii) the HS One API will not infringe on any Intellectual Property Rights of any third party; and (iii) the HS One API shall not contain any virus, worm, or other malicious computer software code or routines designed to disable, damage or impair the operation of Developer Application(s), Location Data, or any other software or computer system used by Developer or accessed by Developer Application(s).

**8.2.    Disclaimer.** DEVELOPER ASSUMES FULL RESPONSIBILITY FOR THE SELECTION OF THE SOFTWARE DEVELOPER KIT TO ACHIEVE DEVELOPER'S INTENDED PURPOSES, FOR THE PROPER INSTALLATION AND USE OF THE SOFTWARE DEVELOPER KIT, CREATION OF THE INTERFACE AND FOR VERIFYING THE RESULTS OBTAINED FROM ITS USE. HS ONE DOES NOT WARRANT, GUARANTEE OR MAKE ANY REPRESENTATION REGARDING THE USE, AVAILABILITY, UPTIME OR THE RESULTS OF THE USE OF THE HS ONE API, HS ONE SOFTWARE, SOFTWARE DEVELOPER KIT, OR REGARDING THE FUNCTIONALITY, RELIABILITY, MERCHANTABILITY OR PERFORMANCE OF THE HS ONE API, HS ONE SOFTWARE, SOFTWARE DEVELOPER KIT, OR THAT THE OPERATION OF THE HS ONE API, HS ONE SOFTWARE, OR SOFTWARE DEVELOPER KIT WILL BE WITHOUT INTERRUPTION OR ERROR-FREE. ALL RIGHTS PROVIDED BY HS ONE HEREUNDER ARE PROVIDED "AS IS" AND "AS AVAILABLE." HS ONE DOES NOT ASSUME ANY RESPONSIBILITY FOR DEVELOPER APPLICATION OR THE USE OR MISUSE OF PERSONAL INFORMATION OR OTHER INFORMATION TRANSMITTED, UPLOADED, OR STORED USING HS ONE API AND SHALL NOT BE HELD LIABLE FOR ANY DAMAGES RESULTING FROM DEVELOPER APPLICATION OR THE USE OR MISUSE OF SUCH INFORMATION. DEVELOPER ACKNOWLEDGES THAT IT HAS NOT ENTERED INTO THIS AGREEMENT IN RELIANCE UPON ANY WARRANTY OR REPRESENTATION BY HS ONE, EXCEPT THOSE SPECIFICALLY SET FORTH IN SECTION 8.1(A). NO HS ONE EMPLOYEE OR AGENT IS AUTHORIZED TO MAKE ANY EXPANSION, MODIFICATION OR ADDITION TO THIS LIMITATION AND EXCLUSION OF WARRANTIES IN THIS AGREEMENT. HS ONE MAKES NO GUARANTEES WITH RESPECT TO THE AVAILABILITY OR UPTIME OF THE SOFTWARE DEVELOPER KIT. HS ONE MAY CONDUCT MAINTENANCE ON OR STOP PROVIDING ANY OF THE SOFTWARE DEVELOPER KIT COMPONENTS AT ANY TIME WITH OR WITHOUT NOTICE TO DEVELOPER.

FURTHERMORE, HS ONE MAY CHANGE THE METHOD OF ACCESS TO THE SOFTWARE DEVELOPER KIT AT ANY TIME.

**9.      Limitation of Liability. IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR ANY THIRD PARTY UNDER ANY CIRCUMSTANCES FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES ARISING OUT OF OR IN CONNECTION WITH DEVELOPER APPLICATION OR THE USE OR INABILITY TO USE THE HS ONE API, HS ONE SOFTWARE, SOFTWARE DEVELOPER KIT, THE BREACH OF ANY EXPRESS OR IMPLIED WARRANTY, OR OTHERWISE IN CONNECTION WITH THIS AGREEMENT (INCLUDING BUT NOT LIMITED TO SOFTWARE DEVELOPER KIT, HS ONE API, HS ONE SOFTWARE OR HS ONE SOFTWARE CONTENT) EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.  IN NO EVENT SHALL EITHER PARTY'S TOTAL LIABILITY FOR ANY DAMAGES, ARISING IN CONNECTION WITH THIS AGREEMENT EXCEED THE FEES PAID HEREUNDER IN THE PRECEDING TWELVE (12) MONTHS WHETHER SUCH LIABILITY ARISES FROM ANY CLAIM BASED UPON CONTRACT, BREACH OF WARRANTY, TORT OR OTHERWISE.  DEVELOPER ACKNOWLEDGES THAT THE FEES PAID HEREUNDER REFLECT THIS ALLOCATION OF RISK.**

**10.      Indemnification**.

**10.1.      Indemnification by Developer.** Developer will indemnify, defend and hold HS One and each of its members and their respective affiliates and subsidiaries and customers ("HS One Indemnified Parties") harmless for and against any and all liabilities, losses, damages (including, actual, punitive and exemplary damages), claims, costs and expenses, interest, awards, judgments and penalties (including attorney's and consultants' fees and expenses) suffered or incurred by any HS One Indemnified Parties arising or resulting from any:  (a) claim of trademark, trade dress, trade secret, copyright, patent or other intellectual property infringement relating to the Developer Application (whether alone or in combination with other products); (b) product liability claim; (c) breach by Developer of any obligation to HS One or any inaccuracy of any written representation made by Developer to HS One; (d) negligent or willful action or omission of Developer or any of its agents, employees, representatives, successors or assigns in connection with the manufacture, development, sale or distribution of the Developer Application; (e) action for recall or seizure of the Developer Application; (f) the Developer Application and use of the Software Developer Kit, HS One API, HS One Software or HS One Software Content; and (g) Developer's use or misuse of: (i) personal information or (ii) protected health information as defined by HIPAA.

**10.2.      Indemnification by HS One.** HS One will indemnify, defend and hold Developer and each of its members and their respective affiliates and subsidiaries and customers ("Developer Indemnified Parties") harmless for and against any and all liabilities, losses, damages (including, actual, punitive and exemplary damages), claims, costs and expenses, interest, awards, judgments and penalties (including attorney's and consultants' fees and expenses) suffered or incurred by any Developer Indemnified Parties arising or resulting from any: (a) claim of trademark, trade dress, trade secret, copyright, patent or other intellectual property infringement relating to the HS One API(s), Software Developer Kit, HS One Software, or any other materials provided by HS One to Developer under this Agreement (whether alone or in combination with other products); (b) product liability claim; (c) breach by HS One of any obligation to Developer or any inaccuracy of any written representation made by HS One to Developer; (d) negligent or willful action or omission of HS One or any of its agents, employees, representatives, successors or assigns in connection with the manufacture, development, sale or distribution of the HS One API(s); (e) action for recall or seizure of the the Software Developer Kit, HS One API(s), HS One Software or HS One Software Content; and (f) HS One's use or misuse of: (i) personal information or (ii) protected health information as defined by HIPAA.

If the use of HS One API(s), Software Developer Kit, HS One Software, or any other materials provided by HS One to Developer under this Agreement is, or in HS One's reasonable opinion is likely to be, enjoined due to an infringement claim, HS One shall, at Developer's option and HS One's expense: (i) procure the right to continue using the affected materials, or (ii) modify or replace them to be non-infringing without materially degrading their functionality. If neither (i) nor (ii) is commercially feasible, then Developer may, upon written notice, immediately terminate the affected portion or the entirety of this Agreement without penalty, and Developer shall have no obligation to pay any further amounts from the date of termination forward. In such event, HS One shall provide Developer, at no additional cost, with reasonable transition assistance to ensure continuity of Developer's services to its Locations consistent herewith.

## 11.    Monitoring and Enforcement.

**11.1.    Audit Rights.** HS One shall have the right, upon thirty (30) days or more written notice, during normal business hours, to have an independent third-party auditor acceptable to Developer inspect, audit and copy relevant accounts and records of Developer, including reviewing the Developer Application, for the purpose of verifying the accuracy of the calculation of fee payments by Developer and the reports regarding such payments as well as compliance with Developer's obligations under this Agreement.  The scope of such audit shall be limited to records and information directly related to this Agreement and shall exclude Developer's unrelated proprietary information, trade secrets, or other customer data.  Developer shall not seek to block or otherwise interfere with such monitoring or audit.  Audits may include requests for documents and information and visits to Developer's facilities.  Such audits will be limited to records created or updated after Effective Date.  All information reviewed and/or obtained through such audits is the Confidential Information of Developer and may only be used for determining the existence of a breach of this Agreement by Developer. The auditor shall not share any Location identifying data (practice names or contact information) with HS One.   Developer's failure to reasonably comply with HS One's efforts to audit shall constitute a material breach of this Agreement.   If such audit determines that payments are due to HS One, Developer shall pay to HS One any such additional amounts within thirty (30) days of the date on which such written audit report is delivered to Developer.  If HS One determines that Developer's payments are in excess of those required under this Agreement, HS One shall remit the difference to Developer within thirty (30) days of the date on which such written audit report is delivered to Developer. Any such inspection of records shall be at HS One's expense, unless such audit discloses an underpayment of fees of more than five percent (5%) of the total in which case, Developer shall bear the cost of such audit. Under no circumstance, however, will Developer's portion of the audit costs exceed $25,000 in the aggregate.  All payments past due shall bear interest calculated at the rate of one- and one-half percent (1.5%) per month.

**11.2.    Specific Performance.** In addition to any other available remedies, HS One may, in its sole discretion, seek specific performance, injunctive relief and/or attorney's fees.   HS One may also take other reasonable corrective action in the event that HS One receives complaints from Locations about the Developer Application or Developer's actions.

## 12.    Miscellaneous.

**12.1.    Notices.** Except as otherwise provided, all notices given under this Agreement shall be in writing and shall be deemed to have been duly given upon receipt if delivered by hand, three days after mailing by certified or registered mail, and one day after sending by overnight courier, to the parties' respective address indicated on the signature page of this Agreement or such other address as a party specifies in writing to the other party, or on the next Business Day after being sent by email as recorded on the device from which the sender sent the email, unless the sender receives an automated message that the email has not been delivered.

**12.2.    Assignment; Developer Change of Control.**  Developer may assign this Agreement without consent to any successor entity in connection with a Developer Change of Control, provided such successor assumes Developer's obligations under this Agreement. Developer shall promptly inform HS One in writing in the event that, through a transaction or series of related transactions (including by way of merger, consolidation, sale of equity or contract), there is a change of control of Developer at the immediate entity level, whereby the holders of more than fifty percent (50%) of the voting shares of Developer immediately prior to such transaction(s) do not, after giving effect to such transactions(s), own at least 50% of the voting shares of Developer (a "**Developer Change of Control**").  For clarity, a change in ownership or control of any parent, holding company, or affiliate of Developer shall not constitute a Developer Change of Control for purposes of this Agreement.

**12.3.    Independent Contractors; No Third-Party Beneficiaries.** The parties are independent contractors, and this Agreement does not create an agency, partnership, or joint venture relationship of any kind between the parties.  There are no third-party beneficiaries to this Agreement.

**12.4.    Force Majeure.** HS One shall have no liability for delays, failure in performance or damages caused by factors beyond its reasonable control, including (without limitation) changes in government regulations, acts of God, Developer's (or a third party developer's or Location's) acts or omissions, labor shortages, strikes, slowdowns, or other combined action of workmen, fires, floods, earthquakes, severe weather, serious accidents, explosions, lightning, pest damage, power surges or failures, epidemics, quarantines, wars, insurrections or riots, acts of civil or military authorities, acts of terrorism, transportation embargoes, shortages or interruptions in delivery of components and materials, acts or omissions of communications carriers, Internet inaccessibility or failure and delays by HS One's suppliers.

**12.5.    Non-Waiver; Severability.** No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power, or privilege hereunder. If any provision herein is otherwise held to be invalid or unenforceable for any reason, the remaining provisions will continue in full force without being impaired or invalidated in any way. The parties agree to replace any invalid provision with a valid provision that most closely approximates the intent and economic effect of the invalid provision.

**12.6.    Governing Law; Venue.** This Agreement shall be governed by the laws of the State of New York, without reference to conflict of laws principles. The parties irrevocably and exclusively submit to the jurisdiction of any state court located in the state and federal courts sitting in the Eastern and Southern Districts of New York or in the counties within those federal judicial districts for the purpose of any suit, action or proceeding arising out of this Agreement and hereby irrevocably waive the defense of an inconvenient forum to the maintenance of any such suit, action or proceeding.

**12.7.    Entire Agreement; Conflicts.** This Agreement supersedes any other prior or collateral agreements, whether oral or written, with respect to the subject matter hereof, including any former Henry Schein Practice Solutions Advanced Integration Program License Agreements, except for those provisions set forth in such agreements that are intended to survive termination.   This Agreement is the parties' entire agreement relating to its subject and supersedes any prior or contemporaneous agreements on that subject. The terms contained in this Agreement shall supersede any conflicting terms contained in any purchase order, invoice or other document used or submitted by either party in connection with the purchase of the Software Developer Kit covered by this Agreement and HS One shall not be bound by any provisions of any purchase order, receipt, acceptance, confirmation, correspondence, or otherwise, unless mutually agreed to in writing and signed by both parties.

13

**12.8.    Counterparts; Headings.** The parties may execute this agreement in counterparts, including PDF or other electronic copies, which taken together will constitute one instrument. The headings and captions used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

**12.9.    Non-disparagement.** Both parties acknowledge and agree that the terms and conditions of this Agreement reflect the relative costs and risk allocation of the parties.  Both parties agree that they will not, in any public forum, communicate with the press or other public media or any Location or other third party, criticize, ridicule or make any negative statement which disparages or is derogatory of the other party or any of its members or their respective affiliates, subsidiaries, officers, employees, directors or agents, or induce or encourage others to disparage or make such negative statements with respect to this Agreement, including the HS One Software or Developer Application(s).  For purposes of this Agreement, the term "disparage" includes, but is not limited to, any comment or statement (either written or verbal) which would adversely affect in any manner (a) the conduct of either party's business, or (b) the reputation or relationships of the other party or any of its members or their respective affiliates, subsidiaries, officers, employees, directors or agents, successors or assigns.

**12.10.    Amendment.** This Agreement may only be amended by a written document signed by both parties.

**IN WITNESS WHEREOF**, the parties have executed this Agreement by persons duly authorized as of the Effective Date.

<table>
<tr><td align="center"><strong>Developer</strong></td><td align="center"><strong>HS One</strong></td></tr>
</table>

| | |
|---|---|
| _____ | _____ |
| Signature | Signature |
| James Grover | Ali Hyatt |
| Name | Name |
| President | Chief Customer & Growth Officer |
| Title | Title |
| _____ | _____ |
| Date | Date |

Notice Address:

National Electronic
Attachment, Inc.
6510 Telecom Drive,
Suite300
Indianapolis, IN 46278
Attn: Chief Financial Officer and Legal


with a copy to:

If applicable

Notice Address:

Henry Schein One, LLC
1220 South 630 East
American Fork, UT 84003
Attn: Director, Partnering

with a copy to:

legal@henryscheinone.com

**EXHIBIT A**

**ACCESS PLANS & FEES**

**Names of Developer Applications:**  Trellis, rPractice (Remote Lite), Opera, Simplifeye

**API Access Plans Definitions:**

1. Commercial API Access Plans are for independent software vendors that develop, integrate, and sell its integrated applications or products to common HS One Software customers.

2. READ means permission to view the records but not perform any actions such as editing or deleting.

   a. **Plus READ Claims:** Access to all READ API categories Tables, Tableviews, and Stored Procedures listed in Exhibit B as well as a Claim Summary API which will provide insurance claim information.

3. WRITE means permission to both view and make edits to the records.

   a. **Plus WRITE:** Access to all READ API categories Tables, Tableviews, Stored Procedures listed in Exhibit B, Claim Summary API which will provide insurance claim information, and all WRITE stored procedures including Appointments, but not including Scheduling API.

   b. **Plus WRITE Scheduling**: Access to all READ API categories Tables, Tableviews, Stored Procedures listed in Exhibit B, Claim Summary API which will provide insurance claim information, and all WRITE stored procedures including Appointments and Scheduling API.

**API Initial Registration Fee**: Due immediately upon contract execution.   The Access Key will not be issued to Developer until this fee is paid.

**Monthly Fees (as applicable):**

Based on the applicable API Access Plan per Developer Application, Developer shall pay a monthly payment equal to the greater of (i) the Monthly Access Fee Per Location or (ii) the Monthly Minimum Fee, in each case as set forth in the chart below, HS One reserves the right to modify the fees set forth in this Exhibit A at any time upon sixty (60) days' written notice to Developer in accordance with Section 12.10 of the Agreement. However, HS One agrees not to increase the fees set forth in this Exhibit A by more than five percent (5%) on an annual basis.

**Development Support**

Developer should submit all technical inquiries and support tickets to the DDP Support Team by logging in at http://ddp.dentrix.com/, clicking Resources and then Support or clicking any Contact Us option on the DDP site and then choosing the technical questions link. All support tickets are captured, prioritized, and responded to in the order in which they are received in the Helpdesk Support Tracking System.

**Selected API Access Plans**

16

| API Access Plan | API Initial Registration Fee | Monthly Access Fee Per Location | Monthly Minimum Fee |
|---|---|---|---|
| Plus READ Claims | $1,750.00 | $27.50 | $625.00 |
| Plus WRITE | $5,000.00 | $41.80 | $1,900.00 |
| Plus WRITE Scheduling | $5,000.00 | $55.00 | $2,500.00 |

*The API Initial Registration Fee and the Monthly Minimum Fee is the maximum value of any row selected, not the sum of the rows selected.*

HS One will provide discounts based on End User volume as follows:

**API Volume Discounts**

| Locations* | Read – No Discount | Write Discount % | Plus Write Discounted Fee | Plus Write Scheduling Discounted Fee |
|---|---|---|---|---|
| < 2,999 | | | No discount | |
| 3,000 – 5,999 | | 10% | $37.62 | $49.50 |
| 6,000 + | | 15% | $35.53 | $46.75 |

*Number of End Users for purposes of these discounts will be the aggregate number of Locations without regard to the separate API Categories.

**EXHIBIT B**

| *READ API Categories |
| --- |
| Appointments (READ) |
| Clinical (READ) |
| Demographics (READ) |
| Financial (READ) |
| Fee Schedules (READ) |
| Insurance (READ) |
| Referral (READ) |
| Practice Setup (READ) |

# Explanation of Vyne's DDP Agreement Redlines

(June 2, 2025)

## Section 2 - Developer Rights and Obligations

- **Section 2.1.c**
  - **Concerns:**
    - There are no provisions for adding applications that Vyne may bring on through acquisition
    - The requirement to notify HS One in writing concerning ***any*** changes to Vyne's applications relative to the use of Location Data would be extremely cost prohibitive to Vyne and provide relatively little benefit to HS One.
  - **Redline Modifications:**
    - Added a provision for adding applications to the Developer Application(s) in Exhibit A through mutually agreed upon addendums
    - Struck the requirement to notify HS One in writing concerning any changes to Vyne's applications relative to the use of Location Data

- **Section 2.1.e**
  - **Concerns:**
    - Cannot access HS One practice management software or Location Data with any other applications outside of the ones listed in Exhibit A. This presents a problem for merger and acquisition activities.
    - Cannot access any data that is not available through the HS One API(s). There appears to be a significant amount of data that is currently unavailable via API but is required for existing functionality in Vyne applications.
    - The current text appears to be a violation of the Cures Act Final Rule, issued by the Office of the National Coordinator for Health Information Technology (ONC) in 2020
  - **Redline Modifications:**
    - Removed existing restrictions and replaced them with the following restrictions:
      - If an API has been made available in the HS One API(s) for accessing the specific data element of Location Data that Developer Application(s) require access to, then Developer Application(s) may only access that data element through the HS One API(s).
      - Developer has a timeline obligation to replace access methods to Location Data in Developer Application(s) with calls to the HS One API(s).  Those timelines are as follows:

- ○ 18 months from Effective Date for all data elements that were accessible via the HS One API(s) prior to Effective Date.
- ○ 18 months from the date that the specific data element becomes available via the HS One API(s) if that data element was not available via the HS One API(s) prior to Effective Date
- ■ Added a new subsection (f) that includes a technical feasibility clause and allows for extension requests upon showing good faith effort and communication. Any delays beyond the 18 month timeframe without an approved extension would constitute a material breach.

- **Section 2.2.a**
  - ○ **Concerns:**
    - ■ 60 days is too short of a timeline for implementing available upgrades
      - Coding and regression testing are likely to take 60+ days
      - That leaves no time for deploying to thousands of customers
      - Attempting to meet this timeline would cause significant disruptions to both Vyne's customer support and product roadmaps (putting previously existing customer commitments at risk).
  - ○ **Redline Modifications:**
    - ■ Replaced 60 days with 180 days
    - ■ Added a provision that HS One will provide adequate notice concerning impending Upgrades (when possible) as well as a pre-release copy of that Upgrade to begin development planning and execution as soon as possible at Vyne

- **Section 2.2.d**
  - ○ **Concerns:** The clause does not grant any opportunity to cure/remediate any security concerns identified during the required security assessment
  - ○ **Redline Modifications:** Added a 30 day provision for remediating any security concerns identified during the required security assessment

- **Section 2.3.d**
  - ○ **Concerns:**
    - ■ (ii) Redundancies with Section 2.1.c that will cause contradictions with the proposed edits for Section 2.1.c
    - ■ (iii) Phrasing that implies that data cannot be transferred to Payers which is Vyne's primary business
  - ○ **Redline Modifications:**
    - ■ Struck clauses related to the above.

- **Section 2.3.e**
  - **Concerns:**
    - Phrasing that implies that data (e.g. Patient insurance information for eligibility verifications) cannot be transferred to Payers which is Vyne's primary business
  - **Redline Modifications:**
    - Struck clauses related to the above
    - Retained phrasing that requires Location's express written permission to share Location Data with any third party (i.e. Payers)

- **Section 2.3.f**
  - **Concerns:**
    - Vyne's knowledge bases, library of instructional videos, and extensive educational materials have numerous references to PMS-specific terminology and workflows (e.g. "Guarnator" vs. "Responsible Party")
    - It would be extremely cost prohibitive for both Vyne and HS One to require that all such materials be "approved in writing in advance by HS One"
  - **Redline Modifications:** Struck the clauses

- **Section 2.3.g**
  - **Concerns:**
    - Prohibits integration for the purpose of payments, mobile payments, online payments, patient financing, point of care payments, or text to pay (which are core features of Vyne Trellis)
    - The current text appears to be a violation of the Cures Act Final Rule, issued by the Office of the National Coordinator for Health Information Technology (ONC) in 2020
    - This restriction was removed for Dental Intelligence when I negotiated their agreement because it was a part of their core functionality as well
  - **Redline Modifications:** Struck the clause

## Section 3 - Royalty Fees, Monthly Reporting, and Auto-Payments

- **Section 3.1; Exhibit A; Section 12.10**
  - **Concerns:** HS One can increase fees with 60 days' notice as frequently as they want with no limitations to the amount of increases. If these increases are exorbitant or unreasonable, Vyne would not have time to pursue a different course to maintain business continuity.
  - **Redline Modifications:** Added a limitation to the amount of increase that can be imposed within a 12 month period in Exhibit A.

- **Section 3.2**
  - **Concerns:** HS One is requesting a listing of all Vyne customers including their contact information. However, there are no clauses that prohibit HS One from intentionally targeting and soliciting those customers with competing solutions.
  - **Redline Modifications:** Limited the provided customer identifiers to simply be Vyne's unique customer IDs (i.e. Facility IDs ("FIDs"))

- **Section 3.3**
  - **Concerns:**
    - It doesn't make sense for HS One to incur ~$100,000 in payment processing fees per year to process Vyne's 12 payments
    - The current verbiage implies that HS One could charge substantially more than 1.5% interest for late fees at its own discretion (if allowed by law)
  - **Redline Modifications:**
    - Removed requirement to pay by credit card in order to allow Vyne to pay via ACH or check
    - Made it clear that the "maximum allowed by law" clause is only invoked if that maximum is *less than* 1.5%

## Section 4 - Term and Termination

- **Section 4.1**
  - **Concerns:**
    - Vyne will incur substantial development and operational costs (likely $1M+) to migrate its applications from their existing integration methods to the use of the HS One API
    - It is not practical for Vyne to incur that expense if the agreement can be terminated prior to reaping any benefit from that development
  - **Redline Modifications:** Increased the 1 year initial term to 3 years

- **Section 4.2.c**
  - **Concerns:** The clause does not require formal notification of a perceived breach so that the other party will have an opportunity to cure within the 30 days allotted
  - **Redline Modifications:** Clarified that "material breach" requires formal notification specifying the nature of the breach in reasonable detail

- **Section 4.2.d**
  - **Concerns:**
    - As a privately held company owned primarily by a private equity firm, Vyne cannot agree to having the agreement terminated upon a Change of Control
    - Such a clause would radically reduce the value of Vyne's investment into moving from its existing integration methods to the HS One API

- ○ **Redline Modifications:** Struck the clause

- **Section 4.3**
  - ○ **Concerns:**
    - ■ The clause allows either party to cancel for convenience with just 60 days written notice
    - ■ Once again, It is not practical for Vyne to incur extremely large development and operational costs to migrate to the HS One API if the agreement can be terminated prior to reaping any benefit from that development
  - ○ **Redline Modifications:** Struck the clause

- **Section 4.4.a**
  - ○ **Concerns:** Termination under any circumstance gives HS One the right to demand immediate final payment for all fees (as opposed to the 30 days outlined in Section 3.3)
  - ○ **Redline Modifications:** Specified 30 days for final payment (consistent with Section 3.3) with the exception of termination for non-payment, in which case immediate payment will be required

- **Section 4.4.b**
  - ○ **Concerns:**
    - ■ The clause stipulates that if HS One terminates the agreement, then Vyne has to remember to notify HS One within 15 days that it would like to exercise its rights. It is highly probable that after operating under the agreement for several years that Vyne will not recall or rediscover the need for notifying within the 15 days allotted.
    - ■ 90 days simply isn't enough time for Vyne to perform the software development and operational changes needed to ensure business continuity if HS One decides to terminate the agreement.
  - ○ **Redline Modifications:**
    - ■ Struck the clause requiring Vyne to notify HS One of its intent to utilize the Wind Down Period
    - ■ Increased the Wind Down Period from 90 days to 12 months

- **Section 4.4.c**
  - ○ **Concerns:** 5 years after the termination of the agreement is too long to ensure that a "complete and accurate set of books and records" are maintained relative to Vyne's payments for the HS One API(s)
  - ○ **Redline Modifications:** Reduced the time period to 3 years (similar to the U.S. Government)

- **Section 4.4 - General Concern**
  - ○ **Redline Modifications:** Added a Section 4.4.d that makes it abundantly clear that Location Data that was lawfully obtained via the HS One API(S) does not constitute "Confidential Information" that must be destroyed upon termination of the Agreement

- **Section 4.5**
  - ○ **Concerns:**
    - ■ Section 2.3 is listed in the sections that will survive the expiration/termination of the Agreement
    - ■ If HS One decides to terminate the Agreement at a future date, then Vyne would have no options for maintaining service continuity for its clients through any form of integration with HS One Software
  - ○ **Redline Modifications:**
    - ■ Struck section 2.3 from the list of surviving clauses
    - ■ Added clarification that surviving obligations apply only to the extent necessary to enforce rights or obligations accrued prior to termination

## Section 8 - Liability and Indemnity

- **Section 8.1**
  - ○ **Concerns:**
    - ■ The representations and warranties are one-sided and only imposed upon Vyne ("Developer")
    - ■ Vyne is too large of a company for it to be practical to warrant that none of its employees' family members develop, market, or sell practice management solutions.  It also wouldn't be legal for Vyne to dismiss an employee because their family member begins working for a practice management company.
  - ○ **Redline Modifications:**
    - ■ Made the representations and warranties mutual
    - ■ Struck the clause about employees' family members not working for practice management companies

## Section 9 - Limited Liability

- **Section 9**
  - ○ **Concerns:** The limitations on liability are one-sided and only imposed upon Vyne ("Developer")
  - ○ **Redline Modifications:** Made the limitations on liability mutual

## Section 10 - Indemnification

- **Section 10**
  - **Concerns:** The requirements for indemnification are one-sided and only imposed upon Vyne ("Developer")
  - **Redline Modifications:** Made the requirements for indemnification mutual

## Section 11 - Monitoring and Enforcement

- **Section 11.1**
  - **Concerns:**
    - The auditing rights as set forth do not require any coordination and pose a risk for substantially disrupting Vyne's business due to the complete omission of any limitations or restrictions on those auditing practices
    - HS One could choose to employ a VERY expensive auditor with no judiciousness and then pass the entirety of those fees onto Vyne ("Developer")
  - **Redline Modifications:**
    - Required 30 days notice for any audits (to allow appropriate coordination and scheduling)
    - Required audits to be performed by a third party
    - Required that information shared with the auditor be kept confidential
    - Placed a limit of $25K on Vyne's portion of auditor's costs

- **Section 11.2**
  - **Concerns:** HS One is permitted to take ***any*** corrective actions it sees fit if they receive ***any*** complaints from ***any*** practices about Vyne
  - **Redline Modifications:** Limited the scope of options to "reasonable corrective actions"

## Section 12 - Miscellaneous

- **Section 12.2**
  - **Concerns:**
    - As a privately held company owned primarily by a private equity firm, Vyne cannot agree to having the agreement terminated upon a Change of Control
    - Such a clause would radically reduce the value of Vyne's investment into moving from its existing integration methods to the HS One API

- The ability to use the HS One API(s) would still be restricted to the Developer Application(s) regardless of a Change of Control
  - **Redline Modifications:**
    - Removed the stipulation prohibiting the assignment of the Agreement w/ a Change of Control
    - Retained the requirement for Vyne (Developer) to notify HS One of any Change of Control

- **Section 12.9**
  - **Concerns:** The requirements for non-disparagement are one-sided and only imposed upon Vyne ("Developer")
  - **Redline Modifications:** Made the requirements for non-disparagement mutual

- **Section 12.10**
  - **Concerns:**
    - The clause allows HS One to unilaterally change the terms of the Agreement with 60 days notice and no requirement of acceptance by Vyne (Developer)
    - Vyne's only recourse under such a circumstance is to terminate the Agreement
    - Once again, It is not practical for Vyne to incur extremely large development and operational costs to migrate to the HS One API if the agreement can be terminated prior to reaping any benefit from that development
  - **Redline Modifications:** Modified the section to stipulate that the Agreement may only be amended by a written document signed by both parties

# EXHIBIT D

8/4/25, 3:33 PM    Vyne Mail - Re: EXTERNAL: [EXTERNAL] Thank you!

Case 1:25-cv-03246-MJM    Document 6-2    Filed 10/02/25    Page 52 of 89



James Grover <james.grover@vynedental.com>

## Re: EXTERNAL: [EXTERNAL] Thank you!

1 message

**Brian Weatherly** <Brian.Weatherly@henryscheinone.com>                    Tue, Jun 3, 2025 at 1:52 PM
To: James Grover <james.grover@vynedental.com>

8/4/25, 3:33 PM      Vyne Mail - Re: EXTERNAL: [EXTERNAL] Thank you!

Case 1:25-cv-03246-MJM     Document 6-2     Filed 10/02/25     Page 53 of 89

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Hi James,

Great talking today- thanks for reaching out. It will be great to get this done.

---

**From:** James Grover <james.grover@vynedental.com>
**Sent:** 03 June 2025 09:34
**To:** Weatherly, Brian <Brian.Weatherly@henryschein.co.uk>
**Subject:** EXTERNAL: [EXTERNAL] Thank you!

**CAUTION:** This email originated from outside the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. When in doubt, contact the IT and Information Security Departments.

**This Message Is From an External Sender**
This message came from outside your organization.

Thank you very much for your time this morning, Brian. It really was great to see you!

I'm looking forward to our increased partnership.

All my best,
-James



**James Grover**
President
PH: 801.380.2824
james.grover@vynedental.com
www.vynedental.com

Please consider the environment before printing this email.

E-mail messages may contain viruses, worms, or other malicious code. By reading the message and opening any attachments, the recipient accepts full responsibility for taking protective action against such code. Henry Schein is not liable for any loss or damage arising from this message.

The information in this email is confidential and may be legally privileged. It is intended solely for the addressee(s). Access to this e-mail by anyone else is unauthorized.

*Confidentiality Notice: The information contained in this electronic message and any attachments to this message are intended only for the individual(s) addressed in the message and may contain proprietary and confidential information. If you are not the intended recipient, you should not disseminate, distribute, or copy this e-mail. Please notify the sender and destroy this message. WARNING: Computer viruses can be transmitted via email. The recipient should scan this email before opening it. The company accepts no liability for any damage caused by any virus transmitted by this email.*

*Confidentiality Notice: The information contained in this electronic message and any attachments to this message are intended only for the individual(s) addressed in the message and may contain proprietary and confidential information. If you are not the intended recipient, you should not disseminate, distribute, or copy this e-mail. Please notify the sender and destroy this message. WARNING: Computer viruses can be transmitted via email. The recipient should scan this email before opening it. The company accepts no liability for any damage caused by any virus transmitted by this email.*

# EXHIBIT E



James Grover <james.grover@vynedental.com>

---

## Re: EXTERNAL: Response to Agreement Draft and Proposal for Path Forward

**James Grover** <james.grover@vynedental.com>        Fri, Jul 11, 2025 at 8:52 PM
To: "Katherine Wich Sugden (LEGAL)" <kwichsugden@henryscheinone.com>
Cc: Alan Rencher <alan.rencher@henryscheinone.com>, Riley Banks <riley.banks@henryscheinone.com>, Kelly Owen <kelly.owen@vynedental.com>, "Chris Warner (LEGAL)" <Chris.Warner@henryscheinone.com>, Brian Weatherly <Brian.Weatherly@henryscheinone.com>

Thank you so very much, Katherine.

In the meantime, I hope that you have a terrific weekend.

All the best,
-James



**James Grover**

President

PH: 801.380.2824

james.grover@vynedental.com

www.vynedental.com

On Fri, Jul 11, 2025 at 7:40 PM Katherine Wich Sugden (LEGAL) <kwichsugden@henryscheinone.com> wrote:

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Hi James: we are working through the items you noted below and will revert.

Best regards,
Katherine

Get Outlook for iOS

---

**From:** James Grover <james.grover@vynedental.com>
**Sent:** Friday, July 11, 2025 6:23 PM
**To:** Brian Weatherly <Brian.Weatherly@henryscheinone.com>
**Cc:** Katherine Wich Sugden (LEGAL) <kwichsugden@henryscheinone.com>; Alan Rencher <alan.rencher@henryscheinone.com>; Riley Banks <riley.banks@henryscheinone.com>; Kelly Owen <kelly.owen@vynedental.com>; Chris Warner (LEGAL) <Chris.Warner@henryscheinone.com>
**Subject:** Re: EXTERNAL: Response to Agreement Draft and Proposal for Path Forward

Brian,

The agreement doesn't even specify the amount for the "Prior Use Fees." (It is currently a blank placeholder.) That is one of the 3 major items that I referenced.

The same is true of "Transition Date."

You indicated below that I have been "welcome to sign the agreement for many weeks." Am I at liberty to populate those values with whatever will work best for Vyne?

Thank you,
-James



**James Grover**

President

PH: 801.380.2824

james.grover@vynedental.com

www.vynedental.com

On Fri, Jul 11, 2025 at 2:23 AM Brian Weatherly <Brian.Weatherly@henryscheinone.com> wrote:

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

James - you've been welcome to sign the agreement for many weeks.

**From:** James Grover <james.grover@vynedental.com>
**Sent:** 10 July 2025 17:57
**To:** Katherine Wich Sugden (LEGAL) <kwichsugden@henryscheinone.com>; Brian Weatherly <brian.weatherly@henryscheinone.com>
**Cc:** Alan Rencher <alan.rencher@henryscheinone.com>; Riley Banks <riley.banks@henryscheinone.com>; Kelly Owen <kelly.owen@vynedental.com>; Chris Warner (LEGAL) <Chris.Warner@henryscheinone.com>
**Subject:** Re: EXTERNAL: Response to Agreement Draft and Proposal for Path Forward

Hello, Katherine & Brian,

When can we meet to align on the commercial terms of the Agreement?

Many thanks,
-James



**James Grover**

President

PH: 801.380.2824

james.grover@vynedental.com

www.vynedental.com

On Thu, Jul 3, 2025 at 3:56 PM James Grover <james.grover@vynedental.com> wrote:
Hi Katherine,

Our list of remaining items (outside of the three critical topics that I sent you earlier) proved to be rather short and only includes the following five issues:

1. **Section 2.3.f -** Section 2.2.f already prohibits advertising the Developer Application in conjunction with HS One's name. However, Section 2.3.f further restricts Vyne from referencing Dentrix in *any* statements or materials without HS One's advance approval. In practice, this would be nearly impossible for us to implement. Our Onboarding Specialists, Trainers, and Support Technicians regularly refer to Dentrix when supporting our product, and our knowledge base and documentation often highlight differences between practice management systems (e.g., noting that Dentrix uses the term "Guarantor" while Eaglesoft uses "Responsible Party"). As written, the provision is overly broad, and we would need a more narrowly tailored stipulation to be able to agree in good faith.

2. **Section 3.1 -** This section relates to individual fees per location (distinct from the lump sum described in Section 3.4). The language should be returned to the previous verbiage: "*upon the Effective Date and throughout the term of this Agreement*" rather than the vague phrasing "*…prior to…*", which lacks a clear starting point.

3. **Section 9 -** The dollar limitation on liability should be reciprocal and equal for both parties.

4. **Section 11.1 -** We cannot agree to open-ended monitoring of our application for security and performance reasons. It's also unclear how monitoring the Developer Application supports "*verifying the accuracy of the calculation of fee payments*".

5. **Section 12.2 -** Vyne is private equity-owned, and by definition, our owners expect to sell the business at some point. Given that HS One offers competitive solutions across nearly every area of dental software (claims, patient payments, analytics, engagement, etc.) it is highly likely that any future PE buyer will have at least one competing product in their portfolio. Since our use of the API is specific to our application and cannot be transferred to another use or product, the inclusion of this provision appears to be exclusively for anti-competitive purposes. Our board simply would not permit us to agree to this stipulation.

# EXHIBIT F



James Grover <james.grover@vynedental.com>

---

## Re: EXTERNAL: DDP Agreement Negotiations

**Brian Weatherly** <Brian.Weatherly@henryscheinone.com>                    Fri, Jul 25, 2025 at 12:57 AM
To: James Grover <james.grover@vynedental.com>
Cc: "Katherine Wich Sugden (LEGAL)" <kwichsugden@henryscheinone.com>, Alan Rencher <alan.rencher@henryscheinone.com>, Riley
Banks <Riley.Banks@henryscheinone.com>, "Chris Warner (LEGAL)" <Chris.Warner@henryscheinone.com>, Kelly Owen
<kelly.owen@vynedental.com>

> CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially
> from unknown senders.
>
> Hi James,
>
> ## Please refer all correspondence to Katherine until further notice.
>
>
>
>
> Sent from Outlook for iOS
> _____
> **From:** James Grover <james.grover@vynedental.com>
> **Sent:** Friday, July 25, 2025 1:52:50 AM
> **To:** Brian Weatherly <Brian.Weatherly@henryscheinone.com>
> **Cc:** Katherine Wich Sugden (LEGAL) <kwichsugden@henryscheinone.com>; Alan Rencher <alan.rencher@henryscheinone.
> com>; Riley Banks <Riley.Banks@henryscheinone.com>; Chris Warner (LEGAL) <Chris.Warner@henryscheinone.com>; Kelly
> Owen <kelly.owen@vynedental.com>
> **Subject:** EXTERNAL: DDP Agreement Negotiations
>
> > **CAUTION:** This email originated from outside the organization. Do not click links or open attachments unless you recognize the
> > sender and know the content is safe. When in doubt, contact the IT and Information Security Departments.
> >
> > Dear Brian,
> >
> > On March 25, 2025, Steve Roberts reached out to you to initiate discussions about an API agreement that would allow Vyne Dental to
> > access the data needed for claims submission from Dentrix. Our current Dentrix integration requires customers to "print" claims to our
> > system (an approach comparable to printing to a fax service or PDF creation tool) which is significantly less efficient than the API-based
> > workflows we maintain with Eaglesoft and Open Dental.
> >
> > We were subsequently referred to Riley Banks and encouraged to join the Dentrix Developer Program (DDP). **However, the DDP does
> > not currently provide the APIs required for successful claims submission, but it restricts *all* other integration methods—
> > including our existing print-based approach.** Given that claims submission is core to our business, we've proposed an interim
> > solution: allow continued use of print integration (with per-location fees if needed) while the APIs are developed.
> >
> > Despite repeated outreach (Steve's follow-up on May 24, my meeting with your team on June 3, and ongoing efforts to revise the
> > agreement through email), progress has stalled. On June 30, I asked to meet regarding our primary concern: **the agreement restricts
> > all integration without guaranteeing access to necessary APIs.** While we provided a list of secondary concerns as requested, our
> > focus remains on resolving this key issue.
> >
> > After no response, I followed up on July 10. Your reply the next day (stating simply that Vyne has "been welcome to sign the agreement
> > for many weeks") suggested no further changes would be considered.
> >
> > Vyne has spent four months trying in good faith to establish an agreement that ensures we can continue submitting claims on behalf of
> > our mutual customers while improving their workflow. If your team remains open to discussing terms, we would welcome the opportunity
> > to meet. Otherwise, if we do not receive a response by July 28, 2025, we will interpret that as confirmation that negotiations have
> > concluded at your direction.
> >
> > Sincerely,
> > -James



## James Grover

President

PH: 801.380.2824

james.grover@vynedental.com

www.vynedental.com

*Confidentiality Notice: The information contained in this electronic message and any attachments to this message are intended only for the individual(s) addressed in the message and may contain proprietary and confidential information. If you are not the intended recipient, you should not disseminate, distribute, or copy this e-mail. Please notify the sender and destroy this message. WARNING: Computer viruses can be transmitted via email. The recipient should scan this email before opening it. The company accepts no liability for any damage caused by any virus transmitted by this email.*

*Confidentiality Notice: The information contained in this electronic message and any attachments to this message are intended only for the individual(s) addressed in the message and may contain proprietary and confidential information. If you are not the intended recipient, you should not disseminate, distribute, or copy this e-mail. Please notify the sender and destroy this message. WARNING: Computer viruses can be transmitted via email. The recipient should scan this email before opening it. The company accepts no liability for any damage caused by any virus transmitted by this email.*

# EXHIBIT G



James Grover <james.grover@vynedental.com>

---

## Re: EXTERNAL: DDP Agreement Negotiations

**Katherine Wich Sugden (LEGAL)** <kwichsugden@henryscheinone.com>      Mon, Jul 28, 2025 at 4:44 PM
To: James Grover <james.grover@vynedental.com>
Cc: Kelly Owen <kelly.owen@vynedental.com>, Brian Weatherly <Brian.Weatherly@henryscheinone.com>, Alan Rencher
<Alan.Rencher@henryscheinone.com>, Riley Banks <Riley.Banks@henryscheinone.com>, "Chris Warner (LEGAL)"
<Chris.Warner@henryscheinone.com>

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

James,

Please find attached a revised draft of the agreement. This draft retains the marked changes we previously made that Vyne has not yet responded to and adds some changes and comments to address points you raised in your recent emails. Note that one point this draft does not address, and that is not up for negotiation, is any provision permitting Vyne to continue to hack our platform during or after the term of this agreement. Vyne's prior and ongoing hacking has caused us damages, compromises the security and integrity of our platform, and violates laws. Outside of providing a ramp period to stop all unauthorized and hostile access, we cannot and will not permit any API partner to access our platform outside of our API. We remain open and willing to continue discussions regarding the remaining provisions within the bounds we have established with the many other partners we work with and updates we have made to our program and platform. Please note that, whether we come to agreement on those remaining terms or not, we will take all action necessary to protect our platform and our customers.

Best regards,
Katherine

**Katherine Wich Sugden**
*Henry Schein One*
*General Counsel, VP*

** Privacy and Confidentiality Notice ** This e-mail (including any attachments) may contain material that (1) is confidential and for the sole use of the intended recipient, and (2) may be protected by the attorney-client privilege, attorney work product doctrine or other legal rules. Any review, reliance, or distribution by others or forwarding without express permission is strictly prohibited. If you are not the intended recipient(s), please contact the sender and delete all copies.

---

**From:** James Grover <james.grover@vynedental.com>
**Sent:** Saturday, July 26, 2025 3:01 PM
**To:** Katherine Wich Sugden (LEGAL) <kwichsugden@henryscheinone.com>
**Cc:** Kelly Owen <kelly.owen@vynedental.com>
**Subject:** Re: EXTERNAL: DDP Agreement Negotiations

Thank you very much, Katherine. We greatly appreciate your assistance and facilitation. We'll look forward to your response on Monday.

All the best,
-James



**James Grover**

President

PH: 801.380.2824

james.grover@vynedental.com

www.vynedental.com

On Fri, Jul 25, 2025 at 3:04 PM Katherine Wich Sugden (LEGAL) <kwichsugden@henryscheinone.com> wrote:

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Hi James - we are working through our responses to the points you raised and expect to send you a fulsome response on Monday. As mentioned, several of our team members have been on vacation. We appreciate your patience.

Best regards,
Katherine

**Katherine Wich Sugden**
*Henry Schein One*
General Counsel, VP

** Privacy and Confidentiality Notice ** This e-mail (including any attachments) may contain material that (1) is confidential and for the sole use of the intended recipient, and (2) may be protected by the attorney-client privilege, attorney work product doctrine or other legal rules. Any review, reliance, or distribution by others or forwarding without express permission is strictly prohibited. If you are not the intended recipient(s), please contact the sender and delete all copies.

**From:** Brian Weatherly <Brian.Weatherly@henryscheinone.com>
**Sent:** Thursday, July 24, 2025 11:57 PM
**To:** James Grover <james.grover@vynedental.com>
**Cc:** Katherine Wich Sugden (LEGAL) <kwichsugden@henryscheinone.com>; Alan Rencher <alan.rencher@henryscheinone.com>; Riley Banks <Riley.Banks@henryscheinone.com>; Chris Warner (LEGAL) <Chris.Warner@henryscheinone.com>; Kelly Owen <kelly.owen@vynedental.com>
**Subject:** Re: EXTERNAL: DDP Agreement Negotiations

Hi James,

Please refer all correspondence to Katherine until further notice.

Sent from Outlook for iOS

**From:** James Grover <james.grover@vynedental.com>
**Sent:** Friday, July 25, 2025 1:52:50 AM
**To:** Brian Weatherly <Brian.Weatherly@henryscheinone.com>
**Cc:** Katherine Wich Sugden (LEGAL) <kwichsugden@henryscheinone.com>; Alan Rencher <alan.rencher@henryscheinone.com>; Riley Banks <Riley.Banks@henryscheinone.com>; Chris Warner (LEGAL) <Chris.Warner@henryscheinone.com>; Kelly Owen <kelly.owen@vynedental.com>
**Subject:** EXTERNAL: DDP Agreement Negotiations

CAUTION: This email originated from outside the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. When in doubt, contact the IT and Information Security Departments.

Dear Brian,

On March 25, 2025, Steve Roberts reached out to you to initiate discussions about an API agreement that would allow Vyne Dental to access the data needed for claims submission from Dentrix. Our current Dentrix integration requires customers to "print" claims to our system (an approach comparable to printing to a fax service or PDF creation tool) which is significantly less efficient than the API-based workflows we maintain with Eaglesoft and Open Dental.

We were subsequently referred to Riley Banks and encouraged to join the Dentrix Developer Program (DDP). **However, the DDP does not currently provide the APIs required for successful claims submission, but it restricts *all* other integration methods —including our existing print-based approach.** Given that claims submission is core to our business, we've proposed an interim solution: allow continued use of print integration (with per-location fees if needed) while the APIs are developed.

Despite repeated outreach (Steve's follow-up on May 24, my meeting with your team on June 3, and ongoing efforts to revise the agreement through email), progress has stalled. On June 30, I asked to meet regarding our primary concern: **the agreement restricts all integration without guaranteeing access to necessary APIs.** While we provided a list of secondary concerns as requested, our focus remains on resolving this key issue.

After no response, I followed up on July 10. Your reply the next day (stating simply that Vyne has "been welcome to sign the agreement for many weeks") suggested no further changes would be considered.

Vyne has spent four months trying in good faith to establish an agreement that ensures we can continue submitting claims on behalf of our mutual customers while improving their workflow. If your team remains open to discussing terms, we would welcome the opportunity to meet. Otherwise, if we do not receive a response by July 28, 2025, we will interpret that as confirmation that negotiations have concluded at your direction.

Sincerely,
-James



**James Grover**

President

PH: 801.380.2824

james.grover@vynedental.com

www.vynedental.com

*Confidentiality Notice: The information contained in this electronic message and any attachments to this message are intended only for the individual(s) addressed in the message and may contain proprietary and confidential information. If you are not the intended recipient, you should not disseminate, distribute, or copy this e-mail. Please notify the sender and destroy this message. WARNING: Computer viruses can be transmitted via email. The recipient should scan this email before opening it. The company accepts no liability for any damage caused by any virus transmitted by this email.*

*Confidentiality Notice: The information contained in this electronic message and any attachments to this message are intended only for the individual(s) addressed in the message and may contain proprietary and confidential information. If you are not the intended recipient, you should not disseminate, distribute, or copy this e-mail. Please notify the sender and destroy this message. WARNING: Computer viruses can be transmitted via email. The recipient should scan this email before opening it. The company accepts no liability for any damage caused by any virus transmitted by this email.*

*Confidentiality Notice: The information contained in this electronic message and any attachments to this message are intended only for the individual(s) addressed in the message and may contain proprietary and confidential information. If you are not the intended recipient, you should not disseminate, distribute, or copy this e-mail. Please notify the sender and destroy this message. WARNING: Computer viruses can be transmitted via email. The recipient should scan this email before opening it. The company accepts no liability for any damage caused by any virus transmitted by this email.*

*Confidentiality Notice: The information contained in this electronic message and any attachments to this message are intended only for the individual(s) addressed in the message and may contain proprietary and confidential information. If you are not the intended recipient, you should not disseminate, distribute, or copy this e-mail. Please notify the sender and destroy this message. WARNING: Computer viruses can be transmitted via email. The recipient should scan this email before opening it. The company accepts no liability for any damage caused by any virus transmitted by this email.*

*Confidentiality Notice: The information contained in this electronic message and any attachments to this message are intended only for the individual(s) addressed in the message and may contain proprietary and confidential information. If you are not the intended recipient, you should not disseminate, distribute, or copy this e-mail. Please notify the sender and destroy this message. WARNING: Computer viruses can be transmitted via email. The recipient should scan this email before opening it. The company accepts no liability for any damage caused by any virus transmitted by this email.*

**Dentrix Developer Program Commercial Agreement (HS1 7.28.25).docx**
98K

# HENRY SCHEIN ONE
## DEVELOPER PROGRAM AGREEMENT

This Henry Schein One Developer Program Agreement, including all exhibits hereto (collectively referred to as, the "**Agreement**"), is effective as of the Effective Date (as defined below) and entered into by and between National Electronic Attachment, Inc., a Delaware corporation dba Vyne Dental ("**Developer**"), and Henry Schein One, LLC, a Delaware limited liability company ("**HS One**").

**NOW THEREFORE**, in consideration of the mutual covenants and promises contained herein, the parties agree as follows:

1.        **Definitions.** Unless defined elsewhere in this Agreement, the following capitalized terms shall have the meanings set forth below:

"**Access Key**" means the security keys and files provided by HS One to Developer for Developer's use of the HS One API or other portions of the Software Developer Kit, including the username(s) and password(s) that permit Developer to access the HS One Software Content.

"**Developer Application(s)**" means the software application(s), developed, owned, or operated by Developer to interact with the HS One API and HS One Software named on Exhibit A attached hereto.

"**Developer Trademark(s)**" means all names, trade names, trademarks, service marks, domain names and logos owned by Developer and used by Developer in connection with Developer's products and services, including the Developer Application.

"**Developer Value Added Services**" means services offered by Developer related to and part of the Developer Application (examples include, but are not limited to, support, installation and conversion, configuration, database tuning, marketing change management and training, etc.).

"**Digital Code Signing Certificate**" means a digital certificate issued by a certificate authority approved by HS One that binds the Developer to a public key that is mathematically related to a private key pair pursuant to a Public Key Infrastructure (PKI).

"**Effective Date**" means the date signed by Developer.

"**HS One API(s)**" means the interfaces, documentation, protocols, and tools utilized to integrate with HS One Software.

"**HS One End User License Agreement**" means the terms and conditions on which HS One offers HS One Software or other products, applicable to Locations.

"**HS One Software**" means HS One's Dentrix practice management software, which includes the machine-readable software programs and associated files, whether in packaged form, or received electronically and any modified version, upgrades and other copies of such programs and files owned or licensed by HS One.

"**HS One Software Content**" means all of HS One's information and procedures stored in and retrieved from HS One Software databases (excluding Location Data and information that Developer obtains independent of the Software Developer Kit and the HS One API).

1

"**HS One Trademark(s)**" means all names, trade names, trademarks, service marks, domain names and logos owned by HS One and its affiliates and used in connection with this Agreement.

"**Intellectual Property Rights**" means any and all intellectual property rights existing from time to time under any laws or regulations anywhere in the world.

"**Interface**" means a shared boundary across which the Developer Application and the HS One Software interact and exchange information using the HS One API.

"**Knowledge Base**" means certain articles and other materials provided by HS One from time to time with information on access and use of the HS One API.

"**Location**" means a clinic or site that uses the HS One Software and that licenses the Developer Application. For the avoidance of doubt, with respect to organizations that have multiple clinics or sites, each such clinic or site shall be a separate Location.

"**Location Data**" means the information (including but not limited to patient, clinical, scheduling, and insurance information) that is loaded into the HS One Software by a Location.

"**Reporting Entities**" means any entity that files a cost report with any federal or state health care program (e.g., Medicare enrolled hospitals; other Medicare Part A enrolled facilities subject to cost reporting, such as dental or medical schools; Federally Qualified Health Centers; Community Health Centers; Rural Health Clinics or other cost reporting entities).

"**Software Developer Kit**" means the Access Key (as defined above), sample code, documentation and all other tools and information made available to Developer to assist in using the HS One API.

"**Term**" has the meaning given in Section 4.1.

"**Territory**" means the United States and Canada.

"**Trademark(s)**" means the Developer Trademarks and the HS One Trademarks.

## 2.      Developer Rights and Obligations.
## 2.1.    Developer's Access and Use of HS One API and Software Developer Kit.

(a)      During the Term, HS One shall make available to Developer the HS One API and Software Developer Kit.  Subject to the terms and conditions of this Agreement, HS One grants to Developer in the Territory a limited, nonexclusive, nontransferable right to:

(i)      access and use the HS One API with the Developer Application;

(ii)      use internally and copy the HS One Software, Software Developer Kit and related documentation solely for the purpose of exercising the foregoing right to access and use the HS One API;

(iii)      access and use the Knowledge Base; and

(iv)      use HS One Trademarks in support of and in accordance with this Agreement.

2

(b)     Developer acknowledges and agrees that Location's use of the HS One Software and HS One Software Content is subject to the terms of the HS One End User License Agreement.

(c)     Developer's right to use and access the HS One API and Software Developer Kit shall be restricted solely to the Developer Application(s) named on Exhibit A attached hereto, and on any subsequent addenda or additional Exhibit as mutually agreed to in writing by the parties hereafter. Developer shall promptly notify HS One in writing of any material changes to the Developer Application with respect to the use and access to the HS One API, HS One Software, HS One Software Content and Location Data. FOR THE AVOIDANCE OF DOUBT, THE RIGHT TO USE AND ACCESS THE HS ONE API, SOFTWARE DEVELOPER KIT, HS ONE SOFTWARE, AND LOCATION DATA ACCESSED THROUGH THE HS ONE API SHALL NOT BE EXTENDED TO ANY OTHER APPLICATIONS OR PRODUCTS OF DEVELOPER OR ANY OF ITS CURRENT OR FUTURE AFFILIATES WITHOUT THE EXPRESS WRITTEN CONSENT OF HS ONE.

(d)     The Developer must use only those API keys generated and issued by HS One in order to ensure accuracy and security of Location Data and cannot use API keys from any other entity or source. Use of any unauthorized API keys is cause for immediate termination of the Agreement.

(e)     As of the date that is ninety (90) days following the Effective Date (the "**Transition Date**"), Developer may not access any HS One practice management software except through means explicitly authorized in an agreement with HSOne. Any access by Developer of any HS One practice management software outside of HS One authorized means will be a material breach of this Agreement and HS One may immediately terminate this Agreement upon discovery of any such unauthorized access and may pursue other remedies with respect thereto.

(f)

## 2.2.    Developer's Obligations.

(a)     Developer shall, at its own cost and expense, develop the Interface relating to the Developer Applications. The "About" screen of each Developer Application shall contain the following statement for Commercial Applications as applicable: "COMPANY NAME / APP NAME" is not affiliated with or sponsored by Henry Schein, Inc. or its affiliates. This software application utilizes the Henry Schein One API Software Development Kit; all rights reserved". HS One may extend, enhance, upgrade, improve, alter, or modify the Software Developer Kit, HS One API, HS One Software or HS One Software Content, or any portions thereof (an "Upgrade") from time to time in HS One's sole discretion. HS One will provide written notice (which may be by email to the last email provided by Developer or last used in communication from Developer) of the Upgrade and a pre-release copy of the Upgrade to Developer ninety (90) days or more prior to HS One's general release of an Upgrade. If the Upgrade is a "hotfix" and ninety (90) days notice is infeasible, then HS One will provide such notice and pre-release copy to Developer as soon as is reasonably feasible. Developer acknowledges and agrees that any such modifications may affect the compatibility and functionality of the Developer Application and may require Developer to make changes to such Developer Application and the Interface, as applicable, at Developer's own cost. To the extent an Upgrade requires Developer to make any modifications, Developer shall, as soon as is reasonably practicable, and in any event within one hundred eighty (180) days after HS One delivers an Upgrade (i) include such Upgrade on all newly licensed Developer Applications, and (ii) distribute the Upgrade to the already-installed base of existing Locations.

3

(b)      Developer further acknowledges and agrees that it shall not provide any access via any means to the HS One Software, HS One Software Content, Access Key, HS One API(s) or Software Developer Kit to any third party.  All third-party access to HS One Software, HS One Software Content, Access Key, HS One API(s) or Software Developer Kit must be authorized directly by HS One via a fully executed Program Agreement between HS One and such third party. Developer is solely responsible for maintaining the strict confidentiality of Access Keys provided by HS One and any damages, or losses that may be incurred or suffered as a result of Developer's failure to maintain such confidentiality are Developer's sole responsibility.  HS One is not liable for any harm related to the unauthorized use of Developer's Access Keys not in accordance with the terms hereof.  The Access Keys are the property of HS One and may be revoked at any time in the sole discretion of HS One for Developer's failure to comply with any of the terms contained herein, including but not limited to the following: (i) Developer shares the Access Keys with any third party, including Locations, (ii) the security of such Access Keys is compromised in any way, (iii) Developer breaches any term of this Agreement; or (iv) this Agreement is terminated.

(c)      Within thirty (30) days of execution of this Agreement and prior to each Renewal Term, Developer shall provide to HS One a copy of its Digital Code Signing Certificate.  The Developer agrees to sign all code with its private key and direct each Location to use the Developer's public key to verify the Developer's identity.  For the avoidance of doubt, Developer must procure its own Digital Code Signing Certificate from a Certificate Authority, cannot sign the certificate as the same individual whose identity the certificate certifies (self-sign), cannot share it with any third party, and must use it to register each Location.  Upon request, Developer will provide HS One with additional information on the use of the HS One API, HS One Software, HS One Software Content and Location Data by the Developer, including the business rationale for access and use of certain data types and documentation of how data will be used.  Depending upon the level of integration with the HS One APIs and HS One Software, whether read-only access through or write-back access, Developer will be required, to the same extent as other similarly situated Developers, to meet certain security protocols to ensure data protection and system integrity.

(d)      Upon request from HS One, Developer will complete an additional or updated security assessment as provided by HS One to ensure that Developer maintains proper security protocols and procedures that are compliant with applicable laws and adhere to industry best practices.  In the event Developer fails to meet the security assessment, HS One shall provide Developer with a written description of the deficiencies. Developer shall have thirty (30) days to remediate the deficiencies or present a mutually agreeable remediation plan. If Developer fails to remediate the deficiencies within the agreed remediation timeline, HS One may immediately terminate this Agreement.

(e)      Developer shall maintain during the Term (and, if any policy is on a claims-made and reported form, for three years thereafter): (i) comprehensive "occurrence" general liability insurance, including "occurrence" product liability, contractual liability insurance and advertising injury coverage, with minimum limits of liability of $3,000,000; and (ii) technology errors and omissions insurance, with minimum limits of $3,000,000 per claim and annual aggregate, covering all acts, errors, omissions, negligence, infringement of intellectual property (except patent and trade secret) and network security and privacy risks (including coverage for unauthorized access, unauthorized use, failure of security including tampering with or introduction of malicious code into firmware, data, software systems or networks, breach of privacy perils, wrongful disclosure or theft of confidential information and affirmative breach remediation expense and regulatory action coverages). Within thirty (30) days of the Effective Date and thereafter upon request from HS One, Developer shall deliver to HS One a certificate thereof with "Henry Schein One, LLC and its

4

subsidiaries and affiliates" named as an additional insured thereon. Such insurance must insure against the Developer Application. Insurance coverage must be procured from an insurance company bearing an AM Best Rating of no less than B+ or an S&P Rating of no less than BBB. Developer shall give HS One at least 30 days' notice of cancellation or expiration of such insurance.

(f)    Except with prior approval from HS One, Developer shall not advertise or list the Developer Application in conjunction with HS One's name, HS One Software or HS One Trademarks.

**2.3.    Prohibitions on Use and Access.**  Developer shall not use or access (nor facilitate or enable any third party to use or access) the Software Developer Kit, HS One API, HS One Software or HS One Software Content in any way not expressly permitted under this Agreement. For the avoidance of doubt, Developer shall not, and shall not allow any third party to:

(a)    Modify, adapt, translate, decompile, reverse engineer, disassemble or otherwise attempt to derive code from the Software Developer Kit, HS One Software or HS One Software Content or use, copy, distribute or modify the HS One API, Software Developer Kit, HS One Software, or the HS One Software Content, or any portion thereof, through any timesharing service, service bureau, network or other similar means, duplicate any of the specific functionality or workflow of the HS One API, Software Developer Kit.

(b)    Remove, deface, obscure, or alter HS One's copyright notice, HS One Trademarks or other notices, branding, text, or images, affixed to or provided as a part of or in connection with the Software Developer Kit, HS One API, HS One Software or HS One Software Content.

(c)    Transfer, sell, distribute, disclose, lease, syndicate, sub-syndicate, lend, or sublicense the Software Developer Kit, HS One API, HS One Software Content, HS One Software or any content or materials provided as a part of or in connection with the foregoing.

(d)    Use the HS One API, Software Developer Kit, HS One Software, HS One Software Content, Interface or any derivative works thereof for any purpose other than in connection with Developer Application as set forth herein, including, without limitation, (i) for the purpose of developing or making available any product that will be owned by a third party or distributed under the trademarks or brand of a third party without HS One's prior written approval, (ii) allow integration with or access to HS One Software, Software Developer Kit, or HS One Software Content without direct use of the HS One API after the Transition Date, (iii) upload the HS One Software Content to any third party service or "middleware" that would bypass the HS One database access services to provide access to others, (iv) use in a manner that is false, inaccurate or misleading or infringes on any third party's Intellectual Property Rights, violates any law, statute, ordinance, contract, regulation or generally accepted practice in all relevant jurisdictions, is defamatory, libelous, threatening or harassing, (v) use in a manner that may damage, interfere (or attempt to interfere) with, surreptitiously intercept or expropriate any system or data, including, without limitation, the HS One API, Software Developer Kit, HS One Software or HS One Software Content; (vi) use that may create liability for HS One to lose (in whole or in part) the services of HS One's Internet service providers or other suppliers; or (vii) use that may impact or damage the HS One API, Software Developer Kit, HS One Software, HS One Software Content or Interface. If HS One determines in its sole discretion that Developer's use constitutes a prohibited use, then HS One shall notify Developer in writing and permit Developer a thirty (30) day time period to cure such prohibited use and, to the extent no cure is provided within thirty (30) days, HS One may take action in its discretion to prevent such use including terminating this Agreement or restricting the transactions that are impacting or damaging the HS One API, Software Developer Kit, HS One

5

Software, HS One Software Content or Interface, including limiting the transactions to non-business hours.

(e)    Provide, use, modify, reproduce, distribute, sell, display or disclose data gathered from the HS One Software, including but not limited to HS One Software Content and Location Data to any third party; provided that such Location Data may be used by Developer for the purpose of and to the extent necessary to provide the Developer Application and Developer Value Added Services (to the extent applicable) and not, for example and without limitation, to otherwise market to or contact such Locations, or to engage in data mining, data sale, analytics, marketing or any other activity outside the direction of HS One but, in all cases, only with  without Location's express written permission and in a manner that is in compliance with all applicable laws. Notwithstanding the foregoing, Developer may use de-identified and aggregated Location Data internally for the purposes of delivering services to its customers, analytics, performance benchmarking, or service improvement, provided that such use is permitted pursuant to Developer's own agreements with Locations and such use complies with all applicable data privacy and security laws and does not result in disclosure to third parties.

**3.    Royalty Fees, Monthly Reporting, and Payments**.

**3.1.    Royalty Fees.** As consideration for the use and access rights granted herein, Developer shall pay to HS One the applicable fees set forth in Exhibit A attached hereto.    Notwithstanding the forgoing, Developer shall in no event pay any fees to HS One with respect to any Reporting Entities as defined herein.  The fees as set forth in Exhibit A will be calculated on a per Location basis starting with the first full month after the Effective Date (e.g. if the Effective Date is other than the first day of a month, fees will begin the following month).  For the avoidance of doubt, notwithstanding Section 2.1(e), Developer will include all Locations in each Royalty Report (as defined below) and pay fees for all such Locations upon the Effective Date and throughout the term of this Agreement, including during the Transition Date and regardless of whether Developer is using the HS One API with respect to any such Locations. Developer is responsible for updating the Location counts on a monthly basis to ensure that the HS One API is not used on behalf of unauthorized Locations.

**3.2.    Monthly Reporting.** Developer shall provide a Location report to HS One through ddp.dentrix.com, in the API Royalty Reporting tab, or such other method as HS One may direct from time to time, no later than the 10th day of each calendar month for the prior calendar month's peak Location count ("**Royalty Report**").  For the avoidance of doubt, a Location is counted for a given month if Developer used an API Access Plan with respect to such Location during any portion of the month.  All Royalty Reports must include Locations by API Access Plan, Developer Application(s) used by each Location, and each Location's unique customer ID assigned by Developer.  If Royalty Reports are not submitted to HS One as per the above instructions, HS One may immediately do any or all of the following: (1) terminate this Agreement, (2) suspend or revoke the Access Key, and (3) suspend customer support to Developer.  For the avoidance of doubt, a Royalty Report must be submitted even if Location count is zero (0) for any given reporting period.  Developer shall submit its first Royalty Report no later than the 10th day of the calendar month following the first full month after the Agreement Effective Date, and without proration (e.g., if the Effective Date is the first day of a month, the first report will be due the tenth day of the following month and if the Effective Date is other than the first day of a month, fees will be payable for the following full month and the first report will be due the tenth day of the month following such full month).

**3.3.    Developer Payments.** HS One will invoice Developer on a monthly basis for the fees due for the previous month. Developer agrees to pay those fees within thirty (30) days of receiving the invoice. If Developer fails to make any payments owed to HS One, HS One may, at its sole discretion, (1) terminate this Agreement, (2) suspend or revoke the Access Key, and/or (3) suspend customer support to Developer. Interest charges of one and one-half percent (1.5%) (or the highest rate permitted by law if the maximum allowed by law is less than one and one-half percent (1.5%)) calculated daily and compounded monthly will apply to any unpaid balance which is more than thirty (30) days past due. Developer shall reimburse HS One for all reasonable costs incurred by HS One in collecting any late payments or interest, including attorney's fees, court costs, and collection agency fees. All payments are non-refundable, whether or not Developer or Locations use the services purchased.

**3.4.    Prior Use Fees.** In addition to the fees set forth on Exhibit A, as consideration for Developer's prior unauthorized access of the HS One Software and Location Data, promptly following the Effective Date HS One will invoice, and Developer agrees to pay, a prior use fee in the amount of $2,000,000.

**4.    Term and Termination.**

**4.1.    Term**. This Agreement will begin as of the Effective Date and will remain effective for an initial term of one (1) year (the "**Initial Term**"). After the Initial Term, this Agreement will automatically renew for successive additional one-year periods (each a "**Renewal Term**") unless and until either party elects not to renew by giving written notice to the other party not less than sixty (60) days prior to the end of the then-current period. As used herein, the "**Term**" means the Initial Term and each Renewal Term.

**4.2.    Termination for Cause**. Notwithstanding the foregoing, this Agreement may be terminated by either party immediately upon written notice to the other party if the other party: (a) has a receiver or similar party appointed for its property, becomes insolvent, acknowledges its insolvency in any manner, ceases to do business, makes an assignment for the benefit of its creditors, or files a petition in bankruptcy; (b) engages in any unlawful business practice related to that party's performance under the Agreement; effectuates a Developer Change of Control which is not in accordance with Section 12.2; (c) commits a material breach of any of its obligations under this Agreement, which breach is not cured within thirty (30) days after receiving written notice from the non-breaching party specifying the nature of the breach in reasonable detail. Termination under this Section 4.2 shall not apply to breaches for failure to make timely payment, in which case HS One may proceed under Section 3.3.

**4.3.    [Intentionally Omitted]**

**4.4.    Effect of Termination.**

(a)    Except as otherwise provided in Section 4.4(b), upon termination of this Agreement: (i) all rights and access granted hereunder shall immediately cease; (ii) Developer shall cease all use of the Software Developer Kit, HS One API, HS One Software or HS One Software Content and HS One Trademarks and shall remove the HS One API from the Developer Applications and (iii) each party shall, upon written request of the other party, return or destroy all copies of any Confidential Information (as defined herein) in its possession of which it is aware and to which it has access and is reasonably able to destroy or delete. For the avoidance of doubt, the obligation to delete Confidential Information will not extend to Location Data to the extent such Location Data does not include any Hs One Confidential Information. Upon request of HS One, a duly authorized officer of Developer shall certify that these steps have been taken. Upon termination, HS One shall invoice Developer for fees accrued up to the effective date of termination. Developer shall pay such amount within thirty (30) days of the invoice date, provided, however, that if the termination is due

7

to Developer's uncured failure to pay fees as set forth in Section 3.3, then such fees shall be payable immediately upon receipt of invoice.

(b)     Except in the event of termination by HS One pursuant to Section 4.2, and subject to Developer providing notice to HS One of its intent to exercise such right at least fifteen (15) days prior to the termination date and subject to Developer's continued compliance with this Agreement, Developer may, for a period of no more than one hundred eighty (180) days following termination ("**Wind Down Period**"), continue to access and use the HS One API and advertise or list the Developer Application in conjunction with HS One's name or HS One Trademarks in order to effectuate the termination of its use for purposes of the Developer Application; provided, however, Developer may not add new Locations to the Developer Applications that will have access to the HS One API.  Developer shall continue to submit Royalty Reports and pay fees during the Wind Down Period.

(c) Developer shall keep and maintain for five (5) years after the termination a complete and accurate set of books and records relating to such fee payments in sufficient detail so that such fee payments can be properly verified or audited in accordance with this Agreement.

**4.5.     Survival.**  The provisions of Section 1 (Definitions),  Section 2.3 (Prohibitions), Section 4.4 (Effect of Termination), Section 4.5 (Survival), Section 5 (Confidentiality), Section 6.1 (Ownership), Section 7 (Proprietary Rights), Section 8.2 (Disclaimer), Section 9 (Limitation of Liability), Section 10 (Indemnification), Section 11.1 (Audit Rights) and Section 12 (Miscellaneous) shall survive expiration or termination of this Agreement.

## 5.     Confidentiality.

**5.1.     Confidential Information**. All information, which may include but will not be limited to business, technical, financial or any other information, disclosed or made accessible by a party (the "**Disclosing Party**") to the other party ("**Receiving Party**"), (i) that is marked as the confidential or proprietary information of the Disclosing Party; or (ii) that should be reasonably recognized as the confidential or proprietary information of the Disclosing Party under the circumstances, is the confidential information of the Disclosing Party ("**Confidential Information**"). Confidential Information does not include information that: (a) is or has become readily publicly available without restriction through no fault of the Receiving Party or the Receiving Party's personnel; (b) is received, without restriction, from a third party lawfully in possession of such information and lawfully empowered to disclose such information; (c) was rightfully in the Receiving Party's possession without restriction prior to its disclosure by the Disclosing Party; or (d) is independently developed by the Receiving Party without access to the Disclosing Party's Confidential Information. The terms of this Agreement, but not the existence of this Agreement, will be the Confidential Information of both parties and Developer may not disclose the fees paid under this Agreement to any third party, including Locations.

**5.2.     Confidentiality**.  The Receiving Party shall safeguard and hold in strict confidence and not disclose (other than to its employees and contractors who have a reasonable need to know in order for a party to perform under this Agreement), and not use for any purpose other than in connection with this Agreement, any Confidential Information of the Disclosing Party received in connection with this Agreement, which efforts shall be at least as protective as those used to protect similar confidential information belonging to the Receiving Party. The Receiving Party may disclose the Disclosing Party's Confidential Information to the extent required by law or court order, so long as the receiving party gives reasonable advance notice to the Disclosing Party in advance of such disclosure, if not prohibited by applicable law; seeks confidential treatment of such information from the entity to which the disclosure is made; and discloses only that information which is legally required to be disclosed.  The Disclosing Party shall be entitled to seek injunctive relief for any violation of this Section.

**6.    Trademarks.**

**6.1.    Ownership.**  Each party shall own all right, title, and interest, including without limitation all Intellectual Property Rights, relating to its Trademarks.  Except to the limited extent expressly provided in this Agreement, neither party grants, and the other party shall not acquire, any right, title, or interest (including, without limitation, any implied license) in or to any Trademarks of the first party; and all rights not expressly granted herein are deemed withheld.  All use by HS One of Developer Trademarks (including any goodwill associated therewith) shall inure to the benefit of Developer, and all use by Developer of HS One Trademarks (including any goodwill associated therewith) shall inure to the benefit of HS One.   No party shall challenge or assist others to challenge the Trademarks of the other party (except to protect such party's rights with respect to its own Trademarks) or the registration thereof by the other party, nor shall either party attempt to register any Trademarks or domain names that are confusingly similar to those of the other party.

**6.2.    License to HS One Trademarks.** Subject to the terms and conditions of this Agreement, HS One grants to Developer a limited, nonexclusive license in the Territory during the Term to display those HS One Trademarks provided by HS One to Developer for use solely in connection with the Developer Application and on associated marketing and promotional materials, in each case to the extent approved in advance in writing by HS One.

**6.3.    License to Developer Trademarks.** Subject to the terms and conditions of this Agreement, Developer grants to HS One a limited, nonexclusive license to display Developer Trademarks during the Term for the sole purpose of advertising or publicizing Developer's use of the HS One API, provided, any such use shall not modify, adapt, or combine Developer's Trademarks with other marks in a manner likely to cause confusion..

**7.    Proprietary Rights.**

**7.1.    HS One.** As between Developer and HS One, HS One retains all right, title and interest, including without limitation all Intellectual Property Rights, in and to the Software Developer Kit, HS One API, Upgrades, HS One Software or HS One Software Content, and HS One Trademarks (and any derivative works or enhancements thereof), including but not limited to, all related software, technology, information, content, materials, guidelines, documentation, and data protocol(s). Developer shall not acquire any right, title, or interest therein, except for the limited use rights expressly set forth in this Agreement.  Any rights not expressly granted herein are withheld. HS One shall have no liability for unauthorized use of the HS One Software, the HS One Software Content, Location Data or other data stored on HS One's databases.

**7.2.    Developer.** As between Developer and HS One, Developer retains all right, title and interest, including without limitation all Intellectual Property Rights, in and to the Developer Applications and Developer Trademarks (and any derivative works or enhancements thereof), excluding the Software Developer Kit, HS One API, HS One Software, HS One Software Content, HS One Trademarks and including, but not limited to, all related software, technology, information, content, materials, guidelines, documentation, and data protocol(s). HS One shall not acquire any right, title, or interest therein, except for the limited rights expressly set forth in this Agreement. Any rights not expressly granted herein are withheld.

**7.3.    Competitive or Similar Materials.** In no event will HS One be precluded from discussing, reviewing, developing for itself, having developed, acquiring, licensing, or developing for third parties, or marketing and distributing, materials which are competitive with the Developer Application or other products or services provided by Developer, irrespective of their similarity to Developer's current products or products that Developer may develop. In no event will Developer be precluded from discussing, reviewing, developing for itself, having developed, acquiring, licensing, or developing for third parties, or

9

marketing and distributing, materials which are competitive with software, products or services offered by HS One or Henry Schein, or other products or services provided by HS One or Henry Schein, irrespective of their similarity to HS One or Henry Schein current products or products that HS One or Henry Schein may develop directly or through third parties.

**8.    Representations, Warranties, Covenants and Disclaimer.**
**8.1.    Representations, Warranties and Covenants**.

(a)    Each party represents and warrants to the other that it has full authority to enter into this Agreement and that the performance of its obligations hereunder will not constitute a breach or default of any other agreement to which it is a party.

(b)    Developer represents and warrants that: (i) it and its directors, officers, employees and agents will comply with all applicable laws, rules, regulations, ordinances, decisions and guidelines, including, without limitation, federal and state anti-kickback laws, applicable export laws and regulations, privacy and data security laws and best practices (including maintaining industry standard data protection practices with respect to the treatment and protection of personal information), Health Insurance Portability and Accountability Act of 1996 Pub. Law 104-191 (Aug. 21, 1996), its implementing regulations, the Health Information Technology for Economic and Clinical Health Act ("**HITECH**") and its implementing regulations (collectively "**HIPAA**") including meeting all obligations of a Business Associate as defined under HIPAA, and any similar obligations under any applicable laws, all as amended from time to time; (ii) the Developer Application, the Interface and all other interfaces with the HS One API and HS One's databases, will not infringe on any Intellectual Property Rights of any third party; (iii) Developer will take all reasonable actions and precautions to prevent the introduction of any software routine, code, instruction, time-limiting routine, back door, time bomb, Trojan horse, worm, drop dead device, logic bomb, virus or combination of the above that is designed to, or permits unauthorized access to HS One Software and HS One Software Content; and (iv) that the Developer Applications are not used to provide patient care, diagnosis, treatment, or prevention of a health care disease or condition, nor regulated by the Food and Drug Administration, and shall immediately notify HS One if at any time such status changes.

HS One represents and warrants to Developer that: (i) it and its directors, officers, employees and agents will comply with all applicable laws, rules, regulations, ordinances, decisions and guidelines, including, without limitation, federal and state anti-kickback laws, applicable export laws and regulations, privacy and data security laws and best practices (including maintaining industry standard data protection practices with respect to the treatment and protection of personal information), Health Insurance Portability and Accountability Act of 1996 Pub. Law 104-191 (Aug. 21, 1996), its implementing regulations, the Health Information Technology for Economic and Clinical Health Act ("HITECH") and its implementing regulations (collectively "HIPAA"), all as amended from time to time; (ii) the HS One API will not infringe on any Intellectual Property Rights of any third party; and (iii) the HS One API shall not contain any virus, worm, or other malicious computer software code or routines designed to disable, damage or impair the operation of Developer Application(s), Location Data, or any other software or computer system used by Developer or accessed by Developer Application(s).

**8.2.    Disclaimer.** DEVELOPER ASSUMES FULL RESPONSIBILITY FOR THE SELECTION OF THE SOFTWARE DEVELOPER KIT TO ACHIEVE DEVELOPER'S INTENDED PURPOSES, FOR THE PROPER INSTALLATION AND USE OF THE SOFTWARE DEVELOPER KIT, CREATION OF THE INTERFACE AND FOR VERIFYING THE RESULTS OBTAINED FROM ITS USE. HS ONE

DOES NOT WARRANT, GUARANTEE OR MAKE ANY REPRESENTATION REGARDING THE USE, AVAILABILITY, UPTIME OR THE RESULTS OF THE USE OF THE HS ONE API, HS ONE SOFTWARE, SOFTWARE DEVELOPER KIT, OR REGARDING THE FUNCTIONALITY, RELIABILITY, MERCHANTABILITY OR PERFORMANCE OF THE HS ONE API, HS ONE SOFTWARE, SOFTWARE DEVELOPER KIT, OR THAT THE OPERATION OF THE HS ONE API, HS ONE SOFTWARE, OR SOFTWARE DEVELOPER KIT WILL BE WITHOUT INTERRUPTION OR ERROR-FREE.  ALL RIGHTS PROVIDED BY HS ONE HEREUNDER ARE PROVIDED "AS IS" AND "AS AVAILABLE."  HS ONE DOES NOT ASSUME ANY RESPONSIBILITY FOR DEVELOPER APPLICATION OR THE USE OR MISUSE OF PERSONAL INFORMATION OR OTHER INFORMATION TRANSMITTED, UPLOADED, OR STORED USING HS ONE API AND SHALL NOT BE HELD LIABLE FOR ANY DAMAGES RESULTING FROM DEVELOPER APPLICATION OR THE USE OR MISUSE OF SUCH INFORMATION.   DEVELOPER ACKNOWLEDGES THAT IT HAS NOT ENTERED INTO THIS AGREEMENT IN RELIANCE UPON ANY WARRANTY OR REPRESENTATION BY HS ONE, EXCEPT THOSE SPECIFICALLY SET FORTH IN SECTION 8.1(A).  NO HS ONE EMPLOYEE OR AGENT IS AUTHORIZED TO MAKE ANY EXPANSION, MODIFICATION OR ADDITION TO THIS LIMITATION AND EXCLUSION OF WARRANTIES IN THIS AGREEMENT.  HS ONE MAKES NO GUARANTEES WITH RESPECT TO THE AVAILABILITY OR UPTIME OF THE SOFTWARE DEVELOPER KIT.  HS ONE MAY CONDUCT MAINTENANCE ON OR STOP PROVIDING ANY OF THE SOFTWARE DEVELOPER KIT COMPONENTS AT ANY TIME WITH OR WITHOUT NOTICE TO DEVELOPER. FURTHERMORE, HS ONE MAY CHANGE THE METHOD OF ACCESS TO THE SOFTWARE DEVELOPER KIT AT ANY TIME.

**9.      Limitation of Liability. IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR ANY THIRD PARTY UNDER ANY CIRCUMSTANCES FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES ARISING OUT OF OR IN CONNECTION WITH DEVELOPER APPLICATION OR THE USE OR INABILITY TO USE THE HS ONE API, HS ONE SOFTWARE, SOFTWARE DEVELOPER KIT, THE BREACH OF ANY EXPRESS OR IMPLIED WARRANTY, OR OTHERWISE IN CONNECTION WITH THIS AGREEMENT (INCLUDING BUT NOT LIMITED TO SOFTWARE DEVELOPER KIT, HS ONE API, HS ONE SOFTWARE OR HS ONE SOFTWARE CONTENT) EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. EXCEPT WITH RESPECT TO A PARTY'S (I) BREACH OF ITS CONFIDENTIALITY PROVISIONS, (II) BREACH OF LAWS OR REGULATIONS, INCLUDING BREACH OF REPRESENTATIONS TO COMPLY WITH LAWS OR REGULATIONS, (III) DATA BREACHES (INCLUDING PRIVACY BREACHES), (IV) INDEMNIFICATION OBLIGATIONS, (V) ACCESS OF ANY HS ONE PRACTICE MANAGEMENT SOFTWARE OR LOCATION DATA THROUGH ANY MEANS NOT SPECIFICALLY AUTHORIZED BY HS ONE, OR (VI) GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, IN NO EVENT SHALL EITHER PARTY'S TOTAL LIABILITY FOR ANY DAMAGES, ARISING IN CONNECTION WITH THIS AGREEMENT EXCEED THE FEES PAID HEREUNDER IN THE PRECEDING TWELVE (12) MONTHS WHETHER SUCH LIABILITY ARISES FROM ANY CLAIM BASED UPON CONTRACT, BREACH OF WARRANTY, TORT OR OTHERWISE.  WITH RESPECT TO (I) HS ONE'S BREACH OF ITS CONFIDENTIALITY OBLIGATIONS UNDER SECTION 5, (II) HS ONE'S INDEMNIFICATION OBLIGATIONS UNDER SECTION 10, (III) A PARTY'S BREACH OF LAWS OR REGULATIONS, (IV) A PARTY'S DATA BREACHES (INCLUDING PRIVACY BREACHES), OR (V) HS ON'ES GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, EACH PARTY'S TOTAL LIABILITY FOR ANY SUCH CLAIM SHALL NOT EXCEED ONE MILLION DOLLARS ($1,000,000).  WITH RESPECT TO (I) DEVELOPER'S BREACH OF ITS CONFIDENTIALITY OBLIGATIONS UNDER SECTION 5, (II) DEVELOPER'S**

**INDEMNIFICATION OBLIGATIONS UNDER SECTION 10, DEVELOPER'S TOTAL LIABILITY FOR ANY SUCH CLAIM SHALL NOT EXCEED THRE GREATER OF FIVE MILLION DOLLARS ($6,000,000) OR THE AMOUNTS PAYABLE BY DEVELOPER'S INSURANCE WITH RESPECT TO SUCH CLAIM.  EACH PARTYACKNOWLEDGES THAT THE FEES PAID HEREUNDER REFLECT THIS ALLOCATION OF RISK.**

**10.      Indemnification**.

**10.1.      Indemnification by Developer.** Developer will indemnify, defend and hold HS One and each of its members and their respective affiliates and subsidiaries and customers ("HS One Indemnified Parties") harmless for and against any and all liabilities, losses, damages (including, actual, punitive and exemplary damages), claims, costs and expenses, interest, awards, judgments and penalties (including attorney's and consultants' fees and expenses) suffered or incurred by any HS One Indemnified Parties arising or resulting from any third party claim based on:  (a) claim of trademark, trade dress, trade secret, copyright, patent or other intellectual property infringement relating to the Developer Application (whether alone or in combination with other non-HSOne products); (b) product liability claim arising from Developer Applications; (c) breach by Developer of any obligation to HS One or any inaccuracy of any written representation made by Developer to HS One; (d) negligent or willful action or omission of Developer or any of its agents, employees, representatives, successors or assigns in connection with the manufacture, development, sale or distribution of the Developer Application; (e) action for recall or seizure of the Developer Application; (f) the Developer Application and use of the Software Developer Kit, HS One API, HS One Software or HS One Software Content; and (g) Developer's use or misuse of: (i) personal information or (ii) protected health information as defined by HIPAA.

**10.2.      Indemnification by HS One.** HS One will indemnify, defend and hold Developer and each of its members and their respective affiliates and subsidiaries and customers ("Developer Indemnified Parties") harmless for and against any and all liabilities, losses, damages (including, actual, punitive and exemplary damages), claims, costs and expenses, interest, awards, judgments and penalties (including attorney's and consultants' fees and expenses) suffered or incurred by any Developer Indemnified Parties arising or resulting from any third party claim based on: (a) claim of trademark, trade dress, trade secret, copyright, patent or other intellectual property infringement relating to the HS One API(s), Software Developer Kit, HS One Software, or any other materials provided by HS One to Developer under this Agreement when used by Developer solely in accordance with this Agreement; (b) product liability claim ; (c) breach by HS One of any obligation to Developer under this Agreement or any inaccuracy of any written representation made by HS One to Developer in this Agreement; (d) negligent or willful action or omission of HS One or any of its agents, employees, representatives, successors or assigns in connection with the manufacture, development, sale or distribution of the HS One API(s); and (e) HS One Software or HS One Software Content; and (f) HS One's use or misuse of: (i) personal information or (ii) protected health information as defined by HIPAA.

If the use of HS One API(s), Software Developer Kit, HS One Software, or any other materials provided by HS One to Developer under this Agreement is, or in HS One's reasonable opinion is likely to be, enjoined due to an infringement claim, HS One shall use reasonable efforts to (i) procure the right to continue using the affected materials, or (ii) modify or replace them to be non-infringing without materially degrading their functionality. If neither (i) nor (ii) is commercially feasible, then Developer may, upon written notice, immediately terminate this Agreement without penalty, and Developer shall have no obligation to pay any further amounts from the date of termination forward.

**11.      Monitoring and Enforcement.**

**11.1.      Audit Rights.** HS One shall have the right, upon thirty (30) days or more written notice, during normal business hours, to have an independent third-party auditor acceptable to Developer inspect, audit and copy relevant accounts and records of Developer, including reviewing and monitoring of the

Developer Application, for the purpose of verifying the accuracy of the calculation of fee payments by Developer and the reports regarding such payments as well as compliance with Developer's obligations under this Agreement. The scope of such audit shall be limited to records and information directly related to this Agreement and shall exclude Developer's unrelated proprietary information, trade secrets, or other customer data. Developer shall not seek to block or otherwise interfere with such monitoring or audit. Audits may include requests for documents and information and visits to Developer's facilities. Such audits will be limited to records created or updated after Effective Date. All information reviewed and/or obtained through such audits is the Confidential Information of Developer and may only be used for determining the existence of a breach of this Agreement by Developer. The auditor shall not share any Location identifying data (practice names or contact information) with HS One. Developer's failure to reasonably comply with HS One's efforts to audit shall constitute a material breach of this Agreement. If such audit determines that payments are due to HS One, Developer shall pay to HS One any such additional amounts within thirty (30) days of the date on which such written audit report is delivered to Developer. If HS One determines that Developer's payments are in excess of those required under this Agreement, HS One shall remit the difference to Developer within thirty (30) days of the date on which such written audit report is delivered to Developer. Any such inspection of records shall be at HS One's expense, unless such audit discloses an underpayment of fees of more than five percent (5%) of the total in which case, Developer shall bear the cost of such audit. All payments past due shall bear interest calculated at the rate of one- and one-half percent (1.5%) per month.

**11.2.    Specific Performance.** In addition to any other available remedies, either Party may, in its sole discretion, seek specific performance, injunctive relief and/or attorney's fees. HS One may also take other reasonable corrective action in the event that HS One receives complaints from Locations about the Developer Application or Developer's actions.

**12.    Miscellaneous.**
**12.1.    Notices**. Except as otherwise provided, all notices given under this Agreement shall be in writing and shall be deemed to have been duly given upon receipt if delivered by hand, three days after mailing by certified or registered mail, and one day after sending by overnight courier, to the parties' respective address indicated on the signature page of this Agreement or such other address as a party specifies in writing to the other party, or on the next Business Day after being sent by email as recorded on the device from which the sender sent the email, unless the sender receives an automated message that the email has not been delivered.

**12.2.    Assignment; Developer Change of Control.** Developer may assign this Agreement without consent to any successor entity in connection with a Developer Change of Control, provided such successor assumes Developer's obligations under this Agreement and provided such successor is not a HS One Competitor. Developer shall promptly inform HS One in writing in the event that, through a transaction or series of related transactions (including by way of merger, consolidation, sale of equity or contract), there is a change of control of Developer, directly or indirectly, whereby the holders of the voting shares of Developer immediately prior to such transaction(s) do not, after giving effect to such transactions(s), own at least 50% of the voting shares or control substantially all of the assets of Developer (a "**Developer Change of Control**"). For clarity, a change in ownership or control of any parent, holding company, or affiliate of Developer shall not constitute a Developer Change of Control for purposes of this Agreement. For purposes of this Section 12.2, an HS One Competitor means any entity that directly or through an affiliate then offers dental practice management software or other services competitive to services offered by HS One, including as of the Effective Date the following companies and their affiliates and successor entities: Patterson Dental, Epic Systems, Planet DDS, Open Dental Software, Carestream or CareStack.

**12.3.    Independent Contractors; No Third-Party Beneficiaries.** The parties are independent contractors, and this Agreement does not create an agency, partnership, or joint venture relationship of any kind between the parties.  There are no third-party beneficiaries to this Agreement.

**12.4.    Force Majeure.** Neither Party shall have liability for delays, failure in performance or damages caused by factors beyond its reasonable control, including (without limitation) changes in government regulations, acts of God, the other Party's (or Location's) acts or omissions, labor shortages, strikes, slowdowns, or other combined action of workmen, fires, floods, earthquakes, severe weather, serious accidents, explosions, lightning, pest damage, power surges or failures, epidemics, quarantines, wars, insurrections or riots, acts of civil or military authorities, acts of terrorism, transportation embargoes, shortages or interruptions in delivery of components and materials, acts or omissions of communications carriers, Internet inaccessibility or failure and delays by HS One's suppliers.

**12.5.    Non-Waiver; Severability.** No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power, or privilege hereunder. If any provision herein is otherwise held to be invalid or unenforceable for any reason, the remaining provisions will continue in full force without being impaired or invalidated in any way. The parties agree to replace any invalid provision with a valid provision that most closely approximates the intent and economic effect of the invalid provision.

**12.6.    Governing Law; Venue.** This Agreement shall be governed by the laws of the State of New York, without reference to conflict of laws principles. The parties irrevocably and exclusively submit to the jurisdiction of any state court located in the state and federal courts sitting in the Eastern and Southern Districts of New York or in the counties within those federal judicial districts for the purpose of any suit, action or proceeding arising out of this Agreement and hereby irrevocably waive the defense of an inconvenient forum to the maintenance of any such suit, action or proceeding.

**12.7.    Entire Agreement; Conflicts.** This Agreement supersedes any other prior or collateral agreements, whether oral or written, with respect to the subject matter hereof, including any former Henry Schein Practice Solutions Advanced Integration Program License Agreements, except for those provisions set forth in such agreements that are intended to survive termination.  This Agreement is the parties' entire agreement relating to its subject and supersedes any prior or contemporaneous agreements on that subject. The terms contained in this Agreement shall supersede any conflicting terms contained in any purchase order, invoice or other document used or submitted by either party in connection with the purchase of the Software Developer Kit covered by this Agreement and HS One shall not be bound by any provisions of any purchase order, receipt, acceptance, confirmation, correspondence, or otherwise, unless mutually agreed to in writing and signed by both parties.

**12.8.    Counterparts; Headings.** The parties may execute this agreement in counterparts, including PDF or other electronic copies, which taken together will constitute one instrument. The headings and captions used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

**12.9.    Non-disparagement.** Both parties acknowledge and agree that the terms and conditions of this Agreement reflect the relative costs and risk allocation of the parties.  Both parties agree that they will not, in any public forum, communicate with the press or other public media or any Location or other third party, criticize, ridicule or make any negative statement which disparages or is derogatory of the other party or any of its members or their respective affiliates, subsidiaries, officers, employees, directors or agents, or induce or encourage others to disparage or make such negative statements with respect to this Agreement, including the HS One Software or Developer Application(s); provided, however, that this

provision does not restrict HS One from notifying its customers of any access by Developer of the HS One Software through any means not specifically authorized by this Agreement or any issues or potential issues associated with such access. For purposes of this Agreement, the term "disparage" includes, but is not limited to, any comment or statement (either written or verbal) which would adversely affect in any manner (a) the conduct of either party's business, or (b) the reputation or relationships of the other party or any of its members or their respective affiliates, subsidiaries, officers, employees, directors or agents, successors or assigns.

**12.10.    Amendment.** This Agreement may only be amended by a written document signed by both parties.

**IN WITNESS WHEREOF**, the parties have executed this Agreement by persons duly authorized as of the Effective Date.


| **Developer** | **HS One** |
|---|---|
| | |
| Signature | Signature |
| James Grover | Ali Hyatt |
| Name | Name |
| | |
| President | Chief Customer & Growth Officer |
| Title | Title |
| | |
| Date | Date |

Notice Address:

National Electronic
Attachment, Inc.
6510 Telecom Drive,
Suite300
Indianapolis, IN 46278
Attn: Chief Financial Officer and Legal

Notice Address:

Henry Schein One, LLC
1220 South 630 East
American Fork, UT 84003
Attn: Director, Partnering

with a copy to:

legal@henryscheinone.com

15

**EXHIBIT A**

**ACCESS PLANS & FEES**

**Names of Developer Applications:**  Trellis, rPractice (Remote Lite), Opera, Simplifeye

**API Access Plans Definitions:**

1.  Commercial API Access Plans are for independent software vendors that develop, integrate, and sell its integrated applications or products to common HS One Software customers.

2.  READ means permission to view the records but not perform any actions such as editing or deleting.

    a.  **Plus READ Claims:** Access to all READ API categories Tables, Tableviews, and Stored Procedures listed in Exhibit B as well as a Claim Summary API which will provide insurance claim information.

3.  WRITE means permission to both view and make edits to the records.

    a.  **Plus WRITE:** Access to all READ API categories Tables, Tableviews, Stored Procedures listed in Exhibit B, Claim Summary API which will provide insurance claim information, and all WRITE stored procedures including Appointments, but not including Scheduling API.

    b.  **Plus WRITE Scheduling**: Access to all READ API categories Tables, Tableviews, Stored Procedures listed in Exhibit B, Claim Summary API which will provide insurance claim information, and all WRITE stored procedures including Appointments and Scheduling API.

**API Initial Registration Fee**: Due immediately upon contract execution.   The Access Key will not be issued to Developer until this fee is paid.

**Monthly Fees (as applicable):**

Based on the applicable API Access Plan per Developer Application, Developer shall pay a monthly payment equal to the greater of (i) the Monthly Access Fee Per Location or (ii) the Monthly Minimum Fee, in each case as set forth in the chart below, HS One reserves the right to modify the fees set forth in this Exhibit A at any time upon sixty (60) days' written notice to Developer in accordance with Section 12.10 of the Agreement. [However, HS One agrees not to increase the fees set forth in this Exhibit A by more than five percent (5%) on an annual basis.]

**<u>Development Support</u>**

Developer should submit all technical inquiries and support tickets to the DDP Support Team by logging in at http://ddp.dentrix.com/, clicking Resources and then Support or clicking any Contact Us option on the DDP site and then choosing the technical questions link. All support tickets are captured, prioritized, and responded to in the order in which they are received in the Helpdesk Support Tracking System.

**Selected API Access Plans**

16

| API<br>Access Plan | API Initial<br>Registration<br>Fee | Monthly<br>Access Fee<br>Per Location | Monthly<br>Minimum<br>Fee |
|---|---|---|---|
| Plus READ Claims | $1,750.00 | $27.50 | $625.00 |
| Plus WRITE | $5,000.00 | $41.80 | $1,900.00 |
| Plus WRITE Scheduling | $5,000.00 | $55.00 | $2,500.00 |

*The API Initial Registration Fee and the Monthly Minimum Fee are separately payable with respect to each API Access Plan selected.*

HS One will provide discounts based on End User volume as follows:

**API Volume Discounts**

| Locations* | Read – No<br>Discount | Write<br>Discount % | Plus Write Discounted Fee | Plus Write Scheduling<br>Discounted Fee |
|---|---|---|---|---|
| < 2,999 | | | No discount | |
| 3,000 – 5,999 | | 10% | $37.62 | $49.50 |
| 6,000 + | | 15% | $35.53 | $46.75 |

*Number of End Users for purposes of these discounts will be the aggregate number of Locations without regard to the separate API Categories.

17

**EXHIBIT B**

| *READ API Categories |
| --- |
| Appointments (READ) |
| Clinical (READ) |
| Demographics (READ) |
| Financial (READ) |
| Fee Schedules (READ) |
| Insurance (READ) |
| Referral (READ) |
| Practice Setup (READ) |

# EXHIBIT H



Steve Roberts <steve.roberts@vynedental.com>

---

## Proposed Commercial Agreement

---

**Brian Weatherly** <Brian.Weatherly@henryscheinone.com>                    Fri, Aug 22, 2025 at 4:05 PM
To: Steve Roberts <steve.roberts@vynedental.com>
Cc: "Katherine Wich Sugden (LEGAL)" <kwichsugden@henryscheinone.com>

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Hi Steve,

I'm reaching out again on behalf of Henry Schein One to finalize a mutually beneficial commercial agreement with Vyne. As you know, our Dentrix Developer Program (DDP) provides a standardized, structured framework for technology partners to connect into Dentrix through published APIs. We have been negotiating this agreement for months and will require that Vyne adhere to the same terms as other vendors and for Vyne's patient engagement solutions to exclusively use the API under the standard DDP economics.  Separately, we see an opportunity to create a new integration with Vyne on claims, attachments, and related clearinghouse services. Our proposal would allow Vyne's clearinghouse APIs to be accessed through the HSOne/Dentrix front end for customers who select this route. This would be supported by a commercially reasonable fee structure on par with market participants, with final terms to be negotiated in a definitive agreement. This would replace all of Vyne's unauthorized access to our PMS and ensure that our mutual customers are not disrupted in their workflows and continue to have choice in the vendors that they utilize in harmony with our software.

The attached draft term sheet outlines these concepts at a high level. It is intended to provide a framework for discussion only and is not a binding agreement.

We value the role Vyne plays in the industry and believe this proposal represents a constructive pathway to formalize our relationship and enable us to continue to enhance the security of our software without sacrificing data integrity. We would welcome the chance to review the attached framework with you and your team on Monday, August 25 in order to move quickly.  However, please note that we are simultaneously moving forward with our planned security enhancements and must reiterate yet again that Vyne must cease all of its unauthorized access to our PMS. Further communications will be sent shortly to enforce our rights and preserve all remedies.

Best regards,

Brian Weatherly

Chief Executive Officer

Henry Schein One

## Term Sheet:

**Draft Term Sheet Proposal**
*(For Discussion Purposes Only – Non-Binding)*
**From:** Brian Weatherly, CEO, Henry Schein One, LLC
**To:** Steve Roberts, Vyne Dental

---

## Parties

- **Henry Schein One, LLC ("HSOne")**
- **Vyne Dental ("Vyne")**

## Scope of Relationship

1. **Dentrix Developer Program (DDP) – Patient Engagement Products**
   - Vyne's patient engagement products (messaging, reminders, payments, etc.) will be made available to Dentrix customers via the DDP.
   - Commercial terms will follow HSOne's standard DDP program economics (as outlined in the attached DDP schedule).
   - Vyne agrees to discontinue use of indirect integrations (printer driver or database access) and instead connect exclusively via HSOne's published APIs.
2. **Claims, Attachments, Eligibility, and Related Transactions**
   - HSOne will develop connectivity from Dentrix to Vyne's clearinghouse APIs for submission of claims, attachments, eligibility, and remittance transactions.
   - All transactions will originate through the HSOne / Dentrix front-end; Vyne will serve as the clearinghouse processor.
   - HSOne and Vyne will establish a fee structure model for all claim-related services.
     - Example: rebates and revenues from claims, attachments, eligibility, and ERA will be structured on an agreed basis.
     - HSOne will pay standard buy-rates (if any) that Vyne requires for claim submission, with rebates and fees offsetting these amounts.
   - Final fee structures to be negotiated in definitive agreements.

---

## Term

- Initial Term: 5 years
- Auto-renewal: 1-year increments
- Termination: Either party may terminate with 180 days' written notice prior to renewal.

---

## Reporting & Settlement

- Monthly invoicing and reporting of transaction volumes and revenues.
- Quarterly reconciliation of rebates and fees.
- Detailed reports to include payer volumes, classifications, and rebate allocations.

---

## Compliance & Exclusivity

- Vyne agrees to access Dentrix solely through HSOne's official API program and contracted integration, assist in the transition of all customers and discontinue all unauthorized integrations.
- Parties to enter into a Tolling Agreement to preserve all rights with respect to Vyne's prior unauthorized access. HSOne reserves the right to pursue enforcement actions for unauthorized access if such activities continue.
- This agreement does not establish exclusivity for either party unless otherwise agreed in writing.

---

## Next Steps

Case 1:25-cv-03246-MJM     Document 6-2     Filed 10/02/25     Page 85 of 89

- Upon execution of this Term Sheet and a Tolling Agreement, parties will move to negotiation of a definitive agreement consistent with the above principles.
- Both parties acknowledge this document is non-binding and intended solely as a framework for discussion.

*Confidentiality Notice: The information contained in this electronic message and any attachments to this message are intended only for the individual(s) addressed in the message and may contain proprietary and confidential information. If you are not the intended recipient, you should not disseminate, distribute, or copy this e-mail. Please notify the sender and destroy this message. WARNING: Computer viruses can be transmitted via email. The recipient should scan this email before opening it. The company accepts no liability for any damage caused by any virus transmitted by this email.*

*Confidentiality Notice: The information contained in this electronic message and any attachments to this message are intended only for the individual(s) addressed in the message and may contain proprietary and confidential information. If you are not the intended recipient, you should not disseminate, distribute, or copy this e-mail. Please notify the sender and destroy this message. WARNING: Computer viruses can be transmitted via email. The recipient should scan this email before opening it. The company accepts no liability for any damage caused by any virus transmitted by this email.*

# EXHIBIT I



Michael Burshteyn
Tel 415.590.5141
Mburshteyn@gtlaw.com

August 26, 2025

**<u>Via Email</u>**
National Electronic Attachment, Inc. dba Vyne Dental
Kelly Owen, General Counsel
kelly.owen@vynedental.com
james.grover@vynedental.com

      Re:    **Demand to Immediately Cease and Desist Unauthorized Computer and Database Access**

Ms. Owen,

We represent Henry Schein One, LLC.  If Vyne is represented by outside counsel, please direct us to them.  Henry Schein One has uncovered alarming evidence of Vyne's computer hacking of Henry Schein One's software platform.  Specifically, Henry Schein One's recent investigation shows that Vyne is unlawfully conducting cyberattacks against Henry Schein One's software, including its Dentrix system, related software services, and underlying database.

Among other things, Vyne is:

- Misappropriating configuration files, including the FAIRCOM C-TREE settings file which Henry Schein One uses to access its database;

- Misappropriating administrator credentials contained inside the FAIRCOM C-TREE settings file to modify settings inside of Dentrix;

- Exploiting Henry Schein One's source code to retrieve the private keys needed to decrypt the FAIRCOM C-TREE settings file without authorization;

- Injecting malicious code to alter the functionality of print drivers in order to unlawfully export data from Henry Schein One's platform;

- Developing software that falsely mimics Dentrix in order to interact with its database and services; and

- Signing Vyne's services with hijacked application certificates.

Vyne's conduct violates the Computer Fraud and Abuse Act and gives rise to multiple related common law and statutory claims.  Vyne has been on express notice that its access is not authorized, yet continues to do it.  Further, Vyne has now escalated its conduct and spread knowingly false and malicious statements about Henry Schein One.  Vyne is attempting to induce Henry Schein One's customers to allow it to hack the Henry Schein One software by misleading them and omitting the details of what it is really doing.

**Greenberg Traurig, LLP | Attorneys at Law**
101 2nd Street | Suite 2200 | San Francisco, California 94563 | T +1 415.590.5141

Most recently, on August 21, 2025, Vyne sent a request naming dozens of Henry Schein One customers purporting to request data access even though Vyne is on notice that its access is unlawful. This raises concerns that Vyne is continuing to interfere with Henry Schein One customer relationships and attempting to unlawfully conduct business through deception, false statements, and omissions. This is independently actionable. As Vyne knows, Henry Schein One maintains an API that vendors can use subject to standard commercial terms. Using the API, rather than unauthorized malicious exploits, is critical to maintaining security and integrity of Henry Schein One's platform and customer's data.

Vyne's conduct, including its ongoing hacking and deceptive statements and omissions, is causing Henry Schein One additional irreparable harm in that it is blocking Henry Schein One's ability to issue routine software updates to its software and interfering with Henry Schein One's valuable customer relationships.

As another way to defend its illegal computer hacking, Vyne has insinuated that Henry Schein One is in violation of the Cures Act by not making information available upon request to Vyne. This does not justify misappropriating credentials, decrypting encrypted files, and Vyne's other hacks. In any event, Henry Schein One has data sharing relationships with many entities and has been willing to negotiate an agreement for sharing information through authorized means with Vyne. But Henry Schein One is not subject to the Cures Act—which does not have a private right of action in any event. For its part, Vyne has failed to follow the request, negotiation, and approval requirements for information requests contained within the Cures Act and instead has unilaterally and without consent hacked Henry Schein One platforms to take sensitive data without request or approval. Our client remains willing to discuss authorized methods for accessing data contained within the Henry Schein One platforms but cannot and will not allow Vyne to use unauthorized and hostile methods to hack its platforms.

**By this letter, Henry Schein One demands the following:**

1. **Vyne must immediately cease all unauthorized access to Henry Schein One platforms;**

2. **Vyne must provide Henry Schein One with detailed information as to its technical computer hacking of Henry Schein One's software platform;**

3. **Vyne must stop making false and deceptive statements about its conduct with respect to Henry Schein One's software platform, and correct all the false statements made thus far;**

4. **Vyne must provide Henry Schein One a list of all Henry Schein One customers whose contracts Vyne interfered with; and**

5. **Vyne must provide Henry Schein One with an accounting of its unjust enrichment based on its unlawful computer hacking and deceptive and unfair competition.**

To be clear, Henry Schein One has never authorized Vyne to undertake any of the malicious conduct described above.

Should Vyne not stop immediately, Henry Schein One will have no choice but to escalate this matter and pursue all remedies available to it.

Vyne is further reminded of its obligation to preserve all evidence and other materials which are relevant to these matters, whether in hard copy, electronic and other medium, including information contained on personal electronic devices or back-ups of such devices. Such documents and information include, but

are not limited to, all documents, e-mails, text messages, Teams, Signal, Telegram, WhatsApp, Slack, or other electronic information that may be subject to discovery by Henry Schein One in a lawsuit regarding the matters set forth above, including the methods Vyne has used to access Henry Schein One platforms, and any continued possession and use by Vyne employees that are former Henry Schein One employees of confidential information regarding the Henry Schein One platforms.

Henry Schein One reserves all rights in law and in equity.

Sincerely,

Michael Burshteyn

Partner, Technology Litigation
Greenberg Traurig, LLP