**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Baltimore Division)**

| | |
|---|---|
| NATIONAL ELECTRONIC ATTACHMENT, INC., d/b/a VYNE DENTAL<br><br>Plaintiff,<br><br>- against –<br><br>HENRY SCHEIN ONE, LLC,<br><br>Defendant. | **Case No. 1:25-cv-03246-MJM** |


**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER**
**AND PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. I

TABLE OF AUTHORITIES ......................................................................................... II

INTRODUCTION ........................................................................................................ 1

FACTUAL BACKGROUND ........................................................................................ 3

    A.   HSOne Develops Innovative, Open, and Transparent Software for the Dental Industry. ........................................................................... 3

    B.   HSOne Makes Continuous Security Investments to Protect its Customers and their Patients' Data. ............................................................ 4

    C.   This Year, HSOne Has Hardened its Platform Security Across the Board. ............................................................................................................ 4

    D.   Vyne Has Resisted HSOne's Security Enhancements and Embarked on a Troubling Campaign of Unauthorized Access, Software Exploitation, Network Traffic Interception, and Circumvention of HSOne Technical Measures. ........................................ 5

    E.   HSOne Demanded Vyne Stop and Set Out to Enforce its Rights, Leading to this Dispute. ............................................................................. 6

LEGAL STANDARD .................................................................................................... 8

ARGUMENT ................................................................................................................ 9

   I.   Vyne Cannot Make a Clear Showing of a Likelihood of Success on the Merits for Any of Its Claims. ........................................................................... 9

    A.   Vyne Cannot Prevail on its Unfair Competition Claim. ........................... 10

       1.   Vyne Fails to Demonstrate that it Can Prevail on its Unfair Competition Claim Based on Maryland Law. ............................. 10

       2.   Vyne's Reliance on the Cures Act Cannot Save its Unfair Competition Claim. ................................................................... 14

       3.   Vyne's Reliance on *Real Time* is Misplaced. ............................... 21

    B.   Vyne Cannot Prevail on its Tortious Interference Claims. ...................... 24

   Ii.   Vyne Cannot Demonstrate the Requisite Irreparable Harm. ................................ 26

   III.   The Balance of Equities and Public Interest Compel Denying Vyne's Motion. .............................................................................................................. 28

CONCLUSION ............................................................................................................ 30

**Cases**

*Advanced Res. Int'l, Inc. v. Tri-Star Petroleum Co.,*
    4 F.3d 327 (4th Cir. 1993) .................................................................................28

*Alexander & Alexander Inc. v. B. Dixon Evander & Associates, Inc.,*
    336 Md. 635, 650 A.2d 260 (1994) ...............................................................13, 25

*Am. Fed'n of Teachers v. Bessent,*
    152 F.4th 162 (4th Cir. 2025) ...........................................................................9

*Am. Fedn. of Teachers v. Bessent,*
    No. 25-1282, 2025 WL 2313244 (4th Cir. Aug. 12, 2025) ..........................8, 9, 10

*Ameritox, Ltd. v. Savelich,*
    92 F. Supp. 3d 389 (D. Md. 2015) ....................................................................27

*Berlyn Inc. v. Gazette Newspapers, Inc.,*
    223 F.Supp.2d 718 (D. Md.2002) ...............................................................11, 13

*Carbone v. Deutsche Bank Nat'l Tr. Co.,*
    No. CV RDB-15-1963, 2016 WL 4158354 (D. Md. Aug. 5, 2016) ......................26

*Chattery Intern., Inc. v. JoLida, Inc.,*
    No. CIV. WDQ-10-2236, 2011 WL 1230822 (D. Md. Mar. 28, 2011)...................9

*ClearOne Advantage, LLC v. Kersen,*
    710 F. Supp. 3d 425 (D. Md. 2024) ..................................................................29

*Columbia Gas Transmission LLC v. Those Certain Parcels in Baltimore Cnty.,*
    *Harford Cnty., Md.,*
    No. CIV. JFM-14-220, 2015 WL 300381 (D. Md. Jan. 21, 2015) ........................8

*Di Biase v. SPX Corp.,*
    872 F.3d 224 (4th Cir. 2017) ...........................................................................27

*Ellicott Dredges, LLC v. DSC Dredge, LLC,*
    280 F. Supp. 3d 724 (D. Md. 2017).............................................................11, 25

*Gorby v. Weiner,*
    No. CIV.A. TDC-13-3276, 2014 WL 4825962 (D. Md. Sept. 23, 2014)..............26

*Harry and Jeanette Weinberg Found., Inc. v. St. Marks Ave., LLC,*
    No. CV GLR-15-3525, 2018 WL 704866 (D. Md. Feb. 5, 2018) ........................25

*Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.,*
    17 F.3d 691 (4th Cir. 1994) .............................................................................27

*Hunter Grp., Inc. v. Smith,*
    164 F.3d 624, 1998 WL 887289 (4th Cir. Dec. 18, 1998).................................26

*Lyon v. Campbell*,
   707 A.2d 850 (Md. Spec. App. 1998) ............................................................26

*M-Edge Accessories LLC v. Amazon.com Inc.*,
   No. CIV.A. MJG-11-3332, 2015 WL 403164 (D. Md. Jan. 29, 2015) .............10, 11, 12, 13

*Macklin v. Robert Logan Associates*,
   334 Md. 287, 639 A.2d 112 (1994) ...........................................................13, 25

*Munaf v. Geren*,
   553 U.S. 674 (2008) .........................................................................................8

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
   555 U.S. 438 (2009) .......................................................................................12

*Pashby v. Delia*,
   709 F.3d 307 (4th Cir. 2013) ...........................................................................9

*Pierce v. N. Carolina State Bd. of Elections*,
   97 F.4th 194 (4th Cir. 2024) .............................................................................9

*Real Time Medical Systems, Inc. v. PointClickCare Technologies, Inc.*,
   131 F.4th 205 (4th Cir. 2025) ................................................2, 21, 22, 24

*Savaria USA, Inc. v. Elevator Works, LLC*,
   No. CV RDB-24-1311, 2024 WL 2212914 (D. Md. May 16, 2024) .....................10

*Tsuka Pharm. Co. v. Burwell*,
   No. GJH-15-852, 2015 WL 1962240 (D. Md. Apr. 29, 2015) .............................28

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004) .......................................................................................12

*Williams Ohio Valley Midstream, LLC v. Kittle*,
   No. 23-2185, 2024 WL 3325532 (4th Cir. July 8, 2024) ...........................26, 27

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ..................................................................................8, 9, 27

**Statutes**

42 U.S.C.A. § 300jj-52 ...................................................................................14, 20

**Other Authorities**

45 C.F.R. § 171.102 .........................................................................................15, 16

45 C.F.R. § 171.203 ...............................................................................................17

45 C.F.R. § 171.301 ...............................................................................................19

85 FR 25642, 25802, May 1, 2020. Available at
   https://www.federalregister.gov/documents/2020/05/01/2020-07419/21st-
   century-cures-act-interoperability-information-blocking-and-the-onc-health-it-
   certification#p-1777 ..............................................................................16, 17, 20, 21

*21st Century Cures Act: Interoperability, Information Blocking, and the ONC Health IT Certification Program*
(May 01, 2020), Federal Register,
https://www.federalregister.gov/documents/2020/05/01/2020-07419/21st-century-cures-act-interoperability-information-blocking-and-the-onc-health-it-certification ................................................................................................16, 17

https://www.henryscheinone.com/about-us/press-release/henry-schein-one-at-chicago-midwinter/?utm_source=chatgpt.com (Press Release, February 20, 2025) ................................................................................................4

Fed. R. Civ. P. 65 ................................................................................................30

Defendant Henry Schein One, LLC ("HSOne") respectfully submits this Memorandum of Law in Opposition ("Opposition") to Plaintiff National Electronic Attachment, Inc., d/b/a Vyne Dental's ("Vyne") Motion for a Temporary Restraining Order and Preliminary Injunction ("Motion").

## INTRODUCTION

Vyne's request for a mandatory affirmative injunction seeks an unfettered license from this Court to access HSOne's software and database systems without regard for HSOne's required authorization thresholds, to circumvent HSOne's technical measures protecting its intellectual property, software and data, and to intercept network traffic designed by HSOne to provide necessary access between HSOne and HSOne's Dentrix applications installed on customer premises. The Fourth Circuit's high bar for early injunctive relief is demanding precisely to prevent litigants from abusing emergency relief to continue breaking the law. Vyne cannot come close to meeting the exacting mandatory injunction burden here because its claims are unlikely to succeed on the merits, it cannot demonstrate irreparable harm or urgency, and because the equitable and public interest considerations weigh in HSOne's favor, not Vyne's.

First, Vyne cannot make a clear showing that it will likely succeed on the merits of its claims. HSOne's security upgrades are not unfair competition, but rather legitimate business activity designed to maintain the security controls necessary to protect its intellectual property, software as well as its own and customers' data. Indeed, the record already shows that HSOne has engaged in good faith commercial negotiations with Vyne, even in the face of Vyne's escalating hacks and stall tactics. Vyne's Cures Act theory also fails at every level. HSOne is not governed by the statute because it is not a health care provider, nor a developer of certified IT, nor a health information exchange or health information network. Even if the Cures Act did apply, HSOne satisfies multiple exceptions that allow reasonable security measures such as those HSOne has

1

deployed. Vyne's tortious interference claim fares no better, because Vyne cannot prove intent, knowledge, or actual interference.

Second, as to the Fourth Circuit authority Vyne touts for its Cures Act claim, it weighs heavily in favor of denying Vyne's motion. *Real Time Medical Systems, Inc. v. PointClickCare Technologies, Inc.*, 131 F.4th 205 (4th Cir. 2025). In that case, the defendant conceded the Cures Act governed it. HSOne does not. The defendant there failed to offer a shred of evidence that they negotiated a commercial agreement in good faith. Here there are scads of such evidence in the record. The defendant in *Real Time* also took the position that they did not need to provide any evidence of security risk. That is not the approach HSOne takes here, in light of its extensive telemetry, forensic investigation, and concrete exposition of Vyne's ongoing and dangerous unauthorized access to HSOne's software and systems.

In addition, all of Vyne's claims require significant discovery and evidence missing from the record. Open questions abound with respect to Vyne's Cures Act theory, which requires a deep dive into the applicability of the Cures Act, commercial negotiations between the parties, and the nature of HSOne's security controls over time. This is an independent reason that merits denying the motion.

Vyne fails on all the other elements too. It cannot make a clear showing of irreparable harm, as Vyne has alternate methods of access. HSOne, even despite Vyne's brazen unlawful software exploit campaign, is still willing to engage with Vyne on commercial terms. The equities lean far in favor of HSOne. HSOne must be allowed to protect its intellectual property, software, and data from an escalating set of exploits by Vyne. There is also a strong public interest in preventing hacking and maintaining security of patient medical records.

Finally, all of Vyne's conduct and its request here is in the context of an anticipatory forum-shopped filing, as set forth in HSOne's pending venue transfer motion. This TRO and PI motion is yet another stall tactic by Vyne meant to pave the way for it to continue its hacking, which has not slowed down since filing. Because Vyne cannot meet its high burden for temporary and preliminary injunctive relief, the Court should deny Vyne's motion.

## FACTUAL BACKGROUND[1]

### A. HSOne Develops Innovative, Open, and Transparent Software for the Dental Industry.

HSOne is a Utah-based dental software provider servicing thousands of dental practices nationwide. (Declaration of Kenton McDaniel ("McDaniel Decl."), ¶ 2.) Among the software systems HSOne provides are Dentrix and Dentrix Ascend, which help dentist offices manage their patient records so they can focus on patient care. *Id.* ¶ 3.

HSOne invests significant resources in making its Dentrix platform open, transparent, and interoperable. Over 100 vendors use HSOne's approved Application Programming Interface ("API") solutions to integrate with the Dentrix software and database deployed at HSOne's customers' premises. (*Id.* ¶ 4.) The API includes over 750 endpoints enabling vendors to perform a variety of functions. Vyne, at one point, was part of HSOne's API program, but unilaterally terminated that relationship and has declined to use the API in the last several years. (*Id.* ¶ 5.)

---

[1] HSOne presents additional factual background relevant to this dispute in its Complaint and its own TRO and PI motion filed in Utah. (Attached as Exhibits 1 and 2, respectively, to the Declaration of Marcelo Barros filed in support of HSOne's motion to transfer pursuant to § 1404 ("Barros Tr. Decl."). (ECF No. 37). This Court may take judicial notice of events in other courts. *See Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

**B.    HSOne Makes Continuous Security Investments to Protect its Customers and their Patients' Data.**

HSOne does not rest when it comes to security.  It focuses on hardening its software systems against attacks from malicious actors.  This requires vigilance towards new hacking methods and development of new techniques and technology to stay ahead of them.  As a result of its sustained security engineering innovation, HSOne's software platform today looks nothing like it did two decades ago.  (*Id.* ¶ 6.)

The last 20 years have seen exponential growth of cybersecurity challenges.  This is due in part to the proliferation of data, rise of cloud infrastructure, and increasing complexity of software and computer systems.  More recently, the prevalence of ransomware as-a-service has created even further risk, particularly to dental practices.  (*Id.* ¶ 7.)  Stopping circumvention of HSOne's API, which is the secure and stable method of integrating with its software platforms, is one of HSOne's top priorities from a security perspective.  This is because API circumvention risks data confidentiality, integrity, and availability—all things that the API helps to maintain.  (*Id.* ¶ 8.)  Vyne's current CEO, when he worked for HSOne some time ago, was tasked with mitigating API circumvention risks and should appreciate the concern.  (*Id.* ¶ 9.)

**C.    This Year, HSOne Has Hardened its Platform Security Across the Board.**

HSOne has been engaged over the last year in an initiative to "enhanc[e] security" and "driv[e] innovation," coinciding with the appointment of its new CEO, Brian Weatherly.[2]  Mr. Weatherly has been tasked with prioritizing the strengthening of HSOne's cybersecurity infrastructure.  HSOne explained in February 2025 that "[w]ith its continued momentum toward

---

[2] https://www.henryscheinone.com/about-us/press-release/henry-schein-one-at-chicago-midwinter/?utm_source=chatgpt.com (Press Release, February 20, 2025). (Ex. 1 to the Declaration of Marcelo Barros ("Barros Decl.").)

the most connected platform, [HSOne] [will be] enhancing security, driving innovation, and creating automated synergies for common dental workflows." *Id.* To that end, HSOne sought to eliminate unauthorized integrations, enforce approved APIs, and deploy security patches and upgrades. (Declaration of Brian Weatherly ("Weatherly Decl.") ¶ 5; McDaniel Decl. ¶ 10.)

Of the over 100 vendors who leverage HSOne's API, the vast majority follow the rules of the road. They abide by HSOne's API terms and do not seek to abuse them. There are, however, instances when HSOne must enforce its API terms or stop third parties from attempting to access its software systems and database without authorization. In response, HSOne deploys security patches and upgrades. From time to time, HSOne has no choice but to assert claims and demand that third parties circumventing its authorized access mechanisms stop their conduct. This is critical for HSOne software so that it can effectively guards its customers' valuable and sensitive data. (McDaniel Decl. ¶ 11.)

**D.     Vyne Has Resisted HSOne's Security Enhancements and Embarked on a Troubling Campaign of Unauthorized Access, Software Exploitation, Network Traffic Interception, and Circumvention of HSOne Technical Measures.**

Vyne is a point solution focused on billing for dentists. As HSOne has increased its platform and API security, Vyne has focused on working around HSOne's controls and accessing its systems without authorization. Last year and earlier this year, it was unclear to HSOne exactly how Vyne was conducting its technical circumventions. Vyne had previously been part of HSOne's API program and also had previously leveraged certain unsecure methods of access that bypassed API endpoints. But in the last year or so, Vyne's activity has ramped up. HSOne initiated discussions with Vyne to better understand (a) what Vyne was doing; (b) why; and (c) how HSOne could come to a commercial agreement with Vyne so that it would stop resorting to unauthorized access of HSOne's software systems and database. Vyne can pursue multiple

legitimate pathways, including manual submission and clearinghouse integration. (McDaniel Decl. ¶ 13.)

As the discussions with Vyne progressed, so did Vyne's hacking. Vyne employs multiple former HSOne engineers who have deep familiarity with HSOne's systems from their time working at HSOne. (*Id.* ¶ 14.) Vyne's CEO, President, and CTO also used to work at HSOne and are familiar with its product architecture. HSOne deployed telemetry into its Dentrix software and database earlier this year to attempt to better track the health, stability, and security of its software, including how unauthorized third parties could access its systems. That telemetry and HSOne's subsequent forensic investigation revealed a shocking scale of unauthorized access by Vyne. Vyne was doing far more than it revealed publicly to its customers or represented to HSOne, and more than it discloses in its Complaint. (*Id.*)

HSOne uncovered that Vyne was misappropriating decryption keys, decrypting encrypted configuration files, injecting data into HSOne's Dentrix settings files, intercepting network traffic, escalating privileges, and developing software that simulated Dentrix to interact with its database and services, among other things. (*Id.* ¶ 15.)[3] When HSOne deployed security upgrades and patches to attempt to stop these attack vectors, Vyne escalated its conduct further. It deployed software that would interfere with and prevent HSOne's updates from taking effect. (*Id.*)

E.     **HSOne Demanded Vyne Stop and Set Out to Enforce its Rights, Leading to this Dispute.**

Although HSOne suspected that Vyne was not engaging in commercial discussions in good faith, it continued to make every effort to try to come to a business resolution. HSOne offered Vyne a return to its API. (Weatherly Decl. ¶ 7.) It offered a direct integration similar to what it

---

[3]HSOne's TRO and PI motion as well as its Complaint in Utah contain further details of Vyne's hacking.

has done in other clearinghouse situations. (*Id.*) HSOne even offered to develop new custom API endpoints and integrations especially for Vyne. (McDaniel Decl. ¶ 17.) Vyne humored the conversations, but nothing materialized. Meanwhile, the hacking continued.

Eventually, by late August 2025, HSOne had no choice but to send Vyne a demand detailing Vyne's violations of multiple federal laws against computer hacking, circumvention, and interception. Vyne responded in early September 2025, claiming it was only using a "print" to "pdf" feature that it had always used for 20 years. Although HSOne's investigation had already disproven this, HSOne continued to attempt to engage with Vyne in good faith. HSOne's CEO continued to meet with Vyne's CEO attempting to find commercial terms. (Weatherly Decl. ¶ 8.) The parties had even agreed upon a Utah-venue tolling agreement in connection with such discussions, something HSOne suggested would show good faith. However, once the terms had been agreed upon by the parties, Vyne never sent HSOne the signed version and refused to do so.

On September 30, 2025, HSOne's CEO conveyed to Vyne's CEO that unless Vyne demonstrated a concrete sign of good faith, by sending the signature to the Utah-venue tolling agreement that the parties had agreed upon, HSOne would have no choice but to conclude that Vyne was not serious about resolution and initiate litigation. Vyne, later that night, filed its case in Maryland in anticipation and its motion for a TRO and PI a few days later. (*Id.* ¶ 9.)

HSOne, which actually needs emergency relief from Vyne's unauthorized access to its software, filed a Complaint shortly after in Utah federal court, alleging that Vyne's conduct violated the Computer Fraud and Abuse Act (CFAA), Electronic Communications Privacy Act (ECPA), Digital Millennium Copyright Act (DMCA), as well as Utah law. HSOne also filed its own motion for a TRO and PI. The court in Utah denied HSOne's motion without prejudice to

refiling,[4] to allow this Court to determine the issue of venue. On October 14, 2025, HSOne filed a venue transfer motion to facilitate that determination. (ECF No. 35.)

Vyne claims that it needs emergency relief to access HSOne's software and database, even though Vyne's hacking is so persistent that it has circumvented HSOne's security patches and upgrades. (McDaniel Decl. ¶ 15.) Vyne's egregious hacking has created a vicious game of whack a mole in which Vyne's repeated unauthorized actions require HSOne to continuously release new security enhancements to protect its intellectual property, software and data. All evidence points to this game continuing absent enforcement of the multiple federal laws that Vyne is violating.

## **LEGAL STANDARD**

Temporary restraining orders and preliminary injunctive relief are "extraordinary remed[ies]" to be granted "only sparingly and in limited circumstances," given the substantial risk of error inherent where courts must "act on an incomplete record." *See Columbia Gas Transmission LLC v. Those Certain Parcels in Baltimore Cnty., Harford Cnty., Md*., No. CIV. JFM-14-220, 2015 WL 300381, at *2 (D. Md. Jan. 21, 2015) (citation omitted). As the United States Supreme Court has emphasized, injunctive relief is a matter of "equitable discretion," and courts are not "obligated to grant an injunction for every violation of law." *See Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 32 (2008) (citation omitted). Accordingly, "granting a preliminary injunction should be the exception, not the rule." *Am. Fedn. of Teachers v. Bessent*, No. 25-1282, 2025 WL 2313244, at *3 (4th Cir. Aug. 12, 2025); *see also Munaf v. Geren*, 553 U.S. 674, 690 (2008). It is a drastic remedy.

To prevail on its motion for injunctive relief, Vyne must make a "clear showing" of each of the following four factors: (1) a likelihood of success on the merits; (2) a likelihood of suffering

---

[4] The Order (ECF No. 18) is attached as Ex. 8 to Barros Tr. Decl.

irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in its favor; and (4) that an injunction is in the public interest. *See Winter*, 555 U.S. at 20. "[A] preliminary injunction can be granted only if every factor is met,…yet *denying* a preliminary injunction only takes the rejection of a single factor." *Am. Fed'n of Teachers v. Bessent*, 152 F.4th 162, 169 (4th Cir. 2025) (citation omitted) (emphasis in original). This standard sets a "high bar" for obtaining injunctive relief, and such relief is appropriate only where "every [*Winter*] factor is met." *Am. Fedn. of Teachers*, 2025 WL 2313244, at *3. Where, like here, "significant factual disputes" exist, courts routinely decline to issue preliminary injunctions. *See Chattery Intern., Inc. v. JoLida, Inc*., No. CIV. WDQ-10-2236, 2011 WL 1230822, at *9 (D. Md. Mar. 28, 2011).

The Fourth Circuit further distinguishes between "prohibitory" injunctions, which maintain the status quo, and "mandatory" injunctions, which alter it. *See Pierce v. N. Carolina State Bd. of Elections*, 97 F.4th 194, 209 (4th Cir. 2024). Vyne seeks mandatory relief that would compel HSOne to dismantle its security controls. Courts apply a "more searching" and "heightened standard" for this sort of relief. *See Pashby v. Delia*, 709 F.3d 307, 319-20 (4th Cir. 2013). Mandatory injunctions are "disfavored in any circumstance" and may be granted only where "the exigencies of the situation demand such relief." *Id*. (citation omitted).

## ARGUMENT

Vyne cannot establish the required elements for temporary or preliminary injunctive relief.

## I. VYNE CANNOT MAKE A CLEAR SHOWING OF A LIKELIHOOD OF SUCCESS ON THE MERITS FOR ANY OF ITS CLAIMS.

Vyne moves for injunctive relief only on its unfair competition and tortious interference claims. (Mot. at 12.) Both of these claims fail to clear the heightened mandatory early injunction

bar.[5]  To prevail, Vyne must demonstrate a likelihood of success on all "independent issues" and show that it is likely to "prevail on the combination of all of the issues" relevant to its claims.  *See Am. Fedn. of Teachers*, 2025 WL 2313244, at *3.  By contrast, HSOne need only establish that it is likely to prevail on a single dispositive issue to defeat Vyne's request for injunctive relief.  *See id*.  The law is clear: even if Vyne could demonstrate a reasonable chance of prevailing on an individual issue, it must still establish "an extremely high likelihood of success" on each individual claim to have a "likelihood of success overall."  *See id*. (vacating grant of injunctive relief where plaintiff failed to show a likelihood of success on the merits).  Here, Vyne falls far short of this demanding standard.  Its Motion should be denied on this basis alone.

A.      **Vyne Cannot Prevail on its Unfair Competition Claim.**

1.      **Vyne Fails to Demonstrate that it Can Prevail on its Unfair Competition Claim Based on Maryland Law.**

Maryland law does not prescribe rigid elements for an unfair competition claim; rather, the analysis turns on the unique facts and circumstances of each case.  *See Savaria USA, Inc. v. Elevator Works, LLC*, No. CV RDB-24-1311, 2024 WL 2212914, at *9 (D. Md. May 16, 2024) ("[T]here are no specific elements required to establish unfair competition under Maryland law") (citation omitted).  The "underlying premise" is that no party is justified in damaging another's business through methods that are dishonest, fraudulent, or deceptive.  *See id.*; *see also M-Edge Accessories LLC v. Amazon.com Inc*., No. CIV.A. MJG-11-3332, 2015 WL 403164, at *4 (D. Md. Jan. 29, 2015).  Only acts that "substantially interfere with the ability of others to compete on the

_____

[5] Vyne addresses only two of its six claims in its Motion.  As HSOne will address in its motion to dismiss, Vyne's claims fail on 12(b)(6) grounds for failure to state claims upon which relief may be granted, even taking all of Vyne's allegations as true and in the most favorable light.  This means that regardless of the evidence, which Vyne also lacks, it cannot satisfy the preliminary injunction standard.  HSOne also does not concede that Maryland law applies to this dispute and reserves its rights on that topic.

merits of their products" or acts that "conflict with accepted principles of public policy" can serve as the grounds of an unfair competition claim. *Ellicott Dredges, LLC v. DSC Dredge, LLC*, 280 F. Supp. 3d 724, 732 (D. Md. 2017) (citation and marks omitted). HSOne's conduct does not fall within either category.

Maryland's unfair competition law does not create a general duty to provide unfettered data access to another business. Rivalry, even if vigorous, does not constitute unfair competition. *See M-Edge Accessories LLC*, 2015 WL 403164, at *4. Here, HSOne's conduct is driven by security concerns. A company making changes to its software system to prevent unauthorized access does not give rise to an unfair competition claim because security hardening is a legitimate business purpose. *See, e.g., Berlyn Inc. v. Gazette Newspapers, Inc.,* 223 F.Supp.2d 718, 738 (D. Md.2002) (no unfair competition claim because plaintiff "failed to show that the defendants' actions in this case were anticompetitive, or that each complained-of action was not taken with some independent and legitimate business purpose"). Unfair competition law exists "to protect the public by healthy competition, [but] not . . . to protect individual plaintiffs." *See M-Edge Accessories LLC*, 2015 WL 403164, at *4.

The tort of unfair competition imposes no duty on HSOne to provide Vyne with preferred, unfettered access to its software, as Vyne asks this Court to do. Vyne presents no evidence of dishonesty, deceit, or trickery by HSOne. Instead, Vyne's Motion describes HSOne's conduct as the opposite. Vyne's allegations center on HSOne's legitimate and necessary actions that HSOne took to counteract Vyne's unauthorized and unlawful attempts to access HSOne's software systems. The record reflects that HSOne investigated Vyne's conduct, promptly notified their

shared customers of the security vulnerabilities, and acted to protect customer data. HSOne communicated its concerns to Vyne and sought to integrate with Vyne, but Vyne refused.[6]

HSOne's actions are rooted in transparency and integrity—not deception. Even if HSOne has an alternative product to Vyne, Maryland law does not require HSOne to compromise its own security protocols for Vyne's benefit. *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 399 (2004); *see* also *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438 (2009) (there is no obligation to set terms favorable to another business absent a duty). *M-Edge Accessories LLC v. Amazon.com Inc.* is instructive. There, Amazon launched its Kindle device, and thereafter M-Edge began to sell Kindle accessories. *See* 2015 WL 403164, at 1. Amazon initiated a "Made for Kindle" program, under which Amazon-selected members whose products met Amazon's standard for quality would be given special benefits including permission to use the Made for Kindle mark, among other benefits. *See id.* at 5. Members would pay Amazon a royalty in return. *See id.* M-Edge rejected Amazon's offer to take part in the program. *See id.* The court noted that M-Edge "failed to produce evidence adequate to permit a reasonable jury to find that the Made for Kindle program constituted actionable unfair competition on the part of Amazon. M–Edge indisputably was given the opportunity to participate in the invitation-only program and made an informed business decision not to participate." *See id.* Any "harm" M-Edge sustained was caused by M-Edge's decision that the benefit of participating would be outweighed by the cost. *See id.* The court also noted that the evidence established the existence of valid business reasons for Amazon's program that had nothing to do with unfair competition vis-à-vis

---

[6] Vyne alleges, for instance, that in March 2025, HSOne started informing dental practices and other healthcare providers that it would be releasing updates to Dentrix because of security concerns related to Vyne's conduct. Mot. at 4. Vyne was aware of this because it disputed HSOne's actions in a letter to its customers. *Id.*

M-Edge. *See id.* Purported threats related to M-Edge's refusal to make a deal with Amazon and participate in the program were no evidence of unfair competition; rather Amazon had a valid reason to discourage M-Edge from rejecting the deal. *See id.* at 8-9.

Similarly, HSOne's implementation of security upgrades to protect its system and the data it stores are valid. Vyne had options. That it chose not to take the legitimate route and that HSOne implemented security controls is not unfair competition.[7] Like in *M-Edge Accessories*, any alleged harm Vyne experienced was caused by Vyne's decision not to participate in HSOne's API Exchange or one of the other alternatives that HSOne proposed.

Dentrix is HSOne's proprietary software. Vyne has no ownership or entitlement to it. HSOne's decision to implement upgrades related to Dentrix after discovering Vyne's improper hacking to work around HSOne's security protocols rather than integrate with Dentrix is legitimate business conduct, not actionable unfair competition. *See, e.g., Berlyn, Inc. v. Gaz. Newspapers, Inc.*, 223 F. Supp. 2d 718, 739 (D. Md. 2002), *aff'd*, 73 Fed. Appx. 576 (4th Cir. 2003) (holding non-anticompetitive activity performed for a legitimate business purpose did not constitute unfair competition). Vyne could access the data it seeks if it went about it in the proper way. That HSOne also offers customers a legitimate—and secure—alternative to Vyne's workaround system also does not give rise to a claim of unfair competition. *M-Edge Accessories LLC*, 2015 WL 403164, at 6 (promotion of one's own or a competitor's product is not unfair competition).

Vyne's "Hobson's choice" argument is baseless. Mot. at 16. Customers are not left without alternatives. (Mot. ¶¶ 5, 10, 26.) Vyne itself can pursue multiple legitimate pathways, including manual submission and clearinghouse integration. (McDaniel Decl. ¶ 13.) It has

---

[7] *See Alexander & Alexander Inc. v. B. Dixon Evander & Associates, Inc.*, 336 Md. 635, 659, 650 A.2d 260, 272 (1994); *Macklin v. Robert Logan Associates*, 334 Md. 287, 307–08, 639 A.2d 112, 122 (1994).

refused to do so. Vyne's refusal to utilize HSOne's API and its decision to attempt circumvention of HSOne's security measures underscore that Vyne's alleged harm is self-inflicted. The law does not require HSOne to lower its security standards to accommodate Vyne's needs or permit Vyne to circumvent HSOne's security controls.

## 2. Vyne's Reliance on the Cures Act Cannot Save its Unfair Competition Claim.

Vyne cannot satisfy its burden to show that HSOne violates the information-blocking provision of the Cures Act (42 U.S.C.A. § 300jj-52) on any standard, particularly the high bar required for a mandatory preliminary injunction. The Cures Act governs health care providers, developers of certified IT, and health information exchanges/health information networks (HIE/HIN). *Id.* There is no dispute that HSOne is not a health care provider. Vyne also admits that HSOne is not a developer of certified IT covered by the Cures Act. Vyne is wrong in its assertion that HSOne is an HIE or HIN subject to the statute. It is not. Even if HSOne was an HIE or HIN, its actions would not violate the Cures Act due to the statute's Manner, Security, and Health IT exceptions.

### a) Vyne Acknowledges that HSOne is Not a Developer of Certified IT Under the Cures Act.

Vyne admits that HSOne's Dentrix software system is not certified under the National Coordinator for Health Information Technology Health IT Certification Program, so it is not regulated under that category. (Compl. ¶ 71.) Vyne manufactures a theory that Vyne is the reason HSOne is not certified, alleging that HSOne "removed Dentrix from the Certification Program" on the "same day" that Vyne sent HSOne a letter about the Cures Act on June 2, 2025. *Id.* Vyne does not support this conclusory allegation with any facts. It cannot, because HSOne's decision to decertify occurred months prior to June 2, 2025. (McDaniel Decl. ¶ 20.) It is not a one-day process but rather takes time, as Vyne is well aware.

HSOne's decision to decertify was driven by business considerations unrelated to Vyne.[8] In reviewing its certification, HSOne determined that none of its Dentrix Enterprise customers used the relevant features requiring certification last year, in 2024. (*Id.*) As a result, HSOne chose to decertify that product. (*Id.*) Vyne's attempts to discredit and sensationalize HSOne's decision to change its certification status, even if they were correct, have no impact on the Cures Act analysis. For purposes of the Cures Act, the reason for decertification is not relevant. All that matters for these purposes is that HSOne is not regulated by the statute as a developer of certified IT, something Vyne does not and cannot dispute. In any event, Vyne's theory is wrong—HSOne's certification decision was made long before Vyne's June 2, 2025 letter and for unrelated reasons.

### b) HSOne is Not a Health Information Exchange or a Health Information Network.

To try to shoehorn HSOne into the Cures Act's regime another way, Vyne alleges that HSOne is an HIE or HIN. (Compl. ¶¶ 69-70.) This allegation misapplies the clear text of the law. The applicable regulation states that to meet the definition of an HIE or HIN, the entity must "permit, enable, or require" the "use of any technology or services for access, exchange, or use of electronic health information . . . [a]mong more than two unaffiliated individuals or entities (other than the individual or entity to which this definition might apply) that are enabled to exchange with each other[.]" 45 C.F.R. § 171.102. In other words, the HIE or HIN must facilitate information flow among **more** than two other parties.

Here, as Vyne knows, HSOne only facilitates information flow bilaterally between **two** parties—HSOne's customer and HSOne. (McDaniel Decl. ¶ 12.) To the extent a customer chooses to work with a vendor that uses HSOne's API, that still does not cross over the three-party

---

[8] Vyne fails to mention in its Complaint that the product HSOne had previously certified was called Dentrix *Enterprise*. This is a different product from the Dentrix software at issue in this dispute. (McDaniel Decl. ¶ 20.)

threshold because HSOne itself is excluded from the "more than two" count under the regulation. 45 C.F.R. § 171.102. Even under the theory that HSOne's software acts as an intermediary in the API use case between a customer and the vendor they choose to work with, the resulting exchange of information in such an instance is still—at most—between only two entities. (*Id.* ¶ 12.)[9]

This nuance is no accident. The Office of the National Coordinator for Health Information Technology ("ONC") expressly excluded intermediaries involved in bilateral exchanges, like HSOne, from the HIE and HIN definition. Even in the API use case, though multiple vendors are part of the API program, each exchange of data is a *single* vendor pulling data for *a single* customer with no capability for any exchange *among* the various vendors or customers (i.e., no vendor participant in the API program can exchange data with any other vendor and no customer can exchange data with any other customer). HSOne is "performing a service on behalf of one entity" and "no actual exchange is taking place among all entities[.]"[10] This is exactly what the ONC excluded. The ONC's goal was to "ensure[] that the definition does not unintentionally cover what are essentially bilateral exchanges" like HSOne.[11] Vyne's theory runs counter to the express intent of the regulation and is unsupported by its plain language. Under any standard, let alone the mandatory preliminary injunction standard, the inquiry should end there.

---

[9] This data flow reflects how HSOne provides its eClaims and Eligibility Essential and Pro products to its customers. First, HSOne customers ask (via submission to the HSOne platform) whether a patient maintains certain insurance coverage. HSOne receives this request and then, on behalf of the customer, makes that request to the applicable payor. The Payor responds to HSOne, and HSOne pushes the response to the customer. HSOne is simply an intermediary between the customer and payor, not facilitating any exchange. It is not a data repository of information inputted by the customer and the payor. (McDaniel Decl. ¶ 12.)

[10] *See* 21st Century Cures Act: Interoperability, Information Blocking, and the ONC Health IT Certification Program, 85 FR 25642-01 (per JB – this citation accessible via Westlaw), available at https://www.federalregister.gov/documents/2020/05/01/2020-07419/21st-century-cures-act-interoperability-information-blocking-and-the-onc-health-it-certification#p-1777.

[11] *See id.*

### c) Even If HSOne was Regulated Under the Cures Act, and it is Not, Vyne's Claim Fails Due to Multiple Exceptions in the Law.

Exceptions built into the Cures Act allow HIEs or HINs to secure their platforms against malicious attacks like those Vyne is deploying. These exceptions exist to permit reasonable and necessary measures to protect the security of electronic health information.

**Security Exception.** (45 C.F.R. § 171.203.) This exception protects "legitimate security practices." It does not cap security at the lowest level needed but rather asks whether the practice is reasonable and necessary and implemented consistently with an objective security policy. *Id.* The Security Exception applies where a regulated entity's restriction on access (i) is tailored to protect the confidentiality, integrity, or availability of data and (ii) is applied consistently. ONC has noted that the "use[] [of a] provider's technology platform for reasons that compromises the integrity of the provider's network… could likely be covered by" the Security Exception.[12]

HSOne easily meets this exception here. First, the access Vyne seeks to directly write back into HSOne's database through a non-existent API endpoint would create data integrity and security risks. HSOne's database contains controls that could not technically be implemented in the form of access Vyne seeks. (McDaniel Decl. ¶ 23.) HSOne maintains policies and procedures that delineate security protocols, which state that third party write-back abilities could lead to improper data manipulation and compromise. (*Id.* ¶ 23.)

Further, HSOne's security patches and fixes are meant to protect confidentiality, integrity, and availability of its customers' sensitive data. Vyne's morass of exploits seek to circumvent these patches by, among other things, altering the permissions and privileged access flow in

---

[12] 21st Century Cures Act: Interoperability, Information Blocking, and the ONC Health IT Certification Program, 85 FR 25642-01 (May 1, 2020 Final Rule), available at https://www.federalregister.gov/documents/2020/05/01/2020-07419/21st-century-cures-act-interoperability-information-blocking-and-the-onc-health-it-certification.

HSOne's Dentrix software on its customers' premises. HSOne's telemetry shows that many of Vyne's rapid-fire exploit releases cause unintended consequences and compromise the customer's instance of the Dentrix software system. This is also evidenced by multiple customer complaints to HSOne. When a third-party application such as Vyne, on its own, attempts to break past technical barriers and access software and databases without authorization, it risks a variety of consequences to the confidentiality, integrity, and availability of the data at issue. The read-write privileges that Vyne awards itself through its hacks can cause data in HSOne's Dentrix database located on its customers' premises to be corrupted too, which could impact accuracy and completeness of information used in a clinical setting—risking compromise to patient safety and care quality. By breaking HSOne's security controls, Vyne leaves all HSOne's customers whose systems it meddles with vulnerable to other malicious hackers. There have been many significant hacks of patient health information in recent years and there are countless malicious actors looking for any vulnerability to exploit. Vyne is paving the way for this to occur, risking disruption to dental practices and their ability to provide patient care. (McDaniel Decl. ¶ 19.)

Contrary to Vyne's unsupported allegations, HSOne's software upgrades and patches do not only target Vyne. HSOne simply implements security controls that stop any software from unauthorized access to its systems—whether created by Vyne or not. (McDaniel Decl. ¶ 16.) HSOne's attempts to secure its systems is nothing new. Indeed, when Vyne's CEO used to work for HSOne, he expressed consistent concerns about unauthorized access outside the realm of HSOne's API. (McDaniel Decl. ¶ 21.) Because Vyne's claims boil down to a complaint about reasonable security measures meant to stop unauthorized access across the board and serious risks to data confidentiality, integrity, and availability, HSOne satisfies the Security Exception.

**Manner Exception**. (45 C.F.R. § 171.301.) This exception permits a regulated entity to decline the exact manner requested and offer a reasonable alternative manner that is feasible and secure.[13] First, an actor is not required to fulfill a request in the manner requested if the actor is technically unable to do so. Second, an actor is not required to fulfill a request in the manner requested if the regulated entity "cannot reach agreeable terms with requestor." If a regulated entity does not fulfill a request for either of these reasons, it is permitted to provide data in an alternative manner to how it was requested.[14] Here, Vyne did not make a proper request for access to data under the Cures Act, give HSOne the details of any supposed requested access, or give HSOne the opportunity to discuss, let alone agree on, terms with Vyne. Rather than asking, Vyne has simply hacked HSOne's software systems. Vyne's hacks include misappropriating decryption keys, escalating administrative privileges, injecting data into settings files, and changing folder permissions, among other things. This is not a request under the Cures Act, this is hacking. The Cures Act is not permission to hack another's software. To actually request access, Vyne would need to include details that would enable HSOne to determine if HSOne would be able to fulfill or come to agreeable terms on this 'request.' Vyne's August 21, 2025 letter is not a bona fide request either. It ignores that Vyne already has access to its customers' data in other ways, is overly broad with respect to the data it seeks, and does not propose any specific manner through which the request could be satisfied. HSOne can only guess at any request Vyne is making, which does not satisfy the requirements of the Cures Act. Furthermore, any request for direct access by Vyne to

---

[13] If an actor does fulfill a request in the manner requested any fees charged for such access do not need to meet the Fees Exception. *See* 45 C.F.R. § 171.301(a)(2)(i).

[14] For the alternative manner exception, the regulated entity must also meet the Fees Exception. *See* 45 C.F.R. § 171.301(b). HSOne meets this exception here because the commercial terms it offered Vyne comport with § 171.302.

HSOne's Dentrix ledger that Vyne is seemingly seeking is not something HSOne could technically be able to support as it would result in serious data integrity issues. (McDaniel Decl. ¶ 23.)

Further, HSOne has tried all year to reach agreeable terms with Vyne on access manners that HSOne provides to its other commercial partners. It is Vyne that cut off the negotiations and filed this case. (Weatherly Decl. ¶ 9.) It was Vyne that chose to access HSOne's systems without authorization, essentially holding HSOne hostage throughout the discussions, rather than negotiate in good faith. Indeed, Vyne escalated its hacks as the negotiations went on, as if to deploy its increasingly malicious unauthorized access as a negotiating strategy to gain leverage. (McDaniel Decl. ¶¶ 14, 15, 19.) HSOne offered reasonable commercial terms following multiple meetings between HSOne and Vyne's senior leadership, but Vyne refused them. (Weatherly Decl. ¶¶ 7, 8, 9.) Because Vyne has not engaged in good faith negotiations, and because HSOne has other means available to Vyne (including an integration similar to what HSOne does with another clearinghouse), HSOne satisfies the Manner Exception.[15]

Importantly, ONC has expressly stated that "[f]ailure to meet an exception does not necessarily mean a practice meets the definition of information blocking."[16] The regulation requires that allegations of information blocking be "evaluated on a case-by-case basis to assess

---

[15] The Cures Act also exempts any practice "required by law" from being deemed information blocking. 42 U.S.C.A. § 300jj-52(a)(1)(A). The ONC preamble underscores this point, explaining that if "otherwise applicable law prohibits a specific access, exchange, or use of information," then the practice is per se excluded from the information blocking definition due to the "required by law" carve-out.[15] For instance, if HSOne prevented access because of security concerns related to violating HIPAA, which is part of the rationale for its controls here, then HSOne is not engaged in information blocking. (McDaniel Decl. ¶ 19.) Congress and the Department of Health and Human Services built in this safety valve to prevent the rule from forcing actors to choose between legal obligations.

[16] *See* 85 FR 25642-01 (May 1, 2020 Final Rule), https://www.federalregister.gov/documents/2020/05/01/2020-07419/21st-century-cures-act-interoperability-information-blocking-and-the-onc-health-it-certification.

the specific facts and circumstances."[17]   Given the complexities, Vyne cannot come close to establishing its claim for information blocking on an abbreviated record.  The Court should deny the motion for this reason alone.

### 3. Vyne's Reliance on *Real Time* is Misplaced.

Vyne appears to have filed this case in Maryland and not Utah (where HSOne is located along with Vyne's CEO, President, and CTO) due to the *Real Time* case.  In that case, this Court denied a TRO but eventually granted a preliminary injunction after a multi-day evidentiary hearing, which the Fourth Circuit upheld.  The circumstances in the *Real Time* case offer a stark contrast to those here.

As a threshold issue, the defendant, PointClickCare, made multiple concessions in the course of its litigation that HSOne does not do here.  Critically, PointClickCare did not contest that it was regulated by the Cures Act or that its conduct was "facial information blocking."  131 F.4th at 231.  HSOne does.  As noted above, HSOne does not fall into any category of entity that the Cures Act's information blocking regulations govern.  Even if it did, Vyne has means of access to the data it seeks, including through the API or other available integrations.  This means there is no facial information blocking.  PointClickCare also did not present an argument for why it could not provide "70% of the data requested" by Real Time and only addressed 30% of the data in its papers. *Id.*  HSOne's arguments apply to 100% of the data Vyne seeks.

As to whether a commercial agreement could be reached, PointClickCare took the position that all it needed to show was that the parties had not yet reached an agreement.  *Id.* at 233.  The Fourth Circuit disagreed, noting that there must be "at least some reasonable efforts and articulable

---

[17]   *See*   85   FR   25642-01   ([May 1, 2020 Final Rule](https://www.federalregister.gov/documents/2020/05/01/2020-07419/21st-century-cures-act-interoperability-information-blocking-and-the-onc-health-it-certification)), https://www.federalregister.gov/documents/2020/05/01/2020-07419/21st-century-cures-act-interoperability-information-blocking-and-the-onc-health-it-certification.

reasons why the parties *cannot* come to an agreement." *Id.* PointClickCare did not offer "any evidence of genuine efforts." *Id.* at 234-35. Here, however, the record shows both reasonable efforts to make a deal and articulable reasons for HSOne's actions. HSOne has tried for nearly a year and every which way to work with Vyne. It has offered Vyne access to its API. It has offered Vyne an integration that HSOne has available to clearinghouses and that is working in the market right now. It even offered to build Vyne custom integrations. It offered Vyne fair commercial terms. (Weatherly Decl. ¶ 7.) Based on what HSOne's security investigation has revealed about Vyne's escalating hacking, as well as Vyne's conduct in the negotiations, it is clear that Vyne has not been seriously interested in working out a deal. HSOne's efforts are miles beyond those of PointClickCare, who "prematurely cut off talks without responding" and "went silent . . . without further explanation." HSOne has done nothing of the sort. *Id.* at 233.

The Fourth Circuit cautioned in *Real Time* that "it is not our role to flyspeck negotiations between two sophisticated parties to determine whether they have exhausted every possible avenue of agreement and force them to return to the negotiating table again and again." *Id.* at 234-35. Yet that is exactly what Vyne asks this Court to do.

Unlike HSOne's approach, PointClickCare was found to have "targeted" Real Time. *Id.* at 235. This was in part based on the fact that PointClickCare was "receiving significant sensitive information from Real Time under the NDA" that informed PointClickCare's acts. Here there are no such facts. In fact, it is the opposite. It is Vyne whose CEO, President, CTO, and multiple engineers worked for HSOne and possess significant sensitive information about HSOne's software systems. (McDaniel Decl. ¶ 14.)

PointClickCare's method, unsolvable CAPTCHAs, also is very different than HSOne's security measures, including the deployment of security patches that sought to address evolving

threats.  (McDaniel Decl. ¶¶ 10, 11, 19.)  These measures are consistent with HSOne's publicly stated objectives and are meant to ensure a safe and compliant customer data environment where the platform allows access and integration, but securely and with proper controls.  (*Id.* ¶ 21.) Vyne's CEO, when he worked at HSOne, articulated the rationale for these controls himself.  (*Id.*) HSOne applies its policies across the board, not just in the case of Vyne.  (*Id.*)

Unlike PointClickCare, HSOne introduced security measures after Vyne's documented attempts to circumvent security protocols, not as a pretext to restrict access.  (*Id.* ¶ 16.) PointClickCare took the position that the "security risk to its platform" was "obvious" and "should not require documentation."  *Id.* at 237-38.  Here, HSOne provides extensive documentation based on its telemetry, forensic investigation, and receipt of customer complaints about the risks Vyne is introducing.  (McDaniel Decl. ¶¶ 14, 16, 19.)  Third-party industry observers have commented on these risks as well.  (Barros Decl., Ex. 2.)  HSOne does not target or single out Vyne; indeed, HSOne has also put other vendors on notice who circumvent technical barriers or access HSOne's software and database without authorization.  (McDaniel Decl. ¶ 16.)  Vyne admits that it is not the only one on HSOne's alleged "hostile printer" list.  (Mot. at 5.)

Vyne references its own security certifications to try to mimic the *Real Time* case (Compl. ¶ 19), but ignores the fact that in *Real Time*, there was no hacking and the offending conduct posed negligible security risks.  Automated bot access at the modest scale that Real Time performed is far less of a security concern than misappropriating decryption keys, escalating privileges, injecting data into settings files, intercepting network traffic, changing security permissions on folders, and improperly reading and writing data into a database containing health information. Vyne claims its security has been audited and that it has some certifications.  But Vyne does not explain when those audits occurred.  Nor does Vyne specify whether the auditor was given full

access and information to all of the methods Vyne is using to access HSOne's software systems without authorization, including the rapid-fire new versions it has released in recent weeks. Given that Vyne has not publicly stated the full extent of its conduct, it is hard to envision that its security auditors were fully informed either.

The Court should reject Vyne's *Real Time* gambit. The Fourth Circuit has not given a license to access computer systems without authorization through sophisticated software exploits. To the contrary, the facts and holding of that case only highlight the wrongfulness of Vyne's conduct here. Where a software provider like HSOne takes routine steps to secure its platform against real, actualized, harm and makes good faith efforts to work out a commercial agreement, *Real Time* guides towards a denial of temporary and preliminary injunctive relief.[18]

## B. Vyne Cannot Prevail on its Tortious Interference Claims.

Vyne appears to seek injunctive relief on both of its claims for tortious interference. (Mot. at 18–21.) Regardless of which theory Vyne intends to advance, Vyne does not demonstrate that it is likely to succeed on either. A claim for tortious interference with contractual relations requires: "(1) existence of a contract between the plaintiff and a third party; (2) defendant's

---

[18] Another independent reason to deny Vyne's request for preliminary relief is that Vyne's reading of the Cures Act raises constitutionality concerns. The Fourth Circuit in *Real Time* did not fully address this. If the Cures Act, as drafted, does not allow an entity to protect its systems through reasonable security measures and forces the entity to allow hacking, that raises multiple constitutional issues. It would constitute an uncompensated taking by forcing HSOne to provide access to its property to those who are attacking it. It also suggests that the regulatory regime is arbitrary and violative of substantive due process rights. *See, e.g.*, *CDK Glob. LLC v. Brnovich*, 461 F. Supp. 3d 906, 922 (D. Ariz. 2020).

In *CDK*, automotive dealer management system software providers alleged that a law "constitutes a taking because permitting third parties to use" their "hardware and software to access and rewrite their DMSs without [their] permission constitutes an interference with [their] property amounting to a physical invasion by government." *Id.* The court in CDK ruled that this was sufficient to state a claim for a "takings violation." *Id.* The Court also noted that this type of "inquiry" was "particularly fact dependent"—yet one more reason to deny the TRO and PI. *Id.*

knowledge of that contract; (3) intentional interference by the defendant with that contract; (4) breach of the contract by the third party; and (5) resulting damages to the plaintiff." *Harry and Jeanette Weinberg Found., Inc. v. St. Marks Ave., LLC*, No. CV GLR-15-3525, 2018 WL 704866, at *3 (D. Md. Feb. 5, 2018) (citation omitted). A claim for tortious interference with prospective relations requires a plaintiff to prove: "(1) intentional and willful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting." *Ellicott Dredges, LLC v. DSC Dredge, LLC*, 280 F. Supp. 3d 724, 731 (D. Md. 2017) (citation omitted).

Maryland requires intentionally improper and wrongful conduct independent of competition to give rise to a tortious interference claim. Conduct taken to protect a company's interests or even for competitive purposes without intentionally wrongful conduct is not tortious interference. *See Macklin v. Robert Logan Associates*, 334 Md. 287, 301, 639 A.2d 112, 119 (1994); *Alexander & Alexander Inc. v. B. Dixon Evander & Associates, Inc.*, 336 Md. 635, 658-60, 650 A.2d 260, 271-72 (1994) ("acts [] undertaken pursuant to legitimate commercial goals . . . "to protect these interests[ ] would not [give rise to] liab[i]l[ity] in tort for interfering with [] economic relationships even if [] harbor[ing] an incidental animosity").

Here, HSOne's controls aim to protect its customers' (and their patients') data. These are motivated by security. Even if Vyne could show that HSOne was attempting to interfere with Vyne's customer relationships improperly, which it cannot, "[t]ortious or deliberate intent to harm a plaintiff's business relationship is not alone sufficient to support an intentional interference claim. There also must be proof that the defendant's conduct in interfering with contract or

business relations was accomplished through improper means." *Lyon v. Campbell*, 707 A.2d 850, 860 (Md. Spec. App. 1998).

Further, Vyne's conclusory assertion that HSOne "well knows" of Vyne's contracts simply because Vyne publishes its terms and conditions on its website (Mot. at 19) is insufficient. *See Carbone v. Deutsche Bank Nat'l Tr. Co.*, No. CV RDB-15-1963, 2016 WL 4158354, at *5 (D. Md. Aug. 5, 2016) (noting the prerequisite of a "clear showing" and plaintiff's claims were "wholly conclusory and devoid of any factual support"). Vyne fails to identify any specific contract of which HSOne had actual knowledge and with which HSOne allegedly interfered. This is insufficient to prove a likelihood of success.

That HSOne may offer alternatives to its customers when Vyne is not complying with acceptable integration does not give rise to tortious interference either. *See Gorby v. Weiner*, No. CIV.A. TDC-13-3276, 2014 WL 4825962, at *9 (D. Md. Sept. 23, 2014) ("if a defendant's purpose in interfering with a non-contractual business relationship has even a partial purpose of advancing his interest in competing with one of the parties, then he is not liable in tort for that interference unless [they] act[s] with tortious intent") (citation omitted). For these reasons, Vyne cannot demonstrate a likelihood of success on its tortious interference claims.

## II. VYNE CANNOT DEMONSTRATE THE REQUISITE IRREPARABLE HARM.

It is "axiomatic" that Vyne must make a "clear showing" of irreparable harm. *See Hunter Grp., Inc. v. Smith*, 164 F.3d 624, 1998 WL 887289, at *2 (4th Cir. Dec. 18, 1998). The alleged harm must be "actual and imminent, not remote or speculative." *See Williams Ohio Valley Midstream, LLC v. Kittle*, No. 23-2185, 2024 WL 3325532, at *3 (4th Cir. July 8, 2024) (citation omitted). "Mere injuries, however substantial, in terms of money, time, and energy necessarily expended in the absence of an injunction are not enough . . . The possibility that adequate compensatory or other corrective relief will be available . . . weighs heavily against a claim of

irreparable harm." *Williams Ohio Valley Midstream, LLC*, 2024 WL 3325532, at *3; *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (citation omitted) (same).[19]

There is no urgency here for Vyne. Vyne has and continues to access HSOne's software systems and database at will. It has developed hacks so advanced that it can bypass and circumvent HSOne's attempts to deploy security upgrades and patches. An analogous situation would be if Vyne asked the Court for an order that HSOne not be allowed to try to replace its broken window. But Vyne already broke down the back door anyway.

As to its own harm, the speculative nature of Vyne's allegations disfavors preliminary relief. *See Winter*, 555 U.S. at 22-24 ("a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy…") (citation omitted). Vyne's purported harm is quantifiable and compensable by monetary damages, which is another reason to deny the motion. Vyne claims "at least 500 Dentrix users have cancelled their accounts" since March 2025. (Mot. at 22.) Even if the evidence were to support this, which would require further inquiry,[20] the calculation of lost fees per account is straightforward, calculable, and does not constitute irreparable harm.

---

[19] Harm is not irreparable where money damages would suffice. *See Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994) ("If the harm complained of is compensable by monetary damages, then it is not irreparable"); *see also Ameritox, Ltd. v. Savelich*, 92 F. Supp. 3d 389, 403 (D. Md. 2015) ("Where the harm suffered is economic, it is generally not considered irreparable"). Even in extraordinary circumstances, any preliminary injunction must be "carefully tailored" and should operate only to "preserve the plaintiff's opportunity" to recover damages at judgment—not to redress ordinary economic harms. *See, e.g., Hughes Network*, 17 F.3d at 694 (rejecting injunctive relief where harms are purely economic and traceable to competition).

[20] Vyne did not submit any evidence of actual cancelations aside from a conclusory statement in a declaration. Vyne also lacks any evidence that cancellations by Dentrix users were caused by HSOne, as opposed to a myriad of other potential factors.

Allegations of reputational harm, moreover, are insufficient where they are speculative or self-inflicted. In *Tsuka Pharm. Co. v. Burwell*, the court denied injunctive relief where the plaintiff had "plan[ned] and prepar[ed] for [the] occurrence," and failed to show actual, imminent harm. *See* No. GJH-15-852, 2015 WL 1962240, at *11 (D. Md. Apr. 29, 2015); *Advanced Res. Int'l, Inc. v. Tri-Star Petroleum Co.*, 4 F.3d 327, 331 (4th Cir. 1993). Here, Vyne's theory is that HSOne deploying security measures hurts Vyne's reputation. Thinking this theory through lays bare the true cause of Vyne's reputational issues—its own attempts to circumvent security controls. Moreover, Vyne has spread false statements about HSOne in conjunction with its hacking, subject to pending Lanham Act and business defamation claims in Utah, all of which cut against Vyne's reputational harm claim given its own unclean hands and wrongful acts.

## III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST COMPEL DENYING VYNE'S MOTION.

The equity balance here weighs heavily in HSOne's favor. Vyne is doing far more than 'print-to-PDF.' It is exploiting HSOne's software at HSOne's customer locations in the customer's infrastructure stack. Vyne makes it so HSOne cannot upgrade its own software, while it misappropriates decryption keys, injects data into settings files, impersonates HSOne's software, and intercepts network traffic. HSOne has laid out in detail how Vyne's conduct violates the CFAA, ECPA, DMCA, and multiple Utah statutes and common law doctrines. Just in the week since HSOne filed its Complaint in Utah, Vyne deployed at least 400 new instances of its malicious software across HSOne's customer base. (McDaniel Decl. ¶ 18.)[21]

Granting Vyne's request here would put in place a mandatory injunction requiring HSOne to roll back security functionality that not only guards against Vyne's malicious conduct, but also

---

[21] (Supplemental Declaration of Kenton McDaniel filed in the Utah action (ECF No. 22) attached as Ex. 5 to Barros Tr. Decl.)

protects against countless malicious hackers who would love nothing more than Vyne's level of unfettered access to tens of thousands of dentist offices' patient records across the United States. Vyne's request is tantamount to asking the Court to sit in the seat of HSOne's head of security. This is fraught with danger. Should the Order require HSOne to disable or stop from deploying new critical security controls, the results could be catastrophic to HSOne's customers, their patients, and HSOne's business. (*Id.* ¶ 24.) Apart from the requested mandatory injunction as to HSOne's security measures, Vyne also seeks onerous, overbroad, and unconstitutional restraints on HSOne's speech and communications to its customers. *See, e.g.*, *Chamber of Commerce of the United States v. Lierman*, No. 24-1727, slip op. at 19–20 (4th Cir. Aug. 15, 2025).

Vyne, meanwhile, has a plethora of options available to it. It can join HSOne's API program. It can work with HSOne on an integration similar to what HSOne has done in other situations where there is a clearinghouse. It can re-engage with HSOne in good faith on commercial discussions, as opposed to manufacturing positions seemingly for no other purpose than to set up a contrived analogy to the *Real Time* case.

The public interest also weighs decisively in HSOne's favor. Both Maryland and federal law prioritize the protection of patient health information, and the Cures Act expressly contemplates exceptions where security is at risk. The risk that other developers might adopt similarly reckless approaches (misappropriating credentials or bypassing encryption) poses a clear threat to patient privacy and data confidentiality, integrity, and availability. HSOne's TRO and PI brief reviews the public's interest in enforcement of CFAA, ECPA, and DMCA—all counseling against giving Vyne a license to continue its unauthorized access, circumvention, and interception. *See, e.g., ClearOne Advantage, LLC v. Kersen*, 710 F. Supp. 3d 425, 438 (D. Md. 2024) ("[C]ountervailing public interests in fostering robust competition . . . are outweighed when

. . . [one party is] engaging not in free competition and enterprise but are instead profiting off of misappropriated confidential customer data in violation of their contractual obligations and trade secrets laws"); (Barros Tr. Decl., Exs. 1, 2.)

Both the equities balance and the public interest factor skew heavy in favor of HSOne here. The Court should not reward unlawful unauthorized access, technological circumvention, and interception by requiring that HSOne stand by while Vyne pillages its software systems.[22]

## CONCLUSION

Vyne cannot meet the high bar for a mandatory preliminary injunction because it will fail on its claims, faces no irreparable harm or urgency, and has all the equities and interests of the public stacked against it. For these reasons, HSOne respectfully requests that the Court deny Vyne's request for temporary and preliminary injunctive relief.

---

[22] As another independent reason to deny Vyne's motion, its proposed orders are both deficient. The proposed orders Vyne asks this Court to adopt contain no findings of fact as required by the Federal Rules and does not state the details for why they would be issued. The TRO seeks indefinite relief, which directly violates Rule 65's mandatory 14-day relief window. The requested orders are vague and overbroad, essentially reading as an 'obey-the-law' injunction. As drafted, the orders would prohibit anything that impedes Vyne's access to HSOne's software and databases, regardless of whether that access was authorized or not.

Dated: October 15, 2025     Respectfully submitted,

**GREENBERG TRAURIG, LLP**

By: */s/ Michael Burshteyn*

   Michael Burshteyn
   *(pro hac vice)*
   Marcelo Barros
   *(pro hac vice)*
   101 Second Street, Suite 2200
   San Francisco, CA 94105
   Tel: (415) 655-1300
   Michael.burshteyn@gtlaw.com
   Marcelo.barros@gtlaw.com

   Michael R. Sklaire (MD Fed. Bar No. 16471)
   1750 Tysons Boulevard, Suite 1000
   Tysons Corner, VA 22102
   Tel: (703) 749-1308
   michael.sklaire@gtlaw.com

   *Counsel for Defendant Henry Schein One, LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 15th day of October, 2025, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

       */s/ Michael R. Sklaire*
       Michael R. Sklaire