1          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MARYLAND
2                    NORTHERN DIVISION
    NATIONAL ELECTRONIC              )
3   ATTACHMENT, INC., d/b/a          )
    VYNE DENTAL,                     )
4             Plaintiff,             )
                                     )    CIVIL CASE NO.
5             vs.                    )    1:25-cv-03246-MJM
                                     )
6   HENRY SCHEIN ONE, LLC,           )
                  Defendant.         )
7   _____    )

8                    THURSDAY, OCTOBER 23, 2025
                         Courtroom 5C
9                     Baltimore, Maryland

10                  TRANSCRIPT OF PROCEEDINGS
          TEMPORARY RESTRAINING ORDER HEARING
11        BEFORE THE HONORABLE MATTHEW J. MADDOX

12  For the Plaintiff:

13  Vincent Levy, Esquire
    Daniel Fahrenthold, Esquire
14  Torrell E. Mills, Esquire
     Holwell Shuster & Goldberg, LLP
15   425 Lexington Avenue, 14th Floor
    New York, NY 10017
16
    Derek Stikeleather, Esquire
17   Goodell DeVries Leech and Dann, LLP
     One South Street, 20th Floor
18   Baltimore, MD 21202

19  For the Defendant:

20  Michael Burshteyn, Esquire
    Marcelo Barros, Esquire
21  Jennifer C. Bartlett, Esquire
    Shirin Afsous, Esquire
22  Brad M. Rostolsky, Esquire
     Greenberg Traurig, P.A.
23   101 Second Street, Suite 2200
    San Francisco, CA 94105
24  _____
         (Computer-aided Transcription of Stenotype Notes)
25       Reported by: Amanda L. Longmore, RPR, CRR, FCRR
              Federal Official Court Reporter

TRO Hearing 10/23/25

1             P R O C E E D I N G S

2        (2:05 p.m.)

3             THE CLERK:   The matter now pending before this court

4    is Civil Matter MJM -25-03246, National Electronic Attachment,

5    Inc., versus Henry Schein One, LLC.   This matter comes before

6    the Court for the purposes of a TRO hearing.

7        Counsel for the record, starting with the plaintiffs.

8             MR. LEVY:   Good afternoon, Your Honor.   Vincent Levy

9    of Holwell Shuster & Goldberg for the plaintiff.

10            THE COURT:   Good afternoon.

11            MR. FAHRENTHOLD:   Daniel Fahrenthold of Holwell

12   Shuster & Goldberg.

13            THE COURT:   Good afternoon.

14            MR. STIKELEATHER:   Good afternoon, Your Honor.   Derek

15   Stikeleather, Goodell DeVries Baltimore.

16            THE COURT:   Good afternoon.

17            MR. MILLS:   Good afternoon, Your Honor.   Torrell

18   Mills, Holwell Shuster & Goldberg.

19            THE COURT:   Good afternoon.   And for the defendant?

20            MR. BURSHTEYN:   Good morning -- or afternoon, Your

21   Honor.   Mike Burshteyn for the defendant and counter-claimant

22   Henry Schein One.

23            THE COURT:   Good afternoon.

24            MR. BARROS:   Your Honor, Marcelo Barros also for the

25   defendant.

```
 1                    THE COURT:  Good afternoon.
 2                    MS. BARTLETT:  Good afternoon, Your Honor.  Jennifer
 3       Bartlett also for the defendant.
 4                    THE COURT:  Good afternoon.
 5                    MR. ROSTOLSKY:  Good afternoon, Your Honor.  Brad
 6       Rostolsky.
 7                    THE COURT:  Good afternoon.
 8                    MS. AFSOUS:  Good afternoon, Your Honor.  Shirin
 9       Afsous also for the defendant.
10                    THE COURT:  Good afternoon.  Good to meet you all.
11           All right.  So we were here for a hearing on the
12       plaintiff's motion for preliminary injunctive relief.  I
13       understand that since that motion was filed the defendant filed
14       a motion to transfer the case and just today filed a motion for
15       their own Temporary Restraining Order.
16           I don't intend to take up that motion, although I'll hear
17       from the defendant about as to whether or not I should.  I know
18       it's a motion for a TRO.  And it may be that there was a
19       request for preliminary injunctive relief in the other district
20       where the case was previously pending that might affect a
21       briefing schedule on that motion.  Perhaps it makes sense for
22       us to take up that issue now, now that I'm thinking about.
23           Mr. Burshteyn, if you to -- I'm sorry, am I pronouncing
24       your name correctly, Burshteyn?
25                    MR. BURSHTEYN:  Burshteyn.
```

1      THE COURT:  Burshteyn, I apologize.

2      MR. BURSHTEYN:  Very close.  Would you prefer we go

3  to the podium?

4      THE COURT:  You may stand where you are.  That's

5  fine.  Wherever you're most comfortable.

6      MR. BURSHTEYN:  Thank you, Your Honor.

7      So yes, Henry Schein One tried to stave off filing that

8  here but we didn't really have a chance.  The way this has

9  proceeded is Vyne rushed into this court to forum shop, then

10 HSOne filed its own complaint and TRO in Utah.  And then the

11 procedural posture now is tricky because the Court in Utah

12 denied that TRO without prejudice to refile and in the order

13 suggested that that court would wait for this court to resolve

14 any venue issues.

15     This puts HSOne in limbo because there is ongoing daily

16 hacking.  It's continued since that filing.  And HSOne had to

17 make essentially a Hobson's choice, do we come here on our

18 counterclaims and then Vyne surely will argue we've waived the

19 venue transfer arguments, or do we allow ourselves to get

20 hacked.

21     And so we filed a motion to reconsider in Utah.  That's

22 still pending.  We thought it was very important not to come in

23 here today without putting before this court for purpose of the

24 balance of the equities on the TRO request, for purposes of,

25 you know, there's a distinction that's important and urgency in

1    that we, our client, Your Honor, HSOne is being hacked, right?
2    There's the Computer Fraud and Abuse Act and some other federal
3    laws, DMCA, you know, ECPA, Electronic Communications Privacy
4    Act that are at issue.  That's happening daily, and that drives
5    a significant need for relief.
6         Whereas on the Vyne side, Your Honor, and I'm sure we'll
7    get into this, they didn't move on their hacking claim.  Their
8    TRO is essentially a statutory construction question about
9    something HSOne has been doing, which is blocking unauthorized
10   access.  There's nothing new.  It's what everyone develops --
11        So in any event, to summarize kind of where we're at
12   today, and we -- you know, my sister went to nursing school
13   here.  This is a beautiful place.  When I had my cybersecurity
14   company I came here to go to the, you know, spy agencies and
15   such.
16        That being said, we think that the most efficient thing to
17   do would be to take up the venue issue, see where this is
18   supposed to be.  HSOne is okay if the Court wants to move
19   everything to Utah, including its own TRO.  There's a pending
20   TRO and PI there we filed.  It will get reactivated.  Of course
21   that's up to the Court, right?  That's the Court's prerogative.
22        Now, if the Court is not inclined to do that type of a
23   bifurcation, then HSOne simply requests that the Court evaluate
24   the full context of dispute, the full balance of the equities,
25   which is part of the TRO standard and the PI standard.  And we

1    thought here today we could argue, we could have a legal
2    argument.  Our position will be that the TRO should be denied
3    as well as the PI and there's nothing further needed.  I'm sure
4    that Vyne will argue otherwise.  And then we'll see where --
5    what happens.
6        If the Court's not inclined to fully deny it, then HSOne
7    would respectfully request some kind of evidentiary hearing.
8    We can't find an example of this type of a TRO that's been
9    granted.  The case they cite actually denied the -- did not
10   grant the TRO and set an evidentiary hearing.
11                THE COURT:  Which case are you referring to?
12                MR. BURSHTEYN:  They cite a case, Real Time and
13   PointClickCare.  It's a case that we don't think is applicable,
14   but that's why they filed --
15                THE COURT:  Is it correct the TRO in that case was
16   denied but a preliminary injunction was granted?
17                MR. BURSHTEYN:  That's right.  And we can go into why
18   this is a totally different situation.  And it is.  There's
19   massive factual disputes.  There wasn't hacking in that case.
20   It was like a -- basically an unsolvable CAPTCHA that got put
21   on so one particular vendor couldn't get in.  It was like an
22   innocuous, like, automated bot.  It had nothing to do with
23   taking encryption keys, decrypting sensitive data.  We can go
24   through it.  I don't want to belabor the Court at this point.
25        Our request just boils down to, Plan A, have the Court

1    resolve the venue issues, move the preliminary relief issues to

2    Utah, including ours.  If the Court's not inclined to do that,

3    we would argue that denial of the TRO is appropriate and we can

4    get into the reasons.  They don't come close to meeting their

5    burden.

6         If the Court's not inclined to do that, deny it outright

7    and end the inquiry, then HSOne would request an evidentiary

8    hearing.  We have a slew of witnesses that are -- it's a "he

9    said/she said" at this point.  There's documentary evidence on

10   our side.  The declarations they just put in on, I believe it

11   was Tuesday make new admissions, raise new factual disputes,

12   and we can address those here but you're going to likely we

13   think hear from the people involved who happen to be in Utah,

14   but yeah.

15              THE COURT:  Can you run by me again those second and

16   third options that you laid out?

17              MR. BURSHTEYN:  Yes, Your Honor.  If the Court is not

18   inclined to transfer the case or dismiss it on 12(b)(3)

19   grounds, either is available to the Court, the second option

20   would be simply to have an oral argument here today and decide

21   whether to fully deny Vyne's motion.  We understand our TRO is

22   not up today, right?  We're not asking for that.

23              THE COURT:  Okay.

24              MR. BURSHTEYN:  Outside of considering it as part of

25   the balance of equities, which is one of the TRO --

1          THE COURT:  Right.

2          MR. BURSHTEYN:  So denial we think is appropriate.

3      If the Court thinks it wants to hear more, the Court

4  wishes to hear evidence, witnesses, then we would request this

5  essentially turns into a status conference, a scheduling

6  conference.  I've done these in the past.  We talk about how

7  many days, how many witnesses, and --

8          THE COURT:  And that's your third?

9          MR. BURSHTEYN:  Yeah.

10          THE COURT:  I just wanted to make sure because when

11  you were referring to TRO, it wasn't clear whether you were

12  referring to your own or the opposing party's.

13          MR. BURSHTEYN:  Yes, Your Honor, and I'll try to be

14  clear.  I know there's a lot of back and forth here.

15          THE COURT:  Right.  When was your motion for a TRO or

16  preliminary injunction filed in the Utah case?

17          MR. BURSHTEYN:  It was October 8th.  So it was some

18  time ago and then we put in a declaration after that to show,

19  you know, we have evidence that it's continuing.  Vyne is being

20  emboldened, right?

21          THE COURT:  I'm just not clear on why you filed your

22  motion today versus October 8th or October 9th.

23          MR. BURSHTEYN:  Your Honor, we have a pending motion

24  to reconsider in Utah.  And so we wanted to give the Court in

25  Utah an opportunity to reconsider its ruling while, you know --

1    and so we just are trying not to flood the federal courts with
2    paper and so we've been trying -- the other issue is we can't
3    really appeal to the Tenth Circuit because the motion to
4    reconsider is live.  And so today was the last possible day
5    that we could wait.  We have a live request for relief in Utah,
6    even at this moment.  It's not a final judgment there, right?
7    And so --
8           THE COURT:  I'm not sure why that would have stopped
9    you from filing your motion at an earlier date.  I mean, you
10   have a claim that you're being irreparably harmed but so does
11   the plaintiff, and they're going to argue that this was just an
12   undue delay, a dilatory tactic on your part.
13          MR. BURSHTEYN:  Your Honor, it's -- we're trying to
14   avoid creating judicial inefficiency with two live TROs in the
15   same place.  The problem is caused by Vyne's forum shopping.
16   So there's nothing -- there has been no delay.  They've been on
17   notice.  The arguments in the TRO are all properly considered,
18   even if we hadn't filed anything today, there's a TRO in Utah
19   that impacts the balance of equities.  So the delay is not
20   really material in the sense of changing the analysis for
21   today.
22       The TRO is on the same grounds, it's on Utah law, it's the
23   same claims, and given the Utah court's order, which was to --
24   which essentially directed the parties, you know, said, hey,
25   let's see what the Court in Maryland does on venue, we didn't

1    think it was appropriate to come here a week ago and flood your

2    court, Your Honor, with transfer and Rule 12 and TRO and

3    counterclaims.

4        And there's also -- there's another equitable issue here,

5    Your Honor.  This is part of our basis for reconsideration in

6    Utah is we are now in the situation by filing here, this is the

7    Hobson's choice that is referred -- this is why anticipatory

8    forum shopping is disfavored because now we have a situation

9    where we have to either set up some sort of waiver debate about

10   how we've consented to venue here, right, because we have a

11   TRO, or let them hack us, right?

12       And so we've had a live TRO still live in Utah this entire

13   time.  We've now put it here because we think it's critical, as

14   you mentioned.  Like, we could wait this long, we've put in

15   supplemental declarations in Utah, we've tried to do everything

16   possible to push that one along.  But this was -- today was the

17   moment, basically, where we could not afford to wait any

18   longer.

19           THE COURT:  Okay.  Did Vyne respond to your TRO

20   motion in Utah?

21           MR. BURSHTEYN:  No, because it was very quickly, you

22   know, absent -- it was just like very quickly the Court said I

23   know there's a first-filed case in Maryland and let's see what

24   the Maryland court thinks.

25           THE COURT:  With respect to your allegation of

 1    ongoing hacking, are you relying upon your affidavits or did

 2    you intend to present any witnesses today?

 3            MR. BURSHTEYN:  Today we do not have witnesses.  We

 4    are prepared to bring witnesses and I think that it would be

 5    critical -- we think denial can happen without the witnesses

 6    because on the papers there's legal issues, there's all sorts

 7    of issues we can talk about.  But yes, we do have witnesses

 8    that are -- you know, that we think would be very important to

 9    hear from them before granting anything.

10            THE COURT:  Okay.  Let me hear from plaintiff's

11    counsel.

12            MR. LEVY:  Your Honor, just on the issues of the

13    transfer motions and --

14            THE COURT:  Yes, about the path forward.  You know,

15    there were three options laid out by defense counsel and I

16    wanted to get your position on those or whether there was some

17    fourth option that you would propose.

18            MR. LEVY:  Well, we're here on our motion for TRO and

19    a PI.  The Court set a hearing after we moved for a briefing

20    schedule and the Court set a hearing.  They then moved for a

21    venue transfer -- or not a venue transfer, a transfer on the

22    basis of inconvenience.  We will oppose that next week when the

23    deadline is due.  Last night they filed a motion to dismiss for

24    lack of venue.  We will oppose that when it's due.  An hour ago

25    they filed a TRO motion that they could have filed weeks ago if

1   they were really irreparably injured.

2       The Court in Utah denied their TRO, and on the day they

3   filed it, and they moved within a day or two for

4   reconsideration, they could have come here instead.  We opposed

5   the reconsideration motion in Utah earlier this week and that's

6   pending.  And the reconsidering issue is really just on the

7   application of the first-filed doctrine.

8       So of course the Court's Local Rules prohibit the filing

9   absent a court order less than 24 or so hours before a hearing,

10  Rule 105(2)(b), of course.  And so the venue issues and their

11  TRO, they're just not in bounds for the hearing today under the

12  Court's rules, and so from my perspective, we're here on our

13  motion for TRO and PI, the Court should enter relief, and if it

14  believes that additional evidence or witnesses would be

15  necessary, we could enter a TRO today subject to having that

16  evidentiary hearing within two weeks or potentially longer if

17  the parties and the Court consent under the rules so that it

18  can hear additional evidence.  We think we've met the showing

19  and are prepared to present argument on that.

20          THE COURT:  Okay.

21          MR. BURSHTEYN:  Your Honor, if I may just one quick

22  thing.

23          THE COURT:  Before -- let me -- I have some follow-up

24  questions here.

25      How long will it take you to respond to their motions,

1    each of them taking them one by one?

2             MR. LEVY:  Well, the --

3             THE COURT:  I know that you noted the fact that

4    they're not due, they haven't been due yet.

5             MR. LEVY:  Right.

6             THE COURT:   Your opposition to the transfer motion is

7    not due until next week, I believe.

8             MR. LEVY:  Right.

9             THE COURT:  And it may be the motion to -- your

10   response to the motion to dismiss is due some point after that.

11   But given that your client is being irreparably harmed and the

12   Court may in just I guess in due consideration of making sure

13   it has all of the arguments on the table, I think it would be

14   the Court's preference for all the motions to be briefed before

15   I do anything, and I think that that's a default position that

16   most judges would probably take.  And if you're going to wait

17   until your deadline to file responses to these motions, that's

18   going to delay any relief that you get and, you know, sort of

19   undercut your argument that you're being irreparably harmed on

20   one hand but, at the same time, continue in the injuries that

21   your plaintiff -- your client may be suffering from.

22        So I guess it's within that context that I'm asking you

23   how fast you think you can respond to those motions.

24             MR. LEVY:  As fast as -- I could file them early next

25   week, if that's the way the Court is inclined to rule.

TRO Hearing 10/23/25

1      THE COURT:  Okay.

2      MR. LEVY:  And from my perspective, and this is

3  without having reviewed, really, the motion to dismiss was

4  filed last night before midnight, the TRO was filed about an

5  hour ago.  I have not had a chance to read it.  I assume it is

6  substantially similar to the Utah case.  But I have not had

7  time to evaluate those motions.

8      THE COURT:  Right.

9      MR. LEVY:  I will say that the law, and I don't have

10  a Fourth Circuit case to cite to Your Honor, but I think the

11  law is settled that if there is a jurisdictional dispute, and

12  this is less than a jurisdictional dispute, the Court has the

13  authority to enter interim relief to maintain the status quo,

14  which is what we're asking, and I can cite a D.C. Circuit

15  decision for that proposition, Belbacha versus United States.

16  It's a 2008 decision from the D.C. Circuit.  And there was

17  there an argument that there was no jurisdiction at all, and

18  the Court, the D.C. Circuit said the Court of course can enter

19  relief to maintain the status quo while that plays out.

20      And we are being irreparably injured, and so the forum

21  fights that -- and disputes that my friends are interposing in

22  an effort to slow things down should not get in the way of the

23  Court ruling on that.

24      THE COURT:  Okay.

25      MR. LEVY:  But we will file -- if the Court wants to

TRO Hearing 10/23/25

```
 1   have everything at the same time before it rules, we will file
 2   very promptly.
 3              THE COURT:  Okay.  All right.  I appreciate that.
 4          Mr. -- I'm sorry, I'm going to mess up your name again.
 5              MR. BURSHTEYN:  Burshteyn.
 6              THE COURT:  Burshteyn.
 7              MR. BURSHTEYN:  It's -- you can call me Mike.  It's
 8   fine.
 9              THE COURT:  Okay.
10              MR. BURSHTEYN:  Your Honor, two quick things.
11         One is we would respectfully just request if there's going
12   to be argument on the merits of the TRO today, we'd like an
13   opportunity to present that.  We don't agree with how they
14   characterize what's going on.
15         That being said, just very quick, we were not going to
16   bring this up.  As far as I understand the Local Rule, and
17   admittedly I'm pro hac-ed in, was that their deadline for their
18   reply brief was 4 p.m. on Tuesday, and they filed it late at
19   night.
20         So we're fine, you know, our deadline on the Rule 12
21   motion was yesterday.  We -- you know, we are not trying to
22   mess anything -- mess around at all in the litigation.  We're
23   just trying to do what is most efficient, what can get this
24   dispute resolved.  And we're not accusing them of anything
25   outside of forum shopping, an anticipatory filing, which we
```

1    think clearly they've done.  But yeah, the Local Rule thing,

2    unless I'm wrong, we're not -- we weren't filing today to have

3    our TRO heard today but just as I explained it, so...

4                THE COURT:  Understood.

5                MR. BURSHTEYN:  Yep.  We have a lot of respect,

6    obviously, for the attorneys on the other side and we want to

7    keep it civil, whatever the clients may think of each other.

8                THE COURT:  Understood.  Mr. Levy, were you planning

9    to present any additional evidence or are you relying upon the

10   evidence attached to your motion?

11               MR. LEVY:  We have one document that we handed to the

12   courtroom deputy, and for the TRO we were relying on the

13   evidence attached to the motion, and I think we had a request

14   that if there were factual issues that and the Court wanted to

15   have additional evidence, we were of course prepared to present

16   testimony, and I'm prepared to present argument on the motion

17   that would assist the Court.

18               THE COURT:  You were prepared to present that

19   testimony today?

20               MR. LEVY:  Oral -- no, to present argument given that

21   the Court scheduled oral argument for today.

22               THE COURT:  Right.

23               MR. LEVY:  So we assumed that the Court wanted to

24   hear argument first, and if there was a need for evidence

25   either by way of witnesses or otherwise, that would be

1    scheduled separately.

2              THE COURT:  Okay.  I'll hear oral argument on the

3    request for a TRO.  Whenever you're ready, Mr. Levy.

4              MR. LEVY:  I'll move here, if that's --

5              THE COURT:  That's fine.

6              MR. LEVY:  So there's obviously a lot in the papers

7    pointing fingers at -- each party pointing fingers at the

8    other.  I think it's helpful to start with some of the points

9    that I believe are undisputed and then to try to address the

10   points of dispute and whether they matter or not.

11        So the plaintiff here is -- provides software services to

12   dental practices.  That software is used to submit claims to

13   insurance carriers and otherwise.  And to function, the

14   software has to obtain patient data from -- from where they're

15   located.  And the patient data today, in day and age, is stored

16   electronically and not on paper.

17        The defendant has software that helps dental practices

18   store patient data, and for -- the two businesses have operated

19   without incident for 20 years.  That doesn't seem to be

20   disputed.  We say that in our papers.  That's not disputed,

21   for, until beginning of this year, the way that the transfer of

22   data from HSOne's software to our software has operated has

23   been through a printer driver and it's simple to a printed PDF

24   function in Adobe or in Microsoft Word where the dental

25   practice could hit a button and the relevant patient

1  information is printed to a file that is automatically

2  transferred to our software.  That's how --

3           THE COURT:  And that button, that print function is

4  one that your software provides; it's not a function of the

5  defendant's software, correct?

6           MR. LEVY:  My client has provided a driver that is --

7  that is used, and when you hit print, it works that -- it is

8  provided by our client and it's been provided that way for 20

9  years without any objection, much the same as in the Real Time

10  case that was in this court and before the Fourth Circuit.

11  There was a practice for over years of one party getting

12  patient data from another, using a technical device.  There it

13  was bots.  Here we have a print -- a printer driver.

14       In March of this year for the first time -- and this is,

15  again, I believe undisputed -- HSOne started to tell mutual

16  customers that it would begin blocking the printer driver.  And

17  it did so for the first time in April of this year.  It

18  deployed a beta version of the software that did two things:

19  It disabled the printer driver and it installed a data

20  gathering tool called EventBridge, which is this telemetry

21  tool.

22       And that's the tool that they say has given them evidence

23  of what they call hacking.  And there's a dispute about that,

24  but I think what's undisputed is that the blocking of the

25  printer driver, the first time the information exchange was

1     blocked occurred before they had what they said was evidence of

2     hacking, and that's just a matter of time and chronology.

3          The other thing that's undisputed is that they did this at

4     the same time as they began offering a competing product that

5     does the same thing as Vyne's product, and that they've paired

6     the software updates with an outreach campaign to their own

7     customers urging them to go from Vyne's product to their

8     product.

9          So the timing and the fact that it was done at the same

10    time as an effort to compete themselves makes it very clear

11    that the motivation was to compete, just as in Real Time.

12    There's the exact same chronology there.

13         It's also undisputed that without the print driver, the

14    transfer of data cannot happen and our software is not usable.

15    That's undisputed.

16         It's also undisputed, I've said that HSOne is its own

17    competing product, and the way their product works is also

18    through a print driver much like ours.  That's undisputed.  So

19    if there is a security issue with a software like ours using a

20    print driver, it's really unclear how it is that it is not a

21    security issue when it is in their product.

22         It's also undisputed that in September, before we filed

23    the lawsuit, what precipitated this lawsuit, they deployed what

24    we describe and can only describe as a virus through their

25    update.  And the way that update worked was to go on the

1    computers of dentists and to disable any software that has a

2    certificate with Vyne's name on it, whatever the product does.

3        And there, as we point out, this virus did not just stop

4    the transfer of information without which our product couldn't

5    function.  It disabled the product altogether.

6        We pointed this out in our opening brief, and it is not

7    only not disputed by them, it is not mentioned.  And there's no

8    explanation for how that virus could be appropriate, how it

9    could be a measure to stop -- to safeguard security, how it

10   could be fair or procompetitive on any measure, and how it does

11   not amount clearly to unfair competition and tortious

12   interference.

13       So the facts that I've laid out that I think those are

14   undisputed parallel those in Real Time, which was the case in

15   this court where the Court entered a preliminary injunction and

16   the Fourth Circuit affirmed.  The Fourth Circuit also affirmed

17   the finding of irreparable harm there just -- and on very much

18   the same facts here.

19       That's because there's evidence in the record that we've

20   lost customers and that this continuing misconduct threatens

21   the further loss of customers which harms my client's

22   reputation, good will, customer relationship, and there's

23   longstanding law in the Fourth Circuit from the '90s, including

24   the Multi-Channel TV case that we cite and in the Real Time

25   case where the facts were very much similar where the Court

1  found irreparable harm and that the balance of equity favored
2  the injunction.
3       So those, I think, are the facts that are not disputed and
4  they establish a violation, at least at this stage, of both
5  Unfair Competition statute and tortious interference.
6       Now, where are there points of dispute?  One is whether
7  the Cures Act applies.  The Cures Act, of course, is a federal
8  statute that limits measures to block information access, and
9  there's some related regulations.
10      Now, as a preliminary matter, whether the Act applies or
11 not, we think the facts that are not disputed establish the
12 torts of unfair competition and of tortious interference.  And
13 that's because, as the Fourth Circuit has said multiple times,
14 there's no requirement to show unlawful activity to establish
15 the elements of those claims.  What's required to be shown is
16 unfair conduct.  And it is plainly unfair to deploy a virus to
17 disable your competitor's product for the purpose of competing
18 yourself.  It is unfair competition and it is a tortious
19 interference with contract relation and prospective relation.
20 And they don't even dispute that.  As I said, they don't
21 mention the virus.  It is also unfair competition and tortious
22 interference to block the information access on which they know
23 our product relies.
24      So it is unfair without regard to whether it's unlawful.
25 But it is also unlawful because the Cures Act does apply and

1    the only argument that they make for why it does not apply, and

2    on that issue we would bear the burden, we bear the burden to

3    show that the Cures Act applies, it's that the regulation says

4    that defines the relevant health information exchanges and

5    networks to the entities that enable communication amongst more

6    than two unaffiliated individuals or entities, more than two.

7    And they say we don't meet that test because their product only

8    facilitates bilateral exchanges, and that's because any single

9    act of communication they say is only between two.

10          But that's not what -- the regulation doesn't look at each

11    individual communication to see whether it's between two or

12    among more than two.  The question is whether it's a platform

13    that facilitates communication among more than two, and that is

14    clearly met because by their own -- on their own account, they

15    have this API network, which they call the "API Exchange," and

16    which does function as an exchange.  It allows dental practices

17    to communicate with more than a hundred vendors through the

18    API.  That's what they say in their declaration.  That's in

19    Paragraph 3 of the Weatherly declaration that they submitted.

20    And the document that I referenced earlier that is from their

21    website also makes this clear, which the Court should have a

22    copy of, it's from their website, it says that the -- on the

23    first page that their API "acts as a central integration hub"

24    -- a hub -- "that enables the seamless communication of

25    multiple parties."

1        It says on the second page, there's a bullet about -- and

2   this goes through some of the functions that are facilitated by

3   their API.  There's a bullet that says it enables integration

4   with other systems, and it says you can build your own seamless

5   integration with other software services enabling data exchange

6   and functionality extension beyond the original system, and it

7   gives you endless possibilities.  This is all on their website.

8   And it allows, also on the last page, scaleability.  And this

9   is a quote, "enables scaleable operations by allowing multiple

10  clients or services to interact with the system

11  simultaneously."

12        So this is not an example of bilateral communications.

13  This is an example of simultaneous communications facilitated

14  by a central hub.  Again, that's from their website.  So we

15  think the Cures Act does apply, and of course it doesn't need

16  to apply.

17        So if the Court concludes it does apply, then I think then

18  the question is whether facially there is information blocking.

19  And there is facially information blocking as -- because the

20  print driver -- and again, it's undisputed -- stops the

21  transfer of information.  And that's enough to shift the burden

22  to them to show that one of the exceptions applies.  And the

23  two exceptions they relied upon is the security exception and

24  the means exception.

25        Again, the burden's on them.  That's what the Court said

1    in Real Time.  But whatever -- whoever has the burden, I think

2    it's pretty clear based on the basis of the undisputed facts

3    that they don't meet it and that the exceptions aren't

4    satisfied.

5         And I go back to the points I made at the outset, which

6    is, number one, the timing of their efforts to block.  The

7    first time they deployed the print driver, stopped the -- the

8    first time they deployed software that stopped the print

9    driver, they did it before they had the evidence they claimed

10   they obtained through their telemetry, they did it at the same

11   time as they started to communicate with clients, to try to

12   convince them to move to their competitive product.  It's an

13   example of shoot first, aim later.

14        And they also don't dispute, again, that their own product

15   has a similar print driver that they use and that they allow --

16   that allows dental practices to use their product to connect

17   with competing CRMs.  So it's the same, if that's not a

18   security issue, then why is ours?

19        Then they have all these, I think in an effort to make the

20   situation more complex than it is, they have all these hacking

21   allegations, they've now filed this TRO a couple hours ago.

22   None of the hacking that they identify -- supposed hacking, we

23   don't concede it's hacking -- is connected to the use of the

24   driver in the first place.  It was all in relation to efforts

25   to reinstitute the driver after they disabled it.  So it's a

1    bit of a -- the chronology is just off.

2         And then the other point is they don't attempt to justify

3    the virus, of course, so at a minimum they should be enjoined

4    from doing that if there's -- but we think, of course, that the

5    Court should block not just the use of this virus but also any

6    effort to impede the transfer of information.  But at a

7    minimum, there's no security justification for deploying

8    software into dental practices to disable any software that

9    runs on a certificate that bears my client's name.

10             THE COURT:  And just so I'm clear about the time

11   frame here, what you're calling a virus being deployed, was

12   that part of the initial steps that the defendants took in

13   March or April, in the March/April --

14             MR. LEVY:  No.

15             THE COURT:  -- time frame, or that happened later?

16             MR. LEVY:  That happened in September, and that's

17   what's precipitated the filing of this lawsuit where they say

18   we jumped the gun and were anticipatory.  There was, in terms

19   of timing, 20 years of no problems with the use of the printer

20   driver.

21        In March of this year, they said there's an issue we're

22   going to -- they told clients there's an issue, we're going to

23   start to do things and you should -- by the way, you should

24   switch to our product.

25        In April, they pushed a software update that stopped the

1    print driver functionality and also deployed their telemetry

2    software that they've used and they've since said has

3    identified evidence of so-called hacking, which we dispute, but

4    not really relevant in terms of the timing.

5         Then there were discussions among the parties to try to

6    reach an agreement, and then in September they deployed this

7    virus for the first time.  And it was so out -- just outside

8    the realm of what anyone had imagined, our CEO asked their CEO,

9    we really need to -- if we can't reach a binding agreement,

10   this is unavoidable.  And that's why we went to the Court when

11   we did.

12        THE COURT:  Can you speak to the relative harms, I

13   will say the harms associated with what they did in April

14   relative to what they did in September?

15        MR. LEVY:  Right.  So the harms of what they did in

16   April, without access and the printer driver function, our

17   dental practices can't use -- can't submit claims

18   automatically.  They'd have to do it by hand.  And the harm is

19   very similar to what was deemed adequate to justify the

20   injunction in Real Time because it stops the transfer of

21   information on which our software relies.

22        Our software needs the patient records, which doesn't

23   belong to them, it belongs to patients, so there's that harm.

24   I think the harm that happened in -- as of not only the virus

25   is in some respects worse because it completely disabled our

1  client's use of the software.  I don't know that they've

2  deployed that again since and they don't mention it, but in

3  terms of reputational harm and harm to good will and harm to

4  reputation, I think they're both bad and adequate to justify an

5  injunction, more than adequate.  The virus may be worse.

6          THE COURT:  But what made it worse is what I'm trying

7  to get at.  I'm trying to figure out whether what they did in

8  September added to the injury in any kind of way.

9          MR. LEVY:  Right.  Well, Your Honor's asking whether

10  why we -- why that was a change in --

11          THE COURT:  I'm not -- and maybe it wasn't a change.

12  I'm trying to establish whether it was a change and how so.

13     So I understand that you're claiming that what they did in

14  April was injurious, and it sounds like that is the main injury

15  is that it interfered with the sort of -- these two platforms

16  working together.

17          MR. LEVY:  Right.

18          THE COURT:  But I'm not sure what in addition to that

19  the virus did in terms of harming your client.

20          MR. LEVY:  I understand.  So in April they disabled a

21  functionality.  We found -- our client found some workarounds,

22  including some that are described, so the functionality was

23  reestablished, but then there was just this back-and-forth

24  where they kept trying to find ways to shut it down and we kept

25  trying to find lawful ways to reestablish it.

1          THE COURT:  Right.

2          MR. LEVY:  And then in September they deployed this

3    virus to a subset of the clients, and it just completely

4    disabled the use of the software altogether no matter what the

5    software did, and it was seen as an escalation.  The harm was,

6    in effect, in a way the same in that it disabled our clients'

7    ability to use their software and submit claims.

8          THE COURT:  But was it just that or did it go beyond

9    that?  I guess what I'm getting at is that what in April you

10   were able to find a workaround.  They're going to call that

11   workaround, hacking, right?  Is that correct?

12         MR. BURSHTEYN:  [Responded with nodding of the head.]

13         THE COURT:  Okay.  You had some sort of, you know,

14   programmatic workaround that you were able to establish to sort

15   of address the harms that were being done to your client at

16   that time, and at some point I guess in September is when they

17   deployed some measure to eliminate the workaround.

18       I guess my question is, when you say that it disabled your

19   client's software, did it go beyond just disabling the

20   workaround or it made it completely impossible for your

21   customers to use your software at all?

22         MR. LEVY:  The latter.  Even if it was rebooted, the

23   software could not be used again.  It's detailed in the first

24   declaration of our CTO.

25         THE COURT:  Because this is how I'm sort of imagining

1    this all playing out in my head.

2        The way that you -- the way that you -- I guess the 20

3    years of history that you're describing is a situation where

4    there's an automated process by which information stored on the

5    defendant's platform gets transferred to your platform and

6    there's nothing for your customer to do other than hit the

7    button, right?

8        But when they took whatever action they took in April, I

9    guess you were either faced with the choice of having your

10   customers have to manually do this, transfer information from

11   their platform to yours, or you could come up with a

12   programmatic workaround, and it looks like you were able to

13   come up with a programmatic workaround.

14       What you're saying now is that what they did in September

15   not only eliminated that programmatic workaround such that your

16   customers would be forced to manually transfer the information,

17   but it also made it impossible for your clients to use your

18   software at all with respect to filing claims for -- and filing

19   insurance claims and such.

20           MR. LEVY:  Right.  The software became unusable.

21           THE COURT:  So it's not just a button that was

22   unusable, it was unusable altogether.

23           MR. LEVY:  Right.  I think there might be a way to --

24   and I don't know whether they've at this point found a way,

25   changed the code in our -- my client's software to enable it

TRO Hearing 10/23/25

1   again, but it was just --

2         THE COURT:  Right.  So it wasn't just what we might

3   call a defensive act, it was an offensive act.

4         MR. LEVY:  Well, they're -- I think they're both

5   offensive, but the -- my understanding is that the -- and it's

6   in the declaration, it's not addressed by them.  So the virus

7   disables the software and it couldn't be used even after a

8   reboot.  That's the record.

9         THE COURT:  Okay.

10        MR. LEVY:  And it's not disputed by them.

11        THE COURT:  Understood.

12        MR. LEVY:  And I think in terms of the harm, the harm

13  is both -- both types of conduct have caused and continue to

14  cause harm to my client's reputation, good will, customer

15  relations.  It's, again, detailed in the declarations.  We've

16  lost -- my client's lost over 500 clients.  50 of them have

17  identified the situation of fights between our clients as a

18  reason for them to leave.  And we strongly suspect that that is

19  also a reason that's led to the -- to a number of the other

20  client to leave, but clients don't always tell you why they're

21  leaving on the way out.  And that's perhaps one reason why the

22  Fourth Circuit has held that the threatened loss of customers

23  is irreparable harm because it -- and so is the loss to

24  reputation.  It takes a very long time to build a good

25  reputation, but it's very easily lost.  And once it's lost,

```
 1    it's very hard to rebuild and it's irreparable.
 2            THE COURT:  We're kind of jumping around from claim
 3    to claim here.  It's all kind of coming at me at once, and
 4    that's fine.  So I guess one question I would have for you is
 5    whether or not your client's customers had contracts that they
 6    breached as a result of -- as a result of the defendant's
 7    actions.
 8            MR. LEVY:  Well --
 9            THE COURT:  Or are these contracts terminable at will
10    such that they could end their relationship with your client
11    whenever they wanted to?
12            MR. LEVY:  Okay.  So this is in terms of the tortious
13    interference with --
14            THE COURT:  Contract.
15            MR. LEVY:  So we have both a tortious interference
16    with contract and a tortious interference with relations claim.
17    And a customer loss, I think the loss was terminable at will
18    and so it becomes a relations point rather than a contract
19    point.
20        I don't think we need to prove a breach of contract to
21    prevail on a claim for tortious interference where we have a
22    tortious interference with relations claim and where the
23    conduct is wrongful in its means and/or its purpose, which is
24    the case here.  And so --
25            THE COURT:  Well, that's the reason why I made the
```

1    comment I made a moment ago about all of this information

2    coming at me irrespective of what claim you're talking about.

3    And I do think it does matter so I have to be clear about this.

4              MR. LEVY:  Right.

5              THE COURT:  Because the arguments you were making

6    earlier about not need for unlawful conduct, as I understand

7    it, that applies to your tortious interference with contract

8    claim, but that argument I didn't understand to be made with

9    respect to tortious interference with prospective business

10   relationships.  And I think your burden is higher with respect

11   to proving wrongfulness from the defendant for the latter

12   claim.  Maybe not so much for the former but for the latter.

13             MR. LEVY:  So I think the Fourth Circuit has made

14   clear that conduct does not need to be unlawful to be wrongful

15   for purposes both of unfair competition, which was -- has been

16   the focus of my presentation, and also for both species of

17   tortious interference.

18             THE COURT:  Both species?

19             MR. LEVY:  Right.

20             THE COURT:  Okay.  Do you have an authority to cite

21   to me with respect to the tortious interference with business

22   relations?

23             MR. LEVY:  I do.  So we have a -- in our opening

24   brief on Page 19, we cite the Macklin case and Baron Financial

25   Corp. for the proposition that proof of a breach is not needed,

1    and in our reply -- I'm sorry, Your Honor.

2                THE COURT:  That's all right.

3                MR. LEVY:  If I can come back to it.

4                THE COURT:  That's fine.

5                MR. LEVY:  So I think it's the Trimed case, Your

6    Honor, from the Fourth Circuit.

7                THE COURT:  That's in your reply?

8                MR. LEVY:  Well, I think so but the cite is 977 F.2d

9    885, and there's both an unfair competition claim and a

10   tortious interference claim, and I believe with respect to both

11   of those the Court says there's no need to show illegality.

12               THE COURT:  Can you give me that citation again?  I

13   apologize.

14               MR. LEVY:  It's 977 F.2d 885.  It's a 1992 case from

15   the Fourth Circuit.

16               THE COURT:  1992?

17               MR. LEVY:  Yeah.

18               THE COURT:  And there's a claim of tortious

19   interference with prospective business relationships in there,

20   or is it just tortious interference with contract?

21               MR. LEVY:  My recollection -- and again, I apologize,

22   my recollection -- this is all going a bit quickly.  But my

23   recollection is that there was a dispute as to whether a proof

24   of a breach was necessary and the Court said it doesn't really

25   matter.

TRO Hearing 10/23/25

1          THE COURT:  Okay.  Well, of course if there's -- if
2    there's not a contract, then you're alleging tortious
3    interference with future relations.  Of course there doesn't
4    need to be a contract in the first place let alone a breach,
5    but the question is how -- what level of proof you need with
6    respect to the wrongfulness of the defendant's conduct to
7    establish that claim.
8          MR. LEVY:  Right.
9          THE COURT:  That's the part I was just getting at and
10   I wanted to figure out what the distinction there is with
11   respect to tortious interference with contract versus
12   prospective business relations.
13         MR. LEVY:  I understand.  I think usually that courts
14   require -- or always require wrongfulness for tortious
15   interference with prospective relations.  I just don't think
16   illegality is required.  Wrongfulness is required.  Deployment
17   of the virus I think plainly qualifies.  And we also think that
18   given that the Cures -- the Cure Act applies, that shows
19   illegality both for the purposes of the unfair competition
20   claim and for purposes of the tortious interference with
21   prospective relations claim.
22         THE COURT:  Okay.  There was another question I had
23   for you.  Just give me one moment, please.
24         MR. LEVY:  If Your Honor would like me to address
25   their other defense, because on the Cures Act, I think they had

1    two -- two defenses.

2             THE COURT:    Before we move on to that, there may be

3    another question that I had for you.    I'm just trying to

4    remember what it was.

5             No, I think you answered it, actually.    You may move on.

6             MR. LEVY:    So as I said, I think on the Cures Act,

7    you they have -- there's a dispute about whether the Act

8    applies, and I explain why I thought it does.    And then they

9    have two defenses, one is the security exception, the other one

10   is the means exception, which I hadn't talked about but it's

11   another point I think of disagreement between the parties, and

12   it's one which, again, they bear the burden under Real Time.

13   And I think, again, this issue relates to both the claims that

14   we've put before the Court on this PI motion because it goes to

15   illegality; although, again, it's not required because the

16   conduct was unfair.

17            Here, again, I think the points of dispute are regarding

18   this API negotiation and whether -- and then whether it's

19   discriminatory as opposed to applied evenhandedly.    I think

20   those are the main points of disagreement.

21            Given the evidence I've cited earlier, which I think,

22   again, is undisputed, in terms of the timing of when the

23   disabled -- the print driver and its combination with the fact

24   that they themselves use a print driver for their product and

25   they reached out to our customers at the same time as they

1    first stopped the print driver in March/April shows that it's

2    not applied evenhandedly and in a nondiscriminatory fashion, as

3    is the deployment of their virus in September which targeted

4    specifically Vyne.  So it's not applied evenhandedly.

5         And then in terms of the API negotiation, again, on this

6    they bear the burden, there's a declaration from our CEO

7    stating that they're -- that Vyne is prepared to sign an API

8    agreement on reasonable market terms.

9         The issue is that, presently, they do not offer the

10   capability using the API for the two programs to interoperate,

11   and so we've always said we're prepared to sign an API subject

12   to our -- to the clients being able to use the print driver

13   during this stopgap period, and that's been something they've

14   never agreed to.  And so --

15             THE COURT:  Because they currently don't provide the

16   software necessary for that button to be used?

17             MR. LEVY:  Well, the issue is the API agreement would

18   have us agree not to use the print driver.  And so we would

19   agree that we would effectively disconnect our clients while

20   they built an API, which would mean that during this period,

21   however long it lasts, could be three months, could be however

22   long, our clients would be unable to use their software, and

23   that's just not something that we could agree to.  It would

24   just cause vast damage to the customer relationships.

25             THE COURT:  So the API that they're offering right

1    now doesn't -- it doesn't function with your software at all?

2              MR. LEVY:  It would need to be upgraded, updated.  It

3    doesn't -- they do not today offer a solution that allows for

4    the transfer of the data that we need.

5              THE COURT:  Okay.

6              MR. LEVY:  So that's number one.

7         Number two, the agreement, proposed agreement that so far

8    has said that our clients cannot use the patient data with any

9    third party.  That, if we agreed to that, would mean that we

10   couldn't do our work because the whole point is to have the

11   patient data used by dentists to submit it to insurance

12   carriers who are third parties.  And so if we agreed that the

13   data obtained through the API couldn't be used with a third

14   party, that again would be an agreement not to use the data in

15   a way that's necessary for the software to work.

16        So, again, the -- this is their defense and the Fourth

17   Circuit has made clear that it's not the Court's job to

18   flyspeck negotiations.  I don't think they meet their burden of

19   showing that there's an alternative for those two reasons at

20   least.

21        So I think for all those reasons, we think the undisputed

22   facts show that there is both unfair competition and tortious

23   interference.  There are unfair practices going on.  Their

24   comment in disabling the print driver function and in deploying

25   a virus and the related communications are unfair.  They're

1    also unlawful under the Cures Act.  And so we're likely to

2    succeed on the merits at least at this stage sufficiently to

3    enter a TRO, and the Court can consider having an evidentiary

4    hearing if it wishes to hear from witnesses in order to

5    determine whether to prolong that injunction.

6         I think the balance of the equities clearly favor entering

7    that relief.  It was the same -- it's returning the parties to

8    the status quo that existed for 20 years.  It is not -- and it

9    is using the same tool that their program uses, the print

10   driver.  So I don't think they can fairly say that it causes

11   them harm to allow us to use the same sort of print driver that

12   their program uses and it safeguards our reputat- -- my

13   client's reputation and the customer relationships that it has

14   long worked hard to build.  And so I think the balance of the

15   equities clearly favors Vyne for the reasons stated and really

16   for the same reasons stated in Real Time.

17        So I think unless the Court has questions, maybe I'll stop

18   there and reserving any rebuttal for in response to what my

19   friends may say.

20              THE COURT:  All right.  Thank you, Mr. Levy.  I don't

21   have any questions for you right now.  Thank you.

22              MR. LEVY:  Thank you.

23              THE COURT:  Whenever you're ready, Mr. Burshteyn.

24              MR. BURSHTEYN:  Thank you, Your Honor.

25        Your Honor, what Vyne is doing is asking for a license to

1    hack, to violate multiple federal laws and access HSOne's

2    systems without authorization.

3        For the first time this week they submitted a declaration

4    to this Court admitting it.  Their CTO, Your Honor, said that

5    they do take encryption keys out of the systems.  The

6    declaration submitted doesn't mention that they circumvent the

7    Windows data protection API to do that.  It's part of why we

8    need witnesses here.  But that's really what this is about.

9        And the 20 years claim, Your Honor, their entire story

10   falls apart when you look at that closely.  It's not true, it

11   cannot be true that for 20 years Vyne has done the same things.

12   20 years ago was 2005.  Software code was different, the

13   Internet was different, Cloud infrastructure was different.

14   They have evolved their system.

15       Your Honor, their CEO used to work for HSOne, as did their

16   CTO, as did their president, moved over to Vyne relatively

17   recently.  When they worked at HSOne, Your Honor, they worked

18   on stopping unauthorized access.  When we get their CEO in

19   here, if we have to, on the stand, there's communications he

20   has sent out with an HSOne e-mail, Your Honor, about why you

21   shouldn't access HSOne's systems through unauthorized means,

22   like what they're doing now.  So that's what's really going on

23   here.

24       Today what Vyne is asking this the Court do is grant on

25   the highest possible standard early injunctive relief.

1    Already, as Your Honor mentioned, the particular claims that

2    they've moved for TRO, which are not all the claims they've

3    filed, and do not include any type of a computer hacking claim

4    about any kind of virus, they didn't move on their CFAA claim.

5    Those claims, Your Honor, have a high bar.  The tortious

6    interference claims, they have to show independent wrongful

7    conduct when it's not a contract claim.  When it's a contract

8    claim you still have to show intent to disrupt the contract.

9    Lawful competitive business activity, security, so there's

10    that.

11        On a PI standard, Your Honor, they have to show -- the

12    Court has to believe that they are likely to win on the merits,

13    that we could get a jury in here with the current record and,

14    no matter what comes out in discovery, no matter what these

15    witnesses say who used to work together for years, it doesn't

16    matter, they've already won, we know how this is going to play

17    out.  That's the PI.  Then on the TRO standard they're asking

18    the Court to do that now before the witnesses show up.  It

19    doesn't work, Your Honor.

20        On the merits, we can go through claim by claim.  In terms

21    of their unfair competition claim, it's legitimate business

22    conduct.  It's contested that it's targeted at Vyne.  What

23    HSOne has been doing, as we've explained in our papers, is

24    increasing its security.  It's not new this year.  It's

25    something HSOne has continually worked on.  But a new CEO did

1    start this year who took a closer look, who started

2    investigating, not just Vyne, but how are people getting into

3    our database.  They say over and over our customers say it's

4    okay.  What about the patients?  Do the patients know that when

5    they go into the dentist, when I go into the dentist or anyone

6    here, that there's some sort of backdoor workaround hacked

7    together encryption key thing happening on my data?  No.

8         They can integrate -- Your Honor, this is critical.  It is

9    contested in the record that Vyne used to use the API, that

10   HSOne has other integrations that are not API-based, that could

11   allow Vyne to do what it wants to do.  There are technical

12   nuances, Your Honor, in this case that even as someone who's

13   managed a dozen engineers in a computer software company are

14   very complicated.

15        The idea that you can just have an API endpoint, which

16   they mischaracterize in their Tuesday declaration, having 700

17   of them doesn't make it a wheel with hub and spokes.  It just

18   means on the user interface, on the visual interface, I can

19   click update my e-mail, update my name, pull this field out.

20   So there's 750 different buttons throughout the app, so we have

21   API calls that you can make to them.  That's all that means.

22   Their CTO tried to tell this court two days ago that that makes

23   this into an exchange.

24        If you have an API, and this is asking we've put into

25   evidence, it's in the record by our Chief Information Security

1    Officer, it corrupts data integrity.  These are claims that are
2    getting updated with financial information real time.  The
3    database has its own protections to ensure auditability, to
4    make sure the claims are right.  An API can't do that.  It's an
5    Internet call that goes from a website to an API endpoint and
6    then to the database.  It has no idea what's happening in the
7    database, which causes patient records to be corrupted, which
8    is why HSOne makes available a clearinghouse integration that
9    it has offered to Vyne and that others use that can get them
10   where they want to go.
11        The problem, Your Honor, the sticking point is just money.
12   They don't want to pay for it.  They want different pricing.
13   They want noncompetitive out-of-market pricing.  That's all
14   this is.  So they used to work for us, they used to be on our
15   engineering team.  They know how to get what they want without
16   a negotiation.
17        It's true that the Fourth Circuit has said the Court
18   shouldn't flyspeck, and in terms of the Cures Act, this is a
19   complex statutory construction issue that's fact-intensive, as
20   the Fourth Circuit has held, it requires the Court evaluate,
21   first, is this information blocking under the Cures Act, which
22   requires the Court to evaluate is HSOne even governed under the
23   Cures Act for these purposes.
24        This concept that you can look at our website and it says
25   the words "hub" and "integrate" means that it falls within the

1    Cures Act definition, it doesn't pass the smell test.  Any
2    engineer, anyone who has familiarity with computer science
3    understands the difference between API calls that one party can
4    make and an idea of a clearinghouse, an exchange of information
5    where it's multiparty and it's about actually, you know,
6    creating a market for the claims, which is what they're trying
7    to do.  The regulation on its face, we cite this in our papers,
8    it was developed to carve us out.  The regulation says that
9    when you're a service provider facilitating like we do, you're
10   not an HIE or HIM.  We can get into the Real Time, and I will.
11   I'll table for a second.
12        Let's talk a bit, Your Honor, about irreparable harm.
13   This idea that Vyne is irreparably harm is backwards.  They
14   have workarounds.  They've put on their website, they tell
15   their customers, don't worry about it.  Once we get the
16   witnesses in here, the Court will hear evidence that Vyne's
17   customers are fine.
18        Counsel just now five minutes ago couldn't answer the
19   question of whether this quote/unquote virus still disables
20   anything.  It's not true that it wasn't addressed.  HSOne put
21   into its papers that all it does is if somebody's trying to
22   hack its software, it's stops it.  This happens millions of
23   times a day.  It's happening on every one of these computers.
24   There is an antivirus software that looks for certificates of
25   malicious software and stops them from interfering.

1    Vyne has chosen to turn its business into a hacking

2    business this year.  They decided to do that.  They didn't want

3    to do a commercial negotiation.  It's as if you have, you know,

4    a malicious hacker who says my revenue will go down because I'm

5    not allowed to interfere.  Vyne's software can run, they can

6    stop interfering with HSOne's, they can put it on a different

7    computer.

8    There are many ways that they can run their software, it

9    will have no problems with our software, but when their

10   software is built and designed, and it's not just printer

11   driver versus the other thing.  It's a complex scaffolding of

12   unauthorized access at the lowest level and some of the most

13   sophisticated hacking techniques on the one hand while sloppily

14   implemented on the other hand that have -- we already have

15   evidence of broken integrity of data have caused our customers

16   to call us, what's going on, because Vyne wants to tell

17   everyone, yeah, just doing the same thing for 20 years.  What

18   kind of computers did we have 20 years ago?

19   So on irreparable harm, the reputational issues, the

20   market issues, it's all legitimate business conduct on HSOne's

21   side, just security upgrades.  It's all caused by Vyne's own

22   conduct.  Its customers and the public are legitimately

23   concerned about what they're doing, and there's nothing new.

24   In terms of the balance of the equities, this is where it

25   gets really bad, Your Honor.  On the one side Vyne is saying we

TRO Hearing 10/23/25

1    should be able to violate the Computer Fraud and Abuse Act,

2    ECPA, DMCA, wiretap, intercepting technical measures.  The

3    declaration they put in two days ago about how customers

4    manually do it, it ignores that there is a debug file.  There's

5    a function in our code for debugging for, if there's a problem,

6    how do we fix it.  They have hijacked that function and used it

7    in production to actually modify the code and intercept the

8    traffic.  They're including that in their declarations.

9              THE COURT:  Is that something that they've more

10   recently deployed in the response to the more recent -- I guess

11   what you all did in April?

12             MR. BURSHTEYN:  Yes, Your Honor.  Well, we don't know

13   exactly what they've been doing when, but we have uncovered

14   that recently, yes, and it is part of what drives the urgency

15   of our relief.

16        And so when you balance these equities, we're -- HSOne,

17   Your Honor, is the one getting hacked in an escalating manner.

18   It's impacting all of HSOne's customers.  On the other hand,

19   you have HSOne simply protecting its systems and Vyne choosing

20   to go into this, you know, foray of we'll just do it anyway and

21   bragging about it and publicly stating we have workarounds,

22   don't worry, call us.  And even today, Your Honor, the hacks

23   continue so it's not clear that what HSOne is doing even works.

24             THE COURT:  Can you speak to the impact of the hacks,

25   as you call them?

TRO Hearing 10/23/25

1    MR. BURSHTEYN:  Yes.  So there's telemetry that HSOne

2    has implemented that shows basically what Vyne is doing is

3    spamming the dentist office systems with new upgrades,

4    continuously issuing upgrades to its software to try multiple

5    methods of unauthorized access.  This damages the computer

6    systems, it causes -- it gives them read-write access into

7    HSOne's database.  That read-write access allows them to inject

8    data, take data out into the database en mass, it creates

9    privacy issues, it creates cybersecurity issues.  We put into

10    evidence, Your Honor, that printer drivers are a vector of

11    attacks that the U.S. Government Information Security CISA

12    Agency has flagged are dangerous.

13    The idea is that HSOne, like Vyne, like everyone who

14    develops software has a security team.  That security team is

15    dealing with thousands of threats daily.  They have to be able

16    to upgrade their own software to stop those threats from

17    exfiltrating data.  We already have evidence that this is

18    damaging the database, that it is interrupting patient care,

19    that it is hitting the computer systems way more than it's

20    supposed to, and then interfering even with our ability to

21    debug our own software and upgrade it.  All the reputational

22    harms, they all flow both ways at a minimum, although we would

23    argue that they are causing their own reputational harm.

24    THE COURT:  Stepping back --

25    MR. BURSHTEYN:  Yeah.

1          THE COURT:  -- to what you were talking about before

2    getting to reputational harms.

3          MR. BURSHTEYN:  Yeah.

4          THE COURT:  Can you speak in more specific terms

5    about what you mean?  I think I understood what you meant in

6    terms of damage to computer systems, but that just seems like a

7    matter of traffic and I guess things that happen

8    programmatically that you're doing to maintain security on your

9    end --

10          MR. BURSHTEYN:  Yeah.

11          THE COURT:  -- and they're doing in order to

12    implement the workaround for what you did in April.

13          MR. BURSHTEYN:  Yeah.

14          THE COURT:  But in terms of impacts on patients,

15    impacts on customers, how are they affected by all of this?

16          MR. BURSHTEYN:  So Your Honor, think of it this way.

17    And there's evidence from our Chief Information Security

18    Officer about the ongoing risks.  They are asking tens of

19    thousands of dental offices, they've created a situation where

20    they live in a house with broken windows, busted doors, and

21    there are thousands of malicious hackers who daily want to get

22    into that house and steal all the data, right?

23          So we already have specific complaints from customers who

24    call us and say, hey, what's going on, why are my systems not

25    working?  why is the database, the patient records database

TRO Hearing 10/23/25

1  that we run our dental practice on, it's not firing correctly.

2  There's something interfering with the database.

3          THE COURT:  But is that just a function of -- is that

4  a result of what they're doing or is that result of what you're

5  doing in response to what they're doing?

6          MR. BURSHTEYN:  Ah.  So that's a good question.

7      Your Honor, it's a result of their unauthorized access.

8  So when we stop what they're doing, nobody calls us and says

9  anything because things work smoothly, right, on our system.

10     The calls we get are, hey, what's going on, and then we

11  look at the debugging log and what's going on is Vyne, or not

12  just Vyne frankly, Your Honor, it's not just Vyne, there are

13  others and we've made demands of them and those cases haven't

14  necessarily escalated yet.  Vyne is perhaps the most brazen or

15  most committed.  But, yeah, when we look at these complaints,

16  we see what's going on.

17     And so it creates a problem for the integrity of the

18  patient data, the integrity of our database.  It essentially

19  just makes them vulnerable to hacks.  It also corrupts, like I

20  said, Your Honor, there's issues with auditing the patient

21  records with the actual flow of the information, the financial

22  information in these claims.  There's integrity problems that

23  we know at scale what they're doing doesn't work.  It's why we

24  don't have that API endpoint.  It's why we have these

25  customized clearinghouse integrations.

1          THE COURT:  Okay.  I'm not sure I got a clear answer

2     to what I was saying.  I think you understood the question,

3     though.

4          The question was whether or not the problems that the

5     customers are reporting, is it a result of the workarounds that

6     you contend that Vyne is implementing, or is it based upon you,

7     your client taking measures to protect the security as it sees

8     it?

9          MR. BURSHTEYN:  It's the former, Your Honor, and the

10    request -- the complaints and the concerns started coming in

11    well before we did this supposed act.  Which, by the way,

12    again, it's not a virus.  We've contested that.  And they

13    haven't moved on CFAA, so there's open questions of law and

14    fact.  But it is the former.

15         THE COURT:  Okay.

16         MR. BURSHTEYN:  The customers are complaining about

17    Vyne's conduct, not, hey, what did you -- in fact, we're so

18    careful about it, we alert the customers in advance, we say,

19    hey, here's what's going on, we're going to need to push an

20    upgrade, right?  We're transparent.  This cuts against all of

21    their merits arguments, right, in that we don't surreptitiously

22    go in and do things that mess with our customers' systems,

23    right?

24         We could roll this out today for everyone, but that's not

25    the way you do.  They've put us in this position, and you'll

1    see, Your Honor, in our TRO one of the big problems we have is

2    rolling out our own security upgrades is something that Vyne is

3    interfering with, not just because it's hard to do or this is a

4    thorny issue, but technically they're stopping us from doing

5    it.  And so that's part of our request is to have the Court

6    enjoin them from interfering with that.  But --

7                THE COURT:  So related to that --

8                MR. BURSHTEYN:  Yeah.

9                THE COURT:  -- counsel for Vyne made the argument

10   that you didn't have evidence of them engaged in any of this,

11   what you're calling hacking activity until after you took the

12   measures that you took in April.

13        Do you have a response to that or do you have evidence of

14   them engaged in this sort of workaround conduct before or this

15   hacking that you're alleging before April?

16               MR. BURSHTEYN:  Your Honor, we've uncovered the

17   details of what they're doing more recently, right?  As time

18   goes on, we uncover more.

19        In April, we implemented or earlier this year some

20   telemetry that gave us deeper visibility.  We had other -- that

21   wasn't like -- it's not like we didn't know.  The reason we

22   implemented that telemetry is because we were seeing anomalies

23   on our system that required a deeper view of it.  So it's not

24   correct as Vyne attempts to portray to this Court that

25   everything was fine for 20 -- no.

1          We knew that Vyne was trying to do workarounds but didn't
2     know exactly how.  Vyne was actually part of our API at one
3     point, right?  We were working with Vyne.  The current
4     executive team worked for us.  Then earlier this year we -- our
5     new CEO started, our clients.  There was an initiative for
6     security.  You see what's been going on in this industry with
7     patient health records and breaches, and we started
8     implementing additional telemetry.
9          Security, Your Honor, it's a continuous cat-and-mouse
10    game, right?  We get bigger defensive techniques, the
11    attackers, they get better offensive techniques.  And so this
12    is a constant struggle, essentially a game of whack-a-mole.
13    The import of whether or not we knew it and, please, if I'm
14    missing any question from the Court, is as I understand it
15    whether there's something truly urgent, like on whose side is
16    it urgent.  We would say they know our policy is not to allow
17    unauthorized access.  In fact, their executives helped to
18    implement that policy.
19         What's urgent is they've escalated their workarounds,
20    right?  They want more data.  They pulled out of the API
21    agreement.  They don't want to have the clearinghouse
22    integrations that others do, so they deployed these hacks.
23              THE COURT:  When was it that they pulled out of the
24    API?
25              MR. BURSHTEYN:  Your Honor, it's in one of the

1   declarations of our CISO, but it was before this year.  So it

2   was earlier than kind of all of the things came to a head this

3   year.

4           THE COURT:  So the fact that they had previously been

5   on the API is something -- I remember that coming up in the

6   briefing.

7           MR. BURSHTEYN:  Yes.

8           THE COURT:  It's not something that I was thinking

9   about when Mr. Levy was standing up and he said that the API

10  agreement that's currently being offered doesn't provide for

11  the print functionality that they need.

12          MR. BURSHTEYN:  Right.

13          THE COURT:  Did the previous API do that?

14          MR. BURSHTEYN:  No.  There has to be a separate

15  integration.  This is what I'm talking about about this idea of

16  a deep custom integration, the ability for them to come in and

17  work alongside our database in a way that doesn't lose all the

18  protections of the database.  It's something that we have with

19  other -- it's not something that doesn't exist.  They just

20  don't like the commercial terms.

21          And this is really important because the Fourth Circuit

22  Real Time case, on that case, the defendant said the security

23  concerns are obvious, we don't have to put evidence in, said

24  there's no agreement because we've chosen not to negotiate and

25  said, you know, basically you don't have to do any factual

1    inquiries.  Here, we have -- we're so far away from the line in

2    terms of the factual disputes on is this blocking, how does

3    this affect our systems, what are the commercial negotiations,

4    it's completely not on all fours, Your Honor.  And so that's

5    part of the issue is that question sort of gives rise to the

6    difference here.

7             THE COURT:  All right.

8             MR. BURSHTEYN:  And if I may, Your Honor, just a few

9    more points to address from plaintiff's counsel.

10            So in terms of the equities balance, just to complete that

11   point, the Court has to weigh it, right, which way to go, and

12   it's part of why you can't grant it here.

13            On the public interest factors, Your Honor, squarely on

14   our side.  The Ninth Circuit looked at this in the hiQ case and

15   found there's a strong public interest in allowing Internet

16   companies to protect their systems, even there where it was

17   public scraping of LinkedIn, right?  You just go to the

18   website, a bot can go to the website.  It's actually a lot more

19   similar to Real Time.  There where there was -- you know,

20   LinkedIn wasn't really able to stop them and their CFAA claim

21   didn't work, the Ninth Circuit said, look, you have a right to

22   stop bots.  It is in the public interest to stop unauthorized

23   access, just as it is here.

24            Their public interest argument is access to data, data's

25   got to be free.  Well, none of the patients have any idea what

1    they're doing, number one.

2        Number two, we complied with all of our duties and

3    obligations in terms of data access under the law.  They can't

4    point to any duty.  There's multiple Maryland cases that say

5    that you're not required to provide unfettered access to all of

6    your internal hooks in your software to competitors.  People

7    used to sue Microsoft for this and say that Microsoft has its

8    own windows API where it does its own thing and we want access

9    to that, too, and Microsoft said, you know, that's ours, we

10   have our house product, you have something else, we can

11   compete, we don't have to give you every hook.  That's what the

12   Fourth Circuit has come down and Tenth Circuit.  That's pretty

13   consistent.  There's a whole line of antitrust cases about how

14   you are allowed to protect your own systems and information.

15       And so, basically, in terms of that balance and the public

16   equities, there's no issue.  In terms of all of their points

17   about the Real Time case, I think the thing that they will not

18   be able to get past in this dispute is just the text of the

19   statute and the regulation.  It's explicitly developed to carve

20   us out because we are a provider that facilitates API

21   connections bilaterally.

22       There are not three exchanges here.  The Court can look at

23   the text.  It is correct that the Fourth Circuit has said the

24   Court's role is not to flyspeck the negotiations.  Here, as I

25   mentioned, were far off, far more viable commercial options and

1    negotiations available, and we're still trying to negotiate

2    with them.  There's no irreparable harm.  Vyne says that it has

3    developed workarounds and consistently does, can't even tell

4    this Court today that it has no workaround to anything.

5        And, you know, in terms of the timing issue, Your Honor,

6    what would happen if the Court granted a TRO today and then

7    said, hey, pending -- you know, stop interfering with their

8    software, which we're not doing, is that they would just

9    continue hacking.  It's basically they would be enlisting the

10   Court in making what they're doing worse, and they have been

11   emboldened.  Their strategy is emboldening them.

12       The way that they manufactured the forum shopping has

13   caused additional hacks.  We see that.  We have evidence of

14   that that we've put into the record.  And nothing has slowed

15   down on their end.  Look at what we're doing, a careful,

16   measured communicated-in-advance rollout.  We're holding back

17   security protections that frankly we should just be

18   implementing and are not unlawful.  But out of care for our

19   customers, out of not wanting to, you know, do things quickly

20   in a sloppy way like Vyne does, we're slowly, carefully

21   thinking through it.

22       The Court's question about what is even happening, what

23   are we doing, it shows why an evidentiary inquiry, witnesses,

24   technical explanations are required.  Counsel cannot explain

25   and didn't try to say that Vyne doesn't work in every dentist

1    office where HSOne is installed.  That's not a true statement.

2    We only stop malare.  We stop programs that try to hack and

3    exfiltrate data out of database, Your Honor.

4         And finally, I'll just say in terms of, you know this

5    whole discussion of tortious interference, I don't think the

6    Court can resolve that without determining whether the conduct

7    is legitimate, whether what they're saying how we're

8    interfering, right, the customer doesn't sign up with Vyne

9    because we rolled out a security upgrade.  There's a question

10   there about whether that's legitimate.  That's disputed in the

11   record.

12        We think the record shows that that dispute can't be

13   resolved early.  This is a peculiarity of this preliminary

14   posture we're in which is that if the Court sees factual

15   questions that require the discovery of documents, that require

16   depositions, witness testimony, that is an independent

17   ground -- it's not just a grounds to deny it, it merits denial

18   because that's the standard, because otherwise you come in

19   early with incomplete facts, with an incomplete record, and

20   there's an injunction that could have the opposite effect of

21   its intention.

22        And so here we don't think the PI's going to work.  Again,

23   the PointClick, the Real Time case, it's literally a CAPTCHA.

24   We all know what a CAPTCHA is.  You type it in, what does the

25   letters mean.  They showed an unsolvable CAPTCHA, right, so

1    when they were coming in, their bot would solve the CAPTCHA.

2    They said, okay, when they come in, give them a CAPTCHA that

3    they can't solve.  They weren't hacking the database.  They

4    were just automatically accessing it.  They weren't stealing

5    encryption keys.  They weren't violating wiretapping statutes

6    at the federal and state level.  Nothing even close to the

7    conduct here.  I don't think there is a case with this type of

8    conduct.

9           So anyway, bottom line, I don't want to belabor it.  The

10   options, Your Honor, are the same, and I didn't address the

11   venue issues, although I think they are relevant to whether

12   anything should be granted here today, but if the Court's, you

13   know, default, as Your Honor mentioned, is to see all the

14   briefing and make a decision, you know, HSOne is under attack,

15   it is, so we appreciate however that can happen.

16          If the Court wishes to see witnesses and evidence and

17   actually hash out what is going on, we're prepared to, you

18   know, come back and do that.

19          THE COURT:  On the balance of the equities point, you

20   know, I can understand you leaning very hard on the use of

21   terms like "hacking" and "attack" and things like that because

22   it sounds really bad.  But a lot of what you're description is

23   of what's happening, it sounds like the harms are abstract in a

24   lot of ways.  I'd like you to put it in more concrete terms for

25   me.

1          What is the nightmare scenario that results from the

2    conduct of the plaintiffs in how they deal with your client's

3    software?

4               MR. BURSHTEYN:  The nightmare scenario is that

5    somebody hijacks the printer driver and steals all of the

6    patient records and you have a massive data breach of all

7    dental patients' records.

8               THE COURT:  We're talking about some third party, not

9    the plaintiffs doing it.

10              MR. BURSHTEYN:  Exactly.  Exactly, Your Honor.  This

11   is the issue.  They can be the best -- not "they."  We know

12   they're good guys.  Vyne could be the best in the world, best

13   intentioned, just trying to lawfully compete.  There's a reason

14   this isn't done this way.  You don't leave your door unlocked

15   and call somebody, you know, 30 minutes away and say, hey,

16   check on my house once a day and then leave, you know, some

17   really expensive jewelry just within view of the window.  I

18   mean, this is what they're doing.  They are going in -- and so

19   that's the worst case.  So the Court had asked about the worst

20   case.

21         There are many lesser or just as bad depending on how you

22   look at it, there is patients whose integrity of their claims

23   are corrupted, so they're submitting the wrong claims,

24   basically, to insurance.  There is disruption of service at the

25   dentist office.  They have to get on the phone with our

1  client's IT team and troubleshoot and they can't deliver care

2  to patients, an argument that they have also made.  I think

3  both sides agree that that's bad, right, the disruption to the

4  operations of the dentist office is bad, something that's

5  caused by them.

6          THE COURT:  And you have evidence of that?

7          MR. BURSHTEYN:  Yeah, we get those calls.  We've put

8  it in the record a declaration from our CISO that we have

9  received customer complaints where they call us and their

10  system, their HSOne system isn't operating.

11          THE COURT:  Before April?

12          MR. BURSHTEYN:  Before April?  Your Honor, we -- I

13  don't know that we've put that evidence in, but we will be able

14  to show evidence that unauthorized access to our systems is

15  harmful.  It's not like only harmful after April, right, and --

16          THE COURT:  Well, I understand, you know,

17  cybersecurity's important for everyone and it's very important

18  because we're trying to address risks of bad things happening.

19  I'm just trying to figure out whether anything bad has happened

20  or the likely -- making an assessment of the likelihood of

21  something bad like that will happen.

22      I understand -- so just to I guess put it in more specific

23  terms, your CEO came in and he was more interested in

24  cybersecurity than perhaps the prior CEO.  I'm wondering

25  whether there was anything that happened either during that

1    timeframe or before he came in that gave rise to this

2    heightened level of concern about cybersecurity?  Because in

3    terms of the balance of the equities I have to make an

4    assessment of likelihood.

5              MR. BURSHTEYN:  Right.  Right.

6              THE COURT:  And I guess something becomes more likely

7    if you have evidence that it's happened in the past, right?

8              MR. BURSHTEYN:  Your Honor, it has.  There are public

9    reports that can be looked at about massive multimillion record

10   patient data breaches across the industry against electronic

11   healthcare systems, Your Honor.

12             THE COURT:  So even if your client didn't suffer it

13   personally, similar, I guess, others in the industry have.

14             MR. BURSHTEYN:  Yes, Your Honor.  And, you know,

15   there's some things maybe that would be better left said in a

16   sealed proceeding or with witnesses that we just -- yeah, we

17   can't really publicly discuss.  But I mean, the patient --

18   Vyne, just as us, by the way, this isn't healthy for their

19   system.  We are all under attack in this industry, which is why

20   there are strict requirements for cybersecurity.

21        And it's not just the security issue, it's a privacy

22   issue.  It's us as patients or anyone going in to get care have

23   an expectation that this also completely turns their unfair

24   competition tortious interference claim upside down, which is

25   there are a bunch of contracts between all the patients and the

1    dentist offices that we all know have clauses in there that say

2    we're not going to just send your data to some vendor through

3    an unauthorized -- right?  So there's that issue which is

4    ongoing.  The privacy harm is irreparable, right, whether or

5    not a breach happens.

6         So anyway, we can get into it, but the short answer to

7    your question, Your Honor, is yes, there is evidence.  We've

8    actually put this in the record of data breaches in the

9    industry.  It's not just that our new CEO came in and really

10   done a great job, but it's interesting that their CEO is new,

11   too, and their CTO and their president.  They came over from

12   us.

13        And so it's -- that timing is suspicious that they go over

14   there and then they start doing these very low level,

15   infrastructure level -- I don't have to use a descriptive term,

16   I'll just use the term of the law and what they're doing --

17   unauthorized access, right?  Going in, taking encryption keys,

18   and they've been the ones that were -- they were our

19   protectors.  They were the one -- there's -- there are

20   communications proving this, right, that they're not going to

21   be able to say on the stand when they worked at HSOne it was

22   all good, free-for-all printer driver, everybody's happy.

23   That's not true.  And we've put that in the record already.

24             THE COURT:  All right.  Thank you.

25        I'll hear Mr. Levy in rebuttal.

TRO Hearing 10/23/25

1          MR. LEVY:  Thank you, Your Honor.  I think I'll try
2     to be brief.
3          I think the first point I'll start with is timing.  We
4     made the point about timing and nothing happening before April
5     2025, not just because of the equities and the harm, but
6     because it goes to whether there was unfair competition in an
7     effort to compete on unfair grounds or whether there was a
8     security concern.  And the fact is there is nothing in the
9     record on their side showing that anything happened before
10    April 2025 with respect to Vyne.
11         The evidence that we put in says we used a printer driver
12    for 20 years.  That is in the record and it's not disputed.
13    The evidence that we put in the record says that to our
14    knowledge there were no calls from any customers or complaints
15    from any customers before April 2025.  There's nothing in the
16    record showing anything happening before April 2025.
17         And we also put in evidence that that's when they started
18    to reach out to customers to have them shift from our product
19    to their product.  And so all of that together collectively
20    shows that the effort to stop the printer driver was unfair
21    competition and an effort to compete not on the merits of a
22    product but on other unfair grounds.
23         I should add that the product that they tried to get our
24    customers to move to their product on, and it's called EDS,
25    that product uses a printer driver.  That's cited in Paragraph

1   6 of the Nix opening declaration.  It was not disputed in their

2   briefing and my friend did not mention it.  And that really

3   puts the lie to the point that there is something wrong,

4   nefarious, improper about using a printer driver when their own

5   competing product used it.

6        There are only, to my understanding, three products in

7   this space that compete:  There's our product, there's their

8   product, and there's a third product that is now under common

9   ownership with them.  It's owned by their private equity owner.

10  So there are three products.

11       Our product uses a printer driver, their product uses a

12  printer driver.  If it's such a security issue, why is it that

13  as of October 2025 they're still advertising that their product

14  uses a printer driver?

15       The so-called hacking, there's no evidence or

16  substantiation in the papers or the record before the Court

17  that we violated -- or my client has violated any federal

18  statutes regarding hacking.  The facts relevant to these

19  so-called hacking claims, it sounds all sensational.  I

20  understand why they're doing it.  I would do the same thing if

21  I were them.  It all happened after the fact and they're not

22  supported by evidence.

23       There's a supplemental declaration of Mr. Nix who goes

24  through factually what these -- what the facts are.  The Court

25  can look at that.  But again, the point remains that this was

1    all conduct that happened after April 2025 and what we're

2    asking for is a return to the status quo, before the last

3    disputed fact before April 2025, before there was anything that

4    they say is hacking.

5         This is about access to patient records, and the patient

6    records belong to the patients.  It doesn't belong to them, has

7    nothing to do with the antitrust cases that they were talking

8    about.

9         Okay.  They've also -- the Court had a question about our

10   client canceling the API and there was some back and forth

11   around that.  The API was for clearinghouse functions, not the

12   services that are at issue here, the RCM functions.  We've put

13   into the record, and it's, again, not disputed that the API

14   function does not today permit, is not adequate to transfer the

15   data that is needed for our software.  So I don't think that's

16   disputed either.

17        Briefly, I think, on harm, I don't think they've disputed,

18   my friend didn't dispute that we suffered harm, tried to

19   explain why there's harm on their side of the ledger.  I didn't

20   hear anything or any citation to the record of any harm that

21   would visit them, the defendant, for returning to the status

22   quo before April 2025 when my client was able to use a printer

23   driver without interference, just as their product does today.

24        I also did not hear any harm that would result from them

25   not deploying a software that goes into their customers'

1    computers -- these aren't their computer systems, these are the

2    computer systems of dental offices -- and looks for and

3    disables any software that has a Vyne certificate.

4         My friend said on the Cures Act that there was an express

5    effort to remove references to healthcare clearinghouses.

6    That's actually not the case.  There is a broad definition that

7    is meant to be interpreted broadly, and in the notice and

8    comment period before the regulation went into effect, there

9    was a comment asking that healthcare clearinghouses be

10   excluded, and the agency declined to do that and urged that

11   there should be a more flexible approach, and I can cite the

12   Federal Register for that.  It's 85 Fed. Reg., the first page

13   is 25642, and the discussion of this comment starts at 25802

14   and goes onto 03.

15        So it's just not true as a matter of regulation that there

16   was an express exclusion of this.  It was, in fact, suggested

17   during the notice and comment period and the agency wished to

18   have a more flexible approach.  It was an approach and a

19   definition that today the only challenge in terms of

20   application and interpretation is about whether there's a

21   facilitation of communication that's only bilateral or not.

22        And, respectfully, to my friend's assertions, I think it's

23   clear from the record that the point of this program, the API,

24   which they call it API Exchange, is to facilitate

25   communications between multiple parties, multiple dental

1    offices on the one hand and multiple vendors on the other hand.

2    And it's not a matter of API data points, endpoints.  I don't

3    know if the Court is familiar with even what that is.  There's

4    a lot of effort I think to obfuscate, but it's about the number

5    of vendors.

6           So they say there's more than a hundred vendors who can

7    participate in this and they -- some of them provide billing

8    services, some of them provide imaging, they provide a whole

9    host of services.  And dentists can use and the APIs are used

10   to communicate between, on the one hand, the dental practices

11   and, on the other hand, these services and that can be done

12   simultaneously.  And it's a hub and it's just a sort of

13   exchange of patient data, which, again, is data that belongs to

14   the patients and not to HSOne that the Cures Act was meant to

15   protect and not to permit information blocking in the absence

16   of one of the exceptions, which they have not satisfied given

17   that it is their burden.

18          I will add, my colleague reminds me with respect to the

19   question the Court had about the virus and the effects.  There

20   is, in Paragraph 19 of the Nix Declaration, a record, evidence

21   regarding --

22          THE COURT:  Let me get there.  This was the first

23   declaration?

24          MR. LEVY:  That's right, Your Honor.

25          THE COURT:  Paragraph?

1          MR. LEVY:  19.  And one --

2          THE COURT:  Okay.  I'm there.

3          MR. LEVY:  So the declaration says, and this is with

4    our opening papers, that many Vyne customers have been unable

5    to submit insurance claims via the print driver or carry out

6    other RCM services due to HSOne's targeting of Vyne software.

7    So this was as of October 2nd, and it was after the virus was

8    deployed.

9          So we think the Court should enter an order return to the

10   status quo, that it should last through the disposition of the

11   merits, but if the Court wishes to hear further evidence, then

12   it should last for two weeks, which is the standard timeframe

13   under the federal rules, which can be extended as a TRO instead

14   of a preliminary injunction so that evidence can be heard from

15   witnesses and the equities can be -- in the balance of the

16   equities the status quo can return to the way it was for 20

17   years.  Unless the Court has questions.

18          THE COURT:  No, I don't have any questions.  I did

19   want to ask a question of counsel for the defendant.

20          It has to do with what plaintiff's counsel noted about

21   your own print function or printer function and why that

22   doesn't create the same kind of security risks or problems that

23   you contend plaintiff's creates.

24          MR. BURSHTEYN:  Your Honor, and this is a question we

25   should really have the witnesses here for, but to ensure what

1    we've put in the declaration of HSOne CISO is that our own
2    software doesn't do the slew of low-level privilege escalation
3    and access that Vyne does.  It's not correct that they just use
4    a simple printer driver.  It's surrounded by a whole bunch of
5    other methods of unauthorized access.
6            This is similar to the point I made about Microsoft's
7    house API versus others.  We have a security team when a
8    function, a feature is developed, there's a software
9    development lifecycle.  What happens is, it's specced out, you
10   have a meeting about what are the security risks, how can we
11   make this optimal.  You test it, you build a prototype, you run
12   it through your test harness, you know the interoperations of
13   function with all the other features that you're going to
14   deploy.  And this is why when they deploy theirs, it causes
15   unintended consequences.  Even Mr. Nix, Your Honor, just a
16   couple days ago in his declaration said I had no idea HSOne was
17   using eTrans, right?  Yeah, because he's not any longer in our
18   internal meetings.
19           So the point is, we may have some kind of a printer driver
20   functionality that we build on our end and secure, but a third
21   party to do that, that's a hack.  That printer driver is a hot
22   target for malicious attackers because it gets you into the
23   system without authorization.
24           The other issue, Your Honor, is they don't just take data
25   out, they write data in.  It's the write-back, too, that causes

1    these integrity issues.  And this is why their TRO doesn't make

2    sense because if the Court were to enjoin, essentially give

3    them the license, say roll back your security upgrades, then

4    they're not going to just go back to whatever they were doing

5    before, which we take issue with.

6         They have ongoing hacks that they're doing that are very

7    valuable to them.  From a business perspective, they're making

8    money.  They can do so much more with what they've built now

9    than their printer driver.  They write back introduce.  They

10   essentially take on the persona of Dentrix.

11        So the point is, Your Honor, the Court would have to

12   enjoin them.  The Court would have to grant an injunction to

13   stop them from unauthorized access, to stop all of the

14   workarounds.  So it's impossible to craft -- and there's

15   problems with the order that they've proposed on that front, so

16   that's one issue.

17        I did have a couple points I just wanted to address very

18   briefly.

19             THE COURT:  All right.

20             MR. BURSHTEYN:  I know the Court has heard a lot and

21   has a lot of paper.  But the write-back which the Court had

22   already asked about, so I think that's very important, that

23   it's not just printer driver for X fill.

24        But on the Cures Act, Your Honor, look, the language of

25   the Cures Act is pretty straightforward here.  And, again,

1    they're confusing the issue between the clearinghouse exception

2    or the clearinghouse coverage, and whether something is an HIE

3    or HIN.  And that's the inquiry.  The Court has to determine

4    that HSOne is an HIE or an HIN in order to even be covered

5    under these blocking regs.  In the only case that they have,

6    the Fourth Circuit Real Time case, that wasn't contested.

7    There was no issue on that.

8         Here, the language of the -- the language says an HIE or

9    HIN "permit, enable, or require," "use of any technology or

10   services for access, exchange, or use of electronic health

11   information among more than two unaffiliated individuals or

12   entities other than the individual entity to which this

13   definition might apply" -- so not us -- "that are enabled to

14   exchange with each other."  With each other.

15        Just because Mr. Barros, Ms. Bartlett, counsel for Vyne

16   and all of us can develop our own API integrations and there

17   can be over a hundred of us that use the HSOne API to -- so you

18   don't have to go and click the buttons on the screen but you

19   can programmatically update certain fields, that doesn't mean

20   that we have some kind of exchange we're facilitating.

21        And the regulation, Your Honor, the Office of the National

22   Coordinator for Health Information Technology looked at this

23   issue and said, when someone is "performing a service on behalf

24   of one entity," "no actual exchange is taking place among all

25   entities."  The goal of the ONC was to "ensure that the

TRO Hearing 10/23/25

1    definition does not unintentionally cover what are essentially

2    bilateral exchanges."

3        Right?  We facilitate a bilateral exchange.  There's not a

4    single piece of evidence in the record that we have API

5    endpoints, because we don't, that would allow essentially what

6    they're saying to function as an HIE or HIN.  If we did, it

7    would be a completely different business model, a different

8    product.  Their theory of how APIs work would make every single

9    piece of software that touches patient records into an HIE or

10   HIM.  It collapses this exception because everyone's going to

11   have multiple API endpoints and everybody's going to have

12   multiple users of the API.  So nothing exists in their world

13   that's not an HIE or HIN, and that's what the ONC was trying to

14   avoid.

15       So bottom line, Your Honor, there are complex issues.

16   We're not trying to obfuscate.  We're actually trying to

17   clarify.  But the important thing is, they have not shown that

18   they will win an unfair competition claim, that we're violating

19   any federal law, that we're doing anything other than

20   legitimate security upgrades that's tortious interference.

21   They don't even mention the speech claims.  I haven't heard

22   anything about that.  They moved on those so, you know, that

23   hasn't been argued at all.  But they have no -- no arguments

24   there.

25       And they cannot meet these burdens with a "he said/she

1    said" set of declarations where we already have indications

2    that Mr. Nix did not tell the full story in his declaration,

3    did not mention that that encryption key, it's not actually

4    public and available like he said in his declaration.  It's in

5    a vault in the Windows data protection API.  And HSOne, Your

6    Honor, must be given the right to cross-examine him.  These

7    are -- these are statements that already are called into

8    question.

9        So anyway, the point is, Your Honor, they do not come

10   close to meet their burden on the merits.  We talked through

11   the other elements.  They can't hit those.  And the Court --

12   you know, we'll be here again.  You know, I had another one of

13   these earlier this summer that ended up being a three-week

14   bench trial and it was less complicated, and there were more

15   questions at the end of that one than at the beginning.  And so

16   we could do that here and it will not result in them meeting

17   their burden.

18       So the Court can deny this and just move this case along,

19   figure out where it's supposed to go, and we can get discovery,

20   get experts which are needed here and resolve the case.

21       If the Court's not inclined to do that then, respectfully,

22   we believe HSOne deserves its day in court, deserves to

23   cross-examine these witnesses and get the real story out.

24              THE COURT:  All right.  I do want to pivot a little

25   bit to the motion to transfer.  I'm not expecting full argument

1    on that.  It hasn't been fully briefed.  I do want to get from

2    the plaintiff sort of preview of the arguments that it intends

3    to make.

4         But I guess the question for you is whether or not you're

5    relying upon these affidavits to establish the evidence of I

6    guess hardships associated with this court exercising venue

7    over this case.  Do the affidavits speak to that?

8              MR. BURSHTEYN:  Yes, Your Honor.  We did submit

9    declarations alongside the motion to transfer, basically going

10   through where the evidence is, where the witnesses are, the

11   convenience factors.  So there's a couple things here.  There's

12   that, the convenience factors.  There's also just whether

13   they've cleared the (b)(3) bar, the 12(b)(3) bar, which is kind

14   of a separate inquiry.

15        But yes, the short answer the Court has heard enough from

16   me maybe is, yes, there is evidence in the record that -- I

17   mean, everyone's in Utah.  The people they're talking about are

18   in Utah, right?  The amount of customers that they highlight,

19   it's less than half a percent of HSOne's customers that they

20   say are impacted in Maryland.  It's less than 2 percent of all

21   the impacted customers that they say in their latest

22   declaration are here, and nothing, there's zero evidence,

23   there's not a single piece of evidence that any of the dispute

24   arose out of Maryland, right?

25        You can have a dispute that impacts every state.  That

1  doesn't mean venue's appropriate in every state.  The test is
2  where did it arise from and didn't even try to meet that
3  standard, right?  And so that's another hourlong argument that
4  maybe the Court doesn't want to hear right now.
5           THE COURT:  Right.
6           MR. BURSHTEYN:  But yeah, there's evidence in the
7  record.
8           THE COURT:  Okay.  Thank you.  Mr. Levy?
9           MR. LEVY:  So I have to admit that I am not prepared
10  to argue the transfer motion.  I do have a few high-level
11  points.
12       Number one, again, in terms of how -- the interposing that
13  issue and the TRO and the PI, I think it really puts the cart
14  before the horse to go to the transfer motion first.  If the
15  case is transferred and there's a TRO or PI in place, that will
16  go along with it.  And so there's no reason the Court shouldn't
17  evaluate that issue, and, indeed, their opposition to the PI or
18  TRO doesn't make that argument.
19       On the merits of the transfer motion, there are cases, and
20  we'll cite them, that hold that the statute they're relying
21  upon speaks to convenience of a case for trial and that it is
22  premature to consider such a motion at this point when the
23  issues haven't been fully formed, and it is best considered
24  closer to trial because the question is what are the issues
25  that will be addressed at trial, who are the relevant witnesses

1    and the relevant relative conveniences, and that's a question

2    that courts say are best addressed right before trial.

3         Number two, they make a big deal about how some of the

4    party witnesses here are in Utah and not here.  That's not

5    really relevant.  The question relates to third-party

6    witnesses, because party witnesses, of course, can travel to

7    the court and the issue for purposes of the federal statute

8    that is meant to be the equivalent of a forum non conveniens

9    analysis is whether they are missing third-party witnesses and

10   witnesses of that nature, and they've identified none.

11        And so, you know, and again, the supposed inconveniences

12   to party witnesses, not a relevant consideration.  We're

13   talking about a forum non conveniens sort of analysis, not a

14   venue or a personal jurisdiction analysis.  So to give a

15   flavor, that will be what we'll say.  I've been focused on this

16   argument, to be clear, and if there's any deviation from that

17   that I've highlighted, I apologize.

18             THE COURT:  Okay.  And you did submit an exhibit up

19   here.  If you could speak to --

20             MR. LEVY:  Yes.

21             THE COURT:  -- what it is.

22             MR. LEVY:  And so in the course of preparing for our

23   argument, we identified this on their website and I cited it

24   earlier --

25             THE COURT:  Oh.

TRO Hearing 10/23/25

1    MR. LEVY:  -- in my presentation.  I quoted from it.

2    It is how their API Exchange is described, and I think

3    particularly the discussion in the upfront where it's described

4    as a hub --

5    THE COURT:  Right.

6    MR. LEVY:  -- and back where it says the API system

7    is scaleable and allows multiple clients or service to interact

8    with the system simultaneously.  I mean, all of that I think

9    highlights that this is not just a simple bilateral exchange of

10   information.

11   THE COURT:  All right.  I remember you quoting that.

12   I didn't realize you were quoting from this document so I

13   understand that now.  Thank you.

14   All right.  I'm going to take a brief recess.  The time,

15   we're approaching 4 p.m., We'll return at 4:10.

16   (A recess was taken from 3:58 p.m. to 4:10 p.m.)

17   THE COURT:  So today my focus has been on whether

18   under Rule 65(b)(1)(A) the plaintiff has made a clear showing

19   of such an immediate and irreparable injury, loss, or damage

20   resulting from ongoing activity of the defendant that a

21   Temporary Restraining Order is necessary at this juncture

22   before the defendant has a full opportunity to challenge the

23   evidence that the plaintiff has presented.

24   I find that the answer so that question today is no, and

25   we'll schedule an evidentiary hearing on the parties'

1    cross-motions for preliminary injunctive relief.  That time

2    will be permitted to complete briefing the defendant's motion

3    for a Temporary Restraining Order and to accommodate full

4    briefing of the motion to transfer.

5        Now, the reason why I come to this conclusion is that

6    based upon the record in front of me, what I have is a

7    situation in which the defendant is alleged to have started

8    engaging in conduct to interfere with the operability of the

9    plaintiff's software which began back in April, but the motion

10   that I've been presented with was filed in a much more recent

11   term.

12       I understand that there are allegations and I think it's

13   probably uncontested that the defendant took additional

14   measures in the more recent term, but there is -- I think

15   there's contests in the evidence and factual disputes as to the

16   nature and extent of the more recent conduct such that I can't

17   come to a firm conclusion that what's occurring today is so

18   injurious to the plaintiff that immediate injunctive relief is

19   necessary.

20       So that's an issue that I will take up once there is a

21   full evidentiary record presented to me, and I don't feel that

22   that full evidentiary record is in front of me today because

23   the parties haven't had an opportunity to contest each other's

24   evidence through cross-examination and the presentation of live

25   testimony.

1        So we'll go ahead and schedule an evidentiary hearing on

2    the cross-motions at this time, but I guess the best question

3    at this point is how much time will be needed to complete the

4    briefing.

5        Now, I think the deadline for the motion to transfer is

6    probably coming up next week.

7        Am I correct about that, Mr. Levy?

8            MR. LEVY:  I believe our opposition is due next week.

9    I'm not --

10            THE COURT:  Okay.

11            MR. LEVY:  For our opposition, and of course they

12    have a reply.

13            THE COURT:  Right.  And then you can file an

14    opposition to the defendant's motion, the motion for a

15    Temporary Restraining Order, I presume in a week's time.  You

16    wouldn't need anymore time than that?

17            MR. LEVY:  I think we could do it next Friday.

18            THE COURT:  By next Friday?

19            MR. LEVY:  Or we could do it Thursday, right?

20            THE COURT:  A week from the today would be Thursday.

21    And defendant's replies could be in by the following --

22            MR. BURSHTEYN:  So --

23            THE COURT:  Yes.

24            MR. BURSHTEYN:  Oh, sorry.  Go ahead, Your Honor.

25            THE COURT:  I was going to say the following

 1    Wednesday, the 5th.

 2                MR. BURSHTEYN:  Yeah, we'll do whatever the Court

 3    prefers.

 4                THE COURT:  Okay.  Hold on one second.  Are the

 5    parties available for a hearing on November 12th?

 6                MR. BURSHTEYN:  Your Honor, well, let me check

 7    with --

 8          Yeah.  Your Honor, without knowing the availability of our

 9    witnesses, we are available.

10                THE COURT:  Okay.

11                MR. BURSHTEYN:  One question, I guess, for the Court

12    is would the Court be inclined to hold on scheduling the

13    hearing until the transfer motion's fully briefed and then

14    could decide, you know, on the chance that the Court is

15    inclined to just resolve that.

16                THE COURT:  Right.

17                MR. BURSHTEYN:  Maybe then -- and if not, if it's

18    fully briefed, the Court -- we can have a status conference, we

19    can figure it out from there.

20                THE COURT:  Okay.  Mr. Levy?

21                MR. LEVY:  We are here because there is irreparable

22    harm.  I understand it's not imminent enough for a TRO, but

23    there is a need for an injunction.  I guess they're not feeling

24    the same sort of irreparable harm as we are.

25                THE COURT:  I do want to just go ahead and schedule

1    it either way and you should check on the availability of your

2    witnesses even while the motion for transfer is being briefed,

3    and if it turns out that in advance of the hearing the Court is

4    satisfied that a transfer is in order and is satisfied that

5    injunctive relief is not necessary, I'll let you know, but I

6    think we should just go ahead and schedule it either way.

7            MR. BURSHTEYN:  Okay.  Thank you, Your Honor.  And I

8    don't mean -- you know, to be clear, we have a reconsideration

9    motion going in Utah.  We'll emergency appeal that up to the

10   Tenth Circuit if it's denied, so we're not trying to slow

11   anything down.

12           THE COURT:  All right.  So November 12th, does that

13   work for you?

14           MR. LEVY:  Subject to check with the clients, but

15   we'll make it work on our side.

16           MR. BURSHTEYN:  It's actually the only day that works

17   in that three-week span.  I've got family stuff before and

18   after.

19           THE COURT:  November 12th is a day that works?

20           MR. BURSHTEYN:  Yeah, randomly the best possible time

21   for me, so appreciate that.

22           THE COURT:  Because I was also looking at the 10th,

23   so I'm assuming the 10th does not work.

24           MR. BURSHTEYN:  That is I guess my grandmother, kids'

25   great-grandmother, we're all flying up to Portland, coming back

1    on the Sunday.  So I could fly here.  Obviously we'll do what

2    we need to do, but the 12th would be ideal, if possible, for

3    me.

4                THE COURT:  I mean, do the parties have I guess at

5    least a preliminary sense on how many witnesses you plan to

6    call?  Mr. Levy?

7                MR. LEVY:  I would say two or three.

8                THE COURT:  Okay.

9                MR. BURSHTEYN:  Your Honor, at a minimum we would

10   call the declarants that we've put in, so the two, and assuming

11   that they call their two, but we may want more.  They employ a

12   decent number of our former people who are important.  But we

13   could get back to the Court with our witness list in very short

14   order, probably within a day or two.

15               THE COURT:  I'm just trying to figure out the

16   likelihood that this is going to spill into a second day.  I

17   understand the Real Time hearing was multiple days.  But it

18   doesn't sound like we'll have that many witnesses.  So I'm just

19   going to schedule it for the one day for now, but if the

20   parties anticipate that they'll need more time, I'll just leave

21   it up to you to let me know that.  But right now we'll just

22   schedule a full-day hearing for November 12th.  And it may be

23   that we don't -- I'm not inviting you all to make the whole

24   day, to be clear, but we'll at least have that day in case we

25   need it.

1          MR. BURSHTEYN:  We can meet and confer, too, about
2    length, see if we can agree on anything, maybe.  Like I said,
3    at the last one of these it went three weeks with four
4    witnesses.
5          THE COURT:  That was for a preliminary injunction?
6          MR. BURSHTEYN:  Yeah.
7          THE COURT:  I thought you said that was a bench
8    trial.
9          MR. BURSHTEYN:  It was a PI bench trial.
10          THE COURT:  Oh, a PI bench trial.
11          MR. BURSHTEYN:  It turned into a full-blown competing
12    claims both sides.
13          THE COURT:  Okay.  Well, we hope that doesn't happen
14    here.
15       November 12 will be the day for the hearing.  The deadline
16    for plaintiff's responses to both the transfer motion and the
17    TRO motion will be next Thursday.  The deadline for defendant's
18    replies will be the following Wednesday.  So that's November
19    5th and then the hearing's the following week.
20       Is there anything else that we should take up, Mr. Levy,
21    from your perspective?
22          MR. LEVY:  I don't think so, Your Honor.  Thank you
23    so much for your time.
24          THE COURT:  Sure.  Mr. Burshteyn?
25          MR. BURSHTEYN:  No, Your Honor.  Thank you.  We

1    appreciate the Court's time and attention.

2              THE COURT:  All right.  Thank you all.  I'll see you

3    in November.

4         (The proceedings concluded at 4:19 p.m.)

5                   CERTIFICATE OF OFFICIAL REPORTER

6         I, Amanda L. Longmore, Registered Professional Reporter
     and Federal Certified Realtime Reporter, in and for the United
7    States District Court for the District of Maryland, do hereby
     certify, pursuant to 28 U.S.C. § 753, that the foregoing is a
8    true and correct transcript of the stenographically-reported
     proceedings held in the above-entitled matter and that the
9    transcript page format is in conformance with the regulations
     of the Judicial Conference of the United States.

10

              Dated this 24th day of October 2025
11                 -S-
             _____

12           AMANDA L. LONGMORE, RPR, CRR, FCRR
             FEDERAL OFFICIAL COURT REPORTER
13

14

15

16

17

18

19

20

21

22

23

24

25

**'90s** [1] - 20:23
**03** [1] - 65:14
**105(2)(b** [1] - 12:10
**10th** [2] - 80:22
**12** [3] - 10:2; 15:20; 82:15
**12(b)(3** [2] - 7:18; 73:13
**12th** [5] - 79:5; 80:12, 19; 81:2, 22
**19** [3] - 32:24; 66:20; 67:1
**1992** [2] - 33:14, 16
**2** [1] - 73:20
**20** [13] - 17:19; 18:8; 25:19; 29:2; 38:8; 39:9, 11-12; 44:17; 50:25; 62:12; 67:16
**2005** [1] - 39:12
**2008** [1] - 14:16
**2025** [8] - 62:5, 10, 15-16; 63:13; 64:1, 3, 22
**24** [1] - 12:9
**25-03246** [1] - 2:4
**25642** [1] - 65:13
**25802** [1] - 65:13
**2:05** [1] - 2:2
**2nd** [1] - 67:7
**3** [1] - 22:19
**30** [1] - 58:15
**3:58** [1] - 76:16
**4** [2] - 15:18; 76:15
**4:10** [2] - 76:15
**50** [1] - 30:16
**500** [1] - 30:16
**5th** [2] - 79:1; 82:19
**6** [1] - 63:1
**65(b)(1)(A** [1] - 76:18
**700** [1] - 41:16
**750** [1] - 41:20
**85** [1] - 65:12
**885** [2] - 33:9, 14
**8th** [2] - 8:17, 22
**977** [2] - 33:8, 14
**9th** [1] - 8:22
**ability** [3] - 28:7; 46:20; 52:16
**able** [11] - 28:10, 14; 29:12; 36:12; 45:1;

**46:15; 53:20; 54:18; 59:13; 61:21; 64:22**
**absence** [1] - 66:15
**absent** [2] - 10:22; 12:9
**abstract** [1] - 57:23
**Abuse** [2] - 5:2; 45:1
**access** [25] - 5:10; 21:8, 22; 26:16; 39:1, 18, 21; 44:12; 46:5-7; 48:7; 51:17; 53:23; 54:3, 5, 8; 59:14; 61:17; 64:5; 68:3, 5; 69:13; 70:10
**accessing** [1] - 57:4
**accommodate** [1] - 77:3
**account** [1] - 22:14
**accusing** [1] - 15:24
**act** [4] - 22:9; 30:3; 49:11
**Act** [22] - 5:2, 4; 21:7, 10, 25; 22:3; 23:15; 34:18, 25; 35:6; 38:1; 42:18, 21, 23; 43:1; 45:1; 65:4; 66:14; 69:24
**action** [1] - 29:8
**actions** [1] - 31:7
**activity** [4] - 21:14; 40:9; 50:11; 76:20
**acts** [1] - 22:23
**actual** [4] - 48:21; 70:24
**add** [2] - 62:23; 66:18
**added** [1] - 27:8
**addition** [1] - 27:18
**additional** [7] - 12:14, 18; 16:9, 15; 51:8; 55:13; 77:13
**address** [8] - 7:12; 17:9; 28:15; 34:24; 53:9; 57:10; 59:18; 69:17

**addressed** [4] - 30:6; 43:20; 74:25; 75:2
**adequate** [4] - 26:19; 27:4; 64:14
**admissions** [1] - 7:11
**admit** [1] - 74:9
**admittedly** [1] - 15:17
**admitting** [1] - 39:4
**Adobe** [1] - 17:24
**advance** [3] - 49:18; 55:16; 80:3
**advertising** [1] - 63:13
**affect** [2] - 3:20; 53:3
**affected** [1] - 47:15
**affidavits** [3] - 11:1; 73:5, 7
**affirmed** [2] - 20:16
**afford** [1] - 10:17
**AFSOUS** [1] - 3:8
**Afsous** [1] - 3:9
**afternoon** [16] - 2:8, 10, 13-14, 16-17, 19-20, 23; 3:1, 4-5, 7-8, 10
**age** [1] - 17:15
**agencies** [1] - 5:14
**agency** [2] - 65:10, 17
**Agency** [1] - 46:12
**ago** [13] - 8:18; 10:1; 11:24; 14:5; 24:21; 32:1; 39:12; 41:22; 43:18; 44:18; 45:3; 68:16
**agree** [6] - 15:13; 36:18, 23; 59:3; 82:2
**agreed** [3] - 36:14; 37:9, 12
**agreement** [10] - 26:6, 9; 36:8, 17; 37:7, 14; 51:21; 52:10, 24
**ahead** [4] - 78:1, 24; 79:25; 80:6

**aim** [1] - 24:13
**alert** [1] - 49:18
**allegation** [1] - 10:25
**allegations** [2] - 24:21; 77:12
**alleged** [1] - 77:7
**alleging** [2] - 34:2; 50:15
**allow** [6] - 4:19; 24:15; 38:11; 41:11; 51:16; 71:5
**allowed** [2] - 44:5; 54:14
**allowing** [2] - 23:9; 53:15
**allows** [6] - 22:16; 23:8; 24:16; 37:3; 46:7; 76:7
**alone** [1] - 34:4
**alongside** [2] - 52:17; 73:9
**alternative** [1] - 37:19
**altogether** [3] - 20:5; 28:4; 29:22
**amount** [2] - 20:11; 73:18
**analysis** [4] - 9:20; 75:9, 13
**anomalies** [1] - 50:22
**answer** [5] - 43:18; 49:1; 61:6; 73:15; 76:24
**answered** [1] - 35:5
**anticipate** [1] - 81:20
**anticipatory** [3] - 10:7; 15:25; 25:18
**antitrust** [2] - 54:13; 64:7
**antivirus** [1] - 43:24
**anyway** [4] - 45:20; 57:9; 61:6; 72:9
**apart** [1] - 39:10
**API** [47] - 22:15, 18, 23; 23:3; 35:18; 36:5, 7, 10-11, 17, 20, 25; 37:13; 39:7; 41:9, 15, 21, 24; 42:4; 43:3;

**48:24; 51:2, 20, 24; 52:5, 9, 13; 54:8, 20; 64:10, 13; 65:23; 66:2; 68:7; 70:16; 71:4, 11-12; 72:5; 76:2, 6**
**API-based** [1] - 41:10
**APIs** [2] - 66:9; 71:8
**apologize** [4] - 4:1; 33:13, 21; 75:17
**app** [1] - 41:20
**appeal** [2] - 9:3; 80:9
**applicable** [1] - 6:13
**application** [2] - 12:7; 65:20
**applied** [3] - 35:19; 36:2, 4
**applies** [7] - 21:7, 10; 22:3; 23:22; 32:7; 34:18; 35:8
**apply** [6] - 21:25; 22:1; 23:15-17; 70:13
**appreciate** [3] - 15:3; 57:15; 80:21
**approach** [3] - 65:11, 18
**approaching** [1] - 76:15
**appropriate** [5] - 7:3; 8:2; 10:1; 20:8; 74:1
**April** [25] - 18:17; 25:13, 25; 26:13, 16; 27:14, 20; 28:9; 29:8; 45:11; 47:12; 50:12, 15, 19; 59:11, 15; 62:4, 10, 15-16; 64:1, 3, 22; 77:9
**argue** [7] - 4:18; 6:1, 4; 7:3; 9:11; 46:23; 74:10
**argued** [1] - 71:23
**argument** [21] - 6:2; 7:20; 12:19; 13:19; 14:17; 15:12; 16:16, 20-21, 24; 17:2; 22:1; 32:8; 50:9;

**53:24; 59:2; 72:25; 74:3, 18; 75:16, 23**
**arguments** [7] - 4:19; 9:17; 13:13; 32:5; 49:21; 71:23; 73:2
**arise** [1] - 74:2
**arose** [1] - 73:24
**assertions** [1] - 65:22
**assessment** [2] - 59:20; 60:4
**assist** [1] - 16:17
**associated** [2] - 26:13; 73:6
**assume** [1] - 14:5
**assumed** [1] - 16:23
**assuming** [2] - 80:23; 81:10
**attached** [2] - 16:10, 13
**Attachment** [1] - 2:4
**attack** [3] - 57:14, 21; 60:19
**attackers** [1] - 51:11; 68:22
**attacks** [1] - 46:11
**attempt** [1] - 25:2
**attempts** [1] - 50:24
**attorneys** [1] - 16:6
**auditability** [1] - 42:3
**auditing** [1] - 48:20
**authority** [2] - 14:13; 32:20
**authorization** [2] - 39:2; 68:23
**automated** [2] - 6:22; 29:4
**automatically** [3] - 18:1; 26:18; 57:4
**availability** [2] - 79:8; 80:1
**available** [6] - 7:19; 42:8; 55:1; 72:4; 79:5, 9
**avoid** [2] - 9:14; 71:14
**b)(3** [1] - 73:13
**back-and-forth** [1] - 27:23
**backdoor** [1] -

41:6
**backwards** [1] - 43:13
**bad** [9] - 27:4; 44:25; 57:22; 58:21; 59:3, 18-19, 21
**balance** [14] - 4:24; 5:24; 7:25; 9:19; 21:1; 38:6, 14; 44:24; 45:16; 53:10; 54:15; 57:19; 60:3; 67:15
**Baltimore** [1] - 2:15
**bar** [3] - 40:5; 73:13
**Baron** [1] - 32:24
**BARROS** [1] - 2:24
**Barros** [2] - 2:24; 70:15
**Bartlett** [2] - 3:3; 70:15
**BARTLETT** [1] - 3:2
**based** [4] - 24:2; 41:10; 49:6; 77:6
**basis** [3] - 10:5; 11:22; 24:2
**bear** [4] - 22:2; 35:12; 36:6
**bears** [1] - 25:9
**beautiful** [1] - 5:13
**became** [1] - 29:20
**becomes** [2] - 31:18; 60:6
**began** [2] - 19:4; 77:9
**begin** [1] - 18:16
**beginning** [2] - 17:21; 72:15
**behalf** [1] - 70:23
**belabor** [2] - 6:24; 57:9
**Belbacha** [1] - 14:15
**believes** [1] - 12:14
**belong** [3] - 26:23; 64:6
**belongs** [2] - 26:23; 66:13
**bench** [4] - 72:14; 82:7, 9
**best** [7] - 58:11;

74:23; 75:2; 78:2; 80:20
**beta** [1] - 18:18
**better** [2] - 51:11; 60:15
**between** [9] - 22:9, 11; 30:17; 35:11; 43:3; 60:25; 65:25; 66:10; 70:1
**beyond** [3] - 23:6; 28:8, 19
**bifurcation** [1] - 5:23
**big** [2] - 50:1; 75:3
**bigger** [1] - 51:10
**bilateral** [6] - 22:8; 23:12; 65:21; 71:2; 76:9
**bilaterally** [1] - 54:21
**billing** [1] - 66:7
**binding** [1] - 26:9
**bit** [4] - 25:1; 33:22; 43:12; 72:25
**block** [4] - 21:8, 22; 24:6; 25:5
**blocked** [1] - 19:1
**blocking** [9] - 5:9; 18:16, 24; 23:18; 42:21; 53:2; 66:15; 70:5
**blown** [1] - 82:11
**boils** [1] - 6:25
**bot** [3] - 6:22; 53:18; 57:1
**bots** [2] - 18:13; 53:22
**bottom** [2] - 57:9; 71:15
**bounds** [1] - 12:11
**Brad** [1] - 3:5
**bragging** [1] - 45:21
**brazen** [1] - 48:14
**breach** [6] - 31:20; 32:25; 33:24; 34:4; 58:6; 61:5
**breached** [1] - 31:6
**breaches** [3] - 51:7; 60:10; 61:8
**brief** [5] - 15:18; 20:6; 32:24;

62:2; 76:14
**briefed** [5] - 13:14; 73:1; 79:13, 18; 80:2
**briefing** [8] - 3:21; 11:19; 52:6; 57:14; 63:2; 77:2, 4; 78:4
**briefly** [2] - 64:17; 69:18
**bring** [2] - 11:4; 15:16
**broad** [1] - 65:6
**broadly** [1] - 65:7
**broken** [2] - 44:15; 47:20
**build** [5] - 23:4; 30:24; 38:14; 68:11, 20
**built** [3] - 36:20; 44:10; 69:8
**bullet** [2] - 23:1, 3
**bunch** [2] - 60:25; 68:4
**burden** [12] - 7:5; 22:2; 23:21; 24:1; 32:10; 35:12; 36:6; 37:18; 66:17; 72:10, 17
**burden's** [1] - 23:25
**burdens** [1] - 71:25
**BURSHTEYN** [67] - 2:20; 3:25; 4:2, 6; 6:12, 17; 7:17, 24; 8:2, 9, 13, 17, 23; 9:13; 10:21; 11:3; 12:21; 15:5, 7, 10; 16:5; 28:12; 38:24; 45:12; 46:1, 25; 47:3, 10, 13, 16; 48:6; 49:9, 16; 50:8, 16; 51:25; 52:7, 12, 14; 53:8; 58:4, 10; 59:7, 12; 60:5, 8, 14; 67:24; 69:20; 73:8; 74:6; 78:22, 24; 79:2, 6, 11, 17; 80:7, 16, 20, 24; 81:9; 82:1, 6, 9, 11, 25
**Burshteyn** [9] - 2:21; 3:23-25; 4:1; 15:5; 38:23;

82:24
**business** [11] - 32:9, 21; 33:19; 34:12; 40:9, 21; 44:1, 20; 69:7; 71:7
**businesses** [1] - 17:18
**busted** [1] - 47:20
**button** [5] - 17:25; 18:3; 29:7, 21; 36:16
**buttons** [2] - 41:20; 70:18
**campaign** [1] - 19:6
**canceling** [1] - 64:10
**cannot** [5] - 19:14; 37:8; 39:11; 55:24; 71:25
**capability** [1] - 36:10
**CAPTCHA** [6] - 6:20; 56:23-25; 57:1
**care** [4] - 46:18; 55:18; 59:1; 60:22
**careful** [2] - 49:18; 55:15
**carefully** [1] - 55:20
**carriers** [2] - 17:13; 37:12
**carry** [1] - 67:5
**cart** [1] - 74:13
**carve** [2] - 43:8; 54:19
**case** [39] - 3:14, 20; 6:9, 11-13, 15, 19; 7:18; 8:16; 10:23; 14:6, 10; 18:10; 20:14, 24-25; 31:24; 32:24; 33:5, 14; 41:12; 52:22; 53:14; 54:17; 56:23; 57:7; 58:19; 65:6; 70:5; 72:18, 20; 73:7; 74:15, 21; 81:24
**cases** [5] - 48:13; 54:4, 13; 64:7; 74:19
**cat** [1] - 51:9
**cat-and-mouse** [1] - 51:9

**caused** [6] - 9:15; 30:13; 44:15, 21; 55:13; 59:5
**causes** [5] - 38:10; 42:7; 46:6; 68:14, 25
**causing** [1] - 46:23
**central** [2] - 22:23; 23:14
**CEO** [11] - 26:8; 36:6; 39:15, 18; 40:25; 51:5; 59:23; 61:9
**certain** [1] - 70:19
**certificate** [3] - 20:2; 25:9; 65:3
**certificates** [1] - 43:24
**CFAA** [3] - 40:4; 49:13; 53:20
**challenge** [2] - 65:19; 76:22
**chance** [3] - 4:8; 14:5; 79:14
**change** [3] - 27:10
**changed** [1] - 29:25
**changing** [1] - 9:20
**Channel** [1] - 20:24
**characterize** [1] - 15:14
**check** [4] - 58:16; 79:6; 80:1, 14
**Chief** [2] - 41:25; 47:17
**choice** [3] - 4:17; 10:7; 29:9
**choosing** [1] - 45:19
**chosen** [2] - 44:1; 52:24
**chronology** [3] - 19:2, 12; 25:1
**Circuit** [25] - 9:3; 14:10, 14, 16, 18; 18:10; 20:16, 23; 21:13; 30:22; 32:13; 33:6, 15; 37:17; 42:17, 20; 52:21; 53:14, 21; 54:12, 23; 70:6; 80:10
**circumvent** [1] - 39:6

**CISA** [1] - 46:11
**CISO** [3] - 52:1; 59:8; 68:1
**citation** [2] - 33:12; 64:20
**cite** [11] - 6:9, 12; 14:10, 14; 20:24; 32:20, 24; 33:8; 43:7; 65:11; 74:20
**cited** [3] - 35:21; 62:25; 75:23
**civil** [2] - 2:4; 16:7
**claim** [27] - 5:7; 9:10; 31:2, 16, 21-22; 32:2, 8, 12; 33:9, 18; 34:7, 20-21; 39:9; 40:3, 7-8, 20-21; 53:20; 60:24; 71:18
**claimant** [1] - 2:21
**claimed** [1] - 24:9
**claiming** [1] - 27:13
**claims** [22] - 9:23; 17:12; 21:15; 26:17; 28:7; 29:18; 35:13; 40:1, 5-6; 42:1, 4; 43:6; 48:22; 58:22; 63:19; 67:5; 71:21; 82:12
**clarify** [1] - 71:17
**clauses** [1] - 61:1
**clear** [9] - 8:11, 14, 21; 19:10; 22:21; 24:2; 25:10; 32:3, 14; 37:17; 45:23; 49:1; 65:23; 75:16; 76:18; 80:8; 81:24
**cleared** [1] - 73:13
**clearinghouse** [7] - 42:8; 43:4; 48:25; 51:21; 64:11; 70:1
**clearinghouses** [2] - 65:5, 9
**clearly** [5] - 16:1; 20:11; 22:14; 38:6, 15
**CLERK** [1] - 2:3
**click** [2] - 41:19; 70:18
**client** [15] - 5:1;

13:11, 21; 18:6,
8; 27:19, 21;
28:15; 30:20;
31:10; 49:7;
60:12; 63:17;
64:10, 22
**client's** [11] -
20:21; 25:9;
27:1; 28:19;
29:25; 30:14,
16; 31:5; 38:13;
58:2; 59:1
**clients** [16] - 16:7;
23:10; 24:11;
25:22; 28:3;
29:17; 30:16,
20; 36:12, 19,
22; 37:8; 51:5;
76:7; 80:14
**clients'** [1] - 28:6
**close** [4] - 4:2;
7:4; 57:6; 72:10
**closely** [1] - 39:10
**closer** [2] - 41:1;
74:24
**Cloud** [1] - 39:13
**code** [4] - 29:25;
39:12; 45:5, 7
**collapses** [1] -
71:10
**colleague** [1] -
66:18
**collectively** [1] -
62:19
**combination** [1] -
35:23
**comfortable** [1] -
4:5
**coming** [7] - 31:3;
32:2; 49:10;
52:5; 57:1; 78:6;
80:25
**comment** [6] -
32:1; 37:24;
65:8, 13, 17
**commercial** [4] -
44:3; 52:20;
53:3; 54:25
**committed** [1] -
48:15
**common** [1] -
63:8
**communicate** [3]
- 22:17; 24:11;
66:10
**communicated**
[1] - 55:16
**communicated-
in-advance** [1] -
55:16

**communication**
[6] - 22:5, 9, 11,
13, 24; 65:21
**Communication
s** [1] - 5:3
**communication
s** [6] - 23:12;
37:25; 39:19;
61:20; 65:25
**companies** [1] -
53:16
**company** [2] -
5:14; 41:13
**compete** [7] -
19:10; 54:11;
58:13; 62:7, 21;
63:7
**competing** [6] -
19:4, 17; 21:17;
24:17; 63:5;
82:11
**competition** [14] -
20:11; 21:5, 12,
18, 21; 32:15;
33:9; 34:19;
37:22; 40:21;
60:24; 62:6, 21;
71:18
**competitive** [2] -
24:12; 40:9
**competitor's** [1] -
21:17
**competitors** [1] -
54:6
**complaining** [1] -
49:16
**complaint** [1] -
4:10
**complaints** [5] -
47:23; 48:15;
49:10; 59:9;
62:14
**complete** [3] -
53:10; 77:2;
78:3
**completely** [6] -
26:25; 28:3, 20;
53:4; 60:23;
71:7
**complex** [4] -
24:20; 42:19;
44:11; 71:15
**complicated** [2] -
41:14; 72:14
**complied** [1] -
54:2
**computer** [9] -
40:3; 41:13;
43:2; 44:7; 46:5,
19; 47:6; 65:1

**Computer** [2] -
5:2; 45:1
**computers** [4] -
20:1; 43:23;
44:18; 65:1
**concede** [1] -
24:23
**concept** [1] -
42:24
**concern** [2] -
60:2; 62:8
**concerned** [1] -
44:23
**concerns** [2] -
49:10; 52:23
**concludes** [1] -
23:17
**conclusion** [2] -
77:5, 17
**concrete** [1] -
57:24
**conduct** [20] -
21:16; 30:13;
31:23; 32:6, 14;
34:6; 35:16;
40:7, 22; 44:20,
22; 49:17;
50:14; 56:6;
57:7; 58:2; 64:1;
77:8, 16
**confer** [1] - 82:1
**conference** [3] -
8:5; 79:18
**confusing** [1] -
70:1
**connect** [1] -
24:16
**connected** [1] -
24:23
**connections** [1] -
54:21
**consent** [1] -
12:17
**consented** [1] -
10:10
**consequences**
[1] - 68:15
**consider** [2] -
38:3; 74:22
**consideration** [2]
- 13:12; 75:12
**considered** [2] -
9:17; 74:23
**considering** [1] -
7:24
**consistent** [1] -
54:13
**consistently** [1] -
55:3
**constant** [1] -

51:12
**construction** [2] -
5:8; 42:19
**contend** [2] -
49:6; 67:23
**contest** [1] -
77:23
**contested** [4] -
40:22; 41:9;
49:12; 70:6
**contests** [1] -
77:15
**context** [2] - 5:24;
13:22
**continually** [1] -
40:25
**continue** [4] -
13:20; 30:13;
45:23; 55:9
**continued** [1] -
4:16
**continuing** [2] -
8:19; 20:20
**continuous** [1] -
51:9
**continuously** [1] -
46:4
**contract** [13] -
21:19; 31:14,
16, 18, 20; 32:7;
33:20; 34:2, 4,
11; 40:7
**contracts** [3] -
31:5, 9; 60:25
**convenience** [3] -
73:11; 74:21
**conveniences** [1]
- 75:1
**conveniens** [2] -
75:8, 13
**convince** [1] -
24:12
**coordinator** [1] -
70:22
**copy** [1] - 22:22
**Corp** [1] - 32:25
**correct** [7] - 6:15;
18:5; 28:11;
50:24; 54:23;
68:3; 78:7
**correctly** [2] -
3:24; 48:1
**corrupted** [2] -
42:7; 58:23
**corrupts** [2] -
42:1; 48:19
**counsel** [10] - 2:7;
11:11, 15;
43:18; 50:9;
53:9; 55:24;

67:19; 70:15
**counter** [1] - 2:21
**counter-
claimant** [1] -
2:21
**counterclaims** [2]
- 4:18; 10:3
**couple** [4] -
24:21; 68:16;
69:17; 73:11
**course** [14] - 5:20;
12:8, 10; 14:18;
16:15; 21:7;
23:15; 25:3;
34:1, 3; 75:6,
22; 78:11
**court** [14] - 2:3;
4:9, 13, 23;
10:2, 24; 12:9;
18:10; 20:15;
41:22; 72:22;
73:6; 75:7
**Court** [89] - 2:6;
4:11; 5:18,
21-23; 6:24;
7:17, 19; 8:3,
24; 9:25; 10:22;
11:19; 12:2, 13,
17; 13:12, 25;
14:12, 18, 23,
25; 16:14, 17,
21, 23; 20:15,
25; 22:21;
23:17, 25; 25:5;
26:10; 33:11,
24; 35:14; 38:3,
17; 39:4, 24;
40:12, 18;
42:17, 20, 22;
43:16; 50:5, 24;
51:14; 53:11;
54:22; 55:4, 6,
10; 56:6, 14;
57:16; 58:19;
63:16, 24; 64:9;
66:3, 19; 67:9,
11, 17; 69:2,
11-12, 20-21;
70:3; 72:11, 18;
73:15; 74:4, 16;
79:2, 11-12, 14,
18; 80:3; 81:13
**COURT** [140] -
2:10, 13, 16, 19,
23; 3:1, 4, 7, 10;
4:1, 4; 6:11, 15;
7:15, 23; 8:1, 8,
10, 15, 21; 9:8;
10:19, 25;
11:10, 14;

12:20, 23; 13:3,
6, 9; 14:1, 8, 24;
15:3, 6, 9; 16:4,
8, 18, 22; 17:2,
5; 18:3; 25:10,
15; 26:12; 27:6,
11, 18; 28:1, 8,
13, 25; 29:21;
30:2, 9, 11;
31:2, 9, 14, 25;
32:5, 18, 20;
33:2, 4, 7, 12,
16, 18; 34:1, 9,
22; 35:2; 36:15,
25; 37:5; 38:20,
23; 45:9, 24;
46:24; 47:1, 4,
11, 14; 48:3;
49:1, 15; 50:7,
9; 51:23; 52:4,
8, 13; 53:7;
57:19; 58:8;
59:6, 11, 16;
60:6, 12; 61:24;
66:22, 25; 67:2,
18; 69:19;
72:24; 74:5, 8;
75:18, 21, 25;
76:5, 11, 17;
78:10, 13, 18,
20, 23, 25; 79:4,
10, 16, 20, 25;
80:12, 19, 22;
81:4, 8, 15;
82:5, 7, 10, 13,
24
**court's** [1] - 9:23
**Court's** [12] -
5:21; 6:6; 7:2, 6;
12:8, 12; 13:14;
37:17; 54:24;
55:22; 57:12;
72:21
**courtroom** [1] -
16:12
**courts** [3] - 9:1;
34:13; 75:2
**cover** [1] - 71:1
**coverage** [1] -
70:2
**covered** [1] - 70:4
**craft** [1] - 69:14
**create** [1] - 67:22
**created** [1] -
47:19
**creates** [4] - 46:8;
48:17; 67:23
**creating** [2] -
9:14; 43:6
**critical** [3] -

10:13; 11:5;
41:8
**CRMs** [1] - 24:17
**cross** [5] - 72:6,
23; 77:1, 24;
78:2
**cross-**
**examination** [1]
- 77:24
**cross-examine**
[2] - 72:6, 23
**cross-motions**
[2] - 77:1; 78:2
**CTO** [5] - 28:24;
39:4, 16; 41:22;
61:11
**Cure** [1] - 34:18
**Cures** [17] - 21:7,
25; 22:3; 23:15;
34:18, 25; 35:6;
38:1; 42:18, 21,
23; 43:1; 65:4;
66:14; 69:24
**current** [2] -
40:13; 51:3
**custom** [1] -
52:16
**customer** [8] -
20:22; 29:6;
30:14; 31:17;
36:24; 38:13;
56:8; 59:9
**customers** [31] -
18:16; 19:7;
20:20; 28:21;
29:10, 16;
30:22; 31:5;
35:25; 41:3;
43:15, 17;
44:15, 22; 45:3,
18; 47:15, 23;
49:5, 16, 18;
55:19; 62:14,
18, 24; 67:4;
73:18, 21
**customers'** [2] -
49:22; 64:25
**customized** [1] -
48:25
**cuts** [1] - 49:20
**cybersecurity** [5]
- 5:13; 46:9;
59:24; 60:2, 20
**cybersecurity's**
[1] - 59:17
**D.C** [3] - 14:14,
16, 18
**daily** [4] - 4:15;
5:4; 46:15;
47:21

**damage** [3] -
36:24; 47:6;
76:19
**damages** [1] -
46:5
**damaging** [1] -
46:18
**dangerous** [1] -
46:12
**Daniel** [1] - 2:11
**data** [38] - 6:23;
17:14, 18, 22;
18:12, 19;
19:14; 23:5;
37:4, 8, 11,
13-14; 39:7;
41:7; 42:1;
44:15; 46:8, 17;
47:22; 48:18;
51:20; 53:24;
54:3; 56:3; 58:6;
60:10; 61:2, 8;
64:15; 66:2, 13;
68:24; 72:5
**data's** [1] - 53:24
**database** [15] -
41:3; 42:3, 6-7;
46:7, 18; 47:25;
48:2, 18; 52:17;
56:3; 57:3
**date** [1] - 9:9
**days** [5] - 8:7;
41:22; 45:3;
68:16; 81:17
**deadline** [7] -
11:23; 13:17;
15:17, 20; 78:5;
82:15, 17
**deal** [2] - 58:2;
75:3
**dealing** [1] -
46:15
**debate** [1] - 10:9
**debug** [2] - 45:4;
46:21
**debugging** [2] -
45:5; 48:11
**decent** [1] - 81:12
**decide** [2] - 7:20;
79:14
**decided** [1] - 44:2
**decision** [3] -
14:15; 57:14
**declarants** [1] -
81:10
**Declaration** [1] -
66:20
**declaration** [20] -
8:18; 22:18;
28:24; 30:6;

36:6; 39:3, 6;
41:16; 45:3;
59:8; 63:1, 23;
66:23; 67:3;
68:1, 16; 72:2,
4; 73:22
**declarations** [7] -
7:10; 10:15;
30:15; 45:8;
52:1; 72:1; 73:9
**declined** [1] -
65:10
**decrypting** [1] -
6:23
**deemed** [1] -
26:19
**deep** [1] - 52:16
**deeper** [2] -
50:20, 23
**default** [2] -
13:15; 57:13
**defendant** [16] -
2:19, 21, 25;
3:3, 9, 13, 17;
17:17; 32:11;
52:22; 64:21;
67:19; 76:20,
22; 77:7, 13
**defendant's** [8] -
18:5; 29:5; 31:6;
34:6; 77:2;
78:14, 21; 82:17
**defendants** [1] -
25:12
**defense** [3] -
11:15; 34:25;
37:16
**defenses** [2] -
35:1, 9
**defensive** [2] -
30:3; 51:10
**defines** [1] - 22:4
**definition** [5] -
43:1; 65:6, 19;
70:13; 71:1
**delay** [4] - 9:12,
16, 19; 13:18
**deliver** [1] - 59:1
**demands** [1] -
48:13
**denial** [4] - 7:3;
8:2; 11:5; 56:17
**denied** [4] - 4:12;
6:2, 9, 16; 12:2;
80:10
**dental** [13] -
17:12, 17, 24;
22:16; 24:16;
25:8; 26:17;
47:19; 48:1;

58:7; 65:2, 25;
66:10
**dentist** [7] - 41:5;
46:3; 55:25;
58:25; 59:4;
61:1
**dentists** [3] -
20:1; 37:11;
66:9
**Dentrix** [1] - 69:10
**deny** [5] - 6:6; 7:6,
21; 56:17; 72:18
**deploy** [3] -
21:16; 68:14
**deployed** [13] -
18:18; 19:23;
24:7; 25:11;
26:1, 6; 27:2;
28:2, 17; 45:10;
51:22; 67:8
**deploying** [3] -
25:7; 37:24;
64:25
**deployment** [2] -
34:16; 36:3
**depositions** [1] -
56:16
**deputy** [1] - 16:12
**Derek** [1] - 2:14
**describe** [2] -
19:24
**described** [3] -
27:22; 76:2
**describing** [1] -
29:3
**description** [1] -
57:22
**descriptive** [1] -
61:15
**deserves** [2] -
72:22
**designed** [1] -
44:10
**detailed** [2] -
28:23; 30:15
**details** [1] - 50:17
**determine** [2] -
38:5; 70:3
**determining** [1] -
56:6
**develop** [1] -
70:16
**developed** [4] -
43:8; 54:19;
55:3; 68:8
**development** [1] -
68:9
**develops** [2] -
5:10; 46:14
**deviation** [1] -

75:16
**device** [1] - 18:12
**DeVries** [1] - 2:15
**difference** [2] -
43:3; 53:6
**different** [9] -
6:18; 39:12;
41:20; 42:12;
44:6; 71:7
**dilatory** [1] - 9:12
**directed** [1] - 9:24
**disable** [3] - 20:1;
21:17; 25:8
**disabled** [9] -
18:19; 20:5;
24:25; 26:25;
27:20; 28:4, 6,
18; 35:23
**disables** [3] -
30:7; 43:19;
65:3
**disabling** [2] -
28:19; 37:24
**disagreement** [2]
- 35:11, 20
**disconnect** [1] -
36:19
**discovery** [3] -
40:14; 56:15;
72:19
**discriminatory** [1]
- 35:19
**discuss** [1] -
60:17
**discussion** [3] -
56:5; 65:13;
76:3
**discussions** [1] -
26:5
**disfavored** [1] -
10:8
**dismiss** [4] - 7:18;
11:23; 13:10;
14:3
**disposition** [1] -
67:10
**dispute** [18] -
5:24; 14:11;
15:24; 17:10;
18:23; 21:6, 20;
24:14; 26:3;
33:23; 35:7, 17;
54:18; 56:12;
64:18; 73:23, 25
**disputed** [13] -
17:20; 20:7;
21:3, 11; 30:10;
56:10; 62:12;
63:1; 64:3, 13,
16

**disputes** [5] -
6:19; 7:11;
14:21; 53:2;
77:15
**disrupt** [1] - 40:8
**disruption** [2] -
58:24; 59:3
**distinction** [2] -
4:25; 34:10
**district** [1] - 3:19
**DMCA** [2] - 5:3;
45:2
**doctrine** [1] - 12:7
**document** [3] -
16:11; 22:20;
76:12
**documentary** [1] -
7:9
**documents** [1] -
56:15
**done** [8] - 8:6;
16:1; 19:9;
28:15; 39:11;
58:14; 61:10;
66:11
**door** [1] - 58:14
**doors** [1] - 47:20
**down** [8] - 6:25;
14:22; 27:24;
44:4; 54:12;
55:15; 60:24;
80:11
**dozen** [1] - 41:13
**driver** [43] - 17:23;
18:6, 13, 16, 19,
25; 19:13, 18,
20; 23:20; 24:7,
9, 15, 24-25;
25:20; 26:1, 16;
35:23; 36:1, 12,
18; 37:24;
38:10; 44:11;
58:5; 61:22;
62:11, 20, 25;
63:4, 11-12, 14;
64:23; 67:5;
68:4, 19, 21;
69:9, 23
**drivers** [1] - 46:10
**drives** [2] - 5:4;
45:14
**due** [9] - 11:23;
13:4, 7, 10, 12;
67:6; 78:8
**during** [4] - 36:13,
20; 59:25; 65:17
**duties** [1] - 54:2
**duty** [1] - 54:4
**e-mail** [2] - 39:20;
41:19

**early** [4] - 13:24; 39:25; 56:13, 19
**easily** [1] - 30:25
**ECPA** [2] - 5:3; 45:2
**ed** [1] - 15:17
**EDS** [1] - 62:24
**effect** [3] - 28:6; 56:20; 65:8
**effectively** [1] - 36:19
**effects** [1] - 66:19
**efficient** [2] - 5:16; 15:23
**effort** [9] - 14:22; 19:10; 24:19; 25:6; 62:7, 20-21; 65:5; 66:4
**efforts** [2] - 24:6, 24
**either** [8] - 7:19; 10:9; 16:25; 29:9; 59:25; 64:16; 80:1, 6
**electronic** [2] - 60:10; 70:10
**Electronic** [2] - 2:4; 5:3
**electronically** [1] - 17:16
**elements** [2] - 21:15; 72:11
**eliminate** [1] - 28:17
**eliminated** [1] - 29:15
**emboldened** [2] - 8:20; 55:11
**emboldening** [1] - 55:11
**emergency** [1] - 80:9
**employ** [1] - 81:11
**en** [1] - 46:8
**enable** [3] - 22:5; 29:25; 70:9
**enabled** [1] - 70:13
**enables** [3] - 22:24; 23:3, 9
**enabling** [1] - 23:5
**encryption** [6] - 6:23; 39:5; 41:7; 57:5; 61:17; 72:3
**end** [6] - 7:7; 31:10; 47:9;

55:15; 68:20; 72:15
**ended** [1] - 72:13
**endless** [1] - 23:7
**endpoint** [3] - 41:15; 42:5; 48:24
**endpoints** [3] - 66:2; 71:5, 11
**engaged** [2] - 50:10, 14
**engaging** [1] - 77:8
**engineer** [1] - 43:2
**engineering** [1] - 42:15
**engineers** [1] - 41:13
**enjoin** [3] - 50:6; 69:2, 12
**enjoined** [1] - 25:3
**enlisting** [1] - 55:9
**ensure** [3] - 42:3; 67:25; 70:25
**enter** [6] - 12:13, 15; 14:13, 18; 38:3; 67:9
**entered** [1] - 20:15
**entering** [1] - 38:6
**entire** [2] - 10:12; 39:9
**entities** [4] - 22:5; 70:12, 25
**entity** [2] - 70:12, 24
**equitable** [1] - 10:4
**equities** [15] - 4:24; 5:24; 7:25; 9:19; 38:6, 15; 44:24; 45:16; 53:10; 54:16; 57:19; 60:3; 62:5; 67:15
**equity** [2] - 21:1; 63:9
**equivalent** [1] - 75:8
**escalated** [2] - 48:14; 51:19
**escalating** [1] - 45:17
**escalation** [2] - 28:5; 68:2
**essentially** [10] - 4:17; 5:8; 8:5;

9:24; 48:18; 51:12; 69:2, 10; 71:1, 5
**establish** [7] - 21:4, 11, 14; 27:12; 28:14; 34:7; 73:5
**eTrans** [1] - 68:17
**evaluate** [5] - 5:23; 14:7; 42:20, 22; 74:17
**evenhandedly** [3] - 35:19; 36:2, 4
**event** [1] - 5:11
**EventBridge** [1] - 18:20
**evidence** [50] - 7:9; 8:4, 19; 12:14, 18; 16:9, 13, 15, 24; 18:22; 19:1; 20:19; 24:9; 26:3; 35:21; 41:25; 43:16; 44:15; 46:10, 17; 47:17; 50:10, 13; 52:23; 55:13; 57:16; 59:6, 13-14; 60:7; 61:7; 62:11, 13, 17; 63:15, 22; 66:20; 67:11, 14; 71:4; 73:5, 10, 16, 22-23; 74:6; 76:23; 77:15, 24
**evidentiary** [10] - 6:7, 10; 7:7; 12:16; 38:3; 55:23; 76:25; 77:21; 78:1
**evolved** [1] - 39:14
**exact** [1] - 19:12
**exactly** [4] - 45:13; 51:2; 58:10
**examination** [1] - 77:24
**examine** [2] - 72:6, 23
**example** [4] - 6:8; 23:12; 24:13
**exception** [6] - 23:23; 35:9; 70:1; 71:10
**exceptions** [4] - 23:22; 24:3; 66:16

**Exchange** [3] - 22:15; 65:24; 76:2
**exchange** [12] - 18:25; 22:16; 23:5; 41:23; 43:4; 66:13; 70:10, 14, 20, 24; 71:3; 76:9
**exchanges** [4] - 22:4, 8; 54:22; 71:2
**excluded** [1] - 65:10
**exclusion** [1] - 65:16
**executive** [1] - 51:4
**executives** [1] - 51:17
**exercising** [1] - 73:6
**exfiltrate** [1] - 56:3
**exfiltrating** [1] - 46:17
**exhibit** [1] - 75:18
**exist** [1] - 52:19
**existed** [1] - 38:8
**exists** [1] - 71:12
**expectation** [1] - 60:23
**expecting** [1] - 72:25
**expensive** [1] - 58:17
**experts** [1] - 72:20
**explain** [3] - 35:8; 55:24; 64:19
**explained** [2] - 16:3; 40:23
**explanation** [1] - 20:8
**explanations** [1] - 55:24
**explicitly** [1] - 54:19
**express** [2] - 65:4, 16
**extended** [1] - 67:13
**extension** [1] - 23:6
**extent** [1] - 77:16
**F.2d** [2] - 33:8, 14
**face** [1] - 43:7
**faced** [1] - 29:9
**facially** [2] - 23:18
**facilitate** [2] -

65:24; 71:3
**facilitated** [2] - 23:2, 13
**facilitates** [3] - 22:8, 13; 54:20
**facilitating** [2] - 43:9; 70:20
**facilitation** [1] - 65:21
**fact** [12] - 13:3; 19:9; 35:23; 42:19; 49:14, 17; 51:17; 52:4; 62:8; 63:21; 64:3; 65:16
**fact-intensive** [1] - 42:19
**factors** [3] - 53:13; 73:11
**facts** [10] - 20:13, 18, 25; 21:3, 11; 24:2; 37:22; 56:19; 63:18, 24
**factual** [7] - 6:19; 7:11; 16:14; 52:25; 53:2; 56:14; 77:15
**factually** [1] - 63:24
**FAHRENTHOLD** [1] - 2:11
**Fahrenthold** [1] - 2:11
**fair** [1] - 20:10
**fairly** [1] - 38:10
**falls** [2] - 39:10; 42:25
**familiar** [1] - 66:3
**familiarity** [1] - 43:2
**family** [1] - 80:17
**far** [5] - 15:16; 37:7; 53:1; 54:25
**fashion** [1] - 36:2
**fast** [2] - 13:23
**favor** [1] - 38:6
**favored** [1] - 21:1
**favors** [1] - 38:15
**feature** [1] - 68:8
**features** [1] - 68:13
**Fed** [1] - 65:12
**federal** [9] - 5:2; 9:1; 21:7; 39:1; 57:6; 63:17; 67:13; 71:19; 75:7
**Federal** [1] - 65:12

**few** [2] - 53:8; 74:10
**field** [1] - 41:19
**fields** [1] - 70:19
**fights** [2] - 14:21; 30:17
**figure** [6] - 27:7; 34:10; 59:19; 72:19; 79:19; 81:15
**file** [7] - 13:17, 24; 14:25; 15:1; 18:1; 45:4; 78:13
**filed** [23] - 3:13; 4:10, 21; 5:20; 6:14; 8:16, 21; 9:18; 10:23; 11:23, 25; 12:3, 7; 14:4; 15:18; 19:22; 24:21; 40:3; 77:10
**filing** [10] - 4:7, 16; 9:9; 10:6; 12:8; 15:25; 16:2; 25:17; 29:18
**fill** [1] - 69:23
**final** [1] - 9:6
**finally** [1] - 56:4
**financial** [3] - 32:24; 42:2; 48:21
**fine** [8] - 4:5; 15:8, 20; 17:5; 31:4; 33:4; 43:17; 50:25
**fingers** [2] - 17:7
**firing** [1] - 48:1
**firm** [1] - 77:17
**first** [21] - 10:23; 12:7; 16:24; 18:14, 17, 25; 22:23; 24:7, 13, 24; 26:7; 28:23; 34:4; 36:1; 39:3; 42:21; 62:3; 65:12; 66:22; 74:14
**first-filed** [2] - 10:23; 12:7
**five** [1] - 43:18
**fix** [1] - 45:6
**flagged** [1] - 46:12
**flavor** [1] - 75:15
**flexible** [2] - 65:11, 18
**flood** [2] - 9:1; 10:1

**flow** [2] - 46:22;
48:21
**fly** [1] - 81:1
**flying** [1] - 80:25
**flyspeck** [3] -
37:18; 42:18;
54:24
**focus** [2] - 32:16;
76:17
**focused** [1] -
75:15
**follow** [1] - 12:23
**follow-up** [1] -
12:23
**following** [4] -
78:21, 25; 82:18
**foray** [1] - 45:20
**forced** [1] - 29:16
**formed** [1] - 74:23
**former** [4] - 32:12;
49:9, 14; 81:12
**forth** [3] - 8:14;
27:23; 64:10
**forum** [8] - 4:9;
9:15; 10:8;
14:20; 15:25;
55:12; 75:8, 13
**forward** [1] -
11:14
**four** [1] - 82:3
**fours** [1] - 53:4
**Fourth** [17] -
14:10; 18:10;
20:16, 23;
21:13; 30:22;
32:13; 33:6, 15;
37:16; 42:17,
20; 52:21;
54:12, 23; 70:6
**fourth** [1] - 11:17
**frame** [2] - 25:11,
15
**frankly** [2] -
48:12; 55:17
**Fraud** [2] - 5:2;
45:1
**free** [2] - 53:25;
61:22
**free-for-all** [1] -
61:22
**Friday** [2] - 78:17
**friend** [3] - 63:2;
64:18; 65:4
**friend's** [1] -
65:22
**friends** [2] -
14:21; 38:19
**front** [3] - 69:15;
77:6, 22
**full** [10] - 5:24;

72:2, 25; 76:22;
77:3, 21-22;
81:22; 82:11
**full-blown** [1] -
82:11
**full-day** [1] -
81:22
**fully** [6] - 6:6;
7:21; 73:1;
74:23; 79:13, 18
**function** [18] -
17:13, 24; 18:3;
20:5; 22:16;
26:16; 37:1, 24;
45:5; 48:3;
64:14; 67:21;
68:8, 13; 71:6
**functionality** [6] -
23:6; 26:1;
27:21; 52:11;
68:20
**functions** [3] -
23:2; 64:11
**future** [1] - 34:3
**game** [2] - 51:10,
12
**gathering** [1] -
18:20
**given** [8] - 9:23;
13:11; 16:20;
18:22; 34:18;
35:21; 66:16;
72:6
**goal** [1] - 70:25
**Goldberg** [3] -
2:9, 12, 18
**Goodell** [1] - 2:15
**governed** [1] -
42:22
**Government** [1] -
46:11
**grandmother** [2] -
80:24
**grant** [4] - 6:10;
39:24; 53:12;
69:12
**granted** [4] - 6:9,
16; 55:6; 57:12
**granting** [1] - 11:9
**great** [2] - 61:10;
80:25
**great-**
**grandmother** [1]
- 80:25
**ground** [1] - 56:17
**grounds** [5] -
7:19; 9:22;
56:17; 62:7, 22
**guess** [20] -
13:12, 22; 28:9,

16, 18; 29:2, 9;
31:4; 45:10;
47:7; 59:22;
60:6, 13; 73:4,
6; 78:2; 79:11,
23; 80:24; 81:4
**gun** [1] - 25:18
**guys** [1] - 58:12
**hac** [1] - 15:17
**hac-ed** [1] - 15:17
**hack** [5] - 10:11;
39:1; 43:22;
56:2; 68:21
**hacked** [4] - 4:20;
5:1; 41:6; 45:17
**hacker** [1] - 44:4
**hackers** [1] -
47:21
**hacking** [24] -
4:16; 5:7; 6:19;
11:1; 18:23;
19:2; 24:20,
22-23; 26:3;
28:11; 40:3;
44:1, 13; 50:11,
15; 55:9; 57:3,
21; 63:15,
18-19; 64:4
**hacks** [6] - 45:22,
24; 48:19;
51:22; 55:13;
69:6
**half** [1] - 73:19
**hand** [9] - 13:20;
26:18; 44:13;
45:18; 66:1, 10
**handed** [1] -
16:11
**happy** [1] - 61:22
**hard** [4] - 31:1;
38:14; 50:3;
57:20
**hardships** [1] -
73:6
**harm** [28] - 20:17;
21:1; 26:18,
23-24; 27:3;
28:5; 30:12, 14,
23; 38:11;
43:12; 44:19;
46:23; 55:2;
61:4; 62:5;
64:17-20, 24;
79:22, 24
**harmed** [3] - 9:10;
13:11, 19
**harmful** [2] -
59:15
**harming** [1] -
27:19

**harms** [8] - 20:21;
26:12, 15;
28:15; 46:22;
47:2; 57:23
**harness** [1] -
68:12
**hash** [1] - 57:17
**head** [3] - 28:12;
29:1; 52:2
**health** [4] - 22:4;
51:7; 70:10, 22
**healthcare** [3] -
60:11; 65:5, 9
**healthy** [1] -
60:18
**hear** [16] - 3:16;
7:13; 8:3; 11:9;
12:18; 16:24;
17:2; 38:4;
43:16; 61:25;
64:20, 24;
67:11; 74:4
**heard** [6] - 16:3;
67:14; 69:20;
71:21; 73:15
**hearing** [19] - 2:6;
3:11; 6:7, 10;
7:8; 11:19; 12:9,
11, 16; 38:4;
76:25; 78:1;
79:5, 13; 80:3;
81:17, 22; 82:15
**hearing's** [1] -
82:19
**heightened** [1] -
60:2
**held** [2] - 30:22;
42:20
**helped** [1] - 51:17
**helpful** [1] - 17:8
**helps** [1] - 17:17
**Henry** [3] - 2:5,
22; 4:7
**HIE** [7] - 43:10;
70:2, 4, 8; 71:6,
9, 13
**high** [2] - 40:5;
74:10
**high-level** [1] -
74:10
**higher** [1] - 32:10
**highest** [1] -
39:25
**highlight** [1] -
73:18
**highlighted** [1] -
75:17
**highlights** [1] -
76:9
**hijacked** [1] - 45:6

**hijacks** [1] - 58:5
**HIM** [2] - 43:10;
71:10
**HIN** [5] - 70:3, 9;
71:6, 13
**hiQ** [1] - 53:14
**history** [1] - 29:3
**hit** [4] - 17:25;
18:7; 29:6;
72:11
**hitting** [1] - 46:19
**Hobson's** [2] -
4:17; 10:7
**hold** [3] - 74:20;
79:4, 12
**holding** [1] -
55:16
**Holwell** [3] - 2:9,
11, 18
**Honor** [85] - 2:8,
14, 17, 21, 24;
3:2, 5, 8; 4:6;
5:1, 6; 7:17;
8:13, 23; 9:13;
10:2, 5; 11:12;
12:21; 14:10;
15:10; 33:1, 6;
34:24; 38:24;
39:4, 9, 15, 17,
20; 40:1, 5, 11,
19; 41:8, 12;
42:11; 43:12;
44:25; 45:12,
17, 22; 46:10;
47:16; 48:7, 12,
20; 49:9; 50:1,
16; 51:9, 25;
53:4, 8, 13;
55:5; 56:3;
57:10, 13;
58:10; 59:12;
60:8, 11, 14;
61:7; 62:1;
66:24; 67:24;
68:15, 24;
69:11, 24;
70:21; 71:15;
72:6, 9; 73:8;
78:24; 79:6, 8;
80:7; 81:9;
82:22, 25
**Honor's** [1] - 27:9
**hook** [1] - 54:11
**hooks** [1] - 54:6
**hope** [1] - 82:13
**horse** [1] - 74:14
**host** [1] - 66:9
**hot** [1] - 68:21
**hour** [2] - 11:24;
14:5

**hourlong** [1] -
74:3
**hours** [2] - 12:9;
24:21
**house** [5] - 47:20,
22; 54:10;
58:16; 68:7
**HSOne** [36] -
4:10, 15-16;
5:1, 9, 18, 23;
6:6; 7:7; 18:15;
19:16; 39:15,
17, 20; 40:23,
25; 41:10; 42:8,
22; 43:20;
45:16, 19, 23;
46:1, 13; 56:1;
57:14; 59:10;
61:21; 66:14;
68:1, 16; 70:4,
17; 72:5, 22
**HSOne's** [9] -
17:22; 39:1, 21;
44:6, 20; 45:18;
46:7; 67:6;
73:19
**hub** [7] - 22:23;
23:14; 41:17;
42:25; 66:12;
76:4
**hundred** [3] -
22:17; 66:6;
70:17
**idea** [8] - 41:15;
42:6; 43:4, 13;
46:13; 52:15;
53:25; 68:16
**ideal** [1] - 81:2
**identified** [4] -
26:3; 30:17;
75:10, 23
**identify** [1] -
24:22
**ignores** [1] - 45:4
**illegality** [4] -
33:11; 34:16,
19; 35:15
**imagined** [1] -
26:8
**imaging** [1] - 66:8
**imagining** [1] -
28:25
**immediate** [2] -
76:19; 77:18
**imminent** [1] -
79:22
**impact** [1] - 45:24
**impacted** [2] -
73:20
**impacting** [1] -

45:18
**impacts** [4] -
9:19; 47:14;
73:25
**impede** [1] - 25:6
**implement** [2] -
47:12; 51:18
**implemented** [4] -
44:14; 46:2;
50:19, 22
**implementing** [3]
- 49:6; 51:8;
55:18
**import** [1] - 51:13
**important** [9] -
4:22, 25; 11:8;
52:21; 59:17;
69:22; 71:17;
81:12
**impossible** [3] -
28:20; 29:17;
69:14
**improper** [1] -
63:4
**Inc** [1] - 2:5
**incident** [1] -
17:19
**inclined** [9] -
5:22; 6:6; 7:2, 6,
18; 13:25;
72:21; 79:12, 15
**include** [1] - 40:3
**including** [5] -
5:19; 7:2; 20:23;
27:22; 45:8
**incomplete** [2] -
56:19
**inconvenience**
[1] - 11:22
**inconveniences**
[1] - 75:11
**increasing** [1] -
40:24
**indeed** [1] - 74:17
**independent** [2] -
40:6; 56:16
**indications** [1] -
72:1
**individual** [2] -
22:11; 70:12
**individuals** [2] -
22:6; 70:11
**industry** [5] -
51:6; 60:10, 13,
19; 61:9
**inefficiency** [1] -
9:14
**information** [26] -
18:1, 25; 20:4;
21:8, 22; 22:4;

23:18, 21; 25:6;
26:21; 29:4, 10,
16; 32:1; 42:2,
21; 43:4; 46:11;
48:21; 54:14;
66:15; 70:11,
22; 76:10
**Information** [2] -
41:25; 47:17
**infrastructure** [2]
- 39:13; 61:15
**initial** [1] - 25:12
**initiative** [1] -
51:5
**inject** [1] - 46:7
**injunction** [12] -
6:16; 8:16;
20:15; 21:2;
26:20; 27:5;
38:5; 56:20;
67:14; 69:12;
79:23; 82:5
**injunctive** [6] -
3:12, 19; 39:25;
77:1, 18; 80:5
**injured** [2] - 12:1;
14:20
**injuries** [1] -
13:20
**injurious** [2] -
27:14; 77:18
**injury** [3] - 27:8,
14; 76:19
**innocuous** [1] -
6:22
**inquiries** [1] -
53:1
**inquiry** [4] - 7:7;
55:23; 70:3;
73:14
**installed** [2] -
18:19; 56:1
**instead** [2] - 12:4;
67:13
**insurance** [5] -
17:13; 29:19;
37:11; 58:24;
67:5
**integrate** [2] -
41:8; 42:25
**integration** [6] -
22:23; 23:3, 5;
42:8; 52:15
**integrations** [4] -
41:10; 48:25;
51:22; 70:16
**integrity** [7] -
42:1; 44:15;
48:17, 22;
58:22; 69:1

**intend** [2] - 3:16;
11:2
**intends** [1] - 73:2
**intensive** [1] -
42:19
**intent** [1] - 40:8
**intention** [1] -
56:21
**intentioned** [1] -
58:13
**interact** [2] -
23:10; 76:7
**intercept** [1] -
45:7
**intercepting** [1] -
45:2
**interest** [4] -
53:13, 15, 22,
24
**interested** [1] -
59:23
**interesting** [1] -
61:10
**interface** [2] -
41:18
**interfere** [2] -
44:5; 77:8
**interfered** [1] -
27:15
**interference** [27] -
20:12; 21:5, 12,
19, 22; 31:13,
15-16, 21-22;
32:7, 9, 17, 21;
33:10, 19-20;
34:3, 11, 15, 20;
37:23; 40:6;
56:5; 60:24;
64:23; 71:20
**interfering** [8] -
43:25; 44:6;
46:20; 48:2;
50:3, 6; 55:7;
56:8
**interim** [1] - 14:13
**internal** [2] - 54:6;
68:18
**Internet** [3] -
39:13; 42:5;
53:15
**interoperate** [1] -
36:10
**interoperations**
[1] - 68:12
**interposing** [2] -
14:21; 74:12
**interpretation** [1]
- 65:20
**interpreted** [1] -
65:7

**interrupting** [1] -
46:18
**introduce** [1] -
69:9
**investigating** [1] -
41:2
**inviting** [1] -
81:23
**involved** [1] -
7:13
**irreparable** [11] -
20:17; 21:1;
30:23; 31:1;
43:12; 44:19;
55:2; 61:4;
76:19; 79:21, 24
**irreparably** [6] -
9:10; 12:1;
13:11, 19;
14:20; 43:13
**irrespective** [1] -
32:2
**issue** [36] - 3:22;
5:4, 17; 9:2;
10:4; 12:6;
19:19, 21; 22:2;
24:18; 25:21;
35:13; 36:9, 17;
42:19; 50:4;
53:5; 54:16;
55:5; 58:11;
60:21; 61:3;
63:12; 64:12;
68:24; 69:5, 16;
70:1, 7, 23;
74:13, 17; 75:7;
77:20
**issues** [18] - 4:14;
7:1; 11:6, 12;
12:10; 16:14;
44:19; 46:9;
48:20; 57:11;
69:1; 71:15;
74:23
**issuing** [1] - 46:4
**IT** [1] - 59:1
**Jennifer** [1] - 3:2
**jewelry** [1] - 58:17
**job** [2] - 37:17;
61:10
**judges** [1] - 13:16
**judgment** [1] - 9:6
**judicial** [1] - 9:14
**jumped** [1] -
25:18
**jumping** [1] - 31:2
**juncture** [1] -
76:21
**jurisdiction** [2] -
14:17; 75:14

**jurisdictional** [2] -
14:11
**jury** [1] - 40:13
**justification** [1] -
25:7
**justify** [3] - 25:2;
26:19; 27:4
**keep** [1] - 16:7
**kept** [2] - 27:24
**key** [2] - 41:7;
72:3
**keys** [4] - 6:23;
39:5; 57:5;
61:17
**kids'** [1] - 80:24
**kind** [12] - 5:11;
6:7; 27:8; 31:2;
40:4; 44:18;
52:2; 67:22;
68:19; 70:20;
73:13
**knowing** [1] -
79:8
**knowledge** [1] -
62:14
**lack** [1] - 11:24
**laid** [3] - 7:16;
11:15; 20:13
**language** [3] -
69:24; 70:8
**last** [8] - 9:4;
11:23; 14:4;
23:8; 64:2;
67:10, 12; 82:3
**lasts** [1] - 36:21
**late** [1] - 15:18
**latest** [1] - 73:21
**latter** [3] - 28:22;
32:11
**law** [8] - 9:22;
14:9, 11; 20:23;
49:13; 54:3;
61:16; 71:19
**lawful** [2] - 27:25;
40:9
**lawfully** [1] -
58:13
**laws** [2] - 5:3;
39:1
**lawsuit** [3] -
19:23; 25:17
**leaning** [1] -
57:20
**least** [5] - 21:4;
37:20; 38:2;
81:5, 24
**leave** [5] - 30:18,
20; 58:14, 16;
81:20
**leaving** [1] - 30:21

**led** [1] - 30:19
**ledger** [1] - 64:19
**left** [1] - 60:15
**legal** [2] - 6:1;
11:6
**legitimate** [5] -
40:21; 44:20;
56:7, 10; 71:20
**legitimately** [1] -
44:22
**length** [1] - 82:2
**less** [5] - 12:9;
14:12; 72:14;
73:19
**lesser** [1] - 58:21
**letters** [1] - 56:25
**level** [8] - 34:5;
44:12; 57:6;
60:2; 61:14;
68:2; 74:10
**LEVY** [67] - 2:8;
11:12, 18; 13:2,
5, 8, 24; 14:2, 9,
25; 16:11, 20,
23; 17:4, 6;
18:6; 25:14, 16;
26:15; 27:9, 17,
20; 28:2, 22;
29:20, 23; 30:4,
10, 12; 31:8, 12,
15; 32:4, 13, 19,
23; 33:3, 5, 8,
14, 17, 21; 34:8,
13, 24; 35:6;
36:17; 37:2, 6;
38:22; 62:1;
66:24; 67:1, 3;
74:9; 75:20, 22;
76:1, 6; 78:8,
11, 17, 19;
79:21; 80:14;
81:7; 82:22
**Levy** [11] - 2:8;
16:8; 17:3;
38:20; 52:9;
61:25; 74:8;
78:7; 79:20;
81:6; 82:20
**license** [2] -
38:25; 69:3
**lie** [1] - 63:3
**lifecycle** [1] - 68:9
**likelihood** [3] -
59:20; 60:4;
81:16
**likely** [5] - 7:12;
38:1; 40:12;
59:20; 60:6
**limbo** [1] - 4:15
**limits** [1] - 21:8

TRO Hearing 10/23/25

line [4] - 53:1; 54:13; 57:9; 71:15

LinkedIn [2] - 53:17, 20

list [1] - 81:13

literally [1] - 56:23

litigation [1] - 15:22

live [7] - 9:4, 14; 10:12; 47:20; 77:24

LLC [1] - 2:5

Local [3] - 12:8; 15:16; 16:1

located [1] - 17:15

log [1] - 48:11

longstanding [1] - 20:23

look [12] - 22:10; 39:10; 41:1; 42:24; 48:11, 15; 53:21; 54:22; 55:15; 58:22; 63:25; 69:24

looked [3] - 53:14; 60:9; 70:22

looking [1] - 80:22

looks [3] - 29:12; 43:24; 65:2

lose [1] - 52:17

loss [6] - 20:21; 30:22; 31:17; 76:19

lost [5] - 20:20; 30:16, 25

low [2] - 61:14; 68:2

low-level [1] - 68:2

lowest [1] - 44:12

Macklin [1] - 32:24

mail [2] - 39:20; 41:19

main [2] - 27:14; 35:20

maintain [3] - 14:13, 19; 47:8

malare [1] - 56:2

malicious [4] - 43:25; 44:4; 47:21; 68:22

managed [1] - 41:13

manner [1] - 45:17

manually [3] - 29:10, 16; 45:4

manufactured [1] - 55:12

Marcelo [1] - 2:24

March [3] - 18:14; 25:13, 21

March/April [2] - 25:13; 36:1

market [4] - 36:8; 42:13; 43:6; 44:20

Maryland [6] - 9:25; 10:23; 54:4; 73:20, 24

mass [1] - 46:8

massive [3] - 6:19; 58:6; 60:9

material [1] - 9:20

matter [15] - 2:3-5; 17:10; 19:2; 21:10; 28:4; 32:3; 33:25; 40:14, 16; 47:7; 65:15; 66:2

mean [13] - 9:9; 36:20; 37:9; 47:5; 56:25; 58:18; 60:17; 70:19; 73:17; 74:1; 76:8; 80:8; 81:4

means [7] - 23:24; 31:23; 35:10; 39:21; 41:18, 21; 42:25

meant [4] - 47:5; 65:7; 66:14; 75:8

measure [3] - 20:9; 28:17

measured [1] - 55:16

measures [5] - 21:8; 45:2; 49:7; 50:12; 77:14

meet [8] - 3:10; 22:7; 24:3; 37:18; 71:25; 72:10; 74:2; 82:1

meeting [3] - 7:4; 68:10; 72:16

meetings [1] - 68:18

mention [6] - 21:21; 27:2;

39:6; 63:2; 71:21; 72:3

mentioned [5] - 10:14; 20:7; 40:1; 54:25; 57:13

merits [10] - 15:12; 38:2; 40:12, 20; 49:21; 56:17; 62:21; 67:11; 72:10; 74:19

mess [4] - 15:4, 22; 49:22

met [2] - 12:18; 22:14

methods [2] - 46:5; 68:5

Microsoft [4] - 17:24; 54:7, 9

Microsoft's [1] - 68:6

midnight [1] - 14:4

might [4] - 3:20; 29:23; 30:2; 70:13

Mike [2] - 2:21; 15:7

millions [1] - 43:22

MILLS [1] - 2:17

Mills [1] - 2:18

minimum [4] - 25:3, 7; 46:22; 81:9

minutes [2] - 43:18; 58:15

mischaracterize [1] - 41:16

misconduct [1] - 20:20

missing [2] - 51:14; 75:9

MJM [1] - 2:4

model [1] - 71:7

modify [1] - 45:7

mole [1] - 51:12

moment [4] - 9:6; 10:17; 32:1; 34:23

money [2] - 42:11; 69:8

months [1] - 36:21

morning [1] - 2:20

most [7] - 4:5; 5:16; 13:16; 15:23; 44:12; 48:14

motion [45] - 3:12-14, 16, 18, 21; 4:21; 7:21; 8:15, 22-23; 9:3, 9; 10:20; 11:18, 23, 25; 12:5, 13; 13:6, 9-10; 14:3; 15:21; 16:10, 13, 16; 35:14; 72:25; 73:9; 74:10, 14, 19, 22; 77:2, 4, 9; 78:5, 14; 80:2, 9; 82:16

motion's [1] - 79:13

motions [8] - 11:13; 12:25; 13:14, 17, 23; 14:7; 77:1; 78:2

motivation [1] - 19:11

mouse [1] - 51:9

move [10] - 5:7, 18; 7:1; 17:4; 24:12; 35:2, 5; 40:4; 62:24; 72:18

moved [7] - 11:19; 12:3; 39:16; 40:2; 49:13; 71:22

MR [139] - 2:8, 11, 14, 17, 20, 24; 3:5, 25; 4:2, 6; 6:12, 17; 7:17, 24; 8:2, 9, 13, 17, 23; 9:13; 10:21; 11:3, 12, 18; 12:21; 13:2, 5, 8, 24; 14:2, 9, 25; 15:5, 7, 10; 16:5, 11, 20, 23; 17:4, 6; 18:6; 25:14, 16; 26:15; 27:9, 17, 20; 28:2, 12, 22; 29:20, 23; 30:4, 10, 12; 31:8, 12, 15; 32:4, 13, 19, 23; 33:3, 5, 8, 14, 17, 21; 34:8, 13, 24; 35:6; 36:17; 37:2, 6; 38:22, 24; 45:12; 46:1, 25; 47:3, 10, 13, 16; 48:6; 49:9, 16; 50:8, 16; 51:25;

52:7, 12, 14; 53:8; 58:4, 10; 59:7, 12; 60:5, 8, 14; 62:1; 66:24; 67:1, 3, 24; 69:20; 73:8; 74:6, 9; 75:20, 22; 76:1, 6; 78:8, 11, 17, 19, 22, 24; 79:2, 6, 11, 17, 21; 80:7, 14, 16, 20, 24; 81:7, 9; 82:1, 6, 9, 11, 22, 25

MS [2] - 3:2, 8

Multi [1] - 20:24

Multi-Channel [1] - 20:24

multimillion [1] - 60:9

multiparty [1] - 43:5

multiple [13] - 21:13; 22:25; 23:9; 39:1; 46:4; 54:4; 65:25; 66:1; 71:11; 76:7; 81:17

must [1] - 72:6

mutual [1] - 18:15

name [5] - 3:24; 15:4; 20:2; 25:9; 41:19

National [1] - 2:4

national [1] - 70:21

nature [2] - 75:10; 77:16

necessarily [1] - 48:14

necessary [7] - 12:15; 33:24; 36:16; 37:15; 76:21; 77:19; 80:5

need [20] - 5:5; 16:24; 23:15; 26:9; 31:20; 32:6, 14; 33:11; 34:4; 37:2, 4; 39:8; 49:19; 52:11; 78:16; 79:23; 81:2, 20, 25

needed [5] - 6:3; 32:25; 64:15; 72:20; 78:3

needs [1] - 26:22

nefarious [1] - 63:4

negotiate [2] - 52:24; 55:1

negotiation [4] - 35:18; 36:5; 42:16; 44:3

negotiations [4] - 37:18; 53:3; 54:24; 55:1

network [1] - 22:15

networks [1] - 22:5

never [1] - 36:14

new [10] - 5:10; 7:11; 40:24; 44:23; 46:3; 51:5; 61:9

next [8] - 11:22; 13:7, 24; 78:6, 8, 17-18; 82:17

night [3] - 11:23; 14:4; 15:19

nightmare [2] - 58:1, 4

Ninth [2] - 53:14, 21

Nix [4] - 63:1; 66:20; 68:15; 72:2

nix [1] - 63:23

nobody [1] - 48:8

non [2] - 75:8, 13

noncompetitive [1] - 42:13

nondiscriminato ry [1] - 36:2

none [3] - 24:22; 53:25; 75:10

noted [1] - 13:3; 67:20

nothing [14] - 5:10; 6:3, 22; 9:16; 29:6; 44:23; 55:14; 57:6; 62:4, 8, 15; 64:7; 71:12; 73:22

notice [3] - 9:17; 65:7, 17

November [6] - 79:5; 80:12, 19; 81:22; 82:15, 18

nuances [1] - 41:12

number [10] - 24:6; 30:19; 37:6; 54:1; 66:4; 74:12; 75:3; 81:12

nursing [1] - 5:12

obfuscate [2] - 66:4; 71:16
objection [1] - 18:9
obligations [1] - 54:3
obtain [1] - 17:14
obtained [2] - 24:10; 37:13
obvious [1] - 52:23
obviously [3] - 16:6; 17:6; 81:1
occurred [1] - 19:1
occurring [1] - 77:17
October [5] - 8:17, 22; 63:13; 67:7
offensive [3] - 30:3, 5; 51:11
offer [2] - 36:9; 37:3
offered [2] - 42:9; 52:10
offering [2] - 19:4; 36:25
office [5] - 46:3; 56:1; 58:25; 59:4; 70:21
Officer [2] - 42:1; 47:18
offices [4] - 47:19; 61:1; 65:2; 66:1
ONC [2] - 70:25; 71:13
once [5] - 30:25; 31:3; 43:15; 58:16; 77:20
one [44] - 6:21; 7:25; 10:16; 12:21; 13:1, 20; 15:11; 16:11; 18:4, 11; 21:6; 23:22; 24:6; 30:21; 31:4; 34:23; 35:9, 12; 37:6; 43:3, 23; 44:13, 25; 45:17; 50:1; 51:2, 25; 54:1; 61:19; 66:1, 10, 16; 67:1; 69:16; 70:24; 72:12, 15; 74:12; 79:4, 11; 81:19; 82:3
One [3] - 2:5, 22; 4:7

ones [1] - 61:18
ongoing [6] - 4:15; 11:1; 47:18; 61:4; 69:6; 76:20
open [1] - 49:13
opening [4] - 20:6; 32:23; 63:1; 67:4
operability [1] - 77:8
operated [2] - 17:18, 22
operating [1] - 59:10
operations [2] - 23:9; 59:4
opportunity [4] - 8:25; 15:13; 76:22; 77:23
oppose [2] - 11:22, 24
opposed [2] - 12:4; 35:19
opposing [1] - 8:12
opposite [1] - 56:20
opposition [5] - 13:6; 74:17; 78:8, 11, 14
optimal [1] - 68:11
option [2] - 7:19; 11:17
options [4] - 7:16; 11:15; 54:25; 57:10
oral [4] - 7:20; 16:20; 17:2
Order [4] - 3:15; 76:21; 77:3; 78:15
order [10] - 4:12; 9:23; 12:9; 38:4; 47:11; 67:9; 69:15; 70:4; 80:4; 81:14
original [1] - 23:6
otherwise [4] - 6:4; 16:25; 17:13; 56:18
ourselves [1] - 4:19
out-of-market [1] - 42:13
outreach [1] - 19:6
outright [1] - 7:6
outset [1] - 24:5

outside [3] - 7:24; 15:25; 26:7
own [23] - 3:15; 4:10; 5:19; 8:12; 19:6, 16; 22:14; 23:4; 24:14; 42:3; 44:21; 46:16, 21, 23; 50:2; 54:8, 14; 63:4; 67:21; 68:1; 70:16
owned [1] - 63:9
owner [1] - 63:9
ownership [1] - 63:9

p.m [5] - 2:2; 15:18; 76:15
page [4] - 22:23; 23:1, 8; 65:12
Page [1] - 32:24
paired [1] - 19:14
paper [3] - 9:2; 17:16; 69:21
papers [8] - 11:6; 17:6, 20; 40:23; 43:7, 21; 63:16; 67:4
Paragraph [3] - 22:19; 62:25; 66:20
paragraph [1] - 66:25
parallel [1] - 20:14
part [12] - 5:25; 7:24; 9:12; 10:5; 25:12; 34:9; 39:7; 45:14; 50:5; 51:2; 53:5, 12
participate [1] - 66:7
particular [2] - 6:21; 40:1
particularly [1] - 76:3
parties [12] - 9:24; 12:17; 22:25; 26:5; 35:11; 37:12; 38:7; 65:25; 77:23; 79:5; 81:4, 20
parties' [1] - 76:25
party [12] - 17:7; 18:11; 37:9, 14; 43:3; 58:8; 68:21; 75:4-6, 9, 12
party's [1] - 8:12

pass [1] - 43:1
past [3] - 8:6; 54:18; 60:7
path [1] - 11:14
patient [21] - 17:14, 18, 25; 18:12; 26:22; 37:8, 11; 42:7; 46:18; 47:25; 48:18, 20; 51:7; 58:6; 60:10, 17; 64:5; 66:13; 71:9
patients [11] - 26:23; 41:4; 47:14; 53:25; 58:22; 59:2; 60:22, 25; 64:6; 66:14
patients' [1] - 58:7
pay [1] - 42:12
PDF [1] - 17:23
peculiarity [1] - 56:13
pending [7] - 2:3; 3:20; 4:22; 5:19; 8:23; 12:6; 55:7
people [5] - 7:13; 41:2; 54:6; 73:17; 81:12
percent [2] - 73:19
performing [1] - 70:23
perhaps [4] - 3:21; 30:21; 48:14; 59:24
period [4] - 36:13, 20; 65:8, 17
permit [3] - 64:14; 66:15; 70:9
permitted [1] - 77:2
persona [1] - 69:10
personal [1] - 75:14
personally [1] - 60:13
perspective [4] - 12:12; 14:2; 69:7; 82:21
phone [1] - 58:25
PI [13] - 5:20, 25; 6:3; 11:19; 12:13; 35:14; 40:11, 17; 74:13, 15, 17; 82:9

PI's [1] - 56:22
piece [3] - 71:4, 9; 73:23
pivot [1] - 72:24
place [6] - 5:13; 9:15; 24:24; 34:4; 70:24; 74:15
plainly [2] - 21:16; 34:17
plaintiff [2] - 2:9; 9:11; 13:21; 17:11; 73:2; 76:18, 23; 77:18
plaintiff's [7] - 3:12; 11:10; 53:9; 67:20, 23; 77:9; 82:16
plaintiffs [3] - 2:7; 58:2, 9
plan [2] - 6:25; 81:5
planning [1] - 16:8
platform [4] - 22:12; 29:5, 11
platforms [1] - 27:15
play [1] - 40:16
playing [1] - 29:1
plays [1] - 14:19
podium [1] - 4:3
point [27] - 6:24; 7:9; 13:10; 20:3; 25:2; 28:16; 29:24; 31:18; 35:11; 37:10; 42:11; 51:3; 53:11; 54:4; 57:19; 62:3; 63:3, 25; 65:23; 68:6, 19; 69:11; 72:9; 74:22; 78:3
PointClick [1] - 56:23
PointClickCare [1] - 6:13
pointed [1] - 20:6
pointing [2] - 17:7
points [11] - 17:8, 10; 21:6; 24:5; 35:17, 20; 53:9; 54:16; 66:2; 69:17; 74:11
policy [2] - 51:16, 18
Portland [1] - 80:25
portray [1] - 50:24

position [4] - 6:2; 11:16; 13:15; 49:25
possibilities [1] - 23:7
possible [5] - 9:4; 10:16; 39:25; 80:20; 81:2
posture [2] - 4:11; 56:14
potentially [1] - 12:16
practice [3] - 17:25; 18:11; 48:1
practices [8] - 17:12, 17; 22:16; 24:16; 25:8; 26:17; 37:23; 66:10
precipitated [2] - 19:23; 25:17
prefer [1] - 4:2
preference [1] - 13:14
prefers [1] - 79:3
prejudice [1] - 4:12
preliminary [12] - 3:12, 19; 6:16; 7:1; 8:16; 20:15; 21:10; 56:13; 67:14; 77:1; 81:5; 82:5
premature [1] - 74:22
prepared [9] - 11:4; 12:19; 16:15, 18; 36:7, 11; 57:17; 74:9
preparing [1] - 75:22
prerogative [1] - 5:21
present [8] - 11:2; 12:19; 15:13; 16:9, 15-16, 18, 20
presentation [3] - 32:16; 76:1; 77:24
presented [3] - 76:23; 77:10, 21
presently [1] - 36:9
president [2] - 39:16; 61:11
presume [1] - 78:15
pretty [3] - 24:2;

54:12; 69:25
**prevail** [1] - 31:21
**preview** [1] - 73:2
**previous** [1] -
52:13
**previously** [2] -
3:20; 52:4
**pricing** [2] - 42:12
**print** [22] - 18:3,
7, 13; 19:13, 18,
20; 23:20; 24:7,
15; 26:1; 35:23;
36:1, 12, 18;
37:24; 38:9, 11;
52:11; 67:5, 21
**printed** [2] -
17:23; 18:1
**printer** [25] -
17:23; 18:13,
16, 19, 25;
25:19; 26:16;
44:10; 46:10;
58:5; 61:22;
62:11, 20, 25;
63:4, 11-12, 14;
64:22; 67:21;
68:4, 19, 21;
69:9, 23
**privacy** [3] - 46:9;
60:21; 61:4
**Privacy** [1] - 5:3
**private** [1] - 63:9
**privilege** [1] -
68:2
**pro** [1] - 15:17
**problem** [4] -
9:15; 42:11;
45:5; 48:17
**problems** [7] -
25:19; 44:9;
48:22; 49:4;
50:1; 67:22;
69:15
**procedural** [1] -
4:11
**proceeded** [1] -
4:9
**proceeding** [1] -
60:16
**process** [1] - 29:4
**procompetitive**
[1] - 20:10
**product** [34] -
19:4, 7-8, 17,
21; 20:2, 4-5;
21:17, 23; 22:7;
24:12, 14, 16;
25:24; 35:24;
54:10; 62:18,
22-25; 63:5,

7-8, 11, 13;
64:23; 71:8
**production** [1] -
45:7
**products** [2] -
63:6, 10
**program** [3] -
38:9, 12; 65:23
**programmatic** [4]
- 28:14; 29:12,
15
**programmaticall
y** [2] - 47:8;
70:19
**programs** [2] -
36:10; 56:2
**prohibit** [1] - 12:8
**prolong** [1] - 38:5
**promptly** [1] -
15:2
**pronouncing** [1] -
3:23
**proof** [3] - 32:25;
33:23; 34:5
**properly** [1] - 9:17
**propose** [1] -
11:17
**proposed** [2] -
37:7; 69:15
**proposition** [2] -
14:15; 32:25
**prospective** [6] -
21:19; 32:9;
33:19; 34:12,
15, 21
**protect** [4] - 49:7;
53:16; 54:14;
66:15
**protecting** [1] -
45:19
**protection** [2] -
39:7; 72:5
**protections** [3] -
42:3; 52:18;
55:17
**protectors** [1] -
61:19
**prototype** [1] -
68:11
**prove** [1] - 31:20
**provide** [6] -
36:15; 52:10;
54:5; 66:7
**provided** [3] -
18:6, 8
**provider** [2] -
43:9; 54:20
**provides** [2] -
17:11; 18:4
**proving** [2] -

32:11; 61:20
**public** [9] - 44:22;
53:13, 15, 17,
22, 24; 54:15;
60:8; 72:4
**publicly** [2] -
45:21; 60:17
**pull** [1] - 41:19
**pulled** [2] - 51:20,
23
**purpose** [3] -
4:23; 21:17;
31:23
**purposes** [7] -
2:6; 4:24; 32:15;
34:19; 42:23;
75:7
**push** [2] - 10:16;
49:19
**pushed** [1] -
25:25
**put** [27] - 6:20;
7:10; 8:18;
10:13; 35:14;
41:24; 43:14,
20; 44:6; 45:3;
46:9; 49:25;
52:23; 55:14;
57:24; 59:7, 13,
22; 61:8, 23;
62:11, 13, 17;
64:12; 68:1;
81:10
**puts** [3] - 4:15;
63:3; 74:13
**putting** [1] - 4:23
**qualifies** [1] -
34:17
**questions** [8] -
12:24; 38:17,
21; 49:13;
56:15; 67:17;
72:15
**quick** [3] - 12:21;
15:10, 15
**quickly** [4] -
10:21; 33:22;
55:19
**quo** [7] - 14:13,
19; 38:8; 64:2,
22; 67:10, 16
**quote** [1] - 23:9
**quote/unquote**
[1] - 43:19
**quoted** [1] - 76:1
**quoting** [1] -
76:11
**raise** [1] - 7:11
**randomly** [1] -
80:20

**rather** [1] - 31:18
**RCM** [2] - 64:12;
67:6
**reach** [3] - 26:6,
9; 62:18
**reached** [1] -
35:25
**reactivated** [1] -
5:20
**read** [3] - 14:5;
46:6
**read-write** [2] -
46:6
**ready** [2] - 17:3;
38:23
**real** [2] - 42:2;
72:23
**Real** [16] - 6:12;
18:9; 19:11;
20:14, 24; 24:1;
26:20; 35:12;
38:16; 43:10;
52:22; 53:19;
54:17; 56:23;
70:6; 81:17
**realize** [1] - 76:12
**really** [24] - 4:8;
9:3, 20; 12:1, 6;
14:3; 19:20;
26:4, 9; 33:24;
38:15; 39:8, 22;
44:25; 52:21;
53:20; 57:22;
58:17; 60:17;
61:9; 63:2;
67:25; 74:13;
75:5
**realm** [1] - 26:8
**reason** [8] -
30:18, 21;
31:25; 50:21;
58:13; 74:16;
77:5
**reasonable** [1] -
36:8
**reasons** [5] - 7:4;
37:19, 21; 38:15
**reboot** [1] - 30:8
**rebooted** [1] -
28:22
**rebuild** [1] - 31:1
**rebuttal** [2] -
38:18; 61:25
**received** [1] - 59:9
**recent** [4] - 45:10;
77:10, 14, 16
**recently** [4] -
39:17; 45:10,
14; 50:17
**recess** [2] - 76:14,

16
**recollection** [3] -
33:21
**reconsider** [4] -
4:21; 8:24; 9:4
**reconsideration**
[4] - 10:5; 12:4;
80:8
**reconsidering** [1]
- 12:6
**record** [29] - 2:7;
20:19; 30:8;
40:13; 41:9, 25;
55:14; 56:11,
19; 59:8; 60:9;
61:8, 23; 62:9,
12-13, 16;
63:16; 64:13,
20; 65:23;
66:20; 71:4;
73:16; 74:7;
77:6, 21
**records** [10] -
26:22; 42:7;
47:25; 48:21;
51:7; 58:6; 64:5;
71:9
**reestablish** [1] -
27:25
**reestablished** [1]
- 27:23
**referenced** [1] -
22:20
**references** [1] -
65:5
**referred** [1] - 10:7
**referring** [3] -
6:11; 8:11
**refile** [1] - 4:12
**Reg** [1] - 65:12
**regard** [1] - 21:24
**regarding** [3] -
35:17; 63:18;
66:21
**Register** [1] -
65:12
**regs** [1] - 70:5
**regulation** [8] -
22:3, 10; 43:7;
54:19; 65:8, 15;
70:21
**regulations** [1] -
21:9
**reinstitute** [1] -
24:25
**related** [3] - 21:9;
37:25; 50:7
**relates** [2] -
35:13; 75:5
**relation** [3] -

21:19; 24:24
**relations** [9] -
30:15; 31:16,
18, 22; 32:22;
34:3, 12, 15, 21
**relationship** [2] -
20:22; 31:10
**relationships** [4] -
32:10; 33:19;
36:24; 38:13
**relative** [3] -
26:12, 14; 75:1
**relatively** [1] -
39:16
**relevant** [9] -
17:25; 22:4;
26:4; 57:11;
63:18; 74:25;
75:1, 5, 12
**relied** [1] - 23:23
**relief** [15] - 3:12,
19; 5:5; 7:1; 9:5;
12:13; 13:18;
14:13, 19; 38:7;
39:25; 45:15;
77:1, 18; 80:5
**relies** [2] - 21:23;
26:21
**relying** [5] - 11:1;
16:9, 12; 73:5;
74:20
**remains** [1] -
63:25
**remember** [3] -
35:4; 52:5;
76:11
**reminds** [1] -
66:18
**remove** [1] - 65:5
**replies** [2] -
78:21; 82:18
**reply** [4] - 15:18;
33:1, 7; 78:12
**reporting** [1] -
49:5
**reports** [1] - 60:9
**reputat** [1] - 38:12
**reputation** [6] -
20:22; 27:4;
30:14, 24-25;
38:13
**reputational** [5] -
27:3; 44:19;
46:21, 23; 47:2
**request** [12] -
3:19; 4:24; 6:7,
25; 7:7; 8:4; 9:5;
15:11; 16:13;
17:3; 49:10;
50:5

requests [1] -
5:23
require [5] -
34:14; 56:15;
70:9
required [7] -
21:15; 34:16;
35:15; 50:23;
54:5; 55:24
requirement [1] -
21:14
requirements [1]
- 60:20
requires [2] -
42:20, 22
reserving [1] -
38:18
resolve [5] - 4:13;
7:1; 56:6; 72:20;
79:15
resolved [2] -
15:24; 56:13
respect [11] -
10:25; 16:5;
29:18; 32:9, 21;
33:10; 34:6, 11;
62:10; 66:18
respectfully [4] -
6:7; 15:11;
65:22; 72:21
respects [1] -
26:25
respond [3] -
10:19; 12:25;
13:23
responded [1] -
28:12
response [5] -
13:10; 38:18;
45:10; 48:5;
50:13
responses [2] -
13:17; 82:16
Restraining [4] -
3:15; 76:21;
77:3; 78:15
result [8] - 31:6;
48:4, 7; 49:5;
64:24; 72:16
resulting [1] -
76:20
results [1] - 58:1
return [4] - 64:2;
67:9, 16; 76:15
returning [2] -
38:7; 64:21
revenue [1] - 44:4
reviewed [1] -
14:3
rise [2] - 53:5;

60:1
risks [4] - 47:18;
59:18; 67:22;
68:10
role [1] - 54:24
roll [2] - 49:24;
69:3
rolled [1] - 56:9
rolling [1] - 50:2
rollout [1] - 55:16
ROSTOLSKY [1] -
3:5
Rostolsky [1] -
3:6
Rule [6] - 10:2;
12:10; 15:16,
20; 16:1; 76:18
rule [1] - 13:25
Rules [1] - 12:8
rules [4] - 12:12,
17; 15:1; 67:13
ruling [2] - 8:25;
14:23
run [5] - 7:15;
44:5, 8; 48:1;
68:11
runs [1] - 25:9
rushed [1] - 4:9
safeguard [1] -
20:9
safeguards [1] -
38:12
said/she [2] - 7:9;
71:25
satisfied [4] -
24:4; 66:16;
80:4
scaffolding [1] -
44:11
scale [1] - 48:23
scaleability [1] -
23:8
scaleable [2] -
23:9; 76:7
scenario [2] -
58:1, 4
schedule [8] -
3:21; 11:20;
76:25; 78:1;
79:25; 80:6;
81:19, 22
scheduled [2] -
16:21; 17:1
scheduling [2] -
8:5; 79:12
Schein [3] - 2:5,
22; 4:7
school [1] - 5:12
science [1] - 43:2
scraping [1] -

53:17
screen [1] - 70:18
sealed [1] - 60:16
seamless [1] -
22:24; 23:4
second [6] - 7:15,
19; 23:1; 43:11;
79:4; 81:16
secure [1] - 68:20
security [29] -
19:19, 21; 20:9;
23:23; 24:18;
25:7; 35:9; 40:9,
24; 44:21;
46:11, 14; 47:8;
49:7; 50:2; 51:6,
9; 52:22; 55:17;
56:9; 60:21;
62:8; 63:12;
67:22; 68:7, 10;
69:3; 71:20
Security [2] -
41:25; 47:17
see [12] - 5:17;
6:4; 9:25; 10:23;
22:11; 48:16;
50:1; 51:6;
55:13; 57:13,
16; 82:2
seeing [1] - 50:22
seem [1] - 17:19
sees [2] - 49:7;
56:14
send [1] - 61:2
sensational [1] -
63:19
sense [4] - 3:21;
9:20; 69:2; 81:5
sensitive [1] -
6:23
sent [1] - 39:20
separate [2] -
52:14; 73:14
separately [1] -
17:1
September [9] -
19:22; 25:16;
26:6, 14; 27:8;
28:2, 16; 29:14;
36:3
service [4] - 43:9;
58:24; 70:23;
76:7
services [9] -
17:11; 23:5, 10;
64:12; 66:8, 11;
67:6; 70:10
set [5] - 6:10;
10:9; 11:19;
72:1

settled [1] - 14:11
shift [2] - 23:21;
62:18
Shirin [1] - 3:8
shoot [1] - 24:13
shop [1] - 4:9
shopping [4] -
9:15; 10:8;
15:25; 55:12
short [3] - 61:6;
73:15; 81:13
show [11] - 8:18;
21:14; 22:3;
23:22; 33:11;
37:22; 40:6, 8,
11, 18; 59:14
showed [1] -
56:25
showing [5] -
12:18; 37:19;
62:9, 16; 76:18
shown [2] - 21:15;
71:17
shows [6] - 34:18;
36:1; 46:2;
55:23; 56:12;
62:20
Shuster [3] - 2:9,
12, 18
shut [1] - 27:24
side [10] - 5:6;
7:10; 16:6;
44:21, 25;
51:15; 53:14;
62:9; 64:19;
80:15
sides [2] - 59:3;
82:12
sign [3] - 36:7, 11;
56:8
significant [1] -
5:5
similar [7] - 14:6;
20:25; 24:15;
26:19; 53:19;
60:13; 68:6
simple [3] - 17:23;
68:4; 76:9
simply [3] - 5:23;
7:20; 45:19
simultaneous [1]
- 23:13
simultaneously
[3] - 23:11;
66:12; 76:8
single [4] - 22:8;
71:4, 8; 73:23
sister [1] - 5:12
situation [2] -
6:18; 10:6, 8;

24:20; 29:3;
30:17; 47:19;
77:7
slew [2] - 7:8;
68:2
sloppily [1] -
44:13
sloppy [1] - 55:20
slow [2] - 14:22;
80:10
slowed [1] - 55:14
slowly [1] - 55:20
smell [1] - 43:1
smoothly [1] -
48:9
so-called [3] -
26:3; 63:15, 19
so.. [1] - 16:3
software [61] -
17:11, 14, 17,
22; 18:2, 4-5,
18; 19:6, 14, 19;
20:1; 23:5; 24:8;
25:8, 25; 26:2,
21-22; 27:1;
28:4, 7, 19, 21,
23; 29:18, 20,
25; 30:7; 36:16,
22; 37:1, 15;
39:12; 41:13;
43:22, 24-25;
44:5, 8-10;
46:4, 14, 16, 21;
54:6; 55:8; 58:3;
64:15, 25; 65:3;
67:6; 68:2, 8;
71:9; 77:9
solution [1] - 37:3
solve [2] - 57:1, 3
someone [2] -
41:12; 70:23
sophisticated [1]
- 44:13
sorry [4] - 3:23;
15:4; 33:1;
78:24
sort [14] - 10:9;
13:18; 27:15;
28:13, 25;
38:11; 41:6;
50:14; 53:5;
66:12; 73:2;
75:13; 79:24
sorts [1] - 11:6
sound [1] - 81:18
sounds [4] -
27:14; 57:22;
63:19
space [1] - 63:7
spamming [1] -

46:3
span [1] - 80:17
speaks [1] - 74:21
specced [1] - 68:9
species [2] -
32:16, 18
specific [3] - 47:4,
23; 59:22
specifically [1] -
36:4
speech [1] - 71:21
spill [1] - 81:16
spokes [1] - 41:17
spy [1] - 5:14
squarely [1] -
53:13
stage [2] - 21:4;
38:2
stand [3] - 4:4;
39:19; 61:21
standard [8] -
5:25; 39:25;
40:11, 17;
56:18; 67:12;
74:3
standing [1] -
52:9
start [5] - 17:8;
25:23; 41:1;
61:14; 62:3
started [8] -
18:15; 24:11;
41:1; 49:10;
51:5, 7; 62:17;
77:7
starting [1] - 2:7
starts [1] - 65:13
state [3] - 57:6;
73:25; 74:1
statement [1] -
56:1
statements [1] -
72:7
States [1] - 14:15
stating [2] - 36:7;
45:21
status [9] - 8:5;
14:13, 19; 38:8;
64:2, 21; 67:10,
16; 79:18
statute [5] - 21:5,
8; 54:19; 74:20;
75:7
statutes [2] -
57:5; 63:18
statutory [2] - 5:8;
42:19
stave [1] - 4:7
steal [1] - 47:22
stealing [1] - 57:4

steals [1] - 58:5
stepping [1] - 46:24
steps [1] - 25:12
sticking [1] - 42:11
STIKELEATHER [1] - 2:14
Stikeleather [1] - 2:15
still [6] - 4:22; 10:12; 40:8; 43:19; 55:1; 63:13
stop [15] - 20:3, 9; 38:17; 44:6; 46:16; 48:8; 53:20, 22; 55:7; 56:2; 62:20; 69:13
stopgap [1] - 36:13
stopped [5] - 9:8; 24:7; 25:25; 36:1
stopping [2] - 39:18; 50:4
stops [4] - 23:20; 26:20; 43:22, 25
store [1] - 17:18
stored [2] - 17:15; 29:4
story [3] - 39:9; 72:2, 23
straightforward [1] - 69:25
strategy [1] - 55:11
strict [1] - 60:20
strong [1] - 53:15
strongly [1] - 30:18
struggle [1] - 51:12
stuff [1] - 80:17
subject [3] - 12:15; 36:11; 80:14
submit [7] - 17:12; 26:17; 28:7; 37:11; 67:5; 73:8; 75:18
submitted [3] - 22:19; 39:3, 6
submitting [1] - 58:23
subset [1] - 28:3
substantially [1] - 14:6

substantiation [1] - 63:16
succeed [1] - 38:2
sue [1] - 54:7
suffer [1] - 60:12
suffered [1] - 64:18
suffering [1] - 13:21
sufficiently [1] - 38:2
suggested [2] - 4:13; 65:16
summarize [1] - 5:11
summer [1] - 72:13
Sunday [1] - 81:1
supplemental [2] - 10:15; 63:23
supported [1] - 63:22
supposed [6] - 5:18; 24:22; 46:20; 49:11; 72:19; 75:11
surely [1] - 4:18
surreptitiously [1] - 49:21
surrounded [1] - 68:4
suspect [1] - 30:18
suspicious [1] - 61:13
switch [1] - 25:24
system [11] - 23:6, 10; 39:14; 48:9; 50:23; 59:10; 60:19; 68:23; 76:6, 8
systems [18] - 23:4; 39:2, 5, 21; 45:19; 46:3, 6, 19; 47:6, 24; 49:22; 53:3, 16; 54:14; 59:14; 60:11; 65:1
table [2] - 13:13; 43:11
tactic [1] - 9:12
target [1] - 68:22
targeted [2] - 36:3; 40:22
targeting [1] - 67:6
team [6] - 42:15; 46:14; 51:4; 59:1; 68:7
technical [4] -

18:12; 41:11; 45:2; 55:24
technically [1] - 50:4
techniques [3] - 44:13; 51:10
technology [2] - 70:9, 22
telemetry [7] - 18:20; 24:10; 26:1; 46:1; 50:20, 22; 51:8
Temporary [4] - 3:15; 76:21; 77:3; 78:15
tens [1] - 47:18
Tenth [3] - 9:3; 54:12; 80:10
term [4] - 61:15; 77:11, 14
terminable [2] - 31:9, 17
terms [29] - 25:18; 26:4; 27:3, 19; 30:12; 31:12; 35:22; 36:5, 8; 40:20; 42:18; 44:24; 47:4, 6, 14; 52:20; 53:2, 10; 54:3, 15-16; 55:5; 56:4; 57:21, 24; 59:23; 60:3; 65:19; 74:12
test [5] - 22:7; 43:1; 68:11; 74:1
testimony [4] - 16:16, 19; 56:16; 77:25
text [2] - 54:18, 23
THE [141] - 2:3, 10, 13, 16, 19, 23; 3:1, 4, 7, 10; 4:1, 4; 6:11, 15; 7:15, 23; 8:1, 8, 10, 15, 21; 9:8; 10:19, 25; 11:10, 14; 12:20, 23; 13:3, 6, 9; 14:1, 8, 24; 15:3, 6, 9; 16:4, 8, 18, 22; 17:2, 5; 18:3; 25:10, 15; 26:12; 27:6, 11, 18; 28:1, 8, 13, 25; 29:21; 30:2, 9, 11; 31:2, 9, 14, 25; 32:5, 18, 20;

33:2, 4, 7, 12, 16, 18; 34:1, 9, 22; 35:2; 36:15, 25; 37:5; 38:20, 23; 45:9, 24; 46:24; 47:1, 4, 11, 14; 48:3; 49:1, 15; 50:7, 9; 51:23; 52:4, 8, 13; 53:7; 57:19; 58:8; 59:6, 11, 16; 60:6, 12; 61:24; 66:22, 25; 67:2, 18; 69:19; 72:24; 74:5, 8; 75:18, 21, 25; 76:5, 11, 17; 78:10, 13, 18, 20, 23, 25; 79:4, 10, 16, 20, 25; 80:12, 19, 22; 81:4, 8, 15; 82:5, 7, 10, 13, 24
theirs [1] - 68:14
themselves [2] - 19:10; 35:24
theory [1] - 71:8
they've [25] - 9:16; 16:1; 19:5; 24:21; 26:2; 27:1; 29:24; 36:13; 40:2, 16; 43:14; 45:9, 13; 47:19; 49:25; 51:19; 61:18; 64:9, 17; 69:8, 15; 73:13; 75:10
thinking [3] - 3:22; 52:8; 55:21
thinks [2] - 8:3; 10:24
third [10] - 7:16; 8:8; 37:9, 12-13; 58:8; 63:8; 68:20; 75:5, 9
third-party [2] - 75:5, 9
thorny [1] - 50:4
thousands [3] - 46:15; 47:19, 21
threatened [1] - 30:22
threatens [1] - 20:20
threats [2] - 46:15
three [9] - 11:15;

36:21; 54:22; 63:6, 10; 72:13; 80:17; 81:7; 82:3
three-week [2] - 72:13; 80:17
throughout [1] - 41:20
Thursday [3] - 78:19; 82:17
timeframe [2] - 60:1; 67:12
timing [1] - 19:9; 24:6; 25:19; 26:4; 35:22; 55:5; 61:13; 62:3
today [36] - 3:14; 4:23; 5:12; 6:1; 7:20, 22; 8:22; 9:4, 18, 21; 10:16; 11:2; 12:11, 15; 15:12; 16:2, 19, 21; 17:15; 37:3; 39:24; 45:22; 49:24; 55:4, 6; 57:12; 64:14, 23; 65:19; 76:17, 24; 77:17, 22; 78:20
together [4] - 27:16; 40:15; 41:7; 62:19
took [7] - 25:12; 29:8; 41:1; 50:11; 77:13
tool [4] - 18:20-22; 38:9
Torrell [1] - 2:17
tortious [26] - 20:11; 21:5, 12, 18, 21; 31:12, 15-16, 21-22; 32:7, 9, 17, 21; 33:10, 18, 20; 34:2, 11, 14, 20; 37:22; 40:5; 56:5; 60:24; 71:20
torts [1] - 21:12
totally [1] - 6:18
touches [1] - 71:9
traffic [2] - 45:8; 47:7
transfer [30] - 3:14; 4:19; 7:18; 10:2; 11:13, 21; 13:6; 17:21; 19:14; 20:4;

23:21; 25:6; 26:20; 29:10, 16; 37:4; 64:14; 72:25; 73:9; 74:10, 14, 19; 77:4; 78:5; 79:13; 80:2, 4; 82:16
transferred [3] - 18:2; 29:5; 74:15
transparent [1] - 49:20
travel [1] - 75:6
trial [8] - 72:14; 74:21, 24-25; 75:2; 82:8
tricky [1] - 4:11
tried [5] - 4:7; 10:15; 41:22; 62:23; 64:18
Trimed [1] - 33:5
TRO [49] - 2:6; 3:18; 4:10, 12, 24; 5:8, 19-20, 25; 6:2, 8, 10, 15; 7:3, 21, 25; 8:11, 15; 9:17, 22; 10:2, 11-12, 19; 11:18, 25; 12:2, 11, 13, 15; 14:4; 15:12; 16:3, 12; 17:3; 24:21; 38:3; 40:2, 17; 50:1; 55:6; 67:13; 69:1; 74:13, 15, 18; 79:22; 82:17
TROs [1] - 9:14
troubleshoot [1] - 59:1
true [7] - 39:10; 42:17; 43:20; 56:1; 61:23; 65:15
truly [1] - 51:15
try [9] - 8:13; 17:9; 24:11; 26:5; 46:4; 55:25; 56:2; 62:1; 74:2
trying [23] - 9:1, 13; 15:21, 23; 27:6, 12, 24-25; 35:3; 43:6, 21; 51:1; 55:1; 58:13; 59:18; 71:13, 16; 80:10; 81:15
Tuesday [3] -

7:11; 15:18;
41:16
**turn** [1] - 44:1
**turned** [1] - 82:11
**turns** [3] - 8:5;
60:23; 80:3
**TV** [1] - 20:24
**two** [30] - 9:14;
12:3, 16; 15:10;
17:18; 18:18;
22:6, 9, 11-13;
23:23; 27:15;
35:1, 9; 36:10;
37:7, 19; 41:22;
45:3; 54:2;
67:12; 70:11;
75:3; 81:7,
10-11, 14
**type** [5] - 5:22;
6:8; 40:3; 56:24;
57:7
**types** [1] - 30:13
**U.S** [1] - 46:11
**unable** [2] -
36:22; 67:4
**unaffiliated** [2] -
22:6; 70:11
**unauthorized** [13]
- 5:9; 39:18, 21;
44:12; 46:5;
48:7; 51:17;
53:22; 59:14;
61:3, 17; 68:5;
69:13
**unavoidable** [1] -
26:10
**unclear** [1] -
19:20
**uncontested** [1] -
77:13
**uncover** [1] -
50:18
**uncovered** [2] -
45:13; 50:16
**under** [13] - 12:11,
17; 35:12; 38:1;
42:21; 54:3;
57:14; 60:19;
63:8; 67:13;
70:5; 76:18
**undercut** [1] -
13:19
**understood** [5] -
16:4, 8; 30:11;
47:5; 49:2
**undisputed** [14] -
17:9; 18:15, 24;
19:3, 13, 15-16,
18, 22; 20:14;
23:20; 24:2;

35:22; 37:21
**undue** [1] - 9:12
**unfair** [22] - 20:11;
21:5, 12, 16, 18,
21, 24; 32:15;
33:9; 34:19;
35:16; 37:22,
25; 40:21;
60:23; 62:6, 20,
22; 71:18
**unfettered** [1] -
54:5
**unintended** [1] -
68:15
**unintentionally**
[1] - 71:1
**United** [1] - 14:15
**unlawful** [7] -
21:14, 24-25;
32:6, 14; 38:1;
55:18
**unless** [3] - 16:2;
38:17; 67:17
**unlocked** [1] -
58:14
**unsolvable** [2] -
6:20; 56:25
**unusable** [3] -
29:20, 22
**up** [23] - 3:16, 22;
5:17, 21; 7:22;
10:9; 12:23;
15:4, 16; 29:11,
13; 40:18; 52:5,
9; 56:8; 72:13;
75:18; 77:20;
78:6; 80:9, 25;
81:21; 82:20
**update** [6] -
19:25; 25:25;
41:19; 70:19
**updated** [2] -
37:2; 42:2
**updates** [1] - 19:6
**upfront** [1] - 76:3
**upgrade** [4] -
46:16, 21;
49:20; 56:9
**upgraded** [1] -
37:2
**upgrades** [6] -
44:21; 46:3;
50:2; 69:3;
71:20
**upside** [1] - 60:24
**urged** [1] - 65:10
**urgency** [2] -
4:25; 45:14
**urgent** [3] - 51:15,
19

**urging** [1] - 19:7
**usable** [1] - 19:14
**user** [1] - 41:18
**users** [1] - 71:12
**uses** [6] - 38:9,
12; 62:25;
63:11, 14
**Utah** [24] - 4:10,
21; 5:19; 7:2,
13; 8:16, 24-25;
9:5, 18, 22-23;
10:6, 12, 15, 20;
12:2, 5; 14:6;
73:17; 75:4;
80:9
**valuable** [1] - 69:7
**vast** [1] - 36:24
**vault** [1] - 72:5
**vector** [1] - 46:10
**vendor** [2] - 6:21;
61:2
**vendors** [4] -
22:17; 66:1, 5
**venue** [13] - 4:14,
19; 5:17; 7:1;
9:25; 10:10;
11:21, 24;
12:10; 57:11;
73:6; 75:14
**venue's** [1] - 74:1
**version** [1] -
18:18
**versus** [6] - 2:5;
8:22; 14:15;
34:11; 44:11;
68:7
**via** [1] - 67:5
**viable** [1] - 54:25
**view** [2] - 50:23;
58:17
**Vincent** [1] - 2:8
**violate** [2] - 39:1;
45:1
**violated** [2] -
63:17
**violating** [2] -
57:5; 71:18
**violation** [1] -
21:4
**virus** [22] - 19:24;
20:3, 8; 21:16,
21; 25:3, 5, 11;
26:7, 24; 27:5,
19; 28:3; 30:6;
34:17; 36:3;
37:25; 40:4;
43:19; 49:12;
66:19; 67:7
**visibility** [1] -
50:20

**visit** [1] - 64:21
**visual** [1] - 41:18
**vulnerable** [1] -
48:19
**Vyne** [48] - 4:9,
18; 5:6; 6:4;
8:19; 10:19;
36:4, 7; 38:15,
25; 39:11, 16,
24; 40:22; 41:2,
9, 11; 42:9;
43:13; 44:1, 16,
25; 45:19; 46:2,
13; 48:11, 14;
49:6; 50:2, 9,
24; 51:1-3;
55:2, 20, 25;
56:8; 58:12;
60:18; 62:10;
65:3; 67:4, 6;
68:3; 70:15
**Vyne's** [9] - 7:21;
9:15; 19:5, 7;
20:2; 43:16;
44:5, 21; 49:17
**wait** [5] - 4:13;
9:5; 10:14, 17;
13:16
**waived** [1] - 4:18
**waiver** [1] - 10:9
**wants** [5] - 5:18;
8:3; 14:25;
41:11; 44:16
**ways** [5] - 27:24;
44:8; 46:22;
57:24
**Weatherly** [1] -
22:19
**website** [10] -
22:21; 23:7, 14;
42:5, 24; 43:14;
53:18; 75:23
**Wednesday** [2] -
79:1; 82:18
**week** [12] - 10:1;
11:22; 12:5;
13:7, 25; 39:3;
72:13; 78:6, 8,
20; 80:17; 82:19
**week's** [1] - 78:15
**weeks** [4] - 11:25;
12:16; 67:12;
82:3
**weigh** [1] - 53:11
**whack** [1] - 51:12
**whack-a-mole** [1]
- 51:12
**wheel** [1] - 41:17
**whereas** [1] - 5:6
**whole** [6] - 37:10;

54:13; 56:5;
66:8; 68:4;
81:23
**win** [2] - 40:12;
71:18
**window** [1] -
58:17
**windows** [3] -
39:7; 47:20;
54:8
**Windows** [1] -
72:5
**wiretap** [1] - 45:2
**wiretapping** [1] -
57:5
**wished** [1] - 65:17
**wishes** [4] - 8:4;
38:4; 57:16;
67:11
**witness** [2] -
56:16; 81:13
**witnesses** [34] -
7:8; 8:4, 7;
11:2-5, 7;
12:14; 16:25;
38:4; 39:8;
40:15, 18;
43:16; 55:23;
57:16; 60:16;
67:15, 25;
72:23; 73:10;
74:25; 75:4, 6,
9-10, 12; 79:9;
80:2; 81:5, 18;
82:4
**won** [1] - 40:16
**wondering** [1] -
59:24
**Word** [1] - 17:24
**words** [1] - 42:25
**workaround** [12] -
28:10, 14, 17,
20; 29:12, 15;
41:6; 47:12;
50:14; 55:4
**workarounds** [8]
- 27:21; 43:14;
45:21; 49:5;
51:1, 19; 55:3;
69:14
**works** [5] - 18:7;
19:17; 45:23;
80:16, 19
**world** [2] - 58:12;
71:12
**worry** [2] - 43:15;
45:22
**worse** [4] - 26:25;
27:5; 55:10
**worst** [2] - 58:19

**write** [6] - 46:6;
68:25; 69:9, 21
**write-back** [2] -
68:25; 69:21
**wrongful** [3] -
31:23; 32:14;
40:6
**wrongfulness** [4]
- 32:11; 34:6,
14, 16
**year** [11] - 17:21;
18:14, 17;
25:21; 40:24;
41:1; 44:2;
50:19; 51:4;
52:1, 3
**years** [14] - 17:19;
18:9, 11; 25:19;
29:3; 38:8; 39:9,
11-12; 40:15;
44:17; 62:12;
67:17
**yesterday** [1] -
15:21
**yourself** [1] -
21:18
**zero** [1] - 73:22