**IN THE UNITED STATES COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| National Electronic Attachment, Inc. | ) | |
| d/b/a Vyne Dental, | ) | |
| | ) | Case No. ——————1:25-cv-03246- |
| MJM | | |
| Plaintiff, | ) | |
| | ) | JURY TRIAL DEMANDED |
| v. | ) | |
| | ) | |
| Henry Schein One, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

---

## AMENDED COMPLAINT

Plaintiff National Electronic Attachment, Inc. d/b/a Vyne Dental ("Vyne") brings this action against Defendant Henry Schein One, LLC ("HS One"), and alleges as follows:

### NATURE OF THE ACTION

1. Plaintiff Vyne offers a software program known as Vyne Trellis, which provides what is referred to in the dental industry as "revenue cycle management" ("RCM") services for dental practices. Vyne Trellis facilitates dentists' submission of dental claims to insurers for payment, provides related clearinghouse services, and enables dental practices to carry out other electronic data exchange transactions standardized under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

2. Defendant HS One is a subsidiary of Henry Schein, Inc. ("Henry Schein"), which claims to be "the world's largest provider of health care solutions to office-based dental and medical practitioners." HS One provides a dental practice management software program known as Dentrix. Dental practices that use Dentrix store their patients' health information on the platform.

3.      For many years, HS One and Vyne co-existed to help their mutual customers manage their dental practices. Thus, thousands of dental practices across the country, including in Maryland, have used both HS One's Dentrix for practice management and patient data intake, and Vyne Trellis for insurance billing and RCM. These common customers benefited from the services of both software programs.

4.      But in 2025, a switch was flipped: HS One openly launched an aggressive campaign to throttle Vyne's business and interfere with Vyne's customer relationships. As part of that campaign, HS One has disseminated smears about Vyne Trellis, and has sought to block mutual customers from using the technology that allows them to securely transmit to Vyne Trellis the dental records they store in Dentrix—patient records that, under federal law, belong to dental practices and are controlled by their patients, *not* HS One. Indeed, HS One has told customers that it will launch its information blocking activity imminently. Last week, without notice or authorization from its customers, it began surreptitiously distributing an updated version of Dentrix that—like a computer virus—trawls users' computer systems searching for any Vyne Trellis processes and then stops and disables those processes, thus barring customers from using Vyne Trellis.

5.      To elaborate: Healthcare providers rely on clearinghouse and RCM services like Vyne Trellis to verify patient eligibility for benefits in a health plan, submit medical claims to insurers, receive electronic remittance advice from insurers, and conduct other HIPAA-standardized electronic data transactions. The use of such services is standard in the healthcare industry and simplifies the administrative burdens associated with claims management, allowing providers to focus on delivering healthcare to patients.

2

6.      For approximately 23 years, Vyne has provided RCM and clearinghouse services to dental practices through its platform, which is now called Vyne Trellis. Over 8,000 dental offices across the United States, including 170 in Maryland, rely on Vyne Trellis to manage their practices in conjunction with Dentrix, the dental practice management software offered by HS One. In order to use Vyne Trellis, dental offices must first transmit electronic health information to Vyne. Many dental offices store such electronic health information on third-party dental practice management systems, including Dentrix.

7.      To facilitate the transfer of electronic health information from Dentrix to Vyne Trellis, Vyne provides its customers with a printer driver that allows dental offices to effectively "print" electronic health information from Dentrix to an electronic document that is then transmitted to Vyne, akin to a "print to PDF" function. The printer driver allows providers to export electronic health information patient data from Dentrix and deliver it to Vyne Trellis. The driver is a technologically simple and efficient means for dental practices to move data from one program to another. It is industry standard. Indeed, Vyne and its customers have used this process, without issue, for over 20 years.

8.      In 2025, HS One informed Vyne for the first time that it objected to Vyne's use of the printer driver functionality to assist providers in transmitting electronic health information from Dentrix to Vyne. HS One claimed that Vyne's use of the printer driver is "hacking" that has "caused [HS One] damages, compromises the security and integrity of [HS One's] platform, and violates laws." But none of HS One's claims are true. They are nothing more than pretext for HS One's ultimate goal—stamping out Vyne's business.

9.      In the months leading up to this baseless accusation, HS One had launched a campaign blatantly designed to injure Vyne's reputation, disparage its services, and drive Vyne

customers towards an alternative claims submission interface, which is offered in connection with Dentrix and as to which (on information and belief) Dentrix has a vested commercial interest. Among other things, HS One (i) published promotional materials containing falsehoods relating to Vyne's services, including that the use of Vyne Trellis supposedly "leads to costly mistakes, claims rejections, and payment delays"; (ii) incessantly contacted Vyne's customers to inform them that their practices will "suffer" if they continue using Vyne; (iii) shamelessly promoted its own claims submission interface through misleading comparisons with Vyne Trellis; and (iv) made false claims of supposed "security breaches" in Vyne software.

10.    Apparently unsatisfied with the results of this smear campaign, HS One has now begun to directly interfere with their own customers' computer systems in an effort to destroy Vyne's business and bar their customers from using Vyne Trellis. As detailed below, HS One has pushed a series of updates to Dentrix seeking to disable the printer driver functionality for Vyne Trellis and other RCM services, blocking HS One's customers from submitting insurance claims by print capture. More recently, HS One released an update to ~~590~~hundreds of its customers that, like a computer virus, (i) disabled Vyne Trellis's printer service, (ii) searches HS One's customers' computer systems to identify any Microsoft Windows services digitally signed by Vyne, and (iii) stops and disables these services so that they will no longer start Vyne programs even after a system reboot. The updates are an effort to completely disable Vyne Trellis on dental practices' computers, and to eliminate Vyne's ability to repair the damage through software updates.

11.    This conduct is tortious and illegal. It harms Vyne and its customers (and indeed HS One's own customers). Vyne brings this action to put a stop to HS One's misconduct.

## PARTIES

12.     Vyne is a Delaware corporation, with its principal place of business in Dunwoody, Georgia.

13.     HS One, LLC is a Delaware limited liability company, with its principal place of business in American Fork, Utah. Upon information and belief, HS One is owned by HSOA, LLC, which is majority owned by Henry Schein Practice Solutions, Inc., which is in turn owned by Henry Schein, Inc., a publicly traded company.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because Counts I, II, and VII arise under the laws of the United States.

15.     With respect to Vyne's claims under state law, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a), because those claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative fact under Article III of the United States Constitution.

16.     HS One is subject to personal jurisdiction in Maryland at least because (1) Vyne's injuries arise in part out of HS One's transaction of business in the State, including offering and providing software and services to Maryland dental practices; (2) HS One's actions are causing injury to Vyne and Maryland dental practices; and (3) HS One regularly does business in Maryland, and derives substantial revenue from products and services sold within the State.

17.     Venue is proper in the District of Maryland pursuant to 28 U.S.C. § 1391(b)(1) because HS One is an "entity with the capacity to sue and be sued in its common name under applicable law" and is therefore "deemed to reside . . . in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question."

28 U.S.C. § 1391(c)(2). HS One has waived any objection to this Court's personal jurisdiction, including by failing to raise the objection in its motion to dismiss. *See* Dkt. 42; *see also* Fed. R. Civ. P. 12(h)(1). HS One therefore resides within the District of Maryland for purposes of venue.

~~17.~~18. In addition, venue is proper in District of Maryland pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this district. Specifically, (1) both Vyne and HS One regularly conduct business in Maryland; (2) at least 164 dental practices in Maryland are joint customers of both Vyne and HS One; (3) on information and belief, HS One has deployed invasive telemetry software on Maryland dental practices' computers to collect information concerning their use of Vyne products; (4) HS One knew of, and deliberately and tortiously interfered with, at least some Maryland dental practices' contracts with Vyne; (5) HS One has targeted Maryland dental practices with measures to impede their use of Vyne's products and with advertising and other communications intended to disparage Vyne's products; and (6) HS One has targeted at least thirteen dental practices in Maryland that are mutual customers of Vyne and HS One with a computer program that targets and wholly disables any Vyne-related Windows services on those customers' computers.

## FACTS

### A.    Vyne, Dentrix, and Historical Use of the Printer Driver

~~18.~~19. Vyne provides clearinghouse and RCM services to dental practices through its platform, Vyne Trellis. Thousands of customers nationwide, including at least 170 practices in Maryland who also utilize Dentrix, rely on Vyne Trellis to verify patients' eligibility for benefits in a health plan, submit claims for payments to dental insurers, receive electronic remittance advice from dental insurers, and conduct other HIPAA-standardized electronic data transactions with multiple insurers through a single electronic connection (instead of multiple separate connections).

Vyne Trellis' end-to-end RCM services include patient appointment scheduling, eligibility checks, patient intake, insurance billing (including claims and attachments), patient payment collection, secure messaging for practice personnel and other services. In short, dental practices rely on Vyne to perform necessary administrative tasks.

19.20. Vyne Trellis is SOC II Type 2-certified and HITRUST-CSF® v.11.3.0 (i1)-certified. These certifications ensure that service providers maintain rigorous standards for data security and privacy and that their data management practices comply with state and federal regulations, including HIPAA. Vyne obtained these certifications through third-party audits of its data security and privacy controls.

20.21. Vyne does not offer its own dental practice management system, so practices must separately provide the data needed for Vyne's clearinghouse and RCM services from their third-party practice management systems.

21.22. To effectuate the transmission of data from dental providers to Vyne Trellis, Vyne and its customers execute contracts governing the rights and obligations of Vyne and its customers with respect to patients' electronic health information. Ex. D.

22.23. Pursuant to their contract with Vyne, Vyne customers expressly authorize Vyne and grant Vyne full agency on their behalf to request, access, use, and export patient information, billing records, scheduling data, and other data maintained in third-party systems (including without limitation dental practice management systems) to facilitate Vyne's provision of services. Vyne customers also represent that they have all necessary rights, consents, and authority to grant Vyne the right to access and use their data. In addition, Vyne customers acknowledge that Vyne's access to their data does not violate any agreements they have with third-party vendors or any applicable law or regulation.

7

23.24.  Further, each contract contains a Business Associate Agreement that sets forth the respective obligations of Vyne and its customers with respect to electronic health information and other data that is protected health information under HIPAA. Under these contracts, Vyne agrees, among other things, (i) not to use or disclose protected health information other than as permitted or required by law and (ii) to use appropriate safeguards to prevent the unlawful use or disclosure of protected health information.

24.25.  HS One licenses its dental practice management software—Dentrix—to dental practice customers nationwide. Dental practices that use Dentrix store their patient electronic health information on the Dentrix platform. HS One does not own, and has no legal right to attempt to control, electronic health information stored on the Dentrix platform.

25.26.  To enable customers who utilize Dentrix (or certain other dental practice management software) to provide the data needed for Vyne Trellis, Vyne provides its customers with a printer driver that allows dental practices to effectively "print" electronic health information to an electronic document that is then transmitted to Vyne. This process is comparable to printing to a PDF creation tool or an electronic fax tool. After a customer has selected the electronic health information they wish to transfer to Vyne, the customer navigates to a "printer setup" toolbar on the Dentrix platform, selects the Vyne printer driver from a list of available drivers, and "prints" the data directly to Vyne.

26.27.  The use of printer drivers is a standard practice in the healthcare clearinghouse and RCM space. Multiple service providers rely on printer driver integration to facilitate the transfer of data from a healthcare provider to the service provider. Indeed, Vyne has integrated its printer driver with over 90 practice management systems without issue. In fact, HS One's own directly

competing RCM service, "EDS,"[1] has used the same basic printer-driver approach to facilitate the transfer of patient health information and, upon information and belief, continues to use that function.[2]

    27.28.  When a customer transfers their data stored on Dentrix to Vyne using the printer driver, none of HS One's confidential or proprietary information is submitted to Vyne; instead, the printer driver simply allows customers to capture their patients' electronic health information from Dentrix and deliver it to Vyne. Put differently, Vyne's printer driver has no "Read" or "Write" access to HS One's databases, meaning that the printer driver does not allow Vyne to independently modify or view any aspects of the Dentrix platform. Vyne encrypts all sensitive data sent by its customers consistent with healthcare industry standards, using TLS 1.2 or greater with common secure ciphers and encryptsto encrypt that data at rest using AES-256in transit.

    28.29.  Moreover, Vyne's printer driver functionality does not create a persistent local file in the process of transferring data, which provides another layer of security. Instead, the printer driver creates a file on the local file system in the customer's user directory that gets picked up by Vyne and converted to a file that is sent via TLS securely up to Vyne's servers. At that point, Vyne deletes the local file.

    29.30.  Dentrix itself uses a similar printer-driver process for its own use of sending PDF print jobs to its document management module.

---

[1] *See* Henry Schein One, "EDS Powered by Henry Schein One," *available at* https://www.henryscheinone.com/products/eds perma.cc/5NBR-JJBD (last visited Sept. 30Nov. 5, 2025).

[2] *See* Electronic Dental Services, "Sending Claims to EDS," *available at* https://hsps.pro/EDS-Eaglesoft/quickstarts/01_EDS_ES_Sending_Claims_to_EDS.htmlperma.cc/GB28-8LXN (last visited Sept. 30Nov. 5, 2025) (describing the "EDS Claims Capture printer" which "'prints' (converts) the claims[] information into text documents and places them into a directory folder from which EDS pulls the documents to read and load into EDS Bridge").

30.31.  Vyne has offered its printer driver functionality to customers for over 20 years. In that time, Vyne has developed meaningful relationships with thousands of dental practices nationwide that rely on Vyne Trellis to manage their practices. Customers have consistently praised Vyne's functionality and reliability, stating that they "absolutely love Vyne, [which] says a lot considering how many platforms we've tried over the past few years"; "have used [Vyne] for YEARS with no issues," and are "happy with the way [V]yne has been integrated into the practice thus far."

31.32.  Vyne has also historically maintained amicable relations with HS One. On information and belief, HS One has been aware of Vyne's printer driver functionality as a means to transmit electronic health information patient data from Dentrix and deliver it to Vyne for *more than 20 years*—since at least 2003. Until earlier this year, Dentrix never complained or raised any concerns with Vyne about Vyne's printer driver.

**B.      HS One Disseminates False Information About Vyne**

32.33.  In early 2025, HS One began spreading misinformation about Vyne and set out to block Vyne's access to their mutual customers' electronic health information, all while aggressively promoting HS One's competing product, Dentrix Eligibility & Claims Suite.

33.34.  From March 2025, HS One began informing dental practices, dental service organizations, and other healthcare providers that HS One would be releasing updates to Dentrix that would intentionally cause Dentrix to no longer be compatible with Vyne. HS One falsely asserted, among other things, that "security issues" affected Vyne's offering.

34.35.  On March 28, 2025, Vyne sent a letter to its customers addressing HS One's threats and false statements. Ex. A. Vyne refuted HS One's statement that Vyne was flagged for "security

issues," emphasizing that Vyne is a "SOC II, HiTrust-certified HIPAA Clearinghouse with a strong focus on quality, security, and performance." *Id.*

~~35.~~36.  A month later, on or around April 17, 2025, HS One took its first step toward severing its customers' ability to share patient data with Vyne. HS One released a new beta version of Dentrix to a public server that (1) included Vyne's printer driver on a list of supposedly "hostile printers"—HS One also transmitted that "hostile printer" list to a number of customers—and (2) prevented customers from printing (their own) data to Vyne from the updated version of Dentrix. As a result, when customers attempted to print their data to Vyne from the new version of Dentrix, the printed document would appear as a blank document. Customers also reported seeing a pop-up indicating that Vyne's printer driver was flagged as "[a]ctivity detected from an unauthorized third-party."



~~36.~~37.  After reviewing the release notes for the new Dentrix version, Vyne discovered that HS One had installed a new data-gathering tool called "EventBridge" on customers' Dentrix platforms. Vyne learned that EventBridge worked by surreptitiously monitoring customers' Dentrix platforms and exporting to HS One information relating to the customer's installed printer drivers and registry settings, allowing Dentrix to specifically identify Vyne customers and block customers' access to Vyne's printer driver.

38.    HS One has admitted that it installed invasive telemetry on its customers' computers in order to monitor their use of Vyne's products, including Vyne Trellis. On information and belief, this telemetry is unauthorized or is in excess of any authorization granted by HS One's customers because, among other things, it exceeds the terms of the End User License Agreement and the Terms and Conditions that HS One's customers have agreed to in connection with their use of Dentrix.

37.39.  HS One's characterization of Vyne's printer driver as "hostile" disparaged Vyne's offering, inhibited its proper functioning, and disadvantaged Vyne in favor of HS One's own competing product, even though HS One's offering is *less — and certainly not*no more — secure than Vyne's. On information and belief, other companies' printer drivers were also targeted as "hostile" in HS One's Dentrix update.

40.    HS One's efforts to target Vyne's printer driver lack any legitimate basis in supposed security concerns. HS One has admitted that the only basis for its claims of security breaches by Vyne is the results of its telemetry, which it deployed *after* it began targeting Vyne's printer driver and disseminating false information concerning Vyne. HS One has never informed Vyne that a Vyne (or any other company's) printer driver caused a security breach in HS One programs or resulted in the loss or theft of any customer data. On information and belief, HS One undertook the decision to target Vyne's printer driver solely to attempt to eliminate Vyne as a competitor, and not because of a legitimate concern regarding the security risks presented by the use of printer drivers. Indeed, HS One itself continues to use a printer driver for its own programs.

38.41.  HS One's campaign to disparage and injure Vyne did not stop there. On or around April 25, 2025, HS One sent a mass advertising email to Vyne's customers with an image titled, "Vyne Disconnects Imaging & Claims." Ex. B. In its email, HS One warned: "If you're using

12

Vyne, you're manually attaching images, typing in CDT codes, and crossing your fingers. Sound familiar? That extra effort often leads to costly mistakes, claim rejections, and payment delays." *Id.* HS One stated that: "Disconnected Tools Mean Denied Claims. Vyne Doesn't Fix That – Dentrix Does." *Id.*

39.42.  Making clear that its tortious conduct was intended to favor its competing offering, HS One offered a "limited time" opportunity for dental providers to "upgrade from Vyne to the Dentrix Eligibility & Claims Suite for just $99/month," claiming that providers would "stop losing time and money on disconnected processes." *Id.*

40.43.  The statements in HS One's email are ~~falsehoods that~~literally false and deliberately misrepresent the functionality and integrity of Vyne's services and that have caused—and continue to cause—damage to Vyne's reputation. On information and belief, HS One has distributed this email to hundreds of Vyne customers with knowledge of, or reckless indifference to, its falsity, and with the intent to mislead Vyne's customers regarding Vyne's products in order to benefit HS One commercially.

41.44.  For example, HS One's claim that Vyne "Disconnects Imaging & Claims" suggests that the Vyne Trellis platform lacks integration between imaging and claim submission. But Vyne Trellis fully supports integration with imaging. *See* Ex. C. Vyne's workflow expressly includes "Imaging System Integration," with an automated "Create Attachment" prompt to integrate (and QC) images. HS One's claim that Vyne lacks imaging functionality is simply a false statement of fact that misrepresents Vyne's functionality.

42.45.  As another example, HS One's claim that "[i]f you're using Vyne, you're manually attaching images, typing in CDT codes, and crossing your fingers" suggests that Vyne Trellis lacks automated functionality that in turn, according to HS One, "leads to costly mistakes, claim

rejections, and payment delays." But Vyne Trellis fully supports automated integration and functionality; indeed, Vyne provides an "Image Sync" option that automatically associates claims with available images and allows dental offices to select the correct documentation when managing claims. Providers are *not* required to *manually* type CDT codes or attach images. Rather, Vyne Trellis facilitates claims validation processes by *automatically* filtering documentation that providers are required to include with each claim submission, thereby ensuring that providers submit the appropriate documentation for each claim.

43.46.  Likewise, HS One's statement that Vyne Trellis "leads to costly mistakes, claim rejections, and payment delays" suggests that Vyne's product causes adverse financial and administrative outcomes. But Vyne Trellis integrates rules directly from insurers regarding the necessary documentation for each claim submission and prompts dental practices to supply the best available documentation, ensuring that claims are submitted in a timely and accurate manner. This verification process *reduces* claim rejections and unnecessary delays caused by missing or incorrect documentation. Again, HS One's statements to the contrary are simply false.

44.47.  Shortly after disseminating its April 25, 2025 email, HS One escalated its campaign against Vyne by falsely informing Vyne's customers that Vyne Trellis had supposedly been flagged for "security issues" and that HS One would therefore be unable to integrate its Dentrix platform with Vyne in the future. In fact, the "security issues" to which HS One referred were baseless pretexts for cutting off customers' access to Vyne Trellis, with the improper purpose of injuring Vyne's business and impairing its ability to compete with HS One. To that end, customers reported receiving mass communications and aggressive outreach from HS One asserting that Vyne is not authorized to access customer data stored on Dentrix—which was another way of

saying that customers would be unable to use Vyne's printer driver to populate their own data stored on Dentrix to Vyne Trellis.

48.     On information and belief, HS One distributed this communication or substantively similar communications to its customers as part of a directed advertising campaign seeking to induce Vyne customers to switch to HS One's competing claims submission product. HS One's assertions concerning "security risks" posed by Vyne's products were literally false because, on information and belief, HS One has not suffered any security breaches or loss of patient data as a result of Vyne products and because Vyne's printer drivers do not present greater security risks than other methods of transferring patient data from practice management software programs. In addition, HS One's misrepresentations were misleading in context because they give the false impression that Vyne's products present greater security risks than Vyne's competitors', disparaging Vyne's products and its business reputation and causing confusion within the market concerning the safety of Vyne's software.

45.49. One customer reported that HS One representatives were actively calling customers' offices and using blatant scare tactics, including telling practices they will be blocked from all eClaim services and that their practice will "suffer" if they continue to use Vyne. The same customer stated that several colleagues had received similar communications from Dentrix sales reps.

46.50. In an email to Vyne, another customer, correctly apprehending HS One's anti-competitive strategy, stated: "This situation feels extremely sketchy. It seems like Dentrix is trying to trap us – and other practices – into working exclusively with them and purchasing additional features." As to any HS One assertion that its product was superior, the customer stated: "We already tried Dentrix Hub and Engage for a year, and it was absolutely horrible." The customer

wrote that her dental practice is now "being forced to pay even more and possibly work with multiple vendors just to replace what Vyne currently handles – and handles very well." This, of course, was the result of HS One's strategy to make it more difficult and burdensome for customers to use Vyne's product.

47.51.  Numerous other customers, on message boards and in other fora, expressed outrage at HS One's tactics. Among other things, customers described HS One's communications as "grimy sales tactic[s]," lamented that they "[h]ate Dentrix," stated that HS One is "making it more difficult for us to use [V]yne for claims," and warned that HS One was using aggressive scare tactics. During this time, Vyne received an influx of customer inquiries expressing concern regarding HS One's communications and requesting assistance as to how to continue using Vyne's Trellis platform.

**C.    HS One's Bad Faith in API Negotiations**

48.52.  In light of HS One's conduct blocking customers' use of Vyne's printer driver functionality to seamlessly provide their data stored on Dentrix to Vyne, Vyne attempted to find workarounds using Application Programming Interfaces ("API") and other forms of electronic software integration. API connections are one method for accessing electronically stored data and transmitting that data from one program to another.

49.53.  On or around March 25, 2025, in an effort to resolve the problems created by HS One's actions, Steve Roberts, Vyne's CEO, initiated contact with HS One to explore possible API integration between Dentrix and Vyne for claims submission. Vyne was prepared to pay HS One to allow customers to transmit their Dentrix-stored data to Vyne Trellis via APIs, even though doing so would be rewarding HS One's tortious and coercive strategy. Vyne's focus was on

ensuring a viable alternative to continue providing services to its customers with data stored on Dentrix.

50.54.  HS One stated that it would be willing to discuss the use of APIs to accomplish what Vyne's printer driver had earlier facilitated, but it soon became apparent that HS One was in bad faith and in fact wished to use the discussions to string Vyne along while HS One further injured its business. In early discussions, HS One claimed to be unable to confirm that its existing APIs supported transmission of the data required for claims submission, an absurd position for a data platform and software provider to take.

51.55.  It only got worse from there. After a few months of halting non-progress, on or around May 27, 2025, Vyne and HS One met to discuss an API-based integration between Vyne Trellis and Dentrix. At the meeting, HS One proposed its "Dentrix Developer Program" ("DDP") as the path forward. However, in what by then was par for the course, HS One indicated that the wrong HS One representatives were in the meeting and that a subsequent meeting would be needed with the right people.

52.56.  HS One then presented Vyne with a proposed "Henry Schein Developer Program Agreement," outlining its supposed proposal for the API integration. But rather than proposing workable arrangements for *allowing* dental providers to export their electronic health information to Vyne, HS One instead sought in a draft DDP agreement to impose draconian contractual *restrictions* on Vyne's ability to work with their mutual customers. And certain of the terms HS One proposed made clear that HS One also wished to frustrate Vyne's ability to market itself to potential purchasers should the opportunity arise.

53.57.  On June 2, 2025, Vyne, attempting to keep the discussions alive despite HS One's apparent bad faith, sent back a red-lined version of the draft DDP agreement HS One provided,

together with explanatory comments. Among other things, Vyne raised concerns with the proposed

limitations on data access. Vyne noted that HS One's proposed restrictive language "appears to be

a violation of the Cures Act Final Rule, issued by the Office of the National Coordinator for Health

Information Technology (ONC) in 2020."

54.58.   Vyne also raised concerns that HS One's draft language "implies that data (e.g.

Patient insurance information for eligibility verifications) cannot be transferred to Payers which is

Vyne's primary business." Of course HS One knew perfectly well that transferring information to

payers was at the core of Vyne's business, and in purporting to prevent Vyne from doing so HS

One was making clear that its real design was to prevent Vyne from competing with HS One's

competitive offering and to injure Vyne's business. Vyne also informed HS One that it could not

agree to having the contract terminated upon a Change of Control, which again would have been

obvious to HS One.

55.59.   Despite HS One's bad faith, Vyne continued to seek an agreement that would

enable it to serve its customers who used the Dentrix platform. On June 3, 2025, Vyne and HS

One executives met. Vyne's President, James Grover, reiterated concerns that the DDP did not

guarantee the required access to support claim submissions and proposed an interim solution (in

which Vyne would join HS One's DDP and pay the required fees for each location, but would be

allowed to use its existing printer driver integration until the necessary APIs were developed by

HS One). Brian Weatherly, HS One's CEO, expressed support for Mr. Grover's proposal, stating

"[i]t will be great to get this done." Thereafter, HS One rejected the same terms that Mr. Weatherly

stated were agreeable.

56.60.   In the following weeks, HS One doubled down on the restrictive terms it originally

proposed, and essentially demanded that Vyne submit to those terms. Nonetheless, Vyne continued

to attempt to find common ground. In response, on July 11, 2025, HS One's General Counsel stated that HS One was supposedly "working through the items" raised in various Vyne communications. That statement turned out to be false.

57.61. After receiving no further communications from HS One, Vyne sent HS One an email advising it that, absent a response to its proposals by July 28, 2025, Vyne would assume negotiations had concluded.

58.62. Thereafter, HS One revealed that its real strategy had been to delay while continuing to disparage Vyne and frustrate its access to customer data while using the same pressure tactics alleged above to coerce customers into switching to HS One's competing offering. On July 28, 2025, HS One's General Counsel sent an email to Vyne making the absurd assertion that Vyne had been "hacking" into HS One's software, claiming that Vyne's services compromise HS One's security, and alleging Vyne's violation of unspecified laws. Having made these accusations and threats, HS One demanded that Vyne agree to its final version of the DDP agreement—which it knew Vyne could not do—or risk losing any and all access to electronic health information stored on the Dentrix platform. HS One's final proposal did not even attempt to resolve any of Vyne's concerns regarding HS One's initial proposal and instead added additional draconian and unacceptable terms. The final proposal called for the following terms and restrictions:

> a. After a 90-day transition period, a restriction prohibiting Vyne from "access[ing] any HS One practice management software except through means explicitly authorized in an agreement with HS One," but the proposed agreement would not authorize any HS One API or other access method that would provide the electronic health information necessary for Vyne to provide its services to its customers, and

HS One would not agree to provide any such access method before the end of the transition period. The proposed agreement would also prohibit the use of any third-party products to access electronic health information stored in Dentrix.

b.   A requirement that Vyne pay royalties for each dental provider using Vyne Trellis and Dentrix, *even if* Vyne opted not to use HS One's API for that particular provider.

c.   Restrictions imposing limitations on Vyne's use of electronic health information that are more restrictive than limitations imposed by Vyne's customers themselves, including a prohibition on the provision, use, modification, reproduction, distribution, sale, display, or disclosure of data gathered from HS One software to any third party.

d.   A restriction prohibiting assignment or change of control of the DDP Agreement to a HS One competitor.

59.63.   Meanwhile, and as further evidence that HS One knew its proposed terms were unworkable and that it was negotiating in bad faith, Vyne learned that HS One was informing Dentrix customers that their Vyne integration would be cut off in the near future. HS One disseminated communications to Vyne's customers informing them that, beginning on August 26September 23, 2025, HS One would take steps to completely block Vyne's printer driver functionality and prevent the sharing of electronic health information with Vyne Trellis.

64.   For example, on August 26, 2025, HS One reached out to at least one customer concerning its use of Vyne products, sending an email with the subject line "We've Detected Unauthorized Activity on Your Dentrix System" and threatening that "[u]nauthorized third-party integrations can pose a security risk to your organization and compromise your Dentrix system

and data." As the HS One representative explained, this communication had been sent to the dental practice because it was "using Vyne for [its] eClaims service," and HS One urged switching to HS One's "integrated eClaims services" because Vyne was "not properly connected through our Dentrix API platform which can cause a security issue." HS One emphasized that the practice should switch from Vyne to HS One's "fully integrated and SECURE eClaims platform" and offered a special pricing package for customers that were supposedly "adversely affected by the Vyne security breach." As HS One is aware, this information was literally false because there was no "security breach" related to Vyne products, and it was calculated to mislead customers with respect to the security of Vyne products. On information and belief, HS One distributed these claims to substantial numbers of Vyne customers as part of a directed advertising campaign[3] and in an effort to induce them to discontinue their contracts with Vyne, relying on false and misleading claims about supposed security vulnerabilities from Vyne's products. As before, HS One did this with knowledge of, or at least recklessness to, the falsity of these claims and the likelihood that they would mislead Vyne customers.

60.65.  On August 26, 2025, in the midst of CEO-to-CEO negotiations, Vyne received a letter from outside litigation counsel retained by HS One, suggesting that HS One intended to sue Vyne for "multiple related common law and statutory claims," all based on Vyne's efforts to allow its customers the same service that it had been providing, with HS One's full knowledge, for decades—which HS One's litigator again baselessly called "hacking."

---

[3] For example, on a webpage on HS One's website concerning its litigation with Vyne, HS One includes an example of a substantively similar mass communication it sent to its customers on August 21, 2025 making claims that non-HS One programs would "jeopardiz[e] the security and integrity of [practice] data" and promising to "contact [practices] shortly with more information if [they were] impacted." *See* Henry Schein One, "Protecting Your Practice, Data, and Dentrix System," *available at* https://perma.cc/WH8M-UJQC (last visited Nov. 5, 2025).

61.66.  HS One did not, and has not since, provided any evidence that Vyne's printer driver compromises the security or integrity of Dentrix or that HS One has a protectable intellectual property interest in its customer's electronic health information. And, as explained above, the allegation is entirely without basis given that Vyne uses a printer driver that is ~~more secure than~~akin to Dentrix's own approach.

62.67.  HS One has continued to slow-roll negotiations with Vyne concerning a potential agreement on API access while, at the same time, pursuing aggressive and unlawful tactics to interfere with Vyne's relationships with its customers and lure Vyne's customers to its own claims-processing system based on false pretenses. A few days later, as detailed below, HS One pushed a Dentrix update that attempted to completely disable Vyne software on Dentrix customers' computers.

**D.      HS One's Disabling of Vyne Software**

63.68.  On September ~~24~~23, 2025, HS One escalated its efforts to throttle Vyne's business, resorting to deploying what can only be described as a virus on the computers of its own customers to remotely disable Vyne software functionality completely—including non-claims and software update functions that HS One has never even objected to—and indeed any software (no matter what it does) that bears Vyne's digital certificate.

64.69.  That day, HS One distributed a Dentrix update to customers containing an automated security scanner that specifically targets and disables Vyne software services. The scanner runs continuously every 10 minutes, automatically stopping and permanently disabling any Windows services signed with Vyne's digital certificate. The scanner operates continuously while Dentrix is running, disabling any Vyne services and preventing them from restarting, even on a reboot of the system. It functionally disables any Vyne Dental software installed on the

computer systems of the affected practices. On information and belief, the update has already been deployed to hundreds of mutual customers of Vyne and HS One as of the date of this filing, and at least ~~five~~thirteen practices in Maryland alone have had their access to Vyne software blocked.

~~65.~~70.  Unlike HS One's previous attempt to block Vyne's printer driver—which maintained a thin veneer of neutrality by listing printing services other than Vyne's as "hostile"—this update specifically and solely targets Vyne's software, hunting for any Windows services that are tied to Vyne or signed by Vyne's digital signature.

71.     To Vyne's knowledge, HS One provided no notice to the affected practices that it would use Dentrix to deploy a virus that would disable a competitor's software, nor does the Dentrix's security scanner inform users or offer an opt-out when it disables Vyne's programs. On information and belief, HS One's access to customers' computers in order to target and disable Vyne software was not authorized by those customers.

~~66.~~72.  HS One's invocation of a supposed security justification for targeting of Vyne software was pretextual because HS One continues to use functionality akin to that used by Vyne in its own programs, including a printer driver, and because HS One lacks any substantial basis to believe that Vyne's programs present a security risk to HS One's software or its customers' data. In addition, HS One's virus targeted Vyne functions wholesale, without even attempting to tailor its impact to any measures that HS One has stated present a security risk. HS One's measures were also adopted in a manner that discriminates against Vyne because HS One has not targeted or disabled any other software developer's programs in a similar way.  Instead, HS One's update represents intentional competitive blocking of Vyne's software disguised as security functionality.

~~67.~~73.  Since that date, Vyne has been forced to take action to restore Vyne functionality for affected users, including, for some customers, manual intervention to enable them to continue

to submit insurance claims. Still, many Vyne customers have been unable to submit insurance claims or carry out other RCM services, and some Vyne customers have cancelled their service agreements with Vyne.

68.74.  In the meantime, HS One has continued to spread false and misleading information regarding Vyne Trellis. OnFor example, as noted, on September 23, 2025, for example, an HS One employee wrote to a Vyne customer that HS One was offering a "new unlimited eClaims bundle for Dentrix customers" who were "adversely affected" by a supposed Vyne "security breach." As HS One is fully aware, there have been no such "security breaches."

### E.    HS One's Improper Information Blocking

69.75.  The Cures Act was designed to accelerate medical product development, promote interoperability, and support patients. The Cures Act authorized the U.S. Department of Health and Human Services to adopt regulations to promote interoperability, prevent information blocking, and ensure various actors in the healthcare IT industry and patients can access electronic health information. *See* 42 U.S.C. § 300jj-52. The United States Department of Health and Human Services, Assistant Secretary for Technology Policy / Office of the National Coordinator for Health Information Technology ("ASTP/ONC") implemented information blocking regulations to avert the use of "practices that increase the cost, complexity, or other burden associated with accessing, exchanging, or using electronic health information." 84 F.3d Reg. 7424, 7516. Under these regulations, entities such as HS One that operate health information networks and health information exchanges are prohibited from interfering with or discouraging access to, exchange of, or use of electronic health information. Violating the information blocking rules under the Cures Act can result in fines of over $1,250,000 million per violation.

70.76. HS One is considered a "health information network or health information exchange" because, as part of Dentrix, HS One provides the "Henry Schein One API Exchange," "Dentrix Developer Program," "eClaims," "Eligibility Essentials and Pro," "Quickbill", and "ePrescribe" technologies that enable more than two unaffiliated individuals or entities to exchange electronic health information for Treatment, Payment, or Health Care Operations purposes, as such terms are defined in 45 CFR § 164.501.

71.77. Dentrix had also been certified under the National Coordinator for Health Information Technology ("ONC") Health IT Certification Program. On June 2, 2025, Vyne informed HS One for the first time that the language in the proposed DDP agreement that prohibited Vyne from "access[ing] any HS One practice management software except through means explicitly authorized in an agreement with HS One" "appears to be a violation of the Cures Act Final Rule, issued by the Office of the National Coordinator for Health Information Technology (ONC) in 2020." *That same day*, apparently recognizing that its conduct violated the Act, HS One voluntarily removed Dentrix from the Certification Program.[4]

78. HS One remains subject to the Cures Act because it qualifies as a health information exchange/health information network ("HIE/HIN") under the applicable regulations, which includes any "entity that determines, controls, or has the discretion to administer any requirement, policy, or agreement that permits, enables, or requires the use of any technology or services for access, exchange, or use of electronic health information" "[a]mong more than two unaffiliated individuals or entities (other than the individual or entity to which this definition might apply) that are enabled to exchange with each other" and "for a treatment, payment, or health care operations

---

[4] *See* Certified Health IT Product List, "Dentrix Enterprise," *available at* https://chpl.healthit.gov/#/listing/11430 (last visited Sept. 30, 2025).

25

purpose." 45 C.F.R. § 171.102. HS One qualifies as an HIE/HIN because it has created and administers the HS One API Exchange, which facilitates real-time exchange of patient and insurance payment electronic health information between thousands of dental practices and over 140 third-party vendors which are part of the API Exchange program using the Dentrix platform. This platform enables HS One customers to exchange patient data with dozens of different HS One-approved vendors, and each of these vendors to interact with thousands of Dentrix users.[5] On its website, HS One describes the API Exchange as a "central hub for platform integration" and "a versatile platform enabling integrations and interoperability with preferred vendors."[6] And it separately describes the API Exchange as "[e]nabl[ing] scalable operations by allowing multiple clients or services to interact with the system simultaneously without relying on a single user interface," stating that the Exchange "processes 6 billion API calls per year."[7]

72.79.    HS One's unjustified refusal to grant Vyne access to the data it seeks from Dentrix and its overt effort to prevent Vyne from using patient data constitutes not just a tort but also an action that interferes with access, exchange, or use of electronic health information, and such action does not fall into any exception to the information blocking rules. *See* 45 CFR § 171.103.

80.    HS One's measures do not satisfy the security exception to the information-blocking rules because they were not tailored to the specific security risk being addressed or implemented in a consistent and non-discriminatory manner. HS One's disabling of the printer

---

[5] *See, e.g.*, Henry Schein One, "Kare Mobile Uses Dentrix Ascend to Bring State-of-the-Art Dentistry Directly to Patients" (2024), *available at* https://perma.cc/JG8P-BQ4J (describing a customer's use of multiple third-party programs that integrate through the HS One API with Dentrix to facilitate the exchange of patient health information, including to analyze patient x-rays, formulate treatment plans, and schedule appointments).

[6] Henry Schein One, "Henry Schein One API Exchange," *available at* https://perma.cc/3LX9-UZJD (last visited Nov. 5, 2025).

[7] Henry Schein One, "Unlocking the Power of Integration: How the Henry Schein API Enhances DSOs" (Aug. 27, 2024), *available at* https://perma.cc/4ZCQ-X4AQ.

driver is not connected to any legitimate security concern arising from the use of that printer driver; on information and belief, HS One has never experienced a security breach from Vyne's printer driver, nor does it have any basis to believe that such a breach is likely. Indeed, HS One seeks to disable a printer-driver functionality that it continues to use for its own products, making clear that its measures are not even-handed or nondiscriminatory. As to HS One's targeting of Vyne-signed Windows services, HS One has never articulated any security objection at all (even a pretextual one) for the services HS One disabled with this update, meaning that its measures are not narrowly tailored to any security risk, and its measures were clearly discriminatory because they targeted Vyne services by name, regardless of their function.

81.    Nor do HS One's actions satisfy the manner exception to the information-blocking rules, as HS One is plainly capable of providing the data sought by Vyne through the same methods that have been used by the parties for the past several years, including the printer driver. There is nothing inherent to the claims data Vyne seeks that presents a security risk or other impediment to the sharing of information.

73.82.  Vyne's customers seek Vyne's assistance to submit claims to help them effectively coordinate payment with insurance providers. HS One's refusal to allow Vyne access to the data via the printer driver, API, or other integration significantly delays and impedes Vyne's access to the necessary electronic health information and increases the costs, complexity, and burden associated with Vyne's use of this data on behalf of Vyne customers. HS One's misconduct leaves Vyne unable to perform on its agreements with its customers or to provide the services they purchase from Vyne.

74.83.  Accordingly, HS One's conduct violates the Cures Act and the federal information blocking regulations. Despite Vyne's informing HS One that HS One's conduct violated the Cures Act, HS One has continued with the implementation of its unlawful information blocking.

\*        \*        \*

75.84.  HS One's information blockade and other misconduct pose an imminent and severe threat to Vyne's existing and future business. Over 8,000 of Vyne's customers rely on Vyne's printer driver functionality to transmit electronic health information from Dentrix to Vyne. On information and belief, HS One plans to block Vyne's access to all its customers' electronic health information via the printer driver integration and/or otherwise by HS One's release of malicious software deploymentor updates. As a result, Vyne's access to its customers' electronic health information, and ability to provide its RCM and clearinghouse services, will be cut off entirely.

76.85.  HS One's actions threaten to crater Vyne's revenue and injure Vyne's business by blocking Vyne's ability to provide services for its customers. Indeed, as part of its contracts with customers, Vyne agrees to provide its customers with, among other things, (i) unlimited electronic claims processing; (ii) unlimited electronic attachments; (iii) claims status and real-time claims updates; and (iv) unlimited eligibility and benefits support. Without access to its customers' electronic health information or the ability to operate Vyne's software on its customers' systems, Vyne's ability to provide these services will be substantially limited. HS One's campaign of smears and hacking has been pursued for the purpose and with the effect of encouraging or pressuring Vyne customers to terminate their contracts with Vyne and utilize its private-label claims submission offering instead.

86.    Further, HS One's campaign of falsehoods and disparaging statements threatens to irreparably harm Vyne's reputation as a healthcare clearinghouse and RCM services provider and

to irreparably impair its ability to provide patient information to payers. In the last several weeks alone, Vyne has observed an over 50% decrease in claims submissions from nearly ~~1~~2,000 dental-provider customers~~.~~, and at least 164 customers have completely stopped submitting claims through Vyne Trellis since September 2025. At least 500 Dentrix customers have cancelled their accounts with Vyne since early March 2025, and since mid-August 2025, at least 50 of these customers have specifically informed Vyne that they were cancelling their Vyne accounts because of concerns arising from HS One's false communications, a desire not to "be in the middle" of a dispute between HS One and Vyne, or because of incompatibilities with Dentrix caused by HS One's efforts to block Vyne's software.[8] If HS One is successful in its efforts to sever Vyne's access to their mutual customers' electronic health information, ~~this number is~~these numbers are certain to rise.

~~77.~~87.  This reputational injury is also certain to have downstream effects, including threatening to drive future customers away from Vyne and interfere with Vyne's prospective business relationships, whether with future vendors, business partners, or investors. In the ordinary course of business, Vyne receives outreach from prospective customers seeking to purchase Vyne products and services, and HS One's injury to Vyne's reputation will inhibit those customers from entering into new contracts with Vyne. Based on information maintained by Vyne's sales teams for the period since mid-August 2025, Vyne is aware of at least 100 potential customers it was in communication with regarding purchasing or upgrading their use of Vyne services who

---

[8] For example, on September 30, 2025, one customer cancelled its use of Vyne's Remote Lite service because the customer understood, based on representations from Dentrix customer support, that it was "either them ([D]entrix) or us ([V]yne)" and had been "threaten[ed] to never be able to print claims again and other possible complications." This customer was reportedly "upset about how they had to make a choice but they HAVE to pick Dentrix per office." Another customer cancelled its use of Vyne's services on October 17, 2025, "[d]ue to the ongoing issues between [Vyne] and Dentrix."

specifically indicated that HS One's misrepresentations concerning Vyne or its efforts to impede Vyne functionality were the reasons they ultimately chose not to contract with Vyne for new or additional services. For example, on August 18, 2025, a potential customer for an upgrade of Vyne services indicated that it was refusing to move forward with Vyne because "Dentrix threatened not to work with [it] anymore," which "[s]cared the office from even staying with [Vyne] with their current account." On August 27, 2025, a potential Vyne customer declined to purchase services from Vyne, explaining that she was "reluctant" to work with Vyne "since the email sent out last week" by HS One "referring to possible restrictive/compatibility issues using Vyne [] with the coming update to Dentrix." Another potential customer indicated on October 15, 2025 that although it was "[h]appy w/ [V]yne and [its] support," it "didn't want to upgrade" its use of Vyne's services because it was "scared w/ Dentrix and cloud update in the future." Vyne believes that many more customers have chosen not to contract with Vyne because of HS One's falsehoods and unfair conduct.

78.88.  ~~More immediately~~In addition, HS One's campaign of falsehoods and disparaging statements has also resulted in a flood of inbound calls to Vyne's customer support lines, which are crucial to ensuring that Vyne customers are able to utilize their Vyne products and services on a day-to-day basis. Vyne has fielded outreach from at least 628 Vyne customer accounts fearing the impact of HS One's efforts to cut off their access to Vyne products. As a result, Vyne customers, including those who do not utilize Dentrix, have had negative customer experiences, further harming Vyne's reputation.

89.    Because of HS One's misconduct targeting Vyne's customers' use of its programs, including the printer driver and, with respect to some Vyne customers, all Vyne software functions, Vyne and its customers have suffered an interruption of service, leaving Vyne functions unusable

30

for those customers. In addition, Vyne has been forced to undertake significant efforts to restore the functionality of Vyne's programs, including in some cases customer-specific intervention to repair damage to Vyne software. Vyne has estimated that it has spent at least $90,000 in the form of management time dedicated to addressing HS One's actions against Vyne this year—a substantial underestimate because it accounts only for time spent by management in meetings, and omits the countless hours devoted to planning and executing responses to HS One's actions, including developer time needed to generate software fixes. That is in addition to at least $7,500 worth of time that Vyne customer support staff have had to expend fielding inquiries from customers regarding HS One's latest software blocking and assisting them with restoring access to Vyne software. Ultimately, the full scope of the cost Vyne has incurred to protect its business from HS One's campaign cannot be determined.

## COUNT I
### Computer Fraud and Abuse Act – 18 U.S.C. § 1030(g)

79.90.  Vyne realleges and incorporates by reference the allegations contained in the preceding paragraphs.

80.91.  Vyne's customers' computer systems are "protected computer[s]" within the meaning of the Computer Fraud and Abuse Act because they are used in or affect interstate or foreign commerce. 18 U.S.C. § 1030(e)(2)(B).

92.    By installing an invasive telemetry system on Vyne's customers' computers in order to extract information about their use of Vyne's programs and thereby identify means to target and disable Vyne's programs, HS One intentionally accessed a computer without authorization or exceeded authorized access, and thereby obtained information. 18 U.S.C. § 1030(a)(2).

81.93.  By engaging in the above-described activities, including by disabling or attempting to disable Vyne Trellis's print driver functionality and, in some cases, deploying an update that crawls its customers' computers to disable all of Vyne's software programs, HS One caused the unauthorized transmission of a program, information, code or command and thereby intentionally caused damage without authorization to Vyne's customers' computer systems. 18 U.S.C. § 1030(a)(5)(A). In addition, by the same conduct, HS One has intentionally accessed a protected computer without authorization, and as a result of such conduct, caused damage and loss to Vyne. 18 U.S.C. § 1030(a)(5)(C).

82.94.  HS One's deployment of software to interfere with Vyne's software and drivers was without actual or legal authorization and/or exceeded such authorization.

83.95.  HS One's misconduct affects more than 10 protected computers and potentially modifies or impairs the medical examination, diagnosis, treatment, or care of one or more individuals.

84.96.  HS One has therefore violated and continues to violate the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5)(A)..

85.97.  Vyne has suffered damages and losses, and will continue to suffer damages and losses, aggregating at least $5,000 in value during any 1-year period, by reason of, and as a direct and proximate result of the actions of HS One referenced above, and has a private right action for damages and equitable relief. 18 U.S.C. § 1030(g).

**COUNT II**
**Lanham Act – False Advertising**

86.98.  Vyne realleges and incorporates by reference the allegations contained in the preceding paragraphs.

87.99.  By engaging in the above-described activities, HS One made false and misleading representations of fact to consumers and potential consumers that misrepresent the nature, characteristics, and quality of Vyne's product and services, including by misrepresenting the functionality of Vyne Trellis, stating that Vyne Trellis leads to errors and adverse financial impacts, and claiming that Vyne Trellis poses security issues to Vyne's customers., and stating that Vyne products have been responsible for "security breaches." HS One made its false and misleading representations of fact in commerce by disseminating the above-referenced falsehoods to Vyne's customers via email communications, phone calls, and letters.

88.100.    This conduct, which was purposeful and willful, violates Section 43(a)(1)(B) of the Lanham Act.

89.101.    As a direct and proximate result of the actions of HS One, Vyne has suffered damages and will continue to suffer damages, and such damages are irreparable.

## COUNT III
### Tortious Interference with Contractual Relations

90.102.    Vyne realleges and incorporates by reference the allegations contained in the preceding paragraphs.

91.103.    Vyne has thousands of subscribing agreements with dental providers across the country, including dental providers in Maryland, under which providers grant Vyne full agency and authority to request, access, retrieve, use, and export each provider's electronic health information on behalf of the provider. The subscribing agreements further grant Vyne authority to send written data access and interoperability requests directly to third-party vendors, platforms, or custodians of such electronic health information on the provider's behalf. In exchange, providers agree to pay fees to Vyne for its clearinghouse and RCM services.

92.104.        HS One, while not a party to the contracts between Vyne and Vyne's customers, has full knowledge of these agreements and the parties' relevant obligations contained therein. Such knowledge stems from, among other sources:

a.  Vyne's own website, where Vyne's standard terms and conditions are published publicly; [9] and

b.  Specific communications between Vyne and HS One, including an August 21, 2025 letter sent by Vyne to HS One identifying hundreds of Vyne customers by name and stating that Vyne was "a Business Associate of each requesting mutual customer and is permitted to access to the[ir] [health] Data through express written authorization from the requesting customer and through its direct Business Associate Agreements with each requesting customer" and that HS One's continued withholding of information would "directly impair the customer's ability to rely on Vyne Dental's services in support of their essential healthcare operations"[10];

c.  Communications between HS One representatives and Vyne customers discussing the contents and pricing of Vyne's business arrangements with its customers, including at least an email from John Giarraputo, an HS One Senior Account Executive, dated Sept. 9, 2025; and

b.d.Other sources and industry-knowledge developed over more than a decade during which Vyne has routinely accessed Dentrix via a printer driver.

---

[9] *See* Vyne Dental, "Terms," *available at* https://vynedental.com/terms/ perma.cc/3X45-9TJ5(last visited Sept. 30,Nov. 5,, 2025).
[10] *See* Dkt. 37, Ex. 10.

105.    HS One's misconduct leaves Vyne unable to perform the services its customers contract for by subscribing to or purchasing Vyne products. Vyne's contracts with its customers incorporate the services or functionality provided by the Vyne products that they choose to subscribe to.[11] Under these agreements, Vyne undertakes to, among other things, "make the Services" that customers contract for "available to [them] pursuant to this Agreement" and to make "commercially reasonable efforts to ensure availability" of those services to the extent Vyne is able.[12]

93.106.    HS One has knowingly, willfully, and intentionally prevented dental providers and Vyne from performing their respective obligations under the agreements by (i) threatening to and planning to sever Vyne's access to electronic health information, and thus (ii) make it impossible for dental providers to provide Vyne with timely and effective access to electronic health information., and for Vyne to perform its obligations under their contracts. As a result, neither Vyne nor its customers are able to fulfill their respective duties under the contracts, hindering Vyne's ability to fulfill its contractual obligations. Further, HS One has knowingly, willfully, and intentionally encouraged and threatened Vyne's customers to terminate their contracts with Vyne, utilizing false and disparaging statements, and directly interfering with Vyne's contractual relationships with its customers.

94.107.    HS One has also knowingly, intentionally, and willfully violated federal law and regulations in its attempts to interfere in these agreements by employing techniques prohibited under the federal Cures Act.

---

[11] Vyne Dental, "Terms" at § 1, *available at* https://perma.cc/3X45-9TJ5 (last visited Nov. 5, 2025).

[12] Vyne Dental, "Terms" at § 12, *available at* https://perma.cc/3X45-9TJ5 (last visited Nov. 5, 2025).

95.108.    HS One has also knowingly, intentionally, and willfully deployed software that illegally interferes with Vyne's software and software licenses with its own customers, including by disabling drivers and indeed any software authenticated by Vyne. That deployment exceeded any authorization that was or could be given by HS One's customers, including under the Cures Act.

96.109.    HS One's actions were calculated to harm Vyne's lawfully conducted business activities, namely providing clearinghouse and RCM services to dental providers who authorized the transmission of their electronic health information to Vyne.

97.110.    HS One's conduct constitutes an intentional interference with Vyne's contractual obligations to its customers, was done through improper means, and was driven by an improper motive.

98.111.    As a result of HS One's intentional interference with the contractual obligations laid out in Vyne's agreements and HS One's efforts to push Vyne's customers to terminate their contracts with Vyne, utilizing false and disparaging statements, Vyne has suffered and continues to suffer damages.

## COUNT IV
### Tortious Interference with Prospective Business Relations

99.112.    Vyne realleges and incorporates by reference the allegations contained in the preceding paragraphs.

100.113.    HS One intentionally and willfully interfered with Vyne's prospective business relations by (i) disseminating disparaging communications to Vyne's customers that were, and continue to be, injurious to Vyne's reputation, (ii) engaging in conduct designed to sever Vyne's access to patient electronic health information and push Vyne's current and future

customers to other favored systems, and (iii) pushing software that illegally disables Vyne software and software functionality.

~~101.~~114.     HS One's actions were plainly and deliberately calculated to cause damage and loss to Vyne in its lawful business by blocking Vyne's ability to receive electronic health information from its customers and obtain additional business.

~~102.~~115.     HS One's actions were further calculated to cause damage and loss to Vyne's business by disseminating communications containing blatant falsehoods and disparaging remarks that have been, and continue to be, injurious to Vyne's reputation.

~~103.~~116.     HS One's actions were conducted with malice as they were done with the unlawful and deliberate purpose of causing damage to Vyne and loss to its business, without right or justifiable cause on the part of HS One.

## COUNT V
## Unfair Competition

~~104.~~117.     Vyne realleges and incorporates by reference the allegations contained in the preceding paragraphs.

~~105.~~118.     By the acts described herein, HS One has engaged in unlawful business practices that have injured, and will continue to injure, Vyne and its business.

~~106.~~119.     Over the course of several months, HS One waged a campaign to interfere with Vyne's contracts with its customers, make disparaging and false remarks about Vyne to its customers, restrict Vyne's access to electronic health information that Vyne was authorized to receive under federal law and pursuant to Vyne's agreements with its customers, and illegally disable Vyne's own software and software functionality on customer computer systems.

~~107.~~120.     The above-referenced misconduct violates public policy, computer protection laws, and the federal Cures Act. Specifically, HS One's actions have damaged and

jeopardized Vyne's business by blocking Vyne's ability to fulfill its contractual obligations to its customers. And HS One's efforts to sever Vyne's access to its customers' data—data that Vyne's customers have full ownership over and authority to transfer—violates the information blocking provisions of the federal Cures Act.

108.121.    HS One's voluntary removal of Dentrix from the ONC's Health IT Certification Program, the very day that Vyne informed HS One that its information blocking violated the Cures Act, in a blatant effort to avoid the dictates of the Cures Act establishes that HS One has engaged in unfair competition and is acting in bad faith. It also does not prevent the Cures Act from applying to HS One because HS One is a "a health information exchange or network engaged in information blocking."

109.122.    Upon information and belief, HS One's acts were committed in bad faith and with unlawful intent.

110.123.    As a direct result of HS One's actions, Vyne has been, and will continue to be, substantially injured in its business. Such injuries include harm to Vyne's customer relationships, goodwill, reputation, and loss of revenue and profits.

**COUNT VI**
**Defamation**

111.124.    Vyne realleges and incorporates by reference the allegations contained in the preceding paragraphs.

112.125.    By the acts described herein, HS One published false and defamatory statements to Vyne's clients regarding Vyne's business methods and the reliability, efficiency, and security of Vyne's products, including Vyne Trellis.

113.126.    HS One's false statements misrepresenting Vyne's longstanding and industry-standard printer driver functionality, among other Vyne products and services, as

ineffectual and the source of security risk or "breaches" was done in reckless disregard of whether the reported information was accurate or not.

114.127.      HS One's statements were of the character that would tend to degrade Vyne's public standing, impugn Vyne's business methods, honesty, and integrity, and cast aspersions on Vyne's products, including Vyne Trellis.

115.128.      Upon information and belief, HS One's acts were committed in bad faith and with actual malice in an attempt to persuade Vyne's clients to transfer their business to competing products sold by HS One or an entity or entities affiliated with HS One.

116.129.      HS One acted with intent to harm Vyne, or with conscious indifference to the consequences of its actions.

117.130.      As a direct result of HS One's actions, Vyne has been, and will continue to be, substantially injured in its business. Such injuries include economic loss and harm to Vyne's goodwill and business reputation.

## COUNT VII
### Declaratory Judgment

118.131.      Vyne realleges and incorporates by reference the allegations contained in the preceding paragraphs.

119.132.      Pursuant to 28 U.S.C. § 2201(a), this Court is authorized to issue a declaratory judgment.

120.133.      HS One's cease and desist letter of August 26, 2025 purported to assert that Vyne committed "computer hacking of Henry Schein One's software platform" in violation of the Computer Fraud and Abuse Act and otherwise made "deceptive statements and omissions" which were "actionable" under state or federal law. These claims, and any other (unsubstantiated) claims the cease and desist letter purports to assert, have no merit.

121.134.    Therefore, by virtue of the parties' actions described herein, an actual, present, substantial, and justiciable controversy under Section 2201(a) exists between Vyne and HS One concerning Vyne's compliance with its obligations under the Computer Fraud and Abuse Act and state and federal law.

122.135.    Pursuant to Section 2201(a) and Federal Rule of Civil Procedure 57, Vyne seeks a declaration from this Court that it did not, through its use of printer-driver software or any other software program, commit "computer hacking of Henry Schein One's software platform" or otherwise engage in conduct violative of the Computer Fraud and Abuse Act or any other applicable state or federal law.

123.136.    Vyne also seeks a permanent injunction prohibiting HS One from asserting, initiating, or pursuing any claim, remedy, notice or proceeding alleging that Plaintiff violated the Computer Fraud and Abuse Act or any other applicable state or federal law based on the allegations contained within its August 26, 2025 cease and desist letter.

### JURY DEMAND

124.137.    Pursuant to Federal Rule of Civil Procedure 38, Vyne hereby demands a trial by jury on all issues so triable.

### PRAYER FOR RELIEF

Vyne respectfully requests that this Court enter judgment in favor of Vyne and against HS One as follows:

a.    an order preliminarily and permanently enjoining HS One from using Dentrix or any other software program to disable Vyne software and/or software functions, or otherwise to interfere with Vyne customers' use of Vyne's software;

b.      an order preliminarily and permanently enjoining HS One from denying printer driver access to Vyne's customer's electronic health information stored in Dentrix;

c.      an order preliminarily and permanently enjoining HS One from denying or otherwise interfering with Vyne's access to Vyne's customer's electronic health information stored on Dentrix;

d.      an order preliminarily and permanently enjoining HS One from publishing any further defamatory statements;

e.      an order preliminarily and permanently enjoining HS One from asserting, initiating, or pursuing any claim, remedy, notice or proceeding alleging that Vyne violated the Computer Fraud and Abuse Act or any other applicable state or federal law;

f.      an award of compensatory and consequential damages, in an amount to be proven at trial;

g.      an award of punitive and exemplary damages, in an amount to be proven at trial;

h.      an award of reasonable attorneys' fees and costs;

i.      an award of prejudgment and post judgment interest;

j.      such additional relief as may be just and proper.


Respectfully submitted,

            /s/ ~~K. Nichole Nesbitt~~ *Vincent Levy*

Michael Shuster
Vincent Levy
Daniel Fahrenthold
Torrell Mills
HOLWELL SHUSTER & GOLDBERG LLP
425 Lexington Avenue, 14th Floor

41

New York, NY 10017
(646) 837-5151
vlevy@hsgllp.com

K. Nichole Nesbitt (Bar No. 26137)
Derek M. Stikeleather (Bar No. 27815)
GOODELL, DEVRIES, LEECH & DANN, LLP
One South Street, 20th Floor
Baltimore, MD 21202
(410) 783-4026
knn@gdldlaw.com
dstikeleather@gdldlaw.com

Michael Shuster (admission motion forthcoming)
Vincent Levy (admission motion forthcoming)
Daniel Fahrenthold (admission motion forthcoming)
Torrell Mills (admission motion forthcoming)
HOLWELL SHUSTER & GOLDBERG LLP
425 Lexington Avenue, 14th Floor
New York, NY 10017
(646) 837-5151
vlevy@hsgllp.com

*Attorneys for Plaintiff*
*National Electronic Attachment, Inc. d/b/a Vyne Dental*