# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

NATIONAL ELECTRONIC ATTACHMENT, INC., D/B/A
VYNE DENTAL,

                                   *Plaintiff*,

          -against-

HENRY SCHEIN ONE, LLC,

                                   *Defendant*.

Case No. 1:25-cv-03246

## SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
## MOTION FOR A PRELIMINARY INJUNCTION

GOODELL, DEVRIES, LEECH & DANN, LLP
One South Street, 20th Floor
Baltimore, MD 21202
(410) 783-4026

HOLWELL SHUSTER & GOLDBERG LLP
425 Lexington Avenue
New York, NY 10017
(646) 837-5151

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

STATEMENT OF FACTS ......................................................................................... 3

    I.    Dental Practices Have Used Vyne's Printer Driver Securely for Decades ....... 3

    II.    Vyne's Printer Driver Has Integrated with Dentrix For Decades ................... 4

    III.    Vyne Offers Different Services Through Different Software (Vyne Sync) ..... 6

    IV.    HSOne's Unfair Competition ........................................................................ 8

    V.    Vyne's Remediation Efforts and HSOne's Virus Attack ............................. 10

ARGUMENT .......................................................................................................... 13

    I.    Vyne is Likely to Succeed on the Merits ...................................................... 13

        A.    HSOne's Conduct Constitutes Unfair Competition ........................ 13

            1.    HSOne's Attacks Constitute Information Blocking Under the Cures Act ................................................................... 14

                i.    HSOne Is a Health Information Network Subject to the Cures Act ................................. 14

                ii.    HSOne Committed "Information Blocking" .. 18

                iii.    HSOne Cannot Establish the "Manner" or "Security" Exceptions ..................................... 19

            2.    HSOne's Conduct Constitutes Unfair Competition Absent the Cures Act .................................................................. 25

            3.    Tortious Interference ......................................................... 26

    II.    Vyne Has And Will Suffer Irreparable Harm Absent Relief ......................... 27

    III.    The Balance Of The Equities Favors Vyne ................................................... 28

    IV.    Vyne's Injunction Will Serve The Public Interest ......................................... 29

CONCLUSION ....................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Accord Sun Dun, Inc. of Wash. v. Coca-Cola Co.*,
   740 F. Supp. 381 (D. Md. 1990) ........................................................................ 26

*Air Evac EMS, Inc. v. McVey*,
   37 F.4th 89 (4th Cir. 2022) ............................................................................... 27

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*,
   No. 110CV910LMBJFA, 2018 WL 1699429 (E.D. Va. Apr. 6, 2018) .................. 17

*Baltimore Bedding Corp. v. Moses*,
   182 Md. 229 (1943) ........................................................................... 14, 25, 26

*Blondell v. Littlepage*,
   185 Md. App. 123 (2009) ................................................................................. 26

*Brightview Grp., LP v. Teeters*,
   441 F. Supp. 3d 115 (D. Md. 2020) ............................................................ 13, 30

*Clear One Advantage, LLC v. Kersen*,
   756 F. Supp. 3d 30 (D. Md. 2024) ...................................................................... 2

*Fowler v. Printers II, Inc.*,
   89 Md. App. 448 (1991) ................................................................................... 26

*K&K Mgmt., Inc. v. Lee*,
   316 Md. 137 (1989) ........................................................................................ 27

*Lonza Walkersville, Inc. v. Adva Biotechnology Ltd.*,
   581 F. Supp. 3d 736 (D. Md. 2022) .................................................................. 28

*Macklin v. Robert Logan Assocs.*,
   334 Md. 287 (1994) .......................................................................................... 2

*Mountain Valley Pipeline, LLC v. 6.56 Acres*,
   915 F.3d 197 (4th Cir. 2019) ........................................................................... 27

*Paccar Inc. v. Elliot Wilson Cap. Trucks LLC*,
   905 F. Supp. 2d 675 (D. Md. 2012) .................................................................. 25

*Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*,
   131 F.4th 205 (4th Cir. 2025) .................................................................... *passim*

*Scotts Co. v. United Indus. Corp.*,
   315 F.3d 264 (4th Cir. 2002) ........................................................................... 29

*Trimed, Inc. v. Sherwood Med. Co.*,
   977 F.2d 885 (4th Cir. 1992) ...................................................................... 25, 27

*United States v. South Carolina*,
   720 F.3d 518 (4th Cir. 2013) ........................................................................... 13

*United States v. Westvaco Corp.*,
   2015 WL 10323214 (D. Md. 2015) ..................................................................... 30

*Winter v. Nat. Res. Def, Council*,
   555 U.S. 7 (2008) ................................................................................................ 29

**Other Authorities**

HSOne, *Henry Schein One API Exchange*,
   https://www.henryscheinone.com/dental-solutions/api-exchange/ (last visited Feb. 22, 2026)
   ........................................................................................................................... 16, 17

HSOne, *SOC2 Compliance*,
   https://hsps.pro/DentrixAscend/Help/SOC2_Compliance.htm (last visited Feb. 22, 2026) ...... 4

NCQA, *About NCQA*,
   https://www.ncqa.org/about-ncqa/ (last visited Feb. 22, 2026) ............................... 16

OnePartner, *OnePartner HIE*,
   https://www.onepartner.com/hie/ (last accessed Feb. 22, 2026) ............................... 16

SHIEC, *HIE Members Associate Members*,
   https://strategichie.com/about/ & https://strategichie.com/membership/hie-members-list/ (last
   visited Feb. 22, 2026) ............................................................................................ 16

UHIN, *Healthcare Interoperability for All*,
   https://uhin.org/ (last visited Feb.2, 2026) ............................................................. 16

*Webster's Ninth New Collegiate Dictionary* 794 (1991) ........................................... 17

**Rules**

42 U.S.C. § 300jj-52; 01(c); 300jj-52(a)(1)(A)-(B)(i)) ..................................... 1, 14, 19

45 C.F.R. § 170, 171 ................................................................................... *passim*

85 Fed. Reg. 25642 (June 30, 2020) ....................................................................... 16, 21

89 Fed. Reg. 102512-01  (Dec. 17, 2024) ................................................................ 18

Restatement (Third) of Unfair Competition § 1 cmt. g (1995) ..................................... 25

> **Q.**  *And you understood that disabling Vyne's printer driver would disrupt its customers' workflows, right?*
>
> **A.**  ***I did understand that, yes.***
>
>     \*    \*    \*
>
> **Q.**  *So then when you disabled Vyne's print driver, you did not disable EDS's print driver, right?*
>
> **A.**  *Our intention is to retire it, but no, we didn't do it at the time.*
>
>     \*    \*    \*
>
> **Q.**  *And obviously throughout this time you weren't telling your own customers that using the EDS printer driver caused security issues, right?*
>
> **A.**  ***No, we didn't say that . . .***
>
> ***Weatherly 355:17-19, 359:13-16, 362:22-25.***

## INTRODUCTION

Plaintiff National Electronic Attachment, Inc., d/b/a Vyne Dental ("Vyne"), moves for a preliminary injunction to stop Defendant Henry Schein One, Inc. ("HSOne") from blocking access to electronic health information ("EHI") protected by the Cures Act, tarnishing Vyne's reputation, and poaching Vyne's customers by unlawful means. Vyne's request is narrow. It seeks to preserve the status quo by enjoining HSOne from: (1) impairing the print-capture functionality that Vyne's customers have relied upon for over twenty years (including by deploying software that disables Vyne's software applications on dentists' computers); and (2) falsely disparaging Vyne's product.

HSOne concedes that it blocked Vyne's printer driver, knowing that doing so would disrupt Vyne customers' workflows and prevent dental practices from accessing their own EHI. Weatherly 355:20-356:4. HSOne did so as part of a campaign to steal Vyne's customers and convert them to its new eClaims bundle, the Dentrix "Eligibility and Claims Processing Suite." PX002.6-7; PX033.1. Almost immediately after blocking Vyne's printer driver, HSOne began wrongfully

soliciting Vyne's customers with mass marketing and targeted outreach alerting customers to supposed "security issues," a "Vyne security breach," and that "Vyne [was] no longer going to be HIPAA compliant," and offering discounts to switch. PX002.1; PX306.01; Roberts 129:15-25.[1] None of that was true. Weatherly 396:13-23; McDaniel 617:8-16. All the while, HSOne itself continues using a print driver for its own products, never telling its clients that this technology is unsafe. Weatherly 359:21-360:4. The only difference, HSOne admits, is who sells it. *Id.* 360:5-16.

HSOne's efforts not only likely, but plainly, violate unfair-competition law. As a health information network subject to the 21st Century Cures Act, HSOne's blocking of EHI violates unfair-competition law. 42 U.S.C. § 300jj-52(a)(1)(A)-(v)(i); *see also Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc*., 131 F.4th 205, 231 (4th Cir. 2025) (upholding injunction predicated on information blocking in violation of the Cures Act). HSOne also cannot compete through unfair means by blocking a competitor's products and making false accusations. *E.g., Clear One Advantage, LLC v. Kersen*, 756 F. Supp. 3d 30, 44 (D. Md. 2024) (conduct that "misled" prospective client to doubt availability of plaintiff's product and enroll in competing product was unfair competition). For much the same reasons, HSOne is also tortiously interfering with Vyne's business relations. *See Macklin v. Robert Logan Assocs*., 334 Md. 287, 301 (1994).

And the balance of the equities plainly favor Vyne. Vyne has suffered irreparable injury and continues to do so: HSOne's conduct has and is damaging Vyne's reputation, eroding its customer base, and substantially damaging customer goodwill—just as in *Real Time*. Vyne's proposed injunction is no broader than necessary to halt ongoing irreparable harm and spare the parties' mutual customers from service interruption while this case proceeds. Requiring HSOne not to interfere with the print-capture functionality will inflict no harm on HSOne, as confirmed

---

[1] Citations to the hearing transcript use the witness name, page, and line numbers, as the transcripts are consecutive.

2

by the fact that it continues to use printer drivers for its own products. And the public interest favors the injunction, as Congress prohibited practices that intentionally block access to EHI.

For these reasons, the Court should grant Vyne's motion for a preliminary injunction.

## STATEMENT OF FACTS

### I.    Dental Practices Have Used Vyne's Printer Driver Securely for Decades

Vyne licenses a revenue-cycle-management ("RCM") software product called Vyne Trellis, which allows dentists to verify insurance eligibility, submit claims, issue bills, and process payment. Roberts 83:4-85:13; PX64. For decades, dental practices have used Vyne's printer driver to securely and efficiently send EHI to Vyne. Nix 254:9-11. As Vyne's Chief Technology Officer testified, to his knowledge, Vyne has never had a security breach, and Vyne's printer driver has never resulted in a data breach. Nix 258:2-6. Even HSOne's witnesses admitted they were unaware of any security or data breach. Weatherly 396:13-23; McDaniel 617:8-16.

Vyne is a "SOC II, HiTrust-certified HIPAA Clearinghouse with a strong focus on quality, security, and performance." PX006.1. Being SOC2, Type 2 certified means that Vyne has met "very stringent criteria" focused on how Vyne "secure[s] [its] customer data." Nix 252:6-14; PX057. Being HiTrust certified "adds an additional layer of processes and procedures" beyond being SOC2 certified for "how you handle data, how you operate as a company, how your software functions," along with "a lot more requirements" that Vyne must adhere to. *Id.* 252:18-24; PX014. Vyne also has a 200-plus page security policy manual "that every employee has to read on an annual basis." *Id.* 253:3-10. These are significant certifications and requirements; HSOne itself tells the public that "[m]eeting SOC2 compliance demonstrates establishing processes and procedures that place security and confidentiality at the forefront."[2] And, Vyne has longstanding

---

[2] HSOne, *SOC2 Compliance*, https://hsps.pro/DentrixAscend/Help/SOC2_Compliance.htm (accessed 2-20-2026).

contractual relationships with insurers that demand even more rigorous security measures, on "data governance, how you handle [data], how long you have the data for, when you dispose of the data, [and] how you dispose of the data." Nix 250:15-20, 251:22-52:14; *see also* Roberts 98:9-24.

## II.     Vyne's Printer Driver Has Integrated with Dentrix For Decades

For over 20 years, dental practices across the country have used Vyne's printer driver and Dentrix together in an integrated way. Weatherly 355:10-12; Roberts 99:4-15. Vyne interfaces with over 90 "practice management services" ("PMS"), including HSOne's Dentrix and competing solutions like Open Dental and Eaglesoft. Roberts 146:10-23. Whereas RCM software services like Vyne Trellis assist primarily with insurance claims and patient billing, PMS software services like Dentrix assist with storing EHI, including patient data, clinical notes, clinical records like x-rays, and payment information. Weatherly 382:23-383:8; Roberts 170:18-171:1.

Dental practices store their practice and patient data on Dentrix databases, but Dentrix does not own that data. Weatherly 351:1-3. To the contrary, the EHI is owned and controlled by the patients and the dental practice, which has obligations under HIPAA. *Id.*; Nix 330:8-15. When a dental practice licenses and installs the Dentrix version at issue here, the relevant data and EHI is all stored "locally" on the dental practice's computers, rather than on servers or computers owned or controlled by HSOne. McDaniel 608:10-11, 614:18-20.

Dentrix enables dental practices to access their EHI and more than 100 third-party vendors that connect to Dentrix through its API Exchange. Weatherly 350:11-25. Notwithstanding the terms of that API program, dental practices also retain the right to print EHI from Dentrix software (including to electronic files like PDFs) to give it to patients, McDaniel 618:14-16, and submit claims, Weatherly 356:22-357:6. Dentrix also facilitates electronic transfers to or from other PMS providers. Rencher 587:14-588:3. HSOne does not monitor or control what dental practices do

4

with their EHI once printed, does not have agreements with dentists as to what they can do with EHI once printed, and is not responsible if a dentist violates its obligations under regulations or law with respect to the storage of patient data. McDaniel 615:1-25.

Vyne has its own relationship with its customers. To comply with HIPAA, the patient grants access to their EHI to the dental practice, which then enters into a Business Associate Agreement with Vyne granting it authority to obtain EHI on its behalf, and Vyne enters a further agreement with insurers that Vyne transfers EHI to for insurance claim processing. Nix 251:1-14. In short, "the patient information is essentially passed from the patient, the practice, to Vyne, to the insurance company, and basically Vyne's in that chain of custod[y]." *Id.*; HS066.

To transfer data from Dentrix to Vyne Trellis, dental practices have for decades used Vyne's printer driver or "print capture" functionality. Weatherly 355:10-12; Roberts 99:4-15, 102:2-22; *see also* PX306. In practice and by definition, Vyne's print driver "does not talk to the database" and "doesn't conduct any database access." Clip 632:23-8, 635:22-636:11; *see also* Nix 288;16-18. To the contrary, "the application treats it as a printer." *Id.*; PX197.

To use Vyne's printer driver, a dental practice must (a) install a print driver and Vyne driver on their computers; (b) select the particular information they wish to transfer; and (c) elect to "print to Vyne" on the Dentrix platform. Nix 255:2-256:21, 261:19-262:11. The printer setup is no different than selecting print to Adobe PDF, OneNote, or Dentrix Document Center (PX285.2):



If a dental practice installs, selects, and prints to Vyne's printer driver, the print driver creates a local "res" file on its computer. Nix 256:9-257:14. That file is protected because practices are required to encrypt their own systems under HIPAA. *Id.* 330:8-15. A separate Vyne driver created by Vyne and installed on the practice's computer identifies that res file, ingests the data, securely sends it to Vyne Trellis using TLS, and then deletes the local file. *Id.* 256:9-257:14.

**III.    Vyne Also Offers Different Services Through Different Software (Vyne Sync)**

Vyne also offers products that use a separate software program called Vyne Sync. This provides read and write functionality, and is entirely distinct from the print-driver software. Roberts 186:4-25; Nix 308:3-7, 265:10-19; Clip 635:22-636:11. Vyne Sync uses Open Database Connectivity ("ODBC"), which is a "standard in the industry" that "allows you to securely connect, retrieve data, and run different queries against the database." Nix 265:20-266:5. It is the same technology that HSOne uses for providing API access. Nix 265:20-266:14.

Vyne obtained Vyne Sync functionality when it acquired a company called Operability in 2021, which already had "existing database integrations with Dentrix, Open Dental, Eaglesoft, and a handful of specialty software programs." Roberts 106:5-19. That acquisition added patient engagement software to Vyne's full RCM services. *Id.* 106:20-107:6. Vyne now provides services

for "the three phases of a patient appointment"—namely, workflows (i) prior to the appointment such as reminders, scheduling, intake forms, and financial clearance; (ii) during the appointment such as health history forms, consent forms, and medical documents; and (iii) after the appointment to review and submit insurance claims. *Id.* 87:13-89:4; PX063.

If dental practices want Vyne to have direct-database access, they have to purchase that "premier tier" option, Roberts 94:20-95:3, and install Vyne Sync separately, Clip 636:12-24; Nix 263:23-264:3. They may, if they choose, authorize Vyne Sync to read and write data on their local computers. *Id;* Clip 650:22-651:7. With the practice's consent, Vyne Sync uses the practice's credentials to access their PMS database locally. Nix 263:23-264:25; 322:15-25. As Dentrix encrypts those credentials, Vyne has used a decryption algorithm since 2021. *Id.* 310:16-25.

Today, dental practices use Vyne Sync only for patient engagement and ledger write-back services. Nix 292:1-8; Clip 635:22-636:11. Patient engagement "is typically focused on communications with the patient" like "reminders that you have an appointment due," "requests to fill out forms," or "marketing." Roberts 83:12-84:4. For ledger write-back, "the process is to receive payment, reconcile it with the ledger, and post it." *Id.* 142:20-23. Dentrix allows its users to do these same things on the user interface, writing data into the software on their own computers. Roberts 142:15-143:5, 203:6-10; McDaniel 618:22-25; Clip 638:8-25. Vyne's ledger write-back function allows dental practices to have Vyne do that automatically by ODBC once payment is received. Roberts 142:15-143:5. For Dentrix clients, "dental practices direct the transmission of specific data from their Vyne program into the Dentrix database, which is stored locally on the dental practices' own computers." Nix 3d. Supp. Decl. DkT.52-1, at 2; Nix 251:1-3, 264:6-25.

Until December 2, 2025, Vyne also read billing statement information using Vyne Sync technology, leveraging the QuickBill module in Dentrix. Nix 261:21-262:6. Vyne Sync's

integration inserted the numerals "911911911" into a selected field on the practices' local database, allowing practices to "route billing statements" to Vyne. *Id.* 281:2-8. At that time, dental practices installing the Vyne Dental Plug-In could elect to install this functionality by enabling "statements"; the Vyne Dental Plug-In would not activate Vyne Sync otherwise (PX311.64):



On December 2, 2025, Vyne deprecated its use of Vyne Sync for billing statements and now uses print-capture technology for this service. Nix 281:9-282:5. As of the hearing, deprecation was ongoing at 130 practices to be rolled off within weeks. *Id.* 281:12-24, 295:15-17.

At present, there are about 7,000 common Vyne-Dentrix clients. Roberts 178:19-25. All of them rely on a print driver to access EHI belonging to the practices and their patients from customers' databases residing on their computer system. *Id.* Nix 250 :10-14; Roberts 101:14-24. Out of those, approximately 20 percent of subscribers also use Vyne Sync for patient engagement and/or ledger write-back. Roberts 186:6-187:8. Thus, only those 20 percent of subscribers have direct linkage enabled to the Dentrix databases on local computer systems.[3]

## IV.    HSOne's Unfair Competition

HSOne deployed a business strategy to provide integrated services to its users. Relevant

---

[3] At the hearing, HSOne introduced a spreadsheet of data (HS2) to suggest more users have database access than Mr. Roberts testified. As Mr. Rencher testified, however, the spreadsheet reflects only whether a Vyne "application [is] present on the machine," not telemetry "associated with reading and writing." Rencher 579:1-7. This includes applications using screen capture only, and the Vyne Dental Plug-In that, for a while, optionally installed Vyne Sync. Mr. Roberts' testimony that approximately 20% (or 1400 practices) had this access is also consistent with a separate exhibit supposedly showing read or write "access" by practices of their own databases in a period of 24 hours. HS248.

here, HSOne recently began marketing an optional "claims and eligibility" package to Dentrix users competing directly with Vyne. Roberts 120:7-10; Weatherly 351:22-354:9.

Then, in April 2025, HSOne first issued software that blocked its customers from accessing EHI stored on Dentrix databases through print drivers for use with Vyne and other third-party vendors that HSOne did not approve. Weatherly 354:15-24. HSOne's CEO approved the deployment of that blocking software. *Id.* 354:15-355:19. He knew dental practices were using Vyne's printer driver to access EHI belonging to the practices and their patients, that deploying the software would block their access, and that it would disrupt dental practices' workflows. *Id.* 355:10-356:4, 355:17-19. As Vyne customers reported, the following pop-up message appeared when seeking to transfer their EHI from Dentrix to Vyne (PX282):



This software blocked Vyne's printer driver from being used, causing this pop-up to appear and a blank document to be sent to the print spooler. Nix 271:15-19. When HSOne did this, HSOne told practices the print driver posed "security issues" and offered "discounts" to switch to HSOne's competing "eligibility and claims" suite. Weatherly 361:19-362:7. That same month, marketing emails offered a "limited time" discount to switch from Vyne to Dentrix eClaims—citing the very problems HSOne had caused, including customers "manually attaching images" and "typing in CDT codes." PX033. Indeed, HSOne knows that without Vyne's printer driver, customers "would need to type the claim in." *Id.* 389:21-25. Vyne's customers pay Vyne because it offers the opposite and *automates* these steps. Roberts 127:20-129:1 (discussing falsehoods in PX033).

HSOne has another product that competes with Vyne—EDS. Weatherly 358:23-359:18.

9

Like Vyne, EDS allows users to process claims using information stored not just on Dentrix, but also on competitor platforms like Eaglesoft and Open Dental. *Id.* And like Vyne, EDS used and still uses a printer driver to access that information. *Id.*; PX019. HSOne never disabled that driver and never told customers it posed security issues; HSOne did not want to disrupt its customers' workflows. *Id.* 359:13-360:9, 362:22-363:1. The only difference between Vyne's print driver and EDS's is who controls it. *Id.* 362:22-363:5; Nix 260:25-261:9.

Dentrix also permits customers to print to paper printers and electronic files. *Id.* 358:17-22. ████████████████████████████████████████████████████

████████████████████████████████████████████████████

Also of note, when HSOne first blocked access to patient and practice EHI through the printer driver, HSOne installed "EventBridge," software injected onto dental practices' computers to track how dentists were using them, including what software they used, and what drivers they selected to print claims and patient data. Nix 271:23-272:24; PX015. Acting as spyware, EventBridge reached far beyond what Dentrix users consented to in user agreements. *Id.*

## V.    Vyne's Remediation Efforts and HSOne's Virus Attack

In an effort to patch dentists' access to their own information after HSOne blocked the print driver in April 2025, Vyne's technical team devised various fixes.

➤  Foremost, Vyne deployed Vyne Sync to revise certain data on databases located on dental practices' computers. Using direct database access, this remediation measure: (a) took Vyne's driver off the hostile list, and (b) changed the date on which hostile printers would be checked to the year 2035. Nix 276:3-12. That technology has since been deleted. *Id.* 296:10-24.

➤  In addition, Vyne provided instructions to customers about how they could transfer data electronically from their Dentrix databases to Vyne using Dentrix's "electronic transmissions" function (or "eTrans"). *Id.* 277:2-24. At the time, HSOne allowed Dentrix users to use this eTrans function to send data electronically from their local Dentrix database to a location of the customer's choosing by typing in a particular internet address on Dentrix. *Id.* 277:15-24. Approximately 50 Vyne customers did

this before HSOne disabled the function. *Id.* 278:5-7. It is not in use today. *Id.*

➢ Finally, Vyne built out a user interface for certain users that would allow those users to employ the Vyne Sync technology to access their database and obtain claims data, called "ClaimSync." *Id.* 278:10-21. This, too, was discontinued. *Id.*

In parallel with these remediation efforts, Vyne's CEO sought to reach a commercial resolution with HSOne. Roberts 147:19-148:11. Vyne has agreements with HSOne's primary PMS competitors—Eaglesoft and Open Dental—to access those systems through APIs. *Id.* 146:3-23. Vyne was hopeful it could reach agreement with HSOne too, proposing to pay market terms for API access. *Id.* 110:13-18, 140:4-5. Indeed, HSOne's CEO previously stated HSOne would be open to such an agreement. PX009. But HSOne had not built out the functionalities Vyne needs to serve its customers. Weatherly 351:4-8; Roberts 141:10-13. For example, HSOne's CISO does not believe the API Exchange has: (i) "any vendors . . . in the claims processing category"; (ii) "that do eligibility verification"; or (iii) "that relate to imaging"; or that it (iv) grants access to "data []  necessary to transmit a claim to a clearinghouse." McDaniel 619:1-13, 620:24-621:1.

And for business reasons, HSOne has conditioned all proposals on Vyne agreeing not to offer services to dentists in competition with HSOne on the "retail" side of the RCM business. Weatherly 400:3-12 ("there's certain accesses that [HSOne] won't agree to build for [Vyne]"); 399:12-15 (HSOne has not "agreed to write back to ledgers"); 390:19-392:5 (if Vyne were only a clearinghouse, Dentrix would serve a different part of the market); 402:7-10 (agreeing HSOne would "agree to ledger write-back" if Vyne were "a clearinghouse solution"). HSOne makes more money selling its eClaims suite than it would through API fees. Weatherly 400:22-401:4.

There is no technical reason that HSOne has not agreed to develop the API functionalities that Vyne requires—and that Vyne has with HSOne's competitors—contrary to what its CEO and expert suggest. Weatherly 399:16-20 ("There are technical difficulties with it, and my Chief

11

Technology Officer and Security Officer would be better to give you the details of that."); PX70.12 (Youssef Rep., repeating HSOne's position that "insurance claims processing cannot be supported through an API-based integration at scale"). HSOne's CISO testified the opposite: Such an API *can* be created; indeed, "anything can be created." McDaniel 621:9-14. "[T]here is no technical reason [] or cybersecurity reason to limit API access to claims," and in fact, HSOne already has "API integration for claims" and write functionalities for "patient engagement and Revenue Cycle Management [] as part of their API." Clip 627:15-24; 638:8-25. HSOne's refusal to offer the API solution Vyne needs is based on business, not technical or cybersecurity reasons.

After weeks of negotiations with HSOne, in which "Vyne was really driving the proposals week after week," Vyne's CEO recalled: "I'd come in one Monday or Tuesday and they've deployed an update that seeks to destroy our software. So [] it's hard to feel like you're negotiating in good faith when you have a gun to your head." *Id.* 147:19-148:11.

In the middle of this, in September 2025, HSOne deployed a software update that disabled any software running on a dental practice's computer that had a Vyne certificate. Nix 273:23-274:7; McDaniel 617:17-23. Using HSOne's EventBridge spy technology, this software targeted *Vyne* certificates, not any others. McDaniel 617:17-23. It was "a virus that essentially disabled every Windows service that [Vyne] had so that they couldn't run." Nix 272:25-273:7; PX015. HSOne also targeted Vyne customers with marketing outreach—"announc[ing] a new unlimited eClaims bundle for Dentrix customers adversely affected by the Vyne security breach." PX002.2. HSOne's CEO and CISO both testified that they were unaware of any such Vyne security or data breach. Weatherly 396:3-23; McDaniel 617:8-16.

Notwithstanding attacks threatening its business, Vyne tried to reach a deal with HSOne and continued negotiating up to the week before the hearing. But HSOne has not offered or agreed

to a solution that would allow Vyne to continue serving its customers. As Vyne's CEO testified: "We'll sign up for this API program today if you don't prevent the use of print capture. If you don't want us to use print capture, we'll stop doing that, too, but you have to provide something to replace that with, and we're willing to pay for that, too." Roberts 190:8-191:9.

Meanwhile, HSOne's campaign has been highly successful. HSOne's parent, Henry Schein Inc., told the marketplace recently that the company has seen substantial revenue growth from its new eClaims product offering. Weatherly 368:24-373:10; PX308. Vyne has lost at least "500" joint Dentrix customers, and its customer base continues to erode. PX300; Roberts 39:22-148:8. In the process, HSOne caused substantial damage to Vyne's reputation and goodwill by causing service disruption and falsely telling Vyne customers these were due to "security issues" and "security breaches." *E.g.,* PX008, PX033, PX306; PX300; PX307; Roberts 149:9-151:1.

## ARGUMENT

The purpose of a preliminary injunction "is merely to preserve the relative positions of the parties until a trial on the merits can be held." *United States v. South Carolina*, 720 F.3d 518, 524 (4th Cir. 2013). To obtain injunctive relief, a plaintiff must establish "(1) that the movant is likely to succeed on the merits, (2) that the movant will face irreparable harm in the absence of preliminary relief, (3) that the balance of equities favors preliminary relief, and (4) that injunctive relief is in the public interest." *Brightview Grp., LP v. Teeters*, 441 F. Supp. 3d 115, 128 (D. Md. 2020). Here, all factors weigh in favor of granting Vyne's narrow request for preliminary relief.

### I.    Vyne is Likely to Succeed on the Merits

#### A.    HSOne's Conduct Constitutes Unfair Competition

Vyne is likely to prevail on its unfair-competition claim on multiple theories. HSOne's conduct constitutes unfair competition both because it: (1) violates the Cures Act and thus involves

unlawful acts; and (2) is patently unfair, involving a wide range of conduct designed to lure customers away from Vyne using "fraud, deceit, trickery or unfair methods." *Real Time,* 131 F.4th at 228 (cleaned up); *Baltimore Bedding Corp. v. Moses*, 182 Md. 229, 237 (1943).

### 1.    HSOne's Attacks Constitute Information Blocking Under the Cures Act

HSOne's witnesses unambiguously admitted to unlawful "information blocking" under the Cures Act, defined as conduct "likely to interfere with, prevent, or materially discourage access, exchange, or use of  EHI," and which "'a health information technology developer, exchange, or network . . . knows, or should know, . . . is likely to' have these effects." *Real Time,* 131 F.4th at 230-31 (quoting 42 U.S.C. §§ 201(c); 300jj-52(a)(1)(A)-(B)(i)). Indeed, HSOne witnesses conceded that: (1) Dentrix is a software platform that facilitates customers' exchange of EHI, including with more than one hundred third-party vendors; (2) HSOne deployed, with CEO approval, software intended to block Dentrix customers from accessing their own EHI through print drivers for use in Vyne; (3) HSOne knew that Vyne customers were using the print driver to access EHI belonging to the practices and their patients; (4) HSOne knew that deploying the software would block that access; and (5) HSOne knew that blocking software would disrupt dental practices' workflows. *Supra* 4, 9. These five admissions alone establish liability.

#### i.    HSOne Is a Health Information Network Subject to the Cures Act

HSOne does not contest that Dentrix facilitates the exchange of information that qualifies as EHI, and indeed, HSOne's witnesses freely admitted this at the hearing. *See, e.g.*, Youssef 464:14-465:13 (describing security considerations around "very, very protected data such as ePHI, which is what HSOne is dealing with here"). And Dentrix is subject to the Cures Act.

Congress passed the 21st Century Cures Act to regulate, among other entities, "health information network[s]" ("HIE") or "health information exchange[s]" ("HIN"). These include any "individual or entity that **determines, controls, or has discretion** to administer any requirement,

policy, or agreement that **permits, enables, or requires** the use of any technology or services for **access, exchange, or use** of EHI . . . **among more than two unaffiliated individuals or entities** (other than the individual or entity to which this definition might apply) that are enabled to exchange with each other; and that is **for treatment, payment, or health care operations purpose**." 45 C.F.R. 171.102 (emphasis added).

Dentrix falls squarely within that very broad definition. *First,* EHI is stored in databases on dental practices' computers that use the Dentrix platform, and throughout this litigation, HSOne has asserted the right to determine who accesses, exchanges, and uses that EHI and how. This includes an exercise of control, by way of technological measures and contractual provisions, over the third parties with whom dental practices can electronically communicate from Dentrix for treatment and payment (like Vyne). Weatherly 358:17-22, 375:20-376:1.

HSOne's control is also confirmed by its practices. HSOne has discretion to and does authorize dental practices to print EHI from Dentrix software (including to electronic files like PDFs), and even transfer files via ODBC, to: (i) give it to patients, McDaniel 618:14-16; (ii) submit claims, Weatherly 356:22-357:6; or (iii) transfer it to a new PMS such as Dentrix competitor, Open Dental, Rencher 587:14-588:3. And HSOne exercised control over the exchange of EHI since attacking Vyne: it went from authorizing all print drivers (including Vyne's) to disabling those it disapproves, and from allowing dental practices to send EHI using its eTrans function to a location of their choosing to disabling that function. *Supra* 9-11. As HSOne's expert explains: "HSOne maintains centralized oversight of third-party data exchanges." PX70.11-12.[4]

*Second*, HSOne permits and enables the use of its Dentrix technology for "access, exchange, or use" of EHI "among more than two unaffiliated individuals or entities." The Cures

---

[4] Mr. Youssef's opinion on whether HSOne is a "health information exchange" under the Cures Act should be disregarded as impermissible legal opinion, a fact he all-but-conceded at deposition. PX312.17:5-10.

Act defines health information exchanges and networks together to cover a range of entities that perform similar or the same functions, including "private exchanges" involved in "the electronic movement of health-related information among organizations." 85 Fed. Reg. 25642, 25803 & n. 126 ("[W]e believe that the Cures Act goals of supporting greater interoperability, access, exchange, and use of EHI are best advanced by a functional definition without specific exclusions."). The Strategic Health Information Exchange Collaborative ("SHIEC") also defines an HIE as "an organization that provides technology and services to allow their stakeholders to securely share health information"; its members facilitate access or exchange of EHI.[5] HSOne plainly qualifies, given that, as noted, it allows practices to store and share EHI, including with patients, insurance carriers, and competing PMS platforms like Open Dental. *Supra* 4.

Consider also HSOne's API Exchange, used by at least 100 third-party vendors. McDaniel 618:3-5. Approximately 100,000 dental practices also use the API Exchange "to deliver seamless integrations and data processing," with "6 billion data requests [] processed annually through the Henry Schein One API Exchange."[6] "So as long as an organization has an agreement with Henry Schein One, they are allowed to interact with the API at a given customer practice," meaning that thousands of practices can access and exchange EHI with up to 100 third-party vendors "should they want to have that many agreements and that many things running on their single practice computer." McDaniel 618:10-21. As Mr. Rencher wrote, the API Exchange "[e]nable[s] scalable operations by allowing multiple clients or services to interact with the system simultaneously

---

[5] SHIEC, https://strategichie.com/about/ & https://strategichie.com/membership/hie-members-list/. Members include: OnePartner which "allows providers to see patient information at the point of care, regardless of place of service," https://www.onepartner.com/hie/; UHIN which enables health plans and providers "to improve the management of their patients' data and to access data from outsider their system," https://uhin.org/; and NCQA, which offers "a way to organize primary care" used by practices and clinicians, https://www.ncqa.org/about-ncqa/ (accessed 2-22-2026).
[6] HSOne, *API Exchange*, https://www.henryscheinone.com/dental-solutions/api-exchange/ (accessed 2-22-2026).

without relying on a single user interface."[7] Dentists and third-party vendors pay Dentrix *for that interactivity*, not the data which is owned and transmitted by dental practices themselves, but to "interface into Dentrix" directly. Weatherly 351:1-3, 387:17-18.

HSOne contends Dentrix is not a HIE or HIN under the Cures Act. But in any context, a network is nothing more than a "system of lines or channels"—it describes an overall population connectivity, not the mechanics of how individual points within the system connect to one another. *Webster's Ninth New Collegiate Dictionary* 794 (1991); *see also Amdocs (Israel) Ltd. v. Openet Telecom, Inc.,* 2018 WL 1699429, at *10 (E.D. Va. Apr. 6, 2018) (defining "network" in internet context as "a system of computers, peripherals, terminals, and databases connected by communications lines"). To argue that Dentrix's hub-and-spoke software is not a "network" because data transmissions supposedly flow from one customer to one third-party at a time is like to saying that the D.C. Metro is not a network because subway trains can only carry passengers to and from one station at a time. Or that the United States Postal Service is not a network because physical packages have one sender and one recipient.

While HSOne may wish to displace some third-party vendors with its own integrated, in-house products, Dentrix does and must facilitate connectivity to unaffiliated service-providers, including Vyne or Vyne's competitors. It is no surprise that HSOne touts this functionality—"[a] central hub for platform integration" giving dentists "[f]ull data ownership and access."[8]

*Third,* the API Exchange administers agreements that "permit, enable, or require" **access**, **exchange**, and **use** of EHI by connecting dentists and vendors, "allow[ing] software vendors to connect with [its] databases," and enabling them to read and write data back to the database.

---

[7] HSOne, *Blog,* https://www.henryscheinone.com/insights/blogs/unlocking-the-power-of-integration-how-the-henry-schein-one-api-enhances-dsos/ (accessed 2-22-2026).
[8] HSOne, *API Exchange*, https://www.henryscheinone.com/dental-solutions/api-exchange/ (accessed 2-22-2026).

Weatherly 350:13-22; McDaniel 619:14-18.

*Finally,* there can be no doubt that the access, exchange, and use of EHI is "for treatment, payment, or health care operations purpose[s]." Indeed, the API Exchange enables dentists and vendors to share EHI for "patient engagement, revenue cycle management, analytics, and imaging." McDaniel 2d Decl. Dkt. 462 ¶ 4. Indeed, Dentrix is "a hub for HSOne's customers' dental practices," with a mission of "accelerat[ing] the future of dental care." *Id.* ¶ 2.

HSOne thus plainly (1) "determines, controls, or has discretion to administer" (2) "any requirement, policy, or agreement that permits, enables, or requires the use of any technology or services" (3) "for access, exchange, or use of EHI," (4) "among more than two unaffiliated individuals or entities," and (5) "for treatment, payment, or health care operations purpose[s]."

### ii.   HSOne Committed "Information Blocking"

HSOne's conduct facially constitutes information blocking under the Cures Act. Multiple witnesses—including HSOne's CEO—admitted that HSOne deployed software that was intended to (and did) disable Vyne's printer driver starting in April 2025, knew that Vyne used its printer driver for many years and that its primary purpose was to enable customer transfer of EHI, and understood that blocking it would disrupt customer workflows. *Supra* 9. That is information blocking. Indeed, the Cures Act prevents actors from "attempt[ing] to exploit their control over interoperability elements to create barriers to entry for competing technologies and services that offer greater value for health IT customers and users, provide new or improved capabilities, and enable more robust access, exchange, and use of EHI." 89 Fed. Reg. 102512-01, 102513 (Dec. 17, 2024) (codified at 45 C.F.R. § 171). That is just what HSOne did when it blocked the printer driver.

HSOne then escalated its information-blocking campaign in September 2025, deploying software that shut down and disabled any piece of software on the dental practices' computers that

ran with a Vyne certificate. *Supra* 12. Again, HSOne plainly knew that this would disable dentists' ability to access EHI and disrupt dentists' workflow; if disabling the print-capture functionality for Vyne had that feature, then plainly so did a software update that fully disabled Vyne. *Id.*

In all relevant respects, HSOne's attacks on Vyne's printer driver parallel and surpass the conduct underlying the preliminary injunction that the Fourth Circuit upheld in *Real Time*. Like this case, *Real Time* involved a dispute between two software companies—Real Time and PCC—involved in access, exchange, or use of EHI. Real Time had been using automated bots to extract EHI from PCC's health-records platform. Although PCC had long known about Real Time's use of bots and had raised no prior objections, PCC precipitously declared those bots a security risk and instituted "CAPTCHAs" that were designed to lock Real Time's bots out of its EHI databases. Real Time moved for and obtained an injunction following a hearing, after which the District Court concluded that "PCC's conduct amounts to 'information blocking' of protected patient medical records in violation of the 21st Century Cures Act." *Real Time*, 2024 WL 3569493, at *6 (D. Md. July 29, 2024), *aff'd*, 131 F.4th 205 (4th Cir. 2025)*.* On appeal, PCC "concede[d] that using indecipherable CAPTCHAs and locking users out facially constitutes information blocking under the Cures Act, absent an applicable exception." *Real Time*, 131 F.4th at 231. So too here.

### iii.    HSOne Cannot Establish the "Manner" or "Security" Exceptions

HSOne cannot meet its burden of showing that an exception to the prohibition on "information blocking" under the Cures Act applies. 42 U.S.C. §§ 201(c); 300jj-52(a)(1)(A)-(B)(i)); *Real Time*, 131 F.4th at 23. Neither the "security" nor the "manner" exception applies here.

**Security Exception.** To meet the security exception, HSOne must show that its conduct was (a) "directly related to safeguarding the confidentiality, integrity, or availability of EHI," (b) "tailored to the specific security risk being addressed," and (c) "implemented in a consistent and non-discriminatory manner." *Real Time*, 2024 WL 3569493, at *9-10 (quoting 45 C.F.R. §

171.203(a)-(c)). HSOne must meet all these criteria, but satisfies none of them.

    *1) Print driver*. HSOne fails to justify its conduct based on purported concerns with the security of print drivers. *First,* as *Real Time* makes clear, HSOne must identify an actual incident or "reliable evidence," and cannot rely on speculation to establish that there is a security risk "directly related to safeguarding the confidentiality, integrity, or availability of" EHI. 2024 WL 3569493, at *9. ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████ When asked whether Vyne's printer driver had "ever caused any security breach," Weatherly did not identify a single breach. 396:3-23. Nor did McDaniel. 617:8-16.

    HSOne's expert, David Youssef, offered nothing more. Youssef admitted that "[t]he printer driver itself, which is a third-party printer, by the way, is not on its own malicious." 480:14-19. He testified generally that "printer drivers are notoriously insecure," that "threat actors have abused a third-party printer driver" in other environments, and that "the industry is making a concerted effort to move away from printer drivers." 454:24-455:13. But a "printer driver is a piece of software. It's not inherently unsafe just because it's a printer driver." Clip 629:8-1. Youssef's testimony that Microsoft is "moving to deprecate . . . the use of third-party print drivers," 455:19-456:3, neglected to explain that deprecation does not become effective until July 2027, and that "Windows will continue to allow vendor-supplied printer drivers to be installed separately, just like the Vyne Dental Plugin installs its printer driver today." Clip 630:23-631:7; PX109; PX135.

    The theoretical possibility that the "driver technique" could be "easily exploited by a range of hostile actors" does not satisfy the security exception. Weatherly 396:13-23. *Vyne* is not a hostile actor—it is a "healthcare provider company that [acts] at the behest of its customers, installing or

providing the software that the customers want." Clip 650:15-651:16. As in *Real Time*, HSOne only "gestur[es] very broadly to the potential malicious use of [print drivers]." 131 F.4th at 238. That is not a "specific security risk" as is required to satisfy the security exception. *Id.*

*Second,* HSOne's conduct was not "tailored to the specific security risk being addressed." *Real Time*, 2024 WL 3569493, at *10. If HSOne was really concerned about the safety of print drivers, then it would have offered an alternative. It can, and it has not. *Supra* 12. HSOne's true motivation was to win market share. There is no real dispute that HSOne was simultaneously using its own disruption of Vyne's services as part of its sales tactics, along with making false statements about Vyne's products and security to Vyne's customers to win them away. *Supra* 9, 12. If, as is the case here, information-blocking "had the practical effect of disadvantaging competitors or steering referrals, this could be evidence that the practice was not directly related and tailored to the specific security risk." 85 FR 25642-01, 25861; *see also Real Time*, 131 F.4th at 237 (rejecting security exception defense where defendant "did not express this [security] concern for years before it started seeking to become a competitor"). That is precisely what occurred here.

*Finally,* and dispositively, HSOne did not implement its restriction in a non-discriminatory manner. HSOne continues to allow Dentrix users to use other print drivers, such as the print drivers needed to print to Adobe PDF or HSOne's own "Dentrix Document Center." *Supra* 9, 12. ███ ████████████████████████████████ Further, HSOne to this day offers its own print driver for EDS customers to integrate with Dentrix and its competitors like Open Dental and Eaglesoft, without warning any customers or third-party PMS's of its purported dangers. *Supra* 9-10. This is by definition a discriminatory practice. HSOne cannot have it both ways: either HSOne's own printer drivers present a security risk that HSOne has failed to remediate or warn its customers of, or it disabled Vyne's printer driver for reasons not related to

security. Clearly, the latter is true. And the September 2025 update targeted only Vyne.

*2) Database-integration method.* HSOne has also sought to justify its conduct by pointing to supposed issues with Vyne's direct-integration method to databases on dental practices' computers. But the two software packages are distinct, so this can be dismissed out of hand. *Supra* 6-7. And, as HSOne witnesses admitted, they learned about the supposed "hacking" after blocking the driver. Weatherly 361:3-362:7, McDaniel 17:4-7.[9] Anyway, this claim fails on its own terms.

*First,* Vyne's database integration method poses no security risk that would justify information blocking by HSOne. Vyne Sync uses exactly the same technology to integrate (ODBC) as HSOne uses for its own API. *Supra* 6. HSOne did identify an issue regarding Vyne's use of Vyne Sync to inject "911911911" into a database field to permit dentists to route QuickBill data to Vyne. But as HSOne's documents show, the issue was that this caused QuickBill to stop working. *E.g.,* HS123, G13-G14. That does not show any compromise to the "confidentiality, integrity, or availability of" EHI. 2024 WL 3569493, at *9. Moreover, Vyne has deprecated this feature, *supra* 8, so this could not defeat the injunction.

At the hearing, Mr. Rencher also raised purported concerns with Vyne users being able to write back to the financial ledger using ODBC integration, asserting that it prevented HSOne from performing certain auditing-like functions. Rencher 541:21-22. But this reflects a business, not technical, issue. Dentrix gives dentists the ability to write back to their own database using the user interface. *Supra* 7. Vyne allows dental practices to do the same thing automatically through Vyne Sync, if they purchase that service from Vyne, and Vyne is fully able to perform the auditing functions that HSOne says are required, should dental practices wish to contract with Vyne instead.

---

[9] Similarly, the technical artifacts post-date blocking the print driver. PX255; Youssef 470:8-23. And HSOne announced plans to disable the printer driver before nearly all QuickBill complaints. Weatherly 397:9-13, 397:19-398:4; Roberts Decl. Dkt. 6-2, ¶¶ 14-15 (Vyne response, March 28); HS123 (nearly all complaints after March).

Nothing prevents HSOne from including in its terms of use that if dental practices elect to use third parties (like Vyne) to write data back to their ledger, then HSOne disclaims all responsibility regarding that data, and dental practices would only have recourse against the third party. The fact that HSOne prefers to sell an integrated offering that includes additional auditing services—and to preclude other third parties like Vyne from providing 'retail' services—is not a security issue.

*Second*, HSOne's conduct—disabling the print driver, and then fully disabling Vyne software—is plainly not "tailored" to any alleged risk regarding Vyne's database-integration methods. The first attack, disabling the print-driver, was not so tailored because the print driver function is completely distinct not only from Vyne's use of Vyne Sync to write 911911911 into dental practices' computers, but also from Vyne's database integration for patient engagement and ledger write-back. Once again, as Vyne's witnesses explained, these are distinct technologies, and Vyne's printer driver does not access the Dentrix database. Nix 258:7-12; PX311 ¶¶ 57, 72.

The second attack, HSOne's deployment of its virus, suffers from the opposite problem: it fully disabled all Vyne software of all practices, fully disabling all features of users who had database access, and even disabling software for the 80% of practices that did not use it.

Given that the only issue identified by HSOne related to the injection of "911911911" for purposes of using QuickBill, HSOne could have deployed a fix to address *that* issue. Consider that after HSOne complained (earlier in this lawsuit) that Vyne was telling its customers that they could send files electronically to Vyne using the Dentrix eTrans functionality, HSOne made it impossible for dental practices to change the eTrans recipient. Nix 344:7-14. HSOne could have done something similar. But one thing is clear, the QuickBill issue HSOne identified was limited, and did not justify shutting down Vyne software—or even blocking Vyne's read-write database integration through ODBC (in place since 2021)—let alone blocking the print driver.

23

*Finally*, again, HSOne did not deploy its "security patches" in a non-discriminatory manner. The print-driver attack was discriminatory because it did not target HSOne's own drivers, while the September 2025 software update targeted only Vyne software. This is not a situation where, for example, it has deployed software to bar all users and third parties from proceeding in a particular way (as HSOne did when it disabled eTrans). So, the defense fails for that reason too.

**Manner Exception.** HSOne also fails to meet its burden under the Cures Act's manner exception. The regulation requires that HSOne "must fulfill a request for EHI in any manner requested, unless [it] is technically unable to fulfill the request or cannot reach agreeable terms with the requestor." 45 C.F.R. § 171.301(a)(1). The exception applies only to inability—not unwillingness. *Real Time*, 2024 WL 3569493, at *10. HSOne fails to meet this exception.

*First,* HSOne cannot demonstrate technical inability to provide EHI in the manner Vyne requested. Here, just as in *Real Time*, the manner exception is unavailable because the plaintiff had long used the same data access workflow the defendant later disabled. *Id*. Vyne used the print-capture workflow for decades across shared customers, as both parties well knew. Roberts 102:2-13; Weatherly 355:10-16. It is HSOne's burden to prove that the system cannot accommodate the requested method, and there is nothing in the record to support that conclusion. The opposite is true. HSOne's unwillingness to offer an alternative was business-, not security-, driven.

*Second*, the exception does not apply because negotiations between the parties to use an API-access method were ongoing when HSOne first disrupted Vyne's printer-driver, and then again when it disabled Vyne's product, foreclosing reliance on the manner exception. That exception applies only where parties definitively cannot reach agreement—not where discussions are ongoing. *Real Time*, 2024 WL 3569493, at *10.

*Finally,* HSOne failed to provide a meaningful alternative manner of access. Even where

24

the requested method is disputed, the regulation requires continued access through an alternative manner. 45 C.F.R. § 171.301(b). HSOne's proposed terms—an agreement through an approved API—would have required Vyne to stop serving its customers beyond basic clearinghouse functions. *Supra* 11. In other words, because HSOne sees itself as entitled to fully control dentists' end-to-end interface, it is unwilling to give Vyne any "ability to interact with the software via the user interface." Roberts 146:9-20. Like the "Hobson's choice" condemned in *Real Time*, HSOne's proposals forced Vyne either to accept terms that undermined its business model or forego access to essential patient data altogether. 2024 WL 3569493, at *11.

### 2. HSOne's Conduct Constitutes Unfair Competition Absent the Cures Act

Vyne is also likely to prevail on its claim that HSOne's conduct constitutes unfair competition under Maryland law, even without regard to the Cures Act. Unfair competition is broadly defined as "'damaging or jeopardizing another's business by fraud, deceit, trickery or unfair methods of any sort,' and must be evaluated case-by-case." *Real Time*, 131 F.4th at 225 (quoting *Balt. Bedding Corp. v. Moses*, 182 Md. 229, 237 (1943)). Maryland courts deliberately preserve "a high degree of flexibility," recognizing that liability turns on whether conduct violates "common honesty and fairness, without taint of fraud or deception." *Id.* at 225; *Balt. Bedding*, 182 Md. at 237. The Restatement similarly recognizes that conduct is "judged unfair" where it "substantially interferes with the ability of others to compete on the merits of their products." Restatement (Third) of Unfair Competition § 1 cmt.g (1995); *see also Paccar Inc. v. Elliot Wilson Cap. Trucks LLC*, 905 F. Supp. 2d 675, 691 (D. Md. 2012). Maryland law thus "has never required *an unlawful act* as an essential element of an unfair competition claim." *Real Time*, 131 F.4th at 226 (quoting *Trimed, Inc. v. Sherwood Med. Co.*, 977 F.2d 885, 891 (4th Cir. 1992)).

HSOne's conduct is patently unfair. As discussed, HSOne's witnesses confirmed that HSOne sought to compete with Vyne's product—not by improving its own product, but by

25

disabling Vyne's software, blocking EHI, and leveling false accusations. *Supra* 9-10, 12. It did so while using the exact same printer-driver technology, and knowing that Vyne's customers had used it for years without issue. *Id.* Blocking a competitor's established means of interoperability, while disparaging its services and security to customers, constitutes precisely the type of interference Maryland's unfair competition law prohibits. *Accord Sun Dun, Inc. of Wash. v. Coca-Cola Co.*, 740 F. Supp. 381, 397 (D. Md. 1990) (unfair to "disparag[e] [plaintiff] to its customers").

HSOne's conduct already resulted in a loss of at least 500 Vyne customers, attributing their departure to HSOne communications that Dentrix and Vyne "are no longer compatible." Roberts 149:3-13; 150:17-151:1; PX300. Vyne's customers took to social media, asking "[i]s our only option to use Dentrix claims or drop Dentrix and use another company like Open Dental?" PX007; *Id.* at 152:14-153:19. Amidst disruption to Vyne's services, HSOne owned EDS and eAssist that customers could use instead. *Id.* All told, HSOne's falsehoods about Vyne, shutdown of decades-old interoperability, and simultaneous promotion of competing products "jeopardiz[ed] another's business" using unfair methods. *Balt. Bedding*, 182 Md. at 237. That is unfair competition.

### 3. Tortious Interference

For much the same reasons, Vyne is also likely to prevail on its tortious-interference claim, having shown: (1) a contract or a legally protectable interest with a third party; (2) defendant's knowledge of the relationship; (3) intentional interference through improper or wrongful means; (4) resulting hindrance of performance; and (5) damages. *Fowler v. Printers II, Inc.*, 89 Md. App. 448, 466 (1991); *Blondell v. Littlepage*, 185 Md. App. 123, 153-54 (2009).

*First*, Vyne maintains contractual relationships and legitimate business expectancies with dental practices. Roberts 91:5-9. And, HSOne knows it. Weatherly 355:10-16. HSOne's visibility into which practices use Vyne confirms knowledge of such relationships. HS2.

*Second*, HSOne intentionally interfered through improper means. HSOne undertook a

26

deliberate campaign to harm Vyne's customer relationships by disseminating false statements about Vyne, exploiting its own disabling of Vyne software to create a false impression of security issues. *Supra* 9-12. That is not competition; it is interference through deception and obstruction. *See Trimed, Inc. v. Sherwood Med. Co.*, 977 F.2d 885, 889 (4th Cir. 1992). Indeed, Maryland law imposes a duty to refrain from using "intimidation, force, coercion, threats, or any other illegal means" to disrupt contractual performance. *K&K Mgmt., Inc. v. Lee*, 316 Md. 137, 161 (1989).

*Third*, HSOne's actions were aimed at redirecting customers, rather than addressing a legitimate purpose. Again, HSOne continued using its own printer drivers. *Supra* 9-10.

*Fourth*, HSOne's conduct hindered Vyne's performance of its contracts and interfered with its business expectancies. Indeed, once Vyne's printer driver was blocked, Vyne could not provide the services customers paid for. Roberts 126:9-12. Moreover, the continuing dissemination of false statements about Vyne's products caused countless customers to terminate services, thus interfering with prospective economic expectancies, just as HSOne intended. PX300; *supra* 9-12.

*Fifth*, Vyne suffered cognizable injury. Maryland law recognizes injury where interference causes loss of contractual benefits, consequential losses, or reputational harm. *Real Time*, 2024 WL 3569493, at *11. Here, Vyne expended substantial resources restoring customer access after HSOne disabled its software, and has lost customers, future business, and goodwill. *Supra* 13, 26.

## II.      VYNE HAS AND WILL SUFFER IRREPARABLE HARM ABSENT RELIEF

Irreparable harm is that which "cannot be fully rectified by the final judgment after trial," *Mountain Valley Pipeline, LLC v. 6.56 Acres*, 915 F.3d 197, 216 (4th Cir. 2019) (internal quotation marks omitted). The Fourth Circuit has made clear that this can include "loss of good will or erosion of [a company's] customer base." *Real Time*, 131 F.4th at 239; *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 103 (4th Cir. 2022) (noting impending likely "loss of customers and

employees" as irreparable harm). A finding of irreparable harm, of course, "seeks to measure harms that no damages payment, however great, could address." *Lonza Walkersville, Inc. v. Adva Biotechnology Ltd.*, 581 F. Supp. 3d 736, 750 (D. Md. 2022). However, "[p]rice erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm." *Id.* As to this factor, too, *Real Time* proves near-dispositive:

> [E]very time Real Time must reach out to a customer to ask them to reset an account, it wastes the customer's time and looks incompetent to the customer. And every time Real Time's access to the records for a given nursing home is disrupted, that is 'a 100% business interruption' with that facility. . . The disruption of Real Time's ability to do its work with hundreds of facilities at a time . . . puts it at immediate risk of breach of its contracts with its customers and 'presents a real and imminent threat to [its] continued ability to do business.'" *Id*.

*Real Time*, 131 F.4th at 239.

Vyne, like Real Time, experienced complete business interruption in its relationship with numerous dental practices because of HSOne's conduct, unable to deliver services to many of those customers for extended periods of time. Roberts 156:2-12, II. 233:8-12 ; PX 300. Vyne has suffered additional harms, too. This includes an ongoing and serious erosion to its customer base (a cognizable harm under *Real Time*) and reputational injuries among its customers and in the market more broadly. *Supra* 9-10, 12-13; PX300; PX306. HSOne's information blocking and false statements led customers and other market participants to believe that Vyne had caused a "security breach" and exposed customers to alarming vulnerabilities. PX002; PX033. And, as HSOne itself has argued, causing a software company's "customers no longer trust that [the company] can secure its software" constitutes irreparable harm. *See* HSOne Opening 55:23-56:1.

Each of those harms is compounded here by HSOne's aggressive campaign to poach Vyne's customers for HSOne's competing product. Whereas *Real Time* and predecessor decisions countenance reputational injuries on acts that threaten an imminent loss of customers and goodwill

because the service provider "looks incompetent to the customer," in this case those injuries are greatly accelerated by the fact that HSOne *actively enticed* Vyne's customers to leave. *Real Time*, 131 F.4th at 239. Indeed, HSOne's falsehoods about Vyne were often accompanied by an invitation to leave Vyne for Dentrix. *E.g,* PX002.10. HSOne's conduct ensured that the risk of Vyne losing customers and goodwill actually came to pass. *Supra* 13. In sum, the nature of the irreparable harm caused by HSOne's conduct is even more extensive than in *Real Time.*

## III.    THE BALANCE OF THE EQUITIES FAVORS VYNE

When weighing whether to grant a preliminary injunction, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def, Council*, 555 U.S. 7, 24 (2008) (quotation omitted). That balancing "is intended to ensure that the district court chooses the course of action that will minimize the costs of being mistaken." *Scotts Co. v. United Indus. Corp*., 315 F.3d 264, 284 (4th Cir. 2002) (cleaned up). The point is to preserve the status quo.

The balance of the equities here tips sharply in Vyne's favor. Absent a preliminary injunction, Vyne, its customers, and their patients will face continued uncertainty and disruption, which HSOne will remain free to exploit. *Supra* 9-13; PX003; PX033. By contrast, HSOne will suffer no cognizable harm should the Court enter Vyne's proposed injunction, which simply maintains a status quo of the preceding twenty years. HSOne's CEO made this clear: Without Vyne's printer driver, Vyne's customers would not be able to submit insurance claims electronically (Vyne's core business), and this would interfere with dental practices' workflows.

In considering the balance of the equities, the Court should also consider HSOne's own choices about its products. In opposing this preliminary injunction, HSOne fundamentally wishes to preserve the ability (a) to block read-access to EHI through a print driver, and (b) label Vyne's

product as unsafe. It does this while using a print driver for its own products, and without telling its customers its print driver is unsafe. It has proceeded this way for its products because the alternative would be to disturb its customers' workflows. So too for Vyne's print driver.

## IV.    VYNE'S INJUNCTION WILL SERVE THE PUBLIC INTEREST

The public interest favors granting Vyne's proposed preliminary relief, which will minimize disruption to dental patients, discourage anticompetitive conduct, and vindicate the animating purposes of the Cures Act is in the public interest to "ensur[e] that the policies of federal law are enforced and upheld," *United States v. Westvaco Corp.*, 2015 WL 10323214, at *9 (D. Md. 2015), and the "public likewise benefits from fostering access to medical records consistent with, and not in contravention of, the Cures Act," *Real Time*, 2024 WL 3569493, at *12. The public interest also favors "the prevention of unfair business practices." *Brightview Grp.*, 441 F. Supp. 3d at 142. It is not only Vyne that has been harmed; its customers have borne much of it.

If the Court grants Vyne's motion and preserves the status quo, dental practices will continue receiving services from both companies using the same technology that has supported their practices for the last two decades. If the Court denies the motion, dental practices will be faced with the choice of (a) enduring a continued state of uncertainty about whether their tools will continue to function so dentists can get paid on time, or (b) avoiding that risk by moving away from Vyne. Saddling dental practices with such a choice would prove a windfall to anticompetitive actors, especially where no evidence has been presented to suggest that the functionality at issue invites a security breach, data loss, or data corruption. *See Real Time*, 131 F.4th at 241.

## CONCLUSION

For the foregoing reasons, the Court should issue Vyne's requested preliminary injunction.

DATED: February 23, 2026

Respectfully submitted,

/s/ *K. Nichole Nesbitt*
_____

K. Nichole Nesbitt (Bar No. 26137)
Derek M. Stikeleather (Bar No. 27815)
GOODELL, DEVRIES, LEECH & DANN, LLP
One South Street, 20th Floor
Baltimore, MD 21202
(410) 783-4026
knn@gdldlaw.com
dstikeleather@gdldlaw.com

Michael Shuster (admitted *pro hac vice*)
Vincent Levy (admitted *pro hac vice*)
Charlotte Baigent (admitted *pro hac vice*)
James Campbell (admitted *pro hac vice*)
Daniel Fahrenthold (admitted *pro hac vice*)
Torrell Mills (admitted *pro hac vice* )
HOLWELL SHUSTER & GOLDBERG LLP
425 Lexington Avenue, 14th Floor
New York, NY 10017
(646) 837-5151
vlevy@hsgllp.com

*Attorneys for Plaintiff*
*National Electronic Attachment, Inc., d/b/a Vyne Dental*

31