**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)**

| | |
|---|---|
| NATIONAL ELECTRONIC ATTACHMENT, INC., d/b/a VYNE DENTAL <br><br>   Plaintiff/Counter-Defendant, <br><br> - against – <br><br> HENRY SCHEIN ONE, LLC, <br><br>   Defendant/Counter-Plaintiff. | **Case No. 1:25-cv-03246-MJM** |

**HENRY SCHEIN ONE, LLC'S POST-HEARING MEMORANDUM OF LAW IN
SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION AND IN
OPPOSITION TO VYNE'S MOTION FOR PRELIMINARY INJUNCTION**

ACTIVE 720086906v1

## TABLE OF CONTENTS

TABLE OF CONTENTS..............................................................................................................I

TABLE OF AUTHORITIES ................................................................................................ III

INTRODUCTION ................................................................................................................ 1

HSONE IS ENTITLED TO A PRELIMINARY INJUNCTION ...................................... 4

I.    HSOne will succeed on the merits of its claims. .................................... 4

      A.    Admissions establish Vyne is violating the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. §§ 1030(a)(2)(C), (a)(4), and (a)(5)(C). ..................................................................................... 4

            1.    Vyne admits egregious unauthorized access................................. 4
            2.    Vyne's excuses do not defeat HSOne's CFAA claim as a matter of law. ................................................................................. 9

      B.    Admissions establish Vyne violated the Digital Millenium Copyright Act ("DMCA"), 17 U.S.C. § 1201(a)(1)(A). ........................... 13

            1.    Dentrix and its files are protected works of copyright................. 13
            2.    HSOne has a multi-layered encryption technological measure to control access................................................................ 13
            3.    Vyne circumvents HSOne's multi-layered encryption controls................................................................................... 13

      C.    Admissions establish Vyne committed trespass to chattels...................... 14

      D.    Admissions establish Vyne engaged in unfair competition and tortiously interfered with HSOne's customer contracts and business relations. ..................................................................................... 15

II.    HSOne has demonstrated Vyne's conduct creates irreparable harm. ................... 16

      A.    Vyne's unauthorized conduct is escalating, and it does not intend to stop.................................................................................................... 16

      B.    Vyne has escalated HSOne's cybersecurity risk, giving rise to potential third-party exploits.................................................................... 17

      C.    Vyne's conduct causes database corruption, loss of data integrity and control over the database, and disruption to services, harming patients and practices. .................................................................. 20

      D.    Vyne has also harmed HSOne's reputation. .......................................... 22

ACTIVE 720086906v1

III. The balance of the equities and public interest weigh in hsone's favor. .............. 23

VYNE IS NOT ENTITLED TO A PRELIMINARY INJUNCTION ........................................ 23

I. Vyne will not succeed on the merits of its claims. .............................................. 24

A. Vyne cannot succeed on its unfair competition claim. ............................ 24

1. Vyne has not met its burden to show that HSOne is subject to the Cures Act. .............................................................................. 25

2. Even if HSOne was subject to the Cures Act, HSOne satisfies the security and manner exceptions. ............................... 26

B. Vyne will not prevail on its tortious interference claims. ......................... 27

II. Vyne failed to demonstrate irreparable harm......................................................... 28

III. The balance of the equities and public interest weigh in favor of HSOne, not Vyne........................................................................................................ 29

CONCLUSION...................................................................................................................... 30

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Facebook, Inc. v. Power Ventures, Inc.*,
  844 F.3d 1058 (9th Cir. 2016) ..................................................................................9

*IntusCare, Inc. v. RTZ Associates, Inc.*,
  No. 24-CV-01132-JST, 2025 WL 3500667 (N.D. Cal. Sept. 18, 2025)................................26

*Macklin v. Robert Logan Assocs.*,
  639 A.2d 112, 119 (Md. 1994) .................................................................................27

*Morton v. Mancari*,
  417 U.S. 535, 94 S. Ct. 2474 (1974).........................................................................12

*Nassi v. Hatsis*,
  525 P.3d 117 (Utah Ct. App. 2023) ...........................................................................14

*In re Pharmatrak Privacy Litig.*,
  329 F.3d 9 (1st Cir. 2003).......................................................................................10

*Philips Med. Sys. Nederland B.V. v. TEC Holdings, Inc.*,
  2023 WL 2064201 (W.D.N.C. Feb. 16, 2023) ...........................................................13

*Phreesia, Inc. v. Certify Glob., Inc.*,
  2022 WL 911207 (D. Md. Mar. 29, 2022)....................................................................9

*Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*,
  131 F.4th 205 (4th Cir. 2025) ..................................................................................24

*State Analysis, Inc. v. Am. Fin. Servs. Assoc.*,
  621 F. Supp. 2d 309 (E.D. Va. 2009) ..........................................................................9

*Trimed, Inc. v. Sherwood Med. Co.*,
  977 F.2d 885 (4th Cir. 1992) ...................................................................................16

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001)..............................................................................................12

**Statutes**

17 U.S.C. § 1201(a)(1)(A) .......................................................................................13

18 U.S.C. § 1030(a)(2)(C) .....................................................................................4, 7

18 U.S.C. § 1030(a)(5)(C) .....................................................................................7, 8

18 U.S.C. § 1030(g) ..............................................................................................11

Cures Act ...............................................................3, 4, 12, 23, 24, 25, 26, 27, 29, 30

DMCA......................................................................................1, 12, 13, 14, 16

ACTIVE 720086906v1

**Other Authorities**

45 C.F.R. § 171.102 ...................................................................................................26

45 C.F.R. § 171.203 ...................................................................................................26

45 C.F.R. § 171.301 ...................................................................................................26

Carequality (*available at* https://carequality.org/) ...................................................25

CommonWell Health Alliance (*available at*
    *https://www.commonwellalliance.org/*) ...................................................................25

https://ehealthexchange.org ......................................................................................25

https://www.crisphealth.org/ .....................................................................................26

iv

Defendant Henry Schein One, LLC ("HSOne") respectfully submits this Memorandum of Law in Support of HSOne's Motion for Preliminary Injunction and in Opposition to Plaintiff National Electronic Attachment, Inc., d/b/a Vyne Dental's ("Vyne") Motion for Preliminary Injunction.

## INTRODUCTION

When Vyne raced to this Court, it put forth the same story it had been telling the market: All Vyne was doing was deploying its printer driver. No different than printing records on paper or to PDF. That has now fallen apart.

The hearing produced a barrage of testimony proving Vyne's escalating and ongoing unauthorized access to HSOne's protected systems. Many facts are now undisputed: That Vyne directly accesses HSOne's database. That Vyne does so by decrypting HSOne's encrypted configuration file. That to decrypt, Vyne takes far more than the dentist's office username and password, but also at least **four** additional secrets that HSOne protects with technical measures in its source code and elsewhere: ███████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████

Even at the hearing, Vyne attempted to obfuscate and hide the details of its decryption. Its Chief Technology Officer proudly proclaimed that Vyne uses nothing more than dentists' usernames and passwords (while at the same time waffling on the extent of his actual knowledge of the code). Clear evidence proved this false within a day. Whether an intentional misstatement or a demonstration that Vyne's CTO has his head in the sand, it does not matter. Vyne's secret misappropriation ends the inquiry on CFAA, DMCA, and trespass and cements the foundation for

1

ACTIVE 720086906v1

all of HSOne's common law claims. These facts—which prove that Vyne is no different than a malicious hacker—also dispel Vyne's offensive claims as well.

However egregious Vyne's conduct was at the time of the hearing, there is also no dispute that Vyne will not stop. Vyne's CEO and CTO made clear that their mandate to Vyne is to maintain access to HSOne's systems by any means necessary. Vyne's CEO admitted that the only reason Vyne has not agreed to commercial terms that would provide it with all access it needs through authorized integrations is because Vyne wishes to preserve the ability to mass-inject and mass-read data in and out of HSOne's Dentrix database through Robotic Process Automation bots. Indeed, the evidence shows Vyne's database access and decryption occurring on over 7,000 shared customers in the lead up to the hearing and even now, as well as over a million instances of access to HSOne's database in just the 24 hours prior to the hearing. And in the short time since the hearing, HSOne has uncovered evidence of new conduct. Vyne is now generating its own API keys using HSOne's proprietary API key generation algorithm as Vyne's next attempt to circumvent HSOne's security controls—an independent unlawful act.

HSOne's expert, the head of FTI's Incident Response team, explained the irreparable harm Vyne's unauthorized access causes HSOne. No breach in the healthcare industry or otherwise announces itself in advance. Attackers hide and persist in systems. For the biggest breaches, this can last for months and years. The types of risks Vyne is introducing through its slapped-together unauthorized access make inevitable that a breach will occur that damages HSOne, its customers, and their patients. Vyne's cavalier introduction of this risk, preventing HSOne from controlling its own cybersecurity attack surface, merits an injunction alone. The hearing also proved, however, a slew of other irreparable harms. Ongoing database corruption to the tune of thousands of instances—a number even Vyne's CEO acknowledged would be material. Reputational harm

2

because HSOne's customers blame HSOne, not Vyne, for the damage to their systems Vyne causes. Damage that, even when Vyne purportedly uninstalls its application, persists.

With respect to HSOne's preliminary injunction, the facts are undisputed. All *Winter* factors lean cleanly towards HSOne. As to Vyne's preliminary injunction, however, the hearing deepened significant factual disputes. It demonstrated that Vyne cannot prevail on any of the *Winter* factors for purposes of its mandatory affirmative injunction.

Vyne has not shown that it is likely to succeed on the merits of either its unfair competition or tortious interference with contract claim. Vyne's unfair competition claim is dependent on the Cures Act, which does not apply to HSOne. Neither does tortious interference apply to a company where there is no actual interference and no unlawful act. Vyne cannot be irreparably harmed for accessing systems it has no legal right to access in the first place. Vyne's CEO made clear that Vyne's alleged damages (which consist of negligible customer churn shown to be a result of Vyne's poor customer service) are all quantifiable. For Vyne, unlike for HSOne, it is all about money. None of the statutes or common law doctrines Vyne invokes provide a license to violate federal computer crime laws. Even under Vyne's own theory, it cannot succeed because HSOne has provided Vyne with easy alternative integration methods that accomplish everything Vyne purports to need to service its contracts. Nothing HSOne has said about Vyne is false, and everything it has done of which Vyne complains consists of reasonable security measures that any company—even Vyne, as proven at the hearing—takes to secure its software systems.

Only the Court can stop Vyne. To do so, HSOne seeks a narrow injunction that simply orders Vyne to stop accessing HSOne's systems without authorization that is causing irreparable harm in terms of the cybersecurity risks, harm to HSOne's systems, harm to HSOne's reputation and relationship with its customers, and harm to HSOne's customers and their patients.

3

## HSONE IS ENTITLED TO A PRELIMINARY INJUNCTION

The hearing testimony, including admissions by Vyne's own witnesses, demonstrates HSOne meets all four *Winter* elements and is entitled to injunctive relief.[1]

## I.    HSONE WILL SUCCEED ON THE MERITS OF ITS CLAIMS.

**A.    Admissions establish Vyne is violating the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. §§ 1030(a)(2)(C), (a)(4), and (a)(5)(C).**

The trial proved every CFAA element.  HSOne lays out the CFAA standard and elements in its prior briefing and in its Opening Statement at Trial.[2]  Vyne cannot dispute that its conduct constitutes unauthorized access under the statute and Supreme Court authority.  Vyne argues merely that its hacking is excused by customers, the location of the protected computers, and the Cures Act.  These arguments all fail.

**1.   Vyne admits egregious unauthorized access.**

**Decryption.**

(Nix ("JN") Dep. attached as Ex. A to Declaration of Jennifer Bartlett ("Bartlett Dec."), 315:21-24.)  When Mr. Nix described the algorithm, however, he left out critical details.[3]  Mr. Nix falsely claimed that Vyne only used the dentist's Windows username and password and nothing more.  Even if this was true, it still constitutes a CFAA violation under applicable law.[4]  In reality, though, Vyne misappropriates at least four other secret values, none of

---

[1] The Court is familiar with the *Winter* standard and HSOne's arguments in its briefing.  The hearing testimony and evidence was framed around the *Winter* standard as well.  *See* HSOne's Opp. to Pl.'s Motion for TRO and PI ("Opp. to Vyne's PI") (ECF 38), HSOne's Mot. for  PI (ECF 46-1), HSOne's Reply ISO Mot. for PI (ECF 62), and the hearing record (ECFs 132-137).

[2] (HSOne's Mot. for PI (ECF 46-1) 15-17; HSOne's Reply ISO Mot. for PI (ECF 62) 3-6; Opp. to Vyne's MTD (ECF 84) 4-10.); Trial Transcript 132.)

[3] JN 313:7-314:8; 315:21-24; 316:22-317:14.
[4] (HSOne's Mot. for PI (ECF 46-1) 16-17.)

ACTIVE 720086906v1

which are known to the dentists' offices, and all of which are secret technical measures designed to protect HSOne's software systems. It is incredible that after months of litigation, hundreds of pages of briefing, and multiple corrections where Mr. Nix—the CTO—admitted to making inaccurate statements to the Court about Vyne's technical approach,[5] he doubled down on falsehoods at the hearing. Within a day, and after the Court honed in on this unbelievable assertion, testimony and evidence disproved Mr. Nix's claims.

To decrypt the ▮▮▮▮▮ file, Vyne requires access to three additional secrets that are exclusively embedded in Dentrix's source code. (Youssef ("DY") 437:8-440:1 (noting "▮



").) The secrets include:

(DY 438:10-19; DY Rpt ¶78-81; HSOne 49 at 3-4 ▮▮▮▮▮▮▮▮

(DY 439:13–22.)

(DY 440:2-9). ▮▮▮▮▮▮▮▮ (DY 440:10-13.)

---

[5] (JN 318:23-321:24.)

ACTIVE 720086906v1

Mr. Youssef confirmed that the only ways to obtain these secrets would be to reverse engineer the compiled application, to be in possession of a copy of the source code, or to have "insider knowledge." (DY 440:14-18; DY 438:10-19; *see also* McDaniel ("KM") 597:17-600:20.) This is because the three secrets are all "stored in the Dentrix code base." (KM 600:11-16.)

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████ (DY 441:5-20). ███████████████████████

█████████████████████████████████████ (DY 443:7-12; HSOne 49; PX267.) Vyne's own expert offered no contrary opinion, stating he had not yet "made up an opinion" as to whether he had seen anything to suggest that Vyne was *not* decrypting the dtx.config file using secrets beyond the customer's own username and password. (Clip ("PC") 659:8–12.) Vyne's CTO also admitted that the same technology had been "leveraged" into what Vyne refers to as the "printer driver," but which has nothing to do printing and which exists across all of Vyne's installations, not just Vyne Sync. (Nix 294:24-295:14.) Regardless, any usage of misappropriated secrets to decrypt encrypted files protecting HSOne's software systems must be enjoined.

***Privilege Escalation through Admin Credentials.*** Vyne's access is unauthorized and would exceed any authorization Vyne purports to have. Mr. Nix admitted Vyne "can access all of the practice's data and it can access configuration." (JN 265:13–15.) ████████████████

████████████████████████████████████████ (KM Dep. attached as Ex. B to Bartlett Dec., 121:21-122:17.) █████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████ (KM

6

Dep. 122:18-123:18.)  Mr. Rencher confirmed that once obtained, the credentials provide Vyne unfettered access.  (Rencher ("GR") 538:9-542:18; 578:19-25.)  Exceeding authorized access independently violates §§ 1030(a)(2)(C) and (a)(4).

*Vyne's Ledger Write-Back is Beyond Authorization*.  With the super credentials, Vyne can "access all of the practice's data and it can access configuration data for Dentrix and also…do some ledger write-back[.]"  (JN 265:10–19.)  HSOne has never authorized this.  HSOne's own API architecture places ledger write-back off-limits for third parties.  ███████████████ ██████████████████████████████████████ .

*Runtime Patching of HSOne's DtxHelp.dll.*  Vyne's software modified HSOne's DtxHelp.dll, a copyrighted HSOne library, at runtime to disable security flags and enable continued unauthorized access despite HSOne's active remediation efforts.  (JN 278:22-279:24 (admitting the code is in Vyne's source code as a "proof of concept" but alleging it was "never used at all").)  Even Vyne's CTO acknowledged that calling third-party DLLs like Vyne is doing here is bad practice:

> A. I think it's a bad practice because you can have -- you can have -- DLLs are likely to change, like, the calls, the methods, what they return back. Those are probably the most transient. And so calling a DLL like what Henry Schein One is doing for DDX Lab, calling Open Dental's DLLs, I think it's a bad strategy because it can change and it can cause issues and problems.

(JN 336:2-8.)  Modifying a software owner's library without authorization is unauthorized access under § 1030(a)(5)(C), independent of any database access claim.

*Vyne Used Escalated Privileges to Defeat HSOne's Own Security Remediations*.  Vyne has worked around HSOne's security measures.  (KM 609:5-610:2.)  Vyne for instance used VyneSync to write directly to Dentrix's options table, removing itself from the hostile printer list and resetting the next security check date to 2035. (JN 276:3-12 noting the first step was modifying the table to remove Vyne from the list and to "change…how often it put Vyne back on there to not

7

do it until 2035"); KM 616:16-22 ("placed the Vyne printer driver on a list of printer drivers that were not allowed to be printed to directly from the Dentrix software through a database update which Vyne then went in and reversed using their direct database access.").)  Vyne's conduct violates § 1030(a)(5)(C), independently of its database read operations.

*Vyne's Attempt to Distinguish Between the Vyne Dental Plugin and VyneSync Fails.* The Vyne Dental Plugin (VDP), what Vyne tells the world is a printer "driver," is in reality a suite of services that runs software applications designed to access HSOne's software systems without authorization—this is no longer in dispute after the hearing.  Despite Vyne's misrepresentation that its interaction with Dentrix is limited to a print driver, Mr. Nix admitted that VyneSync technology was not kept separate from the VDP, but embedded within it: "The VyneSync technology was also *leveraged* to do billing statements," acknowledging that the same database access infrastructure used by VyneSync was built into the plugin that Vyne purports is a mere "printer driver."  (JN 268:19-269:2 (emphasis added).)  When pressed on the technical specifics, Mr. Nix all but confirmed that the component being "leveraged" was the Lattice DLL, the library at the core of VyneSync's decryption of the dtx.config file and database access capability.  (JN 295:5-9; HSOne 49.)  In other words, even customers who only installed the VDP had VyneSync's unauthorized database access technology surreptitiously installed on their machines.

The VDP suite also contains file VyneApiService.exe, which Mr. Youssef confirmed performs decryption.  (HSOne 22, ¶¶60-64.)  Vyne's attempt to sanitize this—by arguing this has been deprecated (PC Rep. ¶ 96-97)—is to no avail.  The fact is Vyne's "print driver" suite (VDP) carries along malicious baggage.  (DY 450:22-25.)  Evidence also showed at the hearing that even when customers remove Vyne from their systems, the database access continues.  (Rencher 558:3-558:19; HSOne 2, Row 971.)  This is not surprising given that Vyne is hacking together its

8

unauthorized access and doing so without the benefit of working with HSOne's engineering team on the dependencies and unexpected consequences that Vyne's conduct introduces.

Finally, even setting aside VDP entirely, VyneSync on its own merits an injunction. Vyne claimed at the hearing that only 20% of its customer base leverages VyneSync, but the evidence shows Vyne's database access persists with over 7,000 shared customers, more than 80% of the shared customer base. (DY 412:16-413:1; 418:1-419:3; 433:3-434:15; HSOne 2; HSOne 248.). Regardless, even a thousand instances—even one hundred—of unauthorized hacking merits a preliminary injunction to stop any such instances. There is no de minimis defense.

### 2. Vyne's excuses do not defeat HSOne's CFAA claim as a matter of law.

#### a) *Customers do not consent to what Vyne does, and any consent does not excuse CFAA violations.*

Vyne's "the customers consented" defense fails because (1) customers were prohibited from authorizing Vyne's purported consented access as a matter of law; and (2) dental offices cannot authorize what they do not understand. (HSOne Mot. for PI (ECF 46-1) 16-17; Reply ISO Mot. for PI (ECF 62) 3-6; Opp. to Vyne's MTD (ECF 84) 7-10.) Rather than receiving voluntary consent, what Vyne is doing amounts more closely to a social engineering attack against its customers. (DY 525:8-21.)

*First*, as a matter of law, a practice's consent is not sufficient to authorize Vyne permission to access HSOne's software systems. *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1068 (9th Cir. 2016); *Phreesia, Inc. v. Certify Glob., Inc.*, 2022 WL 911207, at *6 (D. Md. Mar. 29, 2022). Courts have routinely rejected this theory because it would permit malicious actors who have managed to elicit their customers' uninformed consent to hack into systems to which the hackers are not authorized. This is particularly true where, like here, the terms of a contract prohibit third-party authorization. *See State Analysis, Inc. v. Am. Fin. Services Assoc.*, 621 F.

9

Supp. 2d 309, 316 (E.D. Va. 2009); (HSOne's Mot. for PI (ECF 46-1), 7; KM Decl. (ECF 46-2) ¶ 10; PX35.).

Mr. Roberts himself conceded that developers should access HSOne's software systems only through the routes authorized by DDP program. (SR 222:15-19; 224:1-225:2 (acknowledging that while at HSPS, Mr. Roberts discouraged the use of unauthorized access to the database, including through ODBC [Open Database Connectivity] connections); PX35 (DDP terms).) Vyne must have HSOne's authorization to access its software, not HSOne's customers'.

*Second*, consent requires actual consent to the specific conduct at issue; it should not be "casually inferred." *In re Pharmatrak Privacy Litig.*, 329 F.3d 9, 19-20 (1st Cir. 2003). There is no evidence that any customer consented to Vyne reverse-engineering HSOne's proprietary encryption measures, escalation of administrative credentials the customer never possessed, the writing of "911911911" into the Dentrix database, or storing admin credentials in cleartext. Mr. Nix himself admitted he did not think that the dental offices would understand the technical details of how the integration works. (JN 334:13-16). Customers had no idea what Vyne was doing.

Furthermore, Vyne's terms do not allow customers to consent to what Vyne is doing. Mr. Roberts admitted that there is nothing in Vyne's customer contracts that authorizes decryption, database write back, or credential theft. (SR 162:12-163:13.) Vyne's own terms do not disclose database-level access, or any of the specifics Vyne has been employing. (HSOne 66.)

Mr. Roberts' testimony on this issue is not credible. In his previous capacity at Henry Schein Practice Solutions, or HSPS (HSOne's predecessor), in product management and executive roles, including oversight of third-party vendor enrollment in the Dentrix Developer Program (DDP) (SR 80:14-25), his team advised third-party developers to connect only through authorized mechanisms and did not authorize access outside the program. (SR 220:1-19; 221:10-13; 222:7-

10

19.) Mr. Roberts told a developer, in writing, that "presuming that interacting with the database directly with what is called ODBC or otherwise is without risk" was missing the point, that HSOne "oppose[d] any attempts to interact with the database outside of mechanisms provided by HSPS with particular prejudice for writing to the database." (SR 224:1-21.) Now, however, Mr. Roberts is willing to circumvent authorization barriers he and Mr. Nix have first-hand knowledge of and helped to create at HSOne so that Vyne can compete unfairly in the market.

Mr. Youssef persuasively opined that HSOne should be able to control how its software is used for security purposes while enabling alternative integration. "[J]ust because a patient would like to interact with data…does not mean that the appropriate way to get access to that data is via unauthorized access. There are legitimate ways to do this, and the way that Vyne is operating within the Dentrix technology stack is not legitimate." (DY 511:1-9.)

### b) *The protected computers at issue are within CFAA's scope.*

The CFAA does not require HSOne to own the hardware and protects more than just a PC sitting in a dentist's office. (HSOne Mot. for PI (ECF 46-1) 15-16; Reply ISO Mot. for PI (ECF 62) 3-6; Opp. to Vyne's MTD (ECF 84) 4-7.) The statute reaches "any person who suffers damage or loss by reason of a violation," § 1030(g), and courts do not read in an ownership or control requirement. The CFAA's definition of a protected computer in any event is "exceeding broad" and includes HSOne's software systems. (Opp. to Vyne's MTD (ECF 84) 4-7.)

Vyne's argument that HSOne's CFAA claim fails because its software is not on premise is also factually wrong. The Dentrix software system includes HSOne-owned and HSOne-controlled cloud infrastructure that communicates continuously with customers' on-premise installations. (KM Decl. (ECF 62-1) ¶¶ 2–9.) Vyne is directly interacting with protected and controlled HSOne technology, HSOne databases, and HSOne's technology stack. (DY 453:1-19.) Vyne knows its access is not interacting solely with customers' computers. Mr. Nix admitted HSOne now "sends

11

a copy of the claims and a copy of the billing statements up" to the cloud, as well as how it "update[s] the [Dentrix] software." (JN 341:2-11). Vyne uses the same misappropriated credentials to access that cloud-hosted component. He also admitted that he previously worked on eSync when he was with HSPS, which enabled sending eligibility check data to the cloud. (JN 341:17-343:1.) And Mr. Youssef explained that "[t]his a protected database. Without unauthorized access, this database cannot be accessed by Vyne." (DY 512:12-513:19.) The admissions establish a CFAA violation entirely on HSOne's own infrastructure, independent of any misplaced customer-ownership argument.

### c) The 21st Century Cures Act does not preempt the CFAA.

Vyne repeatedly invokes the 21st Century Cures Act's prohibition on "information blocking" as a justification for its conduct. But no court has held, and the Office of the National Coordinator for Health Information Technology has never suggested, that the Cures Act gives third-party vendors carte blanche to reverse-engineer proprietary software, decrypt and steal administrative credentials, escalate database privileges, or intercept network communications in the name of interoperability. This would render the CFAA and DMCA toothless.[6]

Vyne's CEO even conceded that the Cures Act does not authorize self-help unauthorized access by any means necessary. (SR 166:14-18.) Vyne prohibits its own customers from doing exactly what Vyne does to HSOne. Mr. Roberts conceded there's "a good reason" for these restrictions. (SR 167:13-169:21.) While employed at HSOne, Mr. Roberts held the same view HSOne does now—direct database access like Vyne is doing is dangerous and unauthorized.

---

[6] *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress…does not hide elephants in mouseholes") (citation omitted); *see also Morton v. Mancari*, 417 U.S. 535, 551 (1974) ("The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.")

ACTIVE 720086906v1

**B.**    **Admissions establish Vyne violated the Digital Millenium Copyright Act ("DMCA"), 17 U.S.C. § 1201(a)(1)(A).**

**1.    Dentrix and its files are protected works of copyright.**

It is uncontested that HSOne's Dentrix software, including its source code, DLL files (DtxHelp.dll), configuration files (dtx.config, FairCom C-Tree settings), compiled object code, and related components, are protected by copyright. (Opp. to Vyne's MTD (ECF 84) 10-11.)

**2.    HSOne has a multi-layered encryption technological measure to control access.**

HSOne employs a multi-layered encryption process that controls access to the Dentrix copyrighted software system, including its ███████████████████████ (DY 437:22-438:9.) *First*, circumventing the measure itself requires accessing or obtaining the copyrighted work directly. Vyne had to either decompile portions of Dentrix's software or was provided portions of it in order to obtain administrative credentials. Even knowing all of the components is not enough. Vyne also has to understand the way they work to generate the decryption key, which requires reverse engineering the Dentrix algorithm. (DY 445:15-25.)

*Second*, the credentials provide full access to the Dentrix software system itself, not merely data. (GR 578:5-25 (gaining admin credentials means "they can do anything").) Mr. Nix confirmed VyneSync "can access all of the practice's data and it can access configuration data for Dentrix…" (JN 265:10-15.) The encryption is the lock on the Dentrix system, which Vyne has broken. *See Philips Med. Sys. Nederland B.V. v. TEC Holdings, Inc.*, 2023 WL 2064201, at *13 (W.D.N.C. Feb. 16, 2023) (granting summary judgment on DMCA claim where defendant admitted to using software to bypass plaintiff's encrypted security measures).

**3.    Vyne circumvents HSOne's multi-layered encryption controls.**

The admissions establish Vyne circumvented HSOne's technological measures. Mr. Nix admits Vyne is engaging in decryption that requires keys. (JN 314:25-315:3.) Vyne built and

13

deployed a proprietary algorithm to break the encryption as described in detail above. (JN 264:10–25; 315:24–25 (confirming Vyne created a "proprietary algorithm"); *see* supra Section I.A.1.) Youssef explained how this is happening also *en masse*. (HSOne 248 (Splunk telemetry confirming live decryption at scale).) Vyne also releases software frequently to circumvent HSOne's security controls. (GR 536:25-537:12.) Vyne designed activities to circumvent control:

> [I]t was apparent to me that Vyne did engage in activities that were -- that were designed to circumvent controls, that they knew would circumvent controls, and, in fact, when controls were put in place, they actually pivoted and they evolved their techniques to once again circumvent controls that were adapted by HSOne.

DY 409:21-410:1. All of this activity clearly establishes a violation of the DMCA.

### C.    Admissions establish Vyne committed trespass to chattels.

Trespass to chattels occurs when one "intentionally (a) dispossess[es] another of the chattel, or (b) us[es] or intermeddl[es] with a chattel in the possession of another." *Nassi v. Hatsis*, 525 P.3d 117, 122 (Utah Ct. App. 2023) (quoting Restatement (Second) of Torts § 217) (brackets in original). The admissions establish Vyne engaged in trespass to HSOne's systems. VyneSync's decryption process lacked authorization. (JN 264:16-25; 316:22-318:22; BW 385:16-386:5.) Vyne's database access went beyond reading: the "911911911" overwriting corrupted the credential fields in Dentrix's database and caused hundreds of complaints. (GR 556:19–557:14; 576:15-21; HSOne 123.)

Vyne's software also "touch[es] the database, hold[s] onto database connections," and "can't be uninstalled" because Vyne is not accessing the system through an authorized API but by grabbing and holding the database connection directly. (GR 558:20-559:5.) Vyne's unauthorized occupation blocks HSOne from installing new versions and upgrading Dentrix. (*Id.*) The corruption persists even after customers remove Vyne, because the application remains resident

14

and continues to operate.  (GR at 558:3-19; HSOne 2, Row 971.)  HSOne has lost practical

dominion over its own database and upgrade capabilities.  This is dispossession.[7]

> **D.    Admissions establish Vyne engaged in unfair competition and tortiously interfered with HSOne's customer contracts and business relations.**

Utah's common law unfair competition is broad, prohibiting conduct that jeopardizes

another's business through unfair means.    And Vyne did so until October 2023, at which point,

Vyne "found another way."  (BW 376:2-9.)  Mr. Roberts confirmed that Vyne took this step

because it could not obtain HSOne's authorization for its applications under the API program's

term, yet continued accessing HSOne's systems regardless.  (SR 214:21-215:6;          )[8]

But by not paying for API fees, Vyne "is able to offer its customers an integration without paying

those fees," and "is obtaining a commercial advantage."  (

            BW 387:6-388:2.)

HSOne's customer agreements expressly prohibit granting third-party access to circumvent

HSOne's technical security measures.  (KM Decl. (ECF 46-2) ¶ 10; PX35.)  Every dental practice

that installs Vyne's software and allows it to circumvent HSOne's security patches, alter registry

keys, and access HSOne's database through unauthorized credential exploitation is breaching that

contractual obligation based on Vyne's interference.

---

[7] Vyne's rebuttal that this has been "deprecated" is hollow.  As Mr. Rencher testified, in at least one instance, HSOne's support team restored functionality for a practice, only to find the corruption recurring, because Vyne's software remained resident on the machine even after the customer believed it had been removed.  (GR 558:3–19; HSOne 2, Row 971.)

[8] Notably, Mr. Roberts omitted the critical detail that Vyne used the API after the acquisition at issue for over a year before it stopped.  Mr. Roberts' testimony, until cross, made it seem like Vyne quickly abandoned the API.  It did not. (*Compare* SR 107:7-108:2 (on direct, describing impasse "in 2021, 2022"), *with* (SR 214:17-216:14 (on cross, unable to deny continued API use through October 2023).))

15

Maryland does not require proof of an actual contract breach; interference with contractual rights or expectations is enough. *Trimed, Inc. v. Sherwood Med. Co.*, 977 F.2d 885, 889-90 (4th Cir. 1992). Vyne's violations of the CFAA and the DMCA suffice, even under Vyne's defense theory that customer consent is a blanket defense. *Id*. ((wrongful conduct is sufficient). The admissions establish that the harm to HSOne's customer relationships is not theoretical. It is thoroughly documented. (GR 542:23-543:13; 576:11-14; BW 379:2-380:9; HSOne 2.)

## II. HSONE HAS DEMONSTRATED VYNE'S CONDUCT CREATES IRREPARABLE HARM.

Testimony clearly establishes Vyne's hacking has caused and is causing irreparable harm. The harms Vyne's actions have caused are documented, specific, and largely unquantifiable as HSOne cannot put a number on the harm to Dentrix's integrity loss and the loss of goodwill and reputational harm caused by Vyne. The harm includes the risk of vulnerability that Vyne has created with its interference and unauthorized access of HSOne's systems. In cybersecurity, "you only know what you know and you don't know what you don't know. (DY 468:7-16.) As HSOne explained, threat actors are very quiet because if they make a lot of noise—i.e., cause an immediate and obvious breach—it would defeat their objectives. (DY 526:17-527:5.)

### A. Vyne's unauthorized conduct is escalating, and it does not intend to stop.

Since late 2023, Vyne has been finding "other ways" to access HSOne's systems—and by Vyne's CEO's public account, Vyne is very good at it. Mr. Roberts stated in an interview that "the only way to really prevent Vyne from interfacing would be to intentionally stop it from happening because Vyne is very good at extracting unstructured data." (SR 217:22–218:1.) Vyne's witnesses admitted that Vyne does not intend to stop breaking into HSOne's systems:

> Q. Let's say the -- putting aside the Court and what the Court might order, just if things just continue, is it true that Vyne would continue to develop its own alternative methods of access to Dentrix's database? A. Yes.

16

(SR 183:6-10; *see also* SR 205:1–5 (intends to "preserve [its] right to use" RPA if there are no other methods); 226:20–227:7 (admitting Vyne only stopped its eTrans interface because it stopped working); JN 292:9–12 (admitting Vyne Sync is *not* being deprecated).)

Vyne's attempt to characterize its write back as a "deprecated" feature is also unavailing. First, Vyne admits the code remained in use through at least December 2025, and 130 practices will allegedly be "rolled off within weeks." (Vyne's PH-Br 8 (citing JN 281:12-24, 295:15-17).) Second, deprecation of one harmful feature does not eliminate the ongoing harm from the remaining unauthorized access infrastructure. Third, Mr. Youssef testified that there had not been a "reduced log of ongoing activity," but "sustained activity." (DY 505:13–20.) Mr. Nix admitted that VyneSync (direct database access and write-back software) is not being deprecated. (JN 292:9-12.) The decryption and database access exists, as of the time of the hearing and since then, on over 7,000 shared customer machines. ██████████████████████ ████████████████████████ (Declaration of David Youssef dated March 3, 2026 ("DY Dec.") Even now, Vyne continues its conduct. *Id.*

## B. Vyne has escalated HSOne's cybersecurity risk, giving rise to potential third-party exploits.

Vyne has created vulnerabilities that have paved the way for other malicious actors. Mr. Youssef, who leads FTI's incident response practice and has spent 15 years responding to ransomware attacks, nation-state intrusions, and advanced persistent threats, testified that the indicators and attack patterns he observed in this matter "are consistent with the more advanced persistent actors." (DY 460:17-460:22.) Mr. Youssef opined that in healthcare environments, "integrity and availability of data is equally critical and a loss of availability or integrity is considered a cybersecurity incident just as the loss of confidentiality." (HSOne 22, ¶ 83.) The nature of cybersecurity harm is inherently irreparable: every additional day of unauthorized access

17

is another day during which a sophisticated threat actor—such as a nation-state actor, as Mr. Youssef testified—could replicate Vyne's methods, using the breadcrumbs Vyne has left in its reverse-engineering, to breach Dentrix software systems at scale. (*Id.*; DY 461:6-462:7.) As Mr. Youssef explained, "[t]he largest breaches are the ones that were able to gain lateral movement quietly and maintain that persistence to the system they wanted to access for very long periods of time," even over a year (DY 526:17-23), because threat actors "do not like to make their presence known" or risk exposing themselves. (DY 526:24-527:5)

Vyne's DLLs and decryption capabilities are sitting on over 7,000 dental practice systems, posing an enormous liability. (DY 433:12-434:9.) When the Court asked directly whether Mr. Youssef meant the DLLs themselves were what a threat actor would use, he confirmed: "I'm saying the DLLs and the techniques and the effects of what has been done by Vyne can and likely will, if a threat actor's given the opportunity to, be taken advantage of by that threat actor." (DY 462:8–12.) Further, Vyne's reverse engineering has left the technical trail that could enable a "nation-state actor or other sophisticated threat group to exfiltrate electronic protected health information (ePHI) at scale." (HSOne 22, ¶ 58.)[9] The fact that Vyne also creates unencrypted files containing patient health information is also of concern. (DY 521:10-522:5.) Mr. Youssef placed the severity of what he observed in the 75th to 100th percentile of everything he had seen in his career. (DY 459:5-9.)

Also problematic, Vyne deployed its software with no logging or telemetry capability—a choice Mr. Youssef characterized as "irresponsible and contrary to best practices." (DY 463:12–

---

[9] Critically, Mr. Nix admitted that even "deprecated" VyneSync libraries with full database access capability remain installed on every joint customer's machine, they are simply "not being ran." (JN 294:14–295:9.) Deprecated, in Vyne's usage means dormant, but that does not alleviate the risk. (GR 558:8-14 ("A. They don't have Vyne anymore, took off the computer, took off the server, it's still coming back. Q. Why would this keep happening, this corruption, if Vyne's no longer there? A. Because the application is still there.").)

18

22.) ███████████████████████████████████████████████████

███████████████████████████████████ The damage compounds silently,

across thousands of installations, and, as Mr. Rencher testified, persists even after customers

remove Vyne from their machines.  (GR 558:3–559:5.)

Neither Vyne's CEO nor CTO can account for what Vyne's software is actually doing

inside HSOne's software systems (JN 310:16–17; 310:19–311:4; 311:7–13; 318:18–22; 323:1–6;

SR 108:3-10; 170:4-7; 218:12–25, 219:6–8), and their testimony was contradicted throughout the

hearing.  (Youssef 437:8-440:16; 441:21-442:10; KM 597:17-600:20.) █████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████

Vyne's own rebuttal expert did not fill the credibility gap.  He never reviewed Vyne's

source code (PC 655:1–3), never observed the software as it runs today (PC 656:3–7), never

installed it on a single machine to observe what happens (PC Dep. attached as Ex. G to Bartlett

Dec. 40:18–20), and could not independently verify the Vyne-prepared technical documentation

he relied upon (PC 657:14–18).  Mr. Clip also acknowledged Vyne is likely doing things beyond

what was disclosed (PC  658:11-15), and admits, though reluctantly, that certain files in the VDP

package contain functionality beyond that of a printer driver.  (PC 659:15-660:25.)  On cross, he

confirmed he took Vyne's own technical documentation at face value without independent

verification (*id.* 657:14–658:10), which he also admitted in his deposition.  (PC Dep. 48:17–

49:3.)

Vyne is careless with its system and its actions on HSOne's software systems. While

Vyne's witnesses tried to emphasize that Vyne was HITRUST certified, Vyne's CTO admitted

19

that the HITRUST certification is limited to the Amazon Web Services infrastructure that Vyne uses.  (JN 327:19-21.)  HITRUST in other words did not certify Vyne in connection with on-premises VyneSync software.  (JN 327:22-328:12.)  Mr. Nix also admitted that HITRUST does not know how VyneSync works and had not reviewed its source code or executable.  (JN 328:13-16; 329:5-23.)

As HSOne's expert stated, Vyne's conduct is "incredible," and from what he has assessed from a third-party entity, he "would consider [it] to be egregious."  (DY 466:14-467:6.)

C.    **Vyne's conduct causes database corruption, loss of data integrity and control over the database, and disruption to services, harming patients and practices.**

The harm caused by Vyne's conduct is not limited to HSOne but extends to patients and practices.  (BW 383:13-384:2 (emphasizing that HSOne's concerns are about the damage to its customers in the form of corruption to the database, performance issues, and the cybersecurity risks).)  As HSOne's CTO explained, HSOne's concerns are about Vyne's overall system that consistently and aggressively penetrated HSOne's security controls, manipulated HSOne's database and its configuration files, and corrupted the database with private health information in files in cleartext.  (GR 543:14-544:12.)  Also concerning, is that patient files are being damaged. When that happens, the customer calls, and HSOne is responsible for fixing the problem.  (GR 544:3-8.)

Vyne's persistence in transmitting data to its own servers—rather than through HSOne-approved channels—means that HSOne is deprived of the ability to "monitor, audit, or secure the data flow, essentially stripping HSOne of control over its own system."  (KM Decl. (ECF 62-1) ¶ 35.)

20

███████████████████████████████████████████

███████████████████████████████████████████

(DY 515:6-13; HSOne 2.)  Mr. Rencher testified that HSOne has received "a huge influx of calls reporting [] data corruption, slow performance, broken reports, all symptoms of the database being manipulated and not integrous any longer…something was writing to the database, specifically the ledger, in an unfettered way across many tables…at scale in high volume." (GR 542:19-543:13.) "[W]e're potentially damaging patient files.  And when those patient files are damaged, the customer calls us and we have to be accountable to fix them.  That is our responsibility.  We are the system of record."  (GR 543:14–544:12.)

The corruption directly harms practices and thereby patients.  VyneAPIService.exe writing the "911911911" string into the Dentrix database, replacing valid QuickBill authentication credentials, and re-routing billing statements, resulted in 80 dental office customers opening support tickets with HSOne in October 2025 alone due to billing issues. (HSOne 22, ¶¶ 62–63, 119; PX235; Vyne's PH-Br. 7–8.)  HSOne support volume attributable to this single Vyne-caused corruption totaled approximately 750 calls and chats, each averaging 25–30 minutes of handling time.  (HSOne 22, ¶ 85.)  Beyond billing, Mr. Rencher testified to Vyne's unfettered, out-of-sequence ledger writes creating race conditions that "screws up the balances in the patient files," and HSOne has had to build and deploy its own cleanup tools at its own expense to remediate damage Vyne caused.  (GR 538:6:542:18.)

Vyne's direct database access inevitably corrupts patient files.  (KM 603:9-604:5.)  Even purportedly innocuous reading to the files can cause corruption when done in excess.  (KM 602:4-16 ("Excessive reads can cause corruption if you're trying to do something else and the read leaves the database in an open state...when there is a single streamlined API for all the reads, you don't

21

run into that issue.").) Vyne's unfettered reads and writes "creates significant performance problems in the database….[S]ince [Vyne] is a threat actor, an unauthorized user of direct database access, they're reading and writing the tables that they maybe don't understand[.]" (GR 538:6-542-18.) For example, Vyne's ledger writebacks out of sequence creates race conditions and messes up balances in patient files. (*Id.*) HSOne identified at least 1,000 calls related to corrupted configuration files, write backs though parts of the database, and performance issues due to Vyne's activities. (BW 357:20-358:7.) Even Vyne's CEO conceded 1,000 instances of data corruption would be "moderate-to-high"— even one is enough. (SR 225:15-22.) Vyne also blocks upgrades. (BW 379:4-380:9.) "Some of the pieces have been swapped, some not, and then it doesn't run." (*Id.*)

### D.    Vyne has also harmed HSOne's reputation.

Vyne's actions that have caused Dentrix instability have harmed HSOne in the eyes of its customers. (HSOne 6 (Vyne publicly framing HSOne as the aggressor); HSOne 16 (Vyne framing dispute as HSOne preventing access and undermining HSOne's security efforts).) As HSOne's CEO Brian Weatherly explained, "The customers don't think to themselves, oh, look what Vyne has done to me. They say **Dentrix has failed. They blame us.**" (BW 379:4–380:9.) This reputational harm has been exacerbated by Vyne's misrepresentations concerning its actions, suggesting that its conduct is authorized when it is not, and its misrepresentations concerning HSOne's security upgrades, suggesting HSOne is doing something underhanded by securing its software systems. (BW 384:3–386:5; HSOne 16.)

That reputational harm compounds over time and cannot be remedied by damages at the end of litigation. "Once trust in the system's security is broken, it cannot be fully restored through monetary damages or post hoc remediation." (HSOne 22, ¶¶ 116-117.)

22

III.    **THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST WEIGH IN HSONE'S FAVOR.**

HSOne built and invested in its Dentrix software platform and the security infrastructure protecting it. It has legal right to prevent unauthorized access. HSOne has repeatedly offered Vyne a legitimate path to integration but Vyne has declined because it wanted broader access than HSOne was willing to authorize. It is not permissible and it should not be permissible for a company to build its business on statutory violations and unlawful conduct and then complain when it is caught. Any claimed hardship by Vyne caused by an injunction is self-inflicted. If Vyne's business suffers due to not being able to violate a statute, that is on them. If Vyne lost clients, it is because of its own conduct, not HSOne's. It is Vyne's choice to build its business on unauthorized access and violations of the law rather than seeking legitimate API agreements.

As opposed to an injunction that orders Vyne to obey the law, not granting an injunction would cause significant harm to HSOne, its software systems, reputation, operational integrity, and data security. The balance of equities overwhelmingly tilts in HSOne's favor.

The public interest also weighs in favor of an injunction. (HSOne Mot. for PI (ECF 46-1) 24-26.) Dentrix's software databases stores sensitive PHI—including treatment plans, clinical notes, medication information, and insurance records—for tens of thousands of dental patients. Every additional day of Vyne's unauthorized, unaudited, unmonitored access to those databases is a day in which patient data is at risk. The public interest in securing health IT systems is fully served by granting this injunction. For all these reasons, the circumstances merit granting HSOne's narrow preliminary injunction.

**VYNE IS NOT ENTITLED TO A PRELIMINARY INJUNCTION**

Testimony deepened significant factual disputes concerning Vyne's unfair competition and tortious interference claims. HSOne is not an entity covered by the Cures Act, but even if it was,

23

ACTIVE 720086906v1

HSOne is entitled to protect its system under the security and manner exceptions.  HSOne protects its systems and patient data from unauthorized third parties—Vyne and others.  HSOne has tried to work with Vyne to come to a commercial agreement.  Vyne has refused, instead wanting unfettered access to HSOne's systems regardless of the security risks.  The Cures Act does not require HSOne to permit that.  HSOne's security upgrades and its efforts to inform its customers of the same do not give rise to a tortious interference claim.  Any damages Vyne seeks are quantifiable.

## I.    VYNE WILL NOT SUCCEED ON THE MERITS OF ITS CLAIMS.

### A.    Vyne cannot succeed on its unfair competition claim.

Vyne's unfair competition claim fails because there is no "substantial interference," nor "actual or probable" "deception."[10]  Vyne's entire case rests on an erroneous application of *Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*, 131 F.4th 205 (4th Cir. 2025) to the issues present here.  Try as it might to pigeonhole its way into *Real Time*, Vyne has not shown, nor can it, that HSOne is subject to the Cures Act.  In *Real Time*, the defendant conceded that the Cures Act applied and did not even attempt to articulate security risk (there is no risk from CAPTCHA circumvention, unlike the serious security risk caused by Vyne's action here).  Those facts alone distinguish *Real Time* from the issues present in this litigation. Even if Vyne could show that the Cures Act applies, HSOne satisfies the Cures Act's security and manner exceptions.  As established at the hearing, all actions taken by HSOne were taken in good faith, to protect the integrity of its software and, ultimately, the PHI contained therein.

Vyne's last-ditch effort, summarily arguing that it does not need the Cures Act to succeed on its unfair competition claim, fares no better.  Maryland's unfair competition law is clear that

---

[10] As set forth in HSOne's prior briefing (Opp. to Vyne's PI (ECF 38) 10-14; HSOne's MTD (ECF 86) 22-29; HSOne's Reply ISO MTD (ECF 97) 13-15).

ACTIVE 720086906v1

Vyne's theory must be rejected. Actions undertaken with "some independent and legitimate business purpose" are not unfair competition.

### 1. Vyne has not met its burden to show that HSOne is subject to the Cures Act.

As a threshold point, there is a factual dispute because HSOne does not operate as a HIE/HIN. (GR 553:11-21.) HSOne's API is a bilateral exchange only. Vyne's focus on marketing language like "hub and spoke," multiple endpoints, and multiple users, is smoke and mirrors. (Vyne's PH-Br. 17.) Critically, a HIE/HIN must facilitate the flow of information among more than two other parties. *Id*. This multi-party requirement distinguishes HIEs/HINs from simple bilateral exchange arrangements (such as HSOne's, where data can only flow between HSOne and a single vendor) and captures entities operating network-of-networks structures. (GR, 553:11-21; KM Decl. (ECF 38-2) ¶ 12.)

Dentrix is not operating as a multi-party exchange network where vendors or practices can share data among themselves. HSOne has never even contemplated it; it's not something customers ask about. (GR 553:11-21.) While dental offices using Dentrix can use it to interact with patients and various entities, they *cannot* use it to interact with other dental offices. (*Id*.) It simply is not a function of Dentrix; each dental practice using Dentrix is siloed.

Vyne seeks an order from this Court impermissibly expanding the scope of who/what may qualify as a HIE/HIN and thus who is subject to the Cures Act. (Vyne's PH-Br. 16.) Vyne cites entities that do qualify as HIEs/HINs, all of which *are* systems that enable practices to share patient data among other practices (which HSOne does not); they are not examples of bilateral APIs (which HSOne is). (*See id.* 16, n.5); *see infra*, fn. 1.[11] Vyne argues that because HSOne has more

---

[11] The following are additional examples of HIEs/HINs: eHealth Exchange (*available at* https://ehealthexchange.org/*)*; CommonWell Health Alliance (*available at https://www.commonwellalliance.org/*), Carequality (*available at* https://carequality.org/), and Maryland's CRISP, which states explicitly that it "facilities the electronic transfer of clinical information between disparate health information systems." *Available at*

than 100 third-party vendors signed on to its API program, it satisfies the "more than two" criteria. 45 C.F.R. § 171.102.  This misstates the relevant inquiry, which is not how many vendors are signed on to HSOne's API program, but how many unrelated entities it enables to share among themselves.  The answer is zero.

### 2. Even if HSOne was subject to the Cures Act, HSOne satisfies the security and manner exceptions.

**Security Exception.**  The security exception to the Cures Act, 45 C.F.R. § 171.203, protects legitimate security practices, applying where a regulatory entity's restriction on access is (i) tailored to protect the confidentiality, integrity, or availability of data and (ii) applied consistently.  All the admissions and evidence supporting HSOne's preliminary injunction show there is a real security concern here.  **Manner Exception.**  HSOne also satisfies the Cures Act's manner exception, 45 C.F.R. § 171.301, which permits a regulated entity to decline the exact manner requested and offer a reasonable alternative manner that is feasible and secure.  If a regulated entity does not fulfill a request for either of these reasons (unable to or cannot reach terms), it is permitted to provide data in an alternative manner to how it was requested.  "On the question of whether an actor subject to the Cures Act 'cannot reach agreeable terms' with an information requestor, it is not the court's 'role to flyspeck negotiations between two sophisticated parties to determine whether they have exhausted every possible avenue of agreement and force them to return to the negotiating table again and again." *IntusCare, Inc. v. RTZ Associates, Inc.*, No. 24-CV-01132-JST, 2025 WL 3500667, at *4–5 (N.D. Cal. Sept. 18, 2025).

HSOne has been more than willing to enter into a commercial agreement with Vyne and has engaged in good faith negotiations.  (HSOne 246.)  Between HSOne's API and a back-end

---

https://www.crisphealth.org/.  Even a cursory review of these entities reveals that Dentrix cannot reasonably be analogized to them.

ACTIVE 720086906v1

clearinghouse integration, Vyne needs nothing more.  The sticking point is Vyne's desire not to pay commercially reasonable licensing fees and to retain the ability to use Robotic Process Automation and have unfettered database write-back access. (SR 193:15-195:14.) This is not something the Cures Act protects.

To try to save its unfair competition claim, Vyne argues that it can otherwise prevail under Maryland law.  HSOne's conduct in trying to secure its software and communicating that to its customers cannot constitute unfair competition.  (Opp. to Vyne's PI (ECF 38) 10-24.)  HSOne's statements were not even focused on Vyne, which came out in the hearing.  (BW 374:18-20; 381:2-24; HSOne 69; PX008.)  HSOne's security decisions are not about Vyne—they are about cutting off unauthorized access and securing PHI altogether.  (KM 594:15-25; 613:25-614:6; GR 582:3-13; 585:15-21; BW 374:11-20.)  Any reasonable security team would take the same action.  (DY 507:18-508:6.)   HSOne's security updates aimed at stopping hostile printers is in line with HSOne's goal of deprecating all print drivers.  (KM 624:17-23; BW 375:8-16.)  Contrary to Vyne's claims, HSOne's security protocols are not about competing.  (KM 613:1-5; GR 563:12-15.)  Regardless, HSOne promoting a competing product that might be better than Vyne's does not amount to unfair competition.

### B.    Vyne will not prevail on its tortious interference claims.

Vyne falls short of demonstrating a likelihood of success on its tortious interference with contractual relations claim.[12]  (Opp. to Vyne's PI (ECF 38) 24-26; HSOne's MTD (ECF 86) 18-22.)  Vyne fails to make a colorable argument that HSOne "intentionally interfered through improper means." *Macklin v. Robert Logan Assocs.*, 639 A.2d 112, 119 (Md. 1994).  VyneSync,

---

[12] Vyne seemingly abandons seeking injunctive relief on its interference with prospective relations claim (Vyne's PI (ECF 6-1) 18) and instead relies only on the elements for tortious interference with contractual relations only. (Vyne's PH-Br. 26.)

ACTIVE 720086906v1

the agent connecting *directly* to the Dentrix database, operates outside authorized channels and Vyne admits as much. (SR 186:7-25; 105:6-9.) Vyne's CEO also acknowledges that unauthorized direct database connections and API workarounds present real security "risks" and "system performance issues." (SR 223:15-25.) HSOne's alleged actions were, accordingly, justified responses to protect its data and systems. On cross-examination Vyne's CEO admitted every statement he claimed was false (about manual attachment, typing in codes) was actually not false. (PX033; SR 244:24-247:22, 246:14-247:11.)

Vyne's terms merely authorize Vyne to send *requests* for data and interoperability. (SR, 164:1-21 (stating that customer "agree to authorize Vyne to make interoperability requests from third parties," not to hack).) Vyne claims it lost some customers, but only a small portion of those were alleged attributed to HSOne  (SR, 181:16-19.) The customer complaints that Vyne points to relate primarily to its own practices (PX300.)

## II.    VYNE FAILED TO DEMONSTRATE IRREPARABLE HARM.

Vyne's contention that it faces existential harm is belied by the clear availability of alternative solutions offered by HSOne. Vyne's own admissions confirm that HSOne made available both participation in its API program and a clearinghouse agreement, which would have afforded Vyne back-end write-back access to HSOne's database. (SR 133:8-15, 188:6-12, 193:15-23, 235:1-11; *see also* GR 545:7-16, 590:7-19; BW 386:11-387:5, 402:7-13.) Critically, Vyne retains the ability to facilitate information exchange and avoid manual intervention **without** reliance on the printer driver, further undermining any claim of a "complete business interruption." (SR 101:14-23; BW 389:2-17.) ██████████████████████████████

██ but will not agree to one with HSOne, preferring to continue its unfettered access.

Vyne's purported injuries are quantifiable and self-inflicted. Vyne's CEO expressly testified here that the company regularly projects churn losses and maintains "a forecast" for the

current year. (SR 182:2-16.) He further confirmed that the financial impact of losing access to the HSOne systems is readily "calculable." (SR 177:8-13.)

Vyne is a substantial, well-capitalized enterprise with different lines of business beyond claims submission. (PX063; PX064.) Mr. Roberts testified that a $1 billion valuation was "a fair comparable" to Vyne. (SR 210:9-18.) Mr. Roberts admitted that customer attrition happened "well before" the dispute with HSOne. (SR 181:1-12.) Churn is a normal occurrence in the software industry: "all software companies churn customers." (SR 181:4-12.) Although Vyne claims to have lost 500 customers, Mr. Roberts testified that only approximately 150 of those losses were specifically attributed to the dispute with HSOne, while the vast majority of cancellations were unrelated and simply reflected routine churn. (*Id.*)

Vyne alleges that HSOne disseminated false statements, but its CEO could not identify a single false statement made by HSOne; instead, he acknowledged that the statements at issue constituted nothing more than "marketing rhetoric." (SR 246:14-25.) Vyne also can issue any corrective statement it wishes to and has conducted its own marketing campaign against HSOne. There is no reputational harm caused by HSOne, only by Vyne—to HSOne and to itself.

## III.    THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST WEIGH IN FAVOR OF HSONE, NOT VYNE.

Granting Vyne's PI would require HSOne to open its software systems that processes highly confidential, sensitive patient data to any unauthorized access, putting patients, HSOne's customers, and HSOne at extreme risk. Conversely, Vyne has multiple options at its disposal. It can make what it needs clear and join HSOne's API program. (HSOne 256.) It can work with HSOne on a different integration, which HSOne has done with other companies in the past, as a clearinghouse. (GR 590:7-19.) The public interest also weighs heavily in HSOne's favor. Maryland and federal law unequivocally prioritize the protection of PHI, and the Cures Act

29

expressly contemplates exception where security is at risk.  The risk that other developers might adopt similarly reckless approaches to Vyne (misappropriating credentials and bypassing system checks) poses a clear threat to patient privacy and data confidentiality, integrity and availability—particularly where, as here, Vyne is sharing information with them.  (JN 325:1-326:14.)

## CONCLUSION

HSOne's PI request is based on clear undisputed facts of database hacking that creates existential security risk and tangible ongoing database corruption and reputational harm.  Vyne's PI request is based on a tortured reading of statutory and case law precedent and factual disputes that widened at the hearing.  HSOne is not subject to the Cures Act and, even if it was, its reasonable security measures and willingness to deal with Vyne defeats Vyne's claim.  HSOne has done nothing but protect its software systems, its customers, and their patients by taking reasonable security measures and trying to help Vyne integrate lawfully.  Vyne has shown that its true goal is unfettered read and write access to HSOne's software systems by any means necessary to avoid payment.  Absent Court intervention, Vyne will continue escalating its campaign of unauthorized access while the case proceeds.

ACTIVE 720086906v1

Dated: March 3, 2026

Respectfully submitted,

**GREENBERG TRAURIG, LLP**

By: */s/ Michael Burshteyn*

Michael Burshteyn *(pro hac vice)*
Marcelo Barros *(pro hac vice)*
Jennifer Bartlett *(pro hac vice)*
101 Second Street, Suite 2200
San Francisco, CA 94105
Tel: (415) 655-1300
Michael.burshteyn@gtlaw.com
Marcelo.barros@gtlaw.com
Jennifer.bartlett@gtlaw.com

Michael R. Sklaire (MD Fed. Bar No. 16471)
1750 Tysons Boulevard, Suite 1000
Tysons Corner, VA 22102
Tel: (703) 749-1308
michael.sklaire@gtlaw.com

*Counsel for Defendant/Counter-Plaintiff Henry Schein One, LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 3rd day of March, 2026, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Michael Burshteyn*
Michael Burshteyn

31

ACTIVE 720086906v1