# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| NATIONAL ELECTRONIC | * | |
| ATTACHMENT, INC., d/b/a | * | |
| VYNE DENTAL, | * | |
| | * | |
| Plaintiff/Counter-Defendant, | * | |
| | * | Civ. No. MJM-25-3246 |
| v. | * | |
| | * | |
| HENRY SCHEIN ONE, LLC, | * | |
| | * | |
| Defendant/Counter-Plaintiff. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

The parties to this civil action—National Electronic Attachment, Inc., d/b/a Vyne Dental ("Vyne"), and Henry Schein One, LLC ("HSOne")—each provide certain software platforms to dental practices across the country that the customers use to manage patient data, submit insurance claims, and perform other administrative functions. Vyne provides a platform for the electronic submission of insurance claims, which relies upon access to data stored in patient management systems provided by third parties like HSOne. A dispute between the parties arose around March and April 2025 when, after receiving customer complaints about instability in its patient management system and disrupted workflows, HSOne took action to block the use of certain functions by Vyne's software on their mutual customers' computers. While stating concerns about data security to explain the blocking of Vyne's software, HSOne targeted the parties' mutual customers to promote its own eClaims software bundle, which directly competes with Vyne's platform. In response, Vyne deployed software functions to avoid and prevent HSOne's

blocking—actions HSOne has characterized as unauthorized "hacking" of its patient management system. Since that time, HSOne has taken additional measures to disable Vyne's software in the name of data security and data integrity, and Vyne has worked to circumvent and disable HSOne's security controls—even while the parties have sought to resolve their disputes through a commercial agreement. All the while, the parties' mutual customers have been caught in the middle, enduring software malfunctions that have resulted from both parties' actions and obstacles to accessing the information they need to perform vital administrative tasks.

Vyne filed this civil action against HSOne in September 2025, seeking an award of damages and injunctive and declaratory relief, among other forms of relief, for alleged violations of several federal statutes and Maryland common law. ECF No. 61 (Am. Compl.). HSOne filed counterclaims against Vyne, alleging violations of federal and Utah statutes and Utah common law and seeking an award of damages and injunctive relief, among other relief. ECF No. 45 (Countercl.). Each party filed a motion to dismiss the other party's claims and for preliminary injunctive relief against the other party.[1] This Court has conducted multiple hearings in this matter, including a three-day evidentiary hearing on the parties' motions for preliminary injunction. For the reasons set forth below, the Court shall grant in part and deny in part Vyne's motion to dismiss, deny HSOne's motion to dismiss, and grant in part and deny in part each party's motion for a preliminary injunction.

---

[1] In addition, each party has filed motions to seal certain filings that contain confidential and proprietary information that would injure the party if publicly disclosed. ECF Nos. 72, 151, 154, 161, 165, 173, 179, 185. Where appropriate and practicable, redacted versions of the filings have been filed publicly. The Court finds the sealing motions to be justified by "countervailing interests" that "heavily outweigh the public interests in access[]" to the proposed sealed documents. *Rushford v. New Yorker Mag., Inc.*, 846 F.2d 249, 253 (4th Cir. 1988). No less restrictive alternatives to sealing are available to protect the sensitive information contained in the parties' filings. The sealing motions shall be granted.

## I.    BACKGROUND

### A.  Allegations from Vyne's Amended Complaint

For over 20 years, Vyne has offered a revenue cycle management ("RCM") software platform and related clearinghouse services to dental practices across the United States. Am. Compl. ¶¶ 1, 19, 31. Dental practices use Vyne's RCM software platform, known as "Vyne Trellis," "to verify patients' eligibility for benefits in a health plan, submit claims for payments to dental insurers, receive electronic remittance advice from dental insurers, and conduct other [Health Insurance Portability and Accountability Act of 1996 ("HIPAA")]-standardized electronic data transactions with multiple insurers through a single electronic connection (instead of multiple separate connections)." *Id.* ¶ 19. Dental practices also depend on Vyne's RCM services "to perform necessary administrative tasks[,]" including patient intake and scheduling. *Id.* Vyne is SOC II Type 2-certified and HITRUST-CSF® v.11.3.0 (il)-certified. *Id.* ¶ 20.

Because Vyne does not offer its own dental practice management system to store patient data, "practices must separately provide the data needed for Vyne's clearinghouse and RCM services from their third-party practice management systems." *Id.* ¶ 21. HSOne offers one such dental practice management system called "Dentrix." *Id.* ¶¶ 13, 25. While practices use Dentrix to store patient electronic health information ("EHI"), HSOne does not own the EHI stored on Dentrix. *Id.* ¶ 25.

#### 1.  Vyne's Printer Driver

To enable customers who use Dentrix or other third-party practice management systems to provide the data needed for Vyne Trellis to conduct RCM processes, "Vyne provides its customers with a printer driver that allows dental practices to effectively 'print' [EHI] to an electronic document that is then transmitted to Vyne." *Id.* ¶ 26. After a customer selects the EHI they seek to

transfer to Vyne's software, they navigate to a "printer setup" toolbar on the Dentrix platform, select Vyne's printer driver from a list of available drivers, and "print[]" the data directly to Vyne. *Id.* The process is akin to a "print to PDF" function. *Id.* Upon contracting with Vyne, customers "expressly authorize Vyne and grant Vyne full agency on their behalf to request, access, use, and export patient information, billing records, scheduling data, and other data maintained in third-party systems (including without limitation dental practice management systems) to facilitate Vyne's provision of services." *Id.* ¶ 23. "Under these contracts, Vyne [also] agrees, among other things, . . . not to use or disclose protected health information other than as permitted or required by law[,] and . . . to use appropriate safeguards to prevent the unlawful use or disclosure of protected health information." *Id.* ¶ 24.

Vyne's printer driver has several features designed to protect patient data and limit its access to data stored on third-party systems. First, all sensitive data sent by Vyne's customers is encrypted consistent with healthcare industry standards. *Id.* ¶ 28. Second, Vyne's printer-driver function "does not create a persistent local file in the process of transferring data" and instead "creates a file on the local file system in the customer's user directory." *Id.* ¶ 29. That file then is securely sent to Vyne's servers, and Vyne deletes the local file in its customer's user directory. *Id.* Lastly, customers' use of Vyne's printer driver does not cause any confidential or proprietary information belonging to third-party dental practice management system companies like HSOne to be submitted to Vyne. *Id.* ¶ 28. "Put differently, Vyne's printer driver has no 'Read' or 'Write' access to [HSOne's] databases, meaning that the printer driver does not allow Vyne to independently modify or view any aspects of the Dentrix platform." *Id.*

HSOne has been aware of Vyne's printer-driver function since at least 2003, and, until 2025, has "never complained or raised any concerns with Vyne about Vyne's printer driver." *Id.* ¶

32. "The use of printer drivers is standard practice in the healthcare clearinghouse and RCM space[,]" and HSOne itself has used a "printer-driver approach" to facilitate the transfer of patient health information for its own competing RCM and "eClaims" services, the Dentrix Eligibility and Claims Suite. *Id.* ¶¶ 27, 33, 64. HSOne's competing service still uses a printer-driver function, *id.* ¶ 27, and Dentrix also "uses a similar printer-driver process for its own use of sending PDF print jobs to its document management module[,]" *id.* ¶ 30.

### 2. HSOne's Initial Software Upgrade

Beginning in March 2025, Vyne learned that HSOne had "inform[ed] dental practices, dental service organizations, and other providers of healthcare" that its Dentrix platform would be updated such that it would "no longer be compatible with Vyne [Trellis]." *Id.* ¶ 34. HSOne justified this action by noting issues with the "security, performance[,] and reliability" of Vyne's products. ECF No. 1-1. On March 28, 2025, Vyne sent a letter to its customers addressing HSOne's statements. Am. Compl. ¶ 35; *see also* ECF No. 1-1. Therein, Vyne refuted HSOne's statements, shared its security certifications, and emphasized its "strong focus on quality, security, and performance." Am. Compl. ¶ 35; *see also* ECF No. 1-1.

On or around April 17, 2025, HSOne released a new beta version of Dentrix that "included Vyne's printer driver on a list of supposedly 'hostile printers' . . . and prevented customers from printing (their own) data to Vyne [Trellis] from the updated version of Dentrix." *Id.* ¶ 36. As a result, when customers tried to use Vyne's printer-driver function to transfer data from Dentrix to Vyne Trellis, "the printed document would appear as a blank document." *Id.* Customers attempting to use the printer driver also received a pop-up notification from Dentrix flagging Vyne Trellis as "an unauthorized third-party." *Id.*

Upon review of the release notes for this new version of Dentrix, "Vyne discovered that [HSOne] had installed a new data-gathering tool called 'EventBridge' on customers' Dentrix platforms." *Id.* ¶ 37. Vyne learned that EventBridge exported to HSOne information about a customer's installed printer drivers and programs, enabling Dentrix to identify Vyne's customers and deny them access to Vyne's printer driver. *Id.* HSOne "has admitted that it installed invasive telemetry on its customers' computers in order to monitor their use of Vyne's products, including Vyne Trellis." *Id.* ¶ 38. Vyne alleges on information and belief that HSOne's "telemetry is unauthorized or is in excess of any authorization granted by [HSOne's] customers because, among other things, it exceeds the terms of the End User License Agreement [('EULA')] and the Terms and Conditions that [HSOne's] customers have agreed to in connection with their use of Dentrix." *Id.* Because "the only basis for HSOne's claims of security breaches by Vyne is the results of its telemetry, which it deployed *after* it began targeting Vyne's printer driver and disseminating false information concerning Vyne[,]" HSOne's targeting of Vyne's printer driver "lack[s] any legitimate basis in supposed security concerns." *Id.* ¶ 40. Vyne alleges that the only reason for HSOne's targeting is that it seeks to eliminate Vyne as a competitor. *Id.*

### 3.  HSOne's Marketing Communications

On or around April 25, 2025, just over a week after releasing a Dentrix update that effectively disabled Vyne's printer driver, HSOne emailed an advertisement to Vyne's mutual customers that promoted its competing RCM platform. *Id.* ¶ 41; ECF No. 1-2. The top of the advertisement reads: "Vyne Disconnects Imaging & Claims."  ECF No. 1-2. While this statement "suggests that the Vyne Trellis platform lacks integration between imaging and claim submission[,]" Vyne's workflow "includes 'Imaging System Integration,' with an automated 'Create Attachment' prompt to integrate . . . images." Am. Compl. ¶ 44; *see also* ECF No. 1-3. The

advertisement adds, "If you're using Vyne, you're manually attaching images, typing in CDT codes, and crossing your fingers." ECF No. 1-2. It goes on to state that the "extra effort" it takes to use Vyne Trellis "often leads to costly mistakes, claim rejections, and payment delays." *Id.* But "Vyne Trellis fully supports automated integration and functionality[]" through its "'Image Sync' option that automatically associates claims with available images and allows dental offices to select the correct documentation when managing claims." Am. Compl. ¶ 45. Additionally, "Vyne Trellis facilitates claims validation processes by automatically filtering documentation that providers are required to include with each claim submission," and has a "verification process" for each insurance claim that "ensur[es] . . . claims are submitted in a timely and accurate manner." *Id.* ¶¶ 45–46 (emphasis removed).

In contrast to its description of Vyne Trellis, the advertisement describes HSOne's RCM platform as a more streamlined, automated program that "beats Vyne [Trellis]." ECF No. 1-2. The advertisement also notes that taking advantage of the "[l]imited-time" offer to "upgrade from Vyne [Trellis] to the Dentrix Eligibility & Claims Suite for just $99/month" would allow Vyne's customers to avoid having to "jump[] between tools." *Id.* (emphasis removed). Vyne alleges on information and belief that HSOne "distributed this email to hundreds of Vyne customers with knowledge of, or reckless indifference to, its falsity, and with the intent to mislead Vyne's customers regarding Vyne's products in order to benefit [HSOne] commercially." Am. Compl. ¶ 43.

Shortly after this advertisement was disseminated, Vyne learned through customer reports that HSOne was telling Vyne's customers that "Vyne [wa]s not authorized to access customer data stored on Dentrix" because "Vyne Trellis had . . . been flagged for 'security issues.'" *Id.* ¶ 47. Customers shared that they were "receiving mass communications and aggressive outreach from

[HSOne]" that felt "extremely sketchy[]" and akin to "grimy sales tactic[s][.]" *Id.* ¶¶ 47, 50–51. According to Vyne, "[HSOne's] assertions concerning 'security risks' posed by Vyne's products were literally false because . . . [HSOne] had not suffered any security breaches or loss of patient data as a result of Vyne products and because Vyne's printer drivers do not present greater security risks than other methods of transferring patient data from practice management [systems]." *Id.* ¶ 48. Vyne alleges that the "security risks" HSOne referenced in its customer communications were merely "baseless pretexts for cutting off customers' access to Vyne Trellis." *Id.* ¶ 47. During this period, "Vyne received an influx of customer inquiries expressing concern regarding [HSOne's] communications and requesting assistance as to how to continue using [Vyne Trellis]." *Id.* ¶ 51.

### 4.  The Parties' Failed Negotiations

Given HSOne's blocking of its printer driver, Vyne tried "to find a workaround[] using Application Programming Interfaces ('API')" or another form of electronic software integration with Dentrix. *Id.* ¶ 52. Vyne's Chief Executive Officer ("CEO"), Stephen Roberts, contacted HSOne to discuss "possible API integration between Dentrix and Vyne [Trellis] for claims submission." *Id.* ¶ 53. The parties met on or around May 27, 2025, "to discuss an API-based integration between Vyne Trellis and Dentrix." *Id.* ¶ 55.

HSOne proposed Vyne's participation in the "Dentrix Developer Program" ("DDP"). *Id.* It later sent Vyne a draft DDP agreement, called the "Henry Schein One Developer Program Agreement," that spelled out HSOne's proposal for the API integration between Vyne Trellis and Dentrix. *Id.* ¶ 56; *see also* ECF No. 6-2 at 25–42. On June 2, 2025, Vyne sent back a redlined version of the draft agreement with a document containing explanatory comments. Am. Compl. ¶ 57; *see also* ECF No. 6-2 at 23–24, 43–50. Vyne informed HSOne that some of the language in the agreement "appear[ed] to be a violation of the Cures Act Final Rule, issued by the Office of

the National Coordinator for Health Information Technology [('ONC')] in 2020." Am. Compl. ¶ 57. Vyne also commented that the initial draft agreement language hindered its ability to carry out its "primary business" and seemed "one-sided." *Id.* ¶ 58; ECF No. 6-2 at 44–45, 48. On June 3, 2025, Vyne's President, James Grover, and HSOne's CEO, Brian Weatherly, met to continue discussing the draft agreement. Am. Compl. ¶ 59. Grover proposed allowing Vyne to "join [HSOne's] DDP and pay the required fees" while still "us[ing] its existing printer driver integration until the necessary APIs were developed by [HSOne]." *Id.* Weatherly initially "expressed support for . . . Grover's proposal," but HSOne later rejected those terms. *Id.*; *see also* ECF No. 6-2 at 53.

On July 3, 2025, Grover wrote to HSOne's General Counsel, Katherine Wich Sugden, providing a list of "remaining items" that Vyne wanted HSOne to reconsider. ECF No. 6-2 at 56. HSOne did not respond. *Id.* On July 10, Grover wrote to Sugden and Weatherly asking when they could "meet to align on the commercial terms of the Agreement." *Id.* Weatherly responded that Grover had "been welcome to sign the agreement for many weeks." *Id.* On July 25, Grover reached out to Weatherly again after another period without communication to express that, while Vyne was still open to negotiation, if Weatherly did not respond to Grover within the next three days, then "Vyne would assume negotiations ha[ve] concluded." Am. Compl. ¶ 61; *see also* ECF No. 6-2 at 58. Weatherly responded that Grover should "refer all correspondence to [Sugden] until further notice." ECF No. 6-2 at 58.

On July 28, 2025, Sugden emailed Grover a revised draft DDP agreement. Am. Compl. ¶ 62; ECF No. 6-2 at 61, 64–81. In her email, Sugden referred to Vyne's printer-driver function as "hacking," writing: "[A]ny provision permitting Vyne to continue to hack [HSOne's] platform during or after the term of this agreement" "is not up for negotiation[.]" Am. Compl. ¶ 62; ECF No. 6-2 at 61. Sugden further commented that "Vyne's prior and ongoing hacking has caused

[HSOne] damages, compromises the security and integrity of [HSOne's] platform, and violates laws." ECF No. 6-2 at 61. HSOne "demanded that Vyne agree to its final version of the DDP agreement . . . or risk losing any and all access to [EHI] stored on the Dentrix platform." Am. Compl. ¶ 62. According to Vyne, HSOne "knew that its proposed terms were unworkable" and that Vyne could not agree to them. *Id.* ¶¶ 62–63.

Around this time, HSOne told Dentrix customers "that their Vyne integration would be cut off in the near future." *Id.* ¶ 63. For instance, "on August 26, 2025, [HSOne] reached out to at least one customer concerning its use of Vyne products, sending an email with the subject line 'We've Detected Unauthorized Activity on Your Dentrix System' and threatening that '[u]nauthorized third-party integrations can pose a security risk to your organization and compromise your Dentrix system and data.'" *Id.* ¶ 64. HSOne also urged the customer to switch from Vyne's RCM service "to HSOne's 'fully integrated and SECURE eClaims platform'" because Vyne's software posed a security risk, as it was "not properly connected through [HSOne's] Dentrix API platform." *Id.* Vyne alleges on information and belief that HSOne "distributed these claims to substantial numbers of Vyne customers as part of a directed advertising campaign and in an effort to induce them to discontinue their contracts with Vyne, relying on false and misleading claims about supposed security vulnerabilities from Vyne's products." *Id.*

On August 26, 2025, amid ongoing negotiations, Vyne received a cease-and-desist letter from outside counsel retained by HSOne. *Id.* ¶ 65; ECF No. 6-2 at 87–89. The letter indicated that HSOne planned to sue Vyne for "unlawfully conducting cyberattacks against [HSOne's] software." ECF No. 6-2 at 87.

10

### 5. HSOne's Second Software Upgrade

On September 23, 2025, HSOne released a Dentrix update "containing an automated security scanner that specifically targets and disables Vyne software services." Am. Compl. ¶ 69. "The scanner runs continuously every 10 minutes" and "operates . . . while Dentrix is running, disabling any Vyne services and preventing them from restarting, even on a reboot of the system." *Id.* The scanner also does not "inform users or offer an opt-out when it disables Vyne's programs." *Id.* ¶ 71. This update, unlike the previous one, solely targeted Vyne's software. *Id.* ¶¶ 70, 72. Vyne alleges on information and belief that HSOne's update was distributed to "hundreds" of the parties' mutual customers, and, as of the date of the Amended Complaint's filing, "at least thirteen [dental] practices in Maryland alone have had their access to Vyne software blocked." *Id.* ¶ 69.

Since the deployment of this "virus," Vyne has had to restore its software's functionality for affected users; in some cases, customers needed "manual intervention" to fix the damage caused to their Vyne software. *Id.* ¶¶ 71, 73, 89. "Still, many Vyne customers have been unable to submit insurance claims or carry out other RCM services, and some Vyne customers have cancelled their service agreements with Vyne" as a result of the second Dentrix update. *Id.* ¶ 73.

As a result of both of HSOne's software upgrades, Vyne has lost "[a]t least 500" customers it shared with HSOne. *Id.* ¶ 86. Since mid-August 2025, at least 50 customers have specifically cited (1) HSOne's advertising against Vyne Trellis, (2) the desire to not be "in the middle" of the dispute between Vyne and HSOne, and (3) software incompatibilities caused by HSOne's upgrades as reasons for cancelling their accounts with Vyne. *Id.* Also since mid-August 2025, at least 100 potential customers that were in communication with Vyne "regarding purchasing or upgrading their use of Vyne services . . . specifically indicated that [HSOne's] misrepresentations concerning Vyne or its efforts to impede Vyne functionality were the reasons they ultimately chose

not to contract with Vyne for new or additional services." *Id.* ¶ 87. HSOne's software upgrades have also resulted in Vyne's customer support lines being "flood[ed]," with at least 628 customers calling to express fear over the impact of HSOne's software blocking. *Id.* ¶ 88. "As a result, Vyne customers, including those who do not utilize Dentrix, have had negative customer experiences, further harming Vyne's reputation." *Id.*

Vyne estimates that it has spent at least $90,000 worth of management time dedicated to addressing HSOne's actions against Vyne in 2025. *Id.* ¶ 89. According to Vyne, this figure is a "substantial underestimate because it accounts for only time spent by management in meetings, and omits the countless hours devoted to planning and executing responses to [HSOne's] actions, including developer time needed to generate software fixes." *Id.* Vyne's customer support has also dedicated at least $7,500 worth of time to fielding inquiries from customers regarding HSOne's "software blocking" and assisting impacted customers with restoring their access to Vyne. *Id.* "Ultimately, the full scope of the cost Vyne has incurred to protect its business from [HSOne's conduct] cannot be determined." *Id.*

## B. Allegations from HSOne's Counterclaim

HSOne is a Utah-based dental software company that serves "thousands of dental practices" and offers a practice management system called Dentrix. Countercl. ¶¶ 25, 32. Because Dentrix acts as a "hub" for HSOne's customers and houses customers' patient data, "many third-party vendors seek to integrate and interoperate with it." *Id.* ¶ 26. HSOne allows third-party vendors to do so through its API Exchange, which "implements robust access controls, encryption, system monitoring, and a variety of other technical measures to safeguard its customers' sensitive business and patient health data." *Id.* ¶ 27. At least 100 third-party vendors are enrolled in HSOne's API exchange, and HSOne's API "contains over 750 data endpoints enabling developers to build

a plethora of applications that work with Dentrix." *Id.* ¶ 30. Because HSOne's API is the "secure and stable method of integrating with its software platforms," "[s]topping circumvention" of its API is one of HSOne's "top priorities." *Id.* ¶ 29.

In early 2025, HSOne began to receive "an unusual volume of customer complaints concerning Dentrix system instability, failed claim submissions, and unexplained disruptions to eligibility and payment workflows. *Id.* ¶ 43. HSOne discovered through telemetry implemented in its systems that Vyne was "hacking" Dentrix and "circumventing HSOne's software security controls." *Id.* ¶¶ 7–8. According to HSOne, Vyne, unlike the 100-plus "securely integrated vendors who work with HSOne's API Exchange," "seeks to directly read and write data from HSOne's software platform *en masse* in a way that bypasses HSOne's API." *Id.* ¶¶ 6, 36. "Vyne does so through a series of non-trivial and technically aggressive hacks that access HSOne's protected software database and software systems located on customers' premises without authorization." *Id.* ¶ 6. These hacks include "[c]redential misappropriation and binary masquerading[,]" "[a]dministrator privilege escalation[,]" "[p]atch tampering[,]" "[c]omponent impersonation[,]" and "[c]ode injunction for mass data export[.]" *Id.* ¶ 39. HSOne alleges on information and belief that "Vyne's pervasive and sophisticated methods . . . reflect[] . . . the fact that multiple of Vyne's employees, including its [CEO], used to work at HSOne." *Id.* ¶ 41.

In response to Vyne's "hacks," HSOne "implement[ed] technical measures to protect the integrity of its systems and customer data." *Id.* ¶ 14. Despite HSOne's demands that it cease its alleged hacking and unlawful conduct, Vyne instead "escalated its conduct and deployed new malicious hacking methods," even during commercial negotiations between the parties. *Id.* ¶¶ 14, 42. HSOne's telemetry data revealed that Vyne released "rapid successions of software updates . . . aimed at hacking Dentrix." *Id.* ¶ 45. For instance, on or around September 10, 2025, HSOne

discovered "that Vyne was intercepting Internet traffic from HSOne's customers that was meant to go to HSOne and redirecting those transmissions to a Vyne endpoint. Vyne did this by exploiting a debugging function in Dentrix and modifying what is called the eTrans file." *Id.* ¶ 46. Vyne accomplished this exploit by "reverse-engineering HSOne's configuration files and decrypting them" through misappropriation of "private decryption keys HSOne provides to its customers." *Id.* ¶ 47. "Vyne then injects data into the configuration files, including programmatically intercepting Internet traffic and redirecting it to [Vyne's own] servers." *Id.* "The end result is the rerouting of patient claim data to Vyne . . . ." *Id.* Vyne's interference with HSOne's systems causes HSOne customers to suffer "failed claims, undelivered payment records, and system instability." *Id.* ¶ 51. "Vyne's interference also obstructs HSOne's ability to deploy security patches[,]" *id.* ¶ 52, leaving HSOne's software vulnerable and "corro[ding] the trust, security, and operability of HSOne's software[,]" *id.* ¶ 56. Coupled with Vyne's hacking is its campaign of "false statements" to HSOne's customers and to the public. *Id.* ¶¶ 14, 38, 57. This campaign has included "mass email blasts, public statements by its CEO, and other communications designed to obscure Vyne's unauthorized misconduct and shift blame to HSOne for working to secure its own software." *Id.* ¶¶ 57–65.

According to HSOne, it has done "everything it possibly could to avoid escalating this dispute to court[,]" including inviting Vyne into its API program, offering to customize its API terms for Vyne, and proposing a direct integration workflow to accommodate Vyne. *Id.* ¶ 68. However, even "in the face of these attempts at resolution," Vyne did not stop its conduct. *Id.* ¶ 71. Instead, it continued to "issue[] new updates . . . contain[ing] additional exploits[,]" "misappropriat[e] HSOne software credentials and plac[e] them into configuration files without authorization[,]" "hardcod[e] [misappropriated credentials] in memory and stor[e] them . . . in

Vyne's servers," "modify[] folder permission access to circumvent HSOne's security functionality[,]" and "execut[e] code to enact man-in-the-middle interception and redirect network traffic." *Id.* These acts continue to "undermine the fundamental security architecture of HSOne's software solutions and inflict significant reputational and business harm to HSOne." *Id.* ¶ 72.

## C. Procedural History

On September 30, 2025, Vyne initiated this civil action against HSOne, alleging violations of federal and state law. ECF No. 1. On October 2, Vyne filed a motion for a temporary restraining order and preliminary injunction, ECF No. 6, to which HSOne responded in opposition, ECF No. 38, and Vyne replied in support, ECF No. 40.

On October 14, 2025, HSOne filed a motion to transfer this case to the U.S. District Court for the District of Utah. ECF No. 35. Vyne responded in opposition, ECF No. 51, and HSOne subsequently replied, ECF No. 60. HSOne later withdrew this motion.

On October 22, 2025, HSOne filed a motion to dismiss the initial Complaint pursuant to Rules 12(b)(3) and 12(b)(6) of the Federal Rules of Civil Procedure. ECF No. 42. The next day, HSOne filed counterclaims against Vyne, ECF No. 45 ("Counterclaim"), as well as its own motion for preliminary injunctive relief, ECF No. 46.

On October 23, 2025, the Court held a hearing on Vyne's motion for preliminary injunctive relief and denied Vyne's request for a temporary restraining order, holding its request for a preliminary injunction under advisement pending an evidentiary hearing.

On November 5, 2025, Vyne filed an Amended Complaint, ECF No. 61, its presently operative complaint in this matter. On November 13, Vyne filed a motion to dismiss HSOne's Counterclaim under Rule 12(b)(6). ECF No. 66. HSOne responded in opposition to Vyne's motion to dismiss, ECF No. 84, and Vyne subsequently replied, ECF No. 96.

On November 17, 2025, the Court held a motions hearing regarding HSOne's request for a temporary restraining order and denied that request. It then scheduled a three-day evidentiary hearing on the parties' cross motions for preliminary injunction. ECF No. 74.

On December 16, 2025, HSOne filed a motion to dismiss Vyne's Amended Complaint. ECF No. 85. Vyne responded in opposition, ECF No. 95, and HSOne replied in support of its motion, ECF No. 97.

The Court conducted an evidentiary hearing on the parties' cross-motions for preliminary injunction from February 10 through February 12, 2026. Thereafter, the Court set post-hearing briefing deadlines and scheduled oral argument on pending motions. ECF Nos. 128 & 140. Each party filed post-hearing supplemental briefs. ECF Nos. 141, 144, 152, 155. Vyne moved to strike the post-hearing supplemental declaration of HSOne's expert witness, David Youssef, ECF No. 153, which HSOne opposed, ECF No. 157. During the next hearing, on March 18, the Court granted Vyne's motion to strike as to any post-hearing expert opinion offered in the supplemental declaration. The Court then heard oral argument on the parties' preliminary injunction motions and, at the end of the hearing, stated its intention to grant preliminary injunctive relief in favor of HSOne, while inviting the parties' input as to how the injunction should be crafted. The parties then filed another round of supplemental briefs. ECF Nos. 162, 164, 166, 167. The Court scheduled and conducted another hearing on April 14. During that hearing, HSOne orally withdrew its motion to transfer. After the hearing, the Court entered a Letter Order describing the preliminary injunctive relief it planned to grant in favor of each party and setting a schedule for briefing on technical feasibility, compliance periods, and bond amounts. ECF No. 171. The parties then filed briefs on those topics. ECF Nos. 174, 175, 178, 180.

## II.    MOTIONS TO DISMISS

Each party seeks an award of damages and injunctive relief based on alleged violations of federal and state law. Each party alleges that the other party violated certain provisions of the Computer Fraud and Abuse Act ("CFAA") and the Lanham Act, and committed unfair competition, defamation, and tortious interference with contracts and prospective relations in violation of state law. In addition, HSOne alleges that Vyne violated the Digital Millenium Copyright Act ("DMCA"), the Electronic Communication Privacy Act ("ECPA"), the Utah Truth in Advertising Act ("UTAA"), and the Utah Interception of Communications Act ("UICA"), and is liable for trespass to chattels and unjust enrichment under Utah common law.

As noted *supra*, each party has moved to dismiss the other party's claims under Rule 12(b) of the Federal Rules of Civil Procedure. HSOne moves to dismiss Vyne's Amended Complaint for improper venue under Rule 12(b)(3) and for failure to state a claim for relief under Rule 12(b)(6), and Vyne moves to dismiss HSOne's Counterclaim for failure to state a claim. For the reasons explained below, the Court grants in part and denies in part Vyne's motion to dismiss, and denies HSOne's motion to dismiss in full.

### A.  Standards of Review

#### 1.  Rule 12(b)(3)

HSOne moves to dismiss Vyne's Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(3), arguing that the case should be dismissed for improper venue. "When a defendant challenges venue under Rule 12(b)(3) in the Fourth Circuit, the plaintiff bears the burden of establishing that venue is proper." *Symbology Innovations, LLC v. Lego Sys., Inc.*, 282 F. Supp. 3d 916, 925 (E.D. Va. 2017) (citing cases). Venue is proper in:

> (1) a judicial district in which any defendant resides, if all defendants
> are residents of the State in which the district is located; (2) a judicial

17

district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b).

"Although a plaintiff need not plead venue, courts 'consider to be true any well-pleaded allegations of the complaint that bear on venue, unless contradicted by defendant's affidavit evidence.'" *Symbology Innovations*, 282 F. Supp. 3d at 924–25. Courts may also examine evidence outside the pleadings and must view the facts in the light most favorable to the plaintiff. *See Silo Point II LLC v. Suffolk Constr. Co.*, 578 F. Supp. 2d 807, 809 (D. Md. 2008); *Ademiluyi v. Nat'l Bar Ass'n*, Civ. No. GJH-15-2947, 2016 WL 4705536, at *2 (D. Md. Sept. 8, 2016) (citing *Jones v. Koons Auto. Inc.*, 752 F. Supp. 2d 670, 679 (D. Md. 2010)); *Jackson v. Mayorkas*, Civ. No. TDC-22-2193, 2023 WL 5278819, at *2 (D. Md. Aug. 16, 2023) (citations omitted).

"To survive a motion to dismiss for improper venue when no evidentiary hearing is held, [a] plaintiff need only make a prima facie showing of venue." *Symbology Innovations*, 282 F. Supp. 3d at 925 (quoting *Mitrano v. Hawes*, 377 F.3d 402, 405 (4th Cir. 2004)). "In assessing whether there has been a prima facie venue showing, [courts] view the facts in the light most favorable to the plaintiff." *Id.* (quoting *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 365–66 (4th Cir. 2012)). "The plaintiff faces a heightened burden when an evidentiary hearing is held, and must prove venue by a preponderance of the evidence." *Id.* Where venue is improper, the Court "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a); *see also Carlisle v. McDonald*, 2017 WL 550031, at *2 (D. Md. Feb. 10, 2017) (transferring case under 1406(a)).

18

### 2.  Rule 12(b)(6)

HSOne moves to dismiss Vyne's Amended Complaint, and Vyne moves to dismiss HSOne's Counterclaim, pursuant to Federal Rule of Civil Procedure 12(b)(6). The same standard of review applicable to motions to dismiss a complaint pursuant to Rule 12(b)(6) applies to motions to dismiss a counterclaim. *FTI Consulting, Inc. v. Orszag*, Civ. No. BAH-23-3200, 2025 WL 2085761, at *4 (D. Md. July 24, 2025) (citations omitted).

Under Rule 12(b)(6), a party may seek dismissal for "failure to state a claim upon which relief can be granted[.]" To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead enough factual allegations "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (per curiam). However, "a plaintiff's obligation to provide the grounds of [its] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (cleaned up). While a complaint need not include "detailed factual allegations," it must contain factual allegations sufficient "to raise a right to relief above the speculative level[.]" *Id.* (citation omitted). "[T]ender[ing] 'naked assertion[s]' devoid of 'further factual enhancement'" does not suffice. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (third alteration in *Iqbal*).

When considering a motion to dismiss, a court must take the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *King v. Rubenstein*,

825 F.3d 206, 212 (4th Cir. 2016). At the same time, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" the defendant's liability for the alleged wrong and the plaintiff's entitlement to the remedy sought. *A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Because "motion[s] to dismiss test[] the sufficiency of a complaint," courts assessing such motions are "generally limited to a review of the allegations of the complaint itself." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016) (quoting *Occupy Columbia v. Haley*, 738 F.3d 107, 116 (4th Cir. 2013)). But a court may also "consider documents that are explicitly incorporated into the complaint by reference," documents "attached to the complaint as exhibits," and documents attached to a motion to dismiss so long as they are "integral to the complaint and authentic." *Id.* at 166 (citations omitted). "[I]n the event of conflict between the bare allegations of the complaint and any exhibit attached, the exhibit prevails." *Id.* (citation and ellipses omitted).

### B.  HSOne's Motion to Dismiss Vyne's Amended Complaint

HSOne moves to dismiss the Amended Complaint pursuant to Rule 12(b)(3) for improper venue and Rule 12(b)(6) for failure to state a claim. The Court addresses the issue of venue and the sufficiency of each of Vyne's claims below. *See* ECF No. 85.

### 1. Improper Venue

Vyne argues that venue is proper here under 28 U.S.C. § 1391(b)(1) because HSOne waived any objection to this Court's personal jurisdiction by failing to raise a Rule 12(b)(2) defense in its motion to dismiss and by affirmatively invoking the Court's jurisdiction to bring counterclaims against Vyne. ECF No. 95 at 2–3. Because HSOne has consented to this Court's personal jurisdiction, Vyne argues, HSOne "resides" in the District of Maryland for purposes of the venue statute, making venue proper in this District. *Id.* at 3. Vyne further argues that venue is proper under § 1391(b)(2) because a substantial part of the events giving rise to this claim occurred in Maryland. ECF No. 95 at 4–5.

HSOne argues that it did not waive any objections it could have raised under § 1391(b)(1) and that Vyne's theory conflates personal jurisdiction with venue and, as a result, fails to allege sufficient action-specific contacts with this District to demonstrate that venue is proper here. ECF No. 86 at 8–9. HSOne further argues that Maryland is, at best, only tangentially related to Vyne's claims, and none of the relevant conduct occurred here. ECF No. 86 at 8.

For the reasons stated below, the Court finds that venue is proper in this District.

### a. Section 1391(b)(1)

First, the Court finds venue to be proper under 28 U.S.C. § 1391(b)(1). Section 1391(b)(1) provides that "[a] civil action may be brought in . . . a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located[.]" Regarding residency, the venue statute provides that a defendant "entity with the capacity to sue and be sued in its common name under applicable law, whether or not incorporated, shall be deemed to reside . . . in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question." 28 U.S.C. § 1391(c)(2).

Rule 12 "specifically states that a defense of lack of personal jurisdiction is waived if not raised at the same time as all other Rule 12 defenses." *WW, LLC v. Coffee Beanery, Ltd.*, Civ. No. WMN-05-3360, 2012 WL 3728184, at \*2 (D. Md. Aug. 27, 2012) (citing Fed. Rs. Civ. P. 12(h)(1), (g)(2)). "Therefore, a defendant must assert this defense 'at the time the first significant defensive move is made—whether it be by way of a Rule 12 motion or a responsive pleading.'" *Id.* (quoting 5C WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 1391 (3d ed.)). "This is so even if a plaintiff files an amended complaint, as 'amendment of the complaint . . . does not revive the right to interpose defenses or objections which might have been made to the original complaint.'" *Id.* (quoting *Lanehart v. Devine*, 102 F.R.D. 592, 594 (D. Md. 1984)). "When a defendant fails to raise the issue of personal jurisdiction, [it] consents to the court's exercise of personal jurisdiction." *Chick v. Johnson*, No. 0:18-CV-00814-JMC, 2018 WL 5118499, at \*1 (D.S.C. Oct. 19, 2018) (citing *Foster v. Arletty 3 Sarl*, 278 F.3d 409, 413 (4th Cir. 2002)).

Here, HSOne did not raise a Rule 12(b)(2) challenge to personal jurisdiction in either of its motions to dismiss. *See* ECF Nos. 42, 42-1, 85, 86. It has therefore waived this defense and consented to this Court's exercise of personal jurisdiction. Because "a defendant corporation resides anywhere it is subject to personal jurisdiction," *Zhang v. Lockheed Martin Corp.*, Civ. No. TDC-13-3898, 2014 WL 6646979, at \*1 (D. Md. Nov. 21, 2014) (citing 28 U.S.C. § 1391(c)(2)), the Court concludes that HSOne—the sole defendant in this action—resides in this District for venue purposes. Because venue is proper in a judicial district in which HSOne resides, *see* 28 U.S.C. § 1391(b)(1), HSOne's Rule 12(b)(3) motion fails.

HSOne argues that Vyne's theory under § 1391(b)(1) must fail because (1) "HSOne cannot be said to have 'waived' an objection Vyne failed to raise originally," and (2) the theory "conflates personal jurisdiction with venue." ECF No. 86 at 8–9. The Court disagrees with both arguments.

22

"Under Rule 12(b)(2), a defendant must affirmatively raise a personal jurisdiction challenge." *Grayson v. Anderson*, 816 F.3d 262, 267 (4th Cir. 2016) (citation omitted). Only then does a plaintiff "bear[] the burden of demonstrating personal jurisdiction." *Id.* HSOne "failed to allege lack of personal jurisdiction when moving to dismiss for improper venue, thereby waiving that defense." *Taylor v. Shreeji Swami, Inc.*, Civ. No. PWG-16-3787, 2017 WL 1832206, at *2 (D. Md. May 8, 2017) (citing Fed. R. Civ. P. 12(h)(1)(A)). As a result, HSOne is "deemed to reside" in this District. 28 U.S.C. § 1391(c)(2). "In this analysis, 'the venue inquiry . . . collapses into the question of whether there is personal jurisdiction over [HSOne.]'" *Taylor*, 2017 WL 1832206, at *2 (quoting *World Missions Ministries, Inc. v. Gen. Steel Corp.*, Civ. No. RWT-06-13, 2006 WL 2161851, at *3 (D. Md. July 28, 2006)); *see also Laios v. MTM Builder/Dev., Inc.*, Civ. No. GJH-20-3337, 2021 WL 4478712, at *5 n.4 (D. Md. Sept. 30, 2021). The venue statute itself incorporates the matter of personal jurisdiction to "ensure[] that so long as a federal court has personal jurisdiction over the defendant, venue will always lie somewhere." *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 57 (2013). As such, the Court finds venue to be proper in this District under 28 U.S.C. § 1391(b)(1).

### b. Section 1391(b)(2)

Venue is also proper under 28 U.S.C. § 1391(b)(2). Section 1391(b)(2) provides that "[a] civil action may be brought in . . . a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated[.]" "[I]n determining whether events or omissions are sufficiently substantial to support venue . . . , a court should not focus only on those matters that are in dispute or that directly led to the filing of the action." *Coffee Beanery*, 2011 WL 5110267, at *5 (quoting *Mitrano*, 377 F.3d at 405). Instead, "the court should review the entire sequence of events underlying the

23

claim." *Id.* (citation modified). Further, "[a] plaintiff is not required to establish that his chosen venue has the *most* substantial contacts to the dispute"—"[i]t is sufficient that a substantial part of the events occurred in that venue, even if a greater part of the events occurred elsewhere." *Id.* (emphasis added) (citing *Power Paragon, Inc. v. Precision Tech. USA, Inc.*, 605 F. Supp. 2d 722, 726 (E.D. Va. 2008)).

As noted in Part I.A *supra*, the conduct giving rise to Vyne's claims includes the Dentrix software upgrades that Vyne alleges unlawfully disrupted its printer driver on computers in dozens of dental practices in Maryland, as well as statements HSOne made to mutual Maryland-based customers asserting that Vyne's printer driver is unsecure while promoting HSOne's competing product. Vyne does not have to show that Maryland has the "most substantial contacts to the dispute." *Coffee Beanery*, 2011 WL 5110267, at *5. The disruption caused by the Dentrix upgrades to dental practices based in Maryland and HSOne's marketing communications in Maryland are sufficient to establish venue under § 1391(b)(2). Therefore, the Court finds that venue is proper and denies HSOne's Rule 12(b)(3) motion.

### 2. CFAA Violations

In Count I of its Amended Complaint, Vyne alleges that HSOne violated three provisions of the CFAA: 18 U.S.C. § 1030(a)(2)(C), (a)(5)(A), and (a)(5)(C). *See* Am. Compl. ¶¶ 90–97. "The CFAA is concerned with the unauthorized access of protected computers." *WEC Carolina Energy Sols. LLC v. Miller*, 687 F.3d 199, 204 (4th Cir. 2012). Although § 1030 is primarily a criminal statute, "[a]ny person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." *NRT Mid-Atl., LLC v. D'Ambrosia*, Civ. No. DKC-08-0166, 2008

WL 11367473, at *2 (D. Md. Dec. 22, 2008) (quoting 18 U.S.C. § 1030(g)). The three provisions of the CFAA that Vyne alleges HSOne violated provide penalties for:

> (2) intentionally access[ing] a computer without authorization or exceed[ing] authorized access, and thereby obtain[ing] … (C) information from any protected computer; . . .
>
> [(5)](A) knowingly caus[ing] the transmission of a program, information, code, or command, and as a result of such conduct, intentionally caus[ing] damage without authorization, to a protected computer; [or] . . .
>
> [(5)](C) intentionally access[ing] a protected computer without authorization, and as a result of such conduct, caus[ing] damage and loss . . . .

18 U.S.C. § 1030(a).

Because a "protected computer" is an element common to all three provisions cited in Vyne's Amended Complaint, the Court first examines whether Vyne alleges that HSOne's conduct involved a "computer" that is "protected" within the meaning of the Act. The CFAA provides a "very, very broad definition" of "computer." *United States v. Shamsud-Din*, 580 F. App'x 468, 472 (7th Cir. 2014). Under the Act, a "computer" is an "electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device." 18 U.S.C. § 1030(e)(1). A computer becomes a "protected computer" when it "is used in or affecting interstate or foreign commerce." 18 U.S.C. § 1030(e)(2)(B). "A computer with Internet access generally satisfies this requirement under the CFAA." *Philips Med. Sys. Nederland B.V. v. TEC Holdings, Inc.*, No. 3:20-CV-21-MOC-DSC, 2023 WL 2064201, at *15 (W.D.N.C. Feb. 16, 2023) (citations omitted).

Courts have found that a wide range of devices and systems qualify as protected computers under the Act. *See, e.g.*, *Taylor Made Express, Inc. v. Kidd*, No. 21 C 2903, 2024 WL 197231, at

*8 (N.D. Ill. Jan. 18, 2024) (finding that the Outlook 365 email system is a protected computer under the CFAA); *SkyHop Techs., Inc. v. Narra*, 58 F.4th 1211, 1227 (11th Cir. 2023) (cloud-based servers that permit remote access to stored data "meet the CFAA's definition of 'protected computer[]'"); *Good 'Nuff Garage, LLC v. McCulley*, No. 3:21CV571, 2022 WL 4485810, at *12 (E.D. Va. Sept. 26, 2022) (finding that "servers and, by extension, accounts connected to the internet requiring authorization credentials for access" are protected computers under the CFAA); *Estes Forwarding Worldwide LLC v. Cuellar*, 239 F. Supp. 3d 918, 926–27 (E.D. Va. 2017) (finding that a Google Drive account is a protected computer under the CFAA); *Philips Med. Sys. Puerto Rico Inc. v. GIS Partners Corp.*, 203 F. Supp. 3d 221, 230 (D.P.R. 2016) (quoting *United States v. Nosal*, 844 F.3d 1024, 1032 n.2 (9th Cir. 2016)) (noting that "the CFAA has been held to apply to 'computer networks, databases, and cell phones'"); *Frisco Med. Ctr., L.L.P. v. Bledsoe*, 147 F. Supp. 3d 646, 659 (E.D. Tex. 2015) (finding that a desktop computer and Apple iPad are protected computers under the CFAA); *T-Mobile USA, Inc. v. Terry*, 862 F. Supp. 2d 1121, 1130 (W.D. Wash. 2012) (finding that a telecommunications network and proprietary computer system for activation are each protected computers under the CFAA).

Vyne's CFAA claims implicate "protected computers" within the meaning of the CFAA. According to the Amended Complaint, the devices at issue—Vyne's customers' computers—host software used to store, process, and transmit patient data, Am. Compl. ¶¶ 1–3, 5–7, 19, 21, 25–26, which readily bring them within the CFAA's broad definition of "computer." Vyne's allegations support a reasonable inference that their customers' computers are connected to and accessible through the Internet and thus "protected" within the meaning of the CFAA.

Vyne's claim under 18 U.S.C. § 1030(a)(2)(C) is based on HSOne's installation of a "telemetry system on Vyne's customers' computers in order to extract information about their use

of Vyne's programs and thereby identify means to target and disable Vyne's programs[.]" Am. Compl. ¶ 92. Vyne alleges, "[o]n information and belief,[2] this telemetry is unauthorized or is in excess of any authorization granted by [HSOne's] customers because, among other things, it exceeds the terms of the [EULA] and the Terms and Conditions that [HSOne's] customers have agreed to in connection with their use of Dentrix." *Id.* ¶ 38. Accepting these facts as true, in sum, HSOne "intentionally accesse[d]" customers' protected computers "without authorization or exceed[ed] unauthorized access, and thereby obtain[ed] . . . information from" those computers, in violation of 18 U.S.C. § 1030(a)(2)(C).

Vyne's claim under 18 U.S.C. § 1030(a)(5)(A) and (a)(5)(C) is based on HSOne "disabling or attempting to disable Vyne Trellis's print driver functionality[,]" including through the distribution and deployment of a software update to the computers of the parties' mutual customers, which "crawls" those computers "to disable all of Vyne's software programs[.]" Am. Compl. ¶ 93; *see also id.* ¶¶ 69, 70. Vyne's allegations support a reasonable inference that HSOne's "transmission of [its] program, information, code, or command[]" caused "damage" to customers' protected computers because it impaired the "availability of data" when customers attempted to use their computers to access EHI stored in Dentrix through Vyne Trellis. 18 U.S.C. § 1030(a)(5)(A), (e)(8); *see also* Am. Compl. ¶¶ 79, 82, 84, 89. Further, Vyne plausibly alleges that HSOne disabled Vyne's software without its customers' authorization, *id.* ¶¶ 71, 94, and with the intent of blocking Vyne as a competitor, *id.* ¶¶ 72, 93. HSOne argues that this claim fails because

---

[2] Vyne's use of "on information and belief" as a pleading device is permissible here because the relevant facts concern the terms of the contractual relationship between HSOne and its customers and, therefore, are likely to be "peculiarly within the possession of the defendant," and the facts available to Vyne make its allegations about HSOne's unauthorized access "plausible." *Stone v. Trump*, 400 F. Supp. 3d 317, 341 (D. Md. 2019) (quoting *Malibu Media, LLC v. Doe*, Civ. No. PWG-13-365, 2014 WL 7188822, at *4 (D. Md. Dec. 16, 2014)). *See also* ECF No. 6-3, ¶ 14 (declaration of James Nix, Vyne's Chief Technology Officer ("CTO"), stating that Dentrix's use of telemetry exceeded "what Dentrix's users consented to in Dentrix's [EULA]").

Vyne does not plausibly allege that any damage caused by HSOne's "security updates was . . . intentional" rather than merely incidental. ECF No. 97 at 5. The Court disagrees. Vyne's allegations support a reasonable inference that software updates HSOne deployed were intended to impede the operation of Vyne Trellis on customers' computers and caused that "damage" as intended. *See* 18 U.S.C. § 1030(a)(5), (e)(8).

"A civil action for a violation of [the CFAA] may be brought only if the conduct involves" at least one of the following:

> (I) loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value;
>
> (II) the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of 1 or more individuals;
>
> (III) physical injury to any person;
>
> (IV) a threat to public health or safety; [or]
>
> (V) damage affecting a computer used by or for an entity of the United States Government in furtherance of the administration of justice, national defense, or national security[.]

18 U.S.C. § 1030(c)(4)(A)(i)(I)–(V), (g). Here, Vyne alleges that it "suffered damages and losses, and will continue to suffer damages and losses, aggregating at least $5,000 in value during any 1-year period," as a result of HSOne's conduct. Am. Compl. ¶ 97. Vyne estimates that it has spent at least $90,000 in "management time dedicated to addressing HSOne's actions against Vyne" in 2025. *Id.* ¶ 89. Additionally, Vyne has spent at least $7,500 in customer support time "fielding inquiries from customers regarding [HSOne's] latest software blocking and assisting them with restoring access to Vyne software." *Id.* And, according to Vyne, HSOne's conduct "affects more than 10 protected computers and potentially modifies or impairs the medical examination, diagnosis, treatment, or care of one or more individuals." *Id.* ¶ 95.

For the foregoing reasons, the Court finds that Vyne states plausible claims under the CFAA. HSOne's motion to dismiss Count I of the Amended Complaint is denied.

### 3. False Advertising Under the Lanham Act

In Count II of its Amended Complaint, Vyne alleges that HSOne violated § 43(a)(1)(B) of the Lanham Act, *codified at* 15 U.S.C. § 1125(a)(1)(B). *See* Am. Compl. ¶¶ 98–101. That provision of the Lanham Act prohibits the "use[] in commerce [of] any . . . false or misleading description of fact, or false or misleading representation of fact, which . . . in commerce advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of" a person or entity's "goods, services, or commercial activities[.]" 15 U.S.C. § 1125(a)(1)(B).

To sufficiently plead a false advertising claim under § 43(a)(1)(B), Vyne must allege that:

> (1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.

*Design Res., Inc. v. Leather Indus. of Am.*, 789 F.3d 495, 501 (4th Cir. 2015) (citation modified). "When a false advertising claim involves multiple statements, a plaintiff 'may not mix and match statements, with some satisfying one Lanham Act element and some satisfying [an]other'; rather, at least one challenged statement must satisfy all five elements." *De Simone v. VSL Pharms., Inc.*, 395 F. Supp. 3d 617, 623 (D. Md. 2019), *aff'd sub nom. De Simone v. Alfasigma USA, Inc.*, 847 F. App'x 174 (4th Cir. 2021).

HSOne only argues that Vyne fails to allege the first element of its false advertising claim—that HSOne "made a false or misleading" description or representation in an advertisement. 15 U.S.C. § 1125(a)(1)(B).

### a. Falsity

To establish falsity, the statement "must be either false on its face or, although literally true, likely to mislead and to confuse consumers given the merchandising context." *Design Res.*, 789 F.3d at 501 (citation omitted). The Amended Complaint alleges that HSOne made several "literally false" statements. *See* Am. Compl. ¶¶ 43, 48, 64. "[A] statement that is false on its face—or literally false—may be either explicit or conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated." *Design Res.*, 789 F.3d at 501 (citation modified). "'In analyzing whether an advertisement . . . is literally false,' courts must 'determine, first, the unambiguous claims made by the advertisement . . . , and, second, whether those claims are false.'" *Id.* (quoting *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 274 (4th Cir. 2002)).

The Court begins by identifying the "unambiguous claims" HSOne allegedly made. On or around April 25, 2025, HSOne circulated among Vyne's customers a "mass advertising email" stating that "Vyne '[d]isconnects [i]maging [and] [c]laims'" and that using Vyne software involves "manually attaching images . . . [and] typing in CDT codes, . . . lead[ing] to costly mistakes, claim rejections, and payment delays." Am. Compl. ¶¶ 41, 43–45 (quoting ECF No. 1-2). The email also allegedly stated that "[d]isconnected [t]ools [m]ean[s] [d]enied [c]laims[;] Vyne [d]oesn't [f]ix [t]hat – Dentrix [d]oes." *Id.* ¶ 41 (quoting ECF No. 1-2). Before and after this email was disseminated, HSOne allegedly expressed to Vyne's customers that Vyne Trellis suffered from "security issues" and HSOne accordingly planned to release Dentrix updates that would cause

Vyne's software to cease integration with Dentrix. *Id.* ¶¶ 34, 47. On August 21, 2025, HSOne told Dentrix customers via email that "non-HS One programs would 'jeopardiz[e] the security and integrity of [practice] data[.]'" *Id.* ¶ 64 n.3; *see also* HENRY SCHEIN ONE, https://www.henryscheinone.com/dental-solutions/api-exchange/customer-faqs/ [https://perma.cc/WH8M-UJQC] (last visited Nov. 5, 2025) (hereinafter "August 21, 2025, Email"). Lastly, on August 26, 2025, HSOne allegedly emailed a customer that was "using Vyne for [its] eClaims service[]" to inform them that it "[d]etected [u]nauthorized [a]ctivity on [the customer's] Dentrix [s]ystem" and that such unauthorized activity "pose[d] a security risk to [their] organization and [could] compromise [their] Dentrix system and data." *Id.* ¶ 64. The August 26, 2025, email also allegedly indicated that Vyne suffered a "security breach." *Id.*

The Court now examines whether the Amended Complaint contains sufficient facts to support a reasonable inference that any of the foregoing statements by HSOne were false. Vyne alleges that HSOne's claim that Vyne "[d]isconnects [i]maging [and] [c]laims" is "literally false" because "Vyne's workflow expressly includes 'Imaging System Integration[]' with an automated 'Create Attachment' prompt to integrate (and QC) images." *Id.* ¶¶ 43–44 (quoting ECF No. 1-2); *see also* ECF No. 1-3. Vyne also alleges that HSOne's claim that Vyne users must "*manually* attach[] images" and "typ[e] in CDT codes is "literally false" because (1) "Vyne provides an 'Image Sync' option that automatically associates claims with available images and allows dental offices to select the correct documentation when managing claims[;]" and (2) "Vyne Trellis facilitates claim validation processes by *automatically* filtering documentation that providers are required to include with each claim submission, thereby ensuring that providers submit the appropriate documentation for each claim." Am. Compl. ¶¶ 43, 45 (quoting ECF No. 1-2). Vyne further alleges that HSOne's claim that Vyne Trellis "leads to costly mistakes, claim rejections,

and payment delays" is "literally false" because "Vyne Trellis integrates rules directly from insurers regarding the necessary documentation for each claim submission and prompts dental practices to supply the best available documentation," and "[t]his verification process *reduces* claim rejections and unnecessary delays caused by missing or incorrect documentation." *Id.* ¶¶ 43, 46 (quoting ECF No. 1-2). Regarding HSOne's claims that Vyne's products present "security issues" or "security vulnerabilities," *see id.* ¶¶ 34, 47, 64 & n.3, Vyne alleges that these "assertions . . . [a]re [also] literally false because, on information and belief, [HSOne] has not suffered any security breaches or loss of patient data as a result of Vyne products and because Vyne's printer drivers do not present greater security risks than other methods of transferring patient data from practice management software programs." *Id.* ¶ 48. Lastly, regarding HSOne's claim that Vyne suffered a "security breach," Vyne alleges that this assertion is also "literally false because there was no 'security breach' related to [its] products." *Id.* ¶ 64. The Court finds that Vyne sufficiently alleges the falsity of HSOne's statements. Falsity, however, is only one component of the first element of a false advertising claim; HSOne's false statements must also constitute "commercial advertising or promotion." *Design Res.*, 789 F.3d at 501.

### b. Commercial Advertising or Promotion

HSOne argues that "Vyne has not alleged facts showing that [its contested statements] were made in 'commercial advertising or promotion' as required under § 43(a)(1)(B)." ECF No. 86 at 18. Vyne counters that its Amended Complaint "identifies at least two communications" that constitute commercial advertising or promotion, citing the three previously discussed emails from April and August 2025. ECF No. 95 at 19–20.

For a contested statement or representation to constitute "commercial advertising or promotion," it must be: (1) "commercial speech" (2) "for the purpose of influencing consumers to

buy goods or services" (3) that is "sufficiently disseminated to the relevant purchasing public to constitute advertising or promotion within that industry." *Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 700 F. App'x 251, 256–57 (4th Cir. 2017) (citing *Gordon & Breach Sci. Publishers v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1536 (S.D.N.Y. 1994)). "The Lanham Act is constitutional because it only regulates commercial speech, which is entitled to reduced protections under the First Amendment." *Taubman Co. v. Webfeats*, 319 F.3d 770, 774 (6th Cir. 2003) (citing *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557, 563 (1980)); *see also Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*, 471 U.S. 626, 637 (1985) (citing cases). "At its core, commercial speech is 'speech which does no more than propose a commercial transaction.'" *Handsome Brook Farm*, 700 F. App'x at 257 (citation modified) (quoting *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976)). "It is thus removed from the 'exposition of ideas' or the expression of 'truth, science, morality, [the] arts in general' and other topics that characterize speech fully protected by the First Amendment." *Id.* (quoting *Va. State Bd. of Pharmacy*, 425 U.S. at 762).

The Supreme Court and the Fourth Circuit have recognized four "qualities of commercial speech:" (1) whether the communication is economically motivated, (2) whether it promotes a specific product, (3) whether it is an advertisement, and (4) whether it is "placed in a commercial context and [is] directed at the providing of services rather than toward an exchange of ideas." *Id.* at 257–58 (first citing *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66–67 (1983), and then quoting *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt.*, 721 F.3d 264, 286 (4th Cir. 2013) (en banc)); *see also Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 948 F. Supp. 2d 538, 553 (D. Md. 2013). "The factors are cumulative, but . . . the absence of any particular element does not necessarily render the speech noncommercial." *Radiance Found., Inc.*

33

*v. N.A.A.C.P.*, 786 F.3d 316, 332 (4th Cir. 2015) (quoting *Greater Balt. Ctr. for Pregnancy Concerns*, 721 F.3d at 285–86).

The Court will proceed by applying the commercial advertising or promotion test to the April and August 2025 communications.

HSOne's April 2025 email plausibly constitutes commercial advertising or promotion. Because the email "offer[s] a 'limited time' opportunity for dental providers to 'upgrade from Vyne to the Dentrix Eligibility & Claims Suite for just $99/month,'" Am. Compl. ¶ 42 (quoting ECF No. 1-2), it was clearly economically motivated, promoted a specific product, and was "made with the intention of attracting clients or customers[,]" *Advertisement*, BLACK'S LAW DICTIONARY (12th ed. 2024). Moreover, it is directed at providing services "rather than toward an exchange of ideas[,]" *Handsome Brook Farm*, 700 F. App'x at 258 (quoting *Greater Balt. Ctr. For Pregnancy Concerns*, 721 F.3d at 286), as it makes several claims about how HSOne's eClaims suite outperforms Vyne Trellis, *see* Am. Compl. ¶¶ 41–42 (quoting ECF No. 1-2). These allegations also satisfy the second prong of the test, as the April 2025 email was intended to "influenc[e] consumers to buy goods or services." *Handsome Brook Farm*, 700 F. App'x at 256 (citation omitted). Finally, Vyne's allegation, that HSOne "distributed [the April 2025] email to hundreds of Vyne customers," satisfies the third prong of the test. Am. Compl. ¶ 43.

HSOne's August 21, 2025, email likewise plausibly constitutes commercial advertising or promotion. Because the email encourages Dentrix customers to invite any "unauthorized vendors" with whom they do business to join HSOne's API program—and because participation in that program requires vendors to agree to HSOne's API terms and pay a fee—the email plausibly promotes a commercial relationship between HSOne and those third-party vendors. As a result, the email can be fairly viewed as commercially motivated and in promotion of a specific product

or service. Although the communication is not in the form of a traditional advertisement, as it is an email sent to already existing customers, it is plausibly "directed at the providing of services rather than toward an exchange of ideas." *Handsome Brook Farm*, 700 F. App'x at 258 (citation omitted). Accordingly, the Court finds this email to constitute commercial speech. Vyne's allegations also satisfy the second prong of the test, as the email is intended to persuade third-party vendors to "join[] [HSOne's] authorized vendor community." *See* August 21, 2025, Email. Lastly, because the email was publicly available on HSOne's website, the Court finds that it was "sufficiently disseminated to the relevant purchasing public." *Handsome Brook Farm*, 700 F. App'x at 256 (citation omitted); *see also Colorado Biolabs, Inc. v. Three Arrows Nutra, LLC*, No. 3:25-CV-0601-D, 2025 WL 2524313, at *7 (N.D. Tex. Sept. 2, 2025) (quoting *Greater Hou. Transp. Co. v. Uber Techs., Inc.*, 155 F. Supp. 3d 670, 687 (S.D. Tex. 2015)) (finding that statements published on a website "were sufficiently disseminated to the relevant purchasing public because they were 'available to the consuming public at all times[]'").

Finally, HSOne's August 26, 2025, email also plausibly constitutes commercial advertising or promotion. Because the email encouraged the Vyne customer to "switch from Vyne to [HSOne's] 'fully integrated and SECURE eClaims platform' and offered a special pricing package for customers that were supposedly 'adversely affected by [a] Vyne security breach[,]'" Am. Compl. ¶ 64, it was clearly economically motivated and was "made with the intention of attracting clients or customers[,]" *Advertisement*, BLACK'S LAW DICTIONARY (12th ed. 2024). Considering that the email "urged [Vyne's customer to] switch[] to [HSOne's] 'integrated eClaims services' because Vyne was 'not properly connected through [HSOne's] Dentrix API platform," Am. Compl. ¶ 64, the email was also "directed at the providing of services rather than toward an exchange of ideas[,]" *Handsome Brook Farm*, 700 F. App'x at 258 (citation omitted), and

promoted a specific product or service marketed by HSOne, *see id.* at 256 (citation omitted). Lastly, Vyne's allegation, "[o]n information and belief," that HSOne disseminated the assertions in this email "to substantial numbers of Vyne customers as part of a directed advertising campaign," satisfies the third prong of the test. Am. Compl. ¶ 64.

The Court concludes that Vyne alleges sufficient facts to support a reasonable inference that all three communications identified in the Amended Complaint constitute commercial advertising or promotion.[3] Because HSOne's motion failed to present any argument as to whether Vyne plausibly alleged the remaining elements of its false advertising claim, it has waived any such arguments. *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by failing to present it in its opening brief."). Accordingly, the Court finds that Vyne's Lanham Act claim in Count II survives HSOne's motion to dismiss.

### 4. Tortious Interference with Contractual Relations

Count III of the Amended Complaint asserts a claim against HSOne for tortious interference with contractual relations under Maryland common law. *See* Am. Compl. ¶¶ 102–11.

To state a claim for tortious interference with contractual relations under Maryland law, Vyne must allege five elements: "(1) the existence of a contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional interference

---

[3] HSOne argues that its August 21, 2025, email cannot support Vyne's Lanham Act claim because it "is a communication that makes no reference whatsoever to Vyne." ECF No. 97 at 10. Although the email does not identify Vyne or any of its products by name, the webpage displaying the email identifies Vyne by name elsewhere and plausibly suggests to consumers that Vyne is one of the unauthorized vendors referenced in the email. *See* August 21, 2025, Email ("Despite repeated attempts to reach a secure resolution with Vyne Dental, Vyne has escalated its unauthorized access of Dentrix and put customer operations and security at risk."). At any rate, it is well established that "[a] claim under the Lanham Act does not arise only where a defendant refers to another or another's product by name." *Watson v. Olson*, No. 6:23-CV-03004-RK, 2023 WL 11756893, at *3 (W.D. Mo. Apr. 10, 2023); *see also U.S. Structural Plywood Integrity Coal. v. PFS Corp.*, No. 19-62225-CIV, 2022 WL 953150, at *18 (S.D. Fla. Mar. 30, 2022) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 138 (2014)) ("Lanham Act standing isn't limited to cases 'where the defendant denigrates a plaintiff's product by name.'"). Accordingly, the Court finds that the August 21, 2025, email supports Vyne's Lanham Act claim.

with that contract; (4) hindrance to the performance of the contract; and (5) resulting damages to the plaintiff." *ClearOne Advantage, LLC v. Kersen*, 756 F. Supp. 3d 30, 44 (D. Md. 2024) (quoting *Total Recon Auto Ctr., LLC v. Allstate Ins. Co.*, 705 F. Supp. 3d 510, 517 (D. Md. 2023)). Here, Vyne alleges that it had contracts with its customers, *see* Am. Compl. ¶¶ 22–24; that HSOne had knowledge of those contracts through its recent communications with Vyne, *id.* ¶ 104; that HSOne intentionally interfered with and hindered the parties' ability to perform under the contracts, *id.* ¶¶ 36–37, 39, 68–70, 72–73, 86, 88–89, 106; and that Vyne suffered damages as a result, *id.* ¶¶ 86, 89, 111. Accordingly, the Court finds that Vyne states a plausible claim for tortious interference with contractual relations in Count III.

HSOne challenges Vyne's claim for tortious interference with contractual relations on two grounds. First, it argues that Vyne's claim fails because Vyne does not plausibly allege any independent wrongful conduct or "that any customer actually breached or failed to perform a specific contractual obligation because of HSOne's conduct." ECF No. 86 at 19–20. Vyne counters by arguing that all of its claims regarding HSOne's unlawful conduct are independently wrongful means by which HSOne tortiously interfered with its contractual relations, and that an actual breach of contract by its customers is not "a necessary element of a tortious-interference-with-contract claim under Maryland law." ECF No. 95 at 20–23. The Court agrees with Vyne. Vyne sufficiently alleges independent wrongful conduct by HSOne in support of plausible claims for false advertising, unfair competition, defamation, and violation of the CFAA. *See* Parts II.B.2 & II.B.3 *supra*, and Parts II.B.6 & II.B.7 *infra*.

Second, HSOne asserts that "there can be no tortious interference with contractual relations" "without a third-party breach or wrongfully induced termination." ECF No. 86 at 21. This assertion is incorrect. A contractual breach "is not an essential element" of tortious

interference. *Trimed, Inc. v. Sherwood Medical Co.*, 977 F.2d 885, 889 (4th Cir. 1992) (quoting *Lake Shore Invs. v. Rite Aid Corp.*, 509 A.2d 727, 729 (Md. Ct. Spec. App. 1986)). "[T]he broader form [of the tort] . . . encompasses other sorts of wrongful interference with contractual relations[.]" *Id.* (quoting *Lake Shore Invs.*, 509 A.2d at 731); *see also ClearOne Advantage*, 756 F. Supp. 3d at 44 (quoting *Total Recon Auto Ctr.*, 705 F. Supp. 3d at 517) (requiring "hindrance to the performance of the contract"). Here, Vyne alleges that HSOne took steps to interfere with the proper functioning of Vyne's printer driver and the broader functioning of its software on its customers' computers while disparaging Vyne Trellis in statements to customers, resulting in cancellation of numerous Vyne accounts, and threatening to sever Vyne's access to EHI stored on customers' computers. *See* Am. Compl. ¶¶ 36–37, 39, 68–70, 72–73, 86, 88–89, 106, 111. These allegations support a reasonable inference that HSOne's alleged engagement in false advertising, unfair competition, defamation, and CFAA violations at least hindered contractual performance by Vyne and its customers and caused damages to Vyne. In sum, the Court finds that Vyne has stated a plausible claim for tortious interference with contractual relations and denies HSOne's motion to dismiss Count III.

### 5. Tortious Interference with Prospective Business Relations

Count IV of Vyne's Amended Complaint asserts a claim for tortious interference with prospective business relations under Maryland common law. *See* Am. Compl. ¶¶ 112–16. To state a claim for tortious interference with prospective business relations, Vyne must allege four elements: "(1) intentional and wilful acts; (2) calculated to cause damage to the plaintiff[] in [its] lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendant[] (which constitutes malice); and (4) actual damage and loss resulting." *Audio Visual Assocs., Inc. v. Sharp Elecs. Corp.*, 210 F.3d 254, 261 (4th Cir.

2000) (quoting *Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.*, 650 A.2d 260, 269 (Md. 1994)). Vyne alleges that, "[b]ased on information maintained by Vyne's sales teams for the period since mid-August 2025, . . . at least 100 potential customers [that Vyne] was in communication with regarding purchasing or upgrading their use of Vyne services . . . specifically indicated that [HSOne's] misrepresentations concerning Vyne or its efforts to impede Vyne functionality were the reasons they ultimately chose not to contract with Vyne for new or additional services." Am. Compl. ¶ 87. The Amended Complaint goes on to provide two specific examples of potential customers who declined to purchase services from Vyne due to HSOne's conduct. *Id.* These allegations sufficiently plead the first, second, and fourth elements of a claim for tortious interference with prospective business relations. HSOne's motion does not argue any failure by Vyne to allege that HSOne acted with the unlawful purpose of causing damage and loss. That argument is waived. *See Grayson O Co.*, 856 F.3d at 316. Accordingly, the Court finds that Count IV survives HSOne's motion to dismiss.

### 6. Unfair Competition

In Count V of its Amended Complaint, Vyne asserts a claim against HSOne for unfair competition under Maryland common law. *See* Am. Compl. ¶¶ 117–23.

The "underlying premise" of an unfair competition claim is that no party is justified in damaging or jeopardizing another's business through methods that are dishonest, fraudulent, or deceptive. *Savaria USA, Inc. v. Elevator Works, LLC*, Civ. No. RDB-24-1311, 2024 WL 2212914, at *9 (D. Md. May 16, 2024); *see also Aarow Elec. Sols. v. Tricore Sys., LLC*, 693 F. Supp. 3d 525, 548 (D. Md. 2023). "There are no specific elements required to establish unfair competition under Maryland law." *ClearOne Advantage*, 756 F. Supp. 3d at 43 (quoting *LSR, Inc. v. Satellite Rests. Inc. Crabcake Factory USA*, Civ. No. SAG-17-03722, 2020 WL 4903902, at *6 (D. Md.

Aug. 20, 2020)). "[T]he Maryland Supreme Court 'has preserved a high degree of flexibility in the law of unfair competition,' . . . as '[w]hat constitutes unfair competition in a given case is governed by its own particular facts and circumstances.'" *Aarow*, 693 F. Supp. 3d at 548 (first quoting *Delmarva Sash & Door Co. of Md. v. Andersen Windows, Inc.*, 218 F. Supp. 2d 729, 733 (D. Md. 2002), and then quoting *Balt. Bedding Corp. v. Moses*, 34 A.2d 338, 342 (Md. 1943)). "While the standard for unfair competition is broad, it is not boundless; to recover, a plaintiff must show that the defendant's conduct damaged or jeopardized its business." *ClearOne Advantage*, 756 F. Supp. 3d at 43 (citing *Berlyn Inc. v. The Gazette Newspapers, Inc.*, 73 F. App'x 576, 585 (4th Cir. 2003)).

HSOne argues that Vyne cannot state a claim for unfair competition because it makes no plausible allegation of fraud against HSOne. ECF No. 86 at 22. But "misleading or deceptive conduct is [not] a necessary element of every unfair competition claim." *Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*, 905 F. Supp. 2d 675, 691 (D. Md. 2012). "Maryland courts' description of the tort is not so narrowly drawn[,]" and "key treatises recognize the necessarily open-ended nature of the tort of unfair competition." *Id.* "[A]n unfair competition claim may be premised on fraud, deceit, trickery or *unfair methods of any sort*.'" *Aarow*, 693 F. Supp. 3d at 548 (quoting *Balt. Bedding Corp.*, 34 A.2d at 342); *see also Core Commc'ns, Inc. v. Verizon Md. LLC*, 744 F.3d 310, 324 (4th Cir. 2014) (quoting *Delmarva*, 218 F. Supp. 2d at 733) (recognizing that the tort of unfair competition is a flexible cause of action, "but in all instances requires proof of 'fraud, deceit, trickery, or unfair methods of any sort'").

Other judges of this Court have held that "only acts which 'substantially interfere . . . with the ability of others to compete on the merits of their products' or acts that 'conflict . . . with accepted principles of public policy' can serve as the grounds of an unfair competition claim." *Ellicott Dredges, LLC v. DSC Dredge, LLC*, 280 F. Supp. 3d 724, 732 (D. Md. 2017) (citation

40

omitted); *see also Paccar*, 905 F. Supp. 2d at 692–93; *Brightview Grp., LP v. Teeters*, 441 F. Supp. 3d 115, 134 (D. Md. 2020); *Phreesia, Inc. v. Certify Glob., Inc.*, Civ. No. DLB-21-678, 2022 WL 911207, at *13 (D. Md. Mar. 29, 2022). Additionally, Fourth Circuit precedent "strongly suggests that a finding of unfair competition can be based on an array of actions that interfere with vital aspects of business, such as customer relations, . . . without evidence of fraud or deception." *Paccar*, 905 F. Supp. 2d at 691–92 (citing *Trimed, Inc. v. Sherwood Medical Co.*, 977 F.2d 885 (4th Cir. 1992)). In *Trimed*, for instance, the Fourth Circuit held that this district court did not err when it instructed a jury that actions including the defendant's disparaging remarks about the plaintiff to the plaintiff's customers and restriction of product shipments, when "taken to exclude [competitors] from the marketplace, or to damage them as competitors," may constitute unfair competition and entitle the plaintiff to an award of damages. 977 F.2d at 891 (citation omitted). Similarly, in *Paccar*, counterplaintiffs alleged that representatives of a defendant's company made "disparaging remarks to customers" about the counterplaintiffs losing their franchise, that the counterdefendant tortiously interfered with the counterplaintiffs' contract with the franchisor and disrupted the counterplaintiffs' deals with third parties, and that, as a result, the counterplaintiffs lost customers and partnership opportunities. 905 F. Supp. 2d at 690. Judge Gauvey found these allegations sufficient to state a plausible unfair competition counterclaim. *Id.*

Here, Vyne alleges that HSOne engaged in a "campaign of falsehoods and disparaging statements," including by telling Vyne's customers that its software was affected by "security issues," lacked automation features and thereby exposed dental practices to a range of workflow issues, and had suffered a "security breach," while simultaneously advertising its competing eClaims services and releasing updates that disabled Vyne's products. Am. Compl. ¶¶ 33–34, 36–37, 41–47, 49, 63–64, 86. According to Vyne, this conduct has led to "an over 50% decrease in

41

claims submissions from nearly 2,000 [of its] dental-provider customers, and at least 164 [Vyne] customers have completely stopped submitting claims through Vyne Trellis since September 2025." *Id.* ¶ 86. Additionally, "[a]t least 500 Dentrix customers have cancelled their accounts with Vyne since early March 2025, and[,] since mid-August 2025, at least 50 of these customers have specifically informed Vyne that they were cancelling their Vyne accounts because of concerns arising from [HSOne's] false communications, a desire to not 'be in the middle' of a dispute between [HSOne] and Vyne, or because of incompatibilities with Dentrix caused by [HSOne's] efforts to block Vyne's software." *Id.*

Allegations in the Amended Complaint that HSOne made disparaging statements about Vyne's product to its customers, while directly and wrongfully interfering with the customers' ability to use the product and promoting a competing product, are sufficient to support a plausible unfair competition claim under Maryland law. Facts in the Amended Complaint support a reasonable inference that HSOne disrupted Vyne's relationships with those customers through "acts which 'substantially interfere . . . with [Vyne's] ability . . . to compete on the merits of [its] products . . . .'" *Ellicott Dredges*, 280 F. Supp. 3d at 732 (citation omitted). Further, Vyne's allegations support a reasonable inference that HSOne's conduct "damaged or jeopardized [Vyne's] business." *ClearOne Advantage*, 756 F. Supp. 3d at 43 (citation omitted). Therefore, the Court denies HSOne's motion to dismiss Count V.

### 7. Defamation

Count VI of Vyne's Amended Complaint asserts a claim against HSOne for defamation under Maryland common law based on HSOne's alleged "false statements misrepresenting Vyne's longstanding and industry-standard print driver functionality, among other Vyne products and

services, as ineffectual and the source of security risks or 'breaches.'" Am. Compl. ¶ 126; *see also id.* ¶¶ 34, 39, 41–45, 47, 64 & n.3.

"To state a claim for defamation under Maryland law, [Vyne] must sufficiently allege '(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting to at least negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.'" *Harvey v. Cable News Network, Inc.*, 520 F. Supp. 3d 693, 713 (D. Md. 2021) (quoting *Rabinowitz v. Oates*, 955 F. Supp. 485, 488 (D. Md. 1996)). "To be actionable, a statement must [be] provably false—it cannot be an opinion." *Id.* at 718 (quoting *Gibson v. Boy Scouts of Am.*, 163 F. App'x 206, 212 (4th Cir. 2006)). "Accordingly, where a defendant states 'a subjective view, an interpretation, a theory, conjecture or surmise, rather than a claim to be in possession of objectively verifiable false fact, the statement is not actionable.'" *Id.* (quoting *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 186 (4th Cir. 1998)). In addition to alleging a provably false statement, Vyne "must also allege that the statement is of a defamatory nature." *Id.* at 713. A statement is defamatory in nature if it is "one that tends to expose a person [or entity] to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion of, or from associating or dealing with that person.'" *Murray v. United Food and Commercial Workers Intern. Union*, 289 F.3d 297, 305 (4th Cir. 2002) (citation omitted). A statement is defamatory *per se* if it is "one for which the 'words themselves impute the defamatory character,' such that the plaintiff need not plead additional facts demonstrating their defamatory nature." *Doe v. Johns Hopkins Health Sys. Corp.*, 274 F. Supp. 3d 355, 366 (D. Md. 2017) (quoting *Metromedia, Inc. v. Hillman*, 400 A.2d 1117, 1123 (Md. 1979)). In Maryland, a "statement which disparages the business reputation of a plaintiff is one of the categories

traditionally considered to be defamation *per se*." *Solomon Found. v. Christian Fin. Res., Inc.*, Civ. No. JRR-22-993, 2023 WL 3058321, at *4 (D. Md. Apr. 24, 2023) (citation omitted).

HSOne argues, among other things,[4] that Vyne's defamation claim fails because the contested statements are "protected opinion on matters of technical judgment." ECF No. 86 at 15–16. Vyne responds that HSOne's contested statements are verifiably false—not nonactionable opinions as HSOne contends. ECF No. 95 at 16. For the same reasons the Court found HSOne's contested statements plausibly false under the Lanham Act, it finds it plausible that the statements are verifiably false, and not mere opinions, for purposes of Vyne's defamation claim. *See* Part II.B.3 *supra*. Because the challenged statements plausibly disparaged Vyne's business reputation, *see* Am. Compl. ¶¶ 34, 39, 41–45, 47, 64, 74, 86–87, they are defamatory *per se*, *see Solomon Found.*, 2023 WL 3058321, at *4.

"Another threshold requirement for a claim for defamation is 'publication.'" *Harvey*, 520 F. Supp. 3d at 713–14 (*Mejia v. Telemundo Mid-Atl. LLC*, 440 F. Supp. 3d 495, 499 (D. Md. 2020)). Specifically, "the plaintiff 'must . . . establish that the defendant made the allegedly defamatory statement in issue[,]" *id.* (quoting Robert D. Sack, *Sack on Defamation* § 2:5.1 (5th ed. 2017)), and that the defendant made the defamatory statement "'to a third person[,]'" *id.* (quoting *Mejia*, 440 F. Supp. 3d at 499). Additionally, the published material must not be subject to any privilege. *Talbert v. United States*, 932 F.2d 1064, 1066 (4th Cir. 1991) (citation omitted). Here, the Amended Complaint alleges that all the contested statements were published by HSOne

---

[4] HSOne also argues that Vyne failed to plead its defamation claim in accordance with Federal Rule of Civil Procedure 9(b), which requires addressing "who, what, where, and when questions." ECF No. 86 at 15 (quoting *Total Recon Auto Ctr., LLC v. Allstate Ins. Co.*, 705 F. Supp. 3d 510, 525 (D. Md. 2023)). However, it is well established that "a plaintiff need not plead a defamation claim under the heightened pleading requirements of Rule 9(b) . . . ." *State Farm Mut. Auto. Ins. Co. v. Slade Healthcare, Inc.*, 381 F. Supp. 3d 536, 565 (D. Md. 2019); *see also Hatfill v. New York Times Co.*, 416 F.3d 320, 329 (4th Cir. 2005) (citing cases) ("[T]he usual standards of notice pleading apply in defamation cases such as this one.").

to particular third parties or the public in general. *See* Am. Compl. ¶¶ 34, 41, 47, 64. None of these statements were privileged.

To satisfy the third element of a defamation claim involving a private plaintiff, the plaintiff must show *at minimum* that the defendant acted negligently—that is, that it failed to act reasonably in making the false and defamatory statements. *Goldstein v. Hindle*, Civ. No. GLR-21-03124, 2024 WL 473736, at *3 (D. Md. Feb. 7, 2024) (citation omitted); *see also Robinson v. City of Mount Rainier*, Civ. No. GJH-20-2246, 2021 WL 1222900, at *12 (D. Md. Mar. 31, 2021) (quoting *Mayor of Balt. v. Hart*, 910 A.2d 463, 472 (Md. 2006)) ("Negligence is any conduct, except conduct recklessly disregardful of an interest of others, which falls below the standard established by law for protection of others against unreasonable risk of harm."); *Rorie v. Bd. of Educ. of Charles Cnty.*, 653 F. Supp. 3d 217, 241 (D. Md. 2023) (citation omitted). Only when the plaintiff is a public official must they satisfy the heightened actual-malice standard. *Rorie*, 653 F. Supp. 3d at 241 (citations omitted). "With actual malice, a plaintiff is required to show that the defendant made the defamatory statement with knowledge that it was false or with reckless disregard of whether it was false or not." *Goldstein*, 2024 WL 473736, at *3 (citation omitted). "This standard is subjective: it asks whether the speaker knowingly uttered a falsehood or 'in fact entertained serious doubts as to the truth of his publication' and is measured by the state of mind of [] 'the persons . . . having responsibility for the publication.'" *Harvey*, 520 F. Supp. 3d at 721–22 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 287 (1964)).

Here, Vyne alleges that HSOne published the contested statements with "actual malice" and "reckless disregard of whether the reported information was accurate or not." Am. Compl. ¶¶ 126–27. Because Vyne also alleges that HSOne "lack[ed] any substantial basis to believe that Vyne's programs present a security risk to [HSOne's] software or its customers' data[]" and still

45

published the allegedly false statements "in an attempt to persuade Vyne's clients to transfer their business to . . . [HSOne] or an entity or entities affiliated with [HSOne]," the Court finds that Vyne has plausibly alleged that HSOne acted with actual malice and, therefore, has sufficiently pleaded the third element of defamation. *Id.* ¶¶ 72, 128.

Given that HSOne's contested statements are plausibly false and defamatory *per se* and made with actual malice, the Court need not examine whether Vyne adequately alleges any "special harm" to find the statements actionable. *See Foretich v. Cap. Cities/ABC, Inc.*, 37 F.3d 1541, 1558 (4th Cir. 1994) (citation omitted) ("When defamation is actionable *per se*, the plaintiff need not prove 'special harm' (*i.e.*, actual economic or pecuniary loss)."); *Johns Hopkins Health Sys.*, 274 F. Supp. 3d at 366 (citing *Hearst Corp. v. Hughes*, 466 A.2d 486, 490–92 (Md. 1983)) (stating "harm may be presumed[]" in cases where "the statement was defamatory *per se* and was made with actual malice"); *Samuels v. Tschechtelin*, 763 A.2d 209, 245 (Md. Ct. Spec. App. 2000) ("[I]f the statement is defamatory *per se,* damages are presumed when a plaintiff can demonstrate actual malice, by clear and convincing evidence, even in the absence of proof of harm."). The Court therefore concludes that Vyne states a plausible defamation claim under Maryland law and denies HSOne's motion to dismiss Count VI.

### 8.  Declaratory Judgment

In Count VII of the Amended Complaint, Vyne seeks declaratory relief from HSOne's August 26, 2025, cease-and-desist letter. Am. Compl. ¶ 133; *see also* ECF No. 6-2 at 87–89. Specifically, Vyne seeks a declaration from this Court that it did not commit computer hacking of HSOne's software platform or otherwise violate the CFAA, as well as a permanent injunction against HSOne asserting or pursuing any claim against Vyne for violating any law based on the allegations in its cease-and-desist letter. Am. Compl. ¶¶ 135–36.

"The Declaratory Judgment Act . . . grants federal district courts discretion to entertain declaratory judgment actions." *Madison Mech., Inc. v. Twin City Ins. Co.*, Civ. No. GLR-17-1357, 2018 WL 1583519, at *5 (D. Md. Mar. 30, 2018); *see also* 28 U.S.C. § 2201. District courts may do so "if the relief sought (i) will serve a useful purpose in clarifying and settling the legal relations in issue and (ii) will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Madison Mech.*, 2018 WL 1583519, at *5 (citation modified); *see also Penn-Am. Ins. Co. v. Coffey*, 368 F.3d 409, 412 (4th Cir. 2004). When a declaratory judgment claim is founded upon a cease-and-desist letter, the letter may suffice to establish the requisite controversy if it creates a real and reasonable apprehension of suit. *See Dunn Computer Corp. v. Loudcloud, Inc.*, 133 F. Supp. 2d 823, 827 (E.D. Va. 2001) ("[O]ne cease and desist letter does not a case or controversy make where, as here, that letter invites negotiation, but does not explicitly threaten litigation[.]"); *Chesebrough-Pond's, Inc. v. Faberge, Inc.*, 666 F.2d 393, 396 (9th Cir. 1982) (finding a real threat of litigation where a cease-and-desist letter, though not explicitly threatening suit, explained that the defendants had a *prima facie* case against the plaintiffs).

Here, HSOne's cease-and-desist letter not only sets forth allegations that Vyne violated the CFAA and tortiously interfered with HSOne's contractual relationships, but also expressly threatens litigation, stating that "[s]hould Vyne not stop [its conduct] immediately, [HSOne] will have no choice but to escalate this matter and pursue all remedies available to it." ECF No. 6-2 at 88–89. Unlike the letter in *Dunn Computer*, HSOne's letter contains an express threat of legal action and therefore presents the requisite controversy.[5] Moreover, the relief Vyne seeks would

---

[5] The fact that HSOne's threat has come to fruition through its CFAA and tortious interference counterclaims against Vyne does not, by itself, undermine Vyne's claim for declaratory relief. If these counterclaims are dismissed without a final judgment on their merits, the threat presented in HSOne's cease-and-desist letter would remain and continue to present an actual controversy appropriate for resolution under the Declaratory Judgment Act.

serve the purposes of the Declaratory Judgment Act by clarifying the parties' legal rights and obligations with respect to the conduct identified in the cease-and-desist letter and by resolving the uncertainty created by HSOne's threatened litigation. Accordingly, the Court finds that Vyne states a plausible claim for declaratory relief and denies HSOne's motion to dismiss Count VII.

### C. Vyne's Motion to Dismiss HSOne's Counterclaim

Vyne moves to dismiss the entirety of HSOne's Counterclaim pursuant to Rule 12(b)(6) for failure to state plausible claims for relief. The Court examines each counterclaim below.

### 1. CFAA Violations

In its First Cause of Action, HSOne alleges that Vyne violated three provisions of the CFAA—18 U.S.C. § 1030(a)(2)(C), (a)(4), and (a)(5)(C). Countercl. ¶¶ 75–85.

Because "protected computer" is an element common to all three provisions, the Court first examines whether HSOne alleges that Vyne's conduct involved a "computer" that is "protected" within the meaning of the CFAA. In its Counterclaim, HSOne describes Dentrix as a "software platform" and "database," *see* Countercl. at 33, ¶¶ 1, 6, 9, 14, 25, 28, 31, 37, 39, and indicates that installations of Dentrix database software on its customers' computers are managed, monitored, and secured by HSOne through Internet-based communications and infrastructure, *see id.* ¶¶ 15, 39, 49–50, 52, 55, 79. HSOne alleges, among other things, that Vyne has "accessed [its] software systems and database without authorization," engaged in "database-level tampering," directly "circumvent[ed] … [its] API through … direct connections to [its] database," incepted and redirected Internet traffic intended for HSOne, and "sever[ed]" HSOne's connection to its customers' installations and therefore "HSOne's ability to update its own systems and roll out new security controls." *Id.* ¶¶ 7–8, 10, 39, 46–47, 50, 52, 65, 71, 73, 81. HSOne alleges, in summary, that Vyne "hacks" "computers, servers, endpoints, and software infrastructure" that constitute "protected computers" under the CFAA. *Id.* ¶ 79.

48

The Court finds that HSOne has sufficiently identified "protected computers" within the CFAA's meaning. HSOne's allegations support a reasonable inference that the Dentrix system involves the sort of "data processing device[,]" "data storage facility[,]" and/or "communications facility" that "directly relate[s] to" and "operat[es] in conjunction with" data processing devices, *see* 18 U.S.C. § 1030(e)(1), as it houses and processes patient data for thousands of dental practices and transmits this data, as well as software updates and security upgrades and patches, through Internet-based communications. *See* Countercl. ¶¶ 4, 25–26, 32, 39, 45, 73. Because HSOne's allegations indicate that the Dentrix platform and database are accessible remotely and used to conduct business across state lines, the Court finds that HSOne has adequately alleged Vyne's access to "protected computers" that are "used in or affecting interstate or foreign commerce." 18 U.S.C. § 1030(e)(2)(B).

HSOne alleges several methods by which Vyne accessed protected computers, including (1) inserting code at the driver level to export data, (2) extracting credentials, (3) manipulating and exploiting HSOne's source code, (4) decrypting and misappropriating configuration files, (5) mimicking HSOne's database and services, and (6) impermissibly modifying Dentrix settings. Countercl. ¶¶ 7, 81. The Counterclaim repeatedly emphasizes that Vyne's conduct was unauthorized, *see generally* Countercl., and that Vyne was aware it lacked HSOne's authorization but continued to act, *id.* ¶ 38. The foregoing means of access, alongside others described in the Counterclaim, support a reasonable inference that Vyne acted knowingly and intentionally.

Vyne's defense that its conduct was authorized by its mutual customers finds no support in the allegations of HSOne's Counterclaim. Indeed, HSOne alleges that its customers lacked full awareness of Vyne's conduct because Vyne "has not disclosed its hacking methods to its customers" and "takes great care to obfuscate what it is really doing." *Id.* Insofar as the parties'

49

mutual customers authorized Vyne to obtain EHI from Dentrix, HSOne's Counterclaim alleges that Vyne exceeded that authorization by circumventing HSOne's security measures, misappropriating HSOne's administrator credentials, and reverse-engineering and decrypting HSOne's configuration files. Because HSOne made it clear that Vyne was not allowed to engage in such means of access, Vyne "may not hide behind purported 'authorization' granted to it by [its mutual customers]." *State Analysis, Inc. v. Am. Fin. Servs. Assoc.*, 621 F. Supp. 2d 309, 316 (E.D. Va. 2009).

Ultimately, the Counterclaim suffices to state plausible claims for violations of 18 U.S.C. § 1030(a)(2)(C), (a)(4), and (a)(5)(C). To plead a violation of subsection (a)(2)(C), HSOne must allege that Vyne "obtain[ed] . . . information from any protected computer" by "intentionally access[ing] a computer without authorization or exceed[ing] authorized access[.]" 18 U.S.C. § 1030(a)(2)(C). As explained above, HSOne sufficiently alleges Vyne's intentional access to computers without authorization and in excess of authorization. In addition, HSOne alleges that Vyne "obtained information" through its unauthorized access—specifically, "HSOne customer data" and encrypted "HSOne software credentials," including "administrator credentials," "private decryption keys[,]" and "connection secrets," *id.* ¶¶ 7, 36, 39, 47, 71, 80–82, 90, 110, 115.

To plead a violation of subsection (a)(4), HSOne must allege that Vyne "knowingly and with intent to defraud, accesse[d] a protected computer without authorization, or exceed[ed] authorized access, and by means of such conduct further[ed] the intended fraud and obtain[ed] anything of value[.]" 18 U.S.C. § 1030(a)(4). If "the object of the fraud and the thing obtained consists only of the use of the computer[,]" then "the value of such use" must be $5,000 or more within any one-year period. *Id.* "The term 'defraud' for purposes of § 1030(a)(4) simply means wrongdoing and does not require proof of common law fraud." *Hanger Prosthetics & Orthotics,*

*Inc. v. Capstone Orthopedic, Inc.*, 556 F. Supp. 2d 1122, 1131 (E.D. Cal. 2008); *see also Facebook, Inc. v. MaxBounty, Inc.*, 274 F.R.D. 279, 284 (N.D. Cal. 2011) ("Fraud under the CFAA only requires a showing of unlawful access; there is no need to plead the elements of common law fraud to state a claim under the Act."). "Because the statute is more logically read as prohibiting 'wrongdoing' to obtain something of value and not . . . only acts that sound in common law fraud," this Court declines to apply the heightened pleading standard of Federal Rule of Civil Procedure 9(b) to HSOne's § 1030(a)(4) claim. *Sprint Nextel Corp. v. Simple Cell, Inc.*, Civ. No. CCB-13-617, 2013 WL 3776933, at \*6 (D. Md. July 17, 2013).

Here, HSOne's Counterclaim sufficiently alleges that Vyne's intentional and unauthorized access was wrongful and unlawful in that it violated § 1030(a)(2)(C) and (a)(5)(C), as explained directly above and below, and it violated provisions of the DMCA, tortiously interfered with HSOne's customer relationships, and constituted trespass to chattels under Utah law, as explained in Parts II.C.2 and II.C.5 *infra*. Vyne's unauthorized access also plausibly "further[ed]" the foregoing violations of law, 18 U.S.C. § 1030(a)(4), because Vyne used its unauthorized access to obtain administrator credentials and interfere with HSOne's ability to implement security controls to mitigate and prevent the unauthorized access, Countercl. ¶¶ 7, 9, 36, 39, 52, 71, 73, 80–82. Additionally, Vyne plausibly "obtain[ed] valuable information in excess of \$5,000" through its unauthorized access, including "HSOne customer data" and encrypted "administrator credentials." *Id.* ¶¶ 7, 36, 39, 71, 77, 80–82.

To plead a violation of subsection (a)(5)(C), HSOne must allege that Vyne "intentionally accesse[d] a protected computer without authorization, and "cause[d] damage and loss[,]" "as a result of such conduct[.]" 18 U.S.C. § 1030(a)(5)(C). As explained above, HSOne sufficiently alleges that Vyne accessed the Dentrix system in various ways without authorization. The CFAA

defines "damage" to mean "any impairment to the integrity or availability of data, a program, a system, or information[.]" *Id.* § 1030(e)(8). And "loss" is defined broadly to include "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service[.]" *Id.* § 1030(e)(11).

HSOne sufficiently alleges that Vyne's unauthorized access "undermine[d] the integrity of HSOne's authentication and security architecture[,]" Countercl. ¶ 55; "allow[ed] Vyne to manipulate or delay the flow of information, potentially corrupting records or interfering with time-sensitive transactions[,]" *id.*; and "deprive[d] HSOne of the ability to monitor, audit, or secure the data flow—effectively stripping HSOne of control over its own system[,]" *id.*; and obstructed and interfered with HSOne's receipt of information from its customers installations by intercepting and redirecting Internet traffic, *id.* ¶¶ 7, 10, 44–48, 71. Additionally, Vyne's unauthorized access caused frustration among HSOne's customers, loss of "business opportunities" to HSOne, and "direct costs" to HSOne for "supporting and responding to customer issues caused by Vyne." *Id.* ¶ 72. The foregoing allegations suffice to allege that "damage and loss" resulted from Vyne's authorized access to the Dentrix system. 18 U.S.C. § 1030(a)(5)(C). Finally, HSOne alleges that its "aggregate loss exceeds $5,000 during a one-year period," Countercl. ¶ 84, which is plausible considering how extensive Vyne's conduct in connection with the Dentrix system is alleged to have been within the span of a few months.

In sum, HSOne has adequately pleaded violations of the CFAA by Vyne. Vyne's motion to dismiss HSOne's CFAA counterclaim is denied.

## 2. DMCA Violations

In its Second Cause of Action, HSOne alleges that Vyne violated the DMCA by trafficking in and using technology primarily designed to circumvent measures that were established "to protect HSOne's exclusive rights in its copyright[ed] works." Countercl. ¶¶ 90–91, 93.

The DMCA prohibits "circumvent[ing] a technological measure that effectively controls access to a work protected under [the Copyright Act]." 17 U.S.C. § 1201(a)(1)(A). "A technological measure 'effectively controls access to a work' if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work." *Id.* § 1201(a)(3)(B). "To 'circumvent a technological measure' means to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner." *Philips Med. Sys. Nederland B.V.*, 2023 WL 2064201, at *13 (quoting 17 U.S.C. § 1201(a)(3)(A)); *see also Sinclair Broad. Grp., Inc. v. Colour Basis, LLC*, Civ. No. CCB-14-2614, 2016 WL 3541204, at *4 (D. Md. June 29, 2016). "To state a claim under the anticircumvention provision of the DMCA," § 1201(a)(1)(A), HSOne "must allege that (i) the work at issue was protected under the Copyright Act, (ii) the copyrighted work was protected by a 'technological measure,' and (iii) the technological measure was 'circumvented' in order to obtain access to the copyrighted work." *iSpot.tv, Inc. v. Teyfukova*, No. 2:21-CV-06815-MEMF(MARX), 2023 WL 3602806, at *4 (C.D. Cal. May 22, 2023) (quoting 17 U.S.C. § 1201(a)(1)(A)).

Here, HSOne alleges that (1) it "owns the copyright to its software and related components, including Dentrix, DtxHelp.dll, compiled object code, configuration files (including dtx.config and FairCom C-Tree), admin certificates, and associated documentation[,]" Countercl. ¶ 88; (2) it employs "technological measures to control access to its protected copyrighted works, including

53

encryption . . . , passwords or passphrases, code-signing and application workflows, runtime security flags, driver-level protections, and credential and connection string-controls[,]" *id.* ¶ 89; and (3) Vyne circumvented these technological measures by "[d]ecrypting dtx.config to recover a passphrase and generate an administrator password[,] . . . [r]etrieving and decrypting configuration files (including FairCom C-Tree settings) using private keys taken from HSOne's source code[,] . . . [r]ebuilding Dentrix help components with embedded secrets to survive HSOne updates[,] . . . [h]ijacking application workflows and run[ning] Vyne's services as if authorized[,] . . . [and] [p]atching security flags in DtxHelp.dll at runtime[,]" *id.* ¶ 90. The Court finds these allegations sufficient to state a claim under the DMCA's anticircumvention provision in § 1201(a)(1)(A).

Vyne argues that HSOne's DMCA claim fails because (1) HSOne's allegations focus on technological measures designed to control access to patient data, which is not copyrightable, ECF No. 66 at 9, and (2) HSOne fails to allege that any circumvention by Vyne was done to infringe on HSOne's copyrights, *id.* at 10. The Court is unpersuaded by Vyne's first argument, as HSOne's DMCA allegations clearly concern its copyrighted works, such as its "software source code[,]" code for related software components, and program "interfaces[,]" Countercl. ¶¶ 87–88—not patient data.

In support of its second argument, Vyne cites *Chambers v. Amazon.com, Inc.*, an unpublished opinion in which a panel of the Fourth Circuit stated that "[a] copyright owner alleging a violation of [the DMCA] must prove that the circumvention of the technological measure either infringes or facilitates infringing a right protected by the Copyright Act." 632 F. App'x 742, 744 (4th Cir. 2015) (quoting *Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.*, 421 F.3d 1307, 1318 (Fed. Cir. 2005)). Notably, in *Chambers*, the plaintiff failed to allege that he had implemented any "technological measure" to protect a copyrighted work or

that the defendant had circumvented any such measure. *Id.* Therefore, the court did not analyze the issue of whether liability under the DMCA's anti-circumvention provision requires a nexus to copyright *infringement*, as found by the Federal Circuit in *Storage Technology* and in *Chamberlain Grp., Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178, 1203 (Fed. Cir. 2004).

The Ninth Circuit persuasively rejected the Federal Circuit's position in *MDY Indus., LLC v. Blizzard Ent., Inc.*, 629 F.3d 928, 948–52 (9th Cir. 2010), another case approvingly cited in *Chambers*, *see* 632 F. App'x at 744. In *MDY Industries*, the Ninth Circuit closely examined several related provisions of the DMCA, as well as its legislative history, and concluded that the Federal Circuit's "infringement nexus requirement" was contrary to "the plain language of the statute" and "significant textual evidence showing Congress's intent to create a new anticircumvention right in § 1201(a) distinct from infringement." 629 F.3d at 950. Indeed, the plain language of § 1201(a)(1) and (2) does not include any reference to infringement or any express infringement nexus requirement. It only proscribes circumvention of, and trafficking in technology designed to circumvent, "a technological measure that effectively controls access to" a copyrighted work. *See generally* 17 U.S.C. § 1201(a)(1)–(2). Additional textual evidence cited by the Ninth Circuit includes:

> (1) Congress's choice to link only § 1201(b)(1) explicitly to infringement; (2) Congress's provision in § 1201(a)(3)(A) that descrambling and decrypting devices can lead to § 1201(a) liability, even though descrambling and decrypting devices may only enable non-infringing access to a copyrighted work; and (3) Congress's creation of a mechanism in § 1201(a)(1)(B)–(D) to exempt certain non-infringing behavior from § 1201(a)(1) liability, a mechanism that would be unnecessary if an infringement nexus requirement existed

629 F.3d at 950. The Ninth Circuit also explained that the weight of relevant legislative history supports its conclusion that Congress intended to create "a distinct anti-circumvention right under § 1201(a) without an infringement nexus requirement." *Id.* at 952; *see also id.* at 946–50.[6]

In sum, the Court finds HSOne's allegations sufficient to support its counterclaim under the DMCA. Vyne's motion to dismiss this counterclaim is denied.

### 3.   Unfair Competition Under Utah Law

In its Third Cause of Action, HSOne alleges that Vyne violated the Utah Unfair Competition Act ("UUCA") and engaged in unfair competition in violation of Utah common law. Countercl. ¶¶ 97–106.

The UUCA allows "a person injured by unfair competition [to] bring a private cause of action against a person who engages in unfair competition." Utah Code Ann. § 13-5a-103. Under the UUCA, "[u]nfair competition requires a [claimant] to plead an 'intentional business act or practice that is unlawful, unfair, or fraudulent' and which 'leads to a material diminution in value of intellectual property." *Vendr, Inc. v. Tropic Techs., Inc.*, No. 2:23-CV-165-DAK-DAO, 2023 WL 8789297, at *5 (D. Utah Dec. 19, 2023) (quoting Utah Code Ann. § 13-5a-102(4)).

HSOne has not alleged sufficient facts to support a plausible claim that its intellectual property suffered a material diminution in value due to Vyne's conduct. HSOne merely alleges that it "suffers material diminution in the value of its intellectual property, along with economic harm, including forensic investigation, remediation, and business disruption based on Vyne's conduct." *Id.* ¶ 104. The "material diminution" allegation is conclusory and therefore not entitled to a presumption of truth. *See Bedrock Quartz Surfaces, LLC v. Rock Tops Holdings LLC*, No.

---

[6] This Court agrees with the Ninth Circuit that the balancing of policy concerns undertaken by the Federal Circuit in *Chamberlain* in support of an infringement nexus requirement is better left to Congress. *See MDY Indus.*, 629 F.3d at 949–50 (examining *Chamberlain*, 381 F.3d at 1200–01).

2:23-CV-00310, 2023 WL 8481417, at *5 (D. Utah Dec. 7, 2023) (holding that allegations of financial harms failed to plausibly allege a material diminution in the plaintiff's trademark). Accordingly, the Court finds that HSOne fails to state a claim under the UUCA.

Turning to HSOne's related common law claim, in Utah, unfair competition "includes— but is not limited to—passing off, palming off, imitating, and causing or likely causing confusion or deception." *Overstock.com, Inc. v. SmartBargains, Inc.*, 192 P.3d 858, 862–63 (Utah 2008). "Unfair competition . . . consists in one person imitating by some device or designation the wares made and sold by another for the purpose of palming off or substituting his wares for those of the other, and in that way misleading the purchaser by inducing him to buy the wares made and sold by the first instead of those by the second." *Rocky Mountain Bell Tel. Co. v. Utah Indep. Tel. Co.*, 88 P. 26, 28 (Utah 1906).

Here, HSOne alleges that Vyne "mimic[ked] Dentrix to interact with [HSOne's own] database and services." Countercl. ¶¶ 7, 39, 81. HSOne does not allege that Vyne imitated HSOne's software for the purpose of deceiving and inducing the purchasing public to purchase from Vyne instead of HSOne. Although the Counterclaim alleges that Vyne "develop[ed] and deploy[ed] Dentrix-mimicking components to divert customers and maintain unlawful integration[,]" Countercl. ¶ 110, this allegation does not suggest that Vyne was attempting to "palm[] off" a counterfeit version of Dentrix to customers with the intent of causing HSOne's customers to purchase from Vyne instead. *Rocky Mountain*, 88 P. at 28. Therefore, HSOne fails to state a plausible unfair competition claim under Utah common law.

Because HSOne fails to allege a plausible claim for unfair competition under either the UUCA or Utah common law, its Third Cause of Action is subject to dismissal under Rule 12(b)(6) and shall be dismissed without prejudice.

### 4.  Tortious Interference with Contract and Prospective Economic Relations

In its Fourth Cause of Action, HSOne alleges that Vyne committed tortious interference with contract and prospective economic relations in violation of Utah common law when it "ma[de] material false statements and omissions about its conduct and HSOne to HSOne's customers[]" and engaged in "unlawful . . . anti-security practices." Countercl. ¶¶ 109–11.

To state a claim for tortious interference with contract and prospective economic relations under Utah law, HSOne must allege "(1) that [Vyne] intentionally interfered with [HSOne's] existing or potential economic relations, (2) for an improper purpose or by improper means, (3) causing injury to [HSOne]." *Musselman v. Keele*, 559 P.3d 64, 70 (Utah Ct. App. 2024); *see also Com. Club Bldg. LLC v. Glob. Rescue LLC*, 529 P.3d 382, 394 (Utah Ct. App. 2023) (quoting *Eldridge v. Johndrow*, 345 P.3d 553, 556 (Utah 2015)); *Overstock.com*, 192 P.3d at 864 (quoting *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 201 (Utah 1991)). To establish an "improper purpose," HSOne "must show that [Vyne's] 'predominant purpose was to injure [HSOne]'"; and to establish "improper means," HSOne "must show 'that [Vyne's] means of interference were contrary to statutory, regulatory, or common law or violated an established standard of a trade or profession.'" *Ferguson v. Williams & Hunt, Inc.*, 221 P.3d 205, 216 (Utah 2009).

Here, HSOne alleges sufficient facts to support a plausible tortious interference claim. Vyne's letter to HSOne dated August 21, 2025, confirms Vyne's awareness that it shared specific customers with HSOne, *see* ECF No. 45-3, and suggests that Vyne knew HSOne had existing contracts or, at least, potential economic relations with these customers. Vyne's awareness of these economic relationships supports a reasonable inference that Vyne intentionally interfered with the contracts when it "circumvent[ed] HSOne's security controls to gain unauthorized access to its software systems and data; decrypt[ed] configuration files and extract[ed] credentials to

impersonate HSOne components; hijack[ed] application workflows to make Vyne's services appear authorized; inject[ed] altered credential and endpoints into Dentrix eClaims/eTrans to disable HSOne authentication capabilities and cripple HSOne's ability to issue effective patches; [and] develop[ed] and deploy[ed] Dentrix-mimicking components to divert customers and maintain unlawful integration." Countercl. ¶ 110. As discussed in Parts II.C.1 and II.C.2 *supra*, HSOne's allegations reflect plausible intentional violations of the CFAA and DMCA by Vyne. And, as explained in Parts II.C.10 and II.C.11 *infra*, they also support plausible claims that Vyne intentionally violated the ECPA and UICA. Therefore, drawing all reasonable inferences from HSOne's allegations in its favor, the Court finds that HSOne has sufficiently alleged that Vyne's means of interference were improper and were undertaken for improper purposes. *See Ferguson*, 221 P.3d at 216. In sum, HSOne has alleged a plausible counterclaim for tortious interference under Utah common law. Vyne's motion to dismiss this counterclaim is denied.

### 5. Trespass to Chattels

In its Fifth Cause of Action, HSOne asserts a counterclaim against Vyne for trespass to chattels under Utah common law. HSOne alleges that Vyne "intentionally interfered with HSOne's computer systems" and "impaired HSOne's computer system's value and use," which harmed HSOne by eroding "[c]ustomer experience and goodwill" and causing it "to expend resources in investigating and restoring its affected systems." Countercl. ¶¶ 115–17. To state a claim for trespass to chattels, HSOne must allege that Vyne "intentionally . . . dispossess[ed] [it] of [its] chattel, or . . . us[ed] or intermeddl[ed] with a chattel in [HSOne's] possession . . . ." *Nassi v. Hatsis*, 525 P.3d 117, 122 (Utah Ct. App. 2023) (quoting Restatement (Second) of Torts § 217 (A.L.I. 1965)). The Court finds that HSOne has stated a plausible trespass-to-chattels counterclaim.

The parties dispute whether software is considered "chattel" under Utah law. Vyne argues that software is not chattel because it "is not a tangible item." ECF No. 66 at 25. But HSOne's description of its software system portrays enough characteristics of tangible property to support the conclusion that it constitutes chattel for purposes of a trespass-to-chattel claim. In *Margae, Inc. v. Clear Link Technologies, LLC*, the U.S. District Court for the District of Utah found that a web page "is tangible property" and therefore "could be the subject of a conversion claim under Utah law . . . ." 620 F. Supp. 2d 1284, 1288 (D. Utah 2009). Because "web pages can be physically altered by authorized users and access to web pages can be physically restricted by the use of passwords and other security measures[,]" the court concluded that webpages "ha[ve] the characteristics of tangible property" such that they "can be converted." *Id.* at 1288. More recently, in *Association of Flight Attendants, AFL-CIO v. Skywest Airlines Inc.*, the district court relied on *Margae* to conclude that a "website qualifies as chattel that could form the basis for [a] trespass claim." No. 2:23-CV-00723-DBB-DBP, 2025 WL 3537390, at *8 (D. Utah Dec. 9, 2025). "Unlike intangible information," the court reasoned, "a website can be 'physically altered' by authorized or unauthorized users, and access to and use of a website can be restricted or denied." *Id.* (quoting *Margae*, 620 F. Supp. 2d at 1288). Here, the allegations in HSOne's Counterclaim establish that its software system is capable of being "physically altered," and that access to the system can be "physically restricted" through various security measures. *Margae*, 620 F. Supp. 2d at 1288; *see also* Countercl. ¶¶ 7, 9–10, 14–15, 27, 36–37, 39, 45–47, 50–51, 53, 71, 81, 87, 89–91, 100, 115, 120, 125, 146–47. The Court therefore finds, accepting HSOne's allegations as true, that its software system shares sufficient characteristics with tangible property that may form the basis of a claim for trespass to chattels under Utah law.

HSOne's allegations also support a reasonable inference that HSOne was in possession of software systems with which Vyne intermeddled by circumventing security controls, gaining unauthorized access, altering security configurations, and injecting altered credentials into the system, thereby causing damages to HSOne, as explained in Part II.C.1 *supra*. The Court finds HSOne's allegations sufficient to support a plausible counterclaim for trespass to chattels under Utah law. Vyne's motion to dismiss this counterclaim is denied.

### 6. Unjust Enrichment

In its Sixth Cause of Action, HSOne asserts a counterclaim against Vyne for unjust enrichment under Utah common law based on allegations that Vyne "unlawfully obtained benefits—[specifically,] data access, mass exfiltration, and code injection capabilities"—"[b]y evading HSOne's security controls and altering configurations[.]" Countercl. ¶ 120.

To state a claim for unjust enrichment under Utah law, HSOne must allege that (1) it conferred a benefit on Vyne; (2) Vyne appreciates or has knowledge of the benefit HSOne conferred; and (3) Vyne accepted or retained the benefit under circumstances that make it inequitable for Vyne to retain the benefit without payment of its value. *See Dummar v. Lummis*, 543 F.3d 614, 623 (10th Cir. 2008) (citing *Desert Miriah, Inc. v. B & L Auto, Inc.*, 12 P.3d 580, 582 (Utah 2000)). HSOne must establish "all three elements to sustain a claim of unjust enrichment." *Desert Miriah*, 12 P.3d at 582. The Court finds HSOne's Counterclaim to satisfy these elements. Under Utah law, one person or entity may confer a benefit by providing something of value that advantages another, even if it is not directly transferred from the former to the latter. *See id.* at 583 (holding that the appellant conferred a benefit by loaning money to a third party who used the funds to satisfy a security interest, thereby preventing seizure of the appellee's boat); *Concrete Prods. Co., a Div. of Gibbons & Reed v. Salt Lake Cnty.*, 734 P.2d 910, 911–12 (Utah

1987) (holding that the plaintiff supplier of construction materials did not confer any "direct benefit" on the defendant county government by delivering concrete to a third-party subcontractor, which the subcontractor used to build curbs and gutters that did not generate any revenue or asset for the county).

Here, HSOne alleges that it provided Dentrix to dental practices it shared as customers with Vyne and Vyne knowingly benefited through a direct integration with the Dentrix database. HSOne further alleges that Vyne obtained direct access without HSOne's authorization or agreement to terms of Vyne's access. The Court finds HSOne's allegations sufficient to support a plausible claim that it is inequitable for Vyne to retain the benefit of direct integration with Dentrix without compensating HSOne. Thus, HSOne states a plausible counterclaim for unjust enrichment under Utah law, and the Court denies Vyne's motion to dismiss this counterclaim.

### 7.  UTAA Violations

In its Seventh Cause of Action, HSOne asserts a counterclaim against Vyne for violating the Utah Truth in Advertising Act by "ma[king] false or misleading statements of fact to HSOne's customers with respect to HSOne's security measures . . . while concealing [its own] backdoor access, patching, and configuration tampering." Countercl. ¶ 126.

The purpose of the UTAA is to "prevent deceptive, misleading, and false advertising practices and forms in Utah." Utah Code Ann. § 13-11a-1. The Act "is to be construed to accomplish that purpose and not to prohibit any particular form of advertising so long as it is truthful and not otherwise misleading or deceptive." *Id.* Accordingly, courts are to construe the UTAA "to apply to advertisements that originate in Utah and target consumers in Utah, and to advertisements that originate outside of Utah, but that target consumers in Utah." *Vivint, Inc. v. Alarm Prot., LLC*, No. 2:14-CV-441-CW, 2016 WL 146454, at *3 (D. Utah Jan. 12, 2016).

Additionally, "the statute generally addresses 'false front' business operations that attract customers by misrepresenting the nature, location, source, or quality of their goods or services." *Robert J. DeBry & Assocs., P.C. v. Qwest Dex, Inc.*, 144 P.3d 1079, 1083 (Utah 2006).

Section 13-11a-3(1) outlines various forms of deceptive trade practices proscribed by the UTAA. HSOne's Counterclaim does not identify any specific subsection of § 13-11a-3(1) as the basis for its UTAA counterclaim, *see* Countercl. ¶¶ 125–27, but HSOne asserts in its opposition to Vyne's motion to dismiss that Vyne's conduct constitutes deceptive trade practices under subsections (b), (c), (e), (h), and (t), ECF No. 84 at 26. To plead a UTAA claim based on these subsections, HSOne must allege that, in the course of business, Vyne:

> (b) cause[d] likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;
>
> (c) cause[d] likelihood of confusion or of misunderstanding as to affiliation, connection, association with, or certification by another; . . .
>
> (e) represent[ed] that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have or that [Vyne] has a sponsorship, approval, status, affiliation, or connection that [it] does not have; . . .
>
> (h) disparage[d] the goods, services, or business of another by false or misleading representation of fact; [or] . . .
>
> (t) engage[d] in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

Utah Code Ann. § 13-11a-3(1)(b), (c), (e), (h), (t).

HSOne's UTAA counterclaim is predicated on a series of allegedly "false or misleading" statements by Vyne in or around August 2025. HSOne alleges that Vyne issued the following statements to the parties' mutual customers on August 11, 2025: that "HSOne's [DDP] . . . prohibit[s] 'all alternative integration methods[]'"; that HSOne seeks to block Vyne's "integration method[s]" and is "targeting Vyne[]"; "that HSOne's security measures 'raise concerns about

63

reduced provider choice and increased vendor lock-in[]'"; "that HSOne seeks to 'disable [customers'] ability to send claims through Vyne Dental[]'"; and that HSOne "undermines . . . [customers'] autonomy" and "[o]perational resiliency[.]" Countercl. ¶¶ 14, 58–60; *see also* ECF No. 45-2. In addition, Roberts, Vyne's CEO, allegedly made the following statements during an appearance on a publicly available podcast: that "the only way to really prevent Vyne from interfacing with . . . the [Henry] Schein practice management message would be to intentionally stop it from happening[]"; that Vyne gets around HSOne's API through "direct connections to the database[,]" "user interface[,]" or "application extensions[]"; that Vyne "ha[s] the ability to take a claim through print capture[]"; that Vyne "take[s] a print stream and . . . take[s] a printed ADA claim form[]"; and that Vyne "ha[s] that ability to take a claim through . . . secure file transfer to pick up claims from watch folders . . . and extract claims out of practice management databases." Countercl. ¶¶ 63, 65 (quoting TERESA DUNCAN | SPEAKER & AUTHOR, *EP 152 Future of Interoperability of Dental Information with Steve Roberts, CEO of VYNE*, at 28:27–31:12 (YouTube, June 26, 2025), https://www.youtube.com/watch?v=iQbvfDn5M94&t=112s [https://perma.cc/K8T2-C6FG].

The facts alleged in the Counterclaim are insufficient to demonstrate that any of the foregoing statements attributed to Vyne were likely to cause confusion or misunderstanding in the marketplace or are otherwise actionable under the UTAA. HSOne fails to identify any statement representing or suggesting that any product or service of either party has any "source, sponsorship, approval, or certification" that it does not have. Utah Code Ann. § 13-11a-3(1)(b). Nor does any statement identified by HSOne misrepresent or falsely suggest that either party had any "affiliation, connection, association with, or certification by" anyone that the party lacked. *Id.* § 13-11a-3(1)(c). None of the identified statements represent that "goods or services have

64

sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have or that [Vyne] has a sponsorship, approval, status, affiliation, or connection that [it] does not have[.]" *Id.* § 13-11a-3(1)(e). Some of the statements attributed to Vyne might reasonably be viewed as "disparag[ing]" of HSOne's services, but HSOne's allegations do not support a reasonable inference that, in disparaging HSOne, Vyne made any "false or misleading representation of fact[.]" *Id.* § 13-11a-3(1)(h). For instance, drawing all reasonable inferences in HSOne's favor, the statement that HSOne's DDP prohibits "all alternative integration methods" might tend to disparage HSOne's DDP. But the Counterclaim does not include sufficient facts to demonstrate any misrepresentation of fact in this statement. The Counterclaim does not provide enough context for the statement to assess what Vyne meant by the phrase "all alternative integration methods" (*e.g.*, "alternative" to what?) or how that phrase was likely interpreted by its audience. HSOne alleges that it "supports direct integrations . . .  for claims clearinghouses[,]" in addition to supporting "API-based integration for authorized vendors . . . ." Countercl. ¶ 58. But it is not clear that the phrase "all alternative integration methods" includes "API-based integration for authorized vendors" or "direct integrations . . . for claims clearinghouses." *Id.* Because HSOne fails to identify any statement by Vyne that is plausibly actionable under the UTAA, its Seventh Cause of Action is dismissed without prejudice.

### 8. Lanham Act Violations

In its Eighth Cause of Action, HSOne alleges that Vyne made certain public statements that violate § 43(a)(1)(B) of the Lanham Act. Countercl. ¶¶ 132–38. To sufficiently plead this cause of action, HSOne's allegations must demonstrate, among other things, that Vyne "made a false or misleading description of fact or representation of fact in a commercial advertisement about [its] own or another's product[.]" *Design Res.*, 789 F.3d at 501. "To constitute a violation of

§ 43(a) [of the Lanham Act], . . . 'the contested statement or representation must be either false on its face or, although literally true, likely to mislead and to confuse consumers given the merchandising context.'" *C.B. Fleet Co., Inc. v. SmithKline Beecham Consumer Healthcare, L.P.*, 131 F.3d 430, 434 (4th Cir.1997) (quoting *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1138 (4th Cir. 1993)); *see also Millennium Lab'ys, Inc. v. Ameritox, Ltd.*, 924 F. Supp. 2d 594, 599 (D. Md. 2013). HSOne's Lanham Act counterclaim appears to be founded upon the same statements challenged in its UTAA counterclaim. As explained in Part II.C.7 *supra*, the Court finds the Counterclaim insufficient to identify any advertising or promotional statement Vyne made that is either false on its face or otherwise actionably misleading or confusing. Therefore, HSOne's Lanham Act counterclaim is subject to dismissal for the same reasons as its UTAA counterclaim.

### 9. Business Libel and Defamation

In its Ninth Cause of Action, HSOne asserts a counterclaim against Vyne for business libel and defamation under Utah common law based on statements Vyne made about "HSOne's conduct and security protocols to HSOne's current and prospective customers," which "omitt[ed] the details of Vyne's hacking conduct." Countercl. ¶ 140.

To state a claim for business libel or defamation, HSOne must allege that (1) Vyne "published . . . statements concerning [HSOne]"; (2) "the statements were false, defamatory, and not subject to any privilege"; (3) "the statements were published with the requisite degree of fault"; and (4) Vyne's "publication resulted in damage." *West v. Thomson Newspapers*, 872 P.2d 999, 1007–08 (Utah 1994); *see also Mathews v. McCown*, 575 P.3d 1114, 1125 (Utah 2025). Because HSOne is a private entity, "negligence is the requisite degree of fault." *John Bean Techs. Corp. v. B GSE Grp., LLC*, 480 F. Supp. 3d 1274, 1322 n.333 (D. Utah 2020) (citation omitted). Whether a publisher was negligent depends on whether they "acted reasonably in checking on the truth or

falsity or defamatory character of the communication before publishing it." *Seegmiller v. KSL, Inc.*, 626 P.2d 968, 976 (Utah 1981) (citation omitted). "Under Utah law, a statement is defamatory if it impeaches an individual's honesty, integrity, virtue, or reputation and thereby exposes the individual to public hatred, contempt, or ridicule." *West*, 872 P.2d at 1008 (citation omitted). "However, a publication is not defamatory 'simply because it is nettlesome or embarrassing to a plaintiff, or even because it makes a false statement about the plaintiff.'" *John Bean*, 480 F. Supp. 3d at 1322 (quoting *West*, 872 P.2d at 1009).

HSOne alleges that Vyne published statements concerning HSOne, *see* Countercl. ¶¶ 58–61, 63–65; that those statements were false, *see id.* ¶¶ 1, 14, 16, 38, 57–59, 61–63, 67, 70, 140–44; and that they resulted in "special damages, including lost business and reputational harm," *id.* ¶ 144. As discussed in Parts II.C.7 and II.C.8 *supra*, HSOne fails to allege sufficient facts to establish the verifiable falsity of any statement Vyne published. But even if HSOne had presented sufficient facts to show false statements of fact by Vyne, HSOne does not adequately allege that the statements were defamatory or published with the requisite degree of fault. The Counterclaim includes allegations that, "[a]s a result of Vyne's false statements, HSOne has received many inquiries and complaints from concerned customers[,]" *id.* ¶ 67, and has suffered "reputational harm," *id.* ¶¶ 143–44. But such allegations, without more, do not show that HSOne was exposed to "public hatred, contempt, or ridicule[,]" as required to plead a defamatory statement under Utah law. *West*, 872 P.2d at 1008 (citation omitted). Moreover, HSOne's allegations leave unclear the extent to which, if any, the inquiries and complaints it received from customers were caused by Vyne's allegedly defamatory statements.

The Counterclaim also fails to plead fault. HSOne alleges in a conclusory fashion that Vyne's statements were at least "negligent" and "were made with actual malice and reckless

67

disregard for the truth." Countercl. ¶¶ 141–42. It further alleges that "Vyne knows its statements are false, yet continues to disseminate them." *Id.* ¶ 142. These allegations are unsupported by specific facts showing how Vyne knew the challenged statements were false or that Vyne acted unreasonably in investigating or verifying them before publication. HSOne's "naked assertion[s]" and formulaic recitations of the fault standards are insufficient. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

Accordingly, the Court finds that HSOne fails to state a plausible counterclaim for business libel or defamation under Utah law. Vyne's motion to dismiss this counterclaim is granted.

### 10. ECPA Violations

In its Tenth Cause of Action, HSOne asserts a counterclaim against Vyne for violating the ECPA by "intercept[ing] electronic communications intended for HSOne's services" and "intentionally alter[ing] software and network configurations designed to capture electronic communications." Countercl. ¶¶ 146–47.

"The ECPA protects electronic communications against unauthorized intrusions." *United States v. Clenney*, 631 F.3d 658, 666 (4th Cir. 2011). Title I of the Act "generally prohibits the unauthorized interception of 'any wire, oral, or electronic communication.'" *United States v. Frink*, 328 F. App'x 183, 189 (4th Cir. 2009) (quoting 18 U.S.C. § 2511(1)(a)). To state a claim under Title I, HSOne must allege that Vyne "(1) intentionally (2) intercepted, endeavored to intercept or procured another person to intercept or endeavor to intercept (3) the contents of (4) an electronic communication (5) using a device." *TLS Mgmt. v. Rodriguez-Toledo*, 260 F. Supp. 3d 154, 163 (D.P.R. 2016) (quoting *In re Pharmatrak, Inc.*, 329 F.3d 9, 18 (1st Cir. 2003)). "Intercept" refers to the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). "[T]o constitute an 'intercept'

68

within the meaning of [the] ECPA, 'the acquisition of a communication must be contemporaneous with its transmission.'" *Boudreau v. Lussier*, 901 F.3d 65, 77 (1st Cir. 2018) (quoting *Luis v. Zang*, 833 F.3d 619, 628 (6th Cir. 2016)). "Contents" refers to "any information concerning the substance, purport, or meaning of that [electronic] communication." 18 U.S.C. § 2510(8). "Courts have excluded various types of information from the . . . Act's definition of 'content[,]'" including the "date, time and length of [a] [telephone] call," "cell phone . . . location data," "user name[s] and password[s]," "name[s]," "subscriber number[s]," and "email address[es]." *In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1083–84 (N.D. Cal. 2015) (collecting cases). Such information is considered "record information" that does not implicate the "substance" of a communication. *Id.* at 1082 (quoting *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014)).

The Court finds that HSOne adequately pleads an ECPA claim. HSOne alleges that Vyne "intercept[ed] Internet traffic from HSOne's customers that was meant to go to HSOne and redirect[ed] those transmissions to a Vyne endpoint . . . by . . . modifying" HSOne's eTrans file and "inject[ing] data into [its] configuration files." Countercl. ¶¶ 46–47, 146–47. These allegations are sufficient to support a reasonable inference that Vyne used computing devices to intercept electronic communications contemporaneously with their transmission. The Counterclaim also alleges that the information intercepted included "claim eligibility transactions, statements, and payment records," *id.* ¶ 148, which constitute the substance of communications transmitted and intercepted, and not mere "record information[,]" *In re Zynga Privacy Litig.*, 750 F.3d at 1106.

Vyne argues that its alleged conduct falls within the "safe harbor" provision of 18 U.S.C. § 2511(2)(d) because any alleged interceptions it made were done "with the customer's consent and at the customer's request." ECF No. 66 at 13. Section 2511(2)(d) provides an exception

> for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the

communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State.

18 U.S.C. § 2511(2)(d). But the Counterclaim contains allegations that negate the applicability of the "consent" exception to interception under Title I. Specifically, the Counterclaim alleges that (1) Vyne "malicious[ly]" intercepted network traffic intended for HSOne to "unlawfully obtain[] benefits—data access, mass exfiltration, and code injection capabilities[]"; (2) "Vyne . . . obfuscate[s] what it is really doing and purports to act with authorization, even though [it] has not disclosed its hacking methods to its customers"; and (3) "HSOne did not consent to Vyne's interception and redirection of electronic traffic." Countercl. ¶¶ 2, 38, 52, 120, 149. HSOne further alleges that Vyne intercepted electronic communications in furtherance of its violations of the CFAA and DMCA and other tortious conduct, *see* Parts II.C.1, II.C.2, II.C.4, and II.C.5 *supra*— unlawful purposes to which the statutory protection of § 2511(2)(d) does not apply. Taking these allegations as true, the Court finds that HSOne's pleadings are sufficient to take its ECPA claim outside the consent exception of § 2511(2)(d). Vyne's motion to dismiss HSOne's ECPA counterclaim is denied.

### 11. UICA Violations

In its Eleventh Cause of Action, HSOne asserts a counterclaim against Vyne for violating the Utah Interception of Communications Act by directly, or through procurement of another, "rerouting and captur[ing] . . . electronic communications" intended for HSOne. Countercl. ¶¶ 152, 154. The UICA "generally prohibits the nonconsensual interception and disclosure of wire, electronic, or oral communications." *State v. Hebeishy*, 522 P.3d 943, 947 (Utah Ct. App. 2022) (citing Utah Code Ann. § 77-23a-2(4)). Similarly to the ECPA, to state a claim under the UICA, HSOne must allege that Vyne (1) intentionally or knowingly (2) intercepted, endeavored to

intercept, or procured any other person to intercept or endeavor to intercept (3) any wire, electronic, or oral communication. Utah Code Ann. § 77-23a-4(b)(i). The UICA's definition of "intercept" is identical to the ECPA's: "[T]he acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." Utah Code Ann. § 77-23a-3(10); *see also* 18 U.S.C. § 2510(4). "Electronic, mechanical, or other device" includes "any device or apparatus that may be used to intercept a wire, electronic, or oral communication" except for telephones or telegraphs. Utah Code Ann. § 77-23a-3(8).

Like its ECPA counterclaim, HSOne bases its UICA counterclaim on allegations that Vyne "intercept[ed] Internet traffic from HSOne's customers that was meant to go to HSOne and redirect[ed] those transmissions to a Vyne endpoint . . . by . . . modifying" HSOne's eTrans file and "inject[ing] data into [its] configuration files." Countercl. ¶¶ 46–47, 146–47. For the same reasons the Court's finds HSOne's Counterclaim sufficient to state a plausible ECPA violation, *see* Part II.C.10 *supra*, the Court finds that HSOne alleges a plausible violation of the UICA by Vyne.

## III.    MOTIONS FOR PRELIMINARY INJUNCTION

Vyne and HSOne have each filed a motion seeking a preliminary injunction against certain conduct by the other party. Vyne seeks to enjoin HSOne from disabling Vyne software on the parties' shared customers' computers, denying the customers printer driver access to EHI stored in Dentrix, and denying Vyne access to EHI stored in Dentrix. *See* ECF Nos. 6 & 6-1. HSOne seeks to enjoin Vyne from unauthorized access to HSOne's software systems. *See* ECF Nos. 46 & 46-1. Each party opposes the other party's motion. As noted in Part I.C *supra*, the Court conducted an evidentiary hearing, heard oral argument, and received supplemental briefing on these motions. At the evidentiary hearing, the Court received exhibits from each party and heard testimony from

71

Stephen Roberts, Vyne's CEO; James Nix, Vyne's CTO; Brian Weatherly, HSOne's CEO; David Youssef, HSOne's expert witness on cybersecurity; George Rencher, HSOne's CTO; Kenton McDaniel, HSOne's Chief Information Security Officer; and Paul Clip, Vyne's rebuttal expert.[7] For the reasons explained below, the Court finds limited preliminary injunctive relief in favor of each party to be warranted.

### A. Standard of Review

Preliminary injunctive relief "is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Preliminary injunctive relief "involv[es] the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 272 (4th Cir. 2002) (quoting *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001)). Awarding this extraordinary remedy thus requires "a clear showing that the [movant] is entitled to such relief." *Winter*, 555 U.S. at 22. To prevail on a motion for a preliminary injunction, the movant must demonstrate (1) that it is likely to succeed on the merits of its claims, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of the equities tips in its favor, and (4) that an injunction is in the public interest. *Vitkus v. Blinken*, 79 F.4th 352, 361 (4th Cir. 2023) (citing *Winter*, 555 U.S. at 20).

"A preliminary injunction may be characterized as being either prohibitory or mandatory." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 235 (4th Cir. 2014). A "mandatory" injunction "alter[s] the status quo," while a "prohibitory" injunction "'aim[s] to maintain the status quo and prevent irreparable harm while a lawsuit remains pending.'" *Id.* at 236

---

[7] In this Memorandum Opinion, citations to the witnesses' surnames refer to transcripts of the witness's testimony from the evidentiary hearing. Citations to "PX" refer to Vyne's labeled exhibits, and citations to "HS" refer to HSOne's labeled exhibits.

(quoting *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013)). Importantly, the "status quo" to be preserved by a prohibitory preliminary injunction "is not the circumstances at the moment the lawsuit or injunction request was actually filed, but the 'last uncontested status between the parties which preceded the controversy.'" *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 378 (4th Cir. 2012) (quoting *Stemple v. Bd. of Ed. of Prince George's Cnty.*, 623 F.2d 893, 898 (4th Cir. 1980)). The Fourth Circuit has recognized that "it is sometimes necessary to require a party who has recently disturbed the status quo to reverse its actions, but . . . [s]uch an injunction restores, rather than disturbs, the status quo ante." *League of Women Voters*, 769 F.3d at 236 (quoting *Aggarao*, 675 F.3d at 378). Mandatory preliminary injunctions, on the other hand, alter the status quo ante and are therefore "disfavored, and warranted only in the most extraordinary circumstances." *Robinson v. Nat'l Collegiate Athletic Ass'n*, 172 F.4th 271, 286 (4th Cir. 2026) (quoting *2311 Racing LLC v. Nat'l Ass'n for Stock Car Auto Racing, LLC*, 139 F.4th 404, 408 (4th Cir. 2025)).

### B. Vyne's Likelihood of Success on the Merits and Likelihood of Irreparable Harm

Vyne has made a clear showing it is likely to succeed on the merits of its unfair competition claim in Count V of its Amended Complaint and that it is likely to suffer irreparable harm without a preliminary injunction against HSOne disabling printer driver access to Dentrix. As explained in Part II.B.6 *supra*, the tort of unfair competition under Maryland law is broad, flexible, and open-ended. An unfair competition claim may be founded upon the deceptive or otherwise unfair practice that "substantially interfer[es]" with competitors' ability "to compete . . . or conflicts with accepted principles of public policy[,]" and ultimately "damag[es] or jeopardiz[es]" a competitor's business. *Paccar*, 905 F. Supp. 2d at 690 (quoting *Balt. Bedding Corp.*, 34 A.2d at 342); *see also ClearOne Advantage*, 756 F. Supp. 3d at 43 (citing *Berlyn*, 73 F. App'x at 585). Here, Vyne has made a clear showing that HSOne substantially interfered with Vyne's ability to compete on the

merits of its products by blocking the parties' mutual customers' ability to use Vyne's software while, at the same time, promoting HSOne's own competing product.

Vyne markets the RCM software platform Vyne Trellis to dental practices. Vyne's customers use Vyne Trellis to verify patients' eligibility for insurance benefits and to submit insurance claims. HSOne provides the Dentrix practice management system to dental practices to store patient data, including EHI. Vyne's software utilizes a printer driver to capture data from Dentrix as needed to perform RCM services. For many years, HSOne allowed customers it shared with Vyne to use Vyne's printer driver to access EHI stored in the customers' Dentrix databases. *See* Weatherly 355:10–12, 356:22–357:6; Roberts 99:4–15, 102:2–14; PX306. And HSOne was aware that the printer driver's access to EHI stored in Dentrix was a critical aspect of the mutual customers' insurance claims submission processes. *See* Weatherly 355:10–357:6. Still, in April 2025, HSOne blocked the mutual customers' use of printer drivers provided by Vyne and certain other third-party vendors, knowing that this action would severely disrupt the customers' workflows. *See id.* 354:15–24, 355:10–356:4.

Having disrupted the mutual customers' workflows by blocking Vyne Trellis's printer-driver function, HSOne then targeted the same set of customers to promote HSOne's own competing bundled electronic insurance claims submission product, the Dentrix Eligibility and Claims Processing Suite. *See* PX033; ECF No. 6-2 (Roberts Decl.), ¶¶ 18–19. This bundle competes directly with Vyne Trellis by allowing customers to process insurance claims through use of a printer driver—one substantially similar to Vyne's—to access EHI stored in Dentrix and other practice management systems, like Eaglesoft and Open Dental. *See* Roberts 120:7–15; Weatherly 351:22–354:9, 358:23–359:18; Nix 260:25–261:9; PX019. HSOne sent out at least one marketing email that promoted the ability of HSOne's eClaims bundle to "[a]utoappl[y] CDT

74

codes to images" and "[a]utomatically attach[] images" while asserting that customers using Vyne Trellis to process claims were relegated to "manually attaching images, typing in CDT codes, and crossing [their] fingers[,]" and "[t]hat extra effort often leads to costly mistakes, claim rejections, and payment delays." PX033; *see also* ECF No. 6-2 (Roberts Decl.), ¶ 19. HSOne's statements likely misrepresented the functionality of Vyne Trellis, *see* ECF No. 6-2 (Roberts Decl.), ¶¶ 21–24, at least up to the point where HSOne interfered with that functionality. HSOne's own efforts to disable Vyne's printer driver would have been responsible for any lack of automation and functionality in Vyne Trellis described in the marketing email, *see* Roberts 135:12–19; Weatherly 389:18–25, but the marketing communication left that fact unsaid. The same marketing email offered a discount for HSOne's eClaims bundle to customers who switched from Vyne. PX033; *see also* ECF No. 6-2 (Roberts Decl.), ¶ 20.

In September 2025, HSOne deployed a software update that disabled any Vyne software running on their mutual customers' computers, *see* Nix 273:2–274:7; McDaniel 617:17–23, while continuing to target the same customers with promotion of HSOne's competing product, *see* PX002; PX008. In at least one marketing communication promoting HSOne's eClaims bundle, an HSOne representative suggested that Vyne customers who could no longer use Vyne Trellis's printer driver had been "adversely affected by [a] *Vyne* security breach[,]" PX2.2 (emphasis added), which falsely suggested that customers' trouble with Vyne's printer driver was not a result of HSOne's own interference but was instead attributable to a data security breach suffered or caused by Vyne. There is no evidence that Vyne suffered or caused any data security breach during the relevant period, *see* Nix 258:2–6, and HSOne was not aware of any such breach, *see* Weatherly 396:3–23; McDaniel 617:8–16. Thus, Vyne has clearly demonstrated HSOne's substantial interference with Vyne's "ability . . . to compete on the merits of [its] product" through deceptive

and otherwise unfair means. *Ellicott Dredges*, 280 F. Supp. 3d at 732 (citation omitted). Specifically, HSOne interfered with the use of Vyne's product by Vyne's customers while targeting the same customers for promotion of HSOne's competing product. HSOne likely gained an unfair competitive advantage by disrupting Vyne Trellis's normal operations and using that disruption to persuade customers to switch from Vyne Trellis to HSOne's eClaims bundle.

Furthermore, Vyne has made a clear showing that HSOne's substantial interference with Vyne's ability to compete has "damaged or jeopardized [Vyne's] business." *ClearOne Advantage*, 756 F. Supp. 3d at 43 (citing *Berlyn*, 73 F. App'x at 585). HSOne's disparagement of Vyne Trellis—including misrepresentations about its functionality—while blocking the normal operation of the software naturally injures Vyne's goodwill with its customers and reputation in the market. Harms of this nature are difficult to quantify. Vyne lost at least 500 Vyne Trellis customers it previously shared with HSOne since its interference began in 2025. *See* Roberts 149:1–8. Well over 100 of the lost customers specifically cited the lack of compatibility between Vyne Trellis and Dentrix as a reason for cancellation, while a much higher number provided no specific reason. *See* Roberts 181:1–19; PX300. Vyne's customer base has continued to erode since HSOne began interfering with the operation of Vyne Trellis's printer driver. *See* PX300; PX306.[8] At the same time, HSOne has seen substantial growth in its revenue from its competing eClaims product. *See* Weatherly 368:24–373:10; PX308. The harms Vyne has demonstrated are sufficient to support a finding of irreparable harm. *See Salomon & Ludwin, LLC v. Winters*, 150 F.4th 268, 279 n.7 (4th Cir. 2025) (citation omitted) ("'[P]ermanent loss of customers to a competitor or the loss of goodwill' constitutes irreparable injury.").

---

[8] HSOne characterizes this customer erosion as "negligible customer churn" and attributes it to "Vyne's poor customer service," ECF No. 144 at 3, but fails to cite record evidence to support either contention.

In sum, the record before this Court supports findings that Vyne will likely succeed on the merits of its unfair competition claim and that it has suffered—and, without a preliminary injunction, will continue to suffer—irreparable harm from HSOne's unfair interference in the operation of Vyne Trellis's printer driver.

### C. HSOne's Likelihood of Success on the Merits and Likelihood of Irreparable Harm

At the same time, HSOne has made a clear showing it is likely to succeed on the merits of its CFAA counterclaim against Vyne and that it is likely to suffer irreparable harm without a preliminary injunction against Vyne writing to the Dentrix system. Specifically, HSOne has clearly demonstrated that Vyne likely violated 18 U.S.C. § 1030(a)(5)(C) by "intentionally access[ing] a protected computer without authorization, and[,] as a result of such conduct, caus[ing] damage and loss." !!

### 1. Access to a Protected Computer Without Authorization

HSOne controls a cloud-based software system used to communicate and sync with its customers' local installations of Dentrix, and Vyne has accessed that system without authorization. ECF No. 62-1 (McDaniel Decl.), ¶¶ 2–5; McDaniel 605:17–606:3; Youssef 520:12–521:1. The Dentrix cloud system likely constitutes a "protected computer" under the CFAA because it electronically transmits and stores data "in or affecting interstate or foreign commerce or communication," via the Internet, 18 U.S.C. § 1030(e)(2)(B), with controlled access, *see* McDaniel 607:9–14; Youssef 520:12–521:1. *See also SkyHop Techs.*, 58 F.4th at 1227 (cloud-based servers that permit remote access to stored data "meet the CFAA's definition of 'protected computer[]'"). Specifically, the Dentrix cloud system is the electronic means by which HSOne updates and upgrades Dentrix software stored on its customers' computers and customers send data to servers HSOne controls. *See* ECF No. 62-1 (McDaniel Decl.), ¶¶ 2–3. The Dentrix cloud system is not

publicly accessible; it is protected by technical security measures devised by HSOne. *See id.* ¶¶ 4–5; Youssef 520:12–521:1. HSOne authorizes its customers to access the cloud system but does not authorize Vyne to access it, *see id.*; nor does it authorize customers to give Vyne access, *see* ECF No. 46-2 (McDaniel Decl.), ¶ 10.

The Court finds a clear likelihood that Vyne accessed the Dentrix cloud system controlled by HSOne "without authorization." 18 U.S.C. § 1030(a)(5)(C). While the CFAA lacks an express definition of the term "without authorization," the Act does provide that the phrase "'exceeds authorized access' means to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter[.]" *Id.* § 1030(e)(6). This provision "target[s] so-called *inside* hackers—those who access a computer with permission, but then '"exceed" the parameters of authorized access by entering an area of the computer to which [that] authorization does not extend.'" *Van Buren v. United States*, 593 U.S. 374, 389–90 (2021) (emphasis added) (citations omitted). In contrast, "[t]he 'without authorization' clause . . . protects computers themselves by targeting so-called *outside* hackers—those who 'acces[s] a computer without any permission at all.'" *Id.* at 389 (emphasis added) (citation omitted). *See also Tech Sys., Inc. v. Pyles*, 630 F. App'x 184, 186 (4th Cir. 2015) (holding that a person "accesses a computer 'without authorization' when [they] gain[] admission to a computer without approval," and "'exceeds authorized access' when [they] ha[ve] approval to access a computer, but use[] [their] access to obtain or alter information that falls outside the bounds of [their] approved access.").

The Dentrix cloud system controlled by HSOne is not a computer that Vyne had any permission to access. Still, Vyne accessed that protected computer when it caused its software to connect and integrate with the Dentrix databases installed on the computers of the parties' shared

customers and those local installations synchronized with HSOne's cloud infrastructure. Thus, Vyne's conduct was more akin to the "*outside* hackers" contemplated in the CFAA's "without authorization" term than the "*inside* hackers" targeted by the phrase "exceeds authorized access." *Van Buren*, 593 U.S. at 389–90. By letter dated August 26, 2025, HSOne specifically notified Vyne that its access to the Dentrix system is not authorized and violates the CFAA. ECF No. 6-2 at 87–89.

Vyne argues that its direct connection to the Dentrix database was made with the consent and authorization of the parties' shared customers. *See, e.g.*, ECF No. 152 at 6. There is a provision in Vyne's contracts with its customers that allow Vyne to "access, retrieve, use, and export" certain types of data "from any and all third-party platforms, vendors, and systems," including dental practice management systems like Dentrix. HS066, § 4. But, in the very next paragraph, the contract also includes a provision reflecting the customer's consent and authorization for Vyne "to send written data access and interoperability requests directly to third-party vendors, platforms, or custodians of such data" on the customer's behalf. *Id.* Thus, the contract suggests a distinction between (1) data stored on platforms and systems provided by a third party but controlled by a customer and (2) data stored on platforms controlled by a third party. A customer independently grants Vyne access to the former, but it can only authorize Vyne *to request* access to the latter from the third party who controls that access.

The Court finds a clear likelihood that Vyne's authorization from its customers to access the Dentrix database stored on the customer's computers did not—and could not—include authorization to access to the Dentrix cloud system HSOne controls. *See* ECF No. 46-2 (McDaniel Decl.), ¶ 10; Youssef 434:16–435:4. Vyne was authorized to request "data access and

interoperability" with the cloud system from HSOne on behalf of the parties' shared customers, HS066, § 4, but it had no effective authorization to access the Dentrix cloud system directly.

### 2. Intent

Evidence in the record before this Court supports a finding that Vyne accessed the Dentrix cloud system intentionally. James Nix, Vyne's CTO since 2023, *see* ECF No. 6-3 (Nix Decl.), ¶ 2, was previously employed by HSOne. At HSOne, Nix served as a lead developer and chief architect of technology that HSOne has used to transmit and synchronize data between Dentrix databases stored on customers' computers and databases stored in HSOne's cloud system. *See* Nix 342:2 343:1; McDaniel 607:22–25. During Nix's tenure as Vyne's CTO, Vyne has deployed software called "VyneSync" to connect directly to the Dentrix system and collect patient health information from the database. *See* Nix 250:23–251:2; 263:24–264:3. VyneSync uses Open Database Connectivity to connect to customers' Dentrix database and access the data therein. *See* Nix 264:18–25, 265:10–266:5, 269:1–7; Clip 635:22–636:11. This software has read and write functionality in the Dentrix database, allowing it to read data from the database and write or alter data in the database. *See* Roberts 186:4–25; Nix 265:10–266:5, 276:5–12, 287:4–7, 292:4–6. When, in April 2025, HSOne disabled use of Vyne's printer driver in connection with Dentrix, Vyne leveraged VyneSync's write functionality to remove its printer driver from HSOne's list of hostile printer drivers in Dentrix so that the printer driver would continue to function on the parties' shared customers' computers. *See* Nix 271:2–19; 276:5–12; 296:6–21.

Vyne contends that VyneSync "uses the practice's credentials to access their PMS database locally" and that Vyne's customers authorize it to do so. ECF No. 141 at 7; *see also* Nix 264:6–9,

313:7–314:8; HS066, § 4.[9] But HSOne has presented evidence demonstrating that VyneSync decrypts, extracts, and uses secret administrator-level credentials to gain a greater degree of access to the Dentrix system than what customers are permitted or equipped to achieve through their own credentials. *See* Nix 334:13–16; Rencher 534:9–14, 538:11–17, 578:17–25; McDaniel 607:8–14; Youssef 434:7–435:4, 437:8–440:9, 447:16–448:9; HS022 (Youssef Report), ¶¶ 78–81; HS049. The "unfettered" degree of access Vyne attains by decrypting HSOne's secret credentials allows it to write back to the Dentrix database stored on customers' local installations and on the cloud system controlled by HSOne, through synchronization. *See* McDaniel 597:17–22, 607:5–15; Youssef 447:16–448:9, 512:23–513:5, 520:12–521:5. Vyne's CEO and CTO were both aware of VyneSync's ability to both read and write back to the Dentrix database, and they intended for it to operate in that manner. *See* Roberts 142:15–143:5; 186:4–25; Nix 265:10–266:5, 276:5–12, 280:24–281:8, 287:4–7, 292:4–6. Additionally, HSOne presented expert testimony that credibly establishes that Vyne's method of decryption was obtained through either reverse engineering or insider knowledge, such as knowledge of HSOne's source code. *See* Youssef 440:10–18, 489:22–490:3.

Until December 2, 2025, through VyneSync, Vyne leveraged a module in Dentrix called "QuickBill" to pull information from the Dentrix database and send patient billing statements to Vyne for issuance to dental practices' patients. *See* Nix 269:1–7, 289:2–4; Clip 641:16–20. VyneSync's read and write functionality was used to reconcile payments with the ledger automatically once payments were received. *See* Roberts 142:15–143:5; Nix 265:10–266:5; Clip

---

[9] Although Vyne's contract with its customers authorizes Vyne to access systems and platforms provided by third parties, like the Dentrix database stored on the customer's computers, the contract does not authorize Vyne to write or enter data back into the database. *See* HS066, § 4; Roberts 162:12–163:13.

635:22–636:11, 637:8–12. As part of the process, Vyne caused data to be entered into the Dentrix database for the purpose of routing the billing statements. *See* Nix 281:3–8.

Thus, through the operation of VyneSync, Vyne has inserted and altered data in its customers' Dentrix database installations and was then synchronized and stored in the Dentrix cloud system—a protected computer controlled by HSOne that HSOne did not authorize Vyne to access. And, based on his experience at HSOne, Vyne's CTO likely knew that the Dentrix cloud system would be accessed and impacted through VyneSync's operations. By the date of the evidentiary hearing in this case, Vyne claimed to have deprecated use of VyneSync to issue billing statements, but, even at that time, the software continued to connect to the Dentrix system and maintained write-back functionality. *See* Nix 269:8–270:2, 292:13–20, 294:24–295:7; Clip 639:25–640:19. Even when some customers took steps to uninstall Vyne applications from their computers, Vyne's software remained on their systems and continued to access and cause data corruption within the Dentrix database. *See* Rencher 558:3–559:5; Youssef 433:3–434:15, 505:13–20; HS002; HS248.

### 3. Damage and Loss

Vyne's likely intentional and unauthorized access to the Dentrix cloud system "cause[d] damage and loss[]" within the meaning of the CFAA. 18 U.S.C. § 1030(a)(5)(C). The statute defines "damage" to mean "any impairment to the integrity or availability of data, a program, a system, or information[.]" *Id.* § 1030(e)(8). Here, through the operation of VyneSync, Vyne likely impaired the integrity and availability of data stored in the Dentrix system. Vyne's practice of writing back to the ledger in the Dentrix database out of sequence and without coordination with HSOne created race conditions and errors in balances recorded in the ledger and undermined the ledger's integrity from an accounting perspective. *See* Rencher 541:1–542:8. The access enabled

through VyneSync allowed Vyne to "overwrit[e]" certain data in the Dentrix database, including by inserting the string of numerals "911911911" into certain fields, which caused some of HSOne's customers' QuickBill accounts to stop "working[.]" Rencher 556:21–557:5; *see also* Weatherly 357:22–358:7; HS022 (Youssef Report), ¶¶ 62–63, 84–85, 119.[10] Vyne's writing back to the Dentrix database without coordination with HSOne also disrupted referential integrity within the database, caused database performance issues, and interfered with HSOne's ability to disseminate upgrades to Dentrix software through its cloud infrastructure. *See* Rencher 538:11–539:9, 557:8–10, 559:3–6; Weatherly 357:22–358:7. While Vyne disputes HSOne's characterization of the impacts Vyne's conduct has had on the Dentrix system, testimony by Vyne's witnesses reflects gaps and limitations in their knowledge of the technical details regarding the access Vyne achieved through VyneSync and its impact on Dentrix. *See* Roberts 218:12–25, 219:6–8; Nix 310:16–311:13, 318:18–22, 323:1–6; Clip 655:1–3, 656:3–7. The Court finds the evidence and testimony HSOne presented to be more credible on the question of whether Vyne's access caused "damage" to the Dentrix system under § 1030(a)(5)(C) and the specific impacts it had on that system.

In addition, Vyne's conduct likely caused losses to HSOne. The CFAA defines "loss" broadly to include "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service[.]" 18 U.S.C. § 1030(e)(11). Here, HSOne

---

[10] Although Nix testified that Vyne caused insertion of the unusual string of characters "911911911" to avoid causing problems in the Dentrix database while routing billing statements to Vyne, *see* Nix 280:24–281:8, HSOne's evidence demonstrated that Vyne's insertion of this data interfered with the proper functioning of QuickBill for a number of the parties' shared customers, *see* Rencher 556:21–557:5.

spent time and effort, and incurred expenses, "building tools that clean up some of the data corruption that Vyne has created[]" and assisting customers who experienced problems with the Dentrix database caused by the operation of VyneSync. Rencher 539:10–15; *see also id.* 541:5–10; Weatherly 357:22–358:7. The Court finds by a preponderance of the evidence that the costs to HSOne have exceeded $5,000 in the year that has passed since it discovered the impact Vyne's integration with Dentrix has had on HSOne's system. *See* 18 U.S.C. § 1030(c)(4)(A)(i)(I), (g).

### 4. Irreparable Harm

Furthermore, HSOne has demonstrated a likelihood of irreparable harm in the absence of an injunction against Vyne's writing to the Dentrix system. To establish a likelihood of irreparable injury, a moving party "must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent.'" *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991)). And courts generally decline to find an irreparable harm "[w]here the harm suffered by the moving party may be compensated by an award of money damages at judgment[.]" *Does 1–26 v. Musk*, 771 F. Supp. 3d 637, 678 (D. Md. 2025) (quoting *Hughes Network Sys., Inc. v. Inter Digital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994)).

Vyne's methods of decryption of administrator-level credentials and circumvention of HSOne's security measures have likely placed the Dentrix system in a vulnerable state and at substantially increased risk of a data security breach by malicious actors, which threatens the public disclosure of sensitive patient data stored in Dentrix. *See* Rencher 542:10–14; McDaniel 600:21–601:5; Youssef 454:15–23, 458:10–459:9, 461:6–462:12, 466:14–467:6; HS022 (Youssef Report), ¶ 58; ECF No. 46-2 (McDaniel Decl.), ¶ 35. As Vyne emphasizes, HSOne has made no

84

showing that it has actually suffered any major data security breach to date as a result of Vyne's conduct. But it cannot be the case that a litigant must suffer such a catastrophic breach before it is entitled to an injunction against conduct that places data security at substantial risk. *See Mullins v. City of New York*, 626 F.3d 47, 55 (2d Cir. 2010) ("The standard for preliminary injunctive relief requires a *threat* of irreparable harm, not that irreparable harm already have occurred."); *Musk*, 771 F. Supp. 3d at 682–83 (finding likelihood of irreparable harm based on "the potential disclosure of sensitive personal information" where there were "specific reasons to be concerned about" the risk of public disclosure); *New York v. Trump*, 767 F. Supp. 3d 44, 83 (S.D.N.Y.), *opinion modified on denial of reconsideration*, 778 F. Supp. 3d 578 (S.D.N.Y. 2025), *and modified*, 784 F. Supp. 3d 619 (S.D.N.Y. 2025) (citing cases) ("Indeed, courts have recognized that increased 'risk' of negative consequences is sufficient to meet the irreparable harm requirement for a preliminary injunction."); *Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt.*, 786 F. Supp. 3d 647, 693–94 (S.D.N.Y. 2025) (finding irreparable harm based in part on increased risks to cybersecurity that threaten public disclosure of personal information). HSOne has made a showing that Vyne's conduct places the confidentiality of personal, medical, and financial information belonging to dental patients at substantial risk.

Although the sensitive information Vyne has placed at risk does not belong to HSOne, HSOne stands to suffer pronounced reputational harm and damage to their goodwill if Vyne's conduct in the Dentrix system continues unabated and a major data breach occurs as a result. *See Salomon & Ludwin*, 150 F.4th at 279 n.7 (citation omitted) ("'[P]ermanent loss of customers to a competitor or the loss of goodwill' constitutes irreparable injury."). Vyne's unsecure and uncoordinated integration with the Dentrix database has already caused problems for customers in the use of Dentrix and resulted in many complaints to HSOne, which portends a greater loss of

85

goodwill and more pronounced reputational harm to HSOne without an injunction to curb Vyne's conduct. *See* Weatherly 379:4–380:9; HS123.

Moreover, the impairment and loss of HSOne's ability to monitor, control, and secure the Dentrix system that resulted from Vyne's unauthorized access is sufficient to demonstrate irreparable harm for purposes of a preliminary injunction motion. *See Fla. Atl. Univ. Bd. of Trs. v. Parsont*, 465 F. Supp. 3d 1279, 1296–97 (S.D. Fla. 2020) (citing cases) ("Unsurprisingly, federal courts around the country agree that the interference with an entity's control of its computer systems constitutes irreparable injury."). Without an injunction against Vyne's conduct, HSOne "could never be certain that it was adequately protecting" the patient data stored in its system, and "its failure to protect that information could expose [HSOne] to liability." *Id.* at 1297. It would be difficult, if not impossible, to quantify such a loss of effective control and security in an award of damages.

In opposition to HSOne's preliminary injunction motion, Vyne insists that it has deprecated functions of its software that the Court has found caused damage to the Dentrix system. *See, e.g.*, ECF No. 152 at 12–13. Vyne's voluntary deprecation of certain VyneSync functions does not render HSOne's motion moot. Vyne has not deprecated all software functions that access the Dentrix system with the capability of writing back to the database, and it does not intend to cease all write-back functionality voluntarily. The recent history of the parties' interactions have shown Vyne to be persistent and adaptive in its efforts to decrypt and circumvent HSOne's security measures and to access the Dentrix system without authorization and without limitation. *See* Youssef 460:17–22. As explained *supra*, some of Vyne's efforts have caused HSOne actual damage and loss. The Court cannot rely upon Vyne to cease its injurious conduct without an injunction. *See* Roberts 183:6–10; Nix 292:9–12.

### D. The Balance of the Equities and the Public Interest

The Court shall grant limited preliminary injunctive relief to avoid irreparable harm to each party. Vyne shall be enjoined from marketing software capable of write access to Dentrix databases stored or hosted on HSOne's cloud system and Dentrix databases that sync to HSOne's cloud infrastructure. HSOne shall be enjoined from disabling Vyne's software and denying the software printer-driver access to Dentrix databases operating on customers' computers. Both parties will be given 45 days to comply with the injunction. The Court finds that limited injunctive relief in favor of each party, and against each party, is supported by the public interest and the balance of relevant equities.

### 1. The Public Interest in an Injunction Against Vyne

Maintaining the integrity, confidentiality, and security of patient data—to include personal identifying information and medical information, as well as financial and medical insurance information—are public interests broadly recognized and protected by public policy. *See, e.g.*, HIPAA, Pub. L. 104-191; *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 778 F. Supp. 3d 685, 779 (D. Md. 2025), *vacated and remanded on other grounds*, 172 F.4th 361 (4th Cir. 2026) ("[T]here is a strong public interest in maintaining the confidentiality of PII, such as medical records and financial information."). The availability of such data to the dental practices that need it to provide quality dental services in a timely and cost-effective manner is also a matter of significant public interest that finds protection in public policy. *See, e.g.*, 21st Century Cures Act, Pub. L. 144-255; *Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*, Civ. No. PX-24-313, 2024 WL 3569493, at *12 (D. Md. July 29, 2024), *aff'd*, 131 F.4th 205 (4th Cir. 2025) ("The public benefits from fostering access to medical records consistent with, not in contravention of, the Cures Act. Indeed, the provision of affordable, quality healthcare depends directly on access

to such records."). And, more generally, in a world of increasing preservation and accumulation of sensitive information in the electronic hands of private entities, the Court finds a strong public interest in the implementation of effective data security measures in the private sector.

Dentrix is a patient management system that stores a range of sensitive information about dental patients and is designed to make that information available to the dental practices that serve those patients. A preliminary injunction that restrains Vyne from marketing software capable of writing back to the Dentrix system without HSOne's authorization will avoid the harms and risks this software functionality has posed to the accuracy and quality of data and referential integrity within the Dentrix database, and to the availability of patient data to the parties' shared customers. *See* Part III.C.3 *supra*.[11]

### 2. The Public Interest in an Injunction Against HSOne

At the same time, the public interest is served by curbing practices in the marketplace that give private companies unfair advantages over their competitors. *See Brightview*, 441 F. Supp. 3d at 142 ("[T]he public interest favors . . . the prevention of unfair business practices."); *Prysmian Cables & Sys. USA, LLC v. Szymanski*, 573 F. Supp. 3d 1021, 1045 (D.S.C. 2021) ("[T]he public interest favors enforcing laws . . . preventing unfair competition in the marketplace."). The public interest in "promoting free market competition in a capitalist economy" cannot be protected "unless the legal system 'prevent[s] unethical business behavior[]'" and stops market participants from driving competitors out of business through unfair and deceptive methods. *Brightview*, 441

---

[11] Vyne suggests that an injunction against software functions that write back to the Dentrix system without HSOne's authorization would effectively restrict dental practices in their use of EHI, which would run contrary to public policy. *See* ECF No. 164 at 8. But nothing in this injunction would preclude dental practices in their use of EHI stored in Dentrix. It would only preclude Vyne from providing software capable of accessing and using EHI in Dentrix in a manner that has been shown to damage the Dentrix system. To be sure, the damage likely to result from Vyne's unrestrained access to Dentrix places the EHI stored in it at substantial risk of breach and public disclosure by malicious actors. That outcome clearly runs against the public interest, and a preliminary injunction is necessary to avoid that outcome.

F. Supp. 3d at 142 (quoting *Advanced Instructional Sys., Inc. v. Competentum USA, Ltd.*, No. 1:15CV858, 2015 WL 7575925, at *6 (M.D.N.C. Nov. 25, 2015)).

Here, the parties are competitors in the market of eClaims services for dental practices. But HSOne also provides patient management systems to approximately 7,500 dental practices that use Vyne's eClaims platform, Vyne Trellis. *See* Roberts 178:19-25. HSOne's interference with the functioning of the printer driver needed for Vyne Trellis to function on the parties' shared customers' computers effectively puts Vyne—HSOne's competitor—out of operation for those shared customers. As explained in Part III.B *supra*, for HSOne to pair that interference with promotion of its competing product targeted at the very same customers now prevented from using Vyne Trellis likely constitutes unfair competition in violation of Maryland law. To allow that interference to continue would disserve the public interest in fair market competition.

### 3. The Balance of the Equities

Partial injunctive relief in favor of both parties also serves the balance of relevant equities. It will preserve HSOne's ability to control the Dentrix system, to ensure the accuracy and integrity of data stored in its systems and the proper functioning and performance of the database, to make patient data available to HSOne's customers when they need it, to disseminate updates and upgrades to its customers, and to implement effective security controls to protect that system, without being undermined by Vyne's unsecure and uncoordinated methods of accessing Dentrix. At the same time, injunctive relief in favor of Vyne will protect Vyne's ability to conduct its core business of electronically processing insurance claims for its customers through use of Vyne Trellis's printer driver function, without anti-competitive obstruction by HSOne.

Vyne has characterized any injunction against its unfettered access to Dentrix as a "mandatory" injunction, ECF No. 152 at 14–15, which is generally "disfavored" and requires "the

most extraordinary circumstances[,]" *Robinson*, 172 F.4th at 286 (citation omitted). This Court disagrees. The preliminary injunction here aims to preserve the "last uncontested status between the parties . . . preced[ing] the controversy." *Aggarao*, 675 F.3d at 378 (citation omitted). The record before this Court establishes a long-standing relationship between the parties in which Vyne was allowed to use its printer-driver function to export data from Dentrix without interference from HSOne, and the preliminary injunction in this case will preserve that status quo. But there is no evidence that HSOne ever failed to contest Vyne software functions that circumvent HSOne's security controls to gain unrestricted access to Dentrix, that write back to the system without HSOne's authorization, and that cause damage and loss to HSOne. HSOne did not discover the damage caused by Vyne's unauthorized access until around March and April 2025. Requiring Vyne to reverse the misconduct that HSOne discovered at that point, while preserving Vyne's ability to operate its printer driver, aims to restore the parties' "last uncontested status"—not disturb it. *Aggarao*, 675 F.3d at 378 (citation omitted). For these reasons, the Court finds its preliminary injunction to be a prohibitory injunction—not a mandatory one. It does not *mandate* any specific new and unprecedented action by either party; it only *prohibits* conduct this Court finds likely to cause the opposing party irreparable harm. *See League of Women Voters*, 769 F.3d at 235 (citation omitted) ("[P]rohibitory injunctions 'aim to maintain the status quo and prevent irreparable harm while a lawsuit remains pending.'").[12]

---

[12] Even if the preliminary injunction against Vyne were properly classified as a mandatory injunction, credible testimony offered by HSOne's cybersecurity expert suggests that it would be justified by the extraordinary nature of Vyne's unrestricted access to Dentrix. When asked to opine on the "level of threat actor activity" presented by Vyne's conduct, Youssef stated that "it is quite severe[,]" and placed it in "the upper percentile, in the 75 to 100 percentile[,]" of all the cybersecurity incidents he's seen in his nearly 20-year career working in cybersecurity incident response, "considering the length of time that it's been happening for, the persistent nature of it, and some of the sort of significant impact to customers we've seen," Youssef 458:10–459:9; *see also id.* 403:22–404:7.

The Court recognizes that an injunction against Vyne writing back to the Dentrix database will restrict the manner in which Vyne provides certain patient engagement services to its customers and prevent it from providing these services in the unsecure and uncoordinated manner it has provided them. But Vyne admits that providing such services is not its core business, *see* Roberts 183:1–5, and these services are only utilized by a small minority of the customers it shares with HSOne, *see* Am. Compl. ¶ 58; Roberts 186:4–187:8; Nix 292:1–8. VyneSync is capable of writing back to the Dentrix database but operates separately from Vyne Trellis's printer driver. *See* Roberts 186:4–25; Nix 263:21–22, 268:19–269:2, 288:16–18, 291:17–21, 293:3–7, 308:3–7; Clip 635:19–636:11, 660:7–11.[13] Unlike VyneSync, the printer driver does not write back to the Dentrix database, and write-back is not a necessary component of Vyne's electronic claims submission workflow. *See* Nix 288:16–18; Clip 632:23–28, 635:19–636:11, 637:24–638:7, 660:7–11. And, during the course of this litigation, Vyne has voluntarily deprecated certain functions of its software and, in the case of billing statements, found a technological solution that does not involve writing to the Dentrix system. *See* Nix 281:9–282:5, 280:24–282:5. Any harm to Vyne's legitimate business that may result from the preliminary injunction is outweighed by the damage and loss its integration with Dentrix has caused HSOne and additional irreparable harms it threatens in absence of an injunction. Moreover, Vyne remains free to seek a technological solution and/or a commercial agreement with HSOne that may allow it to continue providing patient engagement

---

[13] The Court notes that HSOne has disputed the proposition that Vyne's printer driver functions independently of Vyne software capable of writing to the Dentrix database, but the Court finds Vyne's evidence on this issue to be more credible. HSOne has collected and presented reliable evidence as to how its systems have been impacted by Vyne's software, but Vyne's witnesses testified credibly about what the printer driver does and what its limitations are. Moreover, Vyne's printer driver functions much the same way as a printer driver HSOne utilizes for its competing eClaims product. *See* Nix 260:25–261:9; Weatherly 362:16–363:5. HSOne has failed to show that Vyne's printer driver has caused any appreciable damage to the Dentrix database or that it presents so grave a security risk that its operation must be enjoined to prevent irreparable harm to HSOne. Even HSOne's expert testified that the printer driver "is not on its own malicious." Youssef 480:14–23.

services to the parties' shared customers. If the parties agree to a commercial solution that is inhibited by the injunction, they may petition for the injunction to be modified or vacated.

### E. Compliance Period

After the evidentiary hearing in this case, the Court has invited each party's input on determining reasonable terms of the preliminary injunction. The Court issued a Letter Order that permitted each party to file a supplemental brief setting forth the party's position on, among other things, a period in which each party could reasonably be expected to comply with the anticipated preliminary injunction. *See* ECF No. 171. In response, Vyne requested a period of 90 days to comply with the injunction against it, ECF No. 175 at 5–6, while HSOne proposed a compliance period of 14 days for Vyne, ECF No. 180 at 7. At the same time, HSOne suggests that it would need at least six months to comply with an injunction against disabling Vyne software. ECF No. 174 at 4.[14] None of these proposals are well supported by facts or evidence. Considering the expediency with which each party has implemented changes to the operation of its software and security measures during this litigation, and the time the Court has given each party to prepare for the injunction, the Court finds a 45-day compliance period for both parties to be reasonable and sufficient to permit orderly compliance.

### F. Bond

Rule 65(c) of the Federal Rules of Civil Procedure requires a party who obtains a preliminary injunction to give "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."

---

[14] In addition, HSOne argues that Vyne should be ordered to pay for printer driver access to Dentrix. ECF No. 174 at 1. The Court finds that it would be improper to order payments to an enjoined party as a form of preliminary relief in the circumstances of this case. Any payments HSOne believes it is owed by Vyne may be recovered in a monetary judgment at the conclusion of this litigation.

After the evidentiary hearing in this case, the Court issued an Order directing the parties to file briefs "addressing . . . reasonable bond amounts and/or [the] need for a bond hearing." ECF No. 171. HSOne responded to the Court's Order, arguing that only Vyne should be required to post a bond, "the amount of which HSOne will establish at a hearing." ECF No. 174 at 10. HSOne asserts that, "[a]t the very least," Vyne should "post a bond in the amount of all fees from its unauthorized access in the past and any continued unauthorized access that the Court allows, as it has agreed that it should do." *Id.*

In its response to the Order, Vyne argues that HSOne should be required to post a bond of $148,219,149 to secure potential losses of existing and future customers and "compliance-related investments of time and resources." ECF No. 175 at 8. In support of its proposal, Vyne submits three declarations—from Nix, ECF No. 175-1; from Vyne's Chief Financial Officer, Eric Markus, ECF No. 175-2; and from Maria Eugenia Garibotti, Ph.D, an economist and expert retained by Vyne, ECF No. 175-3. The latter two declarations include estimates of the revenue losses Vyne would incur as a result of the injunction against it. *See* ECF Nos. 175-2 & 175-3. At the same time, Vyne argues that it should be required to post only a nominal bond at or near zero dollars for the injunction against HSOne. ECF No. 178 at 5.

HSOne filed a second response to the Court's Order, disputing the arguments and valuations presented in Vyne's filings and new declarations. ECF No. 180. In addition, HSOne filed a motion to strike the declarations of Garibotti and Markus, arguing that (1) the declarations are untimely and prejudicial, as Vyne could have presented these witnesses at the evidentiary hearing, ECF No. 181 at 2–4; (2) Garibotti's declaration is unreliable, as her analysis is based upon Vyne's representatives' unsupported statements and materials that have not been disclosed to HSOne, *id.* at 8–15; and (3) Markus's declaration is not based on personal knowledge and is thus

impermissible lay testimony, relies on undisclosed internal data, and is based on conclusory assertions and unsupported assumptions, *id.* at 15–20.

Considering the parties' factual disputes, the Court shall schedule a bond hearing to determine an appropriate bond each party will be required to post pursuant to Federal Rule of Civil Procedure 65(c).

## IV.   CONCLUSION

For the foregoing reasons, Vyne's Motion to Dismiss (ECF No. 66) is granted in part and denied in part. Specifically, the third, seventh, eighth, and ninth causes of action in HSOne's Counterclaim are dismissed without prejudice. HSOne's Motion to Dismiss (ECF No. 85) is denied, and its earlier Motion to Dismiss (ECF No. 42), having been superseded, is denied as moot. HSOne's Motion to Transfer (ECF No. 35) is withdrawn.

In addition, Vyne's Motion for Preliminary Injunction (ECF No. 6) and HSOne's Motion for Preliminary Injunction (ECF No. 46) are each granted in part and denied in part. Vyne shall be enjoined from marketing software capable of write access to Dentrix databases stored or hosted on HSOne's cloud system and Dentrix databases that sync to HSOne's cloud infrastructure. HSOne shall be enjoined from disabling Vyne's software and denying the software printer-driver access to Dentrix databases operating on customers' computers.

A separate Order shall issue.


 July 31, 2026                           /S/
Date                                  Matthew J. Maddox
                              United States District Judge