**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| NATIONAL ELECTRONIC ATTACHMENT, INC., D/B/A VYNE DENTAL,<br><br>                    *Plaintiff*,<br><br>        -against-<br><br>HENRY SCHEIN ONE, LLC,<br><br>                    *Defendant*. | Case No. 1:25-cv-03246<br><br><br>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A STAY PENDING APPEAL AND FOR CLARIFICATION** |

HOLWELL SHUSTER & GOLDBERG LLP
425 Lexington Avenue
New York, NY 10017
(646) 837-5151

GOODELL, DEVRIES, LEECH & DANN, LLP
One South Street, 20th Floor
Baltimore, MD 21202
(410) 783-4000

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

ARGUMENT ................................................................................................................... 4

    I.    There Are Substantial Questions On HSOne's Likelihood of Success. ............................ 5

        A.    The Court's interpretation of the CFAA raises serious and difficult questions............ 5

          i.    Access to Dentrix is not access to HSOne's servers........................................ 6

          ii.    HSOne's customers access Dentrix; Vyne does not. .................................... 10

          iii.    There is no connection between the "access" and the "damage" here. ........................ 12

        B.    The injunction is deficient as a matter of law because it was not necessary to permit ultimate judgment on the merits. .................................................................. 16

    II.    Absent a Stay, Vyne Will Suffer Substantial Harm to Its Business, Customers, Reputation, and Goodwill that Cannot Be Undone ............................................. 18

    III.    A Limited Stay Pending Appeal Will Cause No Substantial Harm to HSOne................. 20

    IV.    The Public Interest Favors a Stay ...................................................................... 21

    V.    An Injunction Cannot Be Ordered Without Adjudicating the Required Security ............ 22

    VI.    Vyne Asks that the Court Clarify that RPA Is Excluded from the Injunction.................. 22

CONCLUSION.................................................................................................................. 24

## TABLE OF AUTHORITIES

**Cases**

*2311 Racing LLC v. NASCAR*,
 139 F.4th 404 (4th Cir. 2025) ...................................................................... 16

*AFSCME v. Soc. Sec. Admin.*,
 172 F.4th 361 (4th Cir. 2026) ...................................................................... 20

*Aggarao v. MOL Ship Mgmt. Co., Ltd.*,
 675 F.3d 355 (4th Cir. 2012) ....................................................................... 17

*Amazon.com Servs., LLC v. Perplexity AI, Inc.*,
 2026 WL 2237587 (9th Cir. Aug. 4, 2026) ..................................... passim

*Civic Ctr. Motors, Ltd. v. Mason St. Imp. Cars, Ltd.*,
 387 F. Supp. 2d 378 (S.D.N.Y. 2005) .......................................................... 13

*Di Biase v. SPX Corp.*,
 872 F.3d 224 (4th Cir. 2017) ....................................................................... 20

*Dist. 17, United Mine Workers of Am. v. A&M Trucking, Inc.*,
 991 F.2d 108 (4th Cir. 1993) ....................................................................... 22

*eBay Inc. v. MercExchange, LLC*,
 547 U.S. 388 (2006) ..................................................................................... 16

*Eden, LLC v. Justice*,
 36 F.4th 166 (4th Cir. 2022) ........................................................................ 21

*ExactLogix, Inc. v. JobProgress, LLC*,
 508 F. Supp. 3d 254 (N.D. Ill. 2020) .......................................................... 12

*GSP Fin. Servs., LLC v. Harrison*,
 2021 WL 288172 (D. Md. Jan. 28, 2021) .................................................... 12

*hiQ Labs v. LinkedIn Corp.*,
 31 F.4th 1180 (9th Cir. 2022) ...................................................................... 11

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*,
 174 F.3d 411 (4th Cir. 1999) ....................................................................... 22

*In re Microsoft Corp. Antitrust Litig.*,
 333 F.3d 517 (2003)................................................................................. 16, 18

*Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*,
 4 F.3d 819 (9th Cir. 1993) ........................................................................... 21

*LivePerson, Inc. v. 24/7 Customer, Inc.*,
 83 F. Supp. 3d 501 (S.D.N.Y. 2015) ........................................................... 13

*Mead Johnson & Co. v. Abbott Labs.*,
 201 F.3d 883 (7th Cir. 2000) ....................................................................... 22

*Meta Platforms, Inc. v. Brand Total Ltd.*,
 605 F. Supp. 3d 1218 (N.D. Cal. 2022) .................................................... 7, 8

*Nken v. Holder*,
    556 U.S. 418 (2009)..................................................................................... 4, 20

*Omega World Travel, Inc. v. Trans World Airlines*,
    111 F.3d 14 (4th Cir. 1997) ................................................................................ 16

*Par Pharms., Inc. v. TWI Pharms., Inc.*,
    2014 WL 3956024 (D. Md. Aug. 12, 2014) ............................................................ 5

*Project Vote/Voting for Am., Inc. v. Long*,
    275 F.R.D. 473 (E.D. Va. 2011)........................................................................... 19

*Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*,
    131 F.4th 205, 214 (4th Cir. 2025) ...................................................................... 23

*U.S. Home Corp. v. Settlers Crossing, LLC*,
    2015 WL 3973071 (D. Md. June 29, 2015)...................................................... 1, 5, 6

*U.S. v. South Carolina*,
    720 F.3d 518 (4th Cir. 2013) ......................................................................... 16, 17

*United States v. Nosal*,
    676 F.3d 854 (9th Cir. 2012) ............................................................................. 6, 11

*Van Buren v. United States*,
    593 U.S. 374 (2021).............................................................................. 6, 7, 10, 12

**Statutes**

18 U.S.C. § 1030(a)(5)(C) ................................................................................ 5, 12, 14

18 U.S.C. § 1030(e)(8)............................................................................................. 13

**Other Authorities**

85 Fed. Reg. 25642 ................................................................................................. 21

**INTRODUCTION**

The Court should stay the preliminary injunction that it entered against Vyne pending appeal because Vyne's appeal will "raise serious and difficult questions of law," even where the Court believes its decision was correct. *U.S. Home Corp. v. Settlers Crossing, LLC*, 2015 WL 3973071, at *6 (D. Md. June 29, 2015).[1]  Vyne requests only a limited stay pending appeal, which it will expedite if the Fourth Circuit allows.  And because the injunction would unsettle a state of affairs that has existed for many years, a stay is necessary to ensure that Vyne is able to obtain meaningful appellate review of the injunction—as is its right—so that, if Vyne prevails, the parties can be restored to the current status quo.

The Court based its injunction against Vyne on holding that Vyne likely "accessed" a "protected computer"—to wit, HSOne's cloud-based servers.  Doc. 189 at 78 ("Op.").  The Court held that (1) Vyne sold software  ("Vyne Trellis") to third-party dental practices, (2) when practices used Vyne Trellis locally, certain Vyne Trellis functions read and wrote data on Dentrix software stored on practices' computers, (3) HSOne has servers that communicate unrelated data with Dentrix software on dental practices' computers, to provide updates and receive telemetry data, and (4) Vyne's software "accessed" HSOne's computers because its software "connect[ed] and integrate[d] with the Dentrix databases installed on the computers of . . . customers and those local installations synchronized with HSOne's cloud infrastructure." *Id.* at 78–79.  That, held the Court, was a federal crime.

The Court's holding raises a host of serious and difficult questions for appeal warranting a stay. *First*, no court has ever endorsed the Court's interpretation of the Computer Fraud and Abuse Act, according to which Vyne Trellis accessed HSOne's computers because HSOne has software

---

[1] Alterations are adopted, quotations omitted, emphases added, and citations cleaned up.

1

that syncs data to and from the third parties' computers on which Vyne Trellis operates. Under this theory, accessing a database stored locally on a computer could become unauthorized (criminal) access to the servers of any other company that chooses to sync data to or from that computer via the cloud—like deleting a photo from an iPhone that is then deleted from Apple's iCloud servers. *Second*, the ruling that Vyne "accessed" a protected computer when dentists are the only *persons* who actually use the software and access data, or that selling software is tantamount to accessing a computer, cannot be reconciled with the CFAA. *Third*, even assuming Vyne accessed HSOne's cloud servers, that access caused no cognizable "damage," and there is a legal disconnect between the damage the Court identified and the protected computers that the Court found were accessed. *Fourth*, the injunction is a mandatory injunction requiring a heightened standard that was not met. *Finally*, the Court erred as a matter of law in issuing a preliminary injunction before setting the bond requirement.

A recent Ninth Circuit decision interpreting the CFAA highlights the need for a stay. *Amazon.com Servs., LLC v. Perplexity AI, Inc.*, 2026 WL 2237587 (9th Cir. Aug. 4, 2026). The court there emphatically rejected the proposition that a company "accesses" a protected computer under the CFAA by selling software, based on a third party's use of its product—even where the company intends the product to access a protected computer. In *Perplexity*, Amazon argued that defendant Perplexity had created a web browser AI tool (the "Assistant") that improperly accessed Amazon servers. *Id.* at *2, *4. The Assistant—which "run[s] locally on a user's machine"—interacted with Amazon's website by accessing the Amazon "user's password-protected account" without Amazon's authorization, and was designed so that certain information it obtained was "transmitted to Perplexity's servers." *Id.* Staying and later overturning a preliminary injunction, the Ninth Circuit held just days ago that, even though Perplexity "may communicate instructions

2

to the Assistant," Perplexity did not itself "access" Amazon's servers, because "[i]t is the user who 'accesses' Amazon's computers, with the help of the Assistant."  *Id.* at *6; *see also id.* at *5 ("Perplexity itself does not directly communicate with Amazon's servers.").

Much the same is true here, and indeed the connection between Vyne (the company) and HSOne's servers is even more attenuated than in *Perplexity*.  The AI bots in *Perplexity* were being controlled by Perplexity to obtain password-protected data stored on Amazon's servers.  Here, as the Court explained, dental practices install Vyne Trellis locally on their computers, and use Vyne Trellis themselves to access data stored on those same computers.  The fact that HSOne separately has software stored on HSOne servers that interacts with software on dental practices' computers (e.g., to provide regular updates) does not mean that Vyne Trellis is accessing HSOne's servers, or indeed that Vyne the company (rather than users) is accessing any computer at all.  The Fourth Circuit is unlikely to create a circuit split and disagree with *Perplexity*, but at a minimum the Ninth Circuit's opinion shows that Vyne's appeal raises substantial questions, warranting a stay.

An example illustrates the breadth of this Court's interpretation of the CFAA.  Many millions of computers in the United States, including those of undersigned counsel, use Microsoft OneDrive, which "[k]eep[s] your files, photos, and videos automatically backed up and available on all your devices" by saving them to cloud servers owned and operated by Microsoft.[2]  If another program—say, Adobe Acrobat—saves a file to the desktop on a computer running OneDrive, by default that file is automatically picked up and saved to Microsoft's servers.  Under the Court's interpretation of the CFAA, Microsoft now has the right to inform Adobe that Acrobat can never be used to save, edit, or delete any file on the desktop of a computer running OneDrive—anywhere

---

[2] Microsoft, "Microsoft OneDrive" (last accessed August 10, 2026), *available at* https://www.microsoft.com/en-us/microsoft-365/onedrive/online-cloud-storage.

in the country—because it will be picked up *by Microsoft* and saved to (or deleted from) its cloud servers. After that warning, if any person in the country saves a PDF from Adobe Acrobat onto her desktop and the file gets backed up by OneDrive to Microsoft's servers, then *Adobe—not even the user of the computer*—has illegally accessed Microsoft's servers, and committed the predicate act for *a federal felony crime*. HSOne has cited no authority that justifies this interpretation. There is none.

The equities also strongly support a limited stay pending an expedited appeal. The injunction requires Vyne to stop selling a core offering that it has sold for years. If the Fourth Circuit reverses this Court's injunction without a stay having been entered, there will be no way to return to the status quo ante, and Vyne will have suffered substantial and irreparable losses to its customer base and goodwill during the appeal. Conversely, a stay will maintain the status quo that has existed for over five years (Vyne Trellis having patient-engagement or ledger write-back services); a status quo that has not resulted in any "major data security breach." Op. 85.

Separately, Vyne respectfully requests that the Court clarify as soon as is practicable whether its Order applies to any potential implementation by Vyne of Robotic Process Automation within Vyne Trellis.

**ARGUMENT**

Courts weigh four factors in evaluating whether to grant a stay pending appeal: (1) "whether the stay applicant has made a strong showing that he is likely to succeed on the merits;" (2) "whether the applicant will be irreparably injured absent a stay;" (3) "whether issuance of the stay will substantially injure the other parties interested in the proceeding;" and (4) "where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009).

Although "[a] party seeking a stay pending appeal must make a 'strong showing' of likely success on the merits," this "standard does not require the trial court to change its mind or conclude

4

that its determination on the merits was erroneous." *U.S. Home*, 2015 WL 3973071, at *6. Instead, the appeal need only "raise serious and difficult questions of law." *Id.*; *see also Par Pharms., Inc. v. TWI Pharms., Inc.*, 2014 WL 3956024, at *2 (D. Md. Aug. 12, 2014) ("To succeed, [movant] thus does not need to demonstrate that it will certainly win on appeal or that there is a mathematical probability of success. At minimum, it must demonstrate a substantial case.").

## I.     There Are Substantial Questions On HSOne's Likelihood of Success.

### A.     The Court's interpretation of the CFAA raises serious and difficult questions.

HSOne's witnesses conceded that Vyne Trellis writes data to (and obtains data from) Dentrix databases stored *locally* on dental practices' computers—not on HSOne servers. HSOne's CISO agreed that "[t]he version of Dentrix that's at issue in this litigation stores patient data on a local computer of the dentist." McDaniel 614:18–20; *accord* Youssef 520:12–521:1; Op. 81 (finding Vyne Trellis "write[s] back to the Dentrix database stored on customers' local installations").[3] HSOne obviously does not own or control the practices' computers. McDaniel 614:21–615:25.

Recognizing this, the likely CFAA violation underlying the Court's preliminary injunction relates to an entirely different set of computers—HSOne's "cloud-based software system used to communicate and sync with its customers' local installations of Dentrix." Op. 77. So the Court's injunction rests on the conclusion that "Vyne accessed the Dentrix cloud system controlled by HSOne 'without authorization,'" *id.* at 78 (quoting 18 U.S.C. § 1030(a)(5)(C)), and the holding that this "access to the Dentrix cloud system 'caused damage and loss'" within the meaning of the CFAA, *id.* at 82 (quoting 18 U.S.C. § 1030(a)(5)(C)).

---

[3] Citations to witness names refer to the relevant passages of the transcripts of the February hearing, Dkts. 132–37.

On appeal, Vyne will argue that the Court's finding of likely liability rests on at least three independent errors of law: *First*, that accessing a database stored locally on a computer can become unauthorized (criminal) access to the servers of any other company that chooses to sync data to or from that database via the cloud. *Second*, that a software publisher commits unauthorized (criminal) access to a computer when its customers use the software it sells. *Third*, that damage caused to a database stored locally on a computer equates to damage caused by access to separate cloud servers solely because those cloud servers communicate with the same local computer.

A stay is warranted here because the preliminary injunction rests on a novel interpretation of the CFAA that the Ninth Circuit rejected and will—at minimum—"raise serious and difficult questions of law" on appeal here. *U.S. Home*, 2015 WL 3973071, at *6.

### i. Access to Dentrix is not access to HSOne's servers.

One serious issue on appeal will be whether a person "accesses" a "protected computer" under the CFAA by accessing a separate computer database on the ground that the local computer syncs with a protected computer. Vyne will argue it does not.

Section 1030(a)(5)(C) criminalizes "intentionally access[ing] a protected computer without authorization, and as a result of such conduct, caus[ing] damage and loss." As the Supreme Court has explained, "access" means "the act of *entering a computer 'system itself'* or a particular 'part of a computer system.'" *Van Buren v. United States*, 593 U.S. 374, 388 & n.6 (2021) (emphasis added); *United States v. Nosal*, 676 F.3d 854, 858 (9th Cir. 2012) (statute prevents "intentionally trespassing into someone else's computer files" (quoting S. Rep. No. 99–432, at 9 (1986))).

This Court found "a clear likelihood that Vyne accessed the Dentrix cloud system controlled by HSOne 'without authorization," in likely violation of 18 U.S.C. § 1030(a)(5)(C). Op. 78. HSOne's CFAA theory, which the Court endorsed, is that the "Dentrix cloud system controlled by HSOne is not a computer that Vyne had any permission to access," and that "Vyne

6

accessed that protected computer when it caused its software to connect and integrate with the Dentrix databases installed on the computers of the parties' shared customers and those local installations synchronized with HSOne's cloud infrastructure." Op. 78–79. No evidence showed, and the Court did not find, that Vyne Trellis ever directly accessed HSOne's cloud servers.[4] Rather, the preliminary injunction premises the "access" necessary for a CFAA claim on Vyne Trellis's access to customers' local Dentrix programs, which then "synced" with HSOne servers.[5]

The application of the CFAA to such conduct is novel, greatly expands potential criminal liability, and respectfully is erroneous. To counsel's knowledge, no court has ever endorsed the theory that a software developer commits a federal crime by selling software if (1) customers use it to modify data on other software stored on those customers' computers and (2) a competing software developer then uploads that data to its own servers. Instead, courts have rejected similar attenuated chains. *E.g.*, *Perplexity*, 2026 WL 2237587, at *5–6 (explaining Perplexity does not "'access' Amazon's computers" via tool it provides to third-party users); *see also Meta Platforms, Inc. v. Brand Total Ltd.*, 605 F. Supp. 3d 1218, 1260–61 (N.D. Cal. 2022) (no access from defendant "accessing and processing the data that Meta has sent to the individual users" because it was "not proactively 'accessing' or 'communicating with' Meta's servers," and observing that the plaintiff found "no case extending the CFAA to comparable conduct"). In rejecting these novel

---

[4] HSOne's expert said the opposite: "My understanding is that the on-premise database is the one that Vyne was gaining unauthorized access to, those actually sync and write back to Dentrix's cloud database." Youssef 520:12–521:1.

[5] Vyne Trellis's actions on its customers' local computers does not constitute a violation of Section 1030(a)(5)(C) because the subsection applies only to "outside hackers" who "access a computer without any permission at all." *Van Buren*, 593 U.S. at 389–90. Vyne's customers installed Trellis intentionally and gave it license to access their computers. Op. 79 (acknowledging "Vyne's authorization from its customers to access the Dentrix database stored on the customer's computers").

7

"access" theories, courts have also emphasized the "rule of lenity." *See id.* at 1261; *see also Perplexity*, 2026 WL 2237587, at *6 (discussing how "rule of lenity" supports decision).

The Ninth Circuit's decision in *Perplexity*—published shortly after this Court's injunction—confirms the point. As noted above, Perplexity offers a web browser which uses an AI "Assistant" to navigate Amazon.com on behalf of its customers. *Perplexity*, 2026 WL 2237587, at *2–3. The browser "operates like Google Chrome, running locally on a user's machine." *Id.* When Perplexity's customers "direct the Assistant to locate an item on Amazon.com, the Assistant takes screenshots of the browser view, sends those screenshots from the user's computer to Perplexity's servers, and receives instructions from Perplexity's servers on how to navigate Amazon.com." *Id.* at *2. Doing so involves "access[ing] with the Amazon user's permission but without authorization by Amazon, the user's password-protected account, thereby obtaining information as to the user's private Amazon account information." *Id.* at *4. Amazon sought an injunction against Perplexity because Perplexity was bypassing a mechanism Amazon was using to try to block its customers from working with Perplexity: "a 'user-agent string'" that "would allow Amazon to block the Assistant's access to the Amazon store." *Id.* at *2. The district court entered a preliminary injunction against Perplexity, holding that this conduct likely violated § 1030(a)(2)(C) of the CFAA (which, like § 1030(a)(5)(C), requires "intentionally access[ing] a computer without authorization"). Perplexity appealed, and after staying the injunction, the Ninth Circuit set that injunction aside. *Id.* at *3.

As Perplexity explained, Perplexity "never 'gained entry' to an Amazon computer because no Perplexity computer ever accessed Amazon's servers. Instead, . . . any Amazon data was first transmitted to the user's computer and then to Perplexity's servers." *Id.* at *4. The Ninth Circuit agreed, holding that Perplexity does not "'access' Amazon's computers" by "us[ing] a tool (the

8

Assistant)" on its customers' computers. *Id.* at *6. This was true even though "Perplexity may receive screenshots of the user's browser and may communicate instructions to the Assistant" on the customers' local computers, which went on to interact with Amazon's servers by using Amazon.com. *Id.* Perplexity's actions on its customers' computers "do not mean that Perplexity has 'accessed' (gained entry) to Amazon's servers." *Id.*

If there was no violation in *Perplexity*, despite Perplexity's direct interaction with AI bots it created to obtain information stored *only* on Amazon servers, then surely there is no violation here, where Vyne Trellis is reading and writing data that is all stored locally on dental practices' computers. Indeed, in explaining how Dentrix local programs and the HSOne cloud servers interact during the March hearing, HSOne's counsel was unequivocal that there is *zero* patient data on the cloud and that *HSOne* initiates the exchange of data between local Dentrix programs and the HSOne cloud: "*we're* pulling up telemetry data, *we're* pulling up logs and *we're* sending down updates, *we're* sending down new versions." Tr. of Mar. 18 Mot. Hearing, Dkt. 163, at 79:16–21; *see also id.* 79:6–10 ("[T]he servers that HSOne operates in its Cloud environment [] talk to the Dentrix database and application, send it updates, right, on the dentist's site or bring back telemetry or other data from it."). There was no confusion on this fact. *E.g.*, Op. 80 (HSOne "transmit[s] and synchronize[s] data between Dentrix databases stored on customers' computers and databases stored in HSOne's cloud system.").

Thus, under this Court's approach, a software developer is guilty of unauthorized access under the CFAA when its customers modify data on their own computers using the developer's software program, if another software developer chooses to upload that data from a local computer to its own servers. *See* Op. 79 (basing CFAA access on "local installations synchroniz[ing] with HSOne's cloud infrastructure"), 82 ("Vyne has inserted and altered data in its customers' Dentrix

9

database installations and was then synchronized and stored in the Dentrix cloud system—a protected computer controlled by HSOne that HSOne did not authorize Vyne to access.").

The implications of this rule are profound: Millions of computers run software programs that, like HSOne's, (1) check with the company's servers to download updates, or (2) upload information from the local system to the cloud, including Microsoft's ubiquitous OneDrive function, or a desktop version of an online file storage system like Google Drive. According to the Court's interpretation of the CFAA, editing without authorization any file that is later picked up by one of these programs and sent to the publisher's cloud servers could be a felony, because it would constitute unlawful "access" to that publisher's servers. This is not the sort of "access" that the CFAA proscribes under penalty of criminal prosecution. *Van Buren*, 593 U.S. at 388, 393 (rejecting CFAA interpretation that "would attach criminal penalties to a breathtaking amount of commonplace computer activity"); *accord Perplexity*, 2026 WL 2237587, at *6.

### ii.   HSOne's customers access Dentrix; Vyne does not.

*Perplexity* highlights another legal flaw in the Court's injunction that Vyne will press on appeal: even if one assumes that accessing Dentrix is equivalent to accessing HSOne's servers (due to synchronization between the local software and the cloud-based system), Vyne would not be "accessing" a protected computer anyway, because it is the *dentists*, not Vyne, that use Vyne Trellis. *Perplexity* explains that "the CFAA contemplates access by a *person*," and that a software program "is a tool, not a person for statutory purposes." 2026 WL 2237587, at *5–6 (emphasis added). Thus, only the *user* of a software program, and not its publisher, can access a protected computer by using that software program. *Id.* ("It is the user who 'accesses' Amazon's computers, with the help of the Assistant to carry out specific acts on Amazon.com.").

*Perplexity*'s holding flowed from the plain meaning of the term "access" under the CFAA, as interpreted in *Van Buren*, but the Ninth Circuit's "conclusion [wa]s further reinforced by the

10

rule of lenity," because "imposing liability" on Perplexity "would require a novel interpretation far afield from the statute's purpose 'to prevent intentional intrusion onto someone else's computer—specifically, computer hacking.'" *Id.* (quoting *hiQ Labs v. LinkedIn Corp.*, 31 F.4th 1180, 1196 (9th Cir. 2022)). The Court observed that "Amazon's approach, if accepted, could expose users themselves to criminal liability (under a conspiracy or aiding-and-abetting theory) for facilitating Perplexity's purported unauthorized access to Amazon's servers." *Id.* ("We are conscious of precedent cautioning against 'transforming whole categories of otherwise innocuous behavior into federal crimes simply because a computer is involved' or 'criminalizing a broad range of day-to-day activity.'" (quoting *Nosal*, 676 F.3d at 860, 862)).

The Ninth Circuit's ruling and reasoning fully apply here and foreclose CFAA liability. Again, Perplexity's bot "r[an] locally on a user's machine" and interacted with the user's local web browser; in turn, "only the browser communicate[d] with the [Amazon] website's server." *Id.* at *2, *5. Vyne indeed has far less control than Perplexity does over its bots. HSOne agreed that, "any reference to Vyne's unauthorized access refers to Vyne's programs—e.g., Vyne Dental Plugin and VyneSync." Dkt. 166 at 6 n.4. Vyne the company develops, markets, and licenses software to dentists. Dentists install the software on their machines, and in the case of dentists that use database-writeback functionality, they are the ones who elect to use software that allows them to have Vyne Trellis (the software) write data to databases stored on their machines (even if those communicate with HSOne servers). Roberts 185:21–186:25. Once Vyne Trellis is installed, dentists are the ones to use it to interface with their Dentrix databases and perform functions like sending appointment reminders to patients. Clip 649:16–18, 650:23–651:7; Nix 277:15–278:7. Section 1030(a)(5)(C) does not impose criminal liability on software designers and publishers who enable computer owners to access information sitting on their own computer, even if the

11

information sits in a database created by a rival and even if the rival decides to create synchronization tools.

Indeed, the disconnect appears on the face of the order, which despite finding unlawful access by Vyne to HSOne computers, does not order Vyne to cease accessing any computer at all (much less HSOne's cloud servers). Instead, it requires Vyne to "not market, sell, or distribute software capable of write access to Dentrix databases stored or hosted on any dental practice's computers." Order ¶ 8(a). But the CFAA does not bar marketing, selling, or distributing software that allows others to access software, or provide a civil cause of action for competitors to sue on such a theory. And there is simply no way to interpret the term "access" to encompass the sale of software. Again, "'access' references the act of entering a computer system itself." *See Van Buren*, 593 U.S. at 388. If distributing software were enough, Perplexity would have been liable, and its users would have been criminals. *Perplexity*, 2026 WL 2237587, at *6. They weren't, and the Fourth Circuit is unlikely to disagree.

Vyne's sale of software to a third party so that it can use this software to interoperate with HSOne's software is not Vyne "hacking" into HSOne's protected computer. *hiQ*, 31 F.4th at 1196.

### iii. There is no connection between the "access" and the "damage" here.

An injunction premised on "access" to HSOne's cloud infrastructure is not likely to survive on appeal for the additional reason that the CFAA requires the identification of "damage and loss" that is "a result of" the unlawful access. 18 U.S.C. § 1030(a)(5)(C). As several courts have held, this statutory text requires a causal connection between HSOne's asserted "damage" and the unlawful access. *GSP Fin. Servs., LLC v. Harrison*, 2021 WL 288172, at *5 (D. Md. Jan. 28, 2021) (plaintiff must show that statutory damages and loss "were caused by the CFAA violation"); *ExactLogix, Inc. v. JobProgress, LLC*, 508 F. Supp. 3d 254, 268 (N.D. Ill. 2020) ("The purported loss must have a reasonable causal connection to the CFAA violation."); *LivePerson, Inc. v. 24/7*

12

*Customer, Inc.*, 83 F. Supp. 3d 501, 514 (S.D.N.Y. 2015) ("Both loss and damage must relate to *the victim's* computer systems."); *Civic Ctr. Motors, Ltd. v. Mason St. Imp. Cars, Ltd.*, 387 F. Supp. 2d 378, 381 (S.D.N.Y. 2005) ("[L]osses under the CFAA are compensable only when they result from damage to, or the inoperability of, *the accessed* computer system."). And "damage" here means "impairment to the integrity or availability of data, a program, a system, or information[.]" 18 U.S.C. § 1030(e)(8).

The Court's ruling makes a finding of damage as defined in the statute, but (1) none of it relates to "data, a program, a system, or information" that was on the protected computers supposedly being accessed here (i.e., HSOne's servers) and (2) none of the damage was "caused" by the supposed "access" to HSOne's servers. Said differently, the damage (and loss) would be precisely the same if there were no data exchange at all between HSOne's servers and dental practices' computers, because the purported damage occurred on dental practices' computers. *See, e.g.*, Op. 82 (holding Vyne likely "impaired the integrity and availability of data stored *in the Dentrix system*," rather than on HSOne's servers).

Thus, the Court based its finding of damage (and loss) on local harms to dental practices computers:

- "Vyne's practice of writing back to the ledger in *the Dentrix database* out of sequence and without coordination with HSOne created race conditions and errors in balances recorded in the ledger and undermined the ledger's integrity from an accounting perspective." Op. 82.

- Vyne's "access enabled through VyneSync allowed Vyne to 'overwrite' certain data in *the Dentrix database*, including by inserting the string of numerals '911911911' into certain fields, which caused some of HSOne's customers' QuickBill accounts to stop 'working.'" Op. 83.

- "Vyne's writing back to *the Dentrix database* without coordination with HSOne also disrupted referential integrity within the database," and "caused database performance issues." Op. 83.

13

None of those findings qualifies as damage "as a result of" the asserted CFAA violation, because none relates to accessing HSOne cloud servers. Each one relates to "the Dentrix database," Op. 82–84, and it was uncontested that HSOne's cloud servers do not have copies of the Dentrix database: HSOne's counsel said clearly to the Court at the March hearing that "our Cloud doesn't have, like, a copy of every Dentrix database and all the patient records. It is – those stay on prem." Mar. 18 Mot. Hearing 79:16–19. HSOne's CISO said the same thing (McDaniel 614:14–20):

> Q. You testified just a few moments ago about the difference between Cloud-hosted and on-premises solutions? Do you remember that?
> A. Yes.
> Q. The version of Dentrix that's at issue in this litigation stores patient data on a local computer of the dentist, right?
> A: That is correct.

So, any harms related to corruption in the database, performance issues, or security vulnerabilities created by local database access—even accepting them as true—cannot be damage that HSOne suffered "as a result" of Vyne's asserted "access without authorization"—the latter of which, as the Court found, was limited to the cloud servers. 18 U.S.C. § 1030(a)(5)(C).

Illustrating the disconnect between purported access to HSOne's cloud servers and the claimed damage, HSOne's initial preliminary injunction motion asserted the same § 1030(a)(5)(C) claim and the same damages on which the Court premised its injunction without ever mentioning its cloud servers. *See* Dkt. 46-1 at 15 ("Vyne accesses HSOne's software on protected computers at HSOne's customers' premises without authorization."). Only after Vyne pointed out in opposition that these computers could not form the basis of a CFAA claim did HSOne add the assertion that "part of the Dentrix software system includes a cloud infrastructure component on HSOne-hosted servers"—and even then, HSOne said only that this cloud infrastructure "sends and receives data *to the customers' installation*." Dkt. 62 at 4 (maintaining argument that Vyne has "violate[d] the CFAA" by "hack[ing]" "HSOne's Dentrix software [] in customer environments").

14

Similarly, the Court cited a "letter dated August 26, 2025," as providing notice to "Vyne that its access to the Dentrix system is not authorized and violates the CFAA," Op. 79, but that letter was also premised on "cyberattacks against Henry Schein One's *software*" on customer computers, and never mentioned access to HSOne's servers, Dkt. 6-2 at 87–89. In other words, take away Vyne's supposed access to the cloud servers, and the rest of HSOne's story stays the same—making clear that access to those servers is not even the but-for cause of any of the database integrity issues HSOne has alleged.

Finally, although the Court found that Vyne Trellis likely "interfered with HSOne's ability to disseminate upgrades to Dentrix software through its cloud infrastructure," Op. 83, this "damage" also only occurred on dentists' computers, and was caused only by Vyne Trellis's access to those computers, not by any supposed access to the cloud servers. Among the record excerpts the Court cited, *see* Op. 83, only two have any relation to cloud servers: Rencher stated that "grabbing the database connection and holding onto it . . . also impacts our ability to install new versions and upgrade Dentrix." Rencher 559:3–5. And Weatherly said that Vyne "caused our upgrades to stumble and break because they're holding our database open." Weatherly 358:2–4. These statements both refer to Vyne Trellis keeping open a connection *to the local Dentrix database*, and neither even refers to (much less proves) any conduct by Vyne that somehow accessed HSOne's cloud.

Because none of the statutory damages HSOne has attempted to substantiate relate to access of HSOne computers by Vyne Trellis, HSOne cannot justify an injunction under the CFAA.[6]

---

[6] The same is true with respect to the Court's analysis of irreparable harm, which was premised on damage to local computers. Op. 85–86. "The purpose of interim equitable relief is

**B.    The injunction is deficient as a matter of law because it was not necessary to permit ultimate judgment on the merits.**

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held," "preserv[ing] the court's ability to render a meaningful judgment on the merits." *U.S. v. South Carolina*, 720 F.3d 518, 524 (4th Cir. 2013). Moreover, "a *mandatory preliminary injunction* must be *necessary* both to protect against irreparable harm in a deteriorating circumstance created by the defendant and to preserve the court's ability to enter ultimate relief on the merits of the same kind." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 526 (2003), *abrogated on other grounds by eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006).

The injunction order does the opposite—it upends the status quo that has existed for at least five years, upon which Vyne's full-suite RCM business and dentists across the country depend. The injunction is therefore heavily disfavored, not only because it would "alter, rather than preserve, the status quo," *2311 Racing LLC v. NASCAR*, 139 F.4th 404, 408 (4th Cir. 2025), but because it is also the final relief that HSOne seeks in this case—ultimately, to prohibit Vyne's access to any patient data stored in Dentrix.

The injunction mandates that Vyne cease "market[ing], sell[ing], or distribut[ing] software" that uses its decryption algorithm. Order ¶ 8(a). It was undisputed that Vyne has used a decryption algorithm since 2021, Nix 310:16–25, and that HSOne did not raise any objection to Vyne's use of that algorithm until Spring 2025, *see* Op. 90—the same time that it initiated a

---

to protect the movant, during the pendency of the action, from being harmed or further harmed . . . *through the illegality alleged*." *Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14, 16 (4th Cir. 1997). Any harm caused by interaction with local databases cannot support the injunction, because the Court did not find that accessing those databases violated the CFAA.

campaign of misrepresentations and software-blocking against Vyne which the Court has found was likely unlawful.[7]    The period of the "last uncontested status between the parties . . . preced[ing] the controversy," *Aggarao v. MOL Ship Mgmt. Co., Ltd.*, 675 F.3d 355, 378 (4th Cir. 2012), was therefore the several years of uncontested access.

Moreover, by requiring Vyne to stop selling software with certain functions, the order will require Vyne to take affirmative steps to remove a core function of its software prospectively, and so the injunction unquestionably upsets the status quo. *See* Op. 90 (referring to "[r]equiring Vyne to reverse the misconduct that HSOne discovered" in Spring 2025). It was undisputed that, once Vyne stops selling software with these software functions, roughly 20% of the Vyne customers that use Dentrix to house their EHI will be forced to find alternate solutions for critical workflows, with the only competing product licensed by HSOne/Dentrix itself, because the injunction appears to order Vyne to take affirmative steps disabling their ability to write EHI to local databases containing their own data. *See* Op. 91. Many if not most of these customers are likely to contract with Dentrix instead of Vyne, and once they do so—should Vyne later prevail on the merits— those customers cannot be compelled to return to Vyne. The injunction here will thus plainly alter the status quo, and will not "merely . . . preserve the relative positions of the parties until a trial on the merits can be held," "preserv[ing] the court's ability to render a meaningful judgment on the merits." *South Carolina*, 720 F.3d at 524.

---

[7] If HSOne "did not discover the damage caused" by Vyne's decryption algorithm "until around March and April 2025," Op. 90, that only illustrates that there was no discernible harm caused to HSOne by Vyne's decryption algorithm until the QuickBill issue arose in early 2025. Rencher 542:24–543:13 (describing "a huge influx of calls" from customers "*starting* in the spring of 2025"). QuickBill-related issues were the only harm that HSOne provided any documentary evidence to support, and Vyne deprecated the related functionality. Dkt. 164 at 4–5.

The preliminary injunction in no way protects this Court's ability to grant that very same relief or other relief after merits proceedings. Without the preliminary injunction, the parties would be in the exact same position they are in today and have been in for at least five years after merits proceedings. Thus, the preliminary injunction is unwarranted and reversible. *See, e.g., In re Microsoft*, 333 F.3d at 531–36 (vacating preliminary injunction that did not preserve court's ability to render final judgment on antitrust and copyright claims).

## II.    Absent a Stay, Vyne Will Suffer Substantial Harm to Its Business, Customers, Reputation, and Goodwill that Cannot Be Undone

Absent a stay, it will be impossible to return Vyne to the pre-injunction status quo if Vyne prevails on appeal, as its customer base and reputation will have greatly suffered—irreparably so.

The Court acknowledged that the injunction "will restrict the manner in which Vyne provides certain patient engagement services to its customers and prevent it from providing these services." Op. 91. Today, approximately 1,400 dental practices use Vyne Trellis services requiring read and write interoperability with Dentrix. Roberts 186:16-25. Trellis uses write-back to support two optional packages: (1) a payment package that allows dentists to automatically record the receipt of payments on dentists' financial ledger on their computers, and (2) a patient-engagement package, which automates schedules, appointment reminders, payment reminders, and patient intake forms. *Id.* 82:17-85:13, 174:14-175:9.

Consider first the harm to dentists from discontinuing these services. For years, dentists *chose* to use Trellis to perform payment and patient functions, building key workflows around them. *Id.* 86:24–91:6. The injunction would cause substantial harm to customers, including:

- **Missed appointments:** Automated appointment reminders to patients would cease.

- **Scheduling errors:** Dental practices will no longer have automated updates to their schedules, increasing the frequency of double booking, missed cancellations, missed appointments, and other booking errors.

18

- **Missed payments:** Automated patient text alerts and email payment requests would cease, reducing practices' collection rates.

- **Inaccurate financial records of payments:** In payment workflows, transactions would continue to be accepted but would no longer be written to dental practice's financial ledgers using Trellis's automation and its own auditing functions, requiring manual reconciliation. This would lead to inaccuracies.

- **Rejected insurance claims:** Automated patient intake forms, real-time eligibility verification, and patient engagement such as requests for missing information would cease and become manual, increasing claims rejections.

- **Harm to reputation:** An injunction against Vyne's services, after HSOne's year-long campaign misinforming customers that Vyne had a security breach and violated HIPAA, would cause irreparable harm to Vyne's reputation and goodwill.

Turning to harm to Vyne, to comply with the injunction, Vyne would need to break 1,400 customers' software, write new code, release it, inform impacted customers that services they paid for and rely on are no longer available, and likely help many of these practices transition to a competitor. Dkt. 175-1 ¶¶ 4–6 (describing technical challenges to compliance with a restriction on selling, marketing and distributing write-capable software, including the ambiguity surrounding an injunction "against software 'capable of write access'" because "software is 'capable of performing a function even if it does not actually perform that function'"). The burden of implementing the Court's preliminary injunction alone demonstrates irreparable harm. *Project Vote/Voting for Am., Inc. v. Long*, 275 F.R.D. 473, 474–75 (E.D. Va. 2011) ("[C]onsidering the time and expense required to implement the changes necessary to comply with this court's . . . judgment, [movants] would suffer irreparable injury absent a stay.").

The main competitor likely to win Vyne's impacted customers is, unsurprisingly, HSOne. Op. 73–76 (describing HSOne's efforts to target Vyne's product "through deceptive and otherwise unfair means" while "continuing to target the same customers with promotion of HSOne's competing product"). HSOne will have gotten *exactly* what its unfair-competition campaign is

19

after—dislodging a competitor by leveraging its control over dentists' access to their own electronic health information—and, for Vyne, it will be *impossible* to return to the status quo. *See Di Biase v. SPX Corp.*, 872 F.3d 224, 235–36 (4th Cir. 2017) (affirming denial of preliminary injunction that would cause retirees to change healthcare plans before merits decision); Op. 75–76 (recognizing irreparable harm to Vyne from loss of its customers caused by HSOne's efforts to block its product).

### III.   A Limited Stay Pending Appeal Will Cause No Substantial Harm to HSOne

While an injunction will inflict significant harm on Vyne and hundreds of dental practices, a limited stay pending appeal—which Vyne is prepared to expedite—will not cause HSOne any undue or substantial harm.  "[W]hether issuance of the stay will substantially injure the other parties interested in the proceeding" is one of the factors courts consider in assessing whether to grant a stay. *Nken v. Holder*, 556 U.S. at 434.  This overlaps with the factors governing preliminary injunctions, *id.*, because a purpose "of a preliminary injunction is to protect the plaintiff from suffering new or additional irreparable harm between the time the preliminary injunction is entered and the case's final resolution," *AFSCME v. Soc. Sec. Admin.*, 172 F.4th 361, 372 (4th Cir. 2026) (en banc).

Here, no evidence suggests HSOne will suffer substantial harm in the time it takes to resolve an expedited appeal, when the stay will merely keep in place a status quo that has existed for more than five years. The only concrete "harm" evidence HSOne presented here consists of a log of about 1,000 customer calls tracking "Vyne['s] impact." Dkt. 164 at 4–5.  But those calls reflect just one issue: some customers elected to switch billing-statement services from Dentrix's QuickBill to Trellis, and later wanted to switch back, so they had to call HSOne to revert. *Id.*  This hardly shows substantial or irreparable harm to HSOne, especially because Vyne has deprecated that function, Nix 281:9–295:17, and will not reinstate it.  It therefore cannot support denying

20

Vyne's stay motion, especially where (as the Court found) "through VyneSync, Vyne leveraged a module in Dentrix called 'QuickBill' to . . . send patient billing statements to Vyne" only "*[u]ntil December 2, 2025*," *i.e.*, eight months from the date of the injunction—with zero evidence of any recurrence in customer complaints since then.  Op. 81; *cf. Eden, LLC v. Justice*, 36 F.4th 166, 170 (4th Cir. 2022) (injunction mooted by voluntary cessation).  And as explained above, the remaining "software functions that access the Dentrix system with the capability of writing back to the database" about which the Court expressed concern, Op. 86, take place on dental practices' local computers—and have no connection to the CFAA violation the court has found.

## IV.    The Public Interest Favors a Stay

A stay also supports competition and consumer choice by enabling a competitor to HSOne to continue to operate.  *See Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 827 (9th Cir. 1993) (affirming denial of injunction that would have "depriv[ed] consumers of a choice of products"); Op. 88 (recognizing "the public interest" in "curbing practices in the marketplace that give private companies unfair advantages over their competitors").  A stay also fosters continued "access, exchange, and use of electronic health information (EHI)," consistent with the purposes of the Cures Act.  85 Fed. Reg. 25642, 25651.  Requiring Vyne to eliminate its integrations with Dentrix—and thus their joint customers' access to their *own* EHI stored on Dentrix and Trellis— would cause substantial disruption to dental practices' work flows and fundamentally undermine the Cures Act's purpose.  That includes, as implementing regulations make clear, when a software publisher tries to undermine the Cures Act by imposing software restrictions alleged to "trigger liability under the Digital Millenium Copyright Act [] or other laws." *Id.* at 25813.  These concerns greatly outweigh the public interest in preventing a supposed intrusion on HSOne's cloud servers caused by HSOne's own back-end synchronization function in Dentrix.  *See* Op. 82 (finding that

21

"through the operation of VyneSync, Vyne has inserted and altered data in its customers' Dentrix database installations and was then synchronized and stored in the Dentrix cloud system").

## V.   An Injunction Cannot Be Ordered Without Adjudicating the Required Security

Finally, the injunction is defective because it will go into effect without requiring HSOne to post a bond before effectiveness.  Rule 65(c) requires security sufficient to cover "costs and damages sustained by any party who is found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).  This requirement is "mandatory and unambiguous," and "failure to require a bond upon issuing injunctive relief is reversible error." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999).

Respectfully, it was error to rule on the injunction and make it effective upon 45 days from the ruling without first ruling on the appropriate bond. *Dist. 17, United Mine Workers of Am. v. A&M Trucking, Inc.*, 991 F.2d 108, 111 (4th Cir. 1993) ("Federal Rule of Civil Procedure 65(c) requires the posting of a bond *before* the issuance of an injunction.").  Here, the Court issued the injunction, starting the clock on the parties' compliance period, but has not yet determined the appropriate bond amount.  Such a bond is essential "because the damages [recovered] for an erroneous preliminary injunction cannot exceed the amount of the bond." *Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 888 (7th Cir. 2000).

## VI.   Vyne Asks that the Court Clarify that RPA Is Excluded from the Injunction

At various times, the subject of Vyne's intention to develop a Robotic Process Automation (or RPA) functionality in Vyne Trellis was raised by the parties and witnesses.  *E.g.*, Roberts 188:21–189:7; Tr. of Apr. 14 Mot. Hearing, Dkt. 170, at 7:25–8:6.  As Vyne's witnesses and counsel explained, RPA operates through Dentrix itself, acting in the place of the Dentrix user on the same user interface, using all of Dentrix's existing rails in order to assist dental practices in managing their patients' electronic health information.  *E.g.*, Roberts 204:4–16; Apr. 14 Mot.

22

Hearing 40:14–41:2. It relies on user but not administrative credentials. Roberts 208:25–209:7. Because it is a "mechanism for interfacing with the patient record and the billing record through the user interface" on Dentrix, Roberts 207:14–19, it would not "writ[e] back to the ledger in the Dentrix database out of sequence and without coordination with HSOne," or "create[] race conditions and errors in balances recorded in the ledger." Op. 82. In fact, as HSOne's counsel put it, "Robotic Process Automation" is "the same thing that just got enjoined . . . in the *Amazon* case in ND Cal," *i.e.*, in *Perplexity*, which injunction was reversed on appeal.[8] Mar. 18 Mot. Hearing 60:4–7.

HSOne submitted a proposed order that would have prohibited Vyne's use of RPA, despite the fact that Vyne has never employed RPA to assist its customers using Dentrix, making a showing of irreparable harm or illegality impossible. Dkt. 166-1 at 8. The Court did not adopt HSOne's proposed language in the injunction order, nor did it mention RPA in its Opinion or make any findings concerning that practice. *See generally* Order. Vyne therefore does not understand the Court to have enjoined RPA or any other integration method other than the direct database integrations described in its Opinion and encompassed by the operative language of its Order. *See* Apr. 14 Mot. Hearing 33:17–19 (observing that "the ODBC access" is "what has occurred" and was "what most of the evidence had to do with"). Indeed, as the Court recognized, "Vyne remains free to seek a technological solution . . . that may allow it to continue providing patient engagement services to the parties' shared customers." Op. 91–92.

Out of an abundance of caution, and because Vyne is considering accelerating the beta testing of its RPA functionality in light of the Court's ruling on the preliminary injunction, Vyne

---

[8] RPA was also the practice at issue in *Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*, 131 F.4th 205, 214 (4th Cir. 2025), in which the Court affirmed an injunction against a healthcare-database operator that tried to block its competitor's use of RPA.

respectfully requests that the Court clarify that its injunction was not intended to, and does not, prohibit the use of RPA.

## CONCLUSION

The Court should stay its injunction pending appeal. Vyne's appeal raises substantial questions and the equities support maintaining the status quo, particularly as Vyne is prepared to proceed with its appeal expeditiously. Alternatively, if the Court denies this stay motion, it should grant an administrative stay that gives Vyne seven days to move for a stay in the Fourth Circuit, and then remains in effect until the Fourth Circuit rules on Vyne's stay motion directed to the Fourth Circuit.

DATED:    August 11, 2026

Respectfully submitted,
*/s/ Vincent Levy*
Vincent Levy (pro hac vice)
Jack L. Millman (pro hac vice)
Charlotte Baigent (pro hac vice)
Daniel Fahrenthold (pro hac vice)
HOLWELL SHUSTER & GOLDBERG LLP
425 Lexington Avenue, 14th Floor
New York, NY 10017
(646) 837-5151
vlevy@hsgllp.com

K. Nichole Nesbitt (Bar No. 26137)
Derek M. Stikeleather (Bar No. 27815)
GOODELL, DEVRIES, LEECH & DANN, LLP
One South Street, 20th Floor
Baltimore, MD 21202
(410) 783-4026
knn@gdldlaw.com
dstikeleather@gdldlaw.com

*Attorneys for Plaintiff*
*National Electronic Attachment, Inc. d/b/a Vyne Dental*

24