# EXHIBIT B

IN THE UNITED STATES COURT
FOR THE DISTRICT OF MARYLAND

National Electronic Attachment, Inc. )
d/b/a Vyne Dental, )
) Case No. 1:25-cv-03246-MJM
Plaintiff, )
) JURY TRIAL DEMANDED
v. )
)
Henry Schein One, LLC, )
)
Defendant. )

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NATIONAL ELECTRONIC ATTACHMENT, INC., D/B/A VYNE DENTAL,

*Plaintiff,*

-against-

HENRY SCHEIN ONE, LLC,

*Defendant.*

Case No. 1:25-cv-03246-MJM

JURY TRIAL DEMANDED

**SECOND AMENDED COMPLAINT**

Plaintiff National Electronic Attachment, Inc. d/b/a Vyne Dental ("Vyne") brings this action against Defendant Henry Schein One, LLC ("HS One"), and alleges as follows:

**NATURE OF THE ACTION**

1. This is a dispute between two of the leading dental software companies.

1.2. Plaintiff Vyne offers a software program known as Vyne Trellis, (sometimes referred to as simply Vyne), which provides what is referred to in the dental industry as "revenue cycle management" ("RCM") servicessoftware for dental practices. Vyne Trellis is an end-to-end RCM software that facilitates dentists' submission of dental claims to insurers for payment,

provides related clearinghouse services, and ~~enables dental practices to carry out other~~assists with patient engagement, billing, payment processing, and various electronic data exchange transactions standardized under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). In short, Vyne Trellis helps dental practices to carry out all the administrative tasks of running a dental practice.

~~2.~~3. Defendant HS One is a subsidiary of Henry Schein, Inc. ("Henry Schein"), which claims to be "the world's largest provider of health care solutions to office-based dental and medical practitioners." HS One ~~provides a dental~~ offers "practice management software ~~program~~" known as Dentrix~~.~~, which it markets as "the most widely adopted dental software in the world." Dental practices that use Dentrix store their patients' health information ~~on the platform~~as well as practice information like their financial results. HS One also enrolls Dentrix customers in its Application Programming Interface ("API") Exchange, which it describes as "the largest network of dentists and patients." HS One—by its own statements—has the largest market share for dental practice management software and controls the largest network of dentists using practice management software in the United States. It has long marketed Dentrix as giving dentists full data ownership, control, and access to their patient and practice data. Until recently, that was true.

~~3.~~4. For ~~many~~over twenty years, HS One and Vyne co-existed to help their mutual customers manage their dental practices. Thus, thousands of dental practices across the country, including in Maryland, have used both HS One's Dentrix for practice management ~~and patient data intake~~, and Vyne Trellis for ~~insurance billing and~~ RCM services such as submitting claims to insurers, sending statements to patients, reconciling ledgers, sending appointment reminders, and more. These common customers benefited from the services of both software programs.

~~4.~~5. But in 2025, a switch was flipped: HS One openly launched an aggressive campaign to throttle Vyne's business and interfere with Vyne's customer relationships. As part of that campaign, HS One has disseminated smears about Vyne Trellis, and has sought to block mutual customers from using the technology that allows them to securely transmit to Vyne Trellis the dental records they store in Dentrix—patient records that, under federal law, belong to dental practices and are controlled by their patients, *not* HS One. Indeed, HS One ~~has~~ told customers that it ~~will~~would launch its information blocking activity imminently~~. Last week~~ and did so. HS One first blocked Vyne's printer driver software functionality used to securely transmit patient electronic health information and practice information from Dentrix to Vyne Trellis. Then, in September 2025, without notice or authorization from its customers, ~~it began~~HS One surreptitiously ~~distributing~~distributed an updated version of Dentrix that—like a computer virus—~~trawls~~trawled users' computer systems searching for any Vyne ~~Trellis processes and then stops and disables those processes, thus~~security certificate and disabled that software, barring customers from using any Vyne ~~Trellis.~~software.

6. HS One's information blocking did not occur in a vacuum. Rather, it is part of HS One's coordinated effort to exert its stranglehold on read-and-write access to patient- and practice-owned data stored in its practice management software to stifle competition in the market for selling end-to-end RCM software to dental practices and in particular sophisticated, multi-office dental practices and related submarkets.

7. Although the API Exchange began as an "open network" that allowed dental offices using Dentrix to store their data and patient data to grant access to their preferred RCM software, HS One has covertly transitioned the API Exchange to a "closed network," allowing HS One to arbitrarily control which third-party software providers can access data owned by dental office

participants and their patients, and thus compete for their RCM business. In addition, HS One now publishes a list of competitors that it deems "unauthorized" to integrate and actively blocks their software, meaning HS One does not permit customers to use their own practice and patient data (other than via manual entry) with competing software.

8. By closing the API Exchange and blocking competition to service participants outside of it, HS One has effectively locked in a substantial majority of sophisticated, multi-office dental practices in the United States. Customers who had no knowledge that their choice of RCM software would be restricted when signing up for Dentrix (including Dentrix Ascend) now face extreme switching costs, data transfer restrictions, loss of control over access to their own practice and patient data, threats and aggressive marketing tactics, and HS One's improper use of its practice management software to spy on its customers and disable and block competing end-to-end RCM software such as Vyne Trellis from running on their computers.

9. Through its misconduct, HS One has unlawfully stifled competition in the market for selling end-to-end RCM software to sophisticated, multi-office practices to the detriment of dentists and their ability to provide high-quality, cost-effective healthcare to patients.

10. In addition, HS One has unlawfully tied its cloud-based Dentrix Ascend practice management software with mandatory add-on RCM software, forcing customers to purchase its RCM software over better, more cost-effective options offered by competitors like Vyne. As HS One announced in November of 2025, its mission is to be "the world's first AI-augmented practice management system, unifying tools and workflows that have traditionally existed in silos." To further its goal of replacing RCM software with its own artificial intelligence ("AI")-powered software tools integrated with Dentrix and Dentrix Ascend, HS One has engaged in anticompetitive conduct to avoid competing on the merits.

5.11. This context further shows how HS One's purported security reasons for blocking Vyne's software in 2025 were pretextual. To elaborate: Healthcare providers rely on clearinghouse and RCM services like Vyne Trellis to complete patient intake forms, schedule appointments, verify patient eligibility for benefits in a health plan, submit medical claims to insurers, transmit supporting documentation such as x-rays and intraoral images to insurers, receive electronic remittance advice from insurers, send billing statements to dental patients, update practice financial ledgers to reflect processed payments from insurers and patients, send automated appointment reminders and other patient communications, and conduct other HIPAA-standardized electronic data transactions. As a full end-to-end RCM provider, Vyne assists dental practices to handle all revenue cycle needs in one place. The use of such services is standard in the healthcare industry and simplifies the administrative burdens associated with claims managementof running a dental practice, allowing providers to focus on delivering healthcare to patients.

6.12. For approximately 23more than 20 years, Vyne has provided RCM and clearinghouse services to dental practices through its platform, which is now called Vyne Trellis. OverAs of the filing of this suit, over 8,000 dental offices across the United States, including 170 in Maryland, relyrelied on Vyne Trellis to manage their practices in conjunction with Dentrix, the dental practice management software offered by HS One. In order to use Vyne Trellis, dental offices must first transmit electronic health information to Vyne Trellis. Many dental offices store such electronic health information on third-party dental practice management systems, including Dentrix.

7.13. To facilitate the transfer of electronic health information from Dentrix to Vyne Trellis, Vyne provides its customers with a printer driver that allows dental offices to effectively "print" electronic health information from Dentrix to an electronic document that is then

transmitted to Vyne, akin to a "print to PDF" function. The printer driver allows providers to export electronic health information including patient data from Dentrix and deliver it to Vyne Trellis. The driver is a technologically simple and efficient means for dental practices to move data from one program to another. It is industry standard. Indeed, Vyne and its customers have used this process, without issue, for over 20 years. (Vyne customers have also used reading-and-writing capabilities using an Open Database Connectivity "ODBC" integration, another industry standard, for many years as well without incident or complaint from HS One.)

~~8.~~14. In 2025, HS One informed Vyne for the first time that it objected to ~~Vyne's~~Vyne Trellis's use of the printer driver functionality to assist providers in transmitting electronic health information from Dentrix to Vyne Trellis. HS One claimed that ~~Vyne's~~Vyne Trellis's use of the printer driver is "hacking" that has "caused [HS One] damages, compromises the security and integrity of [HS One's] platform, and violates laws." But none of HS One's claims are true. They are nothing more than pretext for HS One's ultimate goal—stamping out Vyne's business.

~~9.~~15. In the months leading up to this baseless accusation, HS One had launched a campaign blatantly designed to injure Vyne's reputation, disparage its services, and drive Vyne customers towards an alternative claims submission interface, which is offered in connection with Dentrix and as to which (on information and belief) Dentrix has a vested commercial interest. Among other things, HS One (i) published promotional materials containing falsehoods relating to Vyne's services, including that the use of Vyne Trellis supposedly "leads to costly mistakes, claims rejections, and payment delays"; (ii) incessantly contacted Vyne's customers to inform them that their practices will "suffer" if they continue using Vyne Trellis; (iii) shamelessly promoted its own claims submission interface through misleading comparisons with Vyne Trellis; and (iv) made false claims of supposed "security breaches" in Vyne software.

~~10.~~16. Apparently unsatisfied with the results of this smear campaign, HS One ~~has now begun to~~ directly ~~interfere~~interfered with ~~their~~its own customers' computer systems in an effort to destroy Vyne's business and bar their customers from using Vyne Trellis. As detailed below, HS One ~~has~~ pushed a series of updates to Dentrix seeking to disable the printer driver functionality for Vyne Trellis and other RCM services, blocking HS One's customers from submitting insurance claims by print capture. More recently, HS One released an update to hundreds of its customers that, like a computer virus, (i) ~~disabled~~disables Vyne Trellis's printer service, (ii) searches HS One's customers' computer systems to identify any Microsoft Windows services digitally signed by Vyne, and (iii) stops and disables these services so that they will no longer start Vyne programs even after a system reboot. The updates are an effort to completely disable Vyne Trellis on dental practices' computers, and to eliminate Vyne's ability to repair the damage through software updates.

~~11.~~17. This conduct is tortious and illegal. It harms Vyne and its customers (and indeed HS One's own customers). Vyne brings this action to put a stop to HS One's misconduct.

## PARTIES

~~12.~~18. Vyne is a Delaware corporation, with its principal place of business in Dunwoody, Georgia.

~~13.~~19. HS One, LLC is a Delaware limited liability company, with its principal place of business in American Fork, Utah. Upon information and belief, HS One is owned by HSOA, LLC, which is majority owned by Henry Schein Practice Solutions, Inc., which is in turn owned by Henry Schein, Inc., a publicly traded company.

## JURISDICTION AND VENUE

~~14.~~20. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because Counts I, II, ~~and VII~~IX–XII arise under the laws of the United States.

~~15.~~21. With respect to Vyne's claims under state law, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a), because those claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative fact under Article III of the United States Constitution.

~~16.~~22. HS One is subject to personal jurisdiction in Maryland at least because (1) Vyne's injuries arise in part out of HS One's transaction of business in the State, including offering and providing software and services to Maryland dental practices; (2) HS One's actions are causing injury to Vyne and Maryland dental practices; and (3) HS One regularly does business in Maryland, and derives substantial revenue from products and services sold within the State.

~~17.~~23. Venue is proper in the District of Maryland pursuant to 28 U.S.C. § 1391(b)(1) because HS One is an "entity with the capacity to sue and be sued in its common name under applicable law" and is therefore "deemed to reside . . . in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question." 28 U.S.C. § 1391(c)(2). HS One has waived any objection to this Court's personal jurisdiction, including by failing to raise the objection in its motion to dismiss. *See* Dkt. 42; *see also* Fed. R. Civ. P. 12(h)(1). HS One therefore resides within the District of Maryland for purposes of venue.

~~18.~~24. In addition, venue is proper in District of Maryland pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this district. Specifically, (1) both Vyne and HS One regularly conduct business in Maryland; (2) as of the lawsuit being filed, at least 164 dental practices in Maryland ~~are~~were joint customers of both Vyne and HS One; (3) on information and belief, HS One ~~has~~ deployed invasive telemetry software

on Maryland dental practices' computers to collect information concerning their use of Vyne products; (4) HS One knew of, and deliberately and tortiously interfered with, at least some Maryland dental practices' contracts with Vyne; (5) HS One has targeted Maryland dental practices with measures to impede their use of Vyne's products and with advertising and other communications intended to disparage Vyne's products; and (6) HS One has targeted at least thirteen dental practices in Maryland that are mutual customers of Vyne and HS One with a computer program that targets and wholly disables any Vyne-related Windows services on those customers' computers.

## FACTS

### ~~A. Vyne, Dentrix, and Historical Use of the Printer Driver~~

### A. HS One's Anticompetitive Conduct

#### i. *Relevant Markets*

25. There are at least three relevant interrelated markets: (1) the market for selling practice management software to sophisticated, multi-office dental practices and dental service organizations ("DSOs") that use such software to store data; (2) the market for selling end-to-end RCM software to sophisticated, multi-office dental practices and DSOs that use such software to use, access, or transmit their data stored in practice management software; and (3) the market for selling end-to-end RCM software to dental practices enrolled in the API Exchange that use such software to use, access, or transmit their data stored in Dentrix or Dentrix Ascend.

##### *a. Geographic Market*

26. The relevant geographic scope of these markets is the United States. In its Q1 2026 earnings call, Henry Schein, Inc. reported strong revenue growth in the United States from Dentrix Ascend, modest growth in the United States from Dentrix eClaims, and revenue growth

internationally from a separate practice management software called Dentally. On information and belief, the vast majority of HS One's Dentrix and Dentrix Ascend customers are dental practice locations in the United States. According to HS One's website, HS One markets its RCM software suites and add-on software to its Dentrix and Dentrix Ascend customers and enrolls those same customers in its API Exchange.

27. Dental software is sold virtually and many U.S. dental practices have multiple locations, reinforcing the nationwide scope of the market. Based on industry reports, the leading dental practice management software in the United States are Dentrix (including Dentrix Ascend), Eaglesoft, and Open Dental, all of which are headquartered in the United States and primarily serve U.S. dental practices. HS One's primary competitor for selling end-to-end RCM software is Vyne, which is headquartered in the United States and serves U.S. dental practices.

***b. Practice Management Software***

28. The market for selling practice management software to sophisticated, multi-office dental practices and DSOs that use such software to store data electronically is a separate and distinct product market. Practice management software operates as a dental practice's central database for storing patient electronic health information, financial ledgers, clinical records, and other patient- and practice-owned data electronically. As the repository of practice and patient information, practice management software is essential to a dental office's business. The data stored on practice management software is owned by the dental office, and it is physically stored electronically either on-site at the dental office's premises or via cloud storage.

29. Sophisticated, multi-office dental practices have unique needs for practice management software that meets their operational demands, stakeholder interests, training considerations, access requirements, and scale of business. Those consumers are unlike single-

employee dental practices, for example, whose data storage needs are less complex, their operations are unlikely to rapidly scale, and any software decisions, training, or transitions are managed independently without multiple stakeholders, users, and offices.

30. Increasingly, sophisticated, multi-office dental practices are managed through DSOs, which provide non-clinical business support. According to industry reporting, DSOs currently manage approximately 39% of all dental offices in the United States. That market is rapidly increasing through both roll-ups of dental offices and new clinic openings, and the DSO market size is projected to reach $302 billion by 2035. On information and belief, DSOs are increasingly transitioning to cloud-based practice management software like Dentrix Ascend to facilitate access to practice and patient data across multiple locations.

31. Practice management software serves a distinct purpose as the indispensable software that dental practices use to store data electronically, allowing them to access their patient and practice data from their computers and use it with other third-party software programs. It is not interchangeable or substitutable with paper-based storage options. On information and belief, dental practice locations that store data electronically generally do not consider paper-based storage options to be meaningful substitutes for their practice management software or shift to paper-based storage in response to small but significant and non-transitory price increases for their practice management software.

32. Nor is practice management software interchangeable or substitutable with other dental software products such as RCM software. Unlike practice management software, RCM software does not serve as a central database for all patient and practice data. Thus, a small but significant and non-transitory price increase in practice management software would not lead consumers to shift to purchasing end-to-end RCM software instead. Indeed, dental offices, dental

software providers, and the industry treat practice management software and end-to-end RCM software services as being in separate markets. There are specialized vendors that compete in each market—including Vyne, which competes in the end-to-end RCM software market and requires access to data owned by dental offices and their patients that is stored in their practice management software. Henry Schein, Inc.'s 2025 Annual Statement recognized these two markets as separate and distinct, describing its primary technology business (which competes with other practice management software providers like Eaglesoft and Open Dental) as distinct from its business in "other software end markets, including revenue cycle management, patient relationship management and patient demand generation."

### *c. Revenue Cycle Management Software*

33. The market for selling end-to-end RCM software to sophisticated, multi-office dental practices and DSOs that use such software to use, access, or transmit data stored in their practice management software is a separate and distinct product market. End-to-end RCM software assists dental practices to handle all revenue cycle needs in one place, including client intake, scheduling, insurance verification, claims submission, billing statements, and patient engagement.

34. Sophisticated, multi-office practices have unique needs for their RCM software, including centralized management of all revenue cycle needs, automated software functionalities, and efficient access to their data stored in their practice management software.

35. End-to-end RCM software is not interchangeable or substitutable with paper-based or manual revenue cycle services. Indeed, the primary benefit of RCM software is that it simplifies the administrative burdens of running a dental practice manually such as filling out forms, scanning and affixing attachments, mailing insurance claims and billing statements, calling insurers to check eligibility, calling patients for patient engagement, and other related services. On information and

belief, dental practice locations that use software to use, access, and transmit data electronically generally would not consider paper-based or manual revenue cycle options to be meaningful substitutes, or switch to paper-based or manual revenue cycle options in response to a small but significant and non-transitory price increase for their RCM software.

36. Similarly, end-to-end RCM software is not interchangeable or substitutable with software that facilitates only discrete revenue cycle tasks such as submitting claims to insurers or scheduling appointments. For sophisticated, multi-office practices, end-to-end RCM software is valuable precisely because it automates and optimizes the full revenue lifecycle from patient intake to insurance verification and claims submission, to remittance processing, patient payments, and financial ledger reconciliation, and to patient engagement and appointment scheduling. On information and belief, sophisticated dental practices that use end-to-end RCM software to use, access, and transmit data electronically generally would not consider siloed software that facilitates discrete revenue cycle tasks to be a meaningful substitute, nor would they change to a series of such software offerings in the face of a small but significant and non-transitory price increase for their end-to-end RCM software. Further, the competitors in the end-to-end RCM software market differ. As a software company, end-to-end RCM software is far more complex, expensive, time-consuming, and operationally challenging in terms of software development, regulatory governance, third-party insurer relationships, and user base requirements.

37. As detailed above, end-to-end RCM software is also not interchangeable or substitutable with practice management software. To the contrary, to be competitive, RCM software requires interoperability with third-party practice management software to enable customers to automatically use, access, or transmit their data electronically—*i.e.*, to sell their core services. For example, Vyne's RCM software (Vyne Trellis) requires access to patient x-rays

stored in HS One's practice management software (Dentrix) to simplify the attachment of those x-rays to an insurance claim and transmission to an insurer on behalf of a joint customer's patient. As DSOs increasingly transition to practice management software with cloud-based storage, RCM software providers are increasingly dependent on interoperability with cloud-based practice management software to continue to compete for the RCM business of DSOs. In other words, practice management software is both complementary to and holds critical gatekeeping ability that can determine whether a RCM software supplier will be able to serve its customers effectively. Thus, the end-to-end RCM software market is separate, distinct, and highly sensitive to the exercise of market power in the practice management software market.

***d. The API Exchange Aftermarket***

38. There is also a relevant and valid antitrust submarket for selling end-to-end RCM software to dental offices enrolled in the API Exchange that use such software to use, access, or transmit their data stored in Dentrix or Dentrix Ascend.

39. HS One enrolls Dentrix and Dentrix Ascend users in its API Exchange. On information and belief, a substantial share of all sophisticated, multi-office dental practices in the United States are enrolled in the API Exchange.

40. To provide end-to-end RCM software to Dentrix and Dentrix Ascend users, software companies like Vyne must develop tailored products that enable and optimize interoperability with that particular practice management software. Other competitors like HS One sell end-to-end RCM software that is similarly tailored and offered only within this submarket.

41. As described below, HS One has the power to control prices, restrict output, and exclude competitors from offering end-to-end RCM software to participants in the API Exchange both due to its monopoly power in the foremarket for selling practice management software and

the structural realities of the market. In particular, when signing up for Dentrix, dental practices were not aware that HS One would impose aftermarket restrictions on the end-to-end RCM software that they would be able to use and faced significant information costs that prevented accurate lifecycle pricing. By closing the API Exchange without the knowledge or consent of dental practice participants, HS One has locked them in with significant monetary and non-monetary switching costs, data transfer restrictions, and other structural barriers to exiting the API Exchange. Dental practices cannot readily switch from Dentrix to another practice management software in the face of supracompetitive pricing, restrictions on consumer choice, and other anticompetitive effects in the aftermarket. As a result, a hypothetical monopolist of API Exchange services will not experience sufficient switching subsequent to a small but significant and non-transitory price increase to render the price increase unprofitable, meaning that the API Exchange aftermarket comprises a properly defined product market.

**ii. *HS One's Market Power and Anticompetitive Conduct***

42. HS One sells the leading practice management software in the United States, Dentrix and Dentrix Ascend. On information and belief, HS One sells (i) practice management software to 65–90% of sophisticated, multi-office dental practices that use such software to store data electronically in the United States, and (ii) end-to-end RCM software to a majority of such practices that use such software to use, access, and transmit data electronically in the United States.

43. According to the most recent census data, there are 135,665 dental office locations in the United States.[1] Based on HS One's own statements, its practice management software is

[1] *See* U.S. Census Bureau, "Offices of Dentists," available at https://data.census.gov/profile/6212_-_Offices_of_dentists?g=010XX00US&codeset=naics~6212#explore-more (last visited Nov. 2, 2026).

used by over 100,000 dental practice locations globally.[2] On information and belief, the vast majority of HS One's Dentrix and Dentrix Ascend customers are based in the United States. Indeed, in the United States, HS One claims to serve over 48,000 practices directly and over 90% of the top 50 DSOs.[3] Within those practices and DSOs, HS One sells practice management software to their various dental office locations. For example, Heartland Dental is a DSO that reports using Dentrix and supporting 1,900 dental offices across the United States. According to industry reports, DSOs now manage about 39% of all dental practices in the United States. On information and belief, HS One has over 70% of the market for selling practice management software to sophisticated, multi-office practices including through DSOs, and that share is rapidly increasing in the face of accelerating consolidation of dental practices in the United States.

44. In 2012, Dentrix expanded from practice management software to offering a "practice management platform." It did so through the Dentrix Developer Program, which allowed "third-party applications to interface with Dentrix and access as well as insert data such as appointment confirmations."[4] The goal was to create a "central hub" that connects Dentrix to all other RCM software that a dental practice needs, recognizing that "allowing these systems to talk to each other eliminates duplicate data entry."[5] All roughly 100,000 dental practice locations using Dentrix were enrolled in that central hub, now referred to as HS One's API Exchange.

---

[2] *See* Henry Schein One, "Dental Practice Management Software," available at https://www.henryscheinone.com/dental-solutions/practice-management-solutions/ (last visited Nov. 2, 2026); DentalTop10, "Top 10 Practice Management Software," available at https://bit.ly/3Wdrzfb (last visited Nov. 2, 2026).

[3] *See* Henry Schein One, "Dentrix Ascend Adoption Accelerates as Dental Practices Demand Simpler, Smarter Cloud Technology," available at https:bit.ly/48gTdun (last visited Nov. 11, 2026).

[4] *See* Henry Schein, Inc., "A Platform to Connect It All," available at https:bit.ly/48aceyL (last visited Nov. 2, 2026).

[5] *Id.*

45. HS One markets its API Exchange as "the largest network of dentists and patients."[6] It is a central hub that connects over 100,000 dental practices and over 140 third-party vendors that integrate with HS One's Dentrix and Dentrix Ascend practice management software. Based on recent census data, HS One's API Exchange is the central network through which the majority of dental practices in the United States integrate with third-party RCM software.

46. HS One has two practice management software systems that are part of the API Exchange: Dentrix and Dentrix Ascend. HS One markets the locally installed, on-premises version of Dentrix—*i.e.,* Desktop Dentrix—as "the most widely adopted dental software in the world."[7] HS One describes the "biggest difference" between Desktop Dentrix and cloud-based Dentrix Ascend as follows: "Dentrix is installed locally and gives you full control over your systems. Ascend is cloud-based, offering flexibility, scalability, and easier access from anywhere."[8] Until recently, dental practices that subscribed to Dentrix understood and were told that it was "an open technology platform that allows customers the opportunity to connect their favorite dental applications and technologies to create a single, unified digital office solution."[9]

47. Dentrix Ascend is a cloud-based version of Dentrix that bundles its practice management software with mandatory RCM software for patient engagement, claims, eligibility

---

[6] *See* Henry Schein, Inc., "Henry Schein One Announces Dentrix Ascend API Exchange," available at https://bit.ly/4ySIZeJ (last visited Nov. 2, 2026).

[7] *See* Henry Schein One, "Dentrix or Ascend: Find the Right Fit for Your Practice," available at https://www.dentrix.com/about-us/dentrix-or-ascend/ (last visited Nov. 2, 2026).

[8] *Id.*

[9] *See* Orthodontic Products, "Henry Schein One Launches Dentrix G7," available at https://bit.ly/48AnOmF (last visited Nov. 2, 2026).

checks, statements, payments, and more.[10] Dentrix Ascend subscribers are forced to pay for HS One's end-to-end RCM software as part of their bundles even if they would have preferred to buy end-to-end RCM software elsewhere on different terms. Notably, Henry Schein, Inc. reported during its Q2 2026 earnings call that HS One has higher monthly recurring revenue from Dentrix Ascend customers due to integrated capabilities, higher featured packages, and upgrades (*i.e.*, its tying arrangement). During its Q3 2026 earnings call, Henry Schein Inc. reported that its global technology group's sales grew by 5.2% in part due to Dentrix Ascend and growth in RCM.

48. Practice management software is the tying product in which HS One has market power that it then leverages—along with its effective control over practices' access to patient and practice data—to coerce its customers to also use its tied end-to-end RCM software product. On information and belief, HS One's tying arrangement foreclosed a substantial volume of its rivals' sales of end-to-end RCM software to sophisticated, multi-office dental practices that use such software to use, access, or transmit data because those practices were forced to purchase end-to-end RCM software services from HS One. By forcing Dentrix Ascend customers to buy its own end-to-end RCM software, HS One has made it economically irrational for practices to purchase such software again from a competitor, thereby foreclosing those competitors.

49. In recent years, HS One has aggressively marketed its own RCM software—which competes directly with Vyne Trellis—to Dentrix customers. On information and belief, HS One has also aggressively marketed Dentrix Ascend to existing Desktop Dentrix customers in an effort to lock them into HS One's competing end-to-end RCM software.

[10] *See* Henry Schein One, "Optimize Your Practice Management with Dentrix Ascend Packages and Suites," available at https://www.dentrixascend.com/dental-solutions/dentrix-ascend-packages-and-suites/ (last visited Nov. 2, 2026).

50. On July 13, 2023, HS One announced that Dentrix Ascend was joining the API Exchange, offering "an information marketplace for software vendors to share their expertise with thousands of practices on the Dentrix Ascend SOC-2 security-certified cloud-based system."[11] Although HS One assured the public and customers that adding Dentrix Ascend to the API Exchange "reinforces the Company's commitment to open architecture," it clarified that the Exchange would only be open to approved vendors.[12]

51. By 2025, HS One began publishing an "Authorized Vendors List" and an "Unauthorized Vendors List" for its API Exchange. In addition, HS One began actively blocking Vyne's competing end-to-end RCM software and threatening customers to deter them from using "unauthorized" competitor software. Moreover, HS One has steadfastly refused to agree to permit interoperability between Dentrix and Vyne Trellis by refusing Vyne software's access to necessary data (reading and writing).

52. Over time, HS One had acquired monopoly power in the market for selling practice management software to sophisticated, multi-office practices that use such software to store data electronically in the United States. Faced with extreme switching costs, data transfer restrictions, and other structural barriers, dental practices became locked in to HS One's practice management software and vulnerable to its exercise of monopoly power to restrict competition in the related market for end-to-end RCM software.

53. In particular, HS One has locked in consumers by marketing Dentrix as software that gives dental practices full control and ownership over their data, enrolling them in the API

---

[11] *See* Henry Schein, Inc., "Henry Schein One Announces Dentrix Ascend API Exchange," available at https://bit.ly/4ySIZeJ (last visited Nov. 2, 2026).

[12] *Id*.

Exchange on the understanding that it was an "open network" that allowed them to use or continue using their preferred RCM software, and then covertly closing the API Exchange without the knowledge or consent of dental practice customers. Not only were Dentrix customers unaware that HS One would impose aftermarket restrictions on their choice of RCM software when signing up for Dentrix, they faced significant information costs in obtaining non-public data on the prices of HS One's own end-to-end RCM software sold directly or through partners to enable accurate life-cycle pricing at the time of contracting. On information and belief, HS One's pricing for its own end-to-end RCM software differs by dental practice due to discounts, preferred rates, and rate changes, but its pricing is above competitors such as Vyne and reflects HS One's pricing power over locked-in customers. Given high switching costs, data transfer restrictions, and other structural barriers, HS One was able to restrict aftermarket consumer choices and price its own RCM software at supracompetitive levels without losing Dentrix customers. Thus, general principles of cross-elasticity of demand do not constrain HS One's conduct or ability to monopolize the aftermarket for selling end-to-end RCM software to API Exchange practices.

54. Indeed, HS One has demonstrated its ability to control prices by charging supracompetitive rates to API Exchange dental practices and third-party vendor participants. On information and belief, HS One uses its control over practice- and patient-owned data stored in Dentrix and blocking of third-party software to charge excessive commissions to third-party vendors as a condition of joining the API Exchange and accessing customer data without providing any actual good, service, or benefits other than access to data that HS One does not own, and as to which it (falsely) tells customers they retain full control.

55. Given HS One's registration of most sophisticated, multi-office dental practices across the country in its API Exchange and barriers to exit such as high switching costs, HS One

was able to leverage its power over the practice management software market to force customers to switch their end-to-end RCM software to HS One. HS One has also excluded Vyne, its primary competitor in the end-to-end RCM software market, from the API Exchange through bad faith negotiations, and has steadfastly refused to offer interoperability terms that would allow Vyne to compete in the end-to-end RCM software market. On information and belief, HS One has only permitted third-party vendors to join the API Exchange who are not its perceived close competitors in the end-to-end RCM software market and has conditioned entry on excessive commissions and terms that prevent meaningful competition in that market.

56. In addition, HS One sought to stifle competition from Vyne, its primary competitor in the end-to-end RCM software market, through threatened information-blocking and potential litigation over pretextual security concerns with Vyne's printer driver—technology that HS One knew had never caused a security breach and itself was actively using for its own programs.

57. Today, HS One seeks to be the only dental software used by sophisticated, multi-office dental practices by stifling competition. On November 3, 2025, HS One announced "a groundbreaking partnership" with Amazon Web Services to achieve HS One's goal of becoming "the world's first AI-augmented practice management system, unifying tools and workflows that have traditionally existed in silos."[13] As HS One's Chief Clinical and Strategy Officer explained: "Our vision is to create an AI-first ecosystem that supports every aspect of care — from diagnostics to documentation, from claims to patient engagement — integrating intelligence into the core of

[13] *See* Henry Schein, Inc., "Henry Schein One and AWS Collaborate to Transform Global Dentistry with Generative AI," available at https://bit.ly/4BEVrB7 (last visited Nov. 2, 2026).

every experience."[14] In short, HS One set out to become the only software that dental practices need, replacing end-to-end RCM software with its own AI-augmented software.

58. In furtherance of HS One's goal of being the only software used by dentists by foreclosing its rivals, over time, its API Exchange covertly went from an "open" network to a "closed" one under the guise of pretextual security measures. Now, most dental practices in the U.S. are locked in to HS One's closed network, face high switching costs, and are forced to pay supracompetitive prices for end-to-end RCM software from HS One. At the same time, HS One forecloses its rivals from competing to sell software capable of accessing the critical informational inputs they need to effectively compete and from a significant customer base of dental practices enrolled in the API Exchange through their use of Dentrix and Dentrix Ascend. Indeed, HS One has manufactured security risks, blacklisted competitors, blocked competitor software, and threatened its own customers that it will cut off their services to pressure them to cancel their contracts with "unauthorized" vendors.

59. In addition, HS One's recent shift from an open network to a closed one prevented dental offices from realizing that their choice to use Dentrix or Dentrix Ascend would restrict their end-to-end RCM software choices. In fact, until recently, HS One widely publicized and informed prospective Dentrix customers that they would retain full control and access to their data stored in Dentrix and the choice to use it with their preferred RCM software. On information and belief, a substantial majority of dental practice locations in the United States that use practice management software to store data subscribed to Dentrix or Dentrix Ascend without any warning or knowledge of the present-day restrictions on interoperability with third-party RCM software such as Vyne

---

[14] *Id.*

Trellis. Given HS One's bait-and-switch, high switching costs, data transfer restrictions, and other structural barriers, those dental practices are now locked in to HS One's API Exchange and its limited consumer choices for RCM software services.

### iii. *Competitive Harm & Lack of Procompetitive Justifications*

60. HS One's anticompetitive conduct has had a substantial adverse effect on competition in the market for selling end-to-end RCM software to sophisticated, multi-office dental practices that use such software in the United States.

61. Indeed, HS One's anticompetitive conduct has constrained consumer choice to select their preferred end-to-end RCM software based on price, quality, customer service, and innovation. In doing so, HS One has coerced customers to purchase its end-to-end RCM software over their preferred vendors' products, raising prices to dental practices above competitive levels.

62. By forcing Dentrix Ascend customers to pay for HS One's end-to-end RCM software, HS One has made it economically irrational for those consumers to subscribe to or continue subscribing to third-party end-to-end RCM software such as Vyne Trellis. In doing so, HS One has sold a substantial volume of its end-to-end RCM software to Dentrix Ascend customers that would have preferred to buy such software elsewhere on different terms. In addition, HS One has foreclosed competition on the merits for its tied product to the detriment of dental practices and their patients. On information and belief, HS One has been able to charge supracompetitive prices for its bundled end-to-end RCM software, obtain extraordinarily high margins, and restrict output by preventing its competitors from selling to Dentrix Ascend users.

63. In addition, through its anticompetitive and exclusionary conduct, HS One has deterred sophisticated, multi-office dental practices from adopting, maintaining, or upgrading their Vyne Trellis subscriptions. By excluding its main competitor in the end-to-end RCM software

market from selling to a substantial share of sophisticated, multi-office dental practices in the United States, HS One has prevented practices from accessing a high-quality, lower-cost option.

64. On information and belief, HS One's anticompetitive conduct has enabled it to charge supracompetitive prices for its end-to-end RCM software, raising prices to dental practices. In addition, HS One's conduct has raised operating costs and reduced efficiency for dental practices forced to manage its covert closing of the API Exchange, information-blocking, aggressive marketing with false, misleading, and defamatory statements about Vyne's software, and other anticompetitive conduct.

65. In addition, HS One's information-blocking conduct has harmed dental practices and their ability to focus on providing healthcare to their patients. Indeed, dental practices have suffered from blocked end-to-end RCM software, the inability to access their own data and the data of their patients, system delays and outages, and ongoing threatening, time-consuming, misleading, and defamatory marketing communications that detract from the quality of their dental software services.

66. Further, HS One has acted to stifle innovation and decrease the quality of end-to-end RCM software available to sophisticated, multi-office dental practices or DSOs in the United States. Indeed, Vyne offers the leading end-to-end RCM software in the United States. However, HS One has prohibited Vyne from offering its high-quality, end-to-end RCM software to dental practices enrolled in the API Exchange by blocking the interoperability of its software. HS One has insisted that Vyne must join the API Exchange for dental practices to access their own data and their patients' data stored in Dentrix or Dentrix Ascend to use with Vyne's software, but has prohibited Vyne from joining the API Exchange unless Vyne agrees (i) not to sell end-to-end RCM software, and (ii) not to use any method of interoperability except for HS One's API endpoints

(while representing those endpoints are not technically capable of enabling Vyne's end-to-end RCM software functions).

67. Absent HS One's anticompetitive conduct, Vyne would be selling its high-quality, efficient, lower-cost, and innovative end-to-end RCM software to sophisticated, multi-office dental practices enrolled in the API Exchange. However, as a direct result of HS One's conduct, Vyne has been unable to sell its end-to-end RCM software to Dentrix Ascend users and has lost substantial revenue from existing, former, downgraded, or would-be customers that use Dentrix.

68. HS One's anticompetitive conduct lacks any procompetitive benefit or justification. HS One's specific intent has been to leverage its monopoly power in the market for selling practice management software to sophisticated, multi-office practices in the United States to foreclose competition and monopolize the market for selling end-to-end RCM software to such practices.

69. HS One's purported security justification for excluding its primary competitor, blocking competitor software, and other anticompetitive conduct is purely pretextual. Notably, Vyne's software is interoperable with practice management software offered by other companies without any security issue and HS One knows that Vyne's software has never caused a security breach. Further, on information and belief, HS One allows software from vendors that it does not perceive to be its competitors to access and write data into Dentrix databases through the same methods of interoperability that HS One has prohibited Vyne from using. In reality, HS One's conduct serves no legitimate business purpose and is intended only to further its goal of using AI to replace end-to-end RCM software without competing on price, quality, service, or innovation.

**B. Vyne Trellis, Dentrix, and Historical Integrations**

~~19.~~70. Vyne provides ~~clearinghouse and~~end-to-end RCM services to dental practices through its platform, Vyne Trellis. Thousands of customers nationwide, including, as of the date

of this suit, at least 170 practices in Maryland who also utilize Dentrix, rely on Vyne Trellis to verify patients' eligibility for benefits in a health plan, submit claims for payments to dental insurers, receive electronic remittance advice from dental insurers, and conduct other HIPAA-standardized electronic data transactions with multiple insurers through Vyne's clearinghouse in a single electronic connection (instead of multiple separate connections). Vyne Trellis' end-to-end RCM services include patient appointment scheduling, eligibility checks, patient intake, insurance billing (including claims and attachments), patient payment collection, secure messaging for practice personnel, and other services. In short, dental practices rely on Vyne Trellis to perform necessary administrative tasks.

71. As an end-to-end RCM provider, Vyne Trellis offers services to assist dental practices with all three phases of a patient appointment: (i) services prior to the appointment such as reminders, scheduling, intake forms, and eligibility clearance; (ii) services during the appointment such as health history forms, consent forms, and medical documents; and (iii) services after the appointment to review and submit insurance claims, send patient billing statements, reconcile insurer and patient payments on financial ledgers, and update patients throughout the process with automated communications.

~~20.~~72. Vyne is SOC II Type 2-certified and HITRUST-CSF® v.11.3.0 (i1)-certified. These certifications ensure that service providers maintain rigorous standards for data security and privacy and that their data management practices comply with state and federal regulations, including HIPAA. Vyne obtained these certifications through third-party audits of its data security and privacy controls.

~~21.~~73. Vyne does not offer its own dental practice management system, so practices must separately provide the data needed for Vyne's clearinghouse and RCM services from their third-party practice management systems.

~~22.~~74. To effectuate the transmission of data from dental providers to Vyne Trellis, Vyne and its customers execute contracts governing the rights and obligations of Vyne and its customers with respect to patients' electronic health information. Ex. D.

~~23.~~75. Pursuant to their contract with Vyne, Vyne customers expressly authorize Vyne and grant Vyne full agency on their behalf to request, access, use, and export patient information, billing records, scheduling data, and other data maintained in third-party systems (including without limitation dental practice management systems) to facilitate Vyne's provision of services. Vyne customers also represent that they have all necessary rights, consents, and authority to grant Vyne the right to access and use their data. In addition, Vyne customers acknowledge that Vyne's access to their data does not violate any agreements they have with third-party vendors or any applicable law or regulation.

~~24.~~76. Further, each contract contains a Business Associate Agreement that sets forth the respective obligations of Vyne and its customers with respect to electronic health information and other data that is protected health information under HIPAA. Under these contracts, Vyne agrees, among other things, (i) not to use or disclose protected health information other than as permitted or required by law and (ii) to use appropriate safeguards to prevent the unlawful use or disclosure of protected health information.

~~25.~~77. HS One licenses its dental practice management software—Dentrix—to dental practice customers nationwide. Dental practices that use Dentrix store their patient electronic health information as well as practice information on the Dentrix platform. HS One does not own,

and has no legal right to attempt to control, electronic health information or practice information stored on the Dentrix platform. HS One's conduct to restrict access to that data even in instances where dental practice customers would want Vyne and its software to be able to access that data as their provider of end-to-end RCM services amounts to exclusion and potential foreclosure of Vyne as a rival to HS One for the provision of end-to-end RCM services.

~~26.~~78. To enable customers who utilize Dentrix (or certain other dental practice management software) to provide the data needed for Vyne Trellis, Vyne provides its customers with a printer driver that allows dental practices to effectively "print" electronic health information and practice data to an electronic document that is then transmitted to Vyne Trellis. This process is comparable to printing to a PDF creation tool or an electronic fax tool. After a customer has selected the electronic health information they wish to transfer to Vyne Trellis, the customer navigates to a "printer setup" toolbar on the Dentrix platform, selects the Vyne printer driver from a list of available drivers, and "prints" the data directly to Vyne Trellis.

~~27.~~79. The use of printer drivers is a standard practice in the healthcare clearinghouse and RCM space. Multiple service providers rely on printer driver integration to facilitate the transfer of data from a healthcare provider to the service provider. Indeed, Vyne has integrated its printer driver with over 90 practice management systems without issue. In fact, HS One's own directly competing RCM service, "EDS,"[15] has used the same basic printer-driver approach to facilitate the transfer of patient health information and~~, upon information and belief, continues to use that function~~ continues to use that function.[16] In addition, HS One allows customers to store electronic

[15] *See* Henry Schein One, "EDS Powered by Henry Schein One," *available at* https://perma.cc/5NBR-JJBD (last visited Nov. 5, 2025).

[16] *See* Electronic Dental Services, "Sending Claims to EDS," *available at* https://perma.cc/GB28-8LXN (last visited Nov. 5, 2025) (describing the "EDS Claims Capture printer" which "'prints' (converts) the claims[]

files in a "Dentrix Document Center," which uses a printer-driver to transmit information from third-party vendors to Dentrix.[17]

~~28.~~80. When a customer transfers their data stored on Dentrix to Vyne Trellis using the printer driver, none of HS One's confidential or proprietary information is submitted to Vyne Trellis; instead, the printer driver simply allows customers to capture their patients' electronic health information and/or practice data from Dentrix and deliver it to Vyne Trellis. Put differently, Vyne's printer driver has no "Read" or "Write" access to HS One's databases, meaning that the printer driver does not allow Vyne Trellis to independently ~~modify or~~ view or utilize any aspects of the Dentrix platform. Vyne Trellis encrypts all sensitive data sent by its customers consistent with healthcare industry standards, using TLS 1.2 or greater with common secure ciphers to encrypt that data in transit.

~~29.~~81. Moreover, Vyne's printer driver functionality does not create a persistent local file in the process of transferring data, which provides another layer of security. Instead, the printer driver creates a file on the local file system in the customer's user directory that gets picked up by Vyne Trellis and converted to a file that is sent via TLS securely up to Vyne's servers. At that point, Vyne Trellis deletes the local file.

~~30.~~82. Dentrix itself uses a similar printer-driver process for its own use of sending PDF print jobs to its document management module.

---

information into text documents and places them into a directory folder from which EDS pulls the documents to read and load into EDS Bridge").

[17] *See* ~~Electronic Dental Services, "Sending Claims~~Henry Schein One, "Printing to ~~EDS~~the Dentrix Document Center," available at https://~~perma.cc/GB28-8LXN~~magazine.dentrix.com/printing-to-the-dentrix-document-center/ (last visited Nov. ~~5, 2025) (describing the "EDS Claims Capture printer" which "'prints' (converts) the claims[] information into text documents and places them into a directory folder from which EDS pulls the documents to read and load into EDS Bridge").~~2, 2026).

~~31.~~83. Vyne has offered its printer driver functionality to customers for over 20 years. In that time, Vyne has developed meaningful relationships with thousands of dental practices nationwide that rely on Vyne Trellis to manage their practices. Customers have consistently praised ~~Vyne's~~Vyne Trellis's functionality and reliability, stating that they "absolutely love Vyne, [which] says a lot considering how many platforms we've tried over the past few years"; "have used [Vyne] for YEARS with no issues," and are "happy with the way [V]yne has been integrated into the practice thus far."

~~32.~~84. Vyne has also historically maintained amicable relations with HS One. On information and belief, HS One has been aware of Vyne's printer driver functionality as a means to transmit electronic health information including patient data from Dentrix and deliver it to Vyne Trellis for *more than 20 years*—since at least 2003. Until ~~earlier this year~~2025, Dentrix never complained or raised any concerns with Vyne about Vyne's printer driver.

85. ~~**B.**~~ For many years, Vyne Trellis has also integrated with Dentrix using ODBC. ODBC is an open, standardized API designed to enable software programs to communicate and interoperate. Using ODBC, Vyne Trellis could securely connect to Dentrix, retrieve data, read and write data, and run different queries. On information and belief, HS One has used ODBC for its own products and other dental software companies similarly use it to integrate with third-party software. Moreover, for many years, Vyne Trellis and Dentrix were interoperable using ODBC without issue.

86. Today, Vyne—like HS One—has ambitions of using emerging technologies to augment its end-to-end RCM software. In particular, Vyne seeks to innovate and develop Vyne Trellis to be interoperable with practice management software using Robotic Process Automation ("RPA"). RPA is a technology that uses software scripts to securely automate repetitive, rule-based

digital tasks across software applications, mimicking human actions such as data entry. RPA can facilitate both reading and writing data into Dentrix through the user-interface, exactly as dental practices currently do themselves. As emerging technologies enable improved data automation and efficiency, dental practices are increasingly expecting and asking for tools to better automate their administrative burdens such as filling forms, reconciling financial ledgers, and other routine tasks. Vyne seeks to develop its software capabilities and interoperability using RPA to meet those needs.

### C. HS One Disseminates False Information About Vyne

~~33.~~87. In early 2025, HS One began spreading misinformation about Vyne and set out to block ~~Vyne's~~Vyne software's access to their mutual customers' electronic health and practice information, all while aggressively promoting HS One's competing product, Dentrix Eligibility & Claims Suite.

~~34.~~88. From March 2025, HS One began informing dental practices, dental service organizations, and other healthcare providers that HS One would be releasing updates to Dentrix that would intentionally cause Dentrix to no longer be compatible with Vyne Trellis. HS One falsely asserted, among other things, that "security issues" affected Vyne's offering.

~~35.~~89. On March 28, 2025, Vyne sent a letter to its customers addressing HS One's threats and false statements. Ex. A. Vyne refuted HS One's statement that Vyne Trellis was flagged for "security issues," emphasizing that Vyne is a "SOC II, HiTrust-certified HIPAA Clearinghouse with a strong focus on quality, security, and performance." *Id.*

~~36.~~90. A month later, on or around April 17, 2025, HS One took its first step toward severing its customers' ability to share patient data with Vyne Trellis. HS One released a new beta version of Dentrix to a public server that (1) included Vyne's printer driver on a list of supposedly "hostile printers"—HS One also transmitted that "hostile printer" list to a number of customers—

and (2) prevented customers from printing (their own) data to Vyne Trellis from the updated version of Dentrix. As a result, when customers attempted to print their data to Vyne Trellis from the new version of Dentrix, the printed document would appear as a blank document. Customers also reported seeing a pop-up indicating that Vyne's printer driver was flagged as "[a]ctivity detected from an unauthorized third-party."




91. HS One's Chief Executive Officer, Brian Weatherly, approved the deployment of this blocking software. At the time, Weatherly knew that dental practices were using Vyne's printer-driver functionality to access electronic health and practice information belonging to the practices and their patients, that deploying the software would block their access, and that it would disrupt dental practices' workflows.

~~37.~~92. After reviewing the release notes for the new Dentrix version, Vyne discovered that HS One had installed a new data-gathering tool called "EventBridge" on customers' Dentrix platforms. Vyne learned that EventBridge worked by surreptitiously monitoring customers' Dentrix platforms and exporting to HS One information relating to the customer's installed printer drivers and registry settings, allowing Dentrix to specifically identify Vyne customers and block customers' access to Vyne's printer driver.

~~38.~~93. HS One has admitted that it installed invasive telemetry on its customers' computers in order to monitor their use of Vyne's products, including Vyne Trellis. On information

and belief, this telemetry is unauthorized or is in excess of any authorization granted by HS One's customers because, among other things, it exceeds the terms of the End User License Agreement and the Terms and Conditions that HS One's customers have agreed to in connection with their use of Dentrix.

~~39.~~94. HS One's characterization of Vyne's printer driver as "hostile" disparaged Vyne's offering, inhibited its proper functioning, and disadvantaged Vyne in favor of HS One's own competing product, even though HS One's offering is no more secure than Vyne's. On information and belief, other companies' printer drivers were also targeted as "hostile" in HS One's Dentrix update.

~~40.~~95. HS One's efforts to target Vyne's printer driver lack any legitimate basis in supposed security concerns. HS One has admitted that the only basis for its claims of security breaches by Vyne is the results of its telemetry, which it deployed *after* it began targeting Vyne's printer driver and disseminating false information concerning Vyne. HS One has never informed Vyne that a Vyne (or any other company's) printer driver caused a security breach in HS One programs or resulted in the loss or theft of any customer data. On information and belief, HS One undertook the decision to target Vyne's printer driver solely to attempt to eliminate Vyne as a competitor, and not because of a legitimate concern regarding the security risks presented by the use of printer drivers. Indeed, HS One itself continues to use a printer driver for its own programs.

~~41.~~96. HS One's campaign to disparage and injure Vyne did not stop there. On or around April 25, 2025, HS One sent a mass advertising email to Vyne's customers with an image titled, "Vyne Disconnects Imaging & Claims." Ex. B. In its email, HS One warned: "If you're using Vyne, you're manually attaching images, typing in CDT codes, and crossing your fingers. Sound familiar? That extra effort often leads to costly mistakes, claim rejections, and payment delays."

*Id.* HS One stated that: "Disconnected Tools Mean Denied Claims. Vyne Doesn't Fix That – Dentrix Does." *Id.*

~~42.~~97. Making clear that its tortious conduct was intended to favor its competing offering, HS One offered a "limited time" ~~opportunity~~discounted offer for dental providers to "upgrade from Vyne to the Dentrix Eligibility & Claims Suite for just $99/month," claiming that providers would "stop losing time and money on disconnected processes." *Id.*

~~43.~~98. The statements in HS One's email are literally false and deliberately misrepresent the functionality and integrity of Vyne's services and that have caused—and continue to cause—damage to Vyne's reputation. On information and belief, HS One has distributed this email to hundreds of Vyne customers with knowledge of, or reckless indifference to, its falsity, and with the intent to mislead Vyne's customers regarding Vyne's products in order to benefit HS One commercially.

~~44.~~99. For example, HS One's claim that Vyne "Disconnects Imaging & Claims" suggests that the Vyne Trellis platform lacks integration between imaging and claim submission. But Vyne Trellis fully supports integration with imaging. *See* Ex. C. Vyne's workflow expressly includes "Imaging System Integration," with an automated "Create Attachment" prompt to integrate (and QC) images. HS One's claim that Vyne Trellis lacks imaging functionality is simply a false statement of fact that misrepresents Vyne's software's functionality.

~~45.~~100. As another example, HS One's claim that "[i]f you're using Vyne, you're manually attaching images, typing in CDT codes, and crossing your fingers" suggests that Vyne Trellis lacks automated functionality that in turn, according to HS One, "leads to costly mistakes, claim rejections, and payment delays." But Vyne Trellis fully supports automated integration and functionality; indeed, Vyne Trellis provides an "Image Sync" option that automatically associates

claims with available images and allows dental offices to select the correct documentation when managing claims. Providers are *not* required to *manually* type CDT codes or attach images. Rather, Vyne Trellis facilitates claims validation processes by *automatically* filtering documentation that providers are required to include with each claim submission, thereby ensuring that providers submit the appropriate documentation for each claim.

~~46.~~101. Likewise, HS One's statement that Vyne Trellis "leads to costly mistakes, claim rejections, and payment delays" suggests that Vyne's product causes adverse financial and administrative outcomes. But Vyne Trellis integrates rules directly from insurers regarding the necessary documentation for each claim submission and prompts dental practices to supply the best available documentation, ensuring that claims are submitted in a timely and accurate manner. This verification process *reduces* claim rejections and unnecessary delays caused by missing or incorrect documentation. Again, HS One's statements to the contrary are simply false.

~~47.~~102. Shortly after disseminating its April 25, 2025 email, HS One escalated its campaign against Vyne by falsely informing Vyne's customers that Vyne Trellis had supposedly been flagged for "security issues" and that HS One would therefore be unable to integrate its Dentrix platform with Vyne in the future. In fact, the "security issues" to which HS One referred were baseless pretexts for cutting off customers' access to Vyne Trellis, with the improper purpose of injuring Vyne's business and impairing its ability to compete with HS One. To that end, customers reported receiving mass communications and aggressive outreach from HS One asserting that Vyne Trellis is not authorized to access customer data stored on Dentrix—which was another way of saying that customers would be unable to use Vyne's printer driver to populate their own data stored on Dentrix to Vyne Trellis.

~~48.~~103. On information and belief, HS One distributed this communication or substantively similar communications to its customers as part of a directed advertising campaign seeking to induce Vyne customers to switch to HS One's competing claims submission product. HS One's assertions concerning "security risks" posed by Vyne's products were literally false because, on information and belief, HS One has not suffered any security breaches or loss of patient data as a result of Vyne products and because Vyne's printer drivers do not present greater security risks than other methods of transferring patient data from practice management software programs. In addition, HS One's misrepresentations were misleading in context because they give the false impression that Vyne's products present greater security risks than Vyne's competitors', disparaging Vyne's products and its business reputation and causing confusion within the market concerning the safety of Vyne's software.

~~49.~~104. One customer reported that HS One representatives were actively calling customers' offices and using blatant scare tactics, including telling practices they will be blocked from all eClaim services and that their practice will "suffer" if they continue to use Vyne products. The same customer stated that several colleagues had received similar communications from Dentrix sales reps.

~~50.~~105. In an email to Vyne, another customer, correctly apprehending HS One's anti-competitive strategy, stated: "This situation feels extremely sketchy. It seems like Dentrix is trying to trap us – and other practices – into working exclusively with them and purchasing additional features." As to any HS One assertion that its product was superior, the customer stated: "We already tried Dentrix Hub and Engage for a year, and it was absolutely horrible." The customer wrote that her dental practice is now "being forced to pay even more and possibly work with multiple vendors just to replace what Vyne currently handles – and handles very well." This,

of course, was the result of HS One's strategy to make it more difficult and burdensome for customers to use Vyne's product.

~~51.~~106. Numerous other customers, on message boards and in other fora, expressed outrage at HS One's tactics. Among other things, customers described HS One's communications as "grimy sales tactic[s]," lamented that they "[h]ate Dentrix," stated that HS One is "making it more difficult for us to use [V]yne for claims," and warned that HS One was using aggressive scare tactics. During this time, Vyne received an influx of customer inquiries expressing concern regarding HS One's communications and requesting assistance as to how to continue using Vyne's Trellis platform.

107. ~~C.~~ HS One's aggressive marketing tactics and misrepresentations are ongoing. For example, on September 8, 2026, an HS One account executive left a voicemail and sent an email to a joint customer concerning its Vyne subscription. The correspondence falsely represented that Vyne's claim submission services—which rely on a printer driver—are "hacking," not secure "for the protection of your data as well as your patient data," that "the only secure solution available right now is a Henry Schein solution," and offering a discount to switch from Vyne Trellis to HS One's competing RCM software package.

**D. HS One's Bad Faith in API Negotiations**

~~52.~~108. In light of HS One's conduct blocking customers' use of Vyne's printer driver functionality to seamlessly provide their data stored on Dentrix to Vyne Trellis, Vyne attempted to find workarounds using Application Programming Interfaces ("API") and other forms of electronic software integration. API connections are one method for accessing electronically stored data and transmitting that data from one program to another.

~~53.~~109. On or around March 25, 2025, in an effort to resolve the problems created by HS One's actions, Steve Roberts, Vyne's CEO, initiated contact with HS One to explore possible API integration between Dentrix and Vyne for claims submission. Vyne was prepared to pay HS One to allow customers to transmit their Dentrix-stored data to Vyne Trellis via APIs, even though doing so would be rewarding HS One's tortious and coercive strategy. Vyne's focus was on ensuring a viable alternative to continue providing services to its customers with data stored on Dentrix.

~~54.~~110. HS One stated that it would be willing to discuss the use of APIs to accomplish what Vyne's printer driver had earlier facilitated, but it soon became apparent that HS One was negotiating in bad faith and in fact wished to use the discussions to string Vyne along while HS One further injured its business. In early discussions, HS One claimed to be unable to confirm that its existing APIs supported transmission of the data required for claims submission, an absurd position for a data platform and software provider to take.

~~55.~~111. It only got worse from there. After a few months of halting non-progress, on or around May 27, 2025, Vyne and HS One met to discuss an API-based integration between Vyne Trellis and Dentrix. At the meeting, HS One proposed its "Dentrix Developer Program" ("DDP") as the path forward. However, in what by then was par for the course, HS One indicated that the wrong HS One representatives were in the meeting and that a subsequent meeting would be needed with the right people.

~~56.~~112. HS One then presented Vyne with a proposed "Henry Schein Developer Program Agreement," outlining its supposed proposal for the API integration. But rather than proposing workable arrangements for *allowing* dental providers to export their electronic health information and practice data to Vyne Trellis, HS One instead sought in a draft DDP agreement to

impose draconian contractual *restrictions* on ~~Vyne's~~the ability of Vyne's software to work with their mutual customers. And certain of the terms HS One proposed made clear that HS One also wished to frustrate Vyne's ability to market itself to potential purchasers should the opportunity arise.

~~57.~~113. On June 2, 2025, Vyne, attempting to keep the discussions alive despite HS One's apparent bad faith, sent back a red-lined version of the draft DDP agreement HS One provided, together with explanatory comments. Among other things, Vyne raised concerns with the proposed limitations on data access. Vyne noted that HS One's proposed restrictive language "appears to be a violation of the Cures Act Final Rule, issued by the Office of the National Coordinator for Health Information Technology (ONC) in 2020."

~~58.~~114. Vyne also raised concerns that HS One's draft language "implies that data (e.g. Patient insurance information for eligibility verifications) cannot be transferred to Payers which is Vyne's primary business." Of course, HS One knew perfectly well that transferring information to payers was at the core of Vyne's business, and in purporting to prevent Vyne from doing so HS One was making clear that its real design was to prevent Vyne from competing with HS One's competitive offering and to injure Vyne's business. Vyne also informed HS One that it could not agree to having the contract terminated upon a Change of Control, which again would have been obvious to HS One.

~~59.~~115. Despite HS One's bad faith, Vyne continued to seek an agreement that would enable it to serve its customers who used the Dentrix platform. On June 3, 2025, Vyne and HS One executives met. Vyne's President, James Grover, reiterated concerns that the DDP did not guarantee the required access to support claim submissions and proposed an interim solution (in which Vyne would join HS One's DDP and pay the required fees for each location, but would be

allowed to use its existing printer driver integration until the necessary APIs were developed by HS One). Brian Weatherly, HS One's CEO, expressed support for Mr. Grover's proposal, stating "[i]t will be great to get this done." Thereafter, HS One rejected the same terms that Mr. Weatherly stated were agreeable.

~~60.~~116. In the following weeks, HS One doubled down on the restrictive terms it originally proposed, and essentially demanded that Vyne submit to those terms. Nonetheless, Vyne continued to attempt to find common ground. In response, on July 11, 2025, HS One's General Counsel stated that HS One was supposedly "working through the items" raised in various Vyne communications. That statement turned out to be false.

~~61.~~117. After receiving no further communications from HS One, Vyne sent HS One an email advising it that, absent a response to its proposals by July 28, 2025, Vyne would assume negotiations had concluded.

~~62.~~118. Thereafter, HS One revealed that its real strategy had been to delay while continuing to disparage Vyne and frustrate its software's access to customer data while using the same pressure tactics alleged above to coerce customers into switching to HS One's competing offering. On July 28, 2025, HS One's General Counsel sent an email to Vyne making the absurd assertion that Vyne had been "hacking" into HS One's software, claiming that Vyne's services compromise HS One's security, and alleging Vyne's violation of unspecified laws. Having made these accusations and threats, HS One demanded that Vyne agree to its final version of the DDP agreement—which it knew Vyne could not do—or risk its software losing any and all access to electronic health and practice information stored on the Dentrix platform. HS One's final proposal did not even attempt to resolve any of Vyne's concerns regarding HS One's initial proposal and

instead added additional draconian and unacceptable terms. The final proposal called for the following terms and restrictions:

a. After a 90-day transition period, a restriction prohibiting Vyne software from "access[ing] any HS One practice management software except through means explicitly authorized in an agreement with HS One," but the proposed agreement would not authorize any HS One API or other access method that would provide the electronic health information necessary for Vyne to provide its services to its customers, and HS One would not agree to provide any such access method before the end of the transition period. The proposed agreement would also prohibit the use of any third-party products to access electronic health information stored in Dentrix.

b. A requirement that Vyne pay royalties for each dental provider using Vyne Trellis and Dentrix, *even if* Vyne opted not to use HS One's API for that particular provider.

c. Restrictions imposing limitations on Vyne's software's use of electronic health information that are more restrictive than limitations imposed by Vyne's customers themselves, including a prohibition on the provision, use, modification, reproduction, distribution, sale, display, or disclosure of data gathered from HS One software to any third party.

d. A restriction prohibiting assignment or change of control of the DDP Agreement to a HS One competitor.

~~63.~~119. Meanwhile, and as further evidence that HS One knew its proposed terms were unworkable and that it was negotiating in bad faith, Vyne learned that HS One was informing Dentrix customers that their Vyne integration would be cut off in the near future. HS One disseminated communications to Vyne's customers informing them that, beginning on September

23, 2025, HS One would take steps to completely block Vyne's printer driver functionality and prevent the sharing of electronic health information with Vyne Trellis.

~~64.~~120. For example, on August 26, 2025, HS One reached out to at least one customer concerning its use of Vyne products, sending an email with the subject line "We've Detected Unauthorized Activity on Your Dentrix System" and threatening that "[u]nauthorized third-party integrations can pose a security risk to your organization and compromise your Dentrix system and data." As the HS One representative explained, this communication had been sent to the dental practice because it was "using Vyne for [its] eClaims service," and HS One urged switching to HS One's "integrated eClaims services" because Vyne Trellis was "not properly connected through our Dentrix API platform which can cause a security issue." HS One emphasized that the practice should switch from Vyne Trellis to HS One's "fully integrated and SECURE eClaims platform" and offered a special pricing package for customers that were supposedly "adversely affected by the Vyne security breach." As HS One is aware, this information was literally false because there was no "security breach" related to Vyne products, and it was calculated to mislead customers with respect to the security of Vyne products. On information and belief, HS One distributed these claims to substantial numbers of Vyne customers as part of a directed advertising campaign[18] and in an effort to induce them to discontinue their contracts with Vyne, relying on false and misleading claims about supposed security vulnerabilities from Vyne's products. As before, HS One did this with knowledge of, or at least

[18] For example, on a webpage on HS One's website concerning its litigation with Vyne, HS One includes an example of a substantively similar mass communication it sent to its customers on August 21, 2025 making claims that non-HS One programs would "jeopardiz[e] the security and integrity of [practice] data" and promising to "contact [practices] shortly with more information if [they were] impacted." *See* Henry Schein One, "Protecting Your Practice, Data, and Dentrix System," *available at* https://perma.cc/WH8M-UJQC (last visited Nov. 5, 2025).

recklessness to, the falsity of these claims and the likelihood that they would mislead Vyne customers.

~~65.~~121. On August 26, 2025, in the midst of CEO-to-CEO negotiations, Vyne received a letter from outside litigation counsel retained by HS One, suggesting that HS One intended to sue Vyne for "multiple related common law and statutory claims," all based on Vyne's efforts to allow its customers the same service that it had been providing, with HS One's full knowledge, for decades—which HS One's litigator again baselessly called "hacking."

~~66.~~122. HS One did not, and has not since, provided any evidence that Vyne's printer driver compromises the security or integrity of Dentrix or that HS One has a protectable intellectual property interest in its customer's electronic health information. And, as explained above, the allegation is entirely without basis given that Vyne uses a printer driver that is akin to Dentrix's own approach.

~~67.~~123. HS One has continued to slow-roll negotiations with Vyne concerning a potential agreement on API access while, at the same time, pursuing aggressive and unlawful tactics to interfere with Vyne's relationships with its customers and lure Vyne's customers to its own claims-processing system based on false pretenses. A few days later, as detailed below, HS One pushed a Dentrix update that attempted to completely disable Vyne software on Dentrix customers' computers.

124. ~~**D.**~~ More recent negotiations have revealed that HS One is unwilling to enter a commercial agreement with Vyne unless Vyne agrees to be a back-end clearinghouse, *not* an end-to-end RCM software provider. HS One has conditioned Vyne joining the API Exchange on Vyne agreeing "to operate as a backend, data-only claims provider"—*i.e.*, to not compete with HS One to provide end-to-end RCM services to Dentrix customers. HS One's CEO, Brian Weatherly, has

represented to Vyne that the API endpoints Vyne Trellis requires for end-to-end RCM are "not technically viable." Meanwhile, HS One has represented that Vyne cannot securely integrate with Dentrix using any method other than the API endpoints that HS One has or is willing to create. On information and belief, those representations are false and HS One merely seeks to exclude a competitor from the market for end-to-end RCM software to Dentrix customers.

125. In addition, recent negotiations have demonstrated HS One's use of its control over the API Exchange and the ability of dental office participants to access their own data stored in Dentrix to stifle competition by Vyne, its primary competitor in the end-to-end RCM market. Amidst HS One's efforts to become "the world's first AI-augmented practice management system" by using AI to automate RCM services,[19] it has conditioned Vyne's admission to the API Exchange on Vyne agreeing not to use the same or comparable AI tools to enter data into customers' practice management system using the user-interface exactly as practices can do themselves. In addition, HS One has insisted that Vyne Trellis can only integrate with Dentrix using the API endpoints that it offers and has refused to develop API endpoints to allow Vyne to offer end-to-end RCM software. On information and belief, HS One has insisted on terms that prohibit Vyne Trellis from obtaining necessary read-and-write access to data stored on Dentrix to prevent Vyne from competing on the merits with HS One's end-to-end RCM software. In particular, HS One is using its power over the API Exchange market to stifle competition with its new and forthcoming AI-augmented RCM software that it seeks to sell without competition on price, quality, innovation, or customer service.

[19] See Henry Schein, Inc., "Henry Schein One and AWS Collaborate to Transform Global Dentistry with Generative AI," available at https://bit.ly/4BEVrB7 (last visited Nov. 2, 2026).

**E. HS One's Disabling of Vyne Software**

~~68.~~126. ~~On~~After months of stringing Vyne along in bad faith negotiations over joining the API Exchange, on September 23, 2025, HS One escalated its efforts to throttle Vyne's business, resorting to deploying what can only be described as a virus on the computers of its own customers to remotely disable Vyne software functionality completely—including non-claims and software update functions that HS One has never even objected to—and indeed any software (no matter what it does) that bears Vyne's digital certificate.

~~69.~~127. That day, HS One distributed a Dentrix update to customers containing an automated security scanner that specifically targets and disables Vyne software services. The scanner runs continuously every 10 minutes, automatically stopping and permanently disabling any Windows services signed with Vyne's digital certificate. The scanner operates continuously while Dentrix is running, disabling any Vyne services and preventing them from restarting, even on a reboot of the system. It functionally disables any Vyne Dental software installed on the computer systems of the affected practices. On information and belief, the update ~~has already been~~was deployed to hundreds of mutual customers of Vyne and HS One as of the date of this filing, and at least thirteen practices in Maryland alone ~~have~~ had their access to Vyne software blocked.

~~70.~~128. Unlike HS One's previous attempt to block Vyne's printer driver—which maintained a thin veneer of neutrality by listing printing services other than Vyne's as "hostile"—this update specifically and solely targets Vyne's software, hunting for any Windows services that are tied to Vyne or signed by Vyne's digital signature.

129. On information and belief, HS One has used its telemetry to identify which of its customers use Vyne software and to target Vyne software from operating on those customers' local computers.

130. In addition to blocking Vyne's printer driver, HS One has threatened to block, and blocked, Vyne's interoperability with Dentrix through Open Database Connectivity ("ODBC")—a standard API used to access data stored in databases. By disabling all software with a Vyne certificate running on any joint customer computers, HS One's blocking was also not limited to ODBC and print driver integration.

~~71.~~131. To Vyne's knowledge, HS One provided no notice to the affected practices that it would use Dentrix to deploy a virus that would disable a competitor's software, nor does ~~the~~ Dentrix's security scanner inform users or offer an opt-out when it disables Vyne's programs. On information and belief, HS One's access to customers' computers in order to target and disable Vyne software was not authorized by those customers.

~~72.~~132. HS One's invocation of a supposed security justification for targeting of Vyne software was pretextual because HS One continues to use functionality akin to that used by Vyne in its own programs, including a printer driver and ODBC access, and because HS One lacks any substantial basis to believe that Vyne's programs present a security risk to HS One's software or its customers' data. In addition, HS One's virus targeted Vyne functions wholesale, without even attempting to tailor its impact to any measures that HS One has stated present a security risk. HS One's measures were also adopted in a manner that discriminates against Vyne and its software (and customers who use Vyne Trellis) because HS One has not targeted or disabled any other software developer's programs in a similar way. Instead, HS One's update represents intentional competitive blocking of Vyne's software disguised as security functionality.

73.133. Since that date, Vyne has beenwas forced to take action to restore Vyne Trellis's functionality for affected users, including, for some customers, manual intervention to enable them to continue to submit insurance claims. Still, many Vyne customers have beenwere unable to submit insurance claims or carry out other RCM services, and some Vyne customers have cancelled their service agreements with Vyne.

74.134. In the meantime, HS One has continued to spread false and misleading information regarding Vyne Trellis. For example, as noted, on September 23, 2025 an HS One employee wrote to a Vyne customer that HS One was offering a "new unlimited eClaims bundle for Dentrix customers" who were "adversely affected" by a supposed Vyne "security breach." As HS One is fully aware, there have been no such "security breaches."

**F. E. HS One's Improper Information Blocking**

75.135. The Cures Act was designed to accelerate medical product development, promote interoperability, and support patients. The Cures Act authorized the U.S. Department of Health and Human Services to adopt regulations to promote interoperability, prevent information blocking, and ensure various actors in the healthcare IT industry and patients can access electronic health information. *See* 42 U.S.C. § 300jj-52. The United States Department of Health and Human Services, Assistant Secretary for Technology Policy / Office of the National Coordinator for Health Information Technology ("ASTP/ONC") implemented information blocking regulations to avert the use of "practices that increase the cost, complexity, or other burden associated with accessing, exchanging, or using electronic health information." 84 F.3d Reg. 7424, 7516. Under these regulations, entities such as HS One that operate health information networks and health information exchanges are prohibited from interfering with or discouraging access to, exchange

of, or use of electronic health information. Violating the information blocking rules under the Cures Act can result in fines of over $1,250,000 million per violation.

~~76.~~136. HS One is considered a "health information network or health information exchange" because, as part of Dentrix, HS One provides the "Henry Schein One API Exchange," "Dentrix Developer Program," "eClaims," "Eligibility Essentials and Pro," "Quickbill", and "ePrescribe" technologies that enable more than two unaffiliated individuals or entities to exchange electronic health information for Treatment, Payment, or Health Care Operations purposes, as such terms are defined in 45 ~~CFR~~C.F.R. § 164.501.

~~77.~~137. Dentrix had also been certified under the National Coordinator for Health Information Technology ("ONC") Health IT Certification Program. On June 2, 2025, Vyne informed HS One for the first time that the language in the proposed DDP agreement that prohibited Vyne Trellis from "access[ing] any HS One practice management software except through means explicitly authorized in an agreement with HS One" "appears to be a violation of the Cures Act Final Rule, issued by the Office of the National Coordinator for Health Information Technology (ONC) in 2020." *That same day*, apparently recognizing that its conduct violated the Act, HS One voluntarily removed Dentrix from the Certification Program.[20]

~~78.~~138. HS One remains subject to the Cures Act because it qualifies as a health information exchange/health information network ("HIE/HIN") under the applicable regulations, which includes any "entity that determines, controls, or has the discretion to administer any requirement, policy, or agreement that permits, enables, or requires the use of any technology or services for access, exchange, or use of electronic health information" "[a]mong more than two

[20] *See* Certified Health IT Product List, "Dentrix Enterprise," *available at* https://chpl.healthit.gov/#/listing/11430 (last visited Sept. 30, 2025).

unaffiliated individuals or entities (other than the individual or entity to which this definition might apply) that are enabled to exchange with each other" and "for a treatment, payment, or health care operations purpose." 45 C.F.R. § 171.102. HS One qualifies as an HIE/HIN because it has created and administers the HS One API Exchange, which facilitates real-time exchange of patient and insurance payment electronic health information between ~~thousands of~~approximately 100,000 dental practices and over 140 third-party vendors which are part of the API Exchange program using the Dentrix platform. This platform enables HS One customers to exchange patient data with dozens of different HS One-approved vendors, and each of these vendors to interact with thousands of Dentrix users.[21] On its website, HS One describes the API Exchange as a "central hub for platform integration" and "a versatile platform enabling integrations and interoperability with preferred vendors."[22] And it separately describes the API Exchange as "[e]nabl[ing] scalable operations by allowing multiple clients or services to interact with the system simultaneously without relying on a single user interface," stating that the Exchange "processes 6 billion API calls per year."[23]

~~79.~~139. HS One's unjustified refusal to grant Vyne access to the data it seeks from Dentrix for Vyne Trellis, and its overt effort to prevent Vyne Trellis from using patient data, constitutes not just a tort but also an action that interferes with access, exchange, or use of

---

[21] *See, e.g.*, Henry Schein One, "Kare Mobile Uses Dentrix Ascend to Bring State-of-the-Art Dentistry Directly to Patients~~" (2024),~~," available at https://perma.cc/JG8P-BQ4J (last visited Nov. 22, 2026) (describing a customer's use of multiple third-party programs that integrate through the HS One API with Dentrix to facilitate the exchange of patient health information, including to analyze patient x-rays, formulate treatment plans, and schedule appointments).

[22] Henry Schein One, "Henry Schein One API Exchange," *available at* https://perma.cc/3LX9-UZJD (last visited Nov. 5, 2025~~)~~).

[23] Henry Schein One, "Unlocking the Power of Integration: How the Henry Schein API Enhances DSOs~~" (Aug. 27, 2024),~~," available at https://perma.cc/4ZCQ-X4AQ~~.~~ (last visited Nov. 5, 2025).

electronic health information, and such action does not fall into any exception to the information blocking rules. *See* 45 ~~CFR~~C.F.R. § 171.103.

140. Notwithstanding Vyne's requests for access to its customers' electronic health information, HS One has refused to grant access through Vyne's printer driver, read or write access via ODBC, and access through the user-interface using methods like AI or RPA. HS One has denied any alternatives to allow Vyne Trellis to access customer data and patient stored on Dentrix outside of its API Exchange and has denied access through its API Exchange through bad faith negotiations. On information and belief, HS One has continued to use (and permit other vendors it does not directly compete with to use) comparable technology including a printer driver, ODBC access, and RPA to permit customers to read and write data (including their own EHI and practice data) to third-party databases.

~~80.~~141. HS One's measures do not satisfy the security exception to the information-blocking rules because they were not tailored to the specific security risk being addressed or implemented in a consistent and non-discriminatory manner. HS One's disabling of the printer driver is not connected to any legitimate security concern arising from the use of that printer driver; on information and belief, HS One has never experienced a security breach from Vyne's printer driver, nor does it have any basis to believe that such a breach is likely. Indeed, HS One seeks to disable a printer-driver functionality that it continues to use for its own products, making clear that its measures are not even-handed or nondiscriminatory. Nor has HS One suffered any security breach, to Vyne's knowledge, from ODBC read or write access to Dentrix databases. As to HS One's targeting of Vyne-signed Windows services, HS One has never articulated any security objection at all (even a pretextual one) for the services HS One disabled with this update, meaning

that its measures are not narrowly tailored to any security risk, and its measures were clearly discriminatory because they targeted Vyne services by name, regardless of their function.

81.142. Nor do HS One's actions satisfy the manner exception to the information-blocking rules, as HS One is plainly capable of providing the data sought by Vyne through the same methods that have been used by the parties for the past several years, including the printer driver and ODBC. There is nothing inherent to the claims data Vyne seeks that presents a security risk or other impediment to the sharing of information.

82.143. Vyne's customers seek Vyne's assistance to submit claims to help them effectively coordinate payment with insurance providers. and perform various patient-engagement and claims-processing tasks. HS One's refusal to allow Vyne Trellis access to the data via the printer driver, API, or other integration significantly delays and impedes Vyne'sVyne Trellis's access to the necessary electronic health information and practice information, and increases the costs, complexity, and burden associated with Vyne'sVyne Trellis's use of this data on behalf of Vyne customers. HS One's misconduct leaves Vyne unable to perform on its agreements with its customers or to provide the services they purchase from Vyne.

144. In addition, HS One's conduct has prevented Vyne from offering RCM services to any customers using Dentrix Ascend, which would require access to customer electronic health information and practice information stored on HS One's cloud and servers. By excluding Vyne from the API Exchange, adding Vyne to a list of "unauthorized vendors," and refusing to allow Vyne's software to be interoperable with Dentrix Ascend, HS One has knowingly engaged in action that interferes with access, exchange, or use of electronic health information, and such action does not fall into any exception to the information blocking rules. *See* 45 C.F.R. § 171.103.

145. HS One's blocking of information stored on Dentrix Ascend does not satisfy the manner exception because it is a blanket prohibition on access outside the API Exchange. HS One is not technically unable to fulfill the request for electronic health information outside the API Exchange, nor has HS One been unable to reach agreeable terms with Vyne to do so. To the contrary, HS One has demonstrated an unwillingness to allow Vyne Trellis to access electronic health information stored on Dentrix Ascend through any manner that Vyne or its customers could possibly request due to its blanket prohibition on any manner except the API Exchange, which includes access through the printer driver, ODBC, and/or the user-interface. Moreover, HS One has failed to provide a meaningful alternative manner of access. To join the API Exchange, the only manner offered, HS One has insisted on terms that would deny Vyne and its software access to data that it needs to continue providing existing services to its customers and would prohibit Vyne from competing with HS One to provide end-to-end RCM services to dental offices within the API Exchange.

146. HS One's information-blocking policy for Dentrix Ascend is not directly related to safeguarding the confidentiality, integrity, or availability of electronic health information, tailored to any specific security risk being addressed, or implemented in a consistent and non-discriminatory manner. To the contrary, it is motivated by HS One's desire to monopolize the market for end-to-end RCM software, force potential competitors to agree not to compete with end-to-end RCM software, and extract excessive rents from all such third-party vendors that are permitted to provide narrow siloed software. On information and belief, HS One's information-blocking policy against accessing data stored on Dentrix Ascend outside the API Exchange is enforced arbitrarily against HS One's primary competitors including Vyne, without a case-by-case determination that no reasonable and appropriate alternative means of access exist.

~~83.~~147. Accordingly, HS One's conduct violates the Cures Act and the federal information blocking regulations. Despite Vyne's informing HS One that HS One's conduct violated the Cures Act, HS One has continued with the implementation of its unlawful information blocking.

* * *

~~84.~~148. HS One's information blockade and other misconduct pose an imminent and severe threat to Vyne's existing and future business. ~~Over~~As of the date of filing of this suit, over 8,000 of Vyne's customers ~~rely~~relied on Vyne's printer driver functionality to transmit electronic health information and practice data from Dentrix to Vyne~~.~~ Trellis, and more than a thousand rely on its ODBC functionalities to read and write to Dentrix databases in order to perform claims-processing and patient-engagement tasks. On information and belief, HS One plans to block ~~Vyne's~~Vyne Trellis's access to all its customers' electronic health information and practice information via the printer driver integration and/or otherwise (including ODBC and RPA) by HS One's release of malicious software or updates. As a result, ~~Vyne's~~Vyne Trellis's access to its customers' electronic health information and practice information, and ability to provide its RCM and clearinghouse services, will be cut off entirely.

~~85.~~149. HS One's actions threaten to crater Vyne's revenue and injure Vyne's business by blocking Vyne's ability to provide services for its customers. Indeed, as part of its contracts with customers, Vyne agrees to provide its customers with, among other things, (i)~~-~~ unlimited electronic claims processing; (ii) unlimited electronic attachments; (iii) claims status and real-time claims updates; and (iv) unlimited eligibility and benefits support. Without access to its customers' electronic health information and practice information or the ability to operate Vyne's software on its customers' systems, Vyne's ability to provide these services will be

substantially limited. HS One's campaign of smears and hacking has been pursued for the purpose and with the effect of encouraging or pressuring Vyne customers to terminate their contracts with Vyne and utilize its private-label claims submission offering instead.

~~86.~~150. Further, HS One's campaign of falsehoods and disparaging statements threatens to irreparably harm Vyne's reputation as a healthcare clearinghouse and RCM services provider and to irreparably impair its ability to provide patient information to payers. In the last several weeks before the amended complaint was filed alone, Vyne ~~has~~ observed an over 50% decrease in claims submissions from nearly 2,000 dental-provider customers, and at least 164 customers ~~have~~ completely stopped submitting claims through Vyne Trellis ~~since September 2025. At~~. As of that time, at least 500 Dentrix customers ~~have~~had cancelled their accounts with Vyne since early March 2025, and ~~since~~between mid-August and early November, 2025, at least 50 of these customers ~~have~~had specifically informed Vyne that they were cancelling their Vyne accounts because of concerns arising from HS One's false communications, a desire not to "be in the middle" of a dispute between HS One and Vyne, or because of incompatibilities with Dentrix caused by HS One's efforts to block Vyne's software.[24] If HS One is successful in its efforts to sever ~~Vyne's~~Vyne Trellis's access to their mutual customers' electronic health information and practice information, these numbers are certain to rise.

~~87.~~151. This reputational injury is also certain to have downstream effects, including threatening to drive future customers away from Vyne and interfere with Vyne's

[24] For example, on September 30, 2025, one customer cancelled its use of Vyne's Remote Lite service because the customer understood, based on representations from Dentrix customer support, that it was "either them ([D]entrix) or us ([V]yne)" and had been "threaten[ed] to never be able to print claims again and other possible complications." This customer was reportedly "upset about how they had to make a choice but they HAVE to pick Dentrix per office." Another customer cancelled its use of Vyne's services on October 17, 2025, "[d]ue to the ongoing issues between [Vyne] and Dentrix."

prospective business relationships, whether with future vendors, business partners, or investors. In the ordinary course of business, Vyne receives outreach from prospective customers seeking to purchase Vyne products and services, and HS One's injury to Vyne's reputation will inhibit those customers from entering into new contracts with Vyne. ~~Based~~As of the filing of the first amended complaint, based on information maintained by Vyne's sales teams for the period since mid-August 2025, Vyne is aware of at least 100 potential customers it was in communication with regarding purchasing or upgrading their use of Vyne services who specifically indicated that HS One's misrepresentations concerning Vyne or its efforts to impede Vyne functionality were the reasons they ultimately chose not to contract with Vyne for new or additional services. For example, on August 18, 2025, a potential customer for an upgrade of Vyne services indicated that it was refusing to move forward with Vyne because "Dentrix threatened not to work with [it] anymore," which "[s]cared the office from even staying with [Vyne] with their current account." On August 27, 2025, a potential Vyne customer declined to purchase services from Vyne, explaining that she was "reluctant" to work with Vyne "since the email sent out last week" by HS One "referring to possible restrictive/compatibility issues using Vyne [] with the coming update to Dentrix." Another potential customer indicated on October 15, 2025 that although it was "[h]appy w/ [V]yne and [its] support," it "didn't want to upgrade" its use of Vyne's services because it was "scared w/ Dentrix and cloud update in the future." Vyne believes that many more customers have chosen not to contract with Vyne because of HS One's falsehoods and unfair conduct.

~~88.~~152. In addition, HS One's campaign of falsehoods and disparaging statements has also resulted in a flood of inbound calls to Vyne's customer support lines, which are crucial to ensuring that Vyne customers are able to utilize their Vyne products and services on a day-to-day basis. ~~Vyne has~~By the time of the first amended complaint, Vyne had fielded outreach from at

least 628 Vyne customer accounts fearing the impact of HS One's efforts to cut off their access to Vyne products. As a result, Vyne customers, including those who do not utilize Dentrix, have had negative customer experiences, further harming Vyne's reputation.

~~89.~~153. Because of HS One's misconduct targeting Vyne's customers' use of its programs, including the printer driver and, with respect to some Vyne customers, all Vyne software functions, Vyne and its customers have suffered an interruption of service, leaving Vyne Trellis functions unusable for those customers. In addition, Vyne has been forced to undertake significant efforts to restore the functionality of Vyne's programs, including in some cases customer-specific intervention to repair damage to Vyne software. Vyne has estimated that it has spent at least $90,000 in the form of management time dedicated to addressing HS One's actions against Vyne ~~this year~~between January 2025 and early November, 2025—a substantial underestimate because it accounts only for time spent by management in meetings, and omits the countless hours devoted to planning and executing responses to HS One's actions, including developer time needed to generate software fixes. That is in addition to at least $7,500 worth of time that Vyne customer support staff have had to expend over that period, fielding inquiries from customers regarding HS One's ~~latest~~distribution of a Vyne software~~-~~-blocking virus on September 23, 2025 and assisting them with restoring access to Vyne software. Ultimately, the full scope of the cost Vyne has incurred to protect its business from HS One's campaign cannot be determined.

**COUNT I**
**Computer Fraud and Abuse Act – 18 U.S.C. § 1030(g)**

~~90.~~154. Vyne realleges and incorporates by reference the allegations contained in the preceding paragraphs.

~~91.~~155. Vyne's customers' computer systems are "protected computer[s]" within the meaning of the Computer Fraud and Abuse Act because they are used in or affect interstate or foreign commerce. 18 U.S.C. § 1030(e)(2)(B).

~~92.~~156. By installing an invasive telemetry system on Vyne's customers' computers in order to extract information about their use of Vyne's programs and thereby identify means to target and disable Vyne's programs, HS One intentionally accessed a computer without authorization or exceeded authorized access, and thereby obtained information. 18 U.S.C. § 1030(a)(2).

~~93.~~157. By engaging in the above-described activities, including by disabling or attempting to disable Vyne Trellis's print driver functionality and, in some cases, deploying an update that crawls its customers' computers to disable all of Vyne's software programs, HS One caused the unauthorized transmission of a program, information, code or command and thereby intentionally caused damage without authorization to Vyne's customers' computer systems. 18 U.S.C. § 1030(a)(5)(A). In addition, by the same conduct, HS One has intentionally accessed a protected computer without authorization, and as a result of such conduct, caused damage and loss to Vyne. 18 U.S.C. § 1030(a)(5)(C).

~~94.~~158. HS One's deployment of software to interfere with Vyne's software and drivers was without actual or legal authorization and/or exceeded such authorization.

~~95.~~159. HS One's misconduct affects more than 10 protected computers and potentially modifies or impairs the medical examination, diagnosis, treatment, or care of one or more individuals.

~~96.~~160. HS One has therefore violated and continues to violate the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.

~~97.~~161. Vyne has suffered damages and losses, and will continue to suffer damages and losses, aggregating at least $5,000 in value during any 1-year period, by reason of, and as a direct and proximate result of the actions of HS One referenced above, and has a private right of action for damages and equitable relief. 18 U.S.C. § 1030(g).

**COUNT II**
**Lanham Act – False Advertising**

~~98.~~162. Vyne realleges and incorporates by reference the allegations contained in the preceding paragraphs.

~~99.~~163. By engaging in the above-described activities, HS One made false and misleading representations of fact to consumers and potential consumers that misrepresent the nature, characteristics, and quality of Vyne's product and services, including by misrepresenting the functionality of Vyne Trellis, stating that Vyne Trellis leads to errors and adverse financial impacts, claiming that Vyne Trellis poses security issues to Vyne's customers, and stating that Vyne products have been responsible for "security breaches." HS One made its false and misleading representations of fact in commerce by disseminating the above-referenced falsehoods to Vyne's customers via email communications, phone calls, and letters.

~~100.~~164. This conduct, which was purposeful and willful, violates Section 43(a)(1)(B) of the Lanham Act.

~~101.~~165. As a direct and proximate result of the actions of HS One, Vyne has suffered damages and will continue to suffer damages, and such damages are irreparable.

**COUNT III**
**Tortious Interference with Contractual Relations**

~~102.~~166. Vyne realleges and incorporates by reference the allegations contained in the preceding paragraphs.

~~103.~~167. Vyne has thousands of subscribing agreements with dental providers across the country, including dental providers in Maryland, under which providers grant Vyne full agency and authority to request, access, retrieve, use, and export each provider's electronic health information on behalf of the provider. The subscribing agreements further grant Vyne authority to send written data access and interoperability requests directly to third-party vendors, platforms, or custodians of such electronic health information on the provider's behalf. In exchange, providers agree to pay fees to Vyne for its clearinghouse and RCM services.

~~104.~~168. HS One, while not a party to the contracts between Vyne and Vyne's customers, has full knowledge of these agreements and the parties' relevant obligations contained therein. Such knowledge stems from, among other sources:

~~a.~~169. Vyne's own website, where Vyne's standard terms and conditions are published publicly; [25]

~~b.~~170. Specific communications between Vyne and HS One, including an August 21, 2025 letter sent by Vyne to HS One identifying hundreds of Vyne customers by name and stating that Vyne was "a Business Associate of each requesting mutual customer and is permitted to access to the[ir] [health] Data through express written authorization from the requesting customer and through its direct Business Associate Agreements with each requesting customer" and that HS One's continued withholding of information would "directly impair the customer's ability to rely on Vyne Dental's services in support of their essential healthcare operations"[26];

---

[25] *See* Vyne Dental, "Terms," *available at* https://perma.cc/3X45-9TJ5(last visited Nov. 5,, 2025).

[26] *See* Dkt. 37, Ex. 10.

~~c.~~171. Communications between HS One representatives and Vyne customers discussing the contents and pricing of Vyne's business arrangements with its customers, including at least an email from John Giarraputo, an HS One Senior Account Executive, dated Sept. 9, 2025; and

~~d.~~172. Other sources and industry-knowledge developed over more than a decade during which Vyne Trellis has routinely accessed Dentrix via a printer driver.

~~105.~~173. HS One's misconduct leaves Vyne unable to perform the services its customers contract for by subscribing to or purchasing Vyne products. Vyne's contracts with its customers incorporate the services or functionality provided by the Vyne products that they choose to subscribe to.[27] Under these agreements, Vyne undertakes to, among other things, "make the Services" that customers contract for "available to [them] pursuant to this Agreement" and to make "commercially reasonable efforts to ensure availability" of those services to the extent Vyne is able.[28]

~~106.~~174. HS One has knowingly, willfully, and intentionally prevented dental providers and Vyne from performing their respective obligations under the agreements by (i) threatening to and planning to sever ~~Vyne's~~Vyne Trellis's access to electronic health information~~,~~, and practice data (including by reading and writing), and thus (ii) make it impossible for dental providers to provide Vyne Trellis with timely and effective access to electronic health information and practice information, and for Vyne to perform its obligations under their contracts. As a result, neither Vyne nor its customers are able to fulfill their respective duties under the contracts, hindering Vyne's ability to fulfill its contractual obligations. Further, HS One has

---

[27] *See* Vyne Dental, "Terms" at § 1, available at https://perma.cc/3X45-9TJ5 (last visited Nov. 5, 2025).

[28] *See* Vyne Dental, "Terms" at § ~~12~~13, available at https://perma.cc/3X45-9TJ5 (last visited Nov. 5, 2025).

knowingly, willfully, and intentionally encouraged and threatened Vyne's customers to terminate their contracts with Vyne, utilizing false and disparaging statements, and directly interfering with Vyne's contractual relationships with its customers.

~~107.~~175. HS One has also knowingly, intentionally, and willfully violated federal law and regulations in its attempts to interfere in these agreements by employing techniques prohibited under the federal Cures Act.

~~108.~~176. HS One has also knowingly, intentionally, and willfully deployed software that illegally interferes with Vyne's software and software licenses with its own customers, including by disabling drivers and indeed any software authenticated by Vyne. That deployment exceeded any authorization that was or could be given by HS One's customers, including under the Cures Act.

~~109.~~177. HS One's actions were calculated to harm Vyne's lawfully conducted business activities, namely providing clearinghouse and RCM services to dental providers who authorized the transmission of their electronic health information and practice data to Vyne Trellis.

~~110.~~178. HS One's conduct constitutes an intentional interference with Vyne's contractual obligations to its customers, was done through improper means, and was driven by an improper motive.

~~111.~~179. As a result of HS One's intentional interference with the contractual obligations laid out in Vyne's agreements and HS One's efforts to push Vyne's customers to terminate their contracts with Vyne, utilizing false and disparaging statements, Vyne has suffered and continues to suffer damages.

## COUNT IV
## Tortious Interference with Prospective Business Relations

~~112.~~180. Vyne realleges and incorporates by reference the allegations contained in the preceding paragraphs.

~~113.~~181. HS One intentionally and willfully interfered with Vyne's prospective business relations by (i) disseminating disparaging communications to Vyne's customers that were, and continue to be, injurious to Vyne's reputation, (ii) engaging in conduct designed to sever Vyne's access to patient electronic health information and push Vyne's current and future customers to other favored systems, and (iii) pushing software that illegally disables Vyne software and software functionality.

~~114.~~182. HS One's actions were plainly and deliberately calculated to cause damage and loss to Vyne in its lawful business by blocking Vyne's ability to receive electronic health information from its customers and obtain additional business.

~~115.~~183. HS One's actions were further calculated to cause damage and loss to Vyne's business by disseminating communications containing blatant falsehoods and disparaging remarks that have been, and continue to be, injurious to Vyne's reputation.

~~116.~~184. HS One's actions were conducted with malice as they were done with the unlawful and deliberate purpose of causing damage to Vyne and loss to its business, without right or justifiable cause on the part of HS One.

## COUNT V
## Unfair Competition
## (Information Blocking & Customer Communications)

~~117.~~185. Vyne realleges and incorporates by reference the allegations contained in the preceding paragraphs.

~~118.~~186. By the acts described herein, HS One has engaged in unlawful business practices that have injured, and will continue to injure, Vyne and its business.

~~119.~~187. Over the course of several months, HS One waged a campaign to interfere with Vyne's contracts with its customers, make disparaging and false remarks about Vyne to its customers, restrict Vyne's access to electronic health information that Vyne was authorized to receive under federal law and pursuant to Vyne's agreements with its customers, and illegally disable Vyne's own software and software functionality on customer computer systems.

~~120.~~188. The above-referenced misconduct violates public policy, computer protection laws, and the federal Cures Act. Specifically, HS One's actions have damaged and jeopardized Vyne's business by blocking Vyne's ability to fulfill its contractual obligations to its customers. And HS One's efforts to sever Vyne's access to its customers' data—data that Vyne's customers have full ownership over and authority to transfer—~~violates~~violate the information blocking provisions of the federal Cures Act. Indeed, HS One has unlawfully blocked Vyne's Printer Driver, ODBC read and write access to data stored in Dentrix, and has prohibited interoperability through the user-interface including through Robotic Process Automation.

~~121.~~189. HS One's voluntary removal of Dentrix from the ONC's Health IT Certification Program, the very day that Vyne informed HS One that its information blocking violated the Cures Act, in a blatant effort to avoid the dictates of the Cures Act establishes that HS One has engaged in unfair competition and is acting in bad faith. It also does not prevent the Cures Act from applying to HS One because HS One is ~~a~~ "a health information exchange or network engaged in information blocking."

~~122.~~190. Upon information and belief, HS One's acts were committed in bad faith and with unlawful intent.

~~123.~~191. As a direct result of HS One's actions, Vyne has been, and will continue to be, substantially injured in its business. Such injuries include harm to Vyne's customer relationships, goodwill, reputation, and loss of revenue and profits.

**COUNT VI**
**Unfair Competition**
**(Anticompetitive & Exclusionary Conduct)**

192. Vyne realleges and incorporates by reference the allegations contained in paragraphs 1 through 191 and 210 through 251.

193. By the acts described herein, HS One has engaged in unlawful business practices that have injured, and will continue to injure, Vyne and its business.

194. HS One's conduct violates the Sherman Act and the Clayton Act, and thus constitutes unlawful and anticompetitive conduct. Such conduct conflicts with accepted principles of public policy reflected in the antitrust laws, and thus constitutes the tort of unfair competition under state law.

195. HS One's conduct also constitutes competition through "unfair methods," including denying customers access to their own practice and patient data stored in Dentrix and Dentrix Ascend to use with their preferred end-to-end RCM software, excluding its primary and perceived competitors in the market for end-to-end RCM software from its API Exchange, conditioning entry on Vyne agreeing not to compete with end-to-end RCM software, blocking competitor software, using threatening, false, misleading, and coercive statements to force dental practices not to use Vyne's competing end-to-end RCM software, forcing Dentrix Ascend customers to purchase HS One's end-to-end RCM software, and leveraging its monopoly power in the market for selling practice management software to sophisticated, multi-office dental practices in an effort to monopolize the market for selling end-to-end RCM software to such dental practices.

196. Upon information and belief, HS One's acts were committed in bad faith and with unlawful intent.

197. As a direct result of HS One's actions, Vyne has been, and will continue to be, substantially injured in its business. Such injuries include harm to Vyne's customer relationships, goodwill, reputation, loss of existing and potential market share, and loss of revenue and profits.

**COUNT VII**
**Defamation**

~~124.~~198. Vyne realleges and incorporates by reference the allegations contained in the preceding paragraphs.

~~125.~~199. By the acts described herein, HS One published false and defamatory statements to Vyne's clients regarding Vyne's business methods and the reliability, efficiency, and security of Vyne's products, including Vyne Trellis.

~~126.~~ HS One's false statements misrepresenting Vyne's longstanding and industry-standard printer driver functionality, among other Vyne products and services, as ineffectual and the source of security risk or "breaches" ~~was done~~were made in reckless disregard of whether the reported information was accurate or not.

~~127.~~200. HS One's statements were of the character that would tend to degrade Vyne's public standing, impugn Vyne's business methods, honesty, and integrity, and cast aspersions on Vyne's products, including Vyne Trellis.

~~128.~~201. Upon information and belief, HS One's acts were committed in bad faith and with actual malice in an attempt to persuade Vyne's clients to transfer their business to competing products sold by HS One or an entity or entities affiliated with HS One.

~~129.~~202. HS One acted with intent to harm Vyne, or with conscious indifference to the consequences of its actions.

~~130.~~203. As a direct result of HS One's actions, Vyne has been, and will continue to be, substantially injured in its business. Such injuries include economic loss and harm to Vyne's goodwill and business reputation.

**COUNT ~~VII~~VIII**
**Declaratory Judgment**

~~131.~~204. Vyne realleges and incorporates by reference the allegations contained in the preceding paragraphs.

~~132.~~205. Pursuant to 28 U.S.C. § 2201(a), this Court is authorized to issue a declaratory judgment.

~~133.~~206. HS One's cease and desist letter of August 26, 2025 purported to assert that Vyne committed "computer hacking of Henry Schein One's software platform" in violation of the Computer Fraud and Abuse Act and otherwise made "deceptive statements and omissions" which were "actionable" under state or federal law. These claims, and any other (unsubstantiated) claims the cease and desist letter purports to assert, have no merit.

~~134.~~207. Therefore, by virtue of the parties' actions described herein, an actual, present, substantial, and justiciable controversy under Section 2201(a) exists between Vyne and HS One concerning Vyne's compliance with its obligations under the Computer Fraud and Abuse Act and state and federal law.

~~135.~~208. Pursuant to Section 2201(a) and Federal Rule of Civil Procedure 57, Vyne seeks a declaration from this Court that it did not, through its use of printer-driver software or any other software program, commit "computer hacking of Henry Schein One's software platform" or otherwise engage in conduct violative of the Computer Fraud and Abuse Act or any other applicable state or federal law.

~~136.~~209. Vyne also seeks a permanent injunction prohibiting HS One from asserting, initiating, or pursuing any claim, remedy, notice or proceeding alleging that Plaintiff violated the Computer Fraud and Abuse Act or any other applicable state or federal law based on the allegations contained within its August 26, 2025 cease and desist letter.

**COUNT IX**
**Illegal Tying**

210. Vyne realleges and incorporates by reference the allegations contained in the preceding paragraphs.

211. HS One has imposed tying arrangements on dental practices that purchase Dentrix Ascend that unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 3–4 of the Clayton Act, 15 U.S.C. §§ 14–15.

212. HS One's Dentrix Ascend practice management software on the one hand (the tying product), and its end-to-end RCM software on the other (the tied product), are separate and distinct products. There is sufficient consumer demand for each product such that it is efficient to provide the products separately. Sophisticated, multi-office dental practices and DSOs require both products to effectively manage their patient data and day-to-day functioning. There are companies like Vyne that offer only end-to-end RCM software, and others that offer only practice management software, including to the same end consumers.

213. HS One has tied use of Dentrix Ascend (the tying product) to its mandatory end-to-end RCM software for patient engagement, claims submissions, eligibility verification, attachments, billing statements, and other revenue cycle functions (the tied product). HS One sells Dentrix Ascend in three bundled packages titled Ascend Essentials, Ascend Pro, and Ascend Accelerate. Each package offers a tier of HS One's bundled end-to-end RCM software, which must be purchased with Dentrix Ascend. HS One does not offer Dentrix Ascend as a standalone product.

214. Through its unlawful tying arrangement, HS One has coerced dental practices and DSOs to purchase end-to-end RCM software from HS One that they would have preferred to purchase from other suppliers on different terms, including price, quality, and customer service.

215. HS One has sufficient market power with respect to practice management software to enable it to restrain competition as to end-to-end RCM software. As discussed above, HS One has substantial market power and even monopoly power in the market for selling practice management software to sophisticated, multi-office dental practices that use such software to store data electronically in the United States. That power enables HS One to restrain competition in the market for selling end-to-end RCM software to sophisticated, multi-office dental practices that use such software to use, access, or transmit data electronically in the United States.

216. HS One's conduct has substantially lessened competition and foreclosed a substantial volume of commerce as to end-to-end RCM software in the United States. Indeed, HS One has precluded Vyne—its primary competitor in the market for selling end-to-end RCM software to sophisticated, multi-office dental practices that use such software in the United States—from selling to any Dentrix Ascend customers. By forcing thousands of Dentrix Ascend customers to buy HS One's end-to-end RCM software through an illegal tie rather than competition on the merits, HS One has foreclosed its rivals, including Vyne.

217. HS One's tying arrangement is *per se* unlawful. HS One's end-to-end RCM software is a separate product that HS One can and does sell independently of Dentrix Ascend. In addition, the tie does not offer any procompetitive benefit, let alone one that cannot be achieved through quality standards.

218. Regardless and in the alternative, under a rule of reason analysis, HS One's conduct is unlawful. Through its illegal tying arrangement, HS One has had a substantial adverse effect on

competition in the relevant market, including by excluding competition on price, quality, customer service, and innovation by third parties such as Vyne that would otherwise compete to sell end-to-end RCM software to Dentrix Ascend users. By excluding competition, HS One has been able to remove consumer choice, charge supracompetitive prices for its end-to-end RCM software, obtain extraordinarily high margins, reduce output of end-to-end RCM software, reduce the availability of high-quality, low-cost alternatives, and stifle innovation in interoperability with increasingly dominant cloud-based practice management software.

219. HS One's conduct occurred in and affected interstate commerce.

220. HS One has a financial interest in selling end-to-end RCM software to Dentrix Ascend users, as it earns substantial revenue from doing so through its unlawful tying arrangement.

221. Vyne also has a financial interest in selling end-to-end RCM software to Dentrix Ascend users, and HS One's conduct has foreclosed Vyne from doing so.

222. As a direct result of HS One's actions, Vyne has been, and will continue to be, substantially injured in its business and suffering financial damage. Such injuries include loss of market share, revenue, and profits, and harm to customer relationships, goodwill, and reputation.

**COUNT X**
**Attempted Monopolization (Leveraging)**

223. Vyne realleges and incorporates by reference the allegations contained in the preceding paragraphs.

224. HS One has attempted to monopolize the market for selling end-to-end RCM software to sophisticated, multi-office dental practices that use such software to use, access, or transmit data electronically in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

225. The market for selling RCM software to sophisticated, multi-office dental practices in the United States that use such software to use, access, or transmit data electronically is a valid and relevant antitrust market.

226. HS One has engaged in anticompetitive conduct in an attempt to monopolize that relevant market. It has done so by leveraging its monopoly power over the market for selling practice management software to sophisticated, multi-office dental practices that use such software to *store* data electronically. As discussed above, practice management software stores the critical data inputs that end-to-end RCM software providers require to enable dental practices to use, access, or transmit their data electronically.

227. HS One controls the largest network of dental practices in the United States—the API Exchange—by enrolling all dental practices that use its practice management software. For many years, HS One marketed the API Exchange as an "open network" that allowed dental practices to connect with their preferred RCM software. Moreover, HS One marketed its practice management software as using an "open architecture" and supporting "the interoperability of data" such that customers had no knowledge or warning that they would be restricted in using their preferred end-to-end RCM software in the future.

228. Since 2025, HS One has transitioned to a "closed network" that only allows dental practices to use third-party software that it authorizes and expressly blocks end-to-end RCM software by its perceived competitors such as Vyne Trellis. Upon closing the API Exchange, HS One locked in the vast majority of sophisticated, multi-office dental practices in the United States through high switching costs, data transfer restrictions, and other structural barriers.

229. HS One has attempted to monopolize the relevant market through the exclusionary acts alleged herein, including by controlling access to patient- and practice-owned data stored in

Dentrix and Dentrix Ascend, excluding from its API Exchange perceived competitors in the end-to-end RCM software market, publicizing and threatening customers that they are not authorized to contract with its primary competitor in that market and may lose access to their services if they continue to do so, blocking and disabling competing software such as Vyne Trellis, and aggressively marketing its own end-to-end RCM software through false statements that it is the only secure option in the market and other misleading, false, threatening, and defamatory statements. In addition, HS One has conditioned the sale of Dentrix Ascend on the coerced purchase of its end-to-end RCM software and (on information and belief) is aggressively pushing practices to adopt Dentrix Ascend to force them to purchase its end-to-end RCM software.

230. HS One has specifically intended to monopolize the relevant market through its anticompetitive conduct. By its conduct and public statements, HS One has demonstrated a specific intent to exclude end-to-end RCM software competitors to further its goal of using AI to augment its practice management software and offer the only dental software used by sophisticated, multi-office dental practices that use such software in the United States. Lacking any legitimate business justification, HS One engaged in exclusionary conduct knowing the natural and probable consequence would be to give it monopoly power to control prices, restrict output, and stifle competition in the relevant market.

231. There is a dangerous probability that HS One will achieve its goal of monopoly power in the relevant market. According to public statements by HS One and its parent company, HS One already serves over 90% of the top 50 DSOs, that market and its share are rapidly rising, and sophisticated, multi-office practices are increasingly adopting its bundled or add-on RCM software with its practice management software. On information and belief, HS One provides RCM software to a majority of sophisticated, multi-office dental practices in the United States that

use such software to use, access, or transmit data stored in their practice management software. Further, on information and belief, HS One is charging supracompetitive fees for its RCM software bundled with, added to, or embedded in its practice management software and has achieved extraordinarily high margins.

232. The barriers to entry to sell end-to-end RCM software to sophisticated, multi-office practices are high because of the scale of their operations, their unique needs, and their need for strong brand recognition to garner support from many stakeholders. In addition, the barriers to entry are high because of the software development, regulatory oversight, user base, and third-party insurer relationships needed to offer competitive end-to-end RCM software.

233. The likely effect of HS One's anticompetitive conduct is that it will acquire monopoly power to control prices and exclude competition in the relevant market. Indeed, HS One's market share has rapidly increased in recent years and that trend will continue with the accelerating consolidation of the dental market in the United States.

234. HS One's conduct has occurred in and affected interstate commerce.

235. As a direct result of HS One's actions, Vyne has been, and will continue to be, substantially injured in its business. Such injuries include loss of market share, revenue, and profits, and harm to customer relationships, goodwill, and reputation.

## COUNT XI
## Monopolization (Aftermarket)

236. Vyne realleges and incorporates by reference the allegations contained in the preceding paragraphs.

237. The aftermarket for selling end-to-end RCM software to dental practices enrolled in the API Exchange that use such software is a relevant and valid antitrust market.

238. Dental software companies such as Vyne and HS One have developed end-to-end RCM software that is specific to Dentrix's practice management software, enabling and optimizing interoperability of the two software programs. In the foremarket for selling practice management software to sophisticated, multi-office dental practices that use such software, HS One possesses sufficient market power that competition in the foremarket does not discipline its anticompetitive conduct in the aftermarket. Indeed, HS One has monopoly power in the foremarket.

239. In addition and in the alternative, HS One's bait-and-switch conduct and the market realities are such that HS One could unlawfully monopolize the relevant aftermarket with or without market power in the foremarket. When dental practices chose to use Dentrix to store their data, HS One's aftermarket restrictions on third-party RCM software were not generally known and practices faced significant information costs preventing accurate life-cycle pricing. Indeed, HS One had long advertised Dentrix as giving dental practices full control, ownership, and access to their own data stored on the platform and offering an open architecture that facilitates interoperability with the practice's preferred aftermarket RCM software. Now, HS One has closed its network, and significant monetary and non-monetary switching costs prevent customers from cancelling their Dentrix subscriptions to be able to select the RCM software of their choice based on price, quality, customer service, innovation, and other competitive metrics. Given the market conditions, HS One can exploit and misuse its power in the aftermarket for selling end-to-end RCM software to API Exchange dental offices that use such software without those consumers switching from Dentrix to another practice management software such that cross-elasticity of demand is not a check on its conduct or ability to monopolize.

240. HS One possesses monopoly power in the market for selling end-to-end RCM software to dental offices enrolled in the API Exchange that use such software. As described

herein, HS One has the power to control prices, restrict output, and exclude competition from the relevant market. It has demonstrated that power by raising prices for its RCM software above competitive levels for a significant period of time, earning excessively high profit margins, and excluding competition without any meaningful loss of customers. Further, the structure of the market shows that HS One has market power, including its market share, the rapid and projected increases in that market share, barriers to entry, the inability of potential competitors to offer end-to-end RCM software in the relevant market, the declining market share of competitors, and its success forcing would-be competitors not to compete with end-to-end RCM software and to pay excessive fees just to access data owned by dental practices enrolled in the API Exchange.

241. Through its anticompetitive conduct alleged herein, HS One willfully acquired and maintained monopoly power in the relevant market. Indeed, HS One's anticompetitive conduct is inconsistent with competition on the merits, does not benefit consumers, and would not make business sense apart from the effect it has on excluding competition and harming dental practices by raising prices, reducing consumer choice and output, and stifling innovation. In fact, HS One's conduct would make Dentrix less desirable in a competitive market by restricting the ability of consumers to purchase separate and distinct end-to-end RCM software thereafter based on price, quality, customer service, and innovation. Such conduct would be irrational for a non-monopolist.

242. HS One's conduct occurred in and affected interstate commerce.

243. As a direct result of HS One's actions, Vyne has been, and will continue to be, substantially injured in its business. Such injuries include loss of market share, revenue, and profits, and harm to customer relationships, goodwill, and reputation.

## COUNT XII
## Attempted Monopolization (Aftermarket)

244. Vyne realleges and incorporates by reference the allegations contained in the preceding paragraphs.

245. As set forth above, the aftermarket for selling end-to-end RCM software to dental practices enrolled in the API Exchange that use such software is a relevant and valid antitrust market.

246. As further described above, when customers purchase Dentrix or Dentrix Ascend, they do not generally know that their ability to purchase end-to-end RCM software will be restricted. To the contrary, HS One represents to its customers that they will retain full control and ownership over their data stored in its practice management software and the freedom to choose their preferred third-party software vendors. Once customers have purchased Dentrix or Dentrix Ascend, they face significant switching costs, including the cost of extracting and migrating patient data stored in Dentrix or Dentrix Ascend and other training and implementation costs. Customers thus generally do not make a knowing choice to be locked into HS One's aftermarket offerings.

247. HS One has attempted to monopolize and harm competition in the relevant market through the exclusionary acts alleged herein, including by controlling access to patient- and practice-owned data stored in Dentrix and Dentrix Ascend, excluding from its API Exchange perceived competitors in the end-to-end RCM software market, publicizing and threatening customers that they are not authorized to contract with its primary competitor in that market and may lose access to their services if they continue to do so, blocking and disabling competing software such as Vyne Trellis, and aggressively marketing its own end-to-end RCM software through false statements that it is the only secure option in the market and other misleading, false, threatening, and defamatory statements. In addition, HS One has conditioned the sale of Dentrix

Ascend on the coerced purchase of its end-to-end RCM software and (on information and belief) is aggressively pushing practices to adopt Dentrix Ascend to force them to purchase its bundled end-to-end RCM software.

248. HS One has specifically intended to monopolize the relevant market through its anticompetitive conduct. By its conduct and public statements, HS One has demonstrated a specific intent to exclude end-to-end RCM software such as Vyne Trellis from the relevant market to further its goal of using AI to supplant such software without competing on the merits. Lacking any legitimate business justification, HS One engaged in exclusionary conduct knowing the natural and probable cause would be to give it monopoly power to control prices, restrict output, and stifle competition in the relevant market.

249. There is a dangerous probability that HS One will achieve its goal of monopoly power in the relevant market. On information and belief, HS One has obtained a substantial majority share of the market for selling end-to-end RCM software to dental offices in the API Exchange and that share is rapidly increasing. In addition, the barriers to entry are significant to offer competitive end-to-end RCM software generally and even more so to API Exchange practices because HS One holds the keys and denies them to perceived competitors like Vyne, while actively blocking software and threatening customers not to use "unauthorized" software. The likely effect of HS One's anticompetitive conduct is that it will acquire monopoly power in the relevant market.

250. HS One's conduct occurred in and affected interstate commerce.

251. As a direct result of HS One's actions, Vyne has been, and will continue to be, substantially injured in its business. Such injuries include loss of market share, revenue, and profits, and harm to customer relationships, goodwill, and reputation.

## JURY DEMAND

~~137.~~252. Pursuant to Federal Rule of Civil Procedure 38, Vyne hereby demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

Vyne respectfully requests that this Court enter judgment in favor of Vyne and against HS One as follows:

a. ~~a.~~ an order preliminarily and permanently enjoining HS One from using Dentrix or any other software program to disable Vyne software and/or software functions, or otherwise to interfere with Vyne customers' use of Vyne's software;

b. ~~b.~~ an order preliminarily and permanently enjoining HS One from denying printer driver access to Vyne's customer's electronic health information and practice information stored in Dentrix or Dentrix Ascend;

c. ~~c.~~ an order permanently enjoining HS One from denying ODBC access (including reading and writing) to Vyne's customer's electronic health information and practice information stored in Dentrix or Dentrix Ascend;

d. an order permanently enjoining HS One from denying RPA or other AI-augmented interoperability through the user-interface to access (including to read and write) Vyne's customer's electronic health information and practice information stored in Dentrix or Dentrix Ascend;

e. an order preliminarily and permanently enjoining HS One from denying or otherwise interfering with Vyne's software's read and write access to Vyne's customer's electronic health information and practice information stored ~~on~~in Dentrix or Dentrix Ascend;

a. f. d. an order preliminarily and permanently enjoining HS One from publishing any further false, misleading, and/or defamatory statements;

b. an order preliminarily and permanently enjoining HS One from asserting, initiating, or pursuing any claim, remedy, notice or proceeding alleging that Vyne violated the Computer Fraud and Abuse Act or any other applicable state or federal law;

g. an order permanently enjoining HS One from forcing Dentrix Ascend customers to purchase its end-to-end RCM software through illegal tying;

h. an order permanently enjoining HS One from denying, blocking, or otherwise preventing the interoperability of third-party end-to-end RCM software with Dentrix or Dentrix Ascend, including through a printer driver, ODBC, RPA, or other-user interface integration;

i. f. an award of compensatory and consequential damages, in an amount to be proven at trial;

j. g. an award of punitive and exemplary damages, in an amount to be proven at trial;

k. h. an award of treble damages;

l. an award of reasonable attorneys' fees and costs;

i. i. an award of prejudgment and post judgment interest;

ii. j. such additional relief as may be just and proper.

Respectfully submitted,

*/s/ Vincent Levy*
~~Michael Shuster~~
Vincent Levy
Jack Millman
Charlotte Baigent
Daniel Fahrenthold
~~Torrell Mills~~
Claire Fieldman
HOLWELL SHUSTER & GOLDBERG LLP
425 Lexington Avenue, 14th Floor
New York, NY 10017
(646) 837-5151
vlevy@hsgllp.com

K. Nichole Nesbitt (Bar No. 26137)
Derek M. Stikeleather (Bar No. 27815)
GOODELL, DEVRIES, LEECH & DANN, LLP
One South Street, 20th Floor
Baltimore, MD 21202
(410) 783-4026
knn@gdldlaw.com
dstikeleather@gdldlaw.com

*Attorneys for Plaintiff*
*National Electronic Attachment, Inc. d/b/a Vyne Dental*